**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| OMNIS PLEASANTS, LLC[1] | ) ) Case No. 26-11169 (___) ) |
| Debtor. | ) ) ) |

**DECLARATION OF
DAVID HINDMAN, AS CHIEF EXECUTIVE OFFICER OF
OMNIS PLEASANTS, LLC, d/b/a PLEASANTS POWER STATION,
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, David Hindman, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am a Shareholder, Partner, and Managing Director at AlixPartners, LLP ("**AlixPartners**"), an operational performance advisory firm and an affiliate of AP Services, LLC ("**APS**").  I have been employed at AlixPartners since 2016 and currently serve as the Global Power, Utility, and Renewable Energy Practice Leader, a practice I founded.  Over my 25-plus year career, I have led teams through comprehensive business transformations, with a particular focus on the power and renewables sector.  I hold a Master of Business Administration from Harvard Business School, as well as a Bachelor of Science in Mechanical Engineering and a Bachelor of Arts in Economics from Rice University.

2.      Since around February 17, 2026, APS has provided my services as the Chief Executive Officer of Omnis Pleasants, LLC (the "**Debtor**" or "**Pleasants**").  Before that, starting on October 27, 2025, I served as an advisor to the Debtor through AlixPartners.  As an advisor and

---

[1]  The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is 1 Power Station Blvd., Belmont, West Virginia 26134.

officer of the Debtor over the last nine months, I have become intimately familiar with the business, financial affairs, and day-to-day operations of the Debtor.

3.      Except as otherwise indicated, the statements in this declaration (this "**Declaration**") are based on my own personal knowledge, my review of documents and information available to me as an advisor to and/or CEO of Pleasants, and additional information provided to me by AlixPartners, counsel to Pleasants, Herbert Smith Freehills Kramer LLP ("**HSF Kramer**"), or other advisors retained by Pleasants.

4.      I submit this Declaration in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), filed today (the "**Petition Date**"), and the motions and applications filed along with it (collectively, the "**First Day Motions**").  This Declaration provides the United States Bankruptcy Court for the District of Delaware (the "**Court**") and parties in interest with an overview of the Debtor's business and operations; capital structure; and the circumstances that led to the filing of this chapter 11 case.

5.      As described more fully below, the Debtor is filing the First Day Motions to obtain relief that I believe is necessary to minimize the adverse effects of filing for chapter 11 on the Debtor's employees, suppliers, and business operations.  I am generally familiar with the contents of each First Day Motion and believe that the relief sought through them is necessary to enable the Debtor to operate during this chapter 11 case with minimal disruption, avoid immediate and irreparable harm to the Debtor and its estate, and to preserve value for the Debtor's estate and all parties in interest.

6.      This Declaration is organized as follows:

**Introduction**;

**Part I** provides a general overview of the Debtor's corporate history and business operations;

2

**Part II** provides information on the Debtor's prepetition organizational structure, capital structure, and other obligations;

**Part III** describes the circumstances leading to the filing of this chapter 11 case and the Debtor's objectives in the chapter 11 process; and

**Part IV** sets forth basis for the relief requested in the First Day Motions throughout the chapter 11 process, and contains a summary overview of the First Day Motions and relief sought therein, including the facts supporting the First Day Motions.

## INTRODUCTION

7.  The Debtor owns and operates the Pleasants Power Station (the "**Plant**"), one of the most important electric-generating assets in West Virginia. The 1,278-megawatt facility provides critical generation capacity to the regional market, supports grid reliability, contributes meaningfully to the local economy, and employs a large, dedicated workforce. The Plant is a valuable, revenue generating asset. However, up until the appointment of independent management approximately five months ago, the Plant suffered from severe financial and operational distress as the result of gross misconduct by prior management (described more fully below). Pleasants is burdened by the defaulted debts of affiliated entities, Omnis Parties (defined below) through guarantees and liens granted by prior management. Pleasants has thus been placed in default under several major debt obligations for many months, and is also the subject of serious and protracted investigation by the Federal Energy Regulatory Commission ("**FERC**"). This has had a crippling effect on the Debtor's ability to move forward as a going concern.

8.  Since February 2026, new management, led by Gilbert Nathan, has worked tirelessly to right the ship. Those efforts resulted in significant financial and operational improvements to date. But the Debtor's vast array of direct and inherited debt obligations and

corresponding defaults still require a restructuring. The Debtor spent the last several months trying to do that on a consensual basis. But despite the best efforts of many, those discussions failed.

9. Simultaneously, Mr. Nathan has leveraged the Debtor's recent progress to foster productive discussions with potential purchasers and financiers. However, it has become apparent that the only way to truly maximize value is through chapter 11, where the Debtor's assets can be sold on a free-and-clear basis.

10. The problems that potential buyers want to avoid are numerous, all as a result of years of misconduct by the Debtor's former leadership and entanglement in a web of related party transactions. For nearly three years, Simon Hodson and his insiders controlled the Debtor and its parent and upstream entities. During that period, they promoted a purported hydrogen-production technology known as the "Reformer," raised hundreds of millions of dollars from lenders, investors, and governmental agencies, and promised potential investors that the Plant would become the centerpiece of a revolutionary energy platform. Those promises never materialized. Instead, these insiders pursued speculative ventures and related-party transactions while the Plant was starved of capital, exposed to significant regulatory issues, and left in operational and financial distress.

11. By late 2025, prior management could no longer avoid the consequences of their conduct. Their broader Omnis Parties group of entities, together with the Debtor, was in default under multiple financing arrangements; critical vendor relationships for Pleasants had deteriorated from non-payment; operational reliability had suffered from a lack of funding; and government agencies were investigating alleged misconduct. The Debtor's parent entities also defaulted on their secured debt, which in some instances gave those creditors recourse against the Debtor or its assets. Current management's ongoing investigation has since uncovered substantial evidence of

self-dealing, suspect related-party transactions, misuse of lender and investor funds, diversion of corporate funds to insider-controlled entities, and other conduct that may give rise to significant estate causes of action.

