**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Omnis Pleasants, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11169 (KBO)<br><br>**Objection Deadline: August 28, 2026 at 4PM**<br>**Hearing Date: To Be Determined.** |

**MOTION OF OMNIS FUEL TECHNOLOGIES, LLC D/B/A OMNIS ENERGY AND QUANTUM PLEASANTS, LLC FOR ENTRY OF AN ORDER (I) DISMISSING THE DEBTOR'S CHAPTER 11 CASE, OR, (II) IN THE ALTERNATIVE, DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, AND (III) VACATING THE INTERIM CASH COLLATERAL ORDER**

Omnis Fuel Technologies, LLC d/b/a Omnis Energy ("**Omnis Energy**") and Quantum Pleasants, LLC ("**Quantum**") (collectively, the "**Movants**"), by and through their undersigned counsel, hereby move (this "**Motion**") for the entry of an order: (i) dismissing the above-captioned bankruptcy case (the "**Chapter 11 Case**") of Omnis Pleasants, LLC (the "**Debtor**") pursuant to 11 U.S.C. §§ 105(a) and 1112(b), or, (ii) in the alternative, directing the appointment of a chapter 11 trustee for the Debtor pursuant to 11 U.S.C. § 1104(a), and (iii) vacating the *Interim Order (I) Authorizing Postpetition Use of Prepetition Collateral, Including Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 50] (the "**Interim Cash Collateral Order**"). In support of this Motion, the Movants rely on the *Declaration of Charles Gassenheimer in Support of Motion of Omnis Fuel Technologies, LLC d/b/a Omnis Energy and Quantum Pleasants, LLC for Entry of an Order (I)(A) Dismissing the Debtor's Chapter 11 Case*

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

*or, (B) in the Alternative, Directing the Appointment of a Chapter 11 Trustee and (II) Vacating the Interim Cash Collateral Order* (the "**Gassenheimer Declaration**"), and the exhibits attached thereto, filed concurrently herewith, and respectfully state as follows:

## PRELIMINARY STATEMENT[2]

*"It is in your moments of decision that your destiny is shaped."*

Tony Robbins[3]

1. The Movants submit this Motion to set the record straight and right the many wrongs that have been committed against them and the Debtor. The Debtor's professionals have done a phenomenal job of confusing the issues in this case, but this Motion cuts through that confusion and presents the facts the Court needs to grant the relief requested. At bottom, there are two sides to this dispute: on the one side stand Omnis Global, Omnis Energy, and Quantum; on the other stand Gilbert Nathan, David Hindman, TRAG, and RGE. In the middle sits the Debtor, Omnis Pleasants—the only entity in bankruptcy. The most critical fact—and the one the Debtor's professionals have worked hardest to obscure—is that ***the Debtor does not have a single secured lender***. Every dollar of debt for which the Debtor is actually obligated is unsecured. At most, TRAG and RGE may hold security interests in the Debtor's property.[4] But, the Debtor is not a borrower or guarantor under any of the TRAG/RGE debt. And not one party had moved to enforce any purported liens or claims against the Debtor's property as of the Petition Date. This distinction

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to such terms further below in this Motion.

[3] https://www.tonyrobbins.com/tony-robbins-quotes/leadership-quotes.

[4] The Movants expressly reserve and preserve all rights with respect to any purported security interests or liens granted to or asserted by TRAG and/or RGE, including, without limitation, the right to object to or otherwise contest the validity, enforceability, and/or priority of such security interests or liens and/or to seek standing to avoid such security interests or liens as preferential and/or fraudulent transfers, as well as to seek to recharacterize or equitably subordinate such purported liens.

is not a technicality; it is the central truth obscured by this bankruptcy filing, and this Motion brings it into plain view.

2. This Chapter 11 Case should never have been filed, and it must now be dismissed. The decision to file, which was influenced by purported secured "lenders" controlled by motivational speaker Tony Robbins, shaped the destiny of the Debtor and influenced the ability of the purported secured "lenders" to manifest their own desired destiny.

3. On July 29, the Movants objected to the Debtor's first day motions and asked this Court to exercise its authority to dismiss this Chapter 11 Case *sua sponte*. The Court declined to dismiss *sua sponte* at that time given a lack of evidence, but the grounds for dismissal remain, and today the Movants bring this Motion pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code to obtain immediate dismissal. And now that the Movants have had more than 24 hours to prepare for this Motion, they will provide evidence to support their request to dismiss the Chapter 11 Case, as well as object to cash collateral, seek standing to avoid liens, challenge the disinterestedness of the Debtor's professionals, and seek other relief before the Court.

4. This Chapter 11 Case should be dismissed for at least two independent reasons. First, the Debtor's petition was filed in bad faith. It is now black letter law in the Third Circuit that financial distress is a prerequisite to any good faith bankruptcy filing. But, here, the Debtor was not in any genuine financial distress as of the Petition Date. To the contrary, the Debtor is cash-flow positive, held approximately $13 million in unencumbered cash on the Petition Date, and is projected to generate well over $100 million in annual capacity revenue for each of the next several years—more than double its annual operating expenses. Its two largest unsecured creditors, WVEDA and Bilt (the former of which holds only an unsecured guaranty from the Debtor), took no action, and threatened no action, to enforce their rights prior to the Petition Date. The only

pressure the Debtor claims to face comes from TRAG and RGE. ***However, the Debtor does not owe any debt to TRAG or RGE***. At best, TRAG and RGE have security interests in the Debtor's assets that should have been released upon the Movants' tender of Payment in Full. TRAG and RGE, working with the Debtor's purported Independent Manager, Gilbert Nathan, have improperly refused to release their security interests, making any claimed financial distress of the Debtor wholly manufactured, self-created, and disingenuous.

5. Nevertheless, the Debtor's current management improperly caused the Debtor to file for chapter 11 with the alleged goal of a section 363 sale. However, they do not have the power to approve or direct any sale of all or substantially all of the Debtor's assets, including the Plant, without the Movants' prior consent. Mr. Nathan, TRAG, and RGE have made it abundantly clear that they do not intend to work with the Movants or obtain their consent to any proposed sale. Thus, there is no prospect for any successful sale process in this Chapter 11 Case. Meanwhile, this Chapter 11 Case is already imposing substantial costs on the estate, including nearly $11 million in projected professional fees over just the first 13 weeks, with no corresponding benefit to creditors that could not be achieved outside of bankruptcy, other than creating yet another forum to litigate with the Movants.

6. The timing alone tells the story: the Debtor filed for chapter 11 less than one business day after the West Virginia Court denied TRAG and RGE's request for injunctive relief that would have kept Mr. Nathan in place and blocked the Movants from exercising their governance rights. Having lost that fight in state court, Mr. Nathan and his allies TRAG and RGE, entities controlled by the aforementioned Tony Robbins together with Ajay Gupta, a businessman from a prominent family that runs Tony Robbins' family office (TR = Tony Robbins; AG = Ajay Gupta), turned to this Court to obtain, through the automatic stay, the very relief that the West

Virginia Court had just refused to grant. They knew the Movants planned to resume control of the Debtor and the Plant on Monday, July 27, so they caused the Debtor to file for bankruptcy the day before on Sunday, July 26 to stop that from happening. This is a textbook two-party litigation tactic, not a legitimate bankruptcy purpose.

7. Second, the Debtor's bankruptcy petition was filed without the requisite corporate authority. Under the Debtor's Operating Agreement, once the Movants tendered Payment in Full of the TRAG/RGE Loans—which they did on July 16—the exclusive authority to authorize any bankruptcy filing vested solely in Quantum, as the Debtor's sole member, to the exclusion of Mr. Nathan or anyone else. Further, under Quantum's Operating Agreement, for Quantum to cause the Debtor to file for bankruptcy, Simon K. Hodson, who is the "Omnis Director" of Quantum and the ultimate owner of Omnis Global, had to give his prior consent. However, Mr. Hodson's consent was never sought, let alone given. Instead, Mr. Nathan acted on his own, and in contradiction to his fiduciary duties to the Debtor, to direct the Debtor's bankruptcy filing as its purported Independent Manager, despite Mr. Nathan's removal from that position six days prior on July 20. Mr. Hodson has not approved, and does not now approve, the filing of this Chapter 11 Case. Because the petition was filed without corporate authority, this Court's jurisdiction was not properly invoked, and dismissal is required.

8. While ample cause exists for the Court to dismiss this Chapter 11 Case, if the Court decides not to dismiss, then the Court must instead direct the appointment of a trustee pursuant to section 1104(a) of the Bankruptcy Code. The Debtor's current management has not acted as neutral, independent fiduciaries; rather, they have ignored their fiduciary duties to the Debtor and acted in their own pecuniary interest, in violation of their duty of loyalty and duty of care. The Independent Manager has colluded with TRAG and RGE to obstruct the Movants, deny the

Movants access to the Debtor's books and records, and encumber the Debtor's assets to secure debts that ***the Debtor does not owe***.

9. Most notably, a month before the Petition Date, the Debtor's current management caused the Debtor to execute a Deed of Trust for the benefit of TRAG and RGE, purporting to grant them security interests in the Plant and other assets. If the Debtor's current management is to be believed that the Debtor is truly in financial distress (as is required in the Third Circuit), then they should have immediately acted to avoid this and other transactions on Day 1 of this case. Instead, they have sought to reward TRAG and RGE through the Cash Collateral Motion.

10. To make matters even worse, the Debtor's bankruptcy counsel, HSF Kramer, represented TRAG and RGE in multiple transactions on the opposite side of the Debtor and Quantum. HSF Kramer is listed in TRAG's UCC-1 filed against Quantum in January 2026. More importantly, ***HSF Kramer represented TRAG and RGE in connection with the Forbearance Agreement*** that is at the center of this Chapter 11 Case! HSF Kramer advised TRAG and RGE on the agreement that purportedly granted them security interests in the Debtor's assets, and then, just ***two weeks later***, HSF Kramer began representing the Debtor, at Mr. Nathan's direction. HSF Kramer is hopelessly conflicted, which Mr. Nathan knew or should have known when he nevertheless retained them. Surely, TRAG and RGE are perfectly happy with this arrangement.

11. Furthermore, two and a half weeks after commencing this case, Mr. Nathan filed a Suggestion of Bankruptcy in the West Virginia Litigation mischaracterizing the nature of the litigation and falsely claiming that it is subject to the automatic stay. In so doing, Mr. Nathan misrepresented to the West Virginia Court that the automatic stay applies to any proceeding against a defendant who may assert that the Debtor is "vicariously liable." No such rule exists. Yet, when the Movants demanded that the Suggestion of Bankruptcy be withdrawn, Mr. Nathan refused. It is

therefore clear that Mr. Nathan intends to argue that the Debtor is somehow vicariously liable for the claims in the West Virginia Litigation, in direct conflict with his fiduciary duties to the Debtor.

12. Mr. Nathan is not acting out of any desire to protect the Debtor or its estate, or under any good-faith reading of the Bankruptcy Code. Instead, the Suggestion of Bankruptcy is just another wholly self-serving act in a long line of actions intended to benefit Mr. Nathan, TRAG, and RGE, all at the Debtor's expense.

13. All of the foregoing demonstrates that current management cannot be trusted to protect the Debtor's estate and act in the Debtor's best interests. Nor can they be trusted to conduct a sale or other reorganization process that is in the best interests of the Debtor's real creditors. Thus, if the Debtor is to remain in bankruptcy, a truly independent fiduciary is required for this Chapter 11 Case to have any chance of success and is, therefore, in the best interests of the Debtor and its estate, creditors, and equity holders.

14. Moreover, whether or not the Court decides to dismiss this Chapter 11 Case or appoint a chapter 11 trustee, the Court should, at minimum, vacate the Interim Cash Collateral Order in its entirety. The Movants will be filing a robust and comprehensive objection to the entry of any final order granting the Debtor's Cash Collateral Motion. The facts and arguments that will be set forth in the forthcoming objection, as well as those contained in this Motion, make it clear that the Debtor's current management and professionals have misled this Court and obtained relief pursuant to the Interim Cash Collateral Order that is wholly improper under the Bankruptcy Code. The only remedy for this wrong is for the Court to vacate the Interim Cash Collateral Order.

15. To again quote Mr. Robbins, "*Knowing is not enough! You must take action*."[5] But taking action knowing that you do not have the requisite corporate authority, that the Debtor was

[5] https://www.tonyrobbins.com/tony-robbins-quotes/leadership-quotes.

not in financial distress, that the Debtor was not indebted to TRAG or RGE and that they are not entitled to adequate protection or other relief, and that professionals involved in transactions on behalf of TRAG are now working on behalf of the Debtor—those decisions must be corrected by this Court in order to shape the proper destiny for this Debtor. We cannot let the prior bad actions of Mr. Robbins and his cohorts equal the future of this Debtor.

"*Your past does not equal your future.*"

Tony Robbins[6]

## <u>JURISDICTION AND VENUE</u>

16. The United States Bankruptcy Court for the District of Delaware (this "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. In accordance with Rule 9013-1(f) of the Local Rules of Bankruptcy Procedure for the District of Delaware, the Movants hereby consent to entry of a final order if it is determined that the Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

17. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

18. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19. The statutory bases for this Motion are sections 105(a), 1104(a), and 1112(b) of title 11 of the United States Code (the "**Bankruptcy Code**").

[6] *Id.*

# BACKGROUND

## A. The Debtor's History and Current Ownership Structure

20. The Debtor is a Delaware limited liability company and the owner and operator of the Pleasants Power Station (the "**Plant**"), a 1,278-megawatt coal-fired power plant located along the Ohio River in Pleasants County, West Virginia that has been in operation since 1979.

21. Originally known as ETEM Remediation Two, LLC, the Debtor has owned the Plant since December 2022, shortly after the Debtor was formed as the acquisition vehicle of its then-parent company, Energy Transition Environmental Management LLC ("**ETEM**").

22. ETEM, through the Debtor, acquired the Plant as part of a plan to permanently decommission the Plant by June 2023. However, this decommissioning plan came to an end after the West Virginia state legislature enacted legislation to preserve the Plant and its operation.

23. Quantum then stepped in as the buyer of the Debtor and, hence, the Plant. In August 2023, Quantum purchased all of the membership interests in the Debtor, which was renamed Omnis Pleasants, LLC. Quantum thereby became, and still today remains, the Debtor's sole member and 100% interest holder and the indirect owner of the Plant. As the Debtor's sole member, Quantum owns all of the voting interests in the Debtor.

24. Quantum's ownership, in turn, is split among four investors, as follows:

i. TRAG, LLC ("**TRAG**"): **46.62%**. TRAG is owned and controlled, directly or indirectly by Anthony Jay "Tony" Robbins, who is most known for his career as a motivational speaker, and Ajay Gupta.

ii. Omnis Energy: **43.77%**. Omnis Energy is part of a broader group headed by Omnis Global Technologies, LLC ("**Omnis Global**"),[7] which is wholly-owned by Hodson Investments, LLC, the family holding company for Simon K. Hodson.

---

[7] Omnis Global owns approximately 86% of the membership interests of Omnis Energy. TRAG also holds 9% of Omnis Energy's membership interests, with the remaining 5% held by various individuals. Omnis Global holds all of the voting interests in Omnis Energy, which, in turn, holds all of the voting interests in Quantum.

iii. Harmony Trust ("**Harmony**"): **5%**. Harmony is an entity affiliated with Angela Chen.

iv. Robbins Research International, Inc. ("**RRI**"): **4.61%**. Upon information and belief, RRI is a nonprofit entity that serves as the research and marketing arm of Mr. Robbins' personal development businesses and was established pursuant to an Employee Stock Ownership Plan.

**B. The Debtor's Post-Acquisition Operational Challenges and Turnaround**

25. When Quantum acquired the Debtor, Quantum announced its intentions to restart the Plant and transition it from conventional coal generation to hydrogen-based power using its proprietary pyrolysis and reformer technology (the "**Hydrogen Conversion Project**"). Thus, from the outset of Quantum's acquisition, the communicated business plan around the Plant focused on repurposing the existing coal plant into a hydrogen-enabled, lower carbon emission asset, which would necessarily take time.

26. During this transition, Quantum intended to continue the Plant's traditional coal-powered functions. To that end, Quantum engaged two well-established and independent firms, PurEnergy Management Services LLC ("**PurEnergy**") and TyrEnergy, LLC ("**TyrEnergy**"), to manage the Debtor's operations. Since August 2023, PurEnergy has served as the Debtor's asset manager, responsible for overall commercial and technical oversight of the Plant, including personnel, training, budgeting, compliance, reporting, and oversight, and TyrEnergy has served as the Debtor's energy manager, responsible for dispatch, market participation, and energy and capacity strategy, subject to PurEnergy's oversight.

27. As an energy-producing power plant, one of the Debtor's primary sources of revenue is the capacity payments that are made in exchange for the Plant's obligation to be available for energy production throughout an applicable delivery year. To receive capacity

payments, energy producers must participate in certain auction processes, which are typically held years in advance.

28. However, because ETEM had originally planned to shut down the Plant, the Plant had not participated in any capacity auctions under the Debtor's prior ownership. As a result, from Quantum's acquisition of the Debtor in 2023 until June 2025, the Plant was not eligible for the capacity payments it would have otherwise received. Thus, the Plant was operating through a prolonged stretch of the lowest price electrical revenues in decades, with essentially no recurring capacity revenue, negative cash flow from operations, and significant capex obligations.

29. The losses through this period totaled more than $71 million and had to be funded externally. The funding for those operating losses came from a combination of emergency capital sources, including TRAG and RGE, with the vocal public support of Mr. Robbins, capital raised by Mr. Hodson, RRI's capital investment, and Ms. Chen and her affiliated entities.

30. Issues with the PurEnergy/TyrEnergy management structure further exacerbated the financial strain caused by the gap in capacity revenue. As reported internally, PurEnergy's forecasts were consistently wrong (by orders of magnitude) and not even close to actual performance, which made it extremely difficult for management to plan fuel purchases, maintenance, and liquidity needs in an already cash-constrained environment.

31. Amidst these issues, Mr. Hodson, acting through the Movants, caused the Debtor to participate in capacity auctions for the upcoming delivery years. As a result, the Debtor began receiving capacity payments, the amount of which payments sharply increased beginning in June 2025. Once these capacity revenues began to flow, the Plant and the Debtor became highly profitable, and the Plant has since had the financial ability to attract employees, restore staffing levels, and invest in operations.

32. Specifically, according to the *Declaration of David Hindman, as Chief Executive Officer of Omnis Pleasants, LLC, d/b/a Pleasants Power Station, in Support of Chapter 11 Petition and First Day Motion* [Docket No. 10] ("**First Day Declaration**"), the Debtor's capacity revenue for the 2025/2026 delivery year was $102 million and is projected to be $122 million for the 2026/2027 delivery year, $123 million for the 2027/2028 delivery year, and $119 million for the 2028/2029 delivery year. *See* First Day Decl. ¶ 25. Meanwhile, the Plant's fixed operating costs are approximately $45 million per year. *Id*. Thus, the Debtor's revenues are well over double its operating expenses.

33. The Debtor also reportedly had approximately $13 million of liquidity (mostly cash on hand) as of the Petition Date. *Id.*

34. This positive turnaround reflects improved cash resources and market conditions, and not any fundamental difference in the quality of onsite management.

### C. The Debtor's Prepetition Debt

35. As discussed further herein, since late 2025 the Movants have been excluded from access to the Debtor's books and records and other financial information. As a result, the Movants have had little insight into ongoing operations and accruing debt of the Debtor.

36. However, the Movants nevertheless understand that, as of the Petition Date, the Debtor is obligated under loans issued by the West Virginia Economic Development Authority ("**WVEDA**") and by Bilt Technology LLC ("**Bilt**"), as well as various intercompany loans, and owes other prepetition unsecured debt to trade creditors, as discussed below. Crucially, all of this prepetition debt is ***unsecured*** with respect to the Debtor.

**1. <u>The WVEDA Loan.</u>**

37. To finance the acquisition and construction of certain equipment related to the Hydrogen Conversion Project (the "**Quantum Equipment**"), Quantum, as obligor, and the Debtor, as guarantor, entered into a loan agreement with WVEDA on December 13, 2023, pursuant to which Quantum borrowed $50 million in principal from WVEDA (the "**WVEDA Loan**").

38. The proceeds of the WVEDA Loan were paid to and used by Quantum for the Quantum Equipment, which secures the indebtedness under the WVEDA Loan. The Debtor is not the primary obligor under the WVEDA Loan, and none of the Debtor's assets are part of WVEDA's collateral. Thus, the Debtor's obligation to WVEDA is solely an unsecured guaranty.

39. The WVEDA Loan matured on June 15, 2026 and is currently in default. Immediately prior to the Debtor's bankruptcy filing, Quantum was in the process of working out a forbearance agreement with WVEDA which would grant it a first lien on the sales proceeds from the disposition of the Plant. As a result of these discussions, WVEDA's general counsel informed the Movants, the Debtor, and TRAG and RGE, through their respective principals and counsel, on July 20, 2026—less than one week before the Debtor's bankruptcy filing—that WVEDA was amenable to granting a 90-day forbearance period. *See* Gassenheimer Decl., Ex. 1.

**2. <u>The Bilt Loan.</u>**

40. In April 2025, Bilt advanced $20 million to the Debtor pursuant to a non-interest bearing, unsecured loan that was scheduled to mature in October 2025 (the "**Bilt Loan**"). The Bilt Loan was personally guaranteed by Mr. Hodson, who remains committed to honoring his guaranty and the repayment of the loan.

41. The proceeds of the Bilt Loan were used to refinance a portion of the Debtor's principal indebtedness under an intercompany note held by Omnis Energy.

42. The Bilt Loan was made in conjunction with a certain Power Purchase Agreement (the "**PPA**") entered into between Bilt and an affiliate of the Debtor, which PPA ultimately had to be terminated due to certain regulatory issues.

43. The Bilt Loan could not be paid when it matured in October 2025, and Bilt agreed to forbear in exercising its remedies until December 15, 2025 provided that the loan start to accrue interest at 8% per annum. Quantum had been negotiating a potential resolution of Bilt's claims, but, after his appointment as Independent Manager, Mr. Nathan refused to agree to any such resolution.

44. As of the date hereof, the amounts owed under the Bilt Loan remain outstanding. Omnis Global is willing to indemnify the Debtor against responsibility for repayment of the Bilt Loan and to pledge assets to secure such indemnity.

**3. <u>Intercompany Loans</u>**

45. Since the 2023 acquisition, the Movants and their affiliates have together advanced substantial sums to the Debtor to fund operating losses and also paid various vendor bills on the Debtor's behalf (such advances, collectively, the "**Intercompany Loans**").

46. The Intercompany Loans were made using funds advanced to Omnis Global, Omnis Energy, and/or Quantum by Harmony and/or other entities affiliated with Ms. Chen and by TRAG and RGE.

47. As of the Petition Date, a majority of the Intercompany Loans remain outstanding.

**4. <u>Other Unsecured Prepetition Debt.</u>**

48. According to the First Day Declaration, as of the Petition Date, the Debtor owed approximately $4 million in outstanding trade debt.

49. The Debtor's petition also shows that the Debtor's top largest 30 unsecured creditors, excluding WVEDA and Bilt, are owed the collective liquidated amount of approximately $2.75 million, the majority of which appears to be owed to operational vendors or for professional services. Upon information and belief, some of this amount was paid pursuant to first day orders, including the critical vendor order. *See* Docket No. 1.

**D. The TRAG/RGE Loans**

50. In connection with Quantum's acquisition of the Debtor and operation of the Plant, TRAG and its affiliate, RG Energy LLC ("**RGE**"),[8] issued the following loans, under which loans ***the Debtor is NOT a borrower, guarantor, or otherwise a party***, with the sole exception of one loan that has already been repaid in full:

- **May 2023 Loan** – Omnis Global, as borrower, Omnis Energy, and Quantum entered into a loan agreement dated as of May 26, 2023 with TRAG, as lender, pursuant to which TRAG advanced the original principal amount of $22,500,000 (as amended by that certain amendment dated June 30, 2023, that certain amendment dated July 9, 2024, and that certain amendment dated August 1, 2024, the "**May 2023 Loan**") to finance Quantum's acquisition of the Debtor. The May 2023 Loan was issued for a 120-day term. Pursuant to an amendment to the loan agreement on June 30, 2023, the principal amount of the May 2023 Loan was increased to $27,250,000, and, pursuant to an amendment to the loan agreement on August 1, 2024, the principal amount was decreased to $26,500,000. As collateral, TRAG received security interests in certain intellectual property and license rights with respect to certain patents. Quantum also granted and pledged to TRAG a continuing security interest in all of its personal property and certain intellectual property. The Debtor is not a borrower or guarantor under the May 2023 Loan, and none of the Debtor's assets were pledged as collateral for the May 2023 Loan at the time the loan was made.

- **June 2023 Loan** – Omnis Global, as borrower, and Omnis Energy (as well as any "Qualified Affiliate" that subsequently signed on to the loan agreement) entered into a loan agreement dated as of June 2, 2023 with RGE, as lender, pursuant to which RGE advanced the original principal amount of $12,150,000 (as amended by that certain amendment dated June 30, 2023 and that certain amendment dated July 9, 2024, the "**June 2023 Loan**, and together with the

[8] As with TRAG, RGE is also owned and controlled, directly or indirectly, by Tony Robbins and Ajay Gupta.

May 2023 Loan, the "**2023 Loans**")[9] to finance Quantum's acquisition of the Debtor. The June 2023 Loan was issued for a 120-day term. Pursuant to an amendment to the loan agreement on June 30, 2023, the principal amount of the June 2023 Loan was increased to $27,250,000. As collateral, RGE received security interests in certain intellectual property and license rights with respect to certain patents. Also, each "Qualified Affiliate," upon becoming a party to the loan agreement, granted to RGE a continuing security interest in all personal property and certain intellectual property. The Debtor never signed on to or otherwise became a party to the June 2023 Loan and is not a "Qualified Affiliate" with respect thereto. The Debtor also is not a borrower or guarantor under the June 2023 Loan, and none of the Debtor's assets were pledged as collateral for the June 2023 Loan at the time the loan was made.

- **<u>January 2025 Loan</u>** – Omnis Energy, as borrower, Omnis Global, and Quantum entered into a loan agreement dated as of January 14, 2025 with TRAG, as lender, pursuant to which TRAG funded the principal amount of $4,700,000 (the "**January 2025 Loan**") to help fund the Debtor's business while capacity revenues were still low. The January 2025 Loan matured on February 11, 2025. As collateral, TRAG received continuing security interests in substantially all of the personal and intellectual property of Omnis Energy, Omnis Global, and Quantum. The Debtor is not a borrower or guarantor under the January 2025 Loan, and none of the Debtor's assets were pledged as collateral for the January 2025 Loan at the time the loan was made.

- **<u>March 2025 Loan</u>** – Omnis Energy, as borrower, Omnis Global, and Quantum executed a security promissory note dated as of March 31, 2025 in favor of TRAG, as lender, pursuant to which the Omnis Energy, Omnis Global, and Quantum agreed to repay the additional principal amount of $1,350,000 advanced by TRAG (the "**March 2025 Loan**," and together with the January 2025 Loan, the "**2025 Loans**," and together with the 2023 Loans, the "**TRAG/RGE Loans**"). Payment of the March 2025 Loan became due on November 3, 2025. The March 2025 Loan was issued in connection with the same loan agreement as the January 2025 Loan and supported by the same collateral provided therefor. Again, the Debtor is not a borrower or guarantor under the March 2025 Loan, and none of the Debtor's assets were pledged as collateral for the March 2025 Loan at the time the loan was made.

- **<u>January 2026 Loan</u>** – The Debtor, as borrower, and Quantum entered into a loan agreement dated as of January 23, 2026 with TRAG, as lender, pursuant to which TRAG funded the principal amount of $4,849,000 (the "**January 2026 Loan**") for the purchase of certain coal, lime, and other consumables necessary to run the Plant. The January 2026 Loan was the ***<u>only</u>*** loan issued by TRAG or

[9] In addition to the 2023 Loans, TRAG, Omnis Global, and Omnis Energy also entered into another loan agreement dated as of November 8, 2023 (the "**November 2023 Agreement**"). However, the loan contemplated by the November 2023 Agreement was never funded.

> RGE to the Debtor. The January 2026 Loan was entirely ***unsecured***, and neither the Debtor nor any of Omnis Global, Omnis Energy, or Quantum pledged any assets as collateral for the loan. The January 2026 Loan was also ***repaid in full***, including all principal, interest, and other amounts due thereunder, on or about February 17, 2026.

51. As set forth above, as of the Petition Date, ***the Debtor did NOT owe any amounts to TRAG and/or RGE***. Rather, all of the outstanding TRAG/RGE Loans are owed by one or more of Omnis Global, Omnis Energy, or Quantum (***not*** the Debtor).

52. TRAG and RGE filed financing statements against Omnis Global, Omnis Energy, and/or Quantum, including a UCC-1 filed on behalf of TRAG against Quantum on January 13, 2026 (No. 2026 0297198). *See* Gassenheimer Decl., Ex. 2. Notably, this UCC-1 was filed by Herbert Smith Freehills Kramer (US) LLP, which is now the Debtor's proposed bankruptcy counsel. So, it appears that the Debtor's proposed counsel represented TRAG, which is now asserting a security interest against the Debtor's property, just six months before the Debtor's bankruptcy filing.

## E. The TRAG/RGE Loan Defaults and 2025 Forbearance Agreement

53. The TRAG/RGE Loans had very short-term maturities (some 120 days or less) that could not be repaid except through capital financing or a sale or refinancing of the Plant. Omnis Global, Omnis Energy, and Quantum relied on a commitment made and repeatedly reaffirmed by TRAG that it would raise sufficient capital to more permanently fund the Debtor's business and refinance the debt owed to TRAG and RGE on a longer-term basis. However, that capital never materialized, and each of the TRAG/RGE Loans matured without repayment.

54. Notably, on October 1, 2025, TRAG sent default notices to Omnis Global, Omnis Energy, and Quantum asserting payment defaults with respect to the May 2023 Loan and January 2025 Loan (the "**TRAG Default Notices**"). That same day, RGE sent a default notice to Omnis

Global and Omnis Energy asserting a payment default with respect to the June 2023 Loan (the "**RGE Default Notice**," and together with the TRAG Default Notices, the "**Default Notices**"). True and correct copies of the Default Notices are attached as exhibits to the Forbearance Agreement (as defined below). None of the Default Notices were directed to the Debtor.

55. Later that month, on October 21, 2025, TRAG and RGE sent notices to Omnis Global, Omnis Energy, and Quantum of their intent to foreclose on their collateral under the TRAG/RGE Loans (the "**First Foreclosure Notices**"). True and correct copies of the First Foreclosure Notices are attached as Exhibit B to the Forbearance Agreement. Critically, the First Foreclosure Notices also were not directed to the Debtor.

56. To avoid foreclosure, Omnis Global, Omnis Energy, Quantum, TRAG, and RGE entered into that certain *Forbearance Agreement*, dated as of October 22, 2025 (the "**Initial Forbearance Agreement**"). *See* Gassenheimer Decl., Ex. 3. The ***<u>Debtor</u>*** was ***<u>not</u>*** a party to the Initial Forbearance Agreement.

57. Pursuant to the Initial Forbearance Agreement, TRAG and RGE agreed to forbear from exercising their rights and remedies under the TRAG/RGE Loans against Omnis Global, Omnis Energy, and Quantum until November 30, 2025, and AlixPartners, LLP ("**AlixPartners**") was retained as a financial advisor and given access to the Debtor's books and records, facilities, employees, and other materials and information. But, Quantum retained its voting control over the Debtor.

58. The Initial Forbearance Agreement terminated on November 30, 2025, and the TRAG/RGE Loans remained in default.

59. On February 2, 2026, TRAG and RGE sent additional notices to Omnis Global, Omnis Energy, and Quantum of their intent to foreclose on their collateral under the TRAG/RGE

Loans (the "**Second Foreclosure Notices**"). True and correct copies of the Second Foreclosure Notices are attached hereto as Exhibits C to the Forbearance Agreement. Again, the Second Foreclosure Notices were not directed to the Debtor.

### F. The 2026 Amended and Restated Forbearance Agreement

60. Ultimately, Omnis Global, Omnis Energy, and Quantum, as well as the Debtor, negotiated an *Amended and Restated Forbearance Agreement*, dated as of February 6, 2026, with TRAG and RGE (the "**Forbearance Agreement**"). *See* Gassenheimer Decl., Ex. 4.

61. Pursuant to the 2026 Forbearance Agreement, TRAG and RGE agreed to forbear from exercising their rights and remedies with respect to the TRAG/RGE Loans against Omnis Global, Omnis Energy, and Quantum for a period of 60 days, subject to extension in TRAG and RGE's discretion (unless a "Forbearance Default" occurred first or the Forbearance Agreement was otherwise terminated). Forbearance Agreement § 3.

62. In exchange for their forbearance, among other things, TRAG and RGE were purportedly granted for the first time under the Forbearance Agreement a first-priority security interest in all of the Debtor's property and assets, including the Plant, until such time that the obligations under the TRAG/RGE Loans[10] are no longer outstanding. Forbearance Agreement § 7(g). Critically, ***the Debtor did not assume any of the debt or obligations owed to TRAG or RGE***, and the Debtor otherwise did not become a borrower or guarantor under any of the TRAG/RGE Loans.

63. In connection with its purported collateral pledge, the Debtor authorized TRAG and RGE "to file at any time financing statements, continuation statements, and amendments thereto

[10] The Forbearance Agreement refers only to the May 2023 Loan, the June 2023 Loan, the January 2025 Loan, and the March 2025 Loan. Neither the November 2023 Agreement (under which no loan was ever funded) nor the January 2026 Loan (which has since been repaid) are referenced in or subject to the Forbearance Agreement.

that (i) specifically describe the relevant Power Plant Collateral and (ii) contain any other information required by the Code for the sufficiency of filing office acceptance of any financing statement, continuation statement, or amendment ...[.]." Forbearance Agreement § 7(g). On February 10, 2026, four days after the execution of the Forbearance Agreement, TRAG and RGE each filed an "all assets" financing statement against the Debtor (Nos. 2026 1125554 and 2026 1125562) with the Delaware Secretary of State. *See* Gassenheimer Decl., Ex. 5.

64. Upon Payment in Full, and in addition to the governance changes discussed further below, the TRAG/RGE Loans and the Forbearance Agreement terminate automatically, TRAG and RGE's liens and encumbrances are released automatically, and TRAG and RGE must provide termination statements and other release documents. Forbearance Agreement §§ 2(e), 11(b), 15.

65. "Payment in Full" is defined under the Forbearance Agreement as the indefeasible payment in full in cash of all principal, interest, fees, costs, expenses, and other amounts owing, together with the termination, cancellation, or 103% cash collateralization of a letter of credit that had been issued by TRAG in favor of TyrEnergy (the "**LOC**").[11] Forbearance Agreement § 2(a).

66. The right to tender Payment in Full is a powerful tool designed and intended under the Forbearance Agreement to preserve the Movants' right to refinance and repay the TRAG/RGE Loans and immediately thereafter resume control and authority over the Debtor, without the Independent Manager. Consistent with the importance of this right, the Forbearance Agreement repeatedly reaffirms and protects the Movants' right to tender Payment in Full. Section 11(b) of the Forbearance Agreement provides that "nothing herein will limit or restrict the [Movants] from

[11] Prior to the parties' entry into the Forbearance Agreement, TyrEnergy had withheld approximately $8 million that it refused to release to the Debtor unless a letter of credit was issued providing for repayment if needed. TRAG posted the LOC and TyrEnergy released the $8 million to the Debtor. The LOC terminated on July 1, 2026, thereby satisfying that requirement for "Payment in Full."

procuring funds resulting in a Payment in Full of all Obligations," and confirms that such payment terminates the Forbearance Agreement and Loan Agreements. Section 11(d) excludes from the matters requiring TRAG and RGE's prior written approval any "transactions that will result in the Payment in Full of all Obligations under the Loan Agreements." Further, Sections 8(e) and 13 prohibit any conduct the primary purpose of which is to materially interfere with, frustrate, hinder, or unreasonably interfere with efforts to accomplish Payment in Full or comply with the Forbearance Agreement and Loan Agreements.

### G. The Debtor's and Quantum's Amended Operating Agreements

67. In connection with the Forbearance Agreement, on or about February 12, 2026, Quantum, as the Debtor's sole member, executed an *Amendment to the Amended and Restated Limited Liability Company Operating Agreement of Omnis Pleasants, LLC* (the "**OP Amendment**," and the Debtor's operating agreement as amended by the OP Amendment, the "**OP Operating Agreement**"), and Omnis Energy, on behalf of a super majority of Quantum's members, executed an *Amendment to the First Amended and Restated Limited Liability Company Operating Agreement of Quantum Pleasants, LLC* (the "**QP Amendment**," and Quantum's operating agreement as amended by the QP Amendment, the "**QP Operating Agreement**," and together with the OP Operating Agreement, the "**Operating Agreements**" and each an "**Operating Agreement**") *See id*., Exs. 6 and 7.

68. Pursuant to the OP Operating Agreement, and as required under the Forbearance Agreement, Gilbert Nathan was appointed as Independent Manager and sole Director of the Debtor, and David Hindman of AlixPartners was appointed as CEO of the Debtor.

69. Pursuant to the QP Operating Agreement, Mr. Nathan was also appointed as the Independent Manager and a member of the Board of Quantum. The other member of Quantum's Board is Simon K. Hodson, referred to in the QP Operating Agreement as the "Omnis Director."

70. The Forbearance Agreement and the Operating Agreements granted Mr. Nathan, as the Independent Manager of both the Debtor and Quantum, "approval rights" over certain actions, including the sale or disposal of assets, related party transactions, and the filing of bankruptcy proceedings. *See* Forbearance Agreement § 7(a), (b). However, these approval rights were never exclusive.

71. To the contrary, as the Independent Manager of Quantum, Mr. Nathan merely had the power to act jointly with Mr. Hodson as Quantum's Omnis Director. *See* QP Operating Agreement § 6.4(b). Furthermore, the amendment to the Debtor's Operating Agreement did not change the preexisting requirement that certain actions, including the sale of all or substantially all of the Debtor's assets, require the prior written consent of Quantum, as the Debtor's sole member. *See* OP Operating Agreement § 5(iii) ("Notwithstanding anything in this Agreement to the contrary, each of the following shall require the prior written approval of those Members owning a majority of the membership interests in the Debtor: … (iii) any sale, license, transfer, or other disposition of all or substantially all of the assets of the [Debtor][.]"). And, as Quantum's Independent Manager, Mr. Nathan has no voting rights with respect to such actions, including any sale. *See* QP Operating Agreement § 6.4(c)(iii) ("It being expressly understood that … (iii) with respect to the Board acting on behalf of [Quantum] as the sole member of [the Debtor], the Independent Manager shall have no voting rights as a Board Member on any Board decision relating to actions set forth in Section 5 of the OP Operating Agreement.").

72. Thus, as the Independent Manager of the Debtor and Quantum, Mr. Nathan's power and authority over the Debtor is strictly limited.

### H. Lack of Cooperation and Information from Management and TRAG/RGE

73. Following the execution of the Initial Forbearance Agreement, Quantum quickly stopped receiving meaningful financial information concerning the Debtor and was excluded from decision-making. Although the parties had agreed that information would flow through Ajay Gupta, representing TRAG and RGE, TRAG and RGE instead used this to wrongly assert that they (Mr. Gupta and Tony Robbins) were in charge in the Plant, notwithstanding Quantum's unaltered and ongoing voting control.

74. This information lock-out only worsened once Mr. Nathan stepped in as Independent Manager.

75. Despite repeated requests, Mr. Nathan has denied Quantum access to the Plant. Not only has this made it more difficult for Omnis Global, Omnis Energy, and Quantum to secure financing or sale options for the Plant, but Mr. Nathan's exclusion of Quantum from the Plant is particularly problematic because, pursuant to that certain *Lease Agreement*, dated as of January 2, 2026, between the Debtor, as landlord, and Quantum, as tenant (the "**Lease**"), the Debtor leases to Quantum a portion of the real property on which the Plant sits. *See* Gassenheimer Decl., Ex. 8. Under the Lease, the Debtor granted Quantum the express right to access the property for ingress and egress for Quantum's "reasonable needs so long as such ingress and egress does not unreasonably interfere with [the Debtor's] operations or use of the Property." Lease at 1. Quantum uses the leased premises to house the Quantum Equipment, and Mr. Nathan's improper refusal to allow Quantum access to the Plant puts that equipment, which is WVEDA's collateral, at risk.

76. Further, the Movants' demands for information were frequently made but ignored. On March 9, 2026, Quantum's counsel informed the Debtor's counsel that the Debtor had provided no financing reporting since December 2025, despite repeated requests. *See* Gassenheimer Decl., Ex. 9. Quantum requested all of the Debtor's financial reporting and books and records since December 31, 2025, but they were never provided.

77. On March 20, 2026, Quantum wrote directly to Messrs. Nathan and Hindman, explaining that Quantum remained frustrated in its ability to advance a sale or financing of the Debtor because of their continuing actions and inactions. *See id.*, Ex. 10. Quantum further explained that the information it requested was necessary to facilitate a sale or financing, enable repayment of the debt owed to TRAG and RGE, avoid foreclosure, and preserve the value of the Plant. *Id.* However, Messrs. Nathan and Hindman still did not provide the requested information.

78. This failure to provide the Movants with the requested information violated the express terms of the OP Operating Agreement. Section 15 of the OP Operating Agreement provides that Quantum, as the Debtor's member, shall "have reasonable access to the books and records of the [Debtor]." Mr. Nathan's refusal to provide such access is a clear breach of his obligations under the OP Operating Agreement and his fiduciary duties.

79. Despite his lack of cooperation and breaches under the OP Operating Agreement, Mr. Nathan continued to serve as the Debtor's Independent Manager at the behest of TRAG and RGE, who could have removed him at any time (with Quantum's consent, which would have been given had it been requested). *See* Forbearance Agreement § 7(b).

80. Meanwhile, in order to exercise their Payment in Full right, beginning in April 2026 and continuing into June 2026, the Movants repeatedly requested a payoff letter from TRAG and RGE stating the definitive amount required to fully pay the outstanding debt.

81. Initially, on April 20, 2026, TRAG and RGE's counsel responded that they would provide the payoff information. *See* Gassenheimer Decl., Ex. 11. However, TRAG and RGE subsequently refused to provide a payoff statement and have continued to refuse to do so despite the Movants' repeated requests. By their refusal, TRAG and RGE have violated the terms of the Forbearance Agreement. *See* Forbearance Agreement § 13 (prohibiting TRAG, RGE, the Independent Manager, and the CEO from taking any action, or failing to take any action, that frustrates, hinders, or interferes with the efforts of Omnis Global, Omnis Energy, and Quantum to comply with the Forbearance Agreement or the TRAG/RGE loan agreements).

82. Thus, the Debtor's current management, acting in concert with TRAG and RGE, have repeatedly breached their obligations, ignored their fiduciary duties, and improperly frustrated Omnis Global, Omnis Energy, and Quantum in their efforts to repay TRAG and RGE.

## I. <u>The TRAG/RGE Deed of Trust</u>

83. On June 17, 2026—more than four months after the execution of the Forbearance Agreement and at the very same time that TRAG and RGE were refusing the Movants' requests for definitive payoff information—the Debtor, as grantor, Kent J. George and Lindsay M. Stollings, collectively as trustee, and TRAG and RGE, collectively as beneficiary, entered into a *Deed of Trust, Assignment of Rents, Security Agreement, and Fixture Filing* (the "**Deed of Trust**"), purporting to sell and convey to the trustee, in trust with the power of sale for the benefit of TRAG and RGE, and to grant to TRAG and RGE a continuing security interest in and to all of the Debtor's right, title, and interest in the Plant and certain other assets.[12] *See* Gassenheimer Decl., Ex. 12.

---

[12] The Deed of Trust can be challenged for at least three reasons. First, the 60-day forbearance period under the Forbearance Agreement had already expired by the time the Deed of Trust was executed, meaning there was no reason at all for the Debtor to enter into the Deed of Trust. Second, the Deed of Trust may constitute a transfer or other disposition of the Plant requiring Mr. Hodson's prior consent under the Debtor's and Quantum's Operating

84. The Deed of Trust was recorded with the Clerk of Pleasants County, West Virginia nine days later on June 26, 2026—one month before the Debtor's bankruptcy filing. *Id.*

85. Mr. Hindman signed the Deed of Trust for the Debtor.

86. The Deed of Trust states that the security interests granted thereunder are to secure the indebtedness owed under the TRAG/RGE Loans and related agreements[13] and as a "material inducement" to TRAG and RGE's entry into the Forbearance Agreement. *Id.*

87. However, the Forbearance Agreement did not expressly authorize the execution or recording of any deed of trust or similar instrument, and the Movants were not aware of, and did not approve or authorize, the Deed of Trust.

**J. <u>The West Virginia Litigation, Payment in Full, and Removal of Mr. Nathan</u>**

88. On July 8, 2026, the Movants filed a complaint against TRAG, RGE, and Mr. Nathan, in his capacity as Independent Manager, in the Circuit Court of Pleasants County, West Virginia (the "**West Virginia Court**") (Case No. CC-37-2026-C-14) commencing an action (the "**West Virginia Litigation**") seeking declaratory and injunctive relief compelling the production of a payoff letter from TRAG and RGE and the Debtor's financial information, books, records, and director materials from Mr. Nathan, as well as reasonable access to the premises that Quantum leases from the Debtor and other related Plant-access areas. *See* Gassenheimer Decl., Ex. 13.

89. The same day, the Movants filed a motion in the West Virginia Litigation seeking a temporary restraining order ("**TRO**") and preliminary injunction: (1) prohibiting TRAG and RGE from exercising contractual remedies until seven days after delivery of a complete payoff

---

Agreements. Mr. Hodson never gave his consent. And, third, the Deed of Trust may be avoidable as a preferential and/or fraudulent transfer.

[13] The Deed of Trust does not reference either the November 2023 Agreement or the January 2026 Loan.

letter and accounting; (2) enjoining Mr. Nathan from any further actions in his capacity as Independent Manager until after the delivery of the Debtor's financial information; and (3) enjoining Mr. Nathan from taking any further action with respect to the Debtor and Quantum until seven days after providing the Movants with reasonable access to Quantum's leased premises. *See id.*, Ex. 14.

90. The West Virginia Court denied the Movants' initial TRO and preliminary injunction request on July 9, 2026. *See id.*, Ex. 15.

91. It was not until July 15, 2026, when TRAG and RGE circulated a proposed corporate restructuring term sheet identifying $75,640,000 as the aggregate outstanding obligation amount, that the Movants received, for the first time, any definitive number from which to calculate a payoff amount. The Movants acted immediately.

92. Within one day of receiving that figure, on July 16, 2026, Dynamic Finance Corporation ("**DFC**") delivered a check in the amount of $75,640,000 to counsel for TRAG and RGE as Payment in Full of all obligations under the TRAG/RGE Loans. Notably, the Movants expressly agreed to pay any additional amount properly documented as due and owing.

93. DFC is not a corporate affiliate of any of the Movants or their affiliates. The present DFC financing is a third-party loan to Omnis Energy. It does not sell or transfer the Plant, the Debtor's assets, Quantum's membership interests in the Debtor, or any present governance right in the Debtor or Quantum. Rather, the prospective DFC restructuring contemplates that, after the payoff, other Omnis Energy-affiliated entities may become obligors and may grant collateral on terms more favorable than the TRAG/RGE proposed restructuring. But, that prospective post-payoff restructuring is not the transaction by which DFC funded Omnis Energy's tender, and it does not convert the tender into a present sale of the Plant.

94. Improperly, but predictably, Mr. Nathan refused to approve the transaction, incorrectly characterizing it as a "related-party transaction" requiring his consent—notwithstanding the express language of the Forbearance Agreement preserving the Movants' right to tender Payment in Full without the Independent Manager's approval. TRAG and RGE refused to accept the check.[14] *See id.*, Ex. 16.

95. On July 20, 2026, Quantum—as the Debtor's sole member and understanding that Payment in Full had been made—removed Mr. Nathan as Independent Manager and sole Director of the Debtor and appointed Charles Gassenheimer as interim Director. *See id.*, Ex. 18. Because Payment in Full of the TRAG/RGE Loans automatically terminated the Forbearance Agreement according to its express terms, and pursuant to Section 4(a) of the Debtor's Operating Agreement, neither TRAG's nor RGE's consent was required prior to Mr. Nathan's removal. Further, pursuant to Section 6.4(c) of Quantum's Operating Agreement, Mr. Hodson, as the Omnis Director, did not require Mr. Nathan's consent to remove him as the Debtor's Independent Manager. QP Operating Agreement § 6.4(c)(ii) ("It being expressly understood that … (ii) with respect to Board acting on behalf of [Quantum] as the sole member of [the Debtor], the Independent Manager shall have no voting rights as a Board Member on any Board decision relating to the removal of the independent manager of [the Debtor]."). Upon his removal, the Movants immediately directed Mr. Nathan to turn over all property, records, and access related to the Debtor. *Id.*

96. On July 21, 2026—the day after Quantum removed Mr. Nathan—TRAG and RGE filed counterclaims and their own motion for a TRO and preliminary injunction in the West

[14] As of the Petition Date, TRAG and RGE still had possession of the check through their counsel and/or their counsel's former law firm. The check has now been returned, but only after the Movants requested its return if TRAG and RGE did not intend to cash it. *See* Gassenheimer Decl., Ex. 17. As discussed herein, the Movants remain committed to repaying all of the TRAG/RGE Loans in full.

Virginia Litigation, seeking to maintain Mr. Nathan as the Independent Manager and prevent the Movants from exercising governance control. *See id.*, Ex. 19. The Movants promptly filed a response in opposition to the TRAG/RGE motion the following day. *See id.*, Ex. 20.

97. On Friday, July 24, 2026, the West Virginia Court **DENIED** TRAG and RGE's request for a TRO and preliminary injunction, thus maintaining the status quo of the Payment in Full, Mr. Nathan's removal, and other governance changes that had occurred and were occurring. *See id.*, Ex. 21.

**K. The Chapter 11 Case**

98. On Sunday, July 26, 2026 (the "**Petition Date**")—less than one business day after the West Virginia Court denied the TRAG/RGE TRO motion—the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court, commencing the instant Chapter 11 Case.[15]

99. Mr. Hindman signed the Debtor's petition as its CEO, and Mr. Nathan is the sole signatory to the written consent attached to the petition that purportedly authorized the Debtor's bankruptcy filing. Mr. Nathan signed the written consent as the "sole member of the Board of Directors and the Independent Manager" of the Debtor. *See* Docket No. 1.

100. Quantum, through Mr. Hodson as the "Omnis Director," never consented to, authorized, or approved the Debtor's bankruptcy filing. The Movants never received advanced notice that a bankruptcy petition would be filed.

101. Shortly after the bankruptcy filing, the Debtor filed various "first day" motions, including a motion to use the purported cash collateral of TRAG and RGE in exchange for granting

[15] No statutory committee of unsecured creditors has been appointed in the Chapter 11 Case. *See* Docket No. 66.

TRAG and RGE various forms of adequate protection and other relief [Docket No. 17] (the "**Cash Collateral Motion**").

102. The proposed 13-week budget attached to the Cash Collateral Motion includes a line item for nearly $11 million in professional fees for the Chapter 11 Case, along with a line item for more than $1.5 million in "other non-operating" costs. Both line items appear to be out of step with a "sale case"—unless viewed instead as intended to fund a litigation war chest to litigate with the Movants while in chapter 11.

103. Notably, the Debtor has not filed any motion seeking to obtain or enter into postpetition financing, as the Debtor believes that its cash on hand together with projected receipts and revenues constitute sufficient liquidity to fund this Chapter 11 Case.

104. On July 29, 2026, the Movants filed an omnibus objection [Docket No. 42] to all of the first day motions (the "**Omnibus Objection**"), which Omnibus Objection also asked the Court to exercise its authority to dismiss the Chapter 11 Case *sua sponte*. The Movants hereby incorporate by reference all of the facts and arguments included in the Omnibus Objection as though set forth herein in full.

105. At the first day hearing held later that day on July 29 (the "**First Day Hearing**"), the Court declined to dismiss the Chapter 11 Case *sua sponte*. The Court then entered orders granting the Debtor's first day motions, including the Interim Cash Collateral Order, which granted the Cash Collateral Motion on an interim basis.

106. The final hearing on the first day motions is scheduled for September 3, 2026 at 1 p.m. (ET), and objections to the entry of any final orders are due August 19, 2026 at 4 p.m. (ET).

107. The Movants will file an objection to the approval of the Cash Collateral Motion on a final basis (the "**Cash Collateral Objection**"), which objection is incorporated herein in full.

### L. <u>The Suggestion of Bankruptcy</u>

108. On August 11, 2026, with the Chapter 11 Case pending, all of the parties to the West Virginia Litigation—*i.e.*, Omnis Global, Omnis Energy, Quantum, TRAG, RGE, and Mr. Nathan—agreed to schedule the Rule 26(f) conference in the action for August 18.

109. However, the very next day, and despite the parties' agreement, Mr. Nathan filed a *Notice of Suggestion of Bankruptcy* in the West Virginia Litigation (the "**Suggestion of Bankruptcy**"), claiming that the West Virginia Litigation is stayed due to the Debtor's bankruptcy filing. *See* Gassenheimer Decl., Ex. 22.

110. In the Suggestion of Bankruptcy, Mr. Nathan asserts, incorrectly, that section 362 of the Bankruptcy Code automatically stays and enjoins "(a) the commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor, ***including the continuation of any proceeding against any defendant that may assert that the Debtor is vicariously liable***, that was, or could have been, commenced before the filing of the Chapter 11 Petition or (b) any act to obtain possession of, or exercise control over, property of the Debtor's estate." *Id.* (emphasis added). Mr. Nathan further mischaracterizes the West Virginia Litigation as "an act to obtain possession of or control over property of the Debtor's estate and/or seek a judicial determination or a recovery on account of any claims or causes of actions of the Debtor that are subject to Section 362 of the Bankruptcy Code." *Id.*

111. Given these blatant misstatements, and because the West Virginia Litigation is not an action against the Debtor or its property, the Movants promptly demanded that Mr. Nathan withdraw the Suggestion of Bankruptcy, but his counsel refused. *See id.*, Ex. 23.

112. As of the date hereof, no party has moved to extend the automatic stay to, or otherwise enjoin, the West Virginia Litigation. To the contrary, during the First Day Hearing, the

Debtor's proposed bankruptcy counsel informed this Court that the West Virginia Litigation was still pending and that a permanent injunction hearing would "presumably" be set at some point. *See* Hr'g Tr. 29:3–15 (July 29, 2026). A true and correct copy of the relevant excerpt of the First Day Hearing transcript is attached hereto as **Exhibit A**.

113. Based on the Suggestion of Bankruptcy, the Movants understand that Mr. Nathan intends to argue that the Debtor is somehow vicariously liable for the claims in the West Virginia Litigation. This legal position is directly in conflict with the fiduciary duties that Mr. Nathan owes to the Debtor as its (purported) Independent Manager.

**M. HSF Kramer's Retention Application**

114. On August 13, 2026, the Debtor filed an application seeking to retain and employ Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**") as bankruptcy counsel. *See* Docket No. 83 (the "**Retention Application**").[16]

115. The Retention Application discloses, among other things, that "HSF Kramer represented TRAG and RG Energy in connection with their investments in certain affiliates of the Debtor and in connection with TRAG and RG Energy's entry into that certain amended and restated forbearance agreement, dated February 6, 2026." Retention Application, Ex. B, ¶ 31(a).[17] In other words, HSF Kramer represented TRAG and RGE—who now claim to be the Debtor's secured creditors—in connection with the Forbearance Agreement—the very agreement that purportedly granted TRAG and RGE security interests in the Debtor's assets.

---

[16] The Movants expressly reserve and preserve all rights with respect to the Retention Application.

[17] Notably, the Retention Application does not specifically disclose or discuss HSF Kramer's involvement with the January 2026 UCC-1 that TRAG filed against Quantum. But, presumably, that was part of HSF Kramer's work for TRAG "in connection with [its] investments in certain affiliates of the Debtor." *Id.*

116. Despite this obviously disqualifying conflict of interest, Mr. Nathan decided to retain HSF Kramer as the Debtor's counsel, and HSF Kramer accepted the engagement. Of course, this was done with the blessing of TRAG and RGE. *See id.*

117. Incredibly, the Retention Application states that the Debtor hired HSF Kramer on February 20, 2026—***just two weeks after the execution of the Forbearance Agreement***. *Id.* ¶ 1.

118. Mr. Nathan, who had been appointed just ***8 days prior*** on February 12, signed HSF Kramer's engagement agreement for the Debtor. *Id.*, Ex. A-1. Thus, within days after taking control of the Debtor through Mr. Nathan, TRAG and RGE installed their own counsel as the Debtor's new counsel.

119. From their retention on February 20 to the Petition Date—an approximate ***5-month*** period—HSF Kramer has reportedly been paid ***over $10 million***. *Id.* ¶ 18. The Debtor also reportedly provided a ***$1 million*** retainer to HSF Kramer, which, as of the Petition Date, was still nearly $793,000. *Id.* ¶ 17.

## RELIEF REQUESTED

120. Because the Debtor's bankruptcy petition was filed in bad faith and without corporate authority, the Movants respectfully submit this Motion pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code requesting that the Chapter 11 Case be immediately dismissed. Should the Court decide not to grant dismissal, the Movants request, as an alternative, that a chapter 11 trustee be appointed for the Debtor pursuant to section 1104(a) of the Bankruptcy Code. The Movants also request that the Court vacate the Interim Cash Collateral Order.

## **BASIS FOR RELIEF**

## I. **THE COURT SHOULD DISMISS THE CHAPTER 11 CASE FOR CAUSE.**

121. Section 1112(b) of the Bankruptcy Code provides that a bankruptcy court "shall" either convert a chapter 11 case to a case under chapter 7 or dismiss the case, "whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment … of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (emphasis added).

122. Section 1112(b)(4) lists sixteen examples of what constitutes "cause" for dismissal or conversion, but this list is non-exhaustive. *In re Am. Cap. Equip., LLC,* 688 F.3d 145, 161 (3d Cir. 2012).

123. Although not enumerated in the statute, it is well-established in the Third Circuit that cause exists to dismiss a bankruptcy case under section 1112(b) where the case has been filed in "bad faith." *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100 (3d Cir. 2023); *15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009); *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999).

124. In addition, courts have also long held that a lack of corporate authority to file a bankruptcy petition constitutes cause for dismissal. *See Price v. Gurney*, 324 U.S. 100, 106 (1945) (upholding dismissal of petition for relief under Chapter X of the Bankruptcy Act for lack of corporate authority); *In re 3P Hightstown, LLC*, 631 B.R. 205, 209 (Bankr. D.N.J. 2021) ("Improper authority to file for bankruptcy is often cited as cause for dismissal.").

125. Generally, section 1112(b) is subject to a "two-step process in which the court first determines whether there is 'cause' to convert or dismiss, and next chooses between conversion and dismissal based on 'the best interest of creditors and the estate.'" *Am. Cap.*, 688 F.3d at 161.

126. However, where a bankruptcy petition is filed in bad faith or without corporate authority (or both), the bankruptcy court's jurisdiction is not properly invoked, and the court must therefore dismiss the petition. *See Price*, 324 U.S. at 106 ("If the [c]ourt finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute [bankruptcy] proceedings, it has no alternative but to dismiss the [bankruptcy] petition."); *SGL Carbon,* 200 F.3d at 159 n.8 ("In bad faith cases involving the filing of a petition that is an abuse of the bankruptcy process … [section] 1112(b)'s conversion/dismissal choice is inappropriate. The proponent of an abusive petition does not belong in bankruptcy so it is unnecessary to ask whether dismissal or conversion is in the interest of the creditors."); *Hadeed v. Advanced Vascular Res. of Johnstown, LLC (In re Advanced Vascular Res. of Johnstown, LLC)*, 590 B.R. 689, 691 (Bankr. W.D. Pa. 2018) ("[I]f a bankruptcy petition is filed by persons lacking the power of management, the bankruptcy case must be dismissed for want of legal authority to do so.") (internal quotations and citations omitted); *In re JER/Jameson Mezz Borrower II, LLC,* 461 B.R. 293, 297 (Bankr. D. Del. 2011) ("Good faith is a predicate to the right to file a petition in bankruptcy, as only the 'honest but unfortunate debtor' is eligible to avail itself of the protections afforded by the Bankruptcy Code."); *In re ComScape Telecommunications, Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010) (stating that a bankruptcy court is "required to dismiss an unauthorized filing").

127. In other words, where bad faith is present or corporate authority is lacking, conversion is not an option, and dismissal is required. *See SGL Carbon*, 200 F.3d at 159.

128. Here, the instant Chapter 11 Case should and must be dismissed on the separate and independent grounds that the Debtor's bankruptcy petition was filed (i) in bad faith and (ii) without the requisite corporate authority.

**A. <u>The Debtor's Bankruptcy Petition Was Filed In Bad Faith.</u>**

129. Whether a bankruptcy petition has been filed in good faith is a "fact intensive inquiry" that requires a court to examine "the totality of facts and circumstances" and to determine where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004); *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 374 (Bankr. D. Del. 2018).

130. When good faith is at issue, "the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *Integrated Telecom*, 384 F.3d at 118; *see also In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith.").

131. In the Third Circuit, courts focus primarily on two factors to determine whether a bankruptcy petition is filed in good faith: "(1) whether the petition serves a valid bankruptcy purpose," and "(2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom*, 384 F.3d at 120.

132. The totality of the circumstances of this Chapter 11 Case make it clear that the Debtor's bankruptcy filing serves no valid bankruptcy purpose and was instead filed primarily (if not solely) as a litigation tactic against the Movants. As such, the Chapter 11 Case should and must be immediately dismissed.

**1. <u>The Chapter 11 Case Does Not Serve Any Valid Bankruptcy Purpose.</u>**

133. A valid bankruptcy purpose "assumes the debtor is in financial distress." *LTL Mgmt.*, 64 F.4th at 101 (quoting *Integrated Telecom*, 384 F.3d at 128).

134. Thus, assessing a debtor's financial distress is necessarily the first step in any good faith analysis. *See SGL Carbon*, 200 F.3d at 166 ("Courts … have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."); *In re Bedmar, LLC*, No. 25-11027 (JKS), 2025 WL 2496260, at *9 (Bankr. D. Del. Aug. 29, 2025) ("A debtor who is not in financial distress cannot establish that its petition serves a valid bankruptcy purpose supporting good faith.").

135. Where financial distress is found to exist, courts in the Third Circuit then examine whether the debtor has shown that its petition serves a valid bankruptcy purpose by establishing that the filing either (i) preserves a going concern or (ii) maximizes the value of the debtor's estate. *BEPCO*, 589 F.3d at 619. (quoting *Integrated Telecom*, 384 F.3d at 120).

136. Stated differently, under established Third Circuit precedent, "a Chapter 11 petition filed by a financially healthy debtor, with no intention of reorganizing or liquidating as a going concern, with no reasonable expectation that Chapter 11 proceedings will maximize the value of the debtor's estate for creditors" does not serve a valid bankruptcy purpose and "is not filed in good faith." *Integrated Telecom*, 384 F.3d at 112.

137. This is precisely the case here. The Debtor was not in financial distress as of the Petition Date but was, in fact, financially healthy. Moreover, the apparent goal of this Chapter 11 Case is not to preserve the Debtor as a going concern, but to wield the automatic stay as a weapon against the Movants. Further, given the high costs of this Chapter 11 Case, the only outcome will be to erode, not maximize, value. Dismissal, therefore, is warranted.

**a. <u>The Debtor Is Not In Financial Distress.</u>**

138. To satisfy the requirement of good faith, a debtor's financial distress must be both "genuine" and sufficiently "apparent," "immediate," and "imminent" so as to justify a bankruptcy filing. *Bedmar*, 2025 WL 2496260, at *9, 14 (citing *Integrated Telecom*, 384 F.3d at 124 and *LTL Mgmt.*, 64 F.4th at 102).

139. Where financial distress is instead manufactured, or where the debtor has access to enough cash to pay its obligations as they become due, dismissal for cause is warranted. *See id.* (dismissing petition where debtor "did not face any of the operational, managerial, market, financial, economic, legal, or other challenges that generally cause a debtor genuine financial distress" and financial condition was instead "created by design"); *see also LTL Mgmt.*, 64 F.4th at 108-09 (finding debtor was not in financial distress where it was "highly solvent" and could pay current and future claims in full); *SGL Carbon*, 200 F.3d at 164 ("[Debtor's] ability to meet its debts is but one of many factors compelling the conclusion it did not enter Chapter 11 with a valid reorganizational purpose.").

140. Mere "economic difficulties," standing alone, are insufficient to establish financial distress. *Bedmar*, 2025 WL 2496260, at *9 (citing *Integrated Telecom*, 384 F.3d at 124).

141. Here, although the Debtor has faced economic difficulties in the past, as of the Petition Date, it was not in genuine or imminent financial distress. The Debtor was not facing any threats from its actual creditors, all of whom are unsecured as to the Debtor. While the Debtor's professionals have made much of the debts owed to TRAG and RGE, such debt is not actually owed by the Debtor, and any pressure imposed upon the Debtor by TRAG and RGE is entirely by design. Further, <u>***the Debtor is highly profitable!***</u> The Debtor is plainly not the type of entity in midst or on the brink of insolvency for which chapter 11 was created.

**i. <u>The WVEDA and Bilt Loan Defaults Were Not An Imminent Threat.</u>**

142. According to the Debtor's petition, its two largest unsecured creditors are WVEDA and Bilt, which hold the vast majority of the Debtor's debt. Although their loans are reportedly in default, there is no evidence that either WVEDA or Bilt had initiated any action to enforce their default remedies prior to the bankruptcy filing.

143. In fact, the exact opposite is true as to WVEDA, the Debtor's largest lender (and whose debt is secured by Quantum's assets, not the Debtor's). As the Debtor's current management was well aware, WVEDA had agreed in principle to a 90-day forbearance period ***<u>less than one week before the Petition Date</u>***.

144. Further, as noted above, the Debtor is only the guarantor, not the borrower, under the WVEDA Loan. Under West Virginia law, which governs the WVEDA Loan, a guarantor has the right to demand that a creditor initiate suit against the principal (*i.e.*, the primary obligor) when a claim arises. W. Va. Code § 45-1-1. If the creditor fails to comply with the demand and institute and diligently prosecute the action, the creditor forfeits its right to pursue any claims against the guarantor. W. Va. Code § 45-1-2. So, had WVEDA brought any action against the Debtor (which it had not), the Debtor could have demanded that WVEDA pursue a claim against Quantum first, and if WVEDA refused or failed to do so, it would forfeit its claims against the Debtor. Quantum, not the Debtor, is primarily responsible for the repayment of the WVEDA Loan.

145. The Movants had also been in contact with Bilt and were optimistic that the Bilt Loan could be repaid or otherwise resolved on terms highly favorable to the Debtor. Further, as noted above, Mr. Hodson remains obligated under and committed to honoring his personal guaranty of the Bilt Loan, and Omnis Global is willing to indemnify the Debtor for the debt.

146. Thus, any claim that either the WVEDA Loan or the Bilt Loan posed an imminent financial threat to the Debtor as of the bankruptcy filing is simply not true.

**ii. Any Pressure From TRAG And RGE Was Manufactured.**

147. Moreover, any alleged threat to the Debtor presented by the TRAG/RGE Loans is wholly manufactured.

148. As discussed above, ***the Debtor is not an obligor under any of the TRAG/RGE Loans***. It is not a party to any of the TRAG/RGE Loans and, other than the January 2026 Loan that has been repaid, the Debtor never received any funds directly from TRAG or RGE.

149. At most, the Debtor may have granted to TRAG and RGE first-priority security interests in its assets under the Forbearance Agreement. However, their security interests were not properly perfected. TRAG and RGE waited over four months and until ***just one month before the Petition Date*** to record the Deed of Trust, which Deed of Trust was not even contemplated under the Forbearance Agreement. At best, this constitutes a preferential and/or fraudulent transfer that can and must be avoided.

150. Assuming, solely for the sake of argument, that the security interests are valid and enforceable, the Forbearance Agreement and any security interests granted thereunder were automatically terminated by the Movants' Payment in Full of the obligations owed to TRAG and RGE. *See* Forbearance Agreement §§ 7(g), 15. To the extent TRAG or RGE assert that their refusal to accept the Movants' Payment in Full somehow entitles them to retain their security interests in the Debtor's assets (which the Movants strenuously dispute), that is a situation created by TRAG and RGE's own making.

151. TRAG and RGE have had, and still have, the opportunity to be repaid in full. All they need to do is provide a definitive payoff amount to the Movants—who are the actual

borrowers under the TRAG/RGE Loans—and accept the Movants' tender of Payment in Full. Instead, however, TRAG and RGE have acted in concert with Mr. Nathan (whom TRAG and RGE have actively sought to keep in control of the Debtor for their benefit) to block and obstruct the Movants' efforts to complete Payment in Full. It therefore cannot fairly be said that the Debtor is "genuinely" in financial distress.

152. Critically, TRAG and RGE are not merely third-party lenders. TRAG owns 46.62% of Quantum and 9% of Omnis Energy, the Debtor's direct and indirect parent companies, respectively. TRAG and RGE are affiliates owned and controlled, directly or indirectly, by Ajay Gupta and Tony Robbins, who have tried to exercise complete control over the Debtor in violation of the Movants' voting rights. Thus, TRAG and RGE's actions are best described as those of interested equity holders vying for control rather than lenders engaging in good faith and at arms' length in order to be repaid—which TRAG and RGE have actively avoided.

153. The Court should not countenance TRAG and RGE's efforts to improperly keep the Debtor in chapter 11 and under their control.

**iii. <u>The Debtor Is Profitable.</u>**

154. Furthermore, and most importantly, the Debtor is cash-flow positive and had substantial cash reserves as of the Petition Date. Although the Debtor initially faced liquidity constraints following the 2023 acquisition as a result of the inaction of the Debtor's prior owner and other operational issues, the Debtor has since turned a corner. Notwithstanding current management's claims to the contrary, this turnaround was because of, not in spite of, the Movants. Well before Mr. Nathan was appointed as Independent Manager in February 2026, the Movants acted to ensure that the Debtor would be able to receive capacity payments.

155. Now, with the capacity revenues that were previously unavailable coming in, the Debtor is projected to receive well over $100 million in revenue each year for the next several years. This revenue is projected to be more than double the Debtor's operating expenses. In other words, the Debtor is profitable, and by a wide margin.

156. Indeed, according to the First Day Declaration, the Debtor had approximately $13 million cash on hand prior to the bankruptcy filing. And, unlike most chapter 11 debtors, the Debtor does not require any postpetition financing to fund this Chapter 11 Case.

157. Thus, as of the Petition Date, the Debtor was in a position to pay its obligations. This is quintessential financial health, not financial distress.

158. The Debtor's profits can and should be used to repay or refinance its debts owed to legitimate creditors rather than be wasted on funding an unnecessary bankruptcy filing.

159. Because the Debtor cannot show that it was in financial distress when its petition was filed, it cannot show that its petition was filed in good faith.

**b. <u>The Chapter 11 Case Is Not Intended To Preserve The Debtor.</u>**

160. In the absence of any bona fide or imminent financial distress, the Court can and should end the "good faith" inquiry and grant dismissal. Nonetheless, an examination of the other circumstances surrounding this Chapter 11 Case further shows that it was not filed in a good faith effort to preserve the Debtor as a going concern.

161. Good faith requires, at minimum, "a reasonable expectation on the part of the debtor that a successful reorganization can be accomplished." *In re Schaffer*, 597 B.R. 777, 792 (Bankr. E.D. Pa.), *aff'd*, 606 B.R. 228 (E.D. Pa. 2019), *aff'd*, No. 19-3664, 2020 WL 2529371 (3d Cir. Jan. 24, 2020). Thus, courts have recognized that, if a chapter 11 debtor has no need or ability to

reorganize, "its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *Bedmar*, 2025 WL 2496260, at *16.

162. According to the First Day Declaration, the Debtor intends to run a section 363 sale process. *See* First Day Decl. ¶ 17. However, while asserting that the Debtor has "engaged in productive discussions with numerous potential sale counterparties interested in purchasing the Debtor's assets," *id.* ¶ 18, current management has not identified any proposed purchasers or any entities that have provided a bona fide sale offer or even a written indication of interest.[18]

163. Crucially, current management has not proposed, and cannot propose, any feasible path towards a successful sale. The power and authority of the individual who would purportedly control any sale process (Mr. Nathan) is credibly in dispute and has, in fact, been terminated. Regardless, even if Mr. Nathan had not already been removed (which he has been), under the Debtor's Operating Agreement, any sale, transfer, or other disposition of all or substantially all of the Debtor's assets ***requires Quantum's prior written approval*** as the Debtor's sole member. *See* OP Operating Agreement § 5(iii); *see also* Forbearance Agreement § 8(d) ("[A]ny sale of [the Debtor] or the Power Plant assets … shall also be subject to the prior written approval of the Independent Manager and the board of directors … of [the Debtor] (***and, if applicable, [Quantum]***.") (emphasis added). And any approval by Quantum, in turn, ***requires Mr. Hodson's consent*** as the Omnis Director. *See* QP Operating Agreement § 6.4(b)(1) and Forbearance Agreement 7(b)(1) (providing, together, that any "sales or disposals of [the Debtor's] assets outside

[18] Indeed, on August 13, 2026, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 86] (the "**Bid Procedures and Sale Motion**"), which does not identify any stalking horse bidder or other potential bidders. The Movants expressly reserve and preserve all rights with respect to the Bid Procedures and Sale Motion.

the ordinary course of business (including the Power Plant)" require the ***joint approval*** of both Quantum's Omnis Director and Independent Manager); *see also* QP Operating Agreement § 6.4(c)(iii) (providing that, as a member of the Board of Quantum, the Independent Manager has no voting rights over matters set forth in Section 5 of the Debtor's Operating Agreement).

164. In other words, Mr. Nathan, as the purported Independent Manager of either the Debtor or Quantum, does not have the requisite authority to unilaterally approve or direct the sale of the Debtor's assets, including the Plant. Quantum, which actually possesses the requisite voting power, intends to object to any sale or other restructuring that may be proposed without its consent, which consent requires Mr. Hodson's affirmative vote as Omnis Director. Simply put, the Debtor cannot demonstrate that it can achieve any successful sale or other restructuring at all in this Chapter 11 Case, let alone within a reasonable time.

165. As discussed above, the Debtor does have substantial enterprise value and a profit-generating asset (the Plant) which should and must be preserved. But, chapter 11 is not the appropriate forum to do so. Nor is preserving value the true purpose of this Chapter 11 Case. As the First Day Declaration itself makes clear, the bankruptcy filing is instead intended to provide a new forum for the Debtor's purported current management to bring alleged claims against "former management" (*i.e.*, the Movants and their affiliates). *See id.* ¶ 80. Considering that this is not a case of creditors banging down the Debtor's door in the lead up to the bankruptcy filing, this ulterior motive is not surprising. Why else file for bankruptcy where there is no financial distress? But, while not unexpected, this is not a legitimate use of the Bankruptcy Code.

**c. <u>The Chapter 11 Case Will Not Maximize Value.</u>**

166. Not only will this Chapter 11 Case not preserve value, but it will not maximize value, either. To the contrary, the filing and maintenance of this Chapter 11 Case will only erode value and deplete the Debtor's available assets.

167. To serve a valid bankruptcy purpose, a bankruptcy petition "must seek to create or preserve some value that would otherwise be lost … outside of bankruptcy." *Integrated Telecom*, 384 F.3d at 129 (dismissing chapter 11 case where proponents failed to identify "any efficiencies that were realized in [the] bankruptcy that could not have been realized under Delaware law."). That is, there must be some "value that would otherwise be unavailable to creditors outside of bankruptcy." *BEPCO*, 589 F.3d at 620 (affirming dismissal where the purported benefits to the debtors' estates "could have occurred outside of bankruptcy, or were based on procedural benefits gained from bankruptcy that cannot be said to have maximized the value of the [d]ebtors' estates").

168. Any purported value conferred by a bankruptcy filing must also be weighed against the costs and expenses of administering the case. Where the administrative costs are great and the purported benefits, if any, are minimal, this further supports dismissal. *See id.* at 624 (concluding that the bankruptcy filing "only increased the [d]ebtors' cash shortfall" and that the debtors' financial condition "only deteriorated as substantial bankruptcy-related administrative expenses, including legal fees …, ha[d] accrued").

169. As set forth in the Debtor's Cash Collateral Motion, in the first 13 weeks of this Chapter 11 Case alone, the Debtor projects spending over $12.5 million in fees for its bankruptcy professionals and for other "non-operating" expenses. Nearly $5 million of this amount was budgeted to be spent ***<u>in the very first week</u>*** after the Petition Date. Thus, the costs of this Chapter 11 Case are already substantial and will only grow if the case is permitted to continue.

170. In contrast, no benefits will be conferred upon the Debtor or its estate through this Chapter 11 Case that would be unavailable outside of bankruptcy. The Debtor is profitable and has funds to sustain itself and continue operations outside of chapter 11. The Debtor can also continue to pursue sale or refinancing options after dismissal. As discussed herein, the Movants have already secured the DFC financing (which Mr. Nathan and TRAG and RGE have improperly rejected) and are ready, willing, and able to further address and resolve the Debtor's debts and obligations. The parties can also continue to litigate the issues regarding the Forbearance Agreement and TRAG/RGE Loans in the pending West Virginia Litigation.

171. The only unique benefit of this Chapter 11 Case is the automatic stay. Indeed, the Debtor's professionals all but admit that the automatic stay is what they are after here. *See* First Day Decl. ¶ 80 ("There was no other means by which to remove the overhang of the [Movants'] fraudulent conduct, financial defaults, and persistent efforts to exert control over an asset for their personal gain…"). To be sure, the Movants strongly object to the First Day Declaration's mischaracterization of their actions to enforce and assert their rights under the Forbearance Agreement and Operating Agreement. Regardless, filing for bankruptcy merely to secure the benefit of the automatic stay, without more, as the Debtor has done here, is not a legitimate bankruptcy purpose. *See BEPCO*, 589 F.3d at 620 (rejecting purported benefit of bankruptcy filing that amounted to "nothing more than the Debtors availing themselves of the automatic stay of litigation outside of bankruptcy"); *see also Integrated Telecom*, 384 F.3d at 129 ("To be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code."); *Bedmar*, 2025 WL 2496260, *18 (dismissing bankruptcy case where debtor filed solely to take advantage of section 502(b)(6)).

172. In short, the costs of this Chapter 11 Case vastly outweigh any purported proper benefit, and, as such, the Debtor cannot show that its bankruptcy filing will maximize value. This, combined with the Debtor's lack of financial distress and any intent to preserve the Debtor as a going concern, confirms that this Chapter 11 Case was filed in bad faith and must be dismissed.

**2. <u>The Chapter 11 Case Was Filed As A Litigation Tactic.</u>**

173. The filing of a chapter 11 petition "merely to obtain tactical litigation advantages is not within the 'legitimate scope of the bankruptcy laws.'" *SGL Carbon*, 200 F.3d at 165 (quoting *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994)). Simply put, the Bankruptcy Code cannot "be used as a mechanism to orchestrate pending litigation." *Id.*

174. Thus, "[w]here the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *BEPCO*, 589 F.3d at 625 (internal quotation marks and citations omitted).

175. Here, the Debtor's bankruptcy petition was filed less than one business day after the West Virginia Court denied TRAG and RGE's request for a TRO and preliminary injunction to maintain Mr. Nathan as the Independent Manager and prevent the Movants from exercising their right to resume governance control over the Debtor. In other words, right after the TRAG/RGE TRO motion was unsuccessful in the West Virginia Litigation, Mr. Nathan, with the support of TRAG and RGE, immediately came to this Court to obtain the very same relief that the West Virginia Court denied: a stay. The timing of the Debtor's bankruptcy petition makes it clear that the purpose of this Chapter 11 Case is to secure a tactical advantage over the Movants that was unavailable in state court.

176. Indeed, this is confirmed by the First Day Declaration. As noted above, it asserts that filing for chapter 11 was the only means to halt the Movants' "persistent efforts to exert control" over the Debtor. First Day Decl. ¶ 80. That is, the explicit intent of the Debtor's current management was to use the benefit of the automatic stay as a weapon against the Movants so that current management could continue to assert control over the Debtor, relief they already tried and failed to obtain from the West Virginia Court. The First Day Declaration acknowledges that, otherwise, any bankruptcy filing could have waited or never been necessary at all. *See id.* (stating that "the Debtor's reasonable judgment ***may*** have been that a chapter 11 case ***would be necessary eventually***") (emphasis added). It was, apparently, the Movants' efforts to exercise their rights and the West Virginia Court's rightful refusal to stop the Movants from doing so that motivated the Debtor's bankruptcy filing just 48 hours (less than one business day) later.

177. The Suggestion of Bankruptcy further confirms Mr. Nathan's improper motive. He has now taken the blatantly false position that the West Virginia Litigation is stayed due to this Chapter 11 Case, despite the Debtor's statements to the contrary at the First Day Hearing. In truth, the Debtor is not a party to the West Virginia Litigation, and it is not an action against the Debtor or its property. It is also not a derivative action. Rather, the West Virginia Litigation is a direct action solely between Omnis Global, Omnis Energy, and Quantum, on the one side, and TRAG, RGE, and Mr. Nathan, on the other side, based on TRAG and RGE's breaches under the Forbearance Agreement and Mr. Nathan's breaches of his fiduciary duties, which duties he owes to Quantum both as its Independent Manager and as the sole member of the Debtor. TRAG, RGE, and Mr. Nathan are the only parties who would be adversely affected by the West Virginia Litigation and who would, therefore, benefit from it being stayed. Of course, the automatic stay

does not apply to the West Virginia Litigation, but his attempt to assert otherwise reveals Mr. Nathan's improper motivation for maintaining this Chapter 11 Case.

178. Accordingly, it is evident that the primary—if not the sole—purpose of the Debtor's bankruptcy filing was to obtain an injunction in bankruptcy court so as to frustrate and delay the Movants' exercise and enforcement of their lawful legal rights. This is not a proper basis for a bankruptcy filing and fails to show good faith. *See BEPCO*, 589 F.3d at 620 ("[C]ourts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation, and any perceived benefit of the automatic stay, without more, cannot convert a bad faith filing to a good faith one.") (internal quotation marks and citations omitted); *see also In re LTL Mgmt., LLC*, 637 B.R. 396, 427 (Bankr. D.N.J. 2022), *rev'd and remanded*, 64 F.4th 84 (3d Cir. 2023) (explaining that among the most obvious examples of an abusive litigation strategy warranting dismissal is "where there is pointed effort to exploit the Bankruptcy Code"); *In re Derma Pen, LLC*, No. 14-11894 (KJC), 2014 WL 7269762, at *9 (Bankr. D. Del. Dec. 19, 2014) (dismissing bankruptcy case filed as an improper attempt by the debtor to restart state court litigation in a new court).

179. In sum, the motivation behind this Chapter 11 Case was not any genuine or imminent financial distress or a desire to preserve or maximize value but to achieve a tactical litigation advantage against the Movants immediately after a loss in state court. This is not a valid use of the Bankruptcy Code, and demonstrates that the Debtor's petition was filed in bad faith and must, therefore, be dismissed.

### B. <u>Gilbert Nathan Had No Power To Unilaterally Authorize The Debtor's Bankruptcy Filing.</u>

180. The Court can and should dismiss this Chapter 11 Case on the grounds that it was filed in bad faith. In addition, the Court can and should also grant dismissal on the separate and independent basis that it was filed without the requisite corporate authority.

181. Because Mr. Nathan is the one who purportedly, and unilaterally, authorized and directed the Debtor's bankruptcy filing, the Court must determine whether Mr. Nathan had the corporate authority to do so. *See In re E. End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013). If he did not, this Chapter 11 Case must be dismissed. *Id.*

182. Mr. Nathan did not have the requisite corporate authority for two reasons. First, under the Debtor's Operating Agreement, when the Debtor filed its petition, only Quantum, as the Debtor's sole member, had the authority to approve the petition, not the Independent Manager. Second, under Quantum's Operating Agreement, Mr. Hodson's consent was required prior to any bankruptcy filing by the Debtor, which consent was never sought or given.

#### 1. <u>The Debtor's Bankruptcy Filing Required, Yet Lacked, Quantum's Prior Written Consent.</u>

183. State law governs whether a business entity is authorized to file a bankruptcy petition. *See, e.g.*, *3P Hightstown*, 631 B.R. at 210 ("It is well-settled that applicable state law determines whether a bankruptcy filing was authorized."); *In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014) ("The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law.") (internal citations and quotations omitted); *In re Quad-C Funding LLC*, 496 B.R. 135, 141 (Bankr. S.D.N.Y. 2013) ("In order to determine authority to file, bankruptcy courts initially look to the state law governing the entity.").

184. Here, the Debtor is a Delaware limited liability company. Under Delaware state law, a limited liability company can act only through the authorization provided by its operating agreement or Delaware law. *See* Del. Code Ann. tit. 6, § 18-402.

185. Section 14 of the Debtor's Operating Agreement provides:

> Notwithstanding anything in this Agreement to the contrary, ***after Payment in Full of the Obligations, the Member shall have sole discretion over any filing of any application or petition initiating***

> ***(or consenting to the initiation of) any bankruptcy or insolvency proceeding*** under federal or state bankruptcy or insolvency laws without the consent of any Director or the Independent Manager.

OP Operating Agreement § 14 (emphasis added).

186. As discussed, Quantum is the Debtor's sole member. As such, pursuant to the Debtor's Operating Agreement, upon Payment in Full, Quantum alone had the authority to approve any bankruptcy filing of the Debtor, not Mr. Nathan or any other person or entity.

187. The Movants did, in fact, cause Payment in Full to occur prior to the Petition Date. The terms of the Forbearance Agreement must be given their plain and ordinary meaning. *See* Forbearance Agreement § 16(a) ("This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (under Delaware law, a court's interpretation of a contract is "constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended"). Pursuant to its terms, Payment in Full means indefeasible payment in full in cash of all of the outstanding obligations owed under the TRAG/RGE Loans. Forbearance Agreement § 2(a).

188. Tendering indefeasible payment is precisely what the Movants did. Having been repeatedly denied a definitive payoff amount from TRAG and RGE, the Movants used the next best available number—the balance reflected in TRAG and RGE's restructuring proposal term sheet—and promptly delivered a check in that amount, with a commitment to pay any additional outstanding amount subject to the receipt and review of appropriate documentation. Although TRAG and RGE improperly refused to accept the check, this does not change that the Movants undoubtedly tendered payment in accordance with the terms of the Forbearance Agreement.

189. This had two important immediate effects. First, Quantum automatically had the power to remove Mr. Nathan as the Debtor's Independent Manager without the consent of TRAG, RGE, or Mr. Nathan, which power Quantum properly exercised on July 20. *See* Forbearance Agreement § 7(b); QP Operating Agreement § 6.4(c)(ii). Second, upon and after Payment in Full, only Quantum, as the Debtor's sole member, had the power to authorize a bankruptcy filing by the Debtor. OP Operating Agreement § 14.

190. However, despite these clear terms, and six days after his removal, Mr. Nathan purportedly authorized the Debtor's bankruptcy filing by written consent signed only by him as the "sole member of the Board of Directors and the Independent Manager" of the Debtor. This was improper both as a factual matter (Mr. Nathan was no longer the Independent Manager) and, more importantly, as a corporate authority matter (Quantum did not authorize the filing).

191. The Debtor's professionals have not presented, and cannot present, any evidence that Quantum authorized or approved the commencement of this Chapter 11 Case. As such, the Debtor cannot show that this Chapter 11 Case was filed with the requisite corporate authority.

**2. Gilbert Nathan Had No Authority To Act Unilaterally On Behalf Of Quantum.**

192. To the extent Mr. Nathan alleges that he had the authority as the Independent Manager of Quantum to unilaterally authorize the Debtor's bankruptcy filing, he is wrong.

193. Although the parties agreed under the Forbearance Agreement to grant certain approval rights to Quantum's new Independent Manager, such rights were ***never exclusive***. Rather, Quantum's Operating Agreement requires ***joint approval*** from Mr. Hodson and Mr. Nathan for various acts, including the Debtor's bankruptcy filing. Specifically, Section 6.4 of the QP Operating Agreement provides that, "at any meeting of the Board at which a quorum is present, the vote of the Omnis Director"—who is Mr. Hodson—"shall constitute and for all purposes be

deemed the act of the Board," provided, however, that certain enumerated actions "shall require the prior written approval of the Independent Manager (***in addition to the approval of the Omnis Director***)." QP Operating Agreement § 6.4(b) (emphasis added).

194. Those joint actions include, among other things, "[Quantum's] exercise of voting rights in [the Debtor] with respect to the matters set forth in Section 7(b) of the Forbearance Agreement …[.]" *Id.* § 6.4(b)(1). The matters set forth in Section 7(b) of the Forbearance Agreement, in turn, include "filing any application or petition initiating … any bankruptcy or insolvency proceeding under federal or state bankruptcy or insolvency laws until Payment in Full of the Obligations." Forbearance Agreement § 7(b)(7). Thus, under Quantum's Operating Agreement, both Mr. Hodson and Mr. Nathan had to approve the Debtor's bankruptcy filing. As the Independent Manager of Quantum, Mr. Nathan had no power to do so acting on his own.

195. However, Mr. Hodson never consented to the Debtor's bankruptcy filing. He was not even told in advance that the bankruptcy was coming.

196. Because Mr. Hodson, as the Omnis Director of Quantum, the Debtor's sole member, did not, and does not, consent to or authorize the filing of this Chapter 11 Case, the case was filed without the requisite corporate authority and must be dismissed.

**C. <u>No Unusual Circumstances Overcome The Need For Dismissal.</u>**

197. Section 1112(b)(2) of the Bankruptcy Code provides that a court may deny dismissal of a case if the court finds "unusual circumstances" establishing that dismissal is not in the best interests of creditors and the estate, and the debtor (or any other party in interest) also establishes that (a) "there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) …," and (b) "the grounds for dismissal include an act or omission of the debtor other than under [section 1112(b)(4)(A)]" (i) "for which

there exists a reasonable justification" and (ii) "that will be cured within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2).

198. However, the Third Circuit has held that, where grounds for dismissal include the debtor's lack of financial distress, there is no "reasonable justification" that "validates that missing requirement." *LTL Mgmt.*, 64 F.4th at 110; *see also Bedmar*, 2025 WL 2496260, at *22 ("[N]o unusual circumstances can overcome the [debtor's] manufactured financial distress.").

199. Furthermore, courts have also held that, where a bankruptcy case is filed without the requisite corporate authority, the only option is dismissal, regardless of section 1112(b). *See, e.g.*, *In re Mid-S. Bus. Assocs., LLC*, 555 B.R. 565, 570 (Bankr. N.D. Miss. 2016) ("[A] bankruptcy petition filed without proper corporate authority must be dismissed independent of any finding of 'cause' under § 1112(b), because if the Debtor did not have sufficient corporate authority for the filing of its petition, then this Court lacks subject matter jurisdiction over the case."); *ComScape*, 423 B.R. at 830 (concluding that courts have the authority to dismiss, and required to dismiss, an unauthorized bankruptcy filing "even if § 1112(b) were not in the Bankruptcy Code").

200. Accordingly, if the Court finds, as the Movants submit it should, that this Chapter 11 Case was filed without any genuine financial distress or the requisite corporate authority (or both), the only available path forward is dismissal.

201. Nevertheless, if the Court decides to consider any "unusual circumstances" that the proponents of the Debtor's petition may attempt to raise, the Court should find that no such unusual circumstances exist. As set forth herein, this Chapter 11 Case will not preserve or maximize value for the benefit of the Debtor's legitimate creditors. TRAG and RGE—who are not the Debtor's lenders—are already in a position to be repaid in full. The Debtor is also highly profitable and cash-flow positive and has no need for chapter 11 to continue operating. Simply put, this is a

classic case of a dissatisfied state court litigant coming in to bankruptcy court to secure a tactical advantage with no other legitimate purpose or "unusual circumstances" to justify the cost and expense of a protracted and unnecessary bankruptcy case.

## II. ALTERNATIVELY, THE COURT SHOULD DIRECT THE IMMEDIATE APPOINTMENT OF A CHAPTER 11 TRUSTEE.

202. As set forth above, section 1112(b) provides that, upon finding "cause," the Court "shall" dismiss or convert the case, "unless the court determines that the appointment under section 1104(a) of a trustee … is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). If the Court determines that dismissal is not in the best interests of creditors or the estate, the Movants respectfully submit that the Court should appoint a chapter 11 trustee.

203. Under section 1104(a) of the Bankruptcy Code, at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, a bankruptcy court must order the appointment of a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

204. Subsection (1) of section 1104(a) addresses management's pre- and/or post-petition misdeeds or mismanagement, while subsection (2) "creates a flexible standard" and instructs the court to appoint a trustee when doing so addresses the interests of creditors and the estate. *In re*

*Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). Where the court finds either that cause exists or that the appointment of a trustee is in the interest of the parties, "an order for the appointment … is mandatory." *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

205. While section 1104(a)(1) lists "fraud, dishonesty, incompetence, or gross mismanagement" as examples of what constitutes "cause" for the appointment of a trustee, this list is non-exhaustive. *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998). Thus, courts have found cause in cases involving "conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties." *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020).

206. Given the discretion and flexibility afforded to courts under section 1104(a), findings of "cause" and findings of "best interests" are often "intertwined and dependent on the same facts." *Id.* at 765. The factors that courts consider in appointing a trustee under section 1104(a)(2) include: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *Id.*; *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (collecting cases).

207. In this Chapter 11 Case, the appointment of a chapter 11 trustee is warranted and necessary pursuant to either section 1104(a)(1) or section 1104(a)(2).

### A. Ample Cause Exists For The Appointment Of A Chapter 11 Trustee.

208. The determination of whether "cause" exists for the appointment of a trustee must be made on a case-by-case basis, taking into account all relevant factors. *Sharon Steel,* 871 F.2d at 1225. Both pre- and postpetition conduct is relevant to this analysis, and prepetition conduct alone may provide the basis for a court to appoint a trustee. *See* 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("[T]he Code is clear that the pre-petition conduct of the debtor's management may be the sole deciding factor [in appointing a chapter 11 trustee]."); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[P]re-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

209. As set forth above, this Chapter 11 Case was filed in bad faith, without any genuine financial distress, and solely as a litigation tactic against the Movants. The Debtor's petition was also filed without corporate authority. These facts undoubtedly constitute "cause" to appoint a chapter 11 trustee (as well as dismissal). *See* 11 U.S.C. § 1112(b).

210. Further, the circumstances leading up to the Debtor's bankruptcy filing reveal a pattern of misconduct and collusion among the Debtor's current management, on the one hand, and TRAG and RGE, on the other, that has benefited TRAG and RGE at the Debtor's expense, which pattern has spread into and infected this Chapter 11 Case.

#### 1. Gilbert Nathan and David Hindman Are Not Neutral And Independent Fiduciaries.

211. Messrs. Nathan and Hindman were appointed to serve as neutral and independent fiduciaries of the Debtor. Contrary to this purpose, and the express obligations of good faith and cooperation under the Forbearance Agreement, they have instead served as gatekeepers. They have

repeatedly obstructed the Movants' diligence efforts and requests, denied Quantum access to its own leased premises and equipment, and preserved TRAG and RGE's ability to force their own restructuring or disposition, all in violation of the Forbearance Agreement and the Debtor's Operating Agreement.

212. More than that, the actions taken by Messrs. Nathan and Hindman have arguably placed TRAG and RGE in a better financial position than they otherwise would have been, to the Debtor's detriment. In June, despite no deed of trust being contemplated under the Forbearance Agreement and more than four months having passed since the agreement was signed, Mr. Hindman executed on behalf of the Debtor the Deed of Trust that purports to grant to TRAG and RGE a security interest in the Plant (and other assets). Mr. Nathan presumably approved this transaction, as the Debtor's Independent Manager. Prior to this point, TRAG and RGE had no perfected security interest in or lien on the Plant. Rather, they had only filed UCC-1 financing statements, which do not apply to or create interests in real property.

213. Further, Messrs. Nathan and Hindman caused the Debtor to enter into the Deed of Trust at the very same time that they knew the Movants were working to repay all of the TRAG/RGE Loans. The Movants had repeatedly requested, and were denied, access to the Debtor's books and records and other financial information that would have better enabled them to secure sale or refinancing proposals. The Movants had also repeatedly requested, and were denied, definitive payoff information from TRAG and RGE. Rather than work with the Movants to achieve Payment in Full—as they were required to do—the Debtor's current management instead colluded with TRAG and RGE to encumber the Debtor's profit-generating asset (the Plant)—all to secure debts ***<u>that the Debtor does not owe!</u>***

214. Importantly, the Deed of Trust was recorded just ***30 days before the Petition Date***. If the Debtor's professionals argue, as they must, that the Debtor is in financial distress, then, on Day 1 of this Chapter 11 Case, they could and should have initiated an action to avoid the Deed of Trust as a preferential and/or fraudulent transfer, as well as taken other action against TRAG and RGE. But, they did not. Nor have they expressed any intent to do so.

215. Instead, the Debtor's professionals apparently intend to ***reward*** TRAG and RGE through this Chapter 11 Case. By the Cash Collateral Motion, the Debtor seeks authority to grant TRAG and RGE adequate protection liens and allowed superpriority claims, to reimburse their fees and expenses, and to waive various claims and causes of action against them.

216. This deference and preferential treatment towards TRAG and RGE should come to no surprise given that Messrs. Nathan and Hindman purport to represent the Debtor at the pleasure of TRAG and RGE. TRAG and RGE maintain the (incorrect) position that the Debtor's Independent Manager and CEO can only be removed with their consent. It is therefore in the self-interests of both Messrs. Nathan and Hindman to keep TRAG and RGE happy.

**2. HSF Kramer Is Hopelessly Conflicted.**

217. This self-interest has already irreparably tainted the integrity of this Chapter 11 Case. Mr. Nathan hand-selected HSF Kramer as the Debtor's proposed bankruptcy counsel. ***However, HSF Kramer is TRAG and RGE's own counsel!*** While HSF Kramer claims that it no longer represents TRAG and RGE, HSF Kramer admits that it represented them in connection with the Forbearance Agreement. Indeed, Mr. Nathan signed HSF Kramer's engagement agreement ***just two weeks*** after HSF Kramer represented TRAG and RGE in connection with their entry into the Forbearance Agreement. And, although not disclosed by HSF Kramer in its Retention Application, it is also listed on a UCC-1 that TRAG filed against Quantum in January 2026.

218. In other words, the Debtor's proposed bankruptcy counsel is (or was) also counsel to the Debtor's alleged secured creditors. More than that, HSF Kramer was directly involved in advising TRAG and RGE on the Forbearance Agreement that purportedly granted them the security interests in the Debtor's assets on which their alleged status as secured creditors rests. Then, just days later, HSF Kramer supposedly "switched sides" and started representing the Debtor—at the direction of Mr. Nathan, who was appointed pursuant to the Forbearance Agreement—which representation has yielded over $10 million for HSF Kramer. And now, HSF Kramer is asking this Court and all parties to trust that it can faithfully represent the Debtor and its estate in interpreting and enforcing that very same Forbearance Agreement in accordance with the Debtor's best interests (and not the interests of TRAG and RGE).

219. However, HSF Kramer has already shown that it cannot be trusted. It was responsible for advising the Debtor in obtaining the Interim Cash Collateral Order, which improperly granted adequate protection liens and superpriority claims in favor of TRAG and RGE, and in entering into inappropriate and dishonest stipulations as to the validity and enforceability of TRAG and RGE's security interests (which HSF Kramer itself helped to create!). HSF Kramer has already caused harm to the Debtor and its estate in this Chapter 11 Case, which harm the Movants are now seeking to undo.

220. As this Court is aware, the Forbearance Agreement is at the center of this Chapter 11 Case. It is the document that ties the Debtor together with TRAG and RGE. The Forbearance Agreement is also integral to the ongoing dispute over the governance and control of the Debtor, which will be relevant to each and every action the Debtor attempts to take in this Chapter 11 Case.

221. Mr. Nathan's decision to retain HSF Kramer and HSF Kramer's decision to accept the engagement demonstrate, at best, a severe lack of judgment and, at worst, a concerted effort to allow TRAG and RGE's goals and interests to govern and direct this Chapter 11 Case.

**3. The Improper and False Suggestion of Bankruptcy.**

222. In addition to hiring TRAG and RGE's counsel to represent the Debtor, Mr. Nathan has also attempted to use this Chapter 11 Case for his own personal benefit, as well as the benefit of TRAG and RGE, in the West Virginia Litigation.

223. Over two weeks into this Chapter 11 Case, and the day after agreeing to schedule a Rule 26(f) conference in the West Virginia Litigation, Mr. Nathan suddenly filed the Suggestion of Bankruptcy which falsely claims that the action is subject to the automatic stay.

224. In so doing, Mr. Nathan misrepresented to the West Virginia Court that section 362 applies to "any proceeding against any defendant that may assert that the Debtor is vicariously liable." Not only is this not true, but it shows that Mr. Nathan intends to argue that the Debtor is somehow vicariously liable for the claims asserted against him in the West Virginia Litigation. Mr. Nathan has therefore taken a legal position that is both false and directly adverse to the Debtor and its estate. Yet again, Mr. Nathan has chosen a course of action that is in the interests of only himself, TRAG, and RGE—as the actual defendants in the West Virginia Litigation—and contrary to Mr. Nathan's fiduciary duties to the Debtor.

225. To be sure, Mr. Nathan did not file the Suggestion of Bankruptcy out of any genuine, good faith belief that it was necessary to protect the Debtor or its estate. The Debtor's own proposed bankruptcy counsel—who Mr. Nathan himself retained—told this Court at the First Day Hearing that the West Virginia Litigation was still ongoing, with a permanent injunction

hearing likely to be scheduled. Counsel did ***not*** tell this Court that the West Virginia Litigation was stayed, undoubtedly because counsel knows what the text of section 362 actually states.

226. Mr. Nathan also apparently did not believe that the West Virginia Litigation was stayed on August 11 when he agreed to schedule the Rule 26(f) conference for August 18. Mr. Nathan's sudden change of tune the next day, more than two weeks into this case, can only be explained as a last-minute attempt to protect himself and his allies, TRAG and RGE.

227. Given all of the foregoing, creditors and other parties in interest in this Chapter 11 Case can have no faith that either Mr. Nathan or Mr. Hindman will act in accordance with their fiduciary duties and in the best interests of the Debtor's estate. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.") (internal citations and quotations omitted).

228. Accordingly, if the Debtor is to remain in chapter 11, a truly independent trustee must be appointed.

**B. The Appointment Of A Chapter 11 Trustee Is In The Best Interests Of The Debtor's Estate, Creditors, and Equity Holders.**

229. As demonstrated above, cause exists to appoint a trustee under section 1104(a)(1). Even if the Court does not find cause (which it should so find), the facts and circumstances here overwhelmingly support that appointing a trustee is still warranted under section 1104(a)(2) as being in the best interests of the Debtor's estate, creditors, and equity holders.

230. The appointment of a trustee is in the best interests of the parties because any hope of a successful reorganization or liquidation in this Chapter 11 Case rests on a truly impartial party's investigation of TRAG and RGE's purported security interests and any claims that the

Debtor may have against TRAG, RGE, and/or any other parties. Other than TRAG and RGE, no party has asserted any interest in the Debtor's assets. So, the first step in any sale or restructuring must be to determine the validity or avoidability of TRAG and RGE's purported interests. As set forth above, the Debtor's current management cannot be trusted to see that through. *See Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling.") (internal citation omitted); *see also In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn 1989) (appointing a chapter 11 trustee where debtor was "not in a strong-posture to pursue possible claims" due to conflicts of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); *Ionosphere Clubs*, 113 B.R. at 168 (stating that "the confidence—or lack thereof—of the business community and of creditors in present management" is among the factors that court consider under section 1104(a)(2)); *In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009) (concluding that appointment of chapter 11 trustee to manage a sale process was in the best interests of creditors because it would "eliminate the insider circumstances and conflicts of interest" and would allow for a "professionally managed sale process").

231. Furthermore, there are significant benefits to appointing a chapter 11 trustee. First, as discussed, the appointment of a trustee is the only way to create confidence in this Chapter 11 Case. Second, the Debtor has a business and asset that, if managed properly, should provide

substantial value. More than that, as an energy producer, the success or failure of the Debtor's business and the Plant can have wide-ranging—even catastrophic—consequences. The Plant's ongoing operations under a disinterested and trustworthy fiduciary is essential. And, third, the Debtor also likely possesses various claims and causes of action that, if properly pursued by a truly independent fiduciary, should result in substantial recoveries to the Debtor's estate, as well.

232. In sum, the appointment of a chapter 11 trustee is necessary for there to be any prospect of success in this Chapter 11 Case and is, therefore, in the best interests of the Debtor's estate, creditors, and equity holders and should be granted pursuant to section 1104(a)(2).

## III. THE COURT SHOULD VACATE THE INTERIM CASH COLLATERAL ORDER.

233. Whether or not the Court dismisses the Chapter 11 Case or directs the appointment of a chapter 11 trustee, the Court should vacate the Interim Cash Collateral Order. As set forth herein and in the Cash Collateral Objection, as of the Petition Date, the Debtor did not owe a single cent to TRAG and RGE. TRAG and RGE did not have any validly perfected security interests in or liens on the Debtor's cash. TRAG and RGE had only filed UCC financing statements and the Deed of Trust, the validity of which is subject to challenge on multiple grounds. Therefore, there was no legitimate basis for the Debtor to seek authority to use its unencumbered cash as the "cash collateral" of TRAG or RGE or to grant TRAG or RGE any adequate protection liens, superpriority claims, or any of the other benefits under the Interim Cash Collateral Order. For these reasons, the Interim Cash Collateral Order never should have been entered, and the Movants respectfully submit that it should be vacated and deemed of no force or effect.

## CONCLUSION

234. This Chapter 11 Case represents precisely the kind of abuse of the bankruptcy process that sections 105(a) and 1112(b) are designed to prevent. The Debtor's petition was filed

in bad faith: the Debtor was not in financial distress, had no genuine need to reorganize, and filed for chapter 11 within one business day of losing an injunction fight in state court solely to obtain, through the automatic stay, the very relief that the West Virginia Court had just denied. Consistent with Mr. Robbins' view that "[s]uccess is buried on the other side of rejection," he did not allow that denial to prevent him from exercising control over the Debtor.[19] Allowing this Chapter 11 Case to continue would only compound the harm, permitting current management to entrench itself and continue to deplete estate value through substantial administrative costs while providing no corresponding benefit to creditors that could not be achieved outside of bankruptcy. Moreover, the Debtor's petition was filed without the corporate authority required under the Debtor's own Operating Agreement, since Quantum alone held the right to authorize a bankruptcy filing once the Movants tendered Payment in Full. Quantum did not authorize the bankruptcy filing, and Mr. Nathan could not compel it to do so. Thus, the Chapter 11 Case should be dismissed.

235. Alternatively, cause exists for the Court to direct the immediate appointment of a chapter 11 trustee under section 1104(a). The Debtor's current management has engaged in a course of conduct intended to obstruct and interfere with the Movants' rights for the benefit of TRAG and RGE and to the detriment of the Debtor. They have denied Quantum—the Debtor's 100% owner and sole member—access to the Plant and the Debtor's financial information. They have also allowed the improper Deed of Trust to be recorded against the Plant. The Debtor's chosen counsel is conflicted. The Movants and other parties in interest have more than enough good reason to distrust and lack any confidence in the Debtor's current management. A truly independent fiduciary is needed to investigate and pursue claims and causes of action and actually

[19] https://www.goodreads.com/author/quotes/5627.Anthony_Robbins.

maximize recoveries in this Chapter 11 Case. Accordingly, if the Court declines to grant dismissal, the Movants respectfully request that the Court order the appointment of a trustee.

236. Lastly, the Court should, at minimum, vacate the Interim Cash Collateral Order. While the Court entered that order based on the misleading representations made by the Debtor's conflicted management and professionals, the truth is that there is no legal basis for the Interim Cash Collateral Order (or the proposed final order). The Debtor's cash was unencumbered as of the Petition Date, and TRAG and RGE had no right to adequate protection, superpriority claims, or any of the other relief granted under the Interim Cash Collateral Order. Thus, it must be vacated.

## RESERVATION OF RIGHTS

237. The Movants expressly reserve and preserve all rights with respect to this Chapter 11 Case and to seek or pursue any additional or other forms of relief in this Chapter 11 Case. The Movants further expressly reserve and preserve all rights and remedies with respect to the West Virginia Litigation and the claims asserted therein.

## NOTICE

238. Notice of this Motion has been given to (i) counsel to the Debtor; (ii) the Office of the United States Trustee for the District of Delaware; (iii) counsel to TRAG and RGE; (iv) the Debtor's 30 largest creditors; and (v) all parties entitled to receive notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Movants submit that no other or further notice is necessary.

## NO PRIOR REQUEST

239. No previous request for the relief sought in this Motion has been made to this Court or any other court.

**WHEREFORE**, the Movants respectfully request that the Court (i) enter an order, substantially in the form attached hereto as **Exhibit B**, dismissing this Chapter 11 Case pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code, or (ii) in the alternative, enter an order, substantially in the form attached hereto as **Exhibit C**, directing the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code, (iii) enter an order, substantially in the form attached hereto as **Exhibit D**, vacating the Interim Cash Collateral Order, and (iv) grant such other and further relief as the Court deems just and proper.

Dated: August 14, 2026
Wilmington, Delaware

**LOWENSTEIN SANDLER LLP**

Christopher A. Ward (No. 3877)
Shanti M. Katona (No. 5352)
1000 N West Street, Suite 1200
Wilmington, DE 19801
Telephone: (973) 597-2500
cward@lowenstein.com
skatona@lowenstein.com

*Counsel to Omnis Fuel Technologies, LLC d/b/a Omnis Energy and Quantum Pleasants LLC*