**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Omnis Pleasants, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11169 (KBO)<br><br>**Re: Docket No. 93** |

**DECLARATION OF CHARLES GASSENHEIMER IN SUPPORT OF MOTION OF OMNIS FUEL TECHNOLOGIES, LLC D/B/A OMNIS ENERGY AND QUANTUM PLEASANTS, LLC FOR ENTRY OF AN ORDER (I) DISMISSING THE DEBTOR'S CHAPTER 11 CASE, OR, (II) IN THE ALTERNATIVE, DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, AND (III) VACATING THE INTERIM CASH COLLATERAL ORDER**

I, Charles Gassenheimer, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the President of Omnis Fuel Technologies, LLC d/b/a Omnis Energy ("**Omnis Energy**"). Omnis Energy owns approximately 43% of Quantum Pleasants, LLC ("**Quantum**" and together with Omnis Energy, the "**Movants**") and 100% of Quantum's Class A (voting) interests. I have served as the President of Omnis Energy since July 2025, replacing Rich Hulme upon his retirement. Prior to holding this role, I was the President of other entities affiliated with the Movants from 2013 through 2024. As described herein, on July 20, 2026, I was appointed interim Director of Omnis Pleasants, LLC (the "**Debtor**").

2. I submit this declaration (this "**Declaration**") in support of the *Motion of Omnis Fuel Technologies, LLC d/b/a Omnis Energy and Quantum Pleasants, LLC for Entry of an Order (I) Dismissing the Debtor's Chapter 11 Case, or, (II) in the Alternative, Directing the Appointment*

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

*of a Chapter 11 Trustee, and (III) Vacating the Interim Cash Collateral Order* [Docket No. 93] (the "**Motion**") filed contemporaneously herewith in the above-captioned case (the "**Chapter 11 Case**").

3. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge and review of the relevant documents. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**A. <u>The Debtor's History and Current Ownership Structure</u>**

4. The Debtor is a Delaware limited liability company and the owner and operator of the Pleasants Power Station (the "**Plant**"), a 1,278-megawatt coal-fired power plant located along the Ohio River in Pleasants County, West Virginia that has been in operation since 1979.

5. Originally known as ETEM Remediation Two, LLC, the Debtor has owned the Plant since December 2022, shortly after the Debtor was formed as the acquisition vehicle of its then-parent company, Energy Transition Environmental Management LLC ("**ETEM**").

6. ETEM, through the Debtor, acquired the Plant as part of a plan to permanently decommission the Plant by June 2023, which would have eliminated 150 or more direct and more than 1,000 indirect jobs and devastated the local community.

7. ETEM's decommissioning plan came to an end after the West Virginia state legislature enacted legislation to preserve the Plant and its operation.

8. Quantum then stepped in as the buyer of the Debtor and, hence, the Plant. In August 2023, Quantum purchased for $22.5 million all of the membership interests in the Debtor, which was renamed Omnis Pleasants, LLC. Quantum thereby became, and still today remains, the Debtor's sole member and 100% owner and the indirect owner of the Plant. As the Debtor's sole member, Quantum owns all of the voting interests in the Debtor.

9. Quantum's ownership, in turn, is split among four investors, as follows:

i. TRAG, LLC ("**TRAG**"): **<u>46.62%</u>**. TRAG is owned and controlled, directly or indirectly by Anthony Jay "Tony" Robbins, who is most known for his career as a motivational speaker, and Ajay Gupta (TR = Tony Robbins; AG = Ajay Gupta).

ii. Omnis Energy: **<u>43.77%</u>**. Omnis Energy is part of a broader group headed by Omnis Global Technologies, LLC ("**Omnis Global**"), which is wholly-owned by Hodson Investments, LLC, the family holding company for Simon K. Hodson.

iii. Harmony Trust ("**Harmony**"): **<u>5%</u>**. Harmony is an entity affiliated with Angela Chen.

iv. Robbins Research International, Inc. ("**RRI**"): **<u>4.61%</u>**. Upon information and belief, RRI is a nonprofit entity that serves as the research and marketing arm of Mr. Robbins' personal development businesses and was established pursuant to an Employee Stock Ownership Plan.

10. Omnis Global owns approximately 86% of the membership interests of Omnis Energy. TRAG also holds 9% of Omnis Energy's membership interests, with the remaining 5% held by various individuals. Omnis Global holds all of the voting interests in Omnis Energy.

11. Aside from purchasing 100% of the Debtor's membership interests, Quantum has invested approximately $83 million in hydrogen fuel conversion and carbon reduction equipment (the "**Quantum Equipment**") located at the Plant through land leased from the Debtor. Quantum has no other material assets.

12. Omnis Energy has an exclusive license from Omnis Advanced Technology, LLC, a subsidiary of Omnis Global, to commercialize the Hydrogen Technology (as defined below) in the U.S. and Canada. Omnis Energy has no physical assets.

13. Omnis Global has various subsidiaries that operate businesses unrelated to the commercialization of the Hydrogen Technology.

14. Mr. Hodson serves as the controlling director of Omnis Global and Omnis Energy and, as discussed below, is the "Omnis Director" of Quantum.

**B. <u>The Hydrogen Technology</u>**

15. When Quantum acquired the Debtor, Quantum announced its intentions to restart the Plant and transition it from conventional coal generation to hydrogen-based power (the "**Hydrogen Conversion Project**") using its proprietary pyrolysis and reformer technology (the "**Hydrogen Technology**"). Thus, from the outset of Quantum's acquisition, the communicated business plan around the Plant focused on repurposing the existing coal plant into a hydrogen-enabled, lower carbon emission asset, which would necessarily take time.

16. Omnis Energy retained Teneo, an independent advisory firm, to coordinate third-party testing and validation of the Hydrogen Technology focused on the "Omnis Quantum Reformer" demonstration at the Plant. As part of that work, independent technical firms Sargent & Lundy ("**S&L**") and Ohio Lumex ("**Lumex**") were engaged to perform onsite testing and gas-sampling analysis at the Plant's commercial demonstration to document performance. As reflected in the July 2025 Teneo materials, the S&L and Lumex teams validated the Hydrogen Technology and economic model as being current and predictive of operational performance. As a result of these third party reviews, it is inaccurate to suggest that the Hydrogen Technology was merely a "dog and pony show" or an unsupported marketing claim. This is a real revolutionary documented technology.

17. In August 2024, representatives from the U.S. Department of Energy (the "**DOE**") visited the Omnis Energy hydrogen demonstration site at the Plant and, in a follow-up email, a DOE employee described the tour as informative, expressed excitement about the planned

pulverized-coal-to-hydrogen operation, and proposed a specific DOE/NETL voucher program that could provide both technical and economic analysis and lifecycle assessment support.

### C. The Debtor's Post-Acquisition Operational Challenges and Turnaround

18. During the transition from coal to hydrogen power, Quantum intended to continue the Plant's traditional coal-powered functions. To that end, Quantum engaged two well-established and independent firms, PurEnergy Management Services LLC ("**PurEnergy**") and TyrEnergy, LLC ("**TyrEnergy**"), to manage the Debtor's operations. Since August 2023, PurEnergy has served as the Debtor's asset manager, responsible for overall commercial and technical oversight of the Plant, including personnel, training, budgeting, compliance, reporting, and oversight, and TyrEnergy has served as the Debtor's energy manager, responsible for dispatch, market participation, and energy and capacity strategy, subject to PurEnergy's oversight. So, while Mr. Hodson was the sole or primary director of the Debtor and its CEO, it is inaccurate to say that he managed the Debtor's operations.

19. As an energy-producing power plant, one of the Debtor's primary sources of revenue is the capacity payments that are made in exchange for the Plant's obligation to be available for energy production throughout an applicable delivery year. To receive capacity payments, energy producers must participate in certain auction processes, which are typically held years in advance.

20. However, because ETEM had originally planned to shut down the Plant, the Debtor had not participated in any capacity auctions under its prior ownership. As a result, from Quantum's acquisition of the Debtor in 2023 until June 2025, the Plant was not eligible for the capacity payments it would have otherwise received. Thus, the Plant was operating through a

prolonged stretch of the lowest price electrical revenues in decades with essentially no recurring capacity revenue, negative cash flow from operations, and significant capex obligations.

21. Throughout, management communicated that the Plant had been acquired to develop a pilot project for producing hydrogen and carbon products from coal (and natural gas), with the long-term goal of retrofitting the Plant into a first-of-its-kind hydrogen-powered plant once the Hydrogen Technology was proven. The core frustration expressed by employees arose from the lack of funding, which was primarily caused and prolonged by TyrEnergy, the energy manager, who refused to pass on the revenues received back to PurEnergy as required in their contract, and the reality that capacity payments would not be available in the first year, rather than from any failure in the Debtor's leadership or management.

22. The losses through this early period totaled more than $71 million and had to be funded externally. The funding for those operating losses came from a combination of emergency capital sources, including TRAG and RGE (with Mr. Robbins' vocal public support), as discussed further herein, capital raised by Mr. Hodson, RRI's capital investment, and Ms. Chen and her affiliated entities. In this instance, it is grossly misleading to describe the Plant's 2023/2024 cash distress as simply a product of mismanagement, because the business was under severe financial stress from the outset of Quantum's ownership and was being kept alive while awaiting the start of capacity payments that were made available to all power plants in the PJM system.

23. Issues with the PurEnergy/TyrEnergy management structure further exacerbated the financial strain caused by the gap in capacity revenue. As reported internally, PurEnergy's forecasts were consistently wrong (by orders of magnitude) and not even close to actual performance, which made it extremely difficult for management to plan fuel purchases, maintenance, and liquidity needs in an already cash-constrained environment.

24. Amidst these issues, Mr. Hodson made one critically important decision. Acting through the Movants, Mr. Hodson caused the Debtor to participate in capacity auctions for the upcoming delivery years. As a result, the Debtor began receiving capacity payments, the amount of which payments sharply increased beginning in June 2025. Once capacity revenues began to flow and the Plant had the financial ability to restore staffing levels and invest in operations, it became feasible to attract employees back and stabilize headcount, but that change reflects improved cash resources and market conditions rather than any fundamental difference in the quality of onsite management.

25. Due primarily to the receipt of the capacity payments, the Debtor has become highly profitable. It generated a profit of $25 million in 2025 and the free cash flow for 2026 is evidenced in the Debtor's bankruptcy filings. Offers to purchase the Plant range from $350 million to $400 million—more than 10x of its 2023 purchase price—and any sale would immediately pay all of the estimated indebtedness related to the Plant in full.

26. The improvement in Plant's performance and value (coincident with new management) simply coincides with the commencement of the capacity revenues, thanks to Mr. Hodson, which provided the financial resources to maintain adequate coal inventories and offer more competitive compensation, enabling the Plant to be reliably available during periods of extreme weather and system stress when its revenues are highest, rather than reflecting any fundamental change in the asset or any special expertise of management. Factually, there have been no changes in the day-to-day operations of the Plant from August 2023 to August 2026.

**D. <u>The WVEDA Loan</u>**

27. Because of TRAG's failure to finance the Hydrogen Technology, to finance the acquisition and construction of the Quantum Equipment related to the Hydrogen Conversion

Project, Quantum, as obligor, and the Debtor, as guarantor, entered into a loan agreement with the West Virginia Economic Development Authority ("**WVEDA**") on December 13, 2023, pursuant to which Quantum borrowed $50 million in principal from WVEDA (the "**WVEDA Loan**").

28. The WVEDA Loan proceeds were advanced to Quantum, and the obligation is secured by the Quantum Equipment and not any of the Plant's equipment. The Debtor is not the primary obligor under the WVEDA Loan, and none of the Debtor's assets are part of WVEDA's collateral. Thus, the Debtor's obligation to WVEDA is solely an unsecured guaranty.

29. The WVEDA Loan matured on June 15, 2026, without any plan by Gilbert Nathan to repay the debt, and is currently in default. Immediately prior to the Debtor's bankruptcy filing, Quantum was in the process of working out a forbearance agreement with WVEDA which would grant it a first lien on the sales proceeds from the disposition of the Plant. As a result of these discussions, WVEDA's general counsel informed the Movants, the Debtor, and TRAG and RGE, through their respective principals and counsel, on July 20, 2026—less than one week before the Debtor's bankruptcy filing—that WVEDA was amenable to granting a 90-day forbearance period. A true and correct copy of this July 20 correspondence is attached hereto as **Exhibit 1**.

30. WVEDA previously alleged that Quantum committed various events of default during the term of the WVEDA Loan, including failure to acquire additional property to construct the Quantum facility, to grant a lien on the Plant and misuse of funds. Quantum countered with defenses to each of those points, which essentially had nothing to do with the Debtor and pertain only to Quantum, and WVEDA ultimately did not take any action. It is fair to say that both parties held fast to their positions and ultimately agreed to disagree.

**E. <u>The Bilt Loan</u>**

31. In April 2025, Bilt Technology LLC ("**Bilt**") advanced $20 million to the Debtor pursuant to a non-interest bearing, unsecured loan that was scheduled to mature in October 2025 (the "**Bilt Loan**"). The Bilt Loan was personally guaranteed by Mr. Hodson, who remains committed to honoring his guaranty and the repayment of the loan.

32. The proceeds of the Bilt Loan were used to refinance and pay down a portion of the Debtor's principal indebtedness under an intercompany note held by Omnis Energy, the balance of which note remains outstanding.

33. The Bilt Loan was made in conjunction with a certain Power Purchase Agreement (the "**PPA**") entered into between Bilt and an affiliate of the Debtor, which PPA ultimately had to be terminated due to certain regulatory issues occasioned by new West Virginia legislation.

34. The Bilt Loan could not be paid when it matured in October 2025, and Bilt agreed to forbear in exercising its remedies, provided that the loan start to accrue interest at 8% per annum. If paid by the extended maturity date, Bilt agreed to waive certain alleged claims for non-performance under the PPA. The terms were highly favorable to the Debtor, but Mr. Nathan, as its Independent Manager and sole director, refused to execute a settlement agreement despite repeated requests to do so.

35. As of the date hereof, the amounts owed under the Bilt Loan remain outstanding. Omnis Global is willing to indemnify the Debtor against responsibility for repayment of the Bilt Loan and to pledge assets to secure such indemnity.

**F. <u>Angela Chen Advances</u>**

36. Ms. Chen and her affiliated entities, including Harmony and Dynamic Holdings Corporation ("**DFC**"), provided further financing to fund the operating shortfalls of the Debtor,

Quantum, and Omnis Energy. Overall, she has, directly or indirectly, advanced more than $43 million in financing to Omnis Energy and approximately $102,000 to Quantum, with interest bringing the total amount of the outstanding indebtedness to over $50 million.

**G. <u>Intercompany Loans</u>**

37. Since the 2023 acquisition, the Movants and their affiliates have together advanced substantial sums to the Debtor to fund operating losses and also paid various vendor bills on the Debtor's behalf (the foregoing advances, collectively, the "**Intercompany Loans**").

38. The Intercompany Loans were made using funds advanced to Omnis Global, Omnis Energy, and Quantum by Harmony and/or other entities affiliated with Ms. Chen and by TRAG and RGE.

39. A majority of the Intercompany Loans remain outstanding.

**H. <u>The TRAG/RGE Loans</u>**

40. In connection with Quantum's acquisition of the Debtor and operation of the Plant, TRAG and its affiliate, RG Energy LLC ("**RGE**"), (another entity controlled by Tony Robbins and Ajay Gupta) issued the following loans, under which loans ***<u>the Debtor is NOT a borrower, guarantor, or otherwise a party</u>***, with the sole exception of one loan that has already been repaid in full:

- **<u>May 2023 Loan</u>** – Based upon TRAG's assurances that the $306,000,000 capital would be raised, Omnis Global, as borrower, Omnis Energy, and Quantum entered into a loan agreement dated as of May 26, 2023 with TRAG, as lender, pursuant to which TRAG advanced the original principal amount of $22,500,000 (as amended by that certain amendment dated June 30, 2023, that certain amendment dated July 9, 2024, and that certain amendment dated August 1, 2024, the "**May 2023 Loan**") to finance Quantum's acquisition of the Debtor. The May 2023 Loan was issued for a 120-day term. Pursuant to an amendment to the loan agreement on June 30, 2023, the principal amount of the May 2023 Loan was increased to $27,250,000, and, pursuant to an amendment to the loan agreement on August 1, 2024, the principal amount was decreased to $26,500,000. As collateral, TRAG received security interests in certain

intellectual property and license rights with respect to certain patents. Quantum also granted and pledged to TRAG a continuing security interest in all of its personal property and certain intellectual property. The Debtor is not a borrower or guarantor under the May 2023 Loan, and none of the Debtor's assets were pledged as collateral for the May 2023 Loan at the time the loan was made.

- **June 2023 Loan** – Omnis Global, as borrower, and Omnis Energy (as well as any "Qualified Affiliate" that subsequently signed on to the loan agreement) entered into a loan agreement dated as of June 2, 2023 with RGE, as lender, pursuant to which RGE advanced the original principal amount of $12,150,000 (as amended by that certain amendment dated June 30, 2023 and that certain amendment dated July 9, 2024, the "**June 2023 Loan**, and together with the May 2023 Loan, the "**2023 Loans**") to finance Quantum's acquisition of the Debtor. The June 2023 Loan was issued for a 120-day term. Pursuant to an amendment to the loan agreement on June 30, 2023, the principal amount of the June 2023 Loan was increased to $27,250,000. As collateral, RGE received security interests in certain intellectual property and license rights with respect to certain patents. Also, each "Qualified Affiliate," upon becoming a party to the loan agreement, granted to RGE a continuing security interest in all personal property and certain intellectual property. The Debtor never signed on to or otherwise became a party to the June 2023 Loan and is not a "Qualified Affiliate" with respect thereto. The Debtor also is not a borrower or guarantor under the June 2023 Loan, and none of the Debtor's assets were pledged as collateral for the June 2023 Loan at the time the loan was made.

- **January 2025 Loan** – Omnis Energy, as borrower, Omnis Global, and Quantum entered into a loan agreement dated as of January 14, 2025 with TRAG, as lender, pursuant to which TRAG funded the principal amount of $4,700,000 (the "**January 2025 Loan**") to help fund the Debtor's business while capacity revenues were still low. The January 2025 Loan matured on February 11, 2025. As collateral, TRAG received continuing security interests in substantially all of the personal and intellectual property of Omnis Energy, Omnis Global, and Quantum. The Debtor is not a borrower or guarantor under the January 2025 Loan, and none of the Debtor's assets were pledged as collateral for the January 2025 Loan at the time the loan was made.

- **March 2025 Loan** – Omnis Energy, as borrower, Omnis Global, and Quantum executed a security promissory note dated as of March 31, 2025 in favor of TRAG, as lender, pursuant to which the Omnis Energy, Omnis Global, and Quantum agreed to repay the additional principal amount of $1,350,000 advanced by TRAG (the "**March 2025 Loan**," and together with the January 2025 Loan, the "**2025 Loans**," and together with the 2023 Loans, the "**TRAG/RGE Loans**"). Payment of the March 2025 Loan became due on November 3, 2025. The March 2025 Loan was issued in connection with the same loan agreement as the January 2025 Loan and supported by the same collateral provided therefor. Again, the Debtor is not a borrower or guarantor

under the March 2025 Loan, and none of the Debtor's assets were pledged as collateral for the March 2025 Loan at the time the loan was made.

- **January 2026 Loan** – The Debtor, as borrower, and Quantum entered into a loan agreement dated as of January 23, 2026 with TRAG, as lender, pursuant to which TRAG funded the principal amount of $4,849,000 (the "**January 2026 Loan**") for the purchase of certain coal, lime, and other consumables necessary to run the Plant. The January 2026 Loan was the ***only*** loan issued by TRAG or RGE to the Debtor. The January 2026 Loan was entirely ***unsecured***, and neither the Debtor nor any of Omnis Global, Omnis Energy, or Quantum pledged any assets as collateral for the loan. The January 2026 Loan was also ***repaid in full***, including all principal, interest, and other amounts due thereunder, on or about February 17, 2026.

41. In addition to the above, TRAG, Omnis Global, and Omnis Energy also entered into another loan agreement dated as of November 8, 2023 (the "**November 2023 Agreement**"). However, the loan contemplated by the November 2023 Agreement was never funded, and it is not referenced in either the Forbearance Agreement or the Deed of Trust (each as defined below).

42. TRAG and RGE filed certain financing statements against Omnis Global, Omnis Energy, and/or Quantum, including a UCC-1 filed on behalf of TRAG against Quantum on January 13, 2026 (No. 2026 0297198). A true and correct copy of this UCC-1 is attached hereto as **Exhibit 2**. Notably, it was filed by Herbert Smith Freehills Kramer (US) LLP, which is now the Debtor's proposed bankruptcy counsel. So, it appears that the Debtor's proposed counsel represented TRAG, who is now asserting a security interest in the Debtor's property, just six months before the Debtor's bankruptcy filing.

43. The total principal amount that Omnis Global, Omnis Energy, and Quantum collectively owe to TRAG and RGE is $54 million. As set forth above, the Debtor is not a borrower or guarantor under any of the outstanding TRAG/RGE Loans.

44. While providing short-term financing to Omnis Global, Omnis Energy, and Quantum, Mr. Robbins repeatedly promised to raise large amounts of capital, pushing for Quantum

to enter into expensive power-plant acquisitions and loan structures on the assurance those loans would quickly be repaid from his fundraising. Mr. Robbins then failed to deliver capital while tightening control and undermining operations. He had agreed to raise $306 million for a 4.5% stake in Omnis Energy. TRAG did provide a $25 million loan to Omnis Energy to tie up additional power plants, but that funding ultimately had to be used to cover the Debtor's operational losses, a change TRAG understood and accepted. However, Mr. Robbins asserted that Omnis Global, Omnis Energy, and Quantum were responsible for all financing issues and would not be compensated for raising the required funds, even if they were required to guaranty the obligations. TRAG and RGE repeatedly modified loan agreements the terms of which Omnis Global, Omnis Energy, and Quantum conceded under pressure without allowing legal review by counsel. They interfered with Plant operations and supplier relationships through numerous undisclosed meetings.

45. Mr. Robbins has publicly claimed that he invested $200 million in the various Omnis entities. However, only $54 million was actually advanced, and it was all structured as short-term, fully secured debt that placed the risk of default on Omnis Global, Omnis Energy, and Quantum (not the Debtor). As to the $200 million figure, $75 million was as a loan commitment that TRAG was never actually funded (although fees and interest were paid), and $41 million was funded to Quantum by RRI, a separate non-profit entity. Apart from the $54 million in loans, TRAG and RRI's actual equity investment in all of the Omnis entities is a total of Two Dollars, as discussed below.

### I. <u>The TRAG/Quantum Warrants and RRI Investment</u>

46. As part of June 2023 financing, Quantum granted to TRAG a 10-year warrant to acquire a 50% fully diluted interest in Quantum for $1.00 per unit. On August 15, 2023, TRAG

exercised its warrant and purchased 1,000,000 Class B non-voting units in Quantum for $1.00. However, the contract clearly stated that the exercise price should have been $1,000,000 or $1.00 per unit, not $1.00 for 1,000,000 units. TRAG was subsequently informed of the error, but TRAG's counsel, alleging it had made a drafting error, insisted that the warrant be amended to make the aggregate exercise price $1.00, thereby allowing TRAG to assume a 50% equity stake in Quantum at a minimal cash cost. At the time, Quantum was appraised at a value of at least $800 million, making TRAG's $1.00 investment worth $400 million.

47. On August 16, 2023, one day after the warrant exercise by TRAG, RRI paid approximately $41 million for a 5% interest in Quantum (*i.e.*, roughly 5% of its $800 million appraised value), leaving RRI paying full economic value for a small minority interest while TRAG acquired a 10x greater interest for $1.00. More than a year later, in order to be allocated tax losses that would otherwise be allocated to RRI, a non-profit entity, TRAG agreed to indemnify RRI against loss on its $41 million investment.

48. In connection with the January 2025 Loan, Quantum issued another 10-year warrant to TRAG to acquire 65,211 non-voting units in Quantum, equating to a 3% equity interest in Quantum, for $1.00 per unit. On February 20, 2025, TRAG exercised this warrant, acquiring the 65,211 units but paying only $1.00, rather than $65,211 which was the actual exercise price. When TRAG was subsequently informed of the error, its counsel demanded, as it did with first warrant, that the second warrant be amended to limit the exercise price to $1.00. In addition, despite the express terms of the warrant requiring Quantum to issue the units, TRAG demanded that the 3% equity issuance come from Omnis Energy's ownership percentage so as to avoid any dilution in TRAG's Quantum ownership percentage. Quantum and Omnis Energy capitulated to

this demand on the basis that TRAG would not move forward with threatened foreclosure proceedings, however TRAG reneged and started foreclosure proceedings shortly thereafter.

49. By Mr. Robbins providing assurances that he could obtain $306 million in financing to fund operations and acquire additional power plants, TRAG was granted what ultimately became a 9% non-voting equity interest in Omnis Energy for "zero" cost. In economic terms, Mr. Robbins' loans and equity interests occupy the senior and most favorable positions in the Omnis entity capital structure, capturing both secured debt claims and deeply discounted equity at the Quantum and Omnis Energy levels. Notwithstanding this, apart from their rights under the Forbearance Agreement, as discussed further below, TRAG and RGE have no voting or control rights over Omnis Global, Omnis Energy, Quantum, or the Debtor.

**J. The TyrEnergy LOC**

50. TRAG has included an $8 million letter of credit (the "**LOC**") in its prior payoff figures, which is incorrect because the LOC expired without liability for TRAG. By way of background, TyrEnergy agreed to release $8 million that it was withholding if a letter of credit was issued providing for repayment if needed. TRAG posted the LOC and Tyr released $8 million to the Debtor. The LOC terminated on July 1, 2026 when the $8 million was scheduled to be released by TyrEnergy to the Debtor (in effect the released funds canceled the LOC), and hence it cannot be included as part of any of the debt owed to TRAG. TyrEnergy has confirmed that the LOC expired on July 1, 2026 and was not called.

**K. The TRAG/RGE Loan Defaults and 2025 Initial Forbearance Agreement**

51. The TRAG/RGE Loans had very short-term maturities (some 120 days or less) that could not be repaid except through a capital financing or a sale or refinancing of the Plant. Omnis Global, Omnis Energy, and Quantum relied on a commitment made and repeatedly reaffirmed by

TRAG that it would raise sufficient capital to more permanently fund the Debtor's business and refinance the debt owed to TRAG and RGE on a longer-term basis. However, that capital never materialized, and each of the TRAG/RGE Loans matured without repayment.

52. Notably, on October 1, 2025, TRAG sent default notices to Omnis Global, Omnis Energy, and Quantum asserting payment defaults with respect to the May 2023 Loan and January 2025 Loan (the "**TRAG Default Notices**"). That same day, RGE sent a default notice to Omnis Global and Omnis Energy asserting a payment default with respect to the June 2023 Loan (the "**RGE Default Notice**," and together with the TRAG Default Notices, the "**Default Notices**"). True and correct copies of the Default Notices are attached as Exhibit A to the Forbearance Agreement (as defined below). None of the Default Notices were directed to the Debtor.

53. Later that month, on October 21, 2025, TRAG and RGE sent notices to Omnis Global, Omnis Energy, and Quantum of their intent to foreclose on their collateral under the TRAG/RGE Loans (the "**First Foreclosure Notices**"). True and correct copies of the First Foreclosure Notices are attached as Exhibits B to the Forbearance Agreement. Critically, the First Foreclosure Notices also were not directed to the Debtor.

54. To avoid foreclosure, Omnis Global, Omnis Energy, Quantum, TRAG, and RGE entered into that certain *Forbearance Agreement*, dated as of October 22, 2025 (the "**Initial Forbearance Agreement**"). A true and correct copy of the Initial Forbearance Agreement is attached hereto as **Exhibit 3**. The ***Debtor*** was ***not*** a party to the Initial Forbearance Agreement.

55. Pursuant to the Initial Forbearance Agreement, TRAG and RGE agreed to forbear from exercising their rights and remedies under the TRAG/RGE Loans until November 30, 2025, and AlixPartners, LLP ("**AlixPartners**") was retained as a financial advisor and given access to the Debtor's books and records, facilities, employees, and other materials and information. But,

Quantum retained its voting control over the Debtor. The Initial Forbearance Agreement stated that, as of October 22, 2025, the aggregate amount owed to TRAG and RGE was $65,715,442, plus their legal expenses.

56. The Initial Forbearance Agreement terminated on November 30, 2025, and the TRAG/RGE Loans remained in default.

57. On February 2, 2026, TRAG and RGE sent additional notices to Omnis Global, Omnis Energy, and Quantum of their intent to foreclose on their collateral under the TRAG/RGE Loans (the "**Second Foreclosure Notices**"). True and correct copies of the Second Foreclosure Notices are attached as Exhibits C to the Forbearance Agreement. Again, the Second Foreclosure Notices were not directed to the Debtor.

### L. <u>The 2026 Amended and Restated Forbearance Agreement</u>

58. Ultimately, Omnis Global, Omnis Energy, and Quantum, as well as the Debtor, negotiated an *Amended and Restated Forbearance Agreement*, dated as of February 6, 2026, with TRAG and RGE (the "**Forbearance Agreement**"). A true and correct copy of the Forbearance Agreement, including all exhibits thereto, is attached hereto as **<u>Exhibit 4</u>**.

59. Pursuant to the 2026 Forbearance Agreement, TRAG and RGE agreed to forbear from exercising their rights and remedies with respect to the TRAG/RGE Loans against Omnis Global, Omnis Energy, and Quantum for a period of 60 days, subject to extension in TRAG and RGE's discretion (unless a "Forbearance Default" occurred first or the Forbearance Agreement was otherwise terminated).

60. In exchange for their forbearance, among other things, TRAG and RGE were purportedly granted for the first time under the Forbearance Agreement a first-priority security interest in all of the Debtor's property and assets, including the Plant, until such time that the

obligations under the TRAG/RGE Loans are no longer outstanding. Critically, ***the Debtor did not assume any of the debt or obligations owed to TRAG or RGE***, and the Debtor otherwise did not become a borrower or guarantor under any of the TRAG/RGE Loans.

61. In connection with its purported collateral pledge, the Debtor authorized TRAG and RGE to file financing statements, continuation statements, and amendments with respect to the relevant "Power Plant Collateral." On February 10, 2026, four days after the execution of the Forbearance Agreement, TRAG and RGE each filed an "all assets" financing statement against the Debtor (Nos. 2026 1125554 and 2026 1125562) with the Delaware Secretary of State. True and correct copies of these financing statements are attached hereto as **Exhibit 5**.

62. Upon Payment in Full, the TRAG/RGE Loans and the Forbearance Agreement terminate automatically, TRAG and RGE's liens and encumbrances are released automatically, and TRAG and RGE must provide termination statements and other release documents.

63. "Payment in Full" is defined under the Forbearance Agreement as the indefeasible payment in full in cash of all principal, interest, fees, costs, expenses, and other amounts owing, together with the termination, cancellation, or 103% cash collateralization of the LOC. As stated above, the LOC terminated on July 1, 2026.

64. The right to tender Payment in Full is a powerful tool designed and intended under the Forbearance Agreement to preserve the Movants' right to refinance and repay the TRAG/RGE Loans and immediately thereafter resume control and authority over the Debtor, without the Independent Manager. Consistent with the importance of this right, the Forbearance Agreement repeatedly reaffirms and protects the Movants' right to tender Payment in Full. Section 11(b) of the Forbearance Agreement provides that "nothing herein will limit or restrict the [Movants] from procuring funds resulting in a Payment in Full of all Obligations," and confirms that such payment

terminates the Forbearance Agreement and Loan Agreements. Section 11(d) excludes from the matters requiring TRAG and RGE's prior written approval any "transactions that will result in the Payment in Full of all Obligations under the Loan Agreements." Further, Sections 8(e) and 13 prohibit any conduct the primary purpose of which is to materially interfere with, frustrate, hinder, or unreasonably interfere with efforts to accomplish Payment in Full or comply with the Forbearance Agreement and Loan Agreements.

## M. The Debtor's and Quantum's Amended Operating Agreements

65. In connection with the Forbearance Agreement, on or about February 12, 2026, Quantum, as the Debtor's sole member, executed an *Amendment to the Amended and Restated Limited Liability Company Operating Agreement of Omnis Pleasants, LLC* (the "**OP Amendment**," and the Debtor's operating agreement as amended by the OP Amendment, the "**OP Operating Agreement**"). A true and correct copy of the OP Amendment together with the version of the Debtor's operating agreement that immediately preceded the OP Amendment is attached hereto as **Exhibit 6**. Further, Omnis Energy, on behalf of a super majority of Quantum's members, executed an *Amendment to the First Amended and Restated Limited Liability Company Operating Agreement of Quantum Pleasants, LLC* (the "**QP Amendment**," and Quantum's operating agreement as amended by the QP Amendment, the "**QP Operating Agreement**," and together with the OP Operating Agreement, the "**Operating Agreements**" and each an "**Operating Agreement**"). A true and correct copy of the QP Amendment is attached hereto as **Exhibit 7**.

66. Pursuant to the OP Operating Agreement, and as required under the Forbearance Agreement, Gilbert Nathan was appointed as Independent Manager and sole Director of the Debtor, and David Hindman of AlixPartners was appointed as CEO of the Debtor.

67. Pursuant to the QP Operating Agreement, Mr. Nathan was also appointed as the Independent Manager and a member of the Board of Quantum. The other member of Quantum's Board is Simon K. Hodson, referred to in the QP Operating Agreement as the "Omnis Director."

68. The Forbearance Agreement and the Operating Agreements granted Mr. Nathan, as the Independent Manager of both the Debtor and Quantum, approval rights over certain actions, including the sale or disposal of assets, related party transactions, and the filing of bankruptcy proceedings. However, these approval rights were never exclusive.

69. To the contrary, as the Independent Manager of Quantum, Mr. Nathan merely had the power to act jointly with Mr. Hodson as Quantum's Omnis Director. Furthermore, the amendment to the Debtor's Operating Agreement did not change the preexisting requirement that certain actions, including the sale of all or substantially all of the Debtor's assets, require Quantum's prior consent, as the Debtor's sole member. And, as Quantum's Independent Manager, Mr. Nathan has no voting rights with respect to such actions at all, including any sale.

70. Thus, as the Independent Manager of the Debtor and Quantum, Mr. Nathan's power and authority over the Debtor is strictly limited.

**N. Lack of Cooperation and Information from Management and TRAG/RGE**

71. Following the execution of the Initial Forbearance Agreement, Quantum quickly stopped receiving any business information and any meaningful financial information concerning the Debtor and was excluded from decision-making. Although the parties had agreed that information would flow through Ajay Gupta, representing TRAG and RGE, TRAG and RGE instead used this to wrongly assert that they (and, by extension, Mr. Gupta and Tony Robbins) were in charge in the Plant, notwithstanding Quantum's unaltered and ongoing voting control.

72. Mr. Gupta held an all-hands meeting with Plant employees without permitting Quantum representatives to be present, and stated he and Mr. Robbins, as the majority equity holders, were in charge of the Plant. The Debtor's HR lead objected to these unilateral meetings because they were creating division and confusion, noting that employees had been told that Mr. Hodson was no longer on the Debtor's board and that the employees should going forward report exclusively to Mr. Gupta and Mr. Robbins. The HR lead pointed out that this was inconsistent with the actual ownership structure, in which Mr. Hodson retained voting control over the Debtor. Quantum asked that any future meetings and communications with Plant employees be coordinated with Quantum representatives so that employees were not misled into believing an ownership change had occurred, or that they could no longer communicate with Mr. Hodson, but these requests were ignored by Mr. Gupta. This assertion of control by TRAG and RGE was consistent with Mr. Robbins' oft repeated remarks that he intended to have TRAG assume oversight of the Debtor and day-to-day operational control.

73. This information lock-out only worsened once Mr. Nathan stepped in as Independent Manager in February 2026 pursuant to the Forbearance Agreement.

74. Despite repeated requests, Mr. Nathan has denied Quantum access to the Plant. Not only has this made it more difficult for Omnis Global, Omnis Energy, and Quantum to secure financing or sale options for the Plant, but Mr. Nathan's exclusion of Quantum from the Plant is particularly problematic because, pursuant to that certain *Lease Agreement*, dated as of January 2, 2026, between the Debtor, as landlord, and Quantum, as tenant (the "**Lease**"), the Debtor leases to Quantum a portion of the real property on which the Plant sits. A true and correct copy of the Lease is attached hereto as **Exhibit 8**. Under the Lease, the Debtor granted Quantum the express right to access the property for ingress and egress for Quantum's "reasonable needs so long as such ingress

and egress does not unreasonably interfere with [the Debtor's] operations or use of the Property." Quantum uses the leased premises to house the Quantum Equipment, and Mr. Nathan's improper refusal to allow Quantum access to the Plant puts that equipment, which is WVEDA's collateral, at risk.

75. Further, the Movants' demands for information were frequently made but ignored. On March 9, 2026, Quantum's counsel informed the Debtor's counsel that the Debtor had provided no financing reporting since December 2025, despite repeated requests. A true and correct copy of this March 9 correspondence is attached hereto as **Exhibit 9**. Quantum requested all of the Debtor's financial reporting and books and records since December 31, 2025, but they were never provided.

76. On March 20, 2026, Quantum wrote directly to Messrs. Nathan and Hindman, explaining that Quantum remained frustrated in its ability to advance a sale or financing of the Debtor because of their continuing actions and inactions. A true and correct copy of the March 20 letter is attached hereto as **Exhibit 10**. Quantum further explained that the information it requested was necessary to facilitate a sale or financing, enable repayment of the debt owed to TRAG and RGE, avoid foreclosure, and preserve the value of the Plant. However, Messrs. Nathan and Hindman still did not provide the requested information.

77. Despite Quantum's efforts to raise capital or sell the Debtor to repay the TRAG/RGE Loans, Mr. Nathan refused to provide assistance and affirmatively stated that the Debtor should not be sold. Quantum had been engaged in substantial negotiations with various parties and had received term sheets and advanced deal documentation but could not proceed further without the required financial information and Plant access that the counterparties requested. But, Messrs. Nathan and Hindman deliberately obstructed buyer and financing due

diligence and prohibited Quantum from advancing the sales process despite there being no change in the Debtor's voting ownership.

78. This failure to provide the Movants with the requested information violated the express terms of the OP Operating Agreement. Section 15 of the OP Operating Agreement provides that Quantum, as the Debtor's member, shall "have reasonable access to the books and records of the [Debtor]." Mr. Nathan's refusal to provide such access is a clear breach of his obligations under the OP Operating Agreement and his fiduciary duties.

79. Quantum bitterly complained to TRAG and RGE concerning these breaches, but TRAG, who had the authority (with Quantum's consent, which would have been given had it been requested) to remove Messrs. Nathan and Hindman or modify their behavior under penalty of removal, refused to act, thereby sanctioning their malfeasance. Several prospective purchasers were evaluating the Plant, and two reached advanced stages of transaction documentation, only to be rejected by Mr. Nathan, acting at the direction of TRAG and RGE in furtherance of their effort to block any transaction not aligned with their own preferred restructuring or sale outcome. Under the terms of the Forbearance Agreement, the other Omnis entities were essentially frozen in terms of raising capital, borrowing funds, or selling assets to finance their operations.

80. Meanwhile, in order to exercise their Payment in Full right, beginning in April 2026 and continuing into June 2026, the Movants repeatedly requested a payoff letter from TRAG and RGE stating the definitive amount required to fully pay the outstanding debt.

81. Initially, on April 20, 2026, TRAG and RGE's counsel responded via email that they would provide the payoff information. A true and correct copy of the April 20 email is attached hereto as **<u>Exhibit 11</u>**. However, TRAG and RGE subsequently refused to provide a payoff statement and have continued to refuse to do so despite the Movants' repeated requests.

82. Thus, through the actions and inactions of Messrs. Nathan and Hindman, TRAG, and RGE, Omnis Global, Omnis Energy, and Quantum have been repeatedly frustrated in their efforts to repay the TRAG/RGE Loans.

**O. <u>The TRAG/RGE Deed of Trust</u>**

83. On June 17, 2026—more than four months after the execution of the Forbearance Agreement and at the very same time that TRAG and RGE were refusing the Movants' requests for definitive payoff information—the Debtor, as grantor, Kent J. George and Lindsay M. Stollings, collectively as trustee, and TRAG and RGE, collectively as beneficiary, entered into a *Deed of Trust, Assignment of Rents, Security Agreement, and Fixture Filing* (the "**Deed of Trust**"), purporting to sell and convey to the trustee, in trust with power of sale for the benefit of TRAG and RGE, and to grant to TRAG and RGE "a continuing security interest in and to" all of the Debtor's right, title, and interest in the Plant and certain other assets. A true and correct copy of the as-recorded Deed of Trust is attached hereto as **<u>Exhibit 12</u>**.

84. The Deed of Trust was recorded with the Clerk of Pleasants County, West Virginia nine days later on June 26, 2026—one month before the Debtor's bankruptcy filing.

85. Mr. Hindman signed the Deed of Trust for the Debtor.

86. The Deed of Trust states that the security interests granted thereunder are to secure the indebtedness owed under the TRAG/RGE Loans and related agreements and as a "material inducement" to TRAG and RGE's entry into the Forbearance Agreement.

87. However, the Forbearance Agreement did not expressly authorize the execution or recording of any deed of trust or similar instrument, and the Movants were not aware of, and did not approve or authorize, the Deed of Trust.

## P. The West Virginia Litigation, Payment in Full, and Removal of Mr. Nathan

88. On July 8, 2026, the Movants filed a complaint against TRAG, RGE, and Mr. Nathan, in his capacity as Independent Manager, in the Circuit Court of Pleasants County, West Virginia (the "**West Virginia Court**") (Case No. CC-37-2026-C-14) commencing an action (the "**West Virginia Litigation**") seeking declaratory and injunctive relief compelling the production of a payoff letter from TRAG and RGE and the Debtor's financial information, books, records, and director materials from Mr. Nathan, as well as reasonable access to the premises that Quantum leases from the Debtor and other related Plant-access areas. A true and correct copy of the complaint is attached hereto as **Exhibit 13**.

89. The same day, the Movants filed a motion in the West Virginia Litigation seeking a temporary restraining order ("**TRO**") and preliminary injunction: (1) prohibiting TRAG and RGE from exercising contractual remedies until seven days after delivery of a complete payoff letter and accounting; (2) enjoining Mr. Nathan from any further actions in his capacity as Independent Manager until after the delivery of the Debtor's financial information; and (3) enjoining Mr. Nathan from taking any further action with respect to the Debtor and Quantum until seven days after providing the Movants with reasonable access to Quantum's leased premises. A true and correct copy of the Movants' TRO motion is attached hereto as **Exhibit 14**.

90. The West Virginia Court denied the Movants' initial TRO and preliminary injunction request on July 9, 2026. A true and correct copy of the West Virginia Court's order is attached hereto as **Exhibit 15**.

91. It was not until July 15, 2026, when TRAG and RGE circulated a proposed corporate restructuring term sheet identifying $75,640,000 as the aggregate outstanding obligation amount, that the Movants received, for the first time, any definitive number from which to calculate

a payoff amount. Among other things, the proposed restructuring would restate the terms of the TRAG/RGE Loans and extend their maturity dates until the earlier of the sale of the Plant or January 2, 2027. The proposed plan had terms decidedly adverse to Omnis Global, Omnis Energy, and Quantum and included extinguishing the intercompany payables and requiring third parties to modify or cancel their debt.

92. The Movants acted immediately. Within one day of receiving the $75,640,000 figure, on July 16, 2026, DFC delivered a check in that same amount to counsel for TRAG and RGE as Payment in Full of all obligations under the TRAG/RGE Loans. Notably, the Movants expressly agreed to pay any additional amount properly documented as due and owing.

93. DFC is not a corporate affiliate of any of the Movants or their affiliates. The present DFC financing is a third-party loan to Omnis Energy. It does not sell or transfer the Plant, the Debtor's assets, Quantum's membership interests in the Debtor, or any present governance right in the Debtor or Quantum. Rather, the prospective DFC restructuring contemplates that, after the payoff, other Omnis Energy-affiliated entities may become obligors and may grant collateral on terms more favorable than the TRAG/RGE proposed restructuring. But, that prospective post-payoff restructuring is not the transaction by which DFC funded Omnis Energy's tender, and it does not convert the tender into a present sale of the Plant.

94. Improperly, but predictably, Mr. Nathan refused to approve the transaction, incorrectly characterizing it as a "related-party transaction" requiring his consent—notwithstanding the express language of the Forbearance Agreement preserving the Movants' right to tender Payment in Full without the Independent Manager's approval. TRAG and RGE refused to accept the check. A true and correct copy of the email correspondence from TRAG and RGE's counsel rejecting the check is attached hereto as **Exhibit 16**.

95. As of the Petition Date, TRAG and RGE still had possession of the check through their counsel and/or their counsel's former law firm. The check has now been returned, but only after the Movants requested its return if TRAG and RGE did not intend to cash it. True and correct copies of counsels' correspondence regarding the return of the check are attached hereto as **Exhibit 17**. The Movants remain committed to repaying all of the TRAG/RGE Loans in full.

96. On July 20, 2026, Quantum—as the Debtor's sole member and 100% equity owner—removed Mr. Nathan as Independent Manager and sole Director of the Debtor and appointed Charles Gassenheimer as interim Director. A true and correct copy of the July 20 removal notice is attached hereto as **Exhibit 18**. Because Payment in Full of the TRAG/RGE Loans automatically terminated the Forbearance Agreement according to its express terms, and pursuant to Section 4(a) of the Debtor's Operating Agreement, neither TRAG's nor RGE's consent was required prior to Mr. Nathan's removal. Upon his removal, the Movants immediately directed Mr. Nathan to turn over all property, records, and access related to the Debtor.

97. On July 21, 2026—the day after Quantum removed Mr. Nathan—TRAG and RGE filed counterclaims and their own motion for a TRO and preliminary injunction in the West Virginia Litigation, seeking to maintain Mr. Nathan as the Independent Manager and prevent the Movants from exercising governance control. A true and correct copy of the TRAG/RGE TRO motion is attached hereto as **Exhibit 19**. The Movants promptly filed a response in opposition to the TRAG/RGE motion the following day. A true and correct copy of the Movants' response is attached hereto as **Exhibit 20**.

98. On Friday, July 24, 2026, the West Virginia Court **DENIED** TRAG and RGE's request for a TRO and preliminary injunction, thus maintaining the status quo of the Payment in

Full, Mr. Nathan's removal, and other governance changes that had occurred and were occurring. A true and correct copy of the West Virginia Court's order is attached hereto as **Exhibit 21**.

**Q. The Chapter 11 Case**

99. On Sunday, July 26, 2026 (the "**Petition Date**")—less than one business day after the West Virginia Court denied the TRAG/RGE TRO motion—the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

100. Mr. Hindman signed the Debtor's petition as its CEO, and Mr. Nathan is the sole signatory to the written consent attached to the petition that purportedly authorized the Debtor's bankruptcy filing, which written consent Mr. Nathan signed as the "sole member of the Board of Directors and the Independent Manager" of the Debtor. Mr. Nathan therefore caused the Debtor to file for bankruptcy on the basis that he remained in control of the Debtor, despite his removal as the Debtor's Independent Manager six days prior.

101. TRAG and RGE have apparently acquiesced to the Debtor's bankruptcy filing.

102. However, Quantum, through Mr. Hodson as the "Omnis Director," never consented to, authorized, or approved the Debtor's bankruptcy filing. The Movants never received advanced notice that a bankruptcy petition would be filed.

103. This Chapter 11 Case is nothing more than a litigation tactic being used against the Movants so that the Debtor's current management, acting in concert with TRAG and RGE, can purport to remain in control of the Debtor.

104. As indicated above, Mr. Nathan is far from being independent and has a self-interest in remaining in control of the Debtor through the Chapter 11 Case. He has affirmatively stated that he is against selling the Plant on the basis that it is currently undervalued notwithstanding that TRAG and RGE threatened to foreclose on the assets pledged as collateral, including Quantum's

equity interest in the Debtor, only to be mollified by the Omnis entities capitulation to the terms of the Initial Forbearance Agreement and subsequent Forbearance Agreement. He proposed a two-year loan restructuring plan that would keep him and Mr. Hindman in control even beyond the conclusion of the two-year period. Mr. Nathan affirmatively refused to provide Quantum with financial information stating that it would be used for an "improper" purpose of selling the Plant without his approval, thereby negating further negotiations with interested parties. Moreover, Mr. Nathan has caused the Debtor to expend enormous legal fees exceeding $10 million over a roughly 5-month period, notwithstanding that the Debtor has essentially engaged in normal operations.

105. From the perspective of TRAG and RGE, Mr. Robbins has previously stated that he would not agree to sell the Plant for less than $800 million, and it is Quantum's understanding that this is due to RRI, his ESOP-related entity, investing $41 million in Quantum at this value. TRAG and RGE have essentially rejected each buyer proposed by Quantum, other than one potential buyer and only because it would have agreed to have the proceeds from the Plant's sale disproportionately paid to TRAG at the expense of Omnis Energy.

106. Quantum contends that the economics of the TRAG/RGE investment destroy any suggestion that they are acting to protect a vulnerable creditor position. TRAG and RGE will receive approximately $22 million in interest, fees, and other returns on their debt—representing a 40% return on their loans—and will have a total of Two Dollars invested in Quantum and the Debtor following debt repayment. Contrast this with Omnis Global, Omnis Energy, and Quantum, which are liable under the TRAG/RGE Loans. Mr. Robbins has publicly described the Omnis investment as the single best investment of his life with "ridiculous" returns. This directly contradicts any narrative that the enterprise was simply a vehicle for mismanagement, self-dealing and a misuse of funds.

107. TRAG and RGE contend that Omnis Global, Omnis Energy, and Quantum have not been financially transparent. The truth is that Quantum has provided them with complete documentation of each item of revenue and expense received or paid by Quantum and Omnis Energy over the August 2023 to November 2025 time period, by way of the Debtor's financial statements that were prepared by PurEnergy and TyrEnergy, and audited by an independent accounting firm. In short, Omnis Global, Omnis Energy, and Quantum have provided all required and relevant financial information to TRAG and RGE. TRAG, RGE, and the Debtor's current management are also preoccupied with a handful of issues that can all be resolved out of court.

108. TRAG and RGE enjoy extraordinarily favorable economics and temporary control rights that were expressly designed to terminate upon Payment in Full, yet have refused payment and continue to exercise control over the Debtor. It is noteworthy that neither Mr. Nathan nor the TRAG and RGE have any real economic investment in the Omnis entities once the TRAG/RGE Loans are repaid, and TRAG and RGE are not creditors of the Debtor.

109. TRAG's refusal to accept tender of payment and the filing of the Debtor's bankruptcy petition are solely a last ditch attempt for Mr. Nathan to maintain control of the Debtor and for no other purpose. In fact, because of the enormous legal and professional fees that will be incurred and that will provide no value to the Debtor's estate, this bankruptcy proceeding is and will continue to be enormously harmful to the Debtor's legitimate creditors and direct and indirect members. Among other things, the Chapter 11 Case has had a chilling effect on the sale process.

**R. <u>The Suggestion of Bankruptcy</u>**

110. On August 11, 2026, with the Chapter 11 Case pending, all of the parties to the West Virginia Litigation—Omnis Global, Omnis Energy, Quantum, TRAG, RGE, and Mr. Nathan—agreed to schedule the Rule 26(f) conference in the action for August 18.

111. However, the very next day, and despite the parties' agreement, Mr. Nathan filed a *Notice of Suggestion of Bankruptcy* in the West Virginia Litigation (the "**Suggestion of Bankruptcy**"), claiming that the West Virginia Litigation is stayed due to the Debtor's bankruptcy filing. A true and correct copy of the Suggestion of Bankruptcy is attached hereto as **Exhibit 22**.

112. The Movants promptly demanded that Mr. Nathan withdraw the Suggestion of Bankruptcy, but his counsel refused. A true and correct copy of the correspondence between the Movants' litigation counsel and Mr. Nathan's litigation counsel regarding the Suggestion of Bankruptcy is attached hereto as **Exhibit 23**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 14, 2026

*/s/ Charles Gassenheimer*
Charles Gassenheimer
President