# EXHIBIT 8

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (this "Lease"), is made this 2nd day of January, 2026 (the "Effective Date"), by and between OMNIS PLEASANTS, LLC, a Delaware limited liability company, formerly known as ETEM Remediation Two LLC, having an address of 3710 Collins Ferry Road, Morgantown, West Virginia 26505 ("Landlord"), and QUANTUM PLEASANTS, LLC, a Delaware limited liability company, having an address of 3710 Collins Ferry Road, Morgantown, West Virginia 26505 ("Tenant" and together with Landlord, each a "Party" and together, the "Parties"):

WHEREAS, Landlord owns certain real estate located and situate in Grant District, Pleasants County, West Virginia, being more particularly described in the following instruments of record: (1) Special Warranty Deed from Pleasants LLC, a Delaware limited liability company, to ETEM Remediation Two LLC, a Delaware limited liability company, dated December 27, 2022, made effective December 29, 2022 and recorded in the Office of the Clerk of the County Commission of Pleasants County, West Virginia (the "Clerk's Office") in Deed Book 351, Page 1, and (2) Amended and Restated Special Warranty Deed from Pleasants LLC, a Delaware limited liability company, to ETEM Remediation Two LLC, a Delaware limited liability company, dated July 31, 2023, made effective December 27, 2022 and recorded in the Clerk's Office in Deed Book 356, Page 56, together with improvements thereon and appurtenances pertaining thereto (collectively, the "Property");

WHEREAS, Landlord has agreed to lease and demise to Tenant, and Tenant has agreed to lease and hire from Landlord, the surface of that portion of the Property shown and depicted on Exhibit A attached hereto and incorporated herein by this reference (the "Premises"), all upon the terms and provisions set forth below. The Premises shall permit ingress and egress to, from and over the Property (particularly with regard to access to the adjacent river and the ability to load and unload equipment, supplies, materials and similar items) for Tenant's reasonable needs so long as such ingress and egress does not unreasonably interfere with Landlord's operations or use of the Property;

WHEREAS, Tenant intends to use the Premises to build, construct and operate a hydrogen fuel generation facility (the "Hydrogen Facility") pursuant to which hydrogen fuel generated by such facility shall be supplied to Landlord, on a take or pay basis, as feedstock for the electric generation power plant located on or about a portion of Landlord's residual Property (other than the Premises) ("Landlord's Residual Property"), on discounted pricing from prevailing market prices for delivered coal or natural gas (the "Discounted Supply Commitment");

WHEREAS, Landlord and Tenant are in the process of negotiating r a Hydrogen Supply Contract to memorialize the Discounted Supply Commitment (the "Definitive Fuel Supply Contract"), and shall continue to negotiate the terms and provisions of such Definitive Fuel Supply Contract in good faith; and

WITNESSETH THAT, in consideration of the rents, mutual covenants and agreements between the Parties including, without limitation, Tenant's Discounted Supply Commitment and the mutual commitment to execute and deliver a Definitive Fuel Supply Contract, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Lease and Demise. Landlord does lease and demise to Tenant, and Tenant does lease and hire from Landlord, the Premises. Landlord and Tenant hereby agree to have a survey prepared for the purpose of describing, with particularity, the metes and bounds of the Premises, together with all permitted ingress and egress to, from and over the Property and access to the adjacent river and the ability to load and unload equipment, supplies, materials and similar items (the "Surveyed Descriptions"). Landlord and Tenant further agree to to execute and deliver an amendment to this Lease for the purpose of adopting,

affirming and conforming this Lease to the Surveyed Descriptions deriving from a mutually agreed upon survey.

2. Term. To have and to hold the Premises for a term of twenty (20) years (the "Initial Term") commencing on the Effective Date. Tenant shall the right to extend the Initial Term for four (4) extension or renewal terms of ten (10) years (each, a "Renewal Term" and collectively, the "Renewal Terms") to be exercised automatically by Tenant unless Tenant gives written notice to Landlord at least ninety (90) days notice prior to the expiration of the Initial Term or the then-current Renewal Term, as applicable, that it elects to not extend the Lease for the applicable Renewal Term. As used herein, "Term" shall mean and refer to the Initial Term, as extended by the Renewal Terms, as applicable.

3. Rent. On or about the Effective Date, Tenant shall pay to Landlord the sum of $1.00 (the "Base Rent"). Landlord and Tenant acknowledge and agree that the Base Rent shall be deemed to have been prepaid for the balance of the Term. At the commencement of any Renewal Term, Tenant shall pay to Landlord the sum of $1.00 as rent for the entire Renewal Term. Landlord and Tenant acknowledge and agree that Base Rent, although below market rate, is fair and equitable in consideration of the Discounted Supply Commitment and the Parties' mutual commitment to execute and deliver a Definitive Fuel Supply Contract.

4. AS-IS, WHERE-IS. Tenant has inspected the Premises which are being leased to Tenant in its "AS-IS, WHERE-IS" condition, provided, however, the Premises shall be delivered : (a) in compliance with all laws, rules, regulations, codes and ordinances, (b) free of all other tenancies or occupants, and (c) free of any and all trade fixtures, equipment or furniture not necessary for building operation.

5. Use. Tenant shall use the Premises for construction and operating of a hydrogen fuel plant, and for no other purpose not otherwise related thereto unless approved by Landlord in writing. For the avoidance of doubt, and notwithstanding any provision contained herein to the contrary, the Tenant shall retain all rights and incidents of ownership over the design, build, construction and operation of the hydrogen fuel generation plant including, without limitation, any patents, copyrights or other intellectual property deriving therefrom or associated therewith.

6. Improvements. Tenant shall not build or construct any buildings or improvements (collectively, "Improvements") without first submitting plans and specifications therefor prepared by a registered architect for Landlord's review. In connection with the construction of any approved Improvements on or to the Property by Tenant, Tenant shall conform to all laws, building codes and/or zoning regulations applicable to the Premises and promulgated by any federal, state, county or municipal authority and to all applicable requirements of any board of underwriters, rating bureau and/or carrier insurance with respect to the Premises. Tenant shall keep the Premises free from mechanic's liens or liens of a similar nature by reason of any improvement work done by Tenant or by reason of any work of repair, maintenance, improvement, removal, construction, alteration or addition done thereon by Tenant. Notice is hereby given that no mechanic's, materialmen's or other lien sought to be taken on the Premises shall in any manner affect the right, title or interest of Landlord. Landlord shall not be liable for labor or materials furnished Tenant in or about the construction of any Improvements made by Tenant nor for the death or injury of anyone employed in doing such construction or the making of such Improvements. Tenant agrees to provide, or to cause the contractor(s) doing the Improvements to provide, workmen's compensation insurance and public liability insurance during the construction of any Improvements upon the Premises in liability limits of not less than $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate.

7. Insurance. Tenant agrees to procure and maintain, at all times during the term hereof, a policy or policies of insurance, at its own cost and expense, insuring against claims, costs, demands, liability or actions for bodily injury to or death of any one person and property damages in an amount of

not less $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate, made by or in behalf of any person or persons, firm or corporation arising from, related to, or connected with the conduct and operation of Tenant's business on the Premises or otherwise occurring in, on or about the Premises. In addition, Tenant shall keep the Premises and Improvements insured against fire, windstorm, and other casualty, under an all-risk policy of insurance, written in standard form, in the full replacement value thereof. Landlord shall be named as an additional insured/loss payee on said insurance policy or policies. Tenant shall provide Landlord with a certificate of insurance evidencing the coverage or coverages required by this Section 7.

8. Title. Fee simple title to the Premises shall at all times remain with Landlord. Any Improvements made on the Premises that cannot be removed without doing material damage to the Premises shall be deemed to be affixed to the Premises for purposes of this Lease.

9. Representations and Warranties. Each Party represents and warrants that (i) it has the full right, power and authority to enter into this Lease and to perform its obligations hereunder, (ii) all requisite approvals, consents and board or committee actions necessary to authorize such Party to enter into this Lease and to bound by the provisions of this Lease have been obtained or taken, (iii) the person executing this Lease on behalf of the Party has authority on behalf of the Party to execute this Lease and all other documents contemplated hereby, and (iv) this Lease is a valid obligation of the Party and is binding upon and enforceable against the Party in accordance with its terms.

10. Quiet Enjoyment. Upon payment of rent to Landlord, Tenant shall have the right of quiet enjoyment of and possession of the Premises.

11. Maintenance and Repair. Tenant shall keep the Premises in a clean and tidy condition, ordinary wear and tear and damage from casualty excepted. Tenant, at its sole cost and expense, shall keep all of the Improvements constructed upon the Property in good and sanitary order, condition and repair (ordinary wear and tear excepted). At no time during the Term of this Lease shall Landlord be required to make any repairs to the Improvements or the Premises. The Premises and every part thereof including plumbing, lighting, fixtures, plate glass, heating and cooling equipment and all other equipment whatsoever shall at all times be kept by Tenant in good order, condition and repair and in a clean, sanitary and safe condition and in accordance with all applicable laws, ordinances and regulations of any governmental authority having jurisdiction, all at Tenant's sole cost and expense. To the extent of any shared improvements, common areas or other property, improvements or facilities which benefit both the Premises and Landlord's Residual Property (collectively, "Shared Facilities"), then and in that event Landlord shall maintain, repair and replace such Shared Facilities in good condition and repair, ordinary wear and tear and damage from casualty excepted; provided, that, Tenant shall be responsible for any specific item of damage caused by Tenant, or its employees, agents, vendors, contractors or invitees.

12. Taxes. Landlord will pay all taxes including real property taxes, personal property taxes, fire service fees, assessments and all other levies that may, during the existence of this Lease, become payable against the Property, including the Premises and the Shared Facilities. Notwithstanding the foregoing, Tenant shall pay all personal property taxes, fire service fees, assessments and all other levies that may, during the existence of this Lease, become payable in connection with the Improvements constructed by Tenant on the Premises and any personal property or equipment owned or leased by Tenant and located on the Premises, and Tenant shall defend, indemnify and hold Landlord harmless in respect thereof and reimburse Landlord for such items in the event Landlord is required to pay them as the owner of the Property.

13. Compliance. Tenant shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directions, rules and regulations of all governmental authorities having or claiming jurisdiction over the Premises or Improvements located thereon or any part thereof and of all

insurance companies writing policies covering the Premises or Improvements located thereon or any part thereof. Without limiting the generality of the foregoing, Tenant shall also procure each and every permit, license, certificate or other authorization required in connection with the lawful and proper use of the Premises and Improvements or required in connection with any improvement now or hereafter erected thereon.

14. Default.

(a) If any one or more of the following events occur, said event or events shall hereby be classified as a "Default":

(i) Subject to the Grace Period (as defined below), Tenant fails to pay Base Rent, or any other sums payable by it under this Lease on the due date; or

(ii) Tenant shall default in the performance of any other covenant or agreement of this Lease or any rules and regulations reasonably promulgated by Landlord for the use by Tenant of the Premises (a "Non-Monetary Default"); or

(iii) Tenant shall initiate a bankruptcy proceeding, make a general assignment for the benefit of creditors or have a bankruptcy or insolvency proceeding taken by or against Tenant without the matter being dismissed within sixty (60) days of the initiation of such proceeding; or

(iv) a receiver or trustee in bankruptcy be appointed for the Tenant's property and such appointment be not vacated and set aside within sixty (60) days from the date of such appointment.

(b) Notwithstanding anything contained in this Lease to the contrary, Tenant shall have a ten (10) day Grace Period following written notice from Landlord to pay the past due Base Rent or other monetary amount due hereunder without being deemed to be in Default of this Lease. Landlord shall provide Tenant with written notice of any Non-Monetary Default under this Lease and Tenant shall have sixty (60) additional days as a Grace Period to cure said Non-Monetary Default, provided if such Non-Monetary Default cannot be cured with such time, such additional time as is reasonably required for such cure so long as Tenant is diligently pursuing and using all reasonable best efforts to accomplish the cure at the earliest possible time.

15. Remedies. Should a Default occur under this Lease which is not cured within the Grace Periods set forth in Section 14(b) above, Landlord may pursue any or all of the following:

(a) Terminate this Lease and any right of renewal and retake possession of the Premises;

(b) Enter the Premises and relet the same or any part of the Premises in the name of Landlord, or otherwise, as Tenant's agent, for a term shorter or longer than the balance of the Term, and may grant concessions or free rent in connection therewith, thereby terminating Tenant's right to possess the Premises. Any amounts received by Landlord from reletting the Premises shall be deducted from Tenant's obligations under this Lease. Landlord shall have the obligation to make a reasonable effort to relet the Premises. Landlord shall not, in any event, be required to pay Tenant any surplus of any sums received by Landlord on a reletting of the Premises in excess of Base Rent provided in this Lease. Any entry or re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall not absolve or discharge Tenant from liability under this Lease. "Re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meaning. No such re-entry or taking possession of the

Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease or to accept a surrender of the Premises unless a written notice of such intention is given to Tenant. Notwithstanding any such re-letting without termination, Landlord may at all times thereafter elect to terminate this Lease for such previous Default;

(c) Institute an action to recover Base Rent due hereunder;

(d) Obtain injunctive and declaratory relief, temporary or permanent, or both, against Tenant or any acts, conduct, or omissions of Tenant, and further to obtain specific performance of any term, covenant, or condition of this Lease;

(e) The remedies provided in this Lease or presently or hereafter existing at law or in equity shall be cumulative and concurrent, and may be exercised as often as occasion therefor shall occur. No single or partial exercise by Landlord of any remedy shall preclude any other or further exercise of such remedy or of any other remedy. No action or inaction by Landlord shall constitute a waiver of a Default and no waiver of Default shall be effective unless it is in writing, signed by the Landlord; and

(f) Tenant acknowledges that any rights or options of first refusal, or to extend the Term, to purchase the Premises, or other such or similar rights or options which have been granted to Tenant under this Lease are conditioned upon the prompt and diligent performance of the terms of this Lease by Tenant.

16. Environmental.

(a) Definitions:

(i) Environmental Claim. Means any investigation, enforcement, cleanup, removal, containment, remedial or other private or governmental or regulatory action at any time threatened, instituted or completed pursuant to any applicable Environmental Requirement (hereinafter defined), against either Landlord or Tenant against or with respect to the Property (including the Premises) or any condition, use or activity on the Property (including any such action against Landlord or Tenant regarding the Property), and any claim at any time threatened or made by any person against Landlord or Tenant or against or with respect to the Property or any condition, use or activity on the Property (including any such claim Landlord or Tenant), relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or in any way arising in connection with any Hazardous Material (hereinafter defined) or any Environmental Requirement (hereinafter defined).

(ii) "Environmental Law" means any federal, state or local law, statute, ordinance, code, rule, regulation, license, authorization, decision, order, injunction, decree, or rule of common law applicable to Landlord, Tenant or the Property, and any judicial interpretation of any of the foregoing, which pertains to health, safety, any Hazardous Material, or the environment (including but not limited to ground or air or water or noise pollution or contamination, and underground or above ground tanks) and shall include without limitation, the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"); the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., and any other state or federal environmental statutes, and all rules, regulations, orders and decrees now or hereafter promulgated under any of the foregoing, as any of the foregoing now exist or may be changed or amended or come into effect in the future.

(iii) "Environmental Requirement" means any Environmental Law (hereinafter defined) applicable to :Landlord, Tenant or the Property, as the same now exists or may be changed or amended or come into effect in the future, which pertains to health, safety, any Hazardous Material, or the environment, including but not limited to ground or air or water or noise pollution or contamination, and underground or aboveground tanks.

(iv) "Hazardous Material" means any substance, whether solid, liquid or gaseous: which is listed, defined or regulated as a "hazardous substance", "hazardous waste" or "solid waste", or otherwise classified as hazardous or toxic, in or pursuant to any Environmental Requirement; or which is or contains asbestos, radon, any polychlorinated biphenyl, urea formaldehyde foam insulation, explosive or radioactive material, or motor fuel or other petroleum hydrocarbons; or which causes or poses a threat to cause a contamination or nuisance on the Property or any adjacent property or a hazard to the environment or to the health or safety of persons on the Property.

(v) "On" or "on", when used with respect to the Property or any property adjacent to the Property, means "on, in, under, above or about."

(vi) Whenever the phrase "actual knowledge" is used in connection with a Party, such term shall be interpreted to mean the actual knowledge of the Party and their respective directors, officers, managers, and direct owners.

(b) Representations and Warranties. Landlord and Tenant represent and warrant to the other that the representations and warranties each of them made concerning the environmental condition of the Premises under that certain Heads of Agreement, dated December _________ 2025, among Landlord, Tenant, and other parties, are true and correct as of the date of this Agreement.

(c) Violations. Following the Closing, each Party will comply with all applicable Environmental laws and not cause, commit, or knowingly permit or allow to continue (a) any violation of any Environmental Requirement (i) by such Party or by any person or entity over whom such Party has legal responsibility or control, (ii) by or with respect to the Property or any use of or condition or activity on the Property, or (b) the attachment of any environmental lien to the Property. Except as permitted in the following paragraph, each Party will not place, install, dispose of or release, or cause, permit, or allow the placing, installation, disposal, spilling, leaking, dumping or release of, any Hazardous Material or storage tank (or similar vessel, excluding septic tanks) on the Property and will keep the Property free of Hazardous Material. Tenant, at Tenant's sole expense, shall keep the Premises free and clear of all environmental contaminants or residue ("Environmental Contamination") resulting from or occurring during Tenant's occupation or use of the Premises. Tenant shall be solely responsible for the cost of all work carried out to correct any Environmental Contamination which occurs on the Premises, or which occurs on the Property as a result of Tenant's occupation or use of the Premises. Landlord, at Landlord's sole expense, shall keep Landlord's Residual Property free and clear of Environmental Contamination. Landlord shall be solely responsible for the cost of all work carried out to correct any Environmental Contamination which occurs on the Premises or the Landlord's Residual Property, except to the extent caused by or resulting from Tenant's occupation or use of the Premises.

(d) Notice. Each Party shall promptly deliver to other Party a copy of each material report pertaining to the Property or to the Party pursuant to any Environmental Requirement. Each Party shall promptly advise the other Party in writing of any Environmental Claim or of the discovery of any Hazardous Material on the Property, promptly after such Party first obtains knowledge thereof, including a full description of the nature and extent of the Environmental Claim and/or Hazardous Material and all relevant circumstances.

(e) Remedial Actions. If any Hazardous Material is discovered on the Property at any time due to the breach of a Party's representations or warranties under Section 2 or its covenants under Section 3, the actions or directions of Party (or otherwise due to circumstances within the control of the Party), in violation of Environmental Laws, such Party shall promptly at its sole risk and expense remove, treat, and dispose of the Hazardous Material in compliance with all applicable Environmental Requirements and solely under such Party's name (or if removal is prohibited by any Environmental Requirement, take whatever action is required by any Environmental Requirement), in addition to taking such other action as is necessary to have the full use and benefit of the Property, and provide the other Party with reasonable evidence thereof. Nothing herein shall preclude any Party from seeking reimbursement from any third party for any costs or expenses incurred by such Party due to the acts or omissions of such third party.

(f) Indemnity.

(i) Landlord. Landlord hereby agrees to protect, indemnify, defend and hold (A) Tenant; (B) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Tenant; (C) the directors, officers, members, partners, employees and agents of Tenant and/or such persons or entities; and (D) the heirs, personal representatives, successors and assigns of each of the foregoing persons or entities (each an "Tenant Indemnified Party") harmless from and against, and, if and to the extent paid, reimburse them on demand for, any and all Environmental Damages (hereinafter defined) that are attributable to a beach by Landlord of its representations, warranties or covenants under this Agreement. Such indemnity shall not apply to any Tenant Indemnified Party if the Tenant Indemnified Party caused or contributed to the indemnified claim. Upon demand by the Tenant Indemnified Party, Landlord shall diligently defend any Environmental Claim for which the Tenant Indemnified Party is indemnified hereunder and which affects the Property or is made or commenced against the Tenant Indemnified Party due to an act or omission in which it is indemnified hereunder , whether alone or together with Landlord or any other person, all at Landlord's own cost and expense and by counsel to be approved by the Tenant Indemnified Party in the exercise of its reasonable judgment. Such indemnification obligation shall survive any termination of this Agreement.

(ii) Tenant. Tenant hereby agrees to protect, indemnify, defend and hold (A) Landlord; (B) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Landlord; (C) the directors, officers, members, partners, employees and agents of Landlord and/or such persons or entities; and (D) the heirs, personal representatives, successors and assigns of each of the foregoing persons or entities (each an "Landlord Indemnified Party") harmless from and against, and, if and to the extent paid, reimburse them on demand for, any and all Environmental Damages (hereinafter defined) that are attributable to a beach by Tenant of its representations, warranties or covenants under this Agreement. Such indemnity shall not apply to any Landlord Indemnified Party if the Landlord Indemnified Party caused or contributed to the indemnified claim. Upon demand by the Landlord Indemnified Party, Tenant shall diligently defend any Environmental Claim for which the Landlord Indemnified Party is indemnified hereunder and which affects the Premises or the Property or is made or commenced against the Landlord Indemnified Party due to an act or omission in which it is indemnified hereunder, whether alone or together with Tenant or any other person, all at Tenant's own cost and expense and by counsel to be approved by the Landlord Indemnified Party in the exercise of its reasonable judgment. Such indemnification obligation shall survive any termination of this Agreement.

(iii) As used in this Agreement, the term "Environmental Damages" means all actual claims, demands, liabilities (including strict liability), losses, damages (excluding punitive and consequential damages, and excluding diminution in value), causes of action, judgments, penalties, fines, costs and reasonable expenses (including reasonable fees, costs and expenses of attorneys, consultants, contractors, experts and laboratories), of any and every kind or character, contingent or otherwise, matured or

unmatured, known or unknown, foreseeable or unforeseeable, made, incurred, suffered, brought, or imposed at any time and from time to time, and arising in whole or in part from:

(A) the presence of any Hazardous Material on the Property, or any escape, seepage, leakage, spillage, emission, release, discharge or disposal of any Hazardous Material on or from the Property, or the migration or release or threatened migration or release of any Hazardous Material to, from or through the Property; or

(B) any violation of any Environmental Requirement; or

(C) any Environmental Claim, or the filing or imposition of any environmental lien against the Property, because of, resulting from, in connection with, or arising out of any of the matters referred to in subparagraphs (i) and (ii) preceding; and regardless of whether any of the foregoing subparagraphs (A) through (C) was caused by a Party or a tenant or subtenant of the Property or its tenant or subtenant, or any third party, including but not limited to (v) injury or damage to any person, property or natural resource occurring on or off of the Property, including but not limited to the cost of demolition and rebuilding of any improvements on real property; (w) the investigation or remediation of any such Hazardous Material or violation of any Environmental Requirement, including but not limited to the preparation of any feasibility studies or reports and the performance of any cleanup, remediation, removal, response, abatement, containment, closure, restoration, monitoring or similar work required by any Environmental Requirement; (x) all liability to pay or indemnify any person or governmental authority for costs expended in connection with any of the foregoing; (y) the investigation and defense of any claim, whether or not such claim is ultimately defeated; and (z) the settlement of any claim or judgment. Notwithstanding the foregoing, a Party shall have no indemnification or other obligation under this Agreement or otherwise for any Environmental Damages that are not the result of a breach of their representations, warranties and covenants hereunder, including any acts or omissions solely caused by acts or occurrences by third parties after the Landlord has sold the Property (or its indirect interests therein if the sale is accomplished through the sale of the membership interests in the entity owing the Property), or, in the case of Tenant, after it has ceased to occupy the Premises.

17. <u>Destruction of Shared Facilities</u>.

(a) If the Shared Facilities, or any portion thereof, shall be so damaged that substantial alteration or reconstruction of the Shared Facilities shall be required (whether or not the Premises shall have been damaged by such casualty), Landlord shall commence and proceed with reasonable diligence to restore the Shared Facilities to substantially the same condition they were in immediately prior to the happening of the casualty. If the Premises or any Improvements built or constructed by Tenant, or any portion thereof, shall be so damaged that substantial alteration or reconstruction of the Premises or the Improvements shall be required (whether or not the Landlord's Residual Property shall have been damaged by such casualty), Tenant shall commence and proceed with reasonable diligence to restore the Premises and Improvements to substantially the same condition they were in immediately prior to the happening of the casualty.

(b) Notwithstanding subsection (a) above, (i) Landlord shall have no duty to restore, rebuild, or replace any portion of the Premises or any Improvements built and constructed by Tenant; and (ii) Tenant's obligations to repair, rebuild, or restore the Premises and the Improvements shall exist only to the extent that insurance proceeds are actually received by Tenant in connection with the casualty which gave rise to Tenant's obligation to repair, rebuild, or restore.

(c) If Landlord shall fail to restore any portion of the Shared Facilities not useable by Tenant as a result of any casualty, within thirty (30) days of the date on which the Shared Facilities becomes

unusable, then and in that event Tenant shall have the right to restore the condition of such Shared Facilities and Landlord shall have an obligation to reimburse Tenant for all costs and expenses incurred in connection with such restoration plus a twenty percent (20%) fee to compensate Tenant for the management of the restoration project.

18. Assignment and Sublease. Tenant shall not assign or enter into a sublease of the Premises unless the assignee or sublessee agrees to bound by the terms of this Lease and notwithstanding the assignment or sublease, Tenant shall continue to remain liable to Landlord to perform any obligations under this Lease that were due to be performed prior to the effective date of the assignment or sublease. For the avoidance of doubt, no such assignment or sublease shall relieve Tenant of its obligations hereunder.

19. Indemnification. Except for matters arising from the negligent acts or omissions or the intentional acts of Landlord, its agents, employees or contractors, Tenant shall defend, indemnify and hold Landlord harmless from all costs, expenses, claims, liens and liabilities arising out of or relating to (a) the construction, operation or removal of the Improvements, (b) otherwise as a result of Tenant's or its invitee's use, enjoyment and occupancy of the Premises or any portion thereof, or (c) injury to person or damage to property sustained by anyone in and about the Premises.

20. Surrender. Tenant shall, prior to the expiration or sooner termination of the Term, remove or cause to be removed from the Premises any and all personal property located thereon, and peaceably surrender and yield up to Landlord the Premises and Improvements.

21. Time is of the Essence. Time shall be of the essence of this Lease.

22. Governing Law. This Lease shall be construed pursuant to the laws of State of West Virginia, with regards to any applicable conflicts of law principles.

23. Successors and Assigns. This Lease shall inure to the benefit of, and be binding upon, Landlord and Tenant, and their respective successors and assigns.

24. No Waiver. The waiver by a Party of a breach of a term, covenant or condition herein contained will not be deemed to be a waiver of a subsequent breach of the same or another term, covenant or condition herein contained.

25. Notice. Any notice to be given under this Lease shall be in writing and shall be validly given if delivered, transmitted by facsimile, emailed, or mailed by prepaid registered mail to the Parties as follows:

Landlord: Omnis Pleasants, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505

Tenant: Quantum Pleasants, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505

or to such other person or address as either Party may designate by notice given in accordance with this Lease. Notice shall be deemed to have been initially given on the third (3rd) day following the mailing thereof.

26. Estoppel Certificates. At any time and from time to time during any Term of this Lease, either Party shall deliver to the other Party, within fifteen (15) business days after request therefor, a written statement certifying the following: Tenant is in possession of the Premises; this Lease is unmodified and in full force and effect (or if there have been modifications, this Lease is in full force and effect as modified and stating the modifications); the dates to which the Annual Base Rent have been paid in advance, if any; such party is not aware of any event of default under this Lease and is not aware of any event that with the giving of notice or passage of time would constitute an event of default; and such other certifications as the requesting party may reasonably request.

27. Subordination, Non-Disturbance and Attornment. Tenant hereby acknowledges and agrees that this Lease is and is to be subject and subordinate to, at all times, the encumbrance of any Security Instrument (as such term is defined below) securing any Mortgagee (as such term is defined below), whether dated, executed, acknowledged, delivered, or recorded prior to, concurrently with, or subsequent to this Lease, or a memorandum thereof, to the end and effect that any and all such Security Instruments are to be deemed to have been executed, acknowledged, delivered, and recorded prior to this Lease or a memorandum thereof, without knowledge of this Lease, actual, constructive, or otherwise, on the part of such Mortgagee; provided, however, that any such Mortgagee is to be deemed to have (a) acknowledged and recognized the validity of this Lease, and the rights of Tenant, its successors, assigns, and sub-lessees, to quiet use, enjoyment, and possession of the Premises, and (b) covenanted and agreed not to disturb or otherwise foreclose or terminate this Lease or the rights of Tenant, its successors, assigns and sublessees, to quiet use, enjoyment, and possession of the Premises absent the occurrence of an unremedied or uncured event of default.

(a) Tenant hereby attorns to and recognizes (i) any and all Mortgagees; (ii) any transferee, including any Mortgagee, at a foreclosure sale, whether judicial or non-judicial in nature, under a Security Instrument; (iii) any transferee, including any Mortgagee, that acquires the Premises by way of a deed or deeds in lieu of foreclosure; and (iv) any transferee, successor, or assign that succeeds to such Mortgagee's, Tenant's or transferee's interest in the Premises, as its Landlord for the unexpired balance of the Initial Term or the Renewal Terms, as applicable, under the same terms, provisions, and conditions as set forth in this Lease, which attornment is and is to be effective and self-operative upon the acquisition or any interest in or title to the Premises by any such Mortgagee, Tenant, transferee, successor, or assigns, without the execution, acknowledgment, delivery, or recording of any other instruments, documents, or agreements by Landlord, Tenant or any Mortgagee, Tenant, transferee, successor, or assign.

(b) Tenant is to have the right and authority to encumber Tenant's interest in and to this Lease pursuant to a Security Instrument, Leasehold Mortgage (as such term is defined below) or otherwise; provided, however, that Tenant is to neither have the power, right, nor authority to encumber Landlord's interest in and to the Property or Premises, and that any attempted encumbrance by Tenant of all or any part of Landlord's interest in and to the Property or Premises shall be entirely void and of no effect whatsoever.

(c) In the event Tenant executes, acknowledges, and delivers any Security Instrument that places an Encumbrance on Tenant's interest in and to this Lease, in whole or in part, or subjects Tenant's interest in and to the Lease, in whole or in part, to any Encumbrance (as such term is defined below), Tenant shall, within thirty (30) days of such Encumbrance, notify Landlord, in writing, of the existence of such Security Instrument and the address of the Secured Party or Leasehold Mortgagee to

which notices under this Lease are to be sent. Furthermore, in the event any such Security Instrument is be assigned, Tenant and such Leasehold Mortgagee or Secured Party shall notify Landlord, in writing, of such assignment and the address of such assignee. So long as such a Security Instrument is in effect and Landlord has been given notice in accordance with the provisions of this section, and provided that no event of default has occurred which has not been cured within the applicable grace period, if any, Landlord covenants and agrees that no surrender amendment, alteration, enlargement, modification, or change of this Lease is to be made or effected without the prior written consent of such Secured Party or Leasehold Mortgagee or its assigns.

(d) In the event Landlord gives notice to Tenant with respect to or in connection with any event of default, Landlord shall also serve a copy of such notice upon each Secured Party or Leasehold Mortgagee and the assignee, if any, of any such Leasehold Mortgagee with respect to which Landlord has received notice in accordance with the provisions of this Section 26. Subject to such condition precedent, Landlord covenants and agrees that no such notice to Tenant is to be effective unless and until a copy of such notice is duly served upon such Secured Party or Leasehold Mortgagee or its assignee, if any, in accordance with the provisions of this section. Upon the receipt of such notice by such Secured Party or Leasehold Mortgagee or its assigns, the same is to have the right and opportunity to cure or remedy or cause to be cured or remedied any beach or default within the same time period provided to Tenant, and Landlord shall accept such performance by the same as if the same had been done or performed by Tenant.

(e) In the event any Leasehold Mortgagee exercises its rights of foreclosure, and such Leasehold Mortgagee, its successors or assigns, becomes the holder of the leasehold estate of Tenant, Landlord agrees to recognize such Leasehold Mortgagee, its successors or assigns, as Tenant hereunder, subject to all terms and conditions of this Lease and subject to all uncured events of default.

(f) Landlord agrees to execute and deliver any reasonable Subordination, Non-Disturbance and Attornment Agreement presented by a Leasehold Mortgagee. Landlord acknowledges that Leasehold Mortgagee's request for reasonable additional time for the Leasehold Mortgagee to cure an event of default before the termination of this Lease is acceptable to Landlord, not to exceed thirty (30) days without Landlord's express written consent. Further Landlord acknowledges that Leasehold Mortgagee's request for Landlord to subordinate any express or implied "Landlord's lien" or other similar lien to the lien of the Leasehold Mortgagee shall be acceptable to Landlord.

(g) Tenant agrees to execute and deliver any commercially reasonable Subordination, Non-Disturbance and Attornment Agreement presented by a Mortgagee. Tenant acknowledges that Mortgagee's request for reasonable additional time for the Mortgagee to cure an event of default before the termination of this Lease is acceptable to Tenant, not to exceed thirty (30) days without Tenant's express written consent.

(h) For the purposes of this Lease, the following terms have the meanings as set forth below:

(i) "Encumbrance" means any lien, security interest, or encumbrance on or against this Lease or the Premises that is evidenced or perfected by a Security Instrument, judgment lien, writ of execution, mechanic's liens, tax lien, or notice of lis pendens.

(ii) "Leasehold Mortgagee" means the holder of any debt instrument, the payment of which is secured by a Security Instrument that encumbers or places a lien upon Tenant's interest in and to the Lease.

(iii) "Mortgagee" means the holder of any debt instrument, the payment of which is secured by a Security Instrument that encumbers or places a lien upon Landlord's interest in and to the Premises.

(iv) "Security Instrument" means any deed of trust, leasehold deed of trust, credit line deed of trust, leasehold credit line deed of trust, mortgage, leasehold mortgage, UCC fixture filing, security agreement, UCC financing statement, assignment of leases and rents, collateral assignment of lease, or similar security instrument which secures the payment of any indebtedness or any other obligations and all renewals, modifications, amendments, supplements, consolidations, replacements, and extensions thereof, to the full extent of the amounts secured thereby.

27. Eminent Domain.

(a) If all or any part of the Property is appropriated or condemned by any public or quasi-public authority in the exercise of its right of condemnation or eminent domain, both Landlord and Tenant are to have the right to prosecute a claim for an award and to share in the proceeds of any and all awards based upon their respective interests as hereafter set forth. Specifically, Landlord shall have the right to prosecute a claim for the value of Landlord's Residual Property plus any reversionary interest in the Premises and/or the Improvements beyond the expiration of the Term, and Tenant shall have the right to prosecute a claim for the value of its leasehold interest in the Premises and the Improvements for the remainder of the Term.

(b) If all the Premises is appropriated or condemned, this Lease is to terminate as of the time when possession is required by such public or quasi-public authority. In the event all or any part of the Premises is taken or condemned, Landlord is be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents that it would have received in the future and for the present value of its reversionary interest in the Premises and all Improvements thereon, and the damage to its residual estate, and, notwithstanding the termination of this Lease, Tenant is to be entitled to that portion of any and all awards necessary to compensate it for the leasehold value of its Improvements to the Leasehold Premises, the value of its leasehold estate, and the damages that it may sustain as a result of termination of this Lease prior to the end of the Term, and the present value of any sublessee rents it would have received in the future.

(c) In the event that a part of the Premises is taken or condemned and that (a) the part so taken includes Improvements on the Premises or any part thereof, or (b) the part so taken makes it impracticable for Tenant to continue operation at the Premises in Tenant's sole discretion, Tenant may, at any time either prior to or within a period of sixty (60) days after the date when the condemning authority requires possession of the part of the Premises taken or condemned, elect to terminate this Lease.

(d) In the event Tenant elects to terminate this Lease, Landlord is to be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents that it would have received in the future and for the present value of its reversionary interest in the Premises and all improvements thereon, and the damage to its residual estate, and notwithstanding the termination of this Lease, Tenant is to be entitled to that portion of any and all awards necessary to compensate it for the leasehold value of its Improvements to the Premises, the value of its leasehold estate and the damages that it may sustain as a result of termination of this Lease prior to the end of the Term including, without limitation, the cost of relocating and moving personal property and equipment, and the present value of the sublessee's rents Tenant would have received in the future.

(e) In the event that Tenant does not elect to terminate this Lease or in the event that a part of the Premises is taken or condemned under circumstances under which Tenant will have no such

election, then and in either event, Tenant is to receive so much of any and all awards as is necessary to pay for repairs to and alterations of the Improvements on the Premises for the purpose of restoring the same to an economic architectural unit, susceptible to the same use as that which was in effect immediately prior to such taking and Landlord shall receive the balance, if any, of any awards.

(f) Landlord and Tenant agree to submit any dispute concerning any matter associated with the right to funds arising from eminent domain to binding arbitration before the Judicial Arbitration and Mediation Service ("JAMS") in Wilmington, Delaware under the JAMS' Commercial Arbitration Rules (the "JAMS Rules"). The proceedings of the arbitration shall be kept confidential by the arbitrator, the parties to the arbitration and their respective counsel and other representatives (except to the extent necessary to enforce any award made by the arbitrator). Arbitration may be commenced by Landlord or Tenant by filing a demand for arbitration pursuant to the JAMS Rules (an "Arbitration Demand"). The initiating party shall also send a copy of the Arbitration Demand to the other party. The Parties shall jointly select one arbitrator within fifteen (15) days of the date of the Arbitration Demand. If they fail to agree, the arbitrator shall be selected pursuant to the JAMS Rules within thirty (30) days from the end of such fifteen (15) day period. If an arbitrator so selected becomes unable to serve, his or her successors shall be similarly selected or appointed. Any arbitrator that is appointed shall agree that his or her schedule is sufficiently flexible to accommodate the timelines set forth in this Section 27. Notwithstanding the provision in Section 27 with respect to applicable substantive law, the arbitration shall be conducted pursuant to the Federal Arbitration Act and such procedures as the Parties may agree, or, in the absence of such agreement, pursuant to the JAMS Rules. The arbitrator will agree to comply with the Federal Arbitration Act and the procedures agreed to by the parties, or if applicable, the JAMS Rules and the terms of this Section 27. The arbitrator shall have case management authority and shall resolve the dispute in final within sixty (60) days from the commencement of the arbitration. For purposes of calculating the effects of any statutes of limitations, any lawsuit initiated pursuant to this provision will be deemed to have been filed on the date that the arbitration was commenced, as established by the Federal Arbitration Act or the JAMS Rules, if applicable. Each Party have the right to conduct discovery and present evidence in accordance with the following rules: (a) each Party shall be allowed to conduct reasonable discovery through written document requests and depositions, the nature and extent of which discovery shall be determined by the Party; provided, that if the Parties cannot agree on the terms of discovery, the nature and extent thereof will be determined by the arbitrator who will take into account the needs of the Parties, and the purposes of arbitration to make discovery expeditious and cost effective, and (b) access to any confidential or proprietary financial or other information produced in discovery will be limited to the discovering Party's lawyers and other experts and a limited number (to be agreed by the Parties) of senior management of the discovering Party, who will be obligated to preserve the confidentiality of such information on reasonable and customary terms. Each Party shall provide to the other, reasonably in advance of the hearing, copies of all documents which such Party intends to present at the hearing. Each Party agrees that a judgment may be entered on the arbitrator's award in any court of competent jurisdiction. The arbitrator in reviewing any Arbitration Matter under this Lease shall have the exclusive authority to determine any issues as to the arbitrability of such Arbitration Matter hereunder. In reaching a decision, the arbitrator shall interpret, apply and be bound by this Lease and by applicable law. The arbitrator shall have no authority to add to, detract from or modify this Lease or ancillary agreement, as applicable, or any applicable law in any respect. The arbitrator may grant any remedy or relief that a court of competent jurisdiction could grant, including specific performance and injunctive relief, except that the arbitrator may not grant any relief or remedy greater than that sought by the disputing Parties nor any special, indirect, punitive or consequential damages, except to the extent such damages are reasonably foreseeable or actually awarded to a third party by a court of competent jurisdiction. The arbitrator shall have the power to award attorneys' fees and costs to the prevailing Party. Any up-front costs of the arbitrator and JAMS shall be borne equally by the initiating Party and the responding Party to the dispute, and each such Party shall initially bear its own costs incurred in connection with attorneys' fees, expert witness fees, accounting fees and related expenses; provided,

however, that the non-prevailing Party in any such arbitration (as determined by the arbitrator) shall pay, and, to the extent applicable, reimburse the prevailing Party for, its legal costs, expert witness fees and accounting costs associated with the proceeding, as determined by the arbitrator, and the costs and expenses of the arbitrator and JAMS, including costs and expenses payable to the JAMS. Nothing in this Lease shall limit or in any way restrict the ability of any Party to seek legal or equitable relief in a court or other judicial body. The award of the arbitrator shall be binding and conclusive on the Parties to the proceeding, absent a finding that such award was arbitrary and capricious by a court of competent jurisdiction.

28. Memorandum of Lease. This Lease shall not be recorded, but Tenant may record a memorandum of lease in form acceptable to Landlord and executed by both Parties. Landlord shall prepare the aforesaid memorandum of lease and pay the cost of recording the same.

29. Transfer Taxes. Landlord shall pay all transfer taxes related to or imposed upon this Lease, if any.

30. Signage. Tenant shall have the right to design, locate, and install the maximum signage allowable by the governmental agency with governing authority.

31. Confidentiality. Landlord and Tenant expressly acknowledge and agree that the terms and conditions of this Lease, together with any discussions, negotiations, and or agreements arising out of this Lease or any such discussions shall be deemed confidential information ("Confidential Information") and shall not be disclosed by Landlord, Tenant or any of its agents, professional advisors, directors, lenders, officers, employees or consultants, without the express prior written consent of the other Party; provided the terms of this Lease and a copy thereof may be provided to any person or legal entity interested in purchasing or leasing the Property or Premises or in purchasing either of the Parties.. Except as provided in the immediately preceding sentence, Landlord and Tenant agree to hold the Confidential Information in strict confidence and not to disclose such Confidential Information to any third party, except as specifically authorized, and to use all reasonable precautions to prevent the unauthorized use or disclosure of the Confidential Information. Confidential Information shall not include information that is already available to the public, or becomes available to the public through no fault of Landlord.

[Remainder of Left Blank Intentionally; Signature Page to Follow]

IN WITNESS WHEREOF the Parties hereto have executed this lease as of the day and year written below.

LANDLORD:
OMNIS PLEASANTS, LLC,
a Delaware limited liability company,
formerly known as ETEM Remediation Two LLC

By: ______________________
Name: Randall Smith
Title: CFO

TENANT:
QUANTUM PLEASANTS, LLC,
a Delaware limited liability company,

By: ______________________
Name: Randall Smith
Title: CFO

**EXHIBIT A**
**TO**
**LEASE AGREEMENT**