12.     Faced with these circumstances, the principal secured lenders to the Omnis Parties, the Debtor's parent entities, required fundamental governance reforms as a condition to their continued forbearance from exercising remedies under applicable loan documents on account of defaults thereunder.  In February 2026, former management relinquished all operational control and almost all governance control over the Debtor.  Through Jackson Square Advisors, LLC, Mr. Nathan was appointed as sole Director and Independent Manager, and through APS, I was appointed Chief Executive Officer.  Our mandate was to stabilize operations, preserve value, restructure the debts, and chart a value-maximizing path forward for the Plant and its stakeholders.

13.     Since that transition, the Debtor and its advisors have worked to rehabilitate the business—rebuilding the workforce, hiring critical personnel, improving compensation and retention programs, renegotiating key vendor and fuel-supply arrangements, addressing significant environmental and operational issues, improving relationships with regulators, and restoring operational stability at the Plant.  These efforts have demonstrated that the Plant remains a strategically important asset capable of generating substantial value for stakeholders when managed by responsible fiduciaries focused on operational excellence rather than insider interests.

14.     At the same time, the Debtor has pursued a value-maximizing path forward to address its financial distress.  Over the last several months, the Debtor engaged extensively with its lenders, government stakeholders, equity holders, potential investors, and prospective purchasers to achieve a consensual and value-maximizing restructuring.  This included exploring refinancing alternatives, negotiating with key creditors, and conducting a process to identify

5

qualified purchasers capable of buying and operating the Plant.  Despite substantial efforts by the Debtor, the Debtor and its key stakeholders ultimately reached a fundamental impasse with the Omnis Parties regarding control of any restructuring or sale process, and the Plant's path forward.

15.     Compounding these challenges, former insiders and affiliated parties have recently accelerated their efforts to sideline current management and took a series of coordinated actions designed to displace the independent governance structure installed to protect the Debtor and its stakeholders.   Those actions included: (i) attempting to implement transactions that would undermine the Plant's ability to operate and potentially divert substantial value to the Omnis Parties, including (a) entering into a purported lease agreement that, if valid, would make operating the Plant impossible and (b) selling behind-the-meter power and capacity, which is not permitted as a PJM capacity auction award recipient; (ii) litigation in West Virginia state court seeking to undo previous governance protections; (iii) an attempted improper payoff transaction that, if successful, would have paved the way for the removal of independent management and the restoration of influence to parties whose conduct remains under active investigation; and (iv) threatening Plant staff and Pleasants management to "bring use of force" to gain entry to the Plant.  These actions have created serious governance uncertainty, threatened to destabilize the business, and jeopardized the progress achieved since Mr. Nathan's and my appointment.

16.     Against this backdrop, the need to file chapter 11 became immediate.  This case provides the only means by which the Debtor can preserve value, ensure continued stability of Plant operations, maintain the confidence of employees, customers, vendors, and regulators, investigate potential estate causes of action, and maximize value for all stakeholders.

17.     The Debtor enters chapter 11 from a position of substantially improved operational stability.  It has a valuable operating asset, an experienced management team, the support of trusted

advisors, and a clear objective: to preserve and maximize the value of the Plant through a fair, transparent, and competitive sale process while removing the distractions wrought by former management.

18. To that point, in the months before the Petition Date, the Debtor engaged in productive discussions with numerous potential sale counterparties interested in purchasing the Debtor's assets and potential financing parties interested in providing debtor-in-possession financing. The Debtor will move expeditiously to implement that process, including pursuing a robust marketing and sale process to facilitate a value-maximizing transition to new ownership. This approach offers the best opportunity to maximize value and secure a lasting future for the Plant, its employees, and its stakeholders.

## PART I
### CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.      History of Pleasants Power Station

19. As previously discussed, the Debtor owns and operates a two-unit, 1,278-megawatt coal-fired power plant, together with related buildings, facilities, electrical generation infrastructure, and transmission powerlines, situated on approximately 190 acres of real property in Belmont, West Virginia. The Plant operates within the PJM Interconnection, LLC ("**PJM**") market region.

20. The Plant began commercial operations in 1979 and has operated as a coal-fired power plant for over forty years. Ownership changed several times, and in March 2022, Energy Harbor (formerly known as First Energy Solutions) ("**Energy Harbor**") announced plans to permanently close the Plant by June 2023 and demolish it. In connection with that planned deactivation, Energy Transition Environmental Management LLC ("**ETEM**") acquired the Plant in December 2022 through its subsidiary, ETEM Remediation Two, LLC ("**ER2**"). In March

2023, however, the West Virginia state legislature passed legislation (SB 609) preventing demolition and preserving the Plant for continued operation.

21.     In July 2023, Omnis Fuel Technologies, LLC ("**Omnis Energy**"), through its acquisition subsidiary, Quantum Pleasants, LLC ("**Quantum**"), agreed to acquire the Plant from ETEM through the acquisition of its membership interests in ER2.  After the transaction closed in early August 2023, ER2 was renamed Omnis Pleasants, LLC.

### B.      The Debtor's Coal Fired Power Generation Business

22.     The Plant has historically participated in the wholesale electricity markets administered by PJM.  PJM is a federally regulated regional transmission organization responsible for operating the high-voltage electric grid and administering wholesale electricity markets across 13 states and the District of Columbia, subject to oversight by the FERC.

23.     The principal mechanism by which PJM procures capacity is the Base Residual Auction ("**BRA**"), a forward auction conducted approximately three years in advance of the applicable delivery year.  Energy-producing participants that clear the BRA receive fixed capacity payments, expressed in dollars per megawatt-day, in exchange for an obligation to be available at every moment of the delivery year[2] and to comply with PJM performance requirements.

24.     In the ordinary course of operations, the Plant generates revenue primarily through (i) capacity revenues associated with commitments awarded through the BRA and related incremental auctions, pursuant to which Pleasants receives compensation for maintaining generation capacity *available* to the PJM market if called upon, regardless of whether such capacity is actually utilized on any given day ("**Capacity Revenue**"); (ii) revenues from day-ahead energy sales, pursuant to which Pleasants commits to *deliver* energy into the PJM market; and

---

[2] PJM allows BRA-cleared resources to request planned Maintenance Outages (subject to PJM approval) during periods when the grid is not expected to be under stress or emergency conditions.

(iii) revenues from real-time generation and energy sales, where Pleasants generates power and sells into the market at the real-time market price ((ii)-(iii) together, "**Generation Revenue**").

25.     Pleasants sold 1,037.7 MW at a blended rate of $59.626/MW-day through participation in the 3rd Incremental Auction and a bilateral capacity sale to AEP for the 2024/2025 delivery year, 1,035.6 MW at a blended rate of $270.18/MW-day through the BRA plus a small amount in an Incremental Auction for the 2025/2026 delivery year, 1,018.3 MW in the BRA for the 2026/2027 delivery year at $329.17/MW-day, 1,011.5 MW in the BRA for the 2027/2028 delivery year at $333.44/MW-day, and 1,003.5 MW in the BRA for the 2028/2029 delivery year at $325.00/MW-day, with each delivery year running from June 1 through May 31.  These awards translate into approximate Capacity Revenue of $23 million for the 2024/2025 delivery year, $102 million for the 2025/2026 delivery year, $122 million for the 2026/2027 delivery year, $123 million for the 2027/2028 year, and $119 million for the 2028/2029 year.  On the cost side, the Plant's fixed operating costs are approximately $45 million per year.  Accordingly, if properly managed, the Plant should generate substantial operating profit from Capacity Revenue alone.

26.     From 2023 through mid-2025, however, Pleasants incurred significant operating losses caused by misconduct and mismanagement by prior leadership, inadequate working capital, deferred maintenance that caused significant generation outages that impaired the Plant's performance.  In October 2025, FERC began investigating Pleasants' operations during the 2023-25 period, as well as certain other Omnis Parties affiliates (the "**FERC Investigation**").  Depending on the outcome of the FERC Investigation, certain Capacity Revenue earned during the review period may be subject to disgorgement, and Pleasants may face additional, potentially significant fines.

C.        **The Debtor's Management and Employees**

27.        Day-to-day operations at the Plant are currently conducted through a multi-party operating structure involving Pleasants personnel, PurEnergy Management Services LLC ("**PEMS**") (in its capacity as asset manager), and TyrEnergy, LLC ("**Tyr**") (in its capacity as energy manager).  PEMS and Tyr are affiliated with one another, but are not affiliated with Pleasants or its affiliates.

28.        *PEMS*.  PEMS provides technical and management services to the Plant pursuant to an Asset Management Agreement dated August 1, 2023, as amended by the First Amendment to Asset Management Agreement, dated September 27, 2023, and the Assumption, Assignment and Novation Agreement, dated March 3, 2026 (collectively, the "**PEMS AMA**").  The PEMS AMA remains in effect through July 31, 2028.  In its capacity as asset manager, PEMS is responsible for the overall commercial and technical oversight of the Plant, including, among other things, coordination of compliance-driven outages, oversight of operating budgets and capital expenditures, and fuel supply strategy, regulatory, and financial reporting obligations.

29.        *Tyr/Tenaska*.  Tyr provides energy management services pursuant to an Energy Management Agreement dated August 3, 2023 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, the "**Tyr EMA**"), which had an initial one-year term and renewed automatically thereafter.  Under the Tyr EMA, Tyr is responsible for, among other things, bidding, selling, scheduling, and dispatching the Plant's energy, ancillary services, and capacity into the PJM wholesale electricity markets, up to the full capacity of the Plant for each operating hour.  The Tyr EMA expires on July 31, 2026.  Tenaska Power Services Co. ("**Tenaska**") will become the Plant's energy manager on July 30, 2026 pursuant to an Energy Management Agreement, dated June 17, 2026.

30.    ***Plant Level Management***.  Plant-level personnel responsible for the operation and maintenance of the coal-fired facility were not associated with the Omnis Parties (defined below) prior to the acquisition of the Plant.  Originally, the Debtor outsourced day-to-day operations of the Plant, but plant-level personnel ultimately migrated to become Pleasants employees.

31.    As of the Petition Date, the Debtor employs approximately 136 individuals, roughly five of which are salaried and 131 are paid hourly.  All employees are based in the United States and are employed by the Debtor.

32.    Prior to February 6, 2026, certain of the Debtor's affiliates, Omnis Global (defined below) and Omnis Energy provided certain support services to the Debtor.  Five employees provided support to the Debtor's corporate-level functions (CEO, CFO, and Head of Human Resources), including finance, accounting, and human resources.

33.    The Debtor is seeking to continue satisfying all ordinary course-employee related obligations for Pleasants' employees for the duration of the chapter 11 case, and hopes to minimize any disruption to the workforce that is the lifeblood of the Plant.

## PART II
### DEBTOR'S ORGANIZATIONAL AND CAPITAL STRUCTURE

**A.  Debtor's Organizational Structure**

34.    An illustrative organizational chart of the Debtor and certain of its non-debtor affiliates (collectively, "**Omnis Group**"), together with a description of each of the entities within the Omnis Group, is annexed as **Exhibit A** hereto.

35.    Pleasants is a Delaware limited liability company, with primary business operations at 1 Power Plant Station Blvd, Belmont, West Virginia 26134.  As reflected in the organizational chart, 100% of Pleasants' membership interests are owned by non-debtor Quantum.

36.    The Debtor's books and records reflect that non-debtor Quantum's membership interests, in turn, are owned by TRAG LLC (46.62%) and affiliate Robbins Research International, Inc. (4.61%) (together 51.23%), Omnis Energy (43.77%), and Angela Sabella's Harmony Trust (5.0%).

37.    Non-debtor Omnis Global Technologies, LLC ("**Omnis Global**") is a parent-level holding company in the Omnis Group and is wholly owned by non-debtor Hodson Investments, LLC, which in turn is owned and controlled by Simon Hodson, his spouse, and children.

38.    Mr. Hodson is the Chairman and Chief Executive Officer of Omnis Global, Omnis Energy, and Quantum (collectively, the "**Omnis Parties**") and controls these entities through his indirect ownership of all Class A Units in each entity.  Prior to his removal—pursuant to and in connection with the A&R Forbearance Agreement—in February 2026, Mr. Hodson was also the Chairman and Chief Executive Officer of the Debtor.

## B. Capital Structure

39.    As of the Petition Date, the Debtor's funded debt and guarantee obligations totaled approximately $70.8 million, consisting of approximately $50.9 million unsecured loan obligation owed to the West Virginia Economic Development Authority ("**WVEDA**"), which includes accrued and unpaid interest; a purported $20 million unsecured note issued by Bilt Technology LLC ("**Bilt**") to the Debtor; and as detailed further below, a first priority lien on all of the Debtor's property and assets granted to TRAG LLC ("**TRAG**") and RG Energy LLC ("**RGE**" and together with TRAG, "**TRAG/RGE**") pursuant to the A&R Forbearance Agreement (defined below).

### 1. WVEDA Loan

40.    On December 13, 2023, WVEDA, Quantum (as borrower), Pleasants (as guarantor), and Omnis Energy entered into a loan agreement (the "**WVEDA Loan Agreement**") whereby WVEDA agreed to provide an unsecured loan in the total principal amount not to exceed

12

$50 million to Quantum (the "**WVEDA Loan**").  Quantum executed a negotiable promissory note (the "**WVEDA Note**") evidencing the loan, payable for a term of thirty (30) months at a fixed rate of one percent (1%) per annum.  The WVEDA Note is guaranteed by Pleasants.  The WVEDA Loan matured on June 15, 2026, and remains unpaid and is in default.  As of the Petition Date, approximately $50.9 million is outstanding on the WVEDA Loan. The Debtor continues to investigate the facts and circumstances and potential misconduct by former management in connection with the WVEDA Loan and related transactions (discussed below).

### 2.    Bilt Loan

41.    On April 8, 2025, as part of a related party power purchase agreement,[3] prior management caused Pleasants and Bilt to execute a promissory note (the "**Bilt Note**"), pursuant to which Bilt agreed to loan Pleasants $20 million on an unsecured basis (the "**Bilt Loan**"), with a personal guaranty from Mr. Hodson, ostensibly representing a portion of the "Commitment Fee" related to the purported EH-Bilt PPA (discussed below in Section 3(A)(4)).  The Bilt Note matured on October 5, 2025.  Although Simon Hodson entered into a limited forbearance arrangement with Bilt extending certain repayment obligations through December 15, 2025, those obligations were not satisfied. As of the Petition Date, the Bilt Note is in payment default, with approximately $20 million outstanding.  The Debtor continues to investigate the facts and circumstances and potential misconduct by former management in connection with the Bilt Note and related transactions (discussed below).

---

[3] The power purchase agreement was between Pleasants and Element H (50% owned by Omnis Mining, a subsidiary of Omnis Global).  This transaction was purportedly a deposit for a separate power purchase agreement between Bilt and Element H (to which Pleasants was not a party).

### 3.    TRAG/RGE Liens

42.    Beginning in 2023, TRAG and RGE made a series of loans to direct and indirect parent entities of Pleasants pursuant to separate loan and security agreements entered into between May 2023 through March 2025.  The proceeds of those loans were used to purchase the Plant and to provide funding to maintain Plant's operations. As of the Petition Date, TRAG/RGE are owed over $80 million pursuant to these loan agreements (the "**TRAG/RGE Loans**").  Pursuant to the A&R Forbearance Agreement, in consideration for forbearing from exercising remedies, including foreclosing on their collateral, and other accommodations by TRAG/RGE, TRAG/RGE were granted a first-priority lien on all property and assets of Pleasants, including the Plant. As discussed further below, concerned about the state and operation of the Plant by the prior management, TRAG and RGE agreed to the appointment of an independent manager and me to oversee the Plant. The forbearance period has since terminated and the TRAG and RGE loans remain in default.

### 4.    Intercompany Loans

43.    After further described in Part III(A) of this Declaration, in connection with a review of its books and records, the Debtor, together with its advisors, has identified two sets of purported intercompany loan documents:  (i) a purported revolving promissory note dated October 31, 2023, together with certain purported amendments, between Quantum and Pleasants; and (ii) a purported revolving promissory note dated October 31, 2023, between Omnis Energy and Pleasants (collectively, the "**Purported Intercompany Notes**").  Each of the Purported Intercompany Notes has a maturity date of October 31, 2026.  The Debtor is continuing to investigate the legitimacy of these notes, the historical reported intercompany balances of approximately $46 million plus purported accrued interest, and the transfers and accounting entries associated with such purported obligations.

**5.      Trade Debt**

44.      As further discussed herein, under the Debtor's previous management team, relationships with key trade vendors were severely damaged.  The Debtor's current management team is working diligently to improve the Debtor's relationships with vendors through, among other things, timely paying, or otherwise prepaying, for services and goods provided.  To build upon the Debtor's goodwill, as well as ensure that operations at the Plant remain uninterrupted, the Debtor has sought to stay current with vendor invoices, and accordingly owes only a modest sum of outstanding amounts to its vendor counterparties.  As of the Petition Date, the Debtor has approximately $4 million of outstanding trade debt.

**C.  Debtor's Liquidity**

45.      The Debtor has approximately $13 million of liquidity as of the Petition Date, comprised primarily of cash on hand.  The Debtor believes this, together with projected receipts, will constitute sufficient liquidity to fund the case, but may explore debtor-in-possession financing at a later date particularly to fund necessary repairs.

**PART III**
**CIRCUMSTANCES AND EVENTS LEADING TO CHAPTER 11 FILING**

**A.  Mismanagement and Defaults Under Simon Hodson and His Affiliates**

46.      Under the leadership of Simon Hodson and his affiliates, including Charles Gassenheimer, Randall Smith (Mr. Hodson's brother-in-law), Richard Hulme, Matt Hart, and Blake Stephens, the Plant's operations and financial condition deteriorated significantly.  Since assuming control, current management and its advisors have conducted a comprehensive review

of the Debtor's affairs and have uncovered mismanagement, misconduct, and potential fraud that contributed significantly to the Debtor's current operational and financial distress.

### 1.    Mismanagement of the Plant

47.    In the years leading up to the Petition Date, the Plant suffered from chronic undercapitalization, liquidity shortages, operational failures, and recurring outages caused by prior management. Plant personnel, PEMS, and Tyr repeatedly warned Mr. Hodson and his associates that the Plant lacked sufficient operating capital to buy the coal, lime, and other consumables needed for the Plant to generate power as it was required to do pursuant to its obligations to PJM. Despite those warnings, prior management refused to provide adequate funding, resulting in recurring fuel shortages, forced outages, reduced generating capability, deferred maintenance, personnel attrition, and increasing operational risk. Rather than prioritizing the reliable operation of the Plant, prior management focused substantial time and resources on unrelated ventures, including the Reformer Pilot Project (defined below) and a proposed "behind-the-meter" cryptocurrency mining initiative.

48.    The consequences of prior management's conscious disregard for the wellbeing of the Plant were severe. Coal inventories[4] declined to critically low levels (less than 2,000 tons, or less than five hours of run time, at one point), relationships with key suppliers deteriorated significantly and such suppliers stopped doing business with Pleasants, and the Debtor became increasingly dependent on advances from third parties, including TRAG and RGE, to purchase fuel and other essential consumables. The Debtor also fell behind on vendor obligations, insurance, property tax liabilities, and payroll. And then, in August 2024, the Debtor lost access to an ash-disposal landfill because it did not pay its bills. As a result, substantial quantities of coal

---

[4] Coal inventories refers to coal "on the pile," which is not adjusted for coal at the bottom of the pile mixed with rocks, coal not yet unloaded into the pile but was in transit, or the coal in the silos.

combustion residuals ("**CCR**") accumulated on the Plant site, affecting operational flexibility and creating serious environmental and regulatory concerns. Troublingly, in April 2025, prior management procured lower-quality coal despite repeated warnings from Plant personnel that it would impair Plant performance and generation capacity.

49. As a result of these and other operational issues, the Plant became the subject of an investigation by FERC. Since taking control of the Debtor, current management and its advisors have cooperated with FERC and undertaken efforts to address the operational, financial, and compliance issues inherited from prior management.

**2. Reformer Pilot Project**

50. While they were starving the Plant of the resources necessary to operate safely and reliably, beginning in the fourth quarter of 2023 prior management directed substantial attention, personnel, and capital toward development of Omnis Group's purportedly revolutionary "Reformer" technology (the "**Reformer Pilot Project**"). The project was promoted as a transformative technology capable of converting coal into hydrogen and valuable carbon byproducts, and when Omnis Group acquired the Plant, prior management represented that commercialization was imminent. That was not the case.

51. As technical challenges mounted and progress toward commercialization stalled, the apparent purpose of the Reformer Pilot Project shifted from technology development to fundraising. Beginning in August 2024, the project appears to have been used primarily as a platform for carefully orchestrated demonstrations and tours for investors, lenders, government officials, regulators, and other third parties. In other words, prior management purposefully misrepresented the capabilities and promise of the Reformer Pilot Project to convince third parties to invest in the Omnis Group in reliance on that false promise. These events continued through October 2025, notwithstanding the absence of meaningful technological progress.

52.     As discussed above, while management focused on promoting the Reformer Pilot Project, the Plant suffered.  Plant personnel were frequently asked to support the Reformer Pilot Project with their time and labor even as resources necessary to maintain reliable generation were compromised without compensation to the Plant.  The cumulative effect was to divert capital and labor away from the Plant's core operations, and contributed materially to its broader decline.

**3.     Diversion and Misuse of Project and Other Funds**

53.     The Debtor has also recently uncovered troubling evidence suggesting that funds raised by prior management, ostensibly for development of the Reformer technology and Debtor operations, were diverted for the benefit of Simon Hodson, other insiders, and their affiliates.

54.     In December 2023, Quantum entered into the WVEDA Loan Agreement, pursuant to which WVEDA agreed to provide up to $50 million in funding for the Reformer Pilot Project. Pleasants guaranteed these obligations.  As a condition to obtaining WVEDA funding, Quantum was required to provide dollar-for-dollar project funding and demonstrate qualifying expenditures in advance of requesting matching disbursements.  WVEDA ultimately disbursed the full $50 million by June 2024, believing that Quantum had made matching expenditures.

55.     However, the Debtor's investigation has uncovered evidence showing that nearly all the WVEDA funding was obtained through a scheme involving circular fund transfers, related-party transactions, and invoices whose legitimacy is suspect and is now under active investigation. Preliminary findings by the Debtor indicate that funds were transferred from Omnis Energy to StarSource, LLC ("**StarSource**")—an entity controlled by Simon Hodson—and subsequently returned to Omnis Energy before being retransferred to StarSource and returned to Omnis Energy, with only the outbound transfers presented to WVEDA and the West Virginia State Auditor's Office as purported Reformer Pilot Project expenditures.  The Debtor believes prior management

presented these transactions to create the appearance of qualifying matching expenditures necessary to support additional WVEDA disbursement requests.

56.     The Debtor has further identified more than $114 million in suspicious invoices issued by Industrial Accessories Company ("**IAC**"), including four invoices totaling approximately $100.6 million that were submitted to the State of West Virginia in support of matching-fund requests under the WVEDA Loan.  Although those invoices include statements that IAC received advance payment of $50 million from Quantum, the Debtor has identified less than approximately $4.2 million in actual payments.   The Debtor has also determined that approximately $39.6 million of WVEDA-disbursed funds were transferred directly to IAC accounts.  Despite repeated requests, neither IAC nor prior management has provided a meaningful accounting of these funds.

57.     Over time, concerns regarding the viability of the Reformer Pilot Project increased. Ultimately, WVEDA declared multiple defaults under the applicable loan documents in July 2025, including for the alleged misuse of loan proceeds.  Following the June 2026 maturity of the WVEDA Loan without repayment, WVEDA advised the Debtor that it will not accept any consensual resolution that places former management back in control of the Plant.

### 4.     Element H and Bilt Transactions

58.     From at least December 2023, Simon Hodson also pursued development of a cryptocurrency-mining data center to be co-located with the Plant.  The project was premised on supplying power from the Plant through a "behind-the-meter" microgrid that would bypass the PJM transmission system.  From the moment that Plant personnel and PEMS became aware of the scheme, they repeatedly advised Mr. Hodson that such a project was not feasible, citing, among other issues, the Plant's existing capacity and energy commitments to PJM.

59.     Despite those warnings, on March 26, 2025, Mr. Hodson caused Pleasants to enter into a power purchase agreement ("**P-EH PPA**") with Element H Data, LLC ("**Element H**"), a Hodson-affiliate (50% owned by Omnis Mining Technologies, LLC, a wholly owned subsidiary of Omnis Global) where Mr. Hodson's son, Jonathan Hodson, is on the management team, pursuant to which prior management caused Pleasants to agree to deliver behind-the-meter power. Element H was formed on the same day the P-EH PPA was executed and is controlled by and affiliated with Mr. Hodson.  Two days later, Element H entered into a related power purchase agreement with Bilt (the "**EH-Bilt PPA**"), which Pleasants was not a party to.  Shortly thereafter, Bilt transferred approximately $22.249 million to Pleasants as a purported "Commitment Fee" in connection with the EH-Bilt PPA.  In connection with that payment, Mr. Hodson, on behalf of Pleasants, executed the Bilt Note, pursuant to which Pleasants agreed to repay $20 million of the Commitment Fee, and Mr. Hodson personally guaranteed the obligation.

60.     The Debtor has also identified significant concerns surrounding the commercial purpose and economic substance of the P-EH PPA, the EH-Bilt PPA, and the Bilt Note.  *First*, at the time of these transactions, Mr. Hodson controlled or otherwise significantly influenced both Element H and Pleasants. *Second,* the P-EH PPA required Pleasants to supply power to Element H at a price not exceeding $30.54 per MWh, substantially *below* the Plant's actual cost of generation. Internal analyses provided to Mr. Hodson projected losses to Pleasants exceeding one billion dollars over the life of the P-EH PPA (inclusive of extension terms).  Ignoring these warnings, Mr. Hodson proceeded with these agreements.  *Third,* the P-EH PPA purported to grant Element H the right to acquire 1,300 MW of power (more than the full output of the Plant), even though that same capacity had already been committed to PJM.  *Finally,* of $22.249 million

received from Bilt, $20 million was immediately transferred from Pleasants to Omnis Energy the same day, at the direction of Mr. Hodson.

B. **Appointment of New Management**

61.     In late October 2025, as circumstances at the Plant deteriorated and following the defaults on the TRAG/RGE loans, TRAG, RGE, Omnis Global, Quantum, and the Debtor entered into a forbearance agreement (the **"First Forbearance Agreement"**).  TRAG and RGE agreed to forbear from exercising remedies under their loan documents, and Pleasants engaged AlixPartners to assist with, among other things, developing a revised business plan and designing a restructuring strategy to maximize enterprise value.   The First Forbearance Agreement expired on November 30, 2025.

1.     **The A&R Forbearance Agreement and Accompanying Governance Changes**

62.     With appropriate governance and controls still lacking at the Plant and their loans still in default, on February 6, 2026, TRAG, RGE, Omnis Global, Omnis Energy, Quantum, and Pleasants entered into an Amended and Restated Forbearance Agreement (the "**A&R Forbearance Agreement**"), which provided for robust governance and management changes, including the appointment of (i) an independent manager at Pleasants and Quantum and (ii) a new Chief Executive Officer of Pleasants.

63.     Following execution of the A&R Forbearance Agreement, on February 12, 2026, Gilbert Nathan was appointed as Independent Manager and sole Director of Pleasants and as an Independent Director of Quantum, and I was appointed as Chief Executive Officer of Pleasants. At the same time, former management, including Simon Hodson and Randall Smith, among others, were removed from their respective positions as CEO, CFO, and Directors of the Board of the Debtor.   The A&R Forbearance Agreement granted the CEO authority over all operational

decisions regarding the Plant, including payments and expenditures, hiring and removals, and incurring indebtedness. The Independent Manager and CEO were empowered to take all actions "with the primary objective of maximizing the value of the [Plant]," and the agreement contemplated a process for sale of the Plant.

64.    In connection with the A&R Forbearance Agreement, prior management amended the Debtor's and Quantum's LLC agreements to document these agreed governance changes, including the Independent Manager's authority to approve any sale of all or substantially all of the Debtor's assets and related-party transactions. The A&R Forbearance Agreement further provided that, until TRAG and RGE were repaid in full in cash in accordance with the terms of the A&R Forbearance Agreement, the Independent Manager could not be removed without the lenders' prior written consent. The A&R Forbearance Agreement also granted TRAG and RGE a first-priority lien on substantially all of the Debtor's assets and property, including the Plant.

### 2.    The Debtor Retains an Advisory Team

65.    Following Mr. Nathan's appointment as Independent Manager, Pleasants retained (i) HSF Kramer as general corporate counsel to assist with stabilizing operations and exploring restructuring alternatives and (ii) Sidley Austin LLP as special regulatory counsel to represent the company in the FERC Investigation.

66.    HSF Kramer has advised the Debtor since February 2026 on general corporate matters, capital structure alternatives, renegotiating commercial contracts, and with respect to conducting an internal investigation of former management's conduct. To support turnaround efforts and restructuring contingency planning, the Debtor engaged AlixPartners in October 2025, as financial advisor.

67.    As restructuring efforts proceeded in earnest, the Debtor retained an additional advisor, Young Conaway Stargatt & Taylor, LLP, as co-restructuring counsel with HSF Kramer.

**3.    The Debtor's Investigation into Prepetition Conduct and Transactions**

68.    Since the appointment of the Independent Manager, the Debtor and its advisors have undertaken an extensive review of former management's conduct, the operation of the Plant, the Reformer Pilot Project, and the use of lender, investor, and governmental funds.

69.    Although that review is ongoing and has been impeded by former management's and certain third-parties' refusal to provide requested materials, initial findings have revealed substantial evidence of misconduct.  The Debtor intends to utilize the tools available to it under the Bankruptcy Code to complete that investigation and fully evaluate potential claims belonging to the estate which can be pursued for the benefit of all stakeholders.

**C.  Operational Improvement and Restructuring Efforts**

70.    In tandem with this investigation, the Debtor's new independent management undertook substantial operational initiatives to stabilize and improve operations at the Plant and to identify a value-maximizing path forward.

**1.    Operational Improvements**

71.    Since the Debtor's transition to independent management, the Debtor and its advisors have focused on stabilizing operations, rebuilding the workforce, strengthening vendor and commercial relationships, improving regulatory compliance, and preserving and enhancing the value of the Plant.

72.    Those efforts have produced substantial and measurable improvements in a relatively short period of time.  Among other things:

- The Debtor has undertaken a significant workforce stabilization initiative.  Since the beginning of 2026, the Debtor has hired thirty people, and has successfully returned certain employees who quit under prior management.  The Debtor has also given its employees raises and improved benefits to improve employee retention and competitiveness in the labor market.

- The Debtor increased staffing levels and expanded Plant shift coverage, measures that

23

have improved operational reliability while addressing longstanding concerns raised by Plant personnel.

- The Debtor renegotiated and improved key commercial arrangements relating to coal supply and transportation, resulting in materially more favorable terms.  In addition, the Debtor undertook significant environmental remediation efforts, including the proper management and disposal of more than 120,000 tons of CCR waste that had accumulated on-site, while maintaining an open and cooperative dialogue with the West Virginia Department of Environmental Protection.

- The Debtor has worked collaboratively with PJM to address issues arising from prior management's capacity-testing practices and has significantly reduced the potential economic consequences associated with those practices.

- The Debtor has engaged constructively with FERC and its staff, including by providing information and responding to inquiries concerning the operation and management of the Plant during the 2023-25 period.

- The Debtor retained experienced technical consultants and industry advisors to assist management in evaluating Plant operations, updating operational parameters submitted to PJM, and preparing for critical testing and performance events that directly affect the Plant's value.

- The Debtor has facilitated collaboration between Plant personnel and experienced operators of comparable generating facilities, enabling the exchange of operational best practices and technical expertise.

- The Debtor has completed substantial maintenance and repair work throughout the facility and successfully operated the Plant during recent periods of elevated demand, including extreme summer weather conditions, thereby contributing to the reliability and stability of the regional electric grid.

### 2. Restructuring Efforts

73. Notwithstanding these financial and operational improvements, the Debtor remains in default on the WVEDA Loan, and the Bilt Loan, if legitimate.  The TRAG/RGE Loans likewise remain unpaid.  In the months and weeks leading up to the Petition Date, the Debtor and its advisors engaged in discussions with key stakeholders, including WVEDA, TRAG/RGE, Quantum, and Simon Hodson's representatives regarding a consensual out-of-court restructuring.  The Debtor's proposal contemplated extending the maturity dates on funded debt and, once operations were

sufficiently stabilized, pursuing a value-maximizing sale.  With the Debtor's leadership, consensus was reached between TRAG/RGE, WVEDA and Pleasants.  But Quantum and Simon Hodson would not agree on any restructuring.

74.     Consistent with these discussions, in the lead up to this chapter 11 case, the Debtor and its management team worked to identify suitable purchasers of the Plant.  To facilitate and continue this process post-petition, the Debtor will file a motion with the Court shortly seeking approval of bidding procedures to facilitate a robust and competitive marketing and sale process for the Plant.  Further, the Debtor is in process of selecting a qualified and experienced investment banker to implement the ongoing value maximizing marketing and sale process.

**D.  Prior Management's Efforts to Displace Independent Management**

75.     On July 8, 2026, Omnis Global, Omnis Energy, and Quantum (the "**Omnis Parties**") filed a complaint in WV State Court[5] (defined herein) against TRAG/RGE and Gilbert Nathan in his capacities as independent manager of Pleasants and Quantum, seeking emergency injunctive relief and alleging, among other things, that TRAG/RGE had breached the A&R Forbearance Agreement by failing to provide a payoff letter and that the Omnis Parties were denied access to Pleasants' books and records.  The WV State Court summarily denied the requested temporary restraining order, finding that the Omnis Parties had failed to demonstrate a basis for emergency relief.

76.     On July 16, 2026 entities with an indirect equity interest in the Debtor and affiliated with former management (including Angela Chen Sabella, Dynamic Holdings Corporation, Dynamic Finance Corporation, and Harmony Trust) attempted to deliver an uncertified paper check for $75.64 million to TRAG/RGE's counsel, asserting that the delivery of such check

---

[5]  The litigation proceeding in the Circuit Court of Pleasants County, West Virginia (the "**WV State Court**") is captioned *Omnis Global Technologies, LLC v. TRAG LLC*, CC-37-2026-C-14 (the "**WV State Court Litigation**").

constituted a repayment in full of the TRAG/RGE Loans.  TRAG/RGE did not accept the check, indicating, among other things, that the amount of the check was less than the outstanding balance necessary to repay the TRAG/RGE Loans in full, and that TRAG/RGE could not accept such a check without additional diligence and necessary information concerning the payor, the source of funds, and the suspected related-party transaction.  Given that the proposed paying entities appear to be affiliated with the Debtor's parent and its affiliates, the Independent Manager determined that the Payout Attempt may qualify as a "related party transaction" (as it is used in the A&R Forbearance Agreement), and such transaction would require the approval of the Independent Manager.  As his requests for more information concerning such a transaction had been repeatedly rejected, Independent Manager rejected the transaction.

77.     On July 20, 2026, Omnis Parties representatives declared that the rejected payment had terminated the A&R Forbearance Agreement, and announced an intention to remove Mr. Nathan as the Debtor's Independent Manager, and reinstall the Debtor's former leadership.  In subsequent correspondence from the Omnis Parties to Pleasants, the Omnis Parties maintain that Mr. Nathan is no longer the Independent Manager of Pleasants, and that Charles Gassenheimer now has assumed control of Pleasants as a director.

78.     In response, TRAG and RGE filed an answer and counterclaims against the Omnis Parties in the WV State Court Litigation, arguing that the Omnis Parties breached the A&R Forbearance Agreement, refused to provide information necessary to verify the purported payoff, and that the attempted payoff by Angela Chen Sabella—an individual known to have a relationship with the Omnis Parties—constituted a "related party transaction" requiring the Independent Manager's authorization (which was absent).  TRAG/RGE simultaneously filed a motion for a

temporary restraining order and preliminary injunction to preserve the current governance and operational status quo.  Mr. Nathan filed a joinder in support of that motion.

79.     On July 24, 2026, the WV State Court denied the TRAG/RGE request for a temporary restraining order and preliminary injunction.  The Omnis Parties and TRAG/RGE's claims remain outstanding.  While the court made no express legal or factual findings (other than a general finding that the requirements for injunctive relief had not been met), the Omnis Parties have presented that denial as the court's approval of their impermissible attempt to remove Mr. Nathan.  The Omnis Parties notified plant personnel directly, the Debtor's counterparties, WVEDA and others that Mr. Nathan is no longer the Independent Manager at Pleasants.  They even announced their intent to appear at the Plant premises on Monday, July 26, and to enter the premises, by force if necessary, in reliance on their purported legal rights.

80.     The facts and circumstances surrounding the Debtor make clear that, to truly maximize value, a chapter 11 process is necessary.  There was no other means by which to remove the overhang of the Omnis Parties' fraudulent conduct, financial defaults, and persistent efforts to exert control over an asset for their personal gain, regardless of the consequences to others.  And while the Debtor's reasonable judgment may have been that a chapter 11 case would be necessary eventually, the aggressive and reckless actions of the Omnis Parties over the past several weeks made it clear that the Debtor could not wait to commence a chapter 11 case and risk further value erosion by the actions of the Omnis Parties.  The Debtor's mission in this chapter 11 case is simple and clear:  to preserve and maximize the value that current independent management has begun to carefully rebuild, and to investigate and prosecute claims against former management for the benefit of its stakeholders who have paid the price all along the way.

27

## PART IV
### EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

81.    The Debtor concurrently filed First Day Motions seeking relief necessary to stabilize business operations and facilitate a smooth transition into the chapter 11 case:

**A.  Administrative Pleadings**

  i.  *Debtor's Application for Entry of an Order Authorizing the Debtor to Retain Stretto, Inc. as Claims and Noticing Agent, Effective as of the Petition Date.*

**B.  Operational and Scheduling Pleadings**

  i.  *Debtor's Motion for Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Salaries, and Related Workforce Obligations and (B) Continuation of Benefits Programs; and (II) Granting Related Relief;*

  ii.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor To (A) Continue to Operate Its Cash Management System and Honor Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, and (C) Maintain Existing Business Forms; (II) Suspending the Time to Comply with 11 U.S.C. § 345(b); and (III) Granting Related Relief;*

  iii.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Pay Prepetition Claims of Critical Vendors, Lienholders, and 503(B)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; (III) Directing Financial Institutions to Honor and Process Payments in Connection Therewith; and (IV) Granting Related Relief;*

  iv.  *Debtor's Motion for Entry of Interim and Final Orders (I) Approving Debtor's Proposed Adequate Assurance of Payment for Future Utility Services; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (IV) Granting Related Relief;*

  v.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

  vi.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Continue Prepetition Hedging Arrangement and Honor Any Obligations Related Thereto, (II) Authorizing the Debtor to Enter Into, and Perform Under, Postpetition Hedging Arrangements, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief; and*

> vii. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Maintain Prepetition Insurance Policies and Surety Bonds, and Pay Related Prepetition Obligations Arising Thereunder, and (B) Renew, Replace, Supplement or Otherwise Modify Such Insurance Policies and Surety Bonds; (II) Modifying the Automatic Stay with Respect to The Workers' Compensation Program; and (III) Granting Related Relief.*

\*\*\*

82. The relief sought in the various First Day Motions will allow the Debtor to, among other things, (i) establish certain administrative procedures to promote a seamless transition into and through chapter 11, (ii) ensure the continuation of its business operations and cash management system without interruption, and (iii) preserve valuable relationships with trade vendors and other creditors whose claims are not expected to be impaired in the bankruptcy proceeding.

83. I am familiar with the content and substance of the First Day Motions and the facts referenced therein are incorporated herein by reference. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully restructuring the Debtor's business. If asked to testify as to the facts supporting each First Day Motion, I would testify as to such facts.

84. It is my belief that the relief sought in the First Day Motions is necessary to the success of the Debtor's chapter 11 efforts and the maximization of the value of the Debtor's estate through the restructuring process described herein.

85. Several First Day Motions request authority to pay certain prepetition claims. I am advised by the Debtor's proposed counsel that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days

29

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." Given this requirement, the Debtor has limited its requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. I have consulted with the Debtor's advisors regarding each First Day Motion. The relief sought therein is necessary and in the best interests of the Debtor's estate, as it will allow the Debtor to operate with minimal disruption during the chapter 11 case. The requests for immediate relief have been narrowly tailored to avoid immediate and irreparable harm to the estate.

***

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: July 27, 2026

*/s/ David R. Hindman*
Name:  David R. Hindman
Title:  Chief Executive Officer of Omnis Pleasants, LLC

31

**Exhibit A**



# Illustrative Corporate Organization Chart*

**Key**

Debtor (shaded)

Non-Debtors

Hodson Investments, LLC
— Owns 100% →
Omnis Global Technologies, LLC ("Omnis Global")

Owns 100% → Omnis Advanced Technologies, LLC
— Owns 100% → Omnis Graphite Technologies, LLC

Omnis Global Owns 86.63%
TRAG, LLC Owns 9.0%
Various individuals Own 4.37%
→ Omnis Fuel Technologies, LLC dba Omnis Energy ("Omnis Energy")

TRAG, LLC Owns 46.62%
Robbins Research International, Inc. Owns 4.61%
Omnis Energy Owns 43.77%
Harmony Trust Owns 5.00%
→ Quantum Pleasants, LLC ("Quantum")
— Owns 100% → Omnis Pleasants, LLC dba Pleasants Power Station ("Pleasants")

Owns 100% → Omnis Mining Technologies, LLC

Omnis Mining Technologies Owns 50%
Universal Edge Technologies, Inc. Owns 50%
→ Element H Data, LLC

\* This organizational chart has been prepared by Omnis Pleasants, LLC (the "Debtor") based solely on documents, records, and information available to the Debtor as of the Petition Date. With respect to entities depicted herein other than the Debtor, such entities are not within the Debtor's control and the Debtor has limited ability to independently verify the current accuracy or completeness of the information reflected herein as it relates to such entities.