# EXHIBIT 13

West Virginia E-Filing Notice

CC-37-2026-C-14

Judge: Timothy L. Sweeney

**To:** Isaac Forman
iforman@hfdrlaw.com

# NOTICE OF FILING

IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA
Omnis Global Technologies, LLC v. TRAG LLC
CC-37-2026-C-14

The following complaintwas FILED on 7/8/2026 9:42:10 AM

Notice Date: 7/8/2026 9:42:10 AM

Millie Farnsworth
CLERK OF THE CIRCUIT COURT
Pleasants County
301 Court Lane Room 201
ST MARYS, WV 26170

(304) 684-3513
Millie.Farnsworth@courtswv.gov

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

# COVER SHEET

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF PLEASANTS COUNTY WEST VIRGINIA

**Omnis Global Technologies, LLC v. TRAG LLC**

**First Plaintiff:** ☑ Business ☐ Individual ☐ Government ☐ Other

**First Defendant:** ☑ Business ☐ Individual ☐ Government ☐ Other

**Judge:** Timothy L. Sweeney

## COMPLAINT INFORMATION

**Case Type:** Civil

**Complaint Type:** Contract

**Origin:** ☑ Initial Filing ☐ Appeal from Municipal Court ☐ Appeal from Magistrate Court

**Jury Trial Requested:** ☑ Yes ☐ No

**Case will be ready for trial by:** 7/12/2027

**Mediation Requested:** ☐ Yes ☑ No

**Substantial Hardship Requested:** ☐ Yes ☑ No

☐ Do you or any of your clients or witnesses in this case require special accommodations due to a disability?

- ☐ Wheelchair accessible hearing room and other facilities
- ☐ Interpreter or other auxiliary aid for the hearing impaired
- ☐ Reader or other auxiliary aid for the visually impaired
- ☐ Spokesperson or other auxiliary aid for the speech impaired
- ☐ Other:

☐ I am proceeding without an attorney

☑ I have an attorney: Isaac Forman, P.O. Box 3983 , Charleston, WV 25339

# SERVED PARTIES

**Name:** TRAG LLC

**Address:** 9051 Mira Mesa Boulevard, No. 261229, San Diego CA 92126

**Days to Answer:** 30 **Type of Service:** Circuit Clerk - Certified Mail - Including Copy Fee

---

**Name:** RG Energy LLC

**Address:** 9051 Mira Mesa Boulevard, No. 261229, San Diego CA 92126

**Days to Answer:** 30 **Type of Service:** Circuit Clerk - Certified Mail - Including Copy Fee

---

**Name:** Gilbert Nathan

**Address:** Jackson Square Advisors, LLC 606 Post Road East #624, Westport CT 06880

**Days to Answer:** 30 **Type of Service:** Circuit Clerk - Certified Mail - Including Copy Fee

---

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs,**

v.

**Civil Action No.:_______________**
**Judge:**

**TRAG LLC, RG ENERGY LLC, and**
**GILBERT NATHAN,**

**Defendants.**

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Omnis Global Technologies, LLC ("OGT"), Omnis Fuel Technologies, LLC ("OFT"), and Quantum Pleasants, LLC ("QP") file this Verified Complaint against Defendants TRAG LLC ("TRAG"), RG Energy LLC ("RG Energy," and together with TRAG, the "Lenders"), and Gilbert Nathan, who currently serves as Independent Manager of Omnis Pleasants, LLC ("OP") and QP, and allege as follows:

**NATURE OF THE ACTION**

1. This case concerns the Pleasants Power Station in Belmont, West Virginia.

2. Plaintiffs and their affiliate OP have been working to preserve the Plant, stabilize its finances, pursue sale or financing opportunities, and pay the Lenders in full.

3. The parties entered into an Amended and Restated Forbearance Agreement on February 6, 2026. The Forbearance Agreement was supposed to create a bridge: the Lenders would forbear from exercising remedies while Plaintiffs pursued a sale, financing, or other transaction that would result in Payment in Full. Ex. A.

4. The Forbearance Agreement expressly preserves Plaintiffs' ability to procure funds resulting in Payment in Full and prohibits the Lenders from acting, or failing to act, for the

purpose of frustrating, hindering, or unreasonably interfering with Plaintiffs' ability to comply with the Forbearance Agreement and the loan documents. Ex. A §§ 8(e), 11(b), 11(d), 13.

5. As part of the Forbearance Agreement structure, Nathan was installed in governance roles at OP and QP. Nathan was not supposed to act as the Lenders' agent. He was supposed to act independently, in good faith, and with the primary objective of maximizing the value of the Plant. Ex. A § 9(a); Ex. C § 4(a); Ex. D § 6.2(c).

6. Nathan has instead withheld the financial information, books and records, and Plant access needed to preserve the value of OP and the Plant.

7. Plaintiff QP is OP's sole member. Plaintiff QP is also the tenant under a Ground Lease at the Plant. Exs. C, E.

8. Yet Plaintiff QP has been denied access to financial information from OP, its wholly owned subsidiary, by Nathan. Nathan has also denied Plaintiff QP reasonable access to its leased premises and related Plant-access areas. Those denials impair Plaintiff QP's ability to preserve the Plant, address WVEDA-related issues, support sale and financing diligence, and pursue Payment in Full.

9. The Lenders have separately refused to provide the ordinary payoff information necessary for Plaintiffs to pay them.

10. On April 19, 2026, Plaintiffs requested the amount necessary to pay the Lenders in full. On April 20, the Lenders' counsel responded: "We'll get you the payoff information." Ex. H.

11. The Lenders did not provide it.

12. Instead, the Lenders later demanded broad information about Plaintiffs' funding source, financing terms, and unrelated historical materials as a condition to providing the payoff information. Exs. I, J.

13. Plaintiffs do not ask this Court to approve any sale transaction, financing transaction, related-party transaction, restructuring, equity issuance, lien, asset transfer, or governance change.

14. Plaintiffs seek only three practical forms of relief necessary to preserve the status quo and stop the obstruction: (1) a payoff letter from the Lenders; (2) OP financial information, books, records, and director materials from Nathan; and (3) reasonable access to QP's leased premises and related Plant-access areas.

**PARTIES**

15. Plaintiff Omnis Global Technologies, LLC ("OGT") is a limited liability company organized under the laws of Delaware, with its principal place of business in West Virginia.

16. Plaintiff Omnis Fuel Technologies, LLC ("OFT") is a limited liability company organized under the laws of Delaware, with its principal place of business in West Virginia.

17. Plaintiff Quantum Pleasants, LLC ("QP") is a limited liability company organized under the laws of Delaware, with its principal place of business in West Virginia. OFT is QP's sole Class A member. OFT owns approximately 43% of QP's membership interests and 100% of QP's voting interests.

18. Omnis Pleasants, LLC ("OP") is a limited liability company with its principal place of business in Pleasants County, West Virginia. QP is the sole member of OP. OP owns and operates the Pleasants Power Station located in Belmont, Pleasants County, West Virginia.

19. OP is a party to the Forbearance Agreement and granted certain collateral rights to the Lenders. OP is not named as a party in this action. Plaintiffs seek relief against Nathan only in his capacity as Independent Manager and only to the extent the requested records, information, and access are within his possession, custody, control, authority, or practical ability to provide, approve, direct, or cause to be provided. Plaintiffs do not ask the Court to approve any sale or transfer of OP assets, any financing transaction, any related-party transaction, or any governance change on behalf of OP.

20. Defendant TRAG LLC ("TRAG") is a limited liability company organized under the laws of Delaware, with an address at 9051 Mira Mesa Boulevard, No. 261229, San Diego, California 92126.

21. Defendant RG Energy LLC ("RG Energy") is a limited liability company organized under the laws of Delaware, with an address at 9051 Mira Mesa Boulevard, No. 261229, San Diego, California 92126. TRAG and RG Energy are referred to collectively as the "Lenders."

22. Defendant Gilbert Nathan is an individual residing in Connecticut. At all times relevant to this action, Nathan served as the Independent Manager of OP and as the Independent Manager and Board Member of QP. In those roles, Nathan owed fiduciary and good-faith duties as provided by the governing agreements and applicable law.

23. With respect to the request for injunctive relief, Nathan is sued in his capacity as Independent Manager of OP and QP.

## JURISDICTION AND VENUE

24. This Court has subject-matter jurisdiction over this action because Plaintiffs seek declaratory and injunctive relief concerning contracts, property rights, and business conduct affecting a major asset located in Pleasants County, West Virginia.

25. Venue is proper in Pleasants County because the Plant is located in Pleasants County, the Ground Lease concerns property located in Pleasants County, and a substantial part of the events and omissions giving rise to this action concerns access to and preservation of the Plant in Pleasants County.

26. This Court has personal jurisdiction over the Lenders because they entered into agreements concerning West Virginia property, financing, collateral, and business operations, and because the requested relief concerns their conduct affecting Plaintiffs' ability to preserve and pay obligations relating to the Plant.

27. This Court has personal jurisdiction over Nathan in his capacity as Independent Manager because his challenged conduct concerns OP, QP, the Plant, QP's rights as OP's sole member, and QP's rights as tenant at property located in Pleasants County, West Virginia.

## FACTUAL ALLEGATIONS

### A. Omnis acquired the Pleasants Power Station to preserve and repurpose a major West Virginia asset.

28. Through their wholly owned subsidiary OP, Plaintiffs acquired the Plant in 2023 with the goal of preserving the Plant as a valuable operating asset and using it to showcase Omnis clean-energy technology.

29. The Plant is not an ordinary asset. It is a major industrial asset located in Pleasants County, tied to jobs, creditor rights, public interests, energy infrastructure, and the future value of the Plaintiffs investment.

30. The acquisition and related operations were financed in part by TRAG and RG Energy.

31. The parties later entered into the Forbearance Agreement after defaults under the loan documents. Ex. A.

**B. The Forbearance Agreement preserved Plaintiffs' right to pay off the Lenders.**

32. The Forbearance Agreement created a temporary framework to preserve value while Plaintiffs pursued a transaction that results in Payment in Full.

33. The Agreement established a Sale Process for a sale of OP, the Plant, or OP's assets. Ex. A § 8.

34. The Agreement also separately preserved Plaintiffs' ability to procure funds resulting in Payment in Full. Ex. A § 11(b).

35. Section 11(b) provides that "nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations." Ex. A § 11(b).

36. Section 11(d) likewise carves out "transactions that will result in the Payment in Full of all Obligations under the Loan Agreements." Ex. A § 11(d).

37. Section 8(e) provides that neither the Lenders nor OFT may intentionally take actions whose primary purpose is to materially interfere with the other party's efforts to pursue a transaction resulting in Payment in Full. Ex. A § 8(e).

38. Section 13 prohibits the Lenders from taking or failing to take action whose primary purpose is to frustrate, hinder, or unreasonably interfere with the Omnis Parties' efforts to comply with the Forbearance Agreement or loan documents. Ex. A § 13.

39. Those provisions mean the Lenders cannot preserve a contractual path to Payment in Full and then obstruct the basic steps necessary for Plaintiffs to pursue that path.

**C. Nathan became the gatekeeper for OP and QP.**

40. As part of the Forbearance Agreement, the Lenders obtained significant control protections.

41. One of the most important protections was Nathan's installation in governance roles at OP and QP.

42. The Forbearance Agreement gives the Independent Manager access to board notices, board materials, books and records, and participation in meetings involving material OP or QP actions. Ex. A § 9(a).

43. The OP Operating Agreement amendment gives the Independent Manager a central role in OP governance and requires the Independent Manager to act in good faith with the primary objective of maximizing the value of the Plant, consistent with fiduciary duties under applicable law. Ex. C § 4(a).

44. The QP Operating Agreement amendment provides that QP's board includes an Independent Manager, initially Nathan, and requires the Independent Manager to act in good faith as a fiduciary of QP and consistent with applicable law. Ex. D § 6.2.

45. The Lenders also retained a direct consent right over Nathan's continued service. Under the Forbearance Agreement and amended governing documents, Nathan may not be removed and replaced without the Lenders' written consent before Payment in Full. Ex. A § 7; Ex. C § 4(a); Ex. D § 6.2(a).

46. Plaintiffs have repeatedly advised the Lenders that Nathan is obstructing OP financial-record access, Plant access, sale and financing efforts, and Plaintiffs' ability to pursue Payment in Full. Plaintiffs have also asked the Lenders to consent to Nathan's removal or replacement.

47. The Lenders have not consented to Nathan's removal or replacement. Their refusal to exercise their consent rights, after being advised of Nathan's obstruction, supports a reasonable inference that the Lenders knowingly tolerate, approve, and benefit from Nathan's conduct.

48. Nathan is therefore not a peripheral actor. He is the gatekeeper installed by the Lenders through the Forbearance Agreement and related governance documents. The Lenders have the contractual ability to consent to his removal, but they have refused to do so after Plaintiffs repeatedly identified his obstruction. Nathan's authority exists to preserve value, not destroy it.

49. Nathan's own recent statement confirms that he views himself and OP as the gatekeepers for prospective transactions. On June 22, 2026, after receiving a preliminary indication of interest from a prospective all-cash purchaser, Nathan responded on behalf of OP that OP was "happy to consider parties interested in the asset, but as you know **we are in control of that process**." Ex. L (emphasis supplied).

50. Nathan's assertion of control breaches his contractual and fiduciary obligations and simultaneously confirms that he is currently exercising authority over whether prospective purchasers receive the financial information, operating data, and site access necessary to conduct diligence. That authority extends in practice to the same information and access needed by funding sources seeking to support Payment in Full.

**D. Nathan has blocked OP financial information needed to preserve value.**

51. QP is the sole member of OP and owns 100% of its membership interests. OP owns the Plant.

52. QP needs OP financial information to understand the value, financial condition, obligations, and cash needs of the company it owns.

53. QP also needs that information to support financing, engage with WVEDA, respond to creditor issues, and pursue a transaction that pays the Lenders.

54. Section 15 of the OP Operating Agreement gives QP member-information rights. Ex. C § 15.

55. QP is entitled to receive notices and materials provided to OP's directors in connection with meetings or written consents, reasonable access to OP's books and records, and participation in meetings at which material OP actions are considered. Ex. C § 15.

56. QP began requesting this information no later than March 2026.

57. On March 9, 2026, QP's counsel advised OP's counsel that OP had provided no financial reporting to QP since December 2025, despite repeated demands. Ex. F.

58. QP requested all OP financial reporting and books and records since December 31, 2025, including financial statements, general ledgers, AlixPartners invoices, Independent Manager invoices, the interim CEO agreement, and reports or preliminary reports concerning OP's performance, cash flow, profit and loss, and financial metrics. Ex. F.

59. On March 20, 2026, QP wrote directly to Nathan and David Hindman. Ex. G.

60. QP explained that it remained frustrated in its ability to advance a sale or financing of OP because of Nathan's and Hindman's continuing actions and inactions. Ex. G.

61. QP further explained that the information it requested was necessary to facilitate a sale or financing, enable repayment of the debt owed to the Lenders, avoid foreclosure on OP's and QP's assets, and preserve the value of the Plant. Ex. G.

62. Nathan did not provide or cause production of the requested information.

63. As a result, the owner of OP cannot obtain the financial information it needs about OP, while the supposed independent fiduciary charged with maximizing the Plant's value withholds the information needed to do that.

**E. Nathan has blocked reasonable access to the Plant.**

64. In addition to owning 100% of OP, QP also holds a Ground Lease at the Plant. Ex. E.

65. The Ground Lease gives QP rights to the leased premises and related access, including ingress and egress to, from, and over the property for QP's reasonable needs, including access to load and unload equipment, supplies, and materials, so long as that access does not unreasonably interfere with OP's operations or use of the property. Ex. E.

66. QP needs access for its employees, vendors, contractors, consultants, financing sources, and diligence representatives.

67. That access is necessary to inspect, preserve, maintain, recommission, and protect QP's equipment and technology; support financing and sale diligence; and preserve the value of OP and the Plant.

68. QP raised the access problem in writing.

69. In the March 20 letter, QP advised Nathan and Hindman that QP personnel, vendors, and potential financing sources had been denied access to the Plant and leased property, including personnel from a key equipment vendor. Ex. G.

70. QP explained that this denial of access impaired QP's ability to effect a sale or financing and repay the indebtedness owed to the Lenders. Ex. G.

71. QP is willing to comply with reasonable safety, insurance, escort, advance-notice, and noninterference conditions.

72. Nathan has intentionally denied reasonable access to the Plant, in violation of QP's ground lease.

73. Nathan is not permitted to use control over access as a weapon to prevent QP from preserving its own property, supporting due diligence, and pursuing repayment.

**F. The Lenders promised payoff information and then withheld it.**

74. While Nathan was blocking information and access, the Lenders separately blocked the ordinary first step of any payoff: a payoff letter.

75. On April 19, 2026, Plaintiffs requested the amount required to pay the obligations to TRAG and RG Energy in full. Ex. H.

76. The request asked for all principal, accrued and unpaid interest, fees, costs, expenses, any amount associated with the letter of credit, and wiring instructions. Ex. H.

77. The next day, the Lenders' counsel responded: "We'll get you the payoff information." Ex. H.

78. The Lenders did not provide the payoff information.

79. Plaintiffs renewed the request on June 1 and June 9, 2026. Ex. I.

80. Plaintiffs requested the payoff amount, a component breakdown, daily interest accrual, and information concerning the TYR Energy letter of credit. Ex. I.

81. Instead of providing the payoff information, the Lenders demanded information about the proposed funding source, the terms of the financing, and related documents, along with other broad information previously demanded in March. Ex. I.

82. On June 11, 2026, Plaintiffs responded that the Lenders cannot condition the basic act of providing a payoff letter and accounting on approval of the funding source, the terms of future financing, or broad historical materials unrelated to calculating the payoff amount. Ex. J.

83. Plaintiffs again requested the payoff letter and supporting calculations. Ex. J.

84. The Lenders have not provided a complete payoff letter and accounting.

85. A payoff letter is not extraordinary relief. It is the document needed to pay a creditor.

86. The Lenders know the amount they contend is due. Plaintiffs cannot pay that amount unless the Lenders state it.

**G. Plaintiffs seek payoff information, not approval of a related-party transaction.**

87. The Lenders may contend that Plaintiffs' potential payoff funding implicates related-party restrictions or approval rights.

88. That objection does not excuse the Lenders' refusal to provide payoff information.

89. Plaintiffs are not asking this Court to approve any related-party transaction, financing agreement, lien, asset transfer, equity issuance, restructuring, sale, or governance change.

90. Plaintiffs seek only the payoff amount and customary payoff mechanics needed to determine what the Lenders contend must be paid.

91. The Lenders may reserve whatever objections they believe they have to any future transaction.

92. But the Lenders cannot use a generalized related-party objection to block the first step of the Payment-in-Full process: providing the payoff amount.

**H. Immediate relief is needed.**

93. Angela Chen, a prior investor and creditor, is ready, willing, and able to provide funding sufficient for Plaintiffs to tender Payment in Full, subject to receipt and confirmation of

payoff information, OP financial information, reasonable diligence access, and customary closing documentation. Ex. K.

94. The approximately $50 million loan issued by the West Virginia Economic Development Authority (the "WVEDA Loan") matured on June 12, 2026. QP is the borrower, and OP is obligated on the WVEDA note. Ex. A; Exs. I, J.

95. Ms. Chen has also expressed a willingness to support a partial paydown of the WVEDA Loan to secure WVEDA's cooperation and restructure the remaining balance. Ex. K. That proposed accommodation creates a concrete path to address both the Obligations owed to the Lenders and the separate WVEDA indebtedness while preserving the Plant as a going concern.

96. Plaintiffs cannot meaningfully pursue that WVEDA accommodation while the Lenders withhold the payoff amount and Nathan withholds OP's current financial and operating information. Without those materials, Plaintiffs cannot determine the total capital required, provide WVEDA reliable current financial information, assess OP's ability to perform, or document a restructuring.

97. Delay exposes Plaintiffs and the Plant to cascading harm, including default consequences, acceleration, enforcement, loss of WVEDA's cooperation, impairment of WVEDA collateral, and deterioration of the Plant as a going concern.

98. The threat of Lender enforcement is also concrete. Before the Forbearance Agreement, the Lenders served Notices of Disposition of Collateral by Private Sale seeking to sell broad categories of Plaintiffs' collateral. Ex. A, Recitals & Ex. C thereto.

99. The Forbearance Agreement expressly preserved the Lenders' right to reissue notices of foreclosure or exercise other remedies upon expiration of the Forbearance Period. Ex. A § 3(a). The initial sixty-day Forbearance Period has expired.

100. The Lenders are therefore withholding the payoff information necessary to permit Payment in Full while retaining the ability to reissue private-sale notices and proceed against collateral. A private disposition, credit bid, acceptance of collateral, transfer of equity interests, or other enforcement action could alter ownership, control, and operating rights before Plaintiffs receive a fair opportunity to pay the amount demanded.

101. Payment in Full cannot move forward without a payoff letter. Plaintiffs cannot know the final amount, per diem interest, wire instructions, letter-of-credit treatment, or release mechanics unless the Lenders provide them.

102. Plaintiffs also cannot properly support the available funding, address the matured WVEDA Loan, or protect the Plant without OP financial information and reasonable Plant access.

103. Plaintiffs are trying to preserve a major West Virginia asset, address a matured state-authority loan, pay secured creditors, and prevent the Forbearance Agreement from becoming a loan-to-own mechanism.

104. Nathan's conduct is the center of the obstruction. He was given authority to preserve value; he has asserted control over the transaction process while withholding the records and access needed to preserve value and advance credible opportunities.

105. The Lenders benefit from that obstruction and have added their own obstruction by refusing to provide a payoff letter while retaining the ability to proceed against collateral.

## CLAIMS FOR RELIEF

### COUNT I
***Breach of Forbearance Agreement Against TRAG and RG Energy***

106. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

107. The Forbearance Agreement is a valid and enforceable contract between and among Plaintiffs, the Lenders, and other parties. Ex. A.

108. Plaintiffs have performed, substantially performed, and stand ready, willing, and able to perform their obligations, including pursuing a transaction that would result in Payment in Full.

109. The Forbearance Agreement preserves Plaintiffs' ability to procure funds resulting in Payment in Full. Ex. A § 11(b).

110. The Forbearance Agreement expressly authorizes Plaintiffs to enter into transactions resulting in Payment in Full. Ex. A § 11(d).

111. The Forbearance Agreement prohibits interference with efforts to pursue a transaction resulting in Payment in Full. Ex. A § 8(e).

112. The Forbearance Agreement prohibits the Lenders and Nathan from taking or failing to take action whose primary purpose is to frustrate, hinder, or unreasonably interfere with Plaintiffs' efforts to comply with the Forbearance Agreement and loan documents. Ex. A § 13.

113. The Lenders breached the Forbearance Agreement by refusing to provide a complete payoff letter and accounting necessary for Plaintiffs to pursue Payment in Full.

114. The Lenders further breached the Forbearance Agreement by attempting to condition payoff information on broad extra-contractual disclosures and approvals unrelated to calculating the payoff amount.

115. The Lenders' conduct frustrates the Payment-in-Full path preserved by the Forbearance Agreement.

116. Plaintiffs have been and will continue to be harmed by the Lenders' breach, including by impairment of their ability to pay the Lenders, preserve the Plant, support financing, address WVEDA, and avoid loss of value.

117. Plaintiffs are entitled to declaratory relief, specific performance, temporary and permanent injunctive relief, and such other relief as the Court deems appropriate.

**COUNT II**
***Breach of Implied Covenant of Good Faith and Fair Dealing Against TRAG and RG Energy***

118. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

119. Like all contracts, the Forbearance Agreement contains an implied covenant of good faith and fair dealing.

120. The implied covenant requires the Lenders to exercise discretion, approval rights, and contractual rights in good faith and in a manner that does not destroy Plaintiffs' reasonable expectations under the Forbearance Agreement.

121. Plaintiffs reasonably expected that because the Forbearance Agreement preserves their ability to procure funds resulting in Payment in Full, the Lenders would provide the payoff information necessary to make Payment in Full possible.

122. Plaintiffs further reasonably expected that the Lenders would not impose extra-contractual conditions on the basic act of providing the payoff amount, per diem, wire instructions, letter-of-credit treatment, and lien-release mechanics.

123. The Lenders breached the implied covenant by promising to provide payoff information, failing to provide it, and then attempting to condition that information on broad disclosures and approvals unrelated to calculating the payoff amount.

124. The Lenders' conduct constitutes bad-faith interference with Plaintiffs' ability to receive the fruits of the Forbearance Agreement.

125. Plaintiffs have been and will continue to be harmed by the Lenders' breach, including by impairment of their ability to pursue Payment in Full, preserve the Plant, and protect their contractual and property rights.

126. Plaintiffs are entitled to declaratory relief, specific performance, temporary and permanent injunctive relief, and such other relief as the Court deems appropriate.

**COUNT III**
***Breach of Fiduciary and Good-Faith Duties Against Nathan***

127. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

128. Nathan serves in governance roles for OP and QP, including as Independent Manager, as set forth in the Forbearance Agreement and amended operating agreements. Exs. A, C, D.

129. The governing documents require Nathan to act in good faith and as a fiduciary, including with the primary objective of maximizing the value of the Plant. Ex. C § 4(a); Ex. D § 6.2(c).

130. QP is OP's sole member and owns 100% of the membership interests in OP. Ex. C.

131. As its owner and sole member, QP has express rights to OP books and records, director materials, and participation in material OP matters. Ex. C § 15.

132. QP is also OP's tenant under the Ground Lease and has contractual rights to reasonable access to its leased premises and related Plant-access areas. Ex. E.

133. Nathan owes duties to act in good faith and consistent with his fiduciary obligations, including by not obstructing QP's access to OP financial information, OP books and records, director materials, and reasonable Plant access needed to preserve value.

134. On June 22, 2026, after receiving a preliminary indication of interest from a prospective all-cash purchaser, Nathan stated on behalf of OP that OP was "happy to consider parties interested in the asset, but as you know we are in control of that process." Ex. L.

135. By asserting control over the sale process, Nathan confirmed that he possesses and exercises authority over the information, access, and diligence necessary for prospective transactions to advance. His control over those matters must be exercised in good faith and with the primary objective of maximizing the value of the Plant.

136. Nathan may not use that control to obstruct QP, prevent credible purchasers or funding sources from conducting diligence, withhold information from OP's sole member, or preserve his unilateral control at the expense of OP, QP, their creditors, and the Plant.

137. Nathan breached those duties by asserting control over the transaction process while failing to provide, approve, direct, or cause production of OP financial information, books and records, and director materials reasonably necessary for QP to evaluate OP's financial condition, protect its membership interest, address WVEDA, support Payment in Full, and permit credible sale and funding opportunities to proceed through diligence.

138. Nathan further breached those duties by failing to provide, approve, direct, or cause reasonable access for QP and its representatives to QP's leased premises and related Plant-access areas, subject to reasonable safety, insurance, escort, advance-notice, and noninterference conditions.

139. Nathan's conduct is contrary to his duty to act in good faith and with the primary objective of maximizing the value of the Plant.

140. Plaintiffs have been and will continue to be harmed by Nathan's conduct, including by impairment of QP's membership rights, leasehold rights, access rights, ability to preserve the Plant, ability to support financing and sale diligence, and ability to pursue Payment in Full.

141. Plaintiffs are entitled to declaratory relief, temporary and permanent injunctive relief, and such other relief as the Court deems appropriate.

**COUNT IV**
***Aiding and Abetting Nathan's Breach of Fiduciary Duty Against TRAG and RG Energy***

142. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

143. Nathan owed fiduciary and good-faith duties as alleged above.

144. Nathan breached those duties as alleged above.

145. The Lenders knew of Nathan's role, authority, and duties because the Forbearance Agreement and related governance documents created and defined Nathan's role. Exs. A, C, D.

146. The Lenders obtained control protections tied to Nathan's appointment and service.

147. The Lenders knew no later than March 2026 that Nathan was impairing the sale and financing process, obstructing access, and preventing QP from obtaining OP financial information needed to preserve value and repay the debt owed to the Lenders. Exs. B, F, G.

148. The Lenders knowingly participated in and benefited from Nathan's breach. Nathan may not be removed and replaced before Payment in Full without the Lenders' written consent. Ex. A § 7; Ex. C § 4(a); Ex. D § 6.2(a).

149. Nathan's withholding of OP financial information and Plant access impaired Plaintiffs' ability to preserve the Plant, support financing, address WVEDA, and pursue Payment in Full.

150. The Lenders benefited from that obstruction because it increased their leverage and impaired Plaintiffs' ability to provide Payment in Full before further value deterioration.

151. The Lenders also compounded Nathan's obstruction by withholding a payoff letter and attempting to condition payoff information on broad extra-contractual disclosures and approvals. Exs. H, I, J.

152. Plaintiffs also requested that the Lenders consent to Nathan's removal or replacement because of his obstruction.

153. The Lenders refused or failed to consent to Nathan's removal or replacement.

154. The Lenders' refusal to act after receiving notice of Nathan's obstruction demonstrates that the Lenders knowingly participated in, ratified, acquiesced in, and benefited from Nathan's breach.

155. Plaintiffs have been and will continue to be harmed by the Lenders' knowing participation in Nathan's breach, including by impairment of their ability to preserve the Plant, access OP information, support financing, and pursue Payment in Full.

156. Plaintiffs are entitled to declaratory relief, temporary and permanent injunctive relief, damages to the extent available and proven, and such other relief as the Court deems appropriate.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A. A declaration that the Lenders may not refuse to provide payoff information necessary for Plaintiffs to pursue Payment in Full;

B. A declaration that the Lenders may not condition delivery of payoff information on extra-contractual preconditions, approval of a funding source, approval of financing terms, or production of unrelated historical materials;

C. An order requiring the Lenders to provide a complete written payoff letter and accounting identifying the amount the Lenders contend is required for Payment in Full, including principal, interest, default interest, fees, expenses, attorneys' fees, per diem interest, wire instructions, letter-of-credit treatment, payoff conditions, and lien-release mechanics;

D. A declaration that QP is entitled to OP financial information, books and records, director materials, WVEDA-related materials, consultant and financial-advisor materials, and other OP records reasonably necessary for QP to evaluate OP's financial condition, protect its membership interest, address WVEDA, support Payment in Full, and preserve the Plant;

E. An order requiring Nathan, in his capacity as Independent Manager and to the extent within his possession, custody, control, authority, or practical ability, to provide, approve, direct, or cause OP to provide the OP financial information, books and records, director materials, and related materials described above;

F. A declaration that QP is entitled to reasonable access to QP's leased premises and related Plant-access areas under the Ground Lease, subject to reasonable safety, security, insurance, escort, advance-notice, and noninterference conditions;

G. An order requiring Nathan, in his capacity as Independent Manager and to the extent within his possession, custody, control, authority, or practical ability, to provide, approve, direct, or cause reasonable access for QP and its employees, vendors, contractors, consultants,

financing sources, and sale or diligence representatives to QP's leased premises and related Plant-access areas;

H. Temporary, preliminary, and permanent injunctive relief restraining the Lenders from unreasonably denying, delaying, conditioning, or obstructing delivery of payoff information;

I. Temporary, preliminary, and permanent injunctive relief restraining Nathan from unreasonably denying, delaying, conditioning, or obstructing OP financial-record access or Plant access;

J. Expedited proceedings and an expedited hearing on Plaintiffs' request for preliminary injunctive relief;

K. Damages to the extent available and proven;

L. Costs, attorneys' fees, and expenses to the extent permitted by contract, statute, rule, or equity; and

M. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**OMNIS GLOBAL TECHNOLOGIES, LLC,**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC**

By Counsel

*/s/ Isaac R. Forman*
Isaac R. Forman (WV State Bar No. 11668)
Andrew J. Tessman (WV State Bar No. 13734)
Levi B. Pellegrin (WV State Bar No. 13669)
HISSAM FORMAN DONOVAN RITCHIE, PLLC
P.O. Box 3983
Charleston, WV 25339
681 - 265 - 3802 *office*
304 – 982 – 8056 *fax*

iforman@hfdrlaw.com
atessman@hfdrlaw.com
lpellegrin@hfdrlaw.com

**VERIFICATION**

I, Charles Gassenheimer, state that I am the President of Omnis Fuel Technologies, LLC; that I am authorized to make this Verification on behalf of the Plaintiffs; that I have read the foregoing Verified Complaint; and that the factual allegations contained in it are true and correct to the best of my knowledge, information, and belief.

Charles Gassenheimer (Jul 7, 2026 16:37:43 EDT)

Charles Gassenheimer

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

# AMENDED AND RESTATED

# FORBEARANCE AGREEMENT

This Amended and Restated Forbearance Agreement (this "**Agreement**") is entered into as of February 6, 2026 (the "**Effective Date**"), by and among TRAG LLC ("**TRAG**") and RG Energy LLC ("RGE" and, together with TRAG, the "**Lenders**"), and Omnis Global Technologies, LLC ("**OGT**"), Omnis Fuel Technologies, LLC ("**OFT**"), Quantum Pleasants, LLC ("**Quantum Pleasants**"), and Omnis Pleasants, LLC ("**OP**" and, together with OGT, OFT and Quantum Pleasants, the "**Omnis Parties**"). Terms that are used but not defined herein shall have the meanings set forth in the Loan Agreements (as defined below).

RECITALS

WHEREAS, OGT, as Borrower, OFT, Quantum Pleasants, and TRAG are party to that certain Loan and Security Agreement, dated May 26, 2023, as amended by that certain Amendment No. 1, dated June 30, 2023, as further amended by that certain Amendment No. 2, dated July 9, 2024, as further amended by that certain Amendment No. 3, dated August 1, 2024, and as further amended hereby (as so amended, the "**May 2023 Loan Agreement**");

WHEREAS, OGT, OFT and Quantum Pleasants granted to TRAG a security interest in the assets set forth in the May 2023 Loan Agreement, and Omnis Advanced Technologies, LLC ("**OAT**") granted to TRAG a security interest in the assets set forth in the IP Security Agreement (as defined in the May 2023 Loan Agreement) (such security interests, collectively, the "**May 2023 Loan Agreement Liens**");

WHEREAS, OGT, as Borrower, OFT, and RGE are party to that certain Loan and Security Agreement, dated June 2, 2023, as amended by that certain Amendment No. 1, dated June 30, 2023, as further amended by that certain Amendment No. 2, dated July 9, 2024 and as further amended hereby (as so amended, the "**June 2023 Loan Agreement**");

WHEREAS, OFT granted to RGE a security interest in the assets set forth in the June 2023 Loan Agreement and OAT granted to RGE a security interest in the assets set forth in the IP Security Agreement (as defined in the June 2023 Loan Agreement) (such security interests, collectively, (the "**June 2023 Loan Agreement Liens**");

WHEREAS, Quantum Pleasants, as Borrower, OFT, OP, and the West Virginia Economic Development Authority ("**WVEDA**") are party to that certain Loan Agreement, dated December 13, 2023 (the "**WVEDA Loan Agreement**");

WHEREAS, Quantum Pleasants, OFT, and OP granted or are required to grant to WVEDA a security interest in certain assets set forth in the WVEDA Loan Agreement (the "**WVEDA Liens**");

WHEREAS, Quantum Pleasants, OP, and WVEDA are party to that certain Promissory Note dated December 13, 2023, entered in connection with the WVEDA Loan Agreement (the "**WVEDA Promissory Note**");

WHEREAS, OP endorsed and agreed to pay all principal, interest, amounts, fees and payments of any kind due and owing by Quantum Pleasants in connection with the WVEDA Promissory Note (the "**OP WVEDA Endorsement**"; and the obligations of the Omnis Parties pursuant to the WVEDA Loan Agreement, the WVEDA Promissory Note and the OP WVEDA Endorsement, collectively, the "**WVEDA Indebtedness**");

WHEREAS, OFT, as Borrower, OGT, Quantum Pleasants, and TRAG are party to that certain Loan and Security Agreement, dated January 14, 2025, as amended hereby (as so amended, the "**January 2025 Loan Agreement**");

WHEREAS, OFT granted to TRAG a security interest in the assets set forth in the January 2025 Loan Agreement (the "**January 2025 Loan Agreement Liens**", and together with the May 2023 Loan Agreement Liens and June 2023 Loan Agreement Liens, the "**Lender Liens**");

WHEREAS, OFT, as Borrower, OGT, Quantum Pleasants, and TRAG are party to that certain Secured Promissory Note, dated March 31, 2025, as amended hereby (as so amended, the "**March 2025 Loan Agreement**") which is secured by the Collateral set forth in the January 2025 Loan Agreement and such security interest is included in the January 2025 Loan Agreement Liens;

WHEREAS, OP, as Maker, and Bilt Technology LLC ("**Bilt Technology**") are party to that certain Promissory Note, dated April 8, 2025 (the "**Bilt Technology Promissory Note**", and the obligations of OP pursuant to the Bilt Technology Promissory Note, the "**Bilt Indebtedness**");

WHEREAS, Simon K. Hodson, as Guarantor, and Bilt Technology are party to that certain Personal Guarantee, dated April 8, 2025, entered in connection with the Bilt Technology Promissory Note (the "**Hodson Personal Guarantee**");

WHEREAS, OP, as Borrower, Quantum Pleasants and TRAG are party to that certain Loan and Security Agreement, dated January 29, 2026 (the "**January 2026 Loan Agreement**", and together with the May 2023 Loan Agreement, June 2023 Loan Agreement, the January 2025 Loan Agreement, and the March 2025 Loan Agreement, the "**Loan Agreements**");

WHEREAS, Dynamic HC Co and Harmony Trust have advanced funds to OGT, OFT and Quantum Pleasants to sustain their operations (the "**DHC Indebtedness**");

WHEREAS, the Lenders have sent those certain Notices of Default and Reservation of Rights, dated October 1, 2025 (the "**Notices of Default**") to the Borrowers (copies of which are attached hereto as **Exhibit A**), in which the Lenders identified certain prior and currently existing Events of Default (the "**Noticed Defaults**");

WHEREAS, the Lenders have sent those certain Notices of Disposition of Collateral By Private Sale, dated October 21, 2025 (the "**First Notices of Foreclosure**") to the Borrowers (copies of which are attached hereto as **Exhibit B**);

WHEREAS, certain Events of Default have occurred due to breaches of the "Indebtedness" negative covenant stipulated in the Loan Agreements, resulting from the incurrence of Indebtedness relating to capital lease obligations, certain Contingent Obligations, including credit card obligations, and other indebtedness for borrowed money associated with various other loan documents, including the WVEDA Indebtedness, the Bilt Indebtedness and the DHC Indebtedness (collectively referred to as the "**Debt Covenant Defaults**");

WHEREAS, certain Events of Default have occurred due to breaches of the "Encumbrances" negative covenant stipulated in the Loan Agreements, resulting from the Lender Liens, the WVEDA Liens, vendor liens, purchase money security interests (PSMI) incurred in the ordinary course; equipment capital leases and any related encumbrances (the "**Lien Covenant Defaults**");

WHEREAS, certain Events of Default have occurred due to breaches of the "Confidentiality" covenant stipulated in the Loan Agreements by the Omnis Parties (the "**Confidentiality Covenant Default**"), and together with the Debt Covenant Defaults, the Lien Covenant Defaults and the Noticed Defaults, the "**Existing Defaults**");

WHEREAS, the Lenders and the Omnis Parties previously entered into that certain Forbearance Agreement, dated October 22, 2025 (the "**Prior Agreement**");

WHEREAS, the Prior Agreement has terminated as a result of a breach by the Omnis Parties and pursuant to its terms;

WHEREAS, the Existing Defaults are existing and continuing;

WHEREAS, the Lenders have sent those certain Notices of Disposition of Collateral By Private Sale, dated February 2, 2026 (the "**Second Notices of Foreclosure**" and together with the First Notices of Foreclosure, the "**Notices of Foreclosure**") to the Borrowers (copies of which are attached hereto as **Exhibit C**);

WHEREAS, Lenders are willing to continue to forbear from exercising their rights and remedies under the Loan Agreements for a limited period, subject to and conditioned upon the full, complete, timely and continued performance by the Omnis Parties of all of the terms and conditions set forth herein; and

WHEREAS, the Lenders and the Omnis Parties desire to amend and restate the Prior Agreement with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Prior Agreement be, and hereby is, amended and restated in all respects by this Agreement, and the parties agree as follows:

1. Incorporation by Reference. The parties acknowledge and agree that the foregoing recitals are true and correct and are incorporated herein by reference as if fully set forth in this Agreement.

2. Amendments to Loan Agreements.

a. The following definition shall hereby be inserted into Exhibit A of each Loan Agreement in appropriate alphabetical order:

> ""Payment in Full" or "Paid in Full" means, with respect to the Obligations, the indefeasible payment in full in cash of all principal, accrued and unpaid interest, fees, costs, expenses, and other amounts owing under this Agreement (other than contingent indemnification obligations with respect to claims not yet asserted) and the termination, cancellation, or cash collateralization (in an amount equal to 103% of the face value of the letter of credit) of the Letter of Credit (as defined in that certain Amended and Restated Forbearance Agreement, dated as of February 3, 2026, by and among, inter alia, the Lender and the Omnis Parties)."

b. The definition of "Obligations" contained in Exhibit A of each Loan Agreement is hereby amended and restated as follows:

> ""Obligations" means all debt, principal, interest, Lender Expenses, and other amounts owed to Lender by Borrower pursuant to this Agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding and including any debt, liability, or obligation owing from Borrower to others that Lender may have obtained by assignment or otherwise."

c. With respect to the Obligations, each instance of "payment in full", "paid in full", "satisfied in full" or any similar language used in each of the Loan Agreements is hereby deleted and replaced with "Payment in Full" or "Paid in Full".

d. Section 12.7 of each Loan Agreement is hereby amended and restated in its entirety as follows:

"12.7 Survival. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding. The obligations of each Omnis Party to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run."

e. The following new Section 12.9 shall be inserted into each Loan Agreement immediately following Section 12.8 therein:

"12.9 Termination. Upon Payment in Full of the Obligations, (a) this Agreement and any IP Security Agreement executed in connection herewith shall automatically terminate, except for those provisions that expressly survive termination, and (b) all liens and encumbrances granted to Lender in connection with this Agreement and the IP Security Agreement shall automatically be released and terminated without further action by any Person. At the Borrower's expense, the Lender shall promptly (a) deliver to the Borrower termination statements, lien releases, discharges, reconveyances, and other documents reasonably requested by the Borrower to evidence the release of such Liens, and (b) instruct any third-party depositary, custodian, or other bailee holding Collateral to return such Collateral to the Borrower."

3. Forbearance Period.

a. Subject to and conditioned upon the full, complete, timely and continued performance by the Omnis Parties of all of the terms and conditions set forth herein, Lenders agree to forbear from exercising their rights and remedies under the Loan Agreements solely with respect to the Existing Defaults for a period commencing on the Effective Date and ending on the date that is the earliest of (a) sixty (60) days following the Effective Date or (b) the occurrence of a Forbearance Default (the "**Forbearance Period**"), unless earlier terminated pursuant to this Agreement, which Forbearance Period may be extended in the sole discretion of the Lenders. Notwithstanding the foregoing, if, prior to the expiration of the Forbearance Period, the parties have entered into a binding agreement for the sale of all or substantially all of the assets of OP or the equity interests in OP pursuant to the Sale Process, and the only material condition(s) to closing such sale is the receipt of approval(s) from the Federal Energy Regulatory Commission ("**FERC**") and/or any other applicable regulatory body, then the Forbearance Period shall be automatically extended for an additional thirty (30) days solely to permit the parties to obtain such FERC approval. The Lenders agree that the Notices of Default and the First Notices of Foreclosure were previously rescinded upon the effectiveness of the Prior Agreement. The Lenders further agree to rescind the Second Notices of Foreclosure effective upon the parties' execution and delivery of this Agreement. The parties agree that nothing in this Agreement will prevent the Lenders from: (a) issuing notices of default or Notices of Foreclosure or exercising any other rights and remedies for Forbearance Defaults or (b) reissuing Notices of Default or Notices of Foreclosure or exercising any other rights and remedies upon the expiration of the Forbearance Period. Each of the following shall constitute a "**Forbearance Default**": (i) any Omnis Party fails to comply with any of its covenants, undertakings or other agreements set forth in this Agreement and, if curable, fails to cure such non-compliance with five (5) Business Days of being notified thereof; (ii) the occurrence of any Event of Default other than the Existing Defaults or other than Events of Default arising from non-compliance with Sections 7.3 (Indebtedness) and Sections 7.4 (Encumbrances) of the Loan Agreements (it being understood that any breach of debt and encumbrance covenants contained herein would be considered a "Forbearance Default" pursuant to the preceding clause (i)) and, if curable, fails to cure such non-compliance with five (5) Business Days of being notified thereof; (iii) any representation or warranty in this Agreement proving to have been materially incorrect when made or deemed made, or (iv) any holder of material indebtedness (other than Lenders) of any Omnis Party taking any legal action against such Omnis Party, any Collateral or any other material assets or properties of any Omnis Party as a result of any defaults or events of default under the agreements, documents or instruments evidencing such indebtedness, as the case may be. As used herein "legal action" means the commencement

of any action, suit, or proceeding in any court of competent jurisdiction or before any governmental agency, including but not limited to, the filing of any complaint, petition, application, or motion seeking to enforce rights or remedies with respect to such indebtedness, Collateral, or assets, and expressly excluding the delivery or issuance of any notice (including notices of default, acceleration, or demand) or any other out-of-court or non-judicial enforcement actions that do not require a court or governmental agency filing. Notwithstanding the foregoing, any action or omission of the CEO and/or the Independent Manager that would otherwise constitute a breach of this Agreement or an Event of Default, shall not constitute a Forbearance Default.

4. Acknowledgement of Validity of Loan Agreements, Loans and Default. Each of the Omnis Parties acknowledges and agrees that:

a. Payment Default. The Existing Defaults have occurred, continue to exist and have not been cured.

b. Confirmation of Amounts Due. Each of the Omnis Parties acknowledges and agrees that, as of the close of business on February 3, 2026, pursuant to the terms of the Loan Agreements (i) the aggregate Principal balance of the outstanding amount under the Loan Agreements was not less than $58,891,450; (ii) accrued interest on the aggregate amount due to the Lenders was not less than $12,832,870, (iii) accrued origination fees and late fees due to Lenders were not less than $3,355,497, and (iv) Lender Expenses due to the Lenders was not less than $400,000.

c. Full Force and Effect. The Loan Agreements and the Loans remain in full force and effect and constitute valid, binding obligations of each of the Omnis Parties.

5. Reaffirmation of Loans. Each of the Omnis Parties hereby ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under the Loan Agreements, agrees and acknowledges that the Loan Agreements and the Loans constitute legal, valid and binding obligations of each of the Omnis Parties. Each of the Omnis Parties further agrees that such ratification and reaffirmation is not a condition to the continued effectiveness of the Loan Agreements and neither such ratification and reaffirmation, nor the Lenders solicitation of such ratification and reaffirmation, constitutes a course of dealing giving rise to any obligation or condition requiring a similar or any other ratification or reaffirmation with respect to any subsequent modifications, consent or waiver with respect to the Loan Agreements. Each of the Omnis Parties acknowledges and agrees that the Loan Agreements shall continue in full force and effect and that all of the Loans thereunder are valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Agreement, other than as expressly set forth herein and subject to the terms hereof.

6. Reaffirmation of Liens in Collateral. Each of the Omnis Parties hereby affirms, ratifies, and confirms that the liens and security interests granted to each Lender under its respective Loan Agreement(s) in and to the Collateral are and shall remain in full force and effect, are validly created and secure the prompt payment and performance of the respective Obligations. To the extent continuation, creation or perfection of the Lenders' security interest reasonably requires further documentation at any time, each of the Omnis Parties covenant that they shall cooperate fully with the Lenders' efforts to effectuate the same, including by signing, filing, or recording, or authorizing Lenders to sign, file, or record such additional documentation as may be reasonably requested by the Lender, including the filing of an amendment to the Lenders' UCC-1 Financing Statement(s). Each of the Omnis Parties hereby expressly authorizes the Lenders to file any such an amendment as the Lenders reasonably determine to be appropriate.

7. Consideration for Forbearance. In consideration of this Agreement and the Lenders' forbearance as set forth herein, the Omnis Parties hereby agree as follows:

a. Within five (5) Business Days of the Effective Date (unless extended by the Lenders), the Quantum Pleasants operating agreement will be amended, in a form approved by the Lenders, to grant the Independent Manager approval rights over: (1) Quantum Pleasants' exercise of voting rights in OP with respect to the matters set forth in Section 7(b) and any matters intended to circumvent decisions of the CEO or the terms of this Agreement; (2) sales or disposals of Quantum Pleasants assets outside the ordinary course of business (including its interests in OP and the Power Plant) prior to the Payment in Full of the Obligations; (3) related party transactions involving Quantum Pleasants and its members or affiliates; (4) member distributions (provided that the Independent Manager shall approve distributions to the Quantum Pleasants members in an amount at least equal to the members' estimated tax liabilities (based on the maximum federal and West Virginia income tax rate for individuals residing in West Virginia) attributable to the net taxable profit generated by Quantum Pleasants for the year in question, including gain generated by the sale of the Pleasants Power Plant, as directed by the Independent Accounting Firm); provided that, after Payment in Full of the Obligations, the Independent Manager's approval rights over member distributions shall not restrict or delay any distributions so long as Quantum Pleasants maintains sufficient reserves to account for all liabilities and obligations, as determined in good faith by the Independent Accounting Firm; (5) the annual budget, business plan, and material deviations until Payment in Full of the Obligations; (6) amendments to the operating agreement of Quantum Pleasants, provided that, after Payment in Full of the Obligations, the Independent Manager's approval rights over amendments to the operating agreement shall be limited solely to amendments that would alter or affect the rights, duties, or protections of the Independent Manager, and (7) filing any application or petition initiating (or consenting to the initiation of) any bankruptcy or insolvency proceeding under federal or state bankruptcy or insolvency laws until Payment in Full of the Obligations. The Independent Manager may be appointed and removed only with the joint written consent of OFT and the Lenders. It being expressly understood that in all other matters not described in the foregoing, OFT shall retain exclusive governance and operational authority of Quantum Pleasants.

b. Within five (5) Business Days of the Effective Date (unless extended by the Lenders), the OP operating agreement will be amended, in a form approved by the Lenders, to grant the Independent Manager approval rights over: (1) sales or disposals of OP assets outside the ordinary course of business (including the Power Plant), (2) related party transactions involving Quantum Pleasants and its members or affiliates; (3) member distributions (provided that the Independent Manager shall approve distributions to the OP members from the sale of the Pleasants Power Plant after payment of all liabilities and obligations of OP and the creation of a reasonable reserve for contingent liabilities, and distributions each year will at least equal the members' estimated tax liabilities (based on the maximum federal and West Virginia income tax rate for individuals residing in West Virginia) attributable to the net taxable profit generated by QP for the year in question, as directed by the Independent Accounting Firm); provided that, after Payment in Full of the Obligations, the Independent Manager's approval rights over member distributions shall not restrict or delay any distributions so long as OP maintains sufficient reserves to account for all liabilities and obligations, as determined in good faith by the Independent Accounting Firm; (4) removal of the CEO, (5) the annual budget, business plan, and material deviations, (6) amendments to the operating agreement of OP, provided that, after Payment in Full of the Obligations, the Independent Manager's approval rights over amendments to the operating agreement shall be limited solely to amendments that would alter or affect the rights, duties, or protections of the Independent Manager, and (7) filing any application or petition initiating (or consenting to the initiation of) any bankruptcy or insolvency proceeding under federal or state bankruptcy or insolvency laws until Payment in Full of the Obligations. The Independent Manager may be appointed and removed only with the joint written consent of Quantum Pleasants and the Lenders.

c. The Omnis Parties agree to appoint:

i. Within five (5) Business Days (or such longer period as agreed to by Lender), a qualified and experienced individual approved by the Omnis Parties and Lenders as the "Independent Manager" of OP and Quantum Pleasants (in such capacity, the "**Independent Manager**"), it being

acknowledged that that Gilbert Nathan and William Wexler have been recommended and the parties are currently vetting these choices. In the event the Omnis Parties and Lenders do not approve and appoint an Independent Manager within such period, then David Hindman shall have the authority to choose and appoint the Independent Manager.

ii. David Hindman, by and through AP Services, LLC ("**APS**"), an affiliate of AlixPartners LLP ("**AlixPartners**"), as the Chief Executive Officer of OP (the "**CEO**"). It being understood that the existing Chief Executive Officer of OP be, and hereby is, removed as an officer of OP and David Hindman be, and hereby is, elected as the CEO of OP, with the CEO having such rights as set forth herein, which election is subject to and in accordance with the terms of the engagement letter by and between OP and APS ("**Engagement Letter**"), for the performance of services by APS and Mr. Hindman as CEO. For the avoidance of doubt, in the event of any conflict between this Agreement and the Engagement Letter, the Engagement Letter shall control.

Such appointments shall be pursuant to written consents by the Board of OP (and Quantum Pleasants in the case of the Independent Manager) in form and substance satisfactory to the Lenders.

d. If the Omnis Parties and Lenders agree in writing that it is in the best interests of Quantum Pleasants and OP for the Independent Manager to serve as both the Independent Manager and the CEO, then the Omnis Parties and Lenders may direct the Independent Manager to remove the CEO and all references in this Agreement to the CEO will be deemed to refer to the Independent Manager.

e. APS shall continue the services that AlixPartners has been providing as an independent financial advisor (the "**FA**") to the Power Plant and OP in accordance with the terms and fee structure outlines in the Engagement Letter. The CEO and FA shall be immediately granted access to all books and records, facilities, employees and any other materials and information of all Omnis Parties as may be reasonably necessary to allow the FA to deliver to the Omnis Parties and Lenders a report identifying any and all recommendations to improve performance, cash flow, profit and loss and such other financial metrics as shall be discussed between the FA and the CEO.

f. Randall Smith, be and hereby is, removed as Chief Financial Officer of Quantum Pleasants and OP. Randall Smith and Simon Hodson shall be immediately removed as signatories on the bank accounts of OP and shall be replaced by the CEO. The Omnis Parties agree that the CEO, in consultation with the Independent Manager, shall have the authority to recommend a nationally recognized accounting firm to manage the accounting and financials for the Power Plant, OP and Quantum Pleasants (the "**Independent Accounting Firm**"), which accounting firm shall be subject to the approval of the Lenders and the Board of Directors of each of OP and Quantum Pleasants, which approval shall not be unreasonably withheld, conditioned, or delayed and shall be provided within five (5) days of the CEO's recommendation. The Lenders, including their accountants, shall be immediately granted access to all books, records, and accounts of the Omnis Parties, and the CEO, FA, and independent accounting firm shall be authorized to share all such information with the Lenders.

g. OP hereby grants to Lenders a first priority security interest in all property and assets of OP, including the Power Plant (collectively, the "**Power Plant Collateral**"); provided that Power Plant Collateral will include a second priority security interest in any property required to be pledged as collateral to secure the WVEDA Loan until such time as consent is provided by WVEDA, which WVEDA Loan does not include a pledge of the Power Plant. Notwithstanding any termination of this Agreement or of any filings undertaken related to Lenders' rights under the Uniform Commercial Code (the "**Code**"), the Lenders' lien on the Power Plant Collateral shall remain in effect for so long as any Obligations under the Loan Agreements are outstanding. OP authorizes Lenders to file at any time financing statements, continuation statements, and amendments thereto that (i) specifically describe the relevant Power Plant Collateral and (ii) contain any other information required by the Code for the sufficiency of filing office

acceptance of any financing statement, continuation statement, or amendment, including whether the OP is an organization, the type of organization and any organizational identification number issued to OP, if applicable. OP will not create any chattel paper without placing a legend on the chattel paper acceptable to Lenders indicating that Lenders have a security interest in the chattel paper. OP shall take such other actions as Lenders reasonably request to perfect its security interests granted under this Agreement.

h. The Omnis Parties shall use commercially reasonable efforts to obtain the written consent of the West Virginia Economic Development Authority, a governmental instrumentality and body corporate of the State of West Virginia ("**WVEDA**"), to grant the Lenders a first priority security interest in the Power Plant Collateral. In consideration of such consent by WVEDA, OP shall grant to WVEDA a second priority security interest in Power Plant Collateral in connection with the WVEDA loan, which second priority security interest shall be subordinate in all respects to Lenders' first priority security interest, and WVEDA shall agree in writing to such subordination. All documentation relating to any such security interest shall be subject to Lenders prior written approval, which such consent shall not be unreasonably withheld or conditioned. Subject to OP's compliance with the foregoing, in the event WVEDA refuses to provide such consent, such refusal will not be considered a breach of this Agreement by the Omnis Parties.

i. In connection with that certain Irrevocable Standby Letter of Credit, dated January 28, 2026, issued by Bank of America, N.A. for the benefit of TYR Energy, LLC ("**TYR**") and payable by TRAG (the "**Letter of Credit**"), OP agrees that, in the event the Letter of Credit is drawn against by TYR, OP will repay to TRAG any such amounts drawn against the Letter of Credit and such repayment obligation will be secured by the Power Plant Collateral. OP shall take all further actions and execute all further documents as may be reasonably required by Lenders to memorialize the foregoing payment obligation and security interest. Notwithstanding the foregoing, OP's failure to pay the Lenders any reimbursement obligation during the Forbearance Period due to the unavailability of funds, in the sole discretion of the CEO, shall not constitute a Forbearance Default.

8. Joint Sale Process Authority. Notwithstanding anything to the contrary in this Agreement or the Loan Agreements, the Lenders and OFT, acting through their respective designated representatives, shall have the joint authority to initiate, manage, and conduct a process to solicit, and negotiate one or more transactions for the sale of all or substantially all of the assets of OP, including the Power Plant, or the equity interests in OP (the "**Sale Process**"). The parties may, at their own cost and expense, engage advisors, market the assets, and take such other actions as are reasonably necessary to facilitate the Sale Process and consummate a sale of the Power Plant, subject to the terms herein.

a. Full Transparency and Cooperation. The Lenders, OFT, and their respective advisors shall provide each other with full and prompt access to all information, documents, communications, and materials related to the Sale Process, including but not limited to all term sheets, proposals, offers, correspondence with potential purchasers, and drafts of transaction documents. Both parties and their advisors shall have the right to participate in all material meetings and discussions with prospective purchasers or their representatives, and to receive reasonable advance notice of such meetings.

b. Bona Fide Offer Requirement. No sale of OP or the Power Plant assets shall be promised, pledged, or agreed, including, the execution of any term sheet for the foregoing, unless a bona fide, written offer from a third party (the "**Bona Fide Offer**") is received and approved pursuant to the terms of this Agreement. A Bona Fide Offer must (a) be in writing, (b) be from a financially capable purchaser, (c) set forth all material terms and conditions, including purchase price, form of consideration, and any contingencies, and (d) be accompanied by evidence of committed financing or other proof of funds reasonably satisfactory to the Lenders.

c. Lender Approval. No sale of OP or the Power Plant assets pursuant to the Sale Process shall be promised, pledged, or agreed without the prior written approval of the Lenders, which approval

shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, if a Bona Fide Offer is received for the sale of OP or the Power Plant assets that would result in Payment in Full of the Obligations under the Loan Agreements, plus the payment in full of all other indebtedness of Quantum Pleasants and Omnis Pleasants, the Lenders shall not withhold, condition, or delay their approval of such sale, unless the Lenders present a written, binding, and superior Bona Fide Offer (on terms at least as favorable in the aggregate to the Omnis Parties and their creditors) within five (5) Business Days of receipt of the Bona Fide Offer.

d. Board Approval. Subject to a sale meeting the requirements of Section 8(c), any sale of OP or the Power Plant assets pursuant to the Sale Process shall also be subject to the prior written approval of the Independent Manager and the board of directors (or equivalent governing body) of OP (and, if applicable, Quantum Pleasants).

e. No Interference. Neither the Lenders nor OFT shall intentionally take actions the primary purpose of which is to materially interfere with the other party's efforts to pursue a transaction that would result in the Payment in Full of the Obligations; provided, however, that nothing herein shall limit or restrict the Lenders' rights or remedies under the Loan Agreements following termination of the Forbearance Period.

9. Additional Agreements among the Parties. In addition to the foregoing, each of the Lenders and the Omnis Parties hereby agree as follows:

a. Role of Independent Manager.

i. The Independent Manager shall (A) receive all notices and materials provided to OP and/or Quantum Pleasant's Board in connection with any meeting or action by written consent, (B) have reasonable access to the OP and Quantum Pleasant's books and records, and (C) participate in meetings (in person or telephonically) at which material OP and/or Quantum Pleasant actions are considered. The Independent Manager shall have the consent rights with respect to OP and Quantum Pleasants as set forth in the OP Amendment and Quantum Pleasants Amendment, respectively.

ii. The Independent Manager is not an agent, fiduciary, or representative of any Lender and shall owe fiduciary duties solely as provided under applicable law to OP and Quantum Pleasants (and, if applicable, its members) in performing his or her duties.

b. Role of the CEO.

i. The CEO is hereby authorized to make all operational decisions regarding the Pleasants Power Station (the "**Power Plant**"), including, but not limited to, authority to sign contracts, access all bank accounts, add and remove persons from such bank accounts, authorize payments on behalf of OP and the Power Plant, approve expenditures and disbursements, hire and fire Power Plant personnel, engage counsel, incur indebtedness, and all other actions that are customary for a Chief Executive Officer operating in a similar industry. The CEO shall immediately have access to all books, records, facilities, materials, employees, and such information as may be reasonably necessary to execute the responsibilities set forth in this Agreement. The CEO shall be responsible for ensuring the timely payment of all payroll obligations for employees of Omnis Pleasants in the ordinary course of business consistent with current practices. This obligation shall include, but not be limited to, the payment of all wages, salaries, and related employment taxes and withholdings for such employees as and when due, subject to the availability of funds and applicable law.

ii. The CEO is not an agent, fiduciary, or representative of any Lender and shall owe fiduciary duties solely as provided under applicable law to OP and its members in performing his or her duties.

c. The Independent Manager and the CEO shall act in good faith to ensure that all material decisions, actions, and approvals are made with the primary objective of maximizing the value of the Power Plant, consistent with their other fiduciary duties under applicable law.

d. The Omnis Parties agree to cooperate with the Lender to obtain a standalone Side A directors and officers insurance policy covering the CEO and Independent Manager ("**D&O Insurance**") at the reasonable cost and expense of OP, which D&O Insurance will be secured within five (5) Business Days following the Effective Date and will be effective as of the Effective Date. If such D&O Insurance is not obtained, the CEO shall have the authority to obtain such D&O Insurance on commercially reasonable terms at the reasonable cost and expense of OP. Failure by Omnis Parties to procure such D&O Insurance within 5 Business Days shall not be deemed a breach of this Agreement or a Forbearance Default.

e. The Omnis Parties agree to enter into such other agreements as may be reasonably required by the CEO, AlixPartners, APS, or the Independent Manager in connection with their engagement pursuant to the terms of this Agreement.

f. In addition to the indemnification and exculpation provisions set forth in the OP and Quantum Pleasants operating agreements (as applicable), to the fullest extent permitted by law, the CEO, APS, AlixPartners, and the Independent Manager shall not have any liability to the Omnis Parties, the Lenders, or any other Person for any loss, damage, claim, or liability whatsoever arising out of or related to the performance of their duties as CEO and Independent Manager (as applicable), except to the extent arising from their fraud, gross negligence, willful misconduct, or bad faith.

g. The Lenders and Omnis Parties shall cooperate reasonably in all respects with the CEO and FA in good faith and not interfere with their duties performed in accordance with the terms of this Agreement;

h. The Lenders and Omnis Parties shall take all actions and execute all documents, including without limitation, any and all corporate resolutions, necessary or reasonably appropriate to effectuate the terms of this Agreement;

i. Any decisions made by the Omnis Parties, the Lenders, the CEO, IM, CFO and FA under this Agreement shall be made in good faith and in a manner reasonably intended to be in the best interests of Quantum Pleasants and OP, and for the purpose of reducing their expenses or maximizing their revenues without unduly exposing their assets or operations to risks of material liabilities (other than contractual obligations); and

j. Neither the Lenders nor the Omnis Parties, nor any of their respective principals, officers, directors, employees, agents, or representatives, shall disparage the other party, whether orally or in writing, or make or issue any public statements regarding the other party, except as required by applicable law or regulation; provided that nothing herein shall prohibit good-faith statements made to such party's attorneys, financial advisors, or other professional representatives in connection with this Agreement and the Loan Agreements.

10. Independent Manager and CEO. Lenders hereby agree and confirm that each of the Independent Manager and CEO: (a) do not have any material direct or indirect financial interest in any Lender or an any affiliate of any Lender, and (b) are not a person who controls, is controlled by, or is under common control with any Lender or an any affiliate of any Lender, in each case other than customary compensation for serving as Independent Manager.

11. Negative Covenants. None of the Omnis Parties will take any of the following actions without the prior written consent of the Lenders:

a. Enter into any agreement or take any action that would materially and adversely affect the Lenders' rights and remedies under this Agreement and the Loan Agreements;

b. Raise capital, incur indebtedness, incur or modify any liens, or issue equity in any Omnis Party; provided, however, that nothing herein will limit or restrict (i) the Omnis Parties from incurring vendor liens, purchase money security interests (PSMI), equipment capital leases and any related encumbrances, in the ordinary course of business, (ii) the Omnis Parties (other than Quantum Pleasants or OP) from incurring unsecured indebtedness to fund their operations in the ordinary course as currently conducted provided such amount does not exceed $1,000,000 per month or (iii) modifying the Lender Liens and/or WVEDA Liens as set forth herein, provided, further, that nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations (which payment shall terminate this Agreement and the Loan Agreements);

c. Pay off any indebtedness of any Omnis Party, or of any affiliate of any Omnis Party, including intercompany loans, prior to Payment in Full of all Obligations under each Loan Agreement. For the avoidance of doubt, "indebtedness" for purposes of this Section 11(c) does not include operating liabilities, accounts payable or accrued expenses incurred in the ordinary course of business to third parties that are not affiliates of any Omnis Party;

d. Enter into any transaction to sell, transfer, or assign, any material assets of any Omnis Party, including by merger or equity purchase, the sale of the Power Plant or intellectual property, but excluding sales, transfers or assignments in the ordinary course or transactions that will result in the Payment in Full of all Obligations under the Loan Agreements;

e. Make any distributions of capital to any members of any Omnis Party, including intercompany distributions from one Omnis Party to another Omnis Party (other than distributions made to members of any Omnis Party solely to cover pass-through tax liabilities of the members arising from the operations of such Omnis Party, as directed by the Independent Accounting Firm) prior to Payment in Full of the Obligations with respect to each Loan Agreement;

f. Use revenues derived from the operation of the Power Plant, including, but not limited to, capacity payments, for any purpose other than for the operations of the Power Plant in accordance with the advice of the FA and CEO; and

g. Enter into any agreement with any affiliate or related party, including any member, manager, employee, officer, or family member of any of the foregoing, or any entity owned directly or indirectly by any of the forgoing, other than in the ordinary course of business and subject to the approval of the Independent Manager.

12. General Release; Covenant Not to Sue.

a. In consideration of, among other things, Lenders' execution and delivery of this Agreement, each of the Omnis Parties, and their respective past and present parent, subsidiary, related, affiliated, predecessor, and/or successor entities, as well as their past and present officers, directors, employees, representatives, agents and insurers (the "**Releasors**"), hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Lender and each of their respective affiliates, successors, and assigns, and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing (collectively, the "**Releasees**") from any and all claims (including, without limitation, crossclaims, counterclaims, defenses, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses, defenses or claims whatsoever (collectively, the "**Claims**"), that any of the Releasors now has or hereafter may have, of whatsoever nature and kind, whether known or unknown,

whether now existing or hereafter arising, whether arising at law or in equity, against the Releasees, in each case solely to the extent arising out of or relating to the Loan Agreements, this Agreement, or any related loan documents, or the transactions contemplated thereby; provided, however, that the foregoing release shall not apply to, and nothing herein shall release, (a) any claims arising from the fraud, gross negligence, or willful misconduct of any Releasee, (b) any rights or claims that cannot be waived as a matter of law, or (c) any obligations of any Releasee under this Agreement or any Loan Agreement or related loan document that arise after the date hereof.

b. In connection with such releases, each of the Releasors acknowledge that they are aware that they or their attorneys or others may hereafter discover claims or facts presently unknown or unsuspected in addition to or different from those which they now know or believe to be true with respect to the subject matter of the Claims being released pursuant to this agreement. Nevertheless, it is the intention of each of the Releasors in executing this Agreement to fully, finally, and forever settle and release all matters and all claims relating thereto, which exist, hereafter may exist or might have existed (whether or not previously or currently asserted in any action) constituting Claims released pursuant to this Agreement, subject to the carve-outs set forth above.

c. In entering into this Agreement, each of the Releasors consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity hereof.

d. Each Releaser further agrees that such Releasor is knowingly waiving the provisions and protections of Section 1542 of the California Civil Code and any similar law in any other jurisdiction, which reads:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

e. Each of the Releasors hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged pursuant to this Agreement, subject to the carve-outs set forth above. If any of the Releasors violates the foregoing covenant, each of the Releasors agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and any other out-of-pocket expenses incurred by any Releasee as a result of such violation.

f. The provisions of this Section 12 shall survive the termination of this Agreement, the Loan Agreements, and payment in full of the Obligations.

13. <u>Non-Frustration of Omnis Parties' Compliance</u>. Notwithstanding anything to the contrary in this Agreement or the Loan Agreements, the Lenders, the Independent Manager, and the CEO shall not take any action, or fail to take any action, the primary purpose of which is to frustrate, hinder, or unreasonably interfere with the efforts of the Omnis Parties to comply with the terms and conditions of this Agreement or the Loan Agreements.

14. <u>Further Assurances</u>. Each of the Omnis Parties and Lenders agree to take all further actions and execute all further documents as Lenders may from time to time reasonably request that are necessary

to carry out the transactions contemplated by this Agreement and all other agreements executed and delivered in connection herewith.

15. Termination. This Agreement and each Loan Agreement shall terminate only upon the Payment in Full of all Obligations owed to the Lenders under the Loan Agreements.

16. Miscellaneous.

a. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

b. This Agreement may be executed in counterparts and by electronic signature.

c. All notices sent pursuant to this Agreement or any Loan Agreement shall be sent to the addresses set forth below:

To Omnis Parties:

Omnis Global Technologies, LLC
Omnis Fuel Technologies, LLC
Quantum Pleasants, LLC
Omnis Pleasants, LLC
3710 Collins Ferry Road
Morgantown, WV 26505
Attn: Legal
Email: bstephens@omnisenergy.com

with copy to:

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Attn: Morris DeFeo, Esq
Email: mdefeo@herrick.com

To Lenders:

TRAG, LLC
RG Energy, LLC
9051 Mira Mesa Blvd #261229
San Diego, CA 92126
Attn: Ajay Gupta
Email: ajay@robbinsgupta.com

With a copy to:

Manatt, Phelps & Phillips, LLP
2049 Century Park East
Suite 1700
Los Angeles, CA 90067
Attn: Thomas Michael
Email: tmichael@manatt.com

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

OMNIS GLOBAL TECHNOLOGIES, LLC

By: Signed by: Randall Smith 52F88A74C72E45D...

Name: Randall Smith

Title: CFO

OMNIS FUEL TECHNOLOGIES, LLC

By: Signed by: Randall Smith 52F88A74C72E45D...

Name: Randall Smith

Title: CFO

QUANTUM PLEASANTS, LLC

By: Signed by: Randall Smith 52F88A74C72E45D...

Name: Randall Smith

Title: CFO

OMNIS PLEASANTS, LLC

By: Signed by: Randall Smith 52F88A74C72E45D...

Name: Randall Smith

Title: CFO

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

TRAG LLC

DocuSigned by:

By: _Ajay Gupta_______________

5F3F158A45D04BD...

Name: Ajay Gupta

Title: Manager

RG ENERGY LLC

DocuSigned by:

By: _Ajay Gupta_______________

5F3F158A45D04BD...

Name: Ajay Gupta

Title: Manager

**EXHIBIT A**

**RG ENERGY LLC**
**9051 Mira Mesa Blvd #261229**
**San Diego, CA 92126**

October 1, 2025

Randall Smith, Chief Financial Officer
OMNIS GLOBAL TECHNOLOGIES, LLC
OMNIS FUEL TECHNOLOGIES, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505
Email:

Re: RG ENERGY LLC, as Lender (in such capacity "Lender") Loans to OMNIS GLOBAL TECHNOLOGIES, LLC ("Borrower"), OMNIS FUEL TECHNOLOGIES, LLC ("OFT") and any Qualified Affiliate ("Qualified Affiliate"; and together with Borrower and OFT, the "Omnis Parties"), Notice of Default and Reservation of Rights

Dear Mr. Smith:

Reference is made to that certain Loan and Security Agreement dated as of June 2, 2023 (as amended from time to time, collectively, the "Loan Agreement"), by and among Lender and the Omnis Parties. Unless otherwise defined, all initially capitalized terms used herein shall be as defined in the Loan Agreement.

Lender hereby gives notice to the Omnis Parties that an Event of Default under the Loan Agreement has occurred and continues to exist (the "Existing Default"), including without limitation, violation of the following provisions of the Loan Agreement:

- Section 8.1 (Payment Default) – as a result of Borrower's failure to pay the Obligations as and when due pursuant to the terms of the Loan Agreement.

The Existing Default entitles Lender to exercise the rights, remedies, powers, and privileges afforded to it by contract, under applicable law, in equity, and otherwise arising as a result of the breach or violation of the Loan Documents (collectively, "rights and remedies" and individually or as the context may indicate, "right or remedy"), including, without limitation, the right to accelerate and declare the loan and other Obligations immediately due and payable, enforce its security interest in the collateral securing the Obligations, impose the default rate of interest on the outstanding Obligations to the extent permitted by law, and collect any fees and expenses which Lender may incur in connection with the Obligations or the Existing Default.

Notice is further given to the Omnis Parties that Lender may opt to, without further notice, exercise its other rights and remedies under the Loan Documents and applicable law.

Nothing contained in this letter shall operate as a consent to or a waiver, amendment, or forbearance with respect to any of the above-referenced defaults or any other or further matter (including any default or Event of Default) or any other right, power, or remedy of Lender under the Loan Agreement or any other document, instrument or agreement entered into in connection therewith. No delay on the part of Lender in the exercise of any remedy, power, right or privilege under the Loan Agreement, or any other document, instrument or agreement entered into in connection therewith, shall impair such remedy, power, right, or privilege or be construed to be a waiver of any Default or Event of Default, and Lender

hereby expressly reserves all of Lender’s remedies, powers, rights or privileges under the Loan Agreement and each other document, instrument or agreement entered into in connection therewith, at law, in equity, or otherwise. All of the foregoing hereafter is referred to collectively as the “Reservation of Rights”. The Reservation of Rights hereunder extends to all defaults, whether now existing or hereafter arising, and whether known or unknown. The Loan Documents at all times remain in full force and effect in accordance with their terms and any present or future negotiations or discussions with Lender or its representatives regarding the Obligations or the Loan Documents and any proposed modifications thereto shall not be binding on Lender, unless and until an agreement in writing is signed by an authorized officer of Lender.

Sincerely,

RG ENERGY LLC

DocuSigned by:

By: Ajay Gupta ____________________________

9D71DF73F8D04AB...

Name: Ajay Gupta
Title: Manager

**TRAG LLC**
**9051 Mira Mesa Blvd #261229**
**San Diego, CA 92126**

October 1, 2025

Randall Smith, Chief Financial Officer
OMNIS GLOBAL TECHNOLOGIES, LLC
OMNIS FUEL TECHNOLOGIES, LLC
QUANTUM PLEASANTS, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505
Email:

Re: TRAG LLC, as Lender (in such capacity "Lender") Loan**s** to OMNIS FUEL TECHNOLOGIES, LLC ("Borrower"), OMNIS GLOBAL TECHNOLOGIES, LLC ("OGT") and QUANTUM PLEASANTS, LLC ("Quantum Pleasants"; and together with Borrower and OGT, the "Omnis Parties"), Notice of Default and Reservation of Rights

Dear Mr. Smith:

Reference is made to that certain Loan and Security Agreement dated as of January 14, 2025 (as amended from time to time, collectively, the "Loan Agreement"), by and among Lender and the Omnis Parties. Unless otherwise defined, all initially capitalized terms used herein shall be as defined in the Loan Agreement.

Lender hereby gives notice to the Omnis Parties that an Event of Default under the Loan Agreement has occurred and continues to exist (the "Existing Default"), including without limitation, violation of the following provisions of the Loan Agreement:

- Section 8.1 (Payment Default) – as a result of Borrower's failure to pay the Obligations as and when due pursuant to the terms of the Loan Agreement.

The Existing Default entitles Lender to exercise the rights, remedies, powers, and privileges afforded to it by contract, under applicable law, in equity, and otherwise arising as a result of the breach or violation of the Loan Documents (collectively, "rights and remedies" and individually or as the context may indicate, "right or remedy"), including, without limitation, the right to accelerate and declare the loan and other Obligations immediately due and payable, enforce its security interest in the collateral securing the Obligations, impose the default rate of interest on the outstanding Obligations to the extent permitted by law, and collect any fees and expenses which Lender may incur in connection with the Obligations or the Existing Default.

Notice is further given to the Omnis Parties that Lender may opt to, without further notice, exercise its other rights and remedies under the Loan Documents and applicable law.

Nothing contained in this letter shall operate as a consent to or a waiver, amendment, or forbearance with respect to any of the above-referenced defaults or any other or further matter (including any default or Event of Default) or any other right, power, or remedy of Lender under the Loan Agreement or any other document, instrument or agreement entered into in connection therewith. No delay on the part of Lender in the exercise of any remedy, power, right or privilege under the Loan Agreement, or any other document, instrument or agreement entered into in connection therewith, shall impair such remedy,

power, right, or privilege or be construed to be a waiver of any Default or Event of Default, and Lender hereby expressly reserves all of Lender's remedies, powers, rights or privileges under the Loan Agreement and each other document, instrument or agreement entered into in connection therewith, at law, in equity, or otherwise. All of the foregoing hereafter is referred to collectively as the "Reservation of Rights". The Reservation of Rights hereunder extends to all defaults, whether now existing or hereafter arising, and whether known or unknown. The Loan Documents at all times remain in full force and effect in accordance with their terms and any present or future negotiations or discussions with Lender or its representatives regarding the Obligations or the Loan Documents and any proposed modifications thereto shall not be binding on Lender, unless and until an agreement in writing is signed by an authorized officer of Lender.

Sincerely,

TRAG LLC

By: DocuSigned by: Ajay Gupta 9D71DF73F8D04AB... ____________________________
Name: Ajay Gupta
Title: Manager

**TRAG LLC**
**9051 Mira Mesa Blvd #261229**
**San Diego, CA 92126**

October 1, 2025

Randall Smith, Chief Financial Officer
OMNIS GLOBAL TECHNOLOGIES, LLC
OMNIS FUEL TECHNOLOGIES, LLC
QUANTUM PLEASANTS, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505
Email:

Re: TRAG LLC, as Lender (in such capacity "Lender") Loans to OMNIS GLOBAL TECHNOLOGIES, LLC ("Borrower"), OMNIS FUEL TECHNOLOGIES, LLC ("OFT") and QUANTUM PLEASANTS, LLC ("Quantum Pleasants"; and together with Borrower and OFT, the "Omnis Parties"), Notice of Default and Reservation of Rights

Dear Mr. Smith:

Reference is made to that certain Loan and Security Agreement dated as of May 26, 2023 (as amended from time to time, collectively, the "Loan Agreement"), by and among Lender and the Omnis Parties. Unless otherwise defined, all initially capitalized terms used herein shall be as defined in the Loan Agreement.

Lender hereby gives notice to the Omnis Parties that an Event of Default under the Loan Agreement has occurred and continues to exist (the "Existing Default"), including without limitation, violation of the following provisions of the Loan Agreement:

- Section 8.1 (Payment Default) – as a result of Borrower's failure to pay the Obligations as and when due pursuant to the terms of the Loan Agreement.

The Existing Default entitles Lender to exercise the rights, remedies, powers, and privileges afforded to it by contract, under applicable law, in equity, and otherwise arising as a result of the breach or violation of the Loan Documents (collectively, "rights and remedies" and individually or as the context may indicate, "right or remedy"), including, without limitation, the right to accelerate and declare the loan and other Obligations immediately due and payable, enforce its security interest in the collateral securing the Obligations, impose the default rate of interest on the outstanding Obligations to the extent permitted by law, and collect any fees and expenses which Lender may incur in connection with the Obligations or the Existing Default.

Notice is further given to the Omnis Parties that Lender may opt to, without further notice, exercise its other rights and remedies under the Loan Documents and applicable law.

Nothing contained in this letter shall operate as a consent to or a waiver, amendment, or forbearance with respect to any of the above-referenced defaults or any other or further matter (including any default or Event of Default) or any other right, power, or remedy of Lender under the Loan Agreement or any other document, instrument or agreement entered into in connection therewith. No delay on the part of Lender in the exercise of any remedy, power, right or privilege under the Loan Agreement, or any other document, instrument or agreement entered into in connection therewith, shall impair such remedy,

power, right, or privilege or be construed to be a waiver of any Default or Event of Default, and Lender hereby expressly reserves all of Lender's remedies, powers, rights or privileges under the Loan Agreement and each other document, instrument or agreement entered into in connection therewith, at law, in equity, or otherwise. All of the foregoing hereafter is referred to collectively as the "Reservation of Rights". The Reservation of Rights hereunder extends to all defaults, whether now existing or hereafter arising, and whether known or unknown. The Loan Documents at all times remain in full force and effect in accordance with their terms and any present or future negotiations or discussions with Lender or its representatives regarding the Obligations or the Loan Documents and any proposed modifications thereto shall not be binding on Lender, unless and until an agreement in writing is signed by an authorized officer of Lender.

Sincerely,

TRAG LLC

DocuSigned by:
By: Ajay Gupta
9D71DF73F8D04AB...
Name: Ajay Gupta
Title: Manager

**EXHIBIT B**

**RG ENERGY LLC**

## NOTIFICATION OF DISPOSITION OF COLLATERAL BY PRIVATE SALE

***Via Certified Mail, Return Receipt Requested (and email, as indicated)***

**TO: OMNIS GLOBAL TECHNOLOGIES, LLC. AND PARTIES IN INTEREST:**

NOTICE IS HEREBY GIVEN that RG ENERGY LLC ("Lender") is secured under that Loan and Security Agreement dated as of June 2, 2023 (as amended from time to time, the "Agreement"), wherein OMNIS GLOBAL TECHNOLOGIES, LLC ("Borrower"), OMNIS FUEL TECHNOLOGIES LLC ("OFT") and any Qualified Affiliate that signed a counterpart to the Agreement (any such Qualified Affiliates, together with Borrower and OFT, the "Omnis Parties;" hereinafter collectively referred to as, "Grantor") granted a security interest in certain Collateral described therein to Lender, as secured party. Pursuant to the California Commercial Code Sections 9610 *et seq*., Lender hereby gives notice to the Grantor and to all other parties who are entitled to notice that, because of defaults under the Agreement, certain collateral (the "Collateral") will be sold privately at one or more sales on or after October 31, 2025 commencing at 10:00 a.m. Pacific Standard Time.

**THE COLLATERAL TO BE SOLD CONSISTS OF ALL OF GRANTORS' RIGHT, TITLE AND INTEREST IN THE FOLLOWING:**

The Collateral shall be sold free and clear of any and all security interests of Lender and any security interest or lien subordinate thereto.

The Collateral is more particularly described in **Exhibit A** attached hereto.

Grantors are entitled to an accounting of the unpaid indebtedness secured by the property that Lender intends to sell. Grantors may request an accounting by contacting the undersigned either by telephone at 858-945-5485 or in writing at the address set forth below.

Date: October 21, 2025

RG ENERGY LLC

DocuSigned by:

By: Ajay Gupta

9D71DF73F8D04AB...

Name:

Title: Manager

9051 Mira Mesa Blvd #261229
San Diego, CA 92126

**MAILING LIST**

| | |
|---|---|
| Randall Smith, Chief Financial Officer<br>OMNIS GLOBAL TECHNOLOGIES, LLC<br>OMNIS FUEL TECHNOLOGIES, LLC<br>3710 Collins Ferry Road<br>Morgantown, West Virginia 26505<br>E: rsmith@omnisglobaltechnologies.com<br><br>***Article No:*** | Nicholson Thomas<br>Thomas & Associates International Inc.<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>nick@jnicholsonlawgroup.com<br><br>***Article No:*** |
| David Kennedy<br>dkennedy@dkennedylawoffice.com | |
| Alina Energy | |

# EXHIBIT A

All personal property of Debtor whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles, domain names and software), all Intellectual Property, goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions; and

(c) any rights, interests, or assets, whether directly or indirectly held, relating to hydrogen conversion, graphite or graphene.

**TRAG LLC**

## NOTIFICATION OF DISPOSITION OF COLLATERAL BY PRIVATE SALE

***Via Certified Mail, Return Receipt Requested (and email, as indicated)***

**TO: OMNIS FUEL TECHNOLOGIES LLC. AND PARTIES IN INTEREST:**

NOTICE IS HEREBY GIVEN that TRAG LLC ("Lender") is secured under that Loan and Security Agreement dated as of January 14, 2025 (as amended from time to time, the "Agreement"), wherein Omnis Fuel Technologies LLC ("Borrower"), Omnis Global Technologies, LLC ("OGT"), and Quantum Pleasants, LLC ("QP", together with Borrower and OGT, each an "Omnis Party", and together, the "Omnis Parties"; hereinafter collectively referred to as, "Grantor") granted a security interest in certain Collateral described therein to Lender, as secured party. Pursuant to the California Commercial Code Sections 9610 *et seq*., Lender hereby gives notice to the Omnis Parties and to all other parties who are entitled to notice that, because of defaults under the Agreement, certain collateral (the "Collateral") will be sold privately at one or more sales on or after October 31, 2025 commencing at 10:00 a.m. Pacific Standard Time.

**THE COLLATERAL TO BE SOLD CONSISTS OF ALL OF GRANTORS' RIGHT, TITLE AND INTEREST IN THE FOLLOWING:**

The Collateral shall be sold free and clear of any and all security interests of Lender and any security interest or lien subordinate thereto.

The Collateral is more particularly described in **Exhibit A** attached hereto.

Grantors are entitled to an accounting of the unpaid indebtedness secured by the property that Lender intends to sell. Grantors may request an accounting by contacting the undersigned either by telephone at 858-945-5485 or in writing at the address set forth below.

Date: October 21, 2025

TRAG LLC

DocuSigned by:
By: Ajay Gupta
Name: 9D71DF73F8D04AB...
Title: Manager

9051 Mira Mesa Blvd #261229
San Diego, CA 92126

**MAILING LIST**

| | |
|---|---|
| Randall Smith, Chief Financial Officer<br>OMNIS GLOBAL TECHNOLOGIES, LLC<br>OMNIS FUEL TECHNOLOGIES LLC<br>QUANTUM PLEASANTS, LLC<br>3710 Collins Ferry Road<br>Morgantown, West Virginia 26505<br>E: rsmith@omnisglobaltechnologies.com<br><br>***Article No:*** | Nicholson Thomas<br>Thomas & Associates International Inc.<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>nick@jnicholsonlawgroup.com<br><br>***Article No:*** |
| David Kennedy<br>dkennedy@dkennedylawoffice.com | |
| West Virginia Economic Development Authority<br>Northgate Business Park<br>180 Association Drive<br>Charleston, WV 25311<br><br>***Article No:*** | TYR ENERGY, LLC<br>7500 College Boulevard, Suite 400<br>Overland Park, KS 66210<br><br>***Article No:*** |
| William Herlihy, Spilman Thomas & Battle<br>Joseph Unger<br>300 Kanawha Blvd. East<br>Charleston, WV 25301<br>junger@spilmanlaw.com<br><br>***Article No:*** | Capitol Services, Inc.<br>108 Lakeland Ave.<br>Dover, DE 19901<br><br>***Article No:*** |
| Alina Energy | |

# EXHIBIT A

All of Borrower's right, title, and interest in and to the following property: (i) all goods, Accounts, Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, securities accounts, securities entitlements and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; (ii) all Omnis Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing, and (iii) all Intellectual Property.

**TRAG LLC**

## NOTIFICATION OF DISPOSITION OF COLLATERAL BY PRIVATE SALE

***Via Certified Mail, Return Receipt Requested (and email, as indicated)***

**TO: OMNIS GLOBAL TECHNOLOGIES, LLC. AND PARTIES IN INTEREST:**

NOTICE IS HEREBY GIVEN that TRAG LLC ("Lender") is secured under that Loan and Security Agreement dated as of May 26, 2023 (as amended from time to time, the "Agreement"), wherein OMNIS GLOBAL TECHNOLOGIES, LLC ("Borrower"), OMNIS FUEL TECHNOLOGIES, LLC ("OFT") and QUANTUM PLEASANTS, LLC ("Quantum Pleasants"; and together with Borrower and OFT, the "Omnis Parties;" hereinafter collectively referred to as, "Grantor") granted a security interest in certain Collateral described therein to Lender, as secured party. Pursuant to the California Commercial Code Sections 9610 *et seq*., Lender hereby gives notice to the Omnis Parties and to all other parties who are entitled to notice that, because of defaults under the Agreement, certain collateral (the "Collateral") will be sold privately at one or more sales on or after October 31, 2025 commencing at 10:00 a.m. Pacific Standard Time.

**THE COLLATERAL TO BE SOLD CONSISTS OF ALL OF GRANTORS' RIGHT, TITLE AND INTEREST IN THE FOLLOWING:**

The Collateral shall be sold free and clear of any and all security interests of Lender and any security interest or lien subordinate thereto.

The Collateral is more particularly described in **Exhibit A** attached hereto.

Grantors are entitled to an accounting of the unpaid indebtedness secured by the property that Lender intends to sell. Grantors may request an accounting by contacting the undersigned either by telephone at 858-945-5485 or in writing at the address set forth below.

Date: October 21, 2025

TRAG LLC

By: DocuSigned by: Ajay Gupta 9D71DF73F8D04AB...
Name:
Title: Manager

9051 Mira Mesa Blvd #261229
San Diego, CA 92126

**MAILING LIST**

| | |
|---|---|
| Randall Smith, Chief Financial Officer<br>OMNIS GLOBAL TECHNOLOGIES, LLC<br>OMNIS FUEL TECHNOLOGIES, LLC<br>QUANTUM PLEASANTS, LLC<br>3710 Collins Ferry Road<br>Morgantown, West Virginia 26505<br>E: rsmith@omnisglobaltechnologies.com<br><br>***Article No:*** | Nicholson Thomas<br>Thomas & Associates International Inc.<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>nick@jnicholsonlawgroup.com<br><br>***Article No:*** |
| David Kennedy<br>dkennedy@dkennedylawoffice.com | |
| West Virginia Economic Development Authority<br>Northgate Business Park<br>180 Association Drive<br>Charleston, WV 25311<br><br>***Article No:*** | TYR ENERGY, LLC<br>7500 College Boulevard, Suite 400<br>Overland Park, KS 66210<br><br>***Article No:*** |
| William Herlihy, Spilman Thomas & Battle<br>Joseph Unger<br>300 Kanawha Blvd. East<br>Charleston, WV 25301<br>junger@spilmanlaw.com<br><br>***Article No:*** | Capitol Services, Inc.<br>108 Lakeland Ave.<br>Dover, DE 19901<br><br>***Article No:*** |
| Alina Energy | |

# EXHIBIT A

All personal property of Quantum Pleasants, LLC (herein referred to as "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles, domain names and software), all Intellectual Property, goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions; and

(c) any rights, interests, or assets, whether directly or indirectly held, relating to hydrogen conversion, graphite or graphene.

# EXHIBIT C

**TRAG LLC**

## NOTIFICATION OF DISPOSITION OF COLLATERAL BY PRIVATE SALE

***Via Certified Mail, Return Receipt Requested (and email, as indicated)***

**TO: OMNIS GLOBAL TECHNOLOGIES, LLC. AND PARTIES IN INTEREST:**

NOTICE IS HEREBY GIVEN that TRAG LLC ("Lender") is secured under that Loan and Security Agreement dated as of May 26, 2023 (as amended from time to time, the "Agreement"), wherein OMNIS GLOBAL TECHNOLOGIES, LLC ("Borrower"), OMNIS FUEL TECHNOLOGIES, LLC ("OFT") and QUANTUM PLEASANTS, LLC ("Quantum Pleasants"; and together with Borrower and OFT, the "Omnis Parties;" hereinafter collectively referred to as, "Grantor") granted a security interest in certain Collateral described therein to Lender, as secured party. Pursuant to the California Commercial Code Sections 9610 *et seq*., Lender hereby gives notice to the Omnis Parties and to all other parties who are entitled to notice that, because of defaults under the Agreement, certain collateral (the "Collateral") will be sold privately at one or more sales on or after February 12, 2026 commencing at 10:00 a.m. Pacific Standard Time.

**THE COLLATERAL TO BE SOLD CONSISTS OF ALL OF GRANTORS' RIGHT, TITLE AND INTEREST IN THE FOLLOWING:**

The Collateral shall be sold free and clear of any and all security interests of Lender and any security interest or lien subordinate thereto.

The Collateral is more particularly described in **Exhibit A** attached hereto.

Grantors are entitled to an accounting of the unpaid indebtedness secured by the property that Lender intends to sell. Grantors may request an accounting by contacting the undersigned either by telephone at 858-945-5485 or in writing at the address set forth below.

Date: February 2, 2026

TRAG LLC

DocuSigned by:

By: Ajay Gupta

9D71DF73F8D04AB...

Name:

Title: Manager

9051 Mira Mesa Blvd #261229
San Diego, CA 92126

**MAILING LIST**

| | |
|---|---|
| Simon Hodson, Chief Executive Officer<br>Randall Smith, Chief Financial Officer<br>OMNIS GLOBAL TECHNOLOGIES, LLC<br>OMNIS FUEL TECHNOLOGIES, LLC<br>3710 Collins Ferry Road<br>Morgantown, West Virginia 26505<br>E: rsmith@omnisglobaltechnologies.com<br><br>***Article No:*** | Nicholson Thomas<br>Thomas & Associates International Inc.<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>nick@jnicholsonlawgroup.com<br><br>***Article No:*** |
| David Kennedy<br>dkennedy@dkennedylawoffice.com | Herrick Feinstein LLP<br>301 Grant Street, Suite 270<br>Pittsburgh, PA 15219<br>Attn: Megan Thompson and Morris DeFeo<br>mthompson@herrick.com<br>mdefeo@herrick.com |
| West Virginia Department of Commerce<br>Office of Energy<br>1900 Kanawha Boulevard East, Building 3, Suite 800<br>Charleston, WV 25305<br>Attn: Nicholas Preservati<br>nicholas.s.preservati@wv.gov | Bilt Technology LLC<br>Corporation Trust Center<br>1209 Orange Street<br>New Castle, DE 19801<br>Attention: Jamie Majid, CEO, and Ethan Feffer, GC<br>jamie@biltek.com<br>ethan.feffer@bilttek.com |
| West Virginia Economic Development Authority<br>Northgate Business Park<br>180 Association Drive<br>Charleston, WV 25311<br><br>***Article No:*** | TYR ENERGY, LLC<br>7500 College Boulevard, Suite 400<br>Overland Park, KS 66210<br><br>***Article No:*** |
| William Herlihy, Spilman Thomas & Battle Joseph Unger<br>300 Kanawha Blvd.<br>East Charleston, WV 25301<br>junger@spilmanlaw.com<br><br>***Article No:*** | Capitol Services, Inc.<br>108 Lakeland Ave.<br>Dover, DE 19901<br><br>***Article No:*** |
| Alina Energy | Harmony Trust |

# EXHIBIT A

All personal property of Quantum Pleasants, LLC (herein referred to as "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles, domain names and software), all Intellectual Property, goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions; and

(c) any rights, interests, or assets, whether directly or indirectly held, relating to hydrogen conversion, graphite or graphene.

**TRAG LLC**

## NOTIFICATION OF DISPOSITION OF COLLATERAL BY PRIVATE SALE

***Via Certified Mail, Return Receipt Requested (and email, as indicated)***

**TO: OMNIS FUEL TECHNOLOGIES LLC. AND PARTIES IN INTEREST:**

NOTICE IS HEREBY GIVEN that TRAG LLC ("Lender") is secured under that Loan and Security Agreement dated as of January 14, 2025 (as amended from time to time, the "Agreement"), wherein Omnis Fuel Technologies LLC ("Borrower"), Omnis Global Technologies, LLC ("OGT"), and Quantum Pleasants, LLC ("QP", together with Borrower and OGT, each an "Omnis Party", and together, the "Omnis Parties"; hereinafter collectively referred to as, "Grantor") granted a security interest in certain Collateral described therein to Lender, as secured party. Pursuant to the California Commercial Code Sections 9610 *et seq*., Lender hereby gives notice to the Omnis Parties and to all other parties who are entitled to notice that, because of defaults under the Agreement, certain collateral (the "Collateral") will be sold privately at one or more sales on or after February 12, 2026 commencing at 10:00 a.m. Pacific Standard Time.

**THE COLLATERAL TO BE SOLD CONSISTS OF ALL OF GRANTORS' RIGHT, TITLE AND INTEREST IN THE FOLLOWING:**

The Collateral shall be sold free and clear of any and all security interests of Lender and any security interest or lien subordinate thereto.

The Collateral is more particularly described in **Exhibit A** attached hereto.

Grantors are entitled to an accounting of the unpaid indebtedness secured by the property that Lender intends to sell. Grantors may request an accounting by contacting the undersigned either by telephone at 858-945-5485 or in writing at the address set forth below.

Date: February 2, 2026

TRAG LLC

DocuSigned by:

By: Ajay Gupta

Name: 9D71DF73F8D04AB...

Title: Manager

9051 Mira Mesa Blvd #261229
San Diego, CA 92126

**MAILING LIST**

| | |
|---|---|
| Simon Hodson, Chief Executive Officer<br>Randall Smith, Chief Financial Officer<br>OMNIS GLOBAL TECHNOLOGIES, LLC<br>OMNIS FUEL TECHNOLOGIES, LLC<br>3710 Collins Ferry Road<br>Morgantown, West Virginia 26505<br>E: rsmith@omnisglobaltechnologies.com<br><br>***Article No:*** | Nicholson Thomas<br>Thomas & Associates International Inc.<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>nick@jnicholsonlawgroup.com<br><br>***Article No:*** |
| David Kennedy<br>dkennedy@dkennedylawoffice.com | Herrick Feinstein LLP<br>301 Grant Street, Suite 270<br>Pittsburgh, PA 15219<br>Attn: Megan Thompson and Morris DeFeo<br>mthompson@herrick.com<br>mdefeo@herrick.com |
| West Virginia Department of Commerce<br>Office of Energy<br>1900 Kanawha Boulevard East, Building 3, Suite 800<br>Charleston, WV 25305<br>Attn: Nicholas Preservati<br>nicholas.s.preservati@wv.gov | Bilt Technology LLC<br>Corporation Trust Center<br>1209 Orange Street<br>New Castle, DE 19801<br>Attention: Jamie Majid, CEO, and Ethan Feffer, GC<br>jamie@biltek.com<br>ethan.feffer@bilttek.com |
| West Virginia Economic Development Authority<br>Northgate Business Park<br>180 Association Drive<br>Charleston, WV 25311<br><br>***Article No:*** | TYR ENERGY, LLC<br>7500 College Boulevard, Suite 400<br>Overland Park, KS 66210<br><br>***Article No:*** |
| William Herlihy, Spilman Thomas & Battle Joseph Unger<br>300 Kanawha Blvd.<br>East Charleston, WV 25301<br>junger@spilmanlaw.com<br><br>***Article No:*** | Capitol Services, Inc.<br>108 Lakeland Ave.<br>Dover, DE 19901<br><br>***Article No:*** |
| Alina Energy | Harmony Trust |

# EXHIBIT A

All of Borrower's right, title, and interest in and to the following property: (i) all goods, Accounts, Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, securities accounts, securities entitlements and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; (ii) all Omnis Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing, and (iii) all Intellectual Property.

**RG ENERGY LLC**

**NOTIFICATION OF DISPOSITION OF COLLATERAL BY PRIVATE SALE**

***Via Certified Mail, Return Receipt Requested (and email, as indicated)***

**TO: OMNIS GLOBAL TECHNOLOGIES, LLC. AND PARTIES IN INTEREST:**

NOTICE IS HEREBY GIVEN that RG ENERGY LLC ("Lender") is secured under that Loan and Security Agreement dated as of June 2, 2023 (as amended from time to time, the "Agreement"), wherein OMNIS GLOBAL TECHNOLOGIES, LLC ("Borrower"), OMNIS FUEL TECHNOLOGIES LLC ("OFT") and any Qualified Affiliate that signed a counterpart to the Agreement (any such Qualified Affiliates, together with Borrower and OFT, the "Omnis Parties;" hereinafter collectively referred to as, "Grantor") granted a security interest in certain Collateral described therein to Lender, as secured party. Pursuant to the California Commercial Code Sections 9610 *et seq*., Lender hereby gives notice to the Grantor and to all other parties who are entitled to notice that, because of defaults under the Agreement, certain collateral (the "Collateral") will be sold privately at one or more sales on or after February 12, 2026 commencing at 10:00 a.m. Pacific Standard Time.

**THE COLLATERAL TO BE SOLD CONSISTS OF ALL OF GRANTORS' RIGHT, TITLE AND INTEREST IN THE FOLLOWING:**

The Collateral shall be sold free and clear of any and all security interests of Lender and any security interest or lien subordinate thereto.

The Collateral is more particularly described in **Exhibit A** attached hereto.

Grantors are entitled to an accounting of the unpaid indebtedness secured by the property that Lender intends to sell. Grantors may request an accounting by contacting the undersigned either by telephone at 858-945-5485 or in writing at the address set forth below.

Date: February 2, 2026

RG ENERGY LLC

DocuSigned by:

By: Ajay Gupta

9D71DF73F8D04AB...

Name: [illegible]

Title: Manager

9051 Mira Mesa Blvd #261229
San Diego, CA 92126

**MAILING LIST**

| | |
|---|---|
| Simon Hodson, Chief Executive Officer<br>Randall Smith, Chief Financial Officer<br>OMNIS GLOBAL TECHNOLOGIES, LLC<br>OMNIS FUEL TECHNOLOGIES, LLC<br>3710 Collins Ferry Road<br>Morgantown, West Virginia 26505<br>E: rsmith@omnisglobaltechnologies.com<br><br>***Article No:*** | Nicholson Thomas<br>Thomas & Associates International Inc.<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>nick@jnicholsonlawgroup.com<br><br>***Article No:*** |
| David Kennedy<br>dkennedy@dkennedylawoffice.com | Herrick Feinstein LLP<br>301 Grant Street, Suite 270<br>Pittsburgh, PA 15219<br>Attn: Megan Thompson and Morris DeFeo<br>mthompson@herrick.com<br>mdefeo@herrick.com |
| West Virginia Department of Commerce<br>Office of Energy<br>1900 Kanawha Boulevard East, Building 3, Suite 800<br>Charleston, WV 25305<br>Attn: Nicholas Preservati<br>nicholas.s.preservati@wv.gov | Bilt Technology LLC<br>Corporation Trust Center<br>1209 Orange Street<br>New Castle, DE 19801<br>Attention: Jamie Majid, CEO, and Ethan Feffer, GC<br>jamie@biltek.com<br>ethan.feffer@bilttek.com |
| West Virginia Economic Development Authority<br>Northgate Business Park<br>180 Association Drive<br>Charleston, WV 25311<br><br>***Article No:*** | TYR ENERGY, LLC<br>7500 College Boulevard, Suite 400<br>Overland Park, KS 66210<br><br>***Article No:*** |
| William Herlihy, Spilman Thomas & Battle Joseph Unger<br>300 Kanawha Blvd.<br>East Charleston, WV 25301<br>junger@spilmanlaw.com<br><br>***Article No:*** | Capitol Services, Inc.<br>108 Lakeland Ave.<br>Dover, DE 19901<br><br>***Article No:*** |
| Alina Energy | Harmony Trust |

# EXHIBIT A

All personal property of Debtor whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles, domain names and software), all Intellectual Property, goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions; and

(c) any rights, interests, or assets, whether directly or indirectly held, relating to hydrogen conversion, graphite or graphene.

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

HERRICK

Elizabeth Plowman
Partner
212.592.1586
eplowman@herrick.com

March 1, 2026

**VIA ELECTRONIC MAIL**

Herbert Smith Freehills Kramer
1177 Avenue of the Americas
New York, NY 10036
Attention: Alexander Woolverton
Email: alexander.woolverton@hsfkramer.com

Gilbert Nathan
Jackson Square Advisors, LLC
606 Post Road East # 624
Westport, Connecticut 06880
Email: gil@jacksonsquareadvisors.com

Manatt, Phelps & Phillips, LLC
2049 Century Park East - Suite 1700
Los Angeles, CA 90067
Attention: Thomas Michael
Email: TMichael@manatt.com
*Counsel to TRAG LLC and RG Energy LLC*

David Hindman
AP Services, LLC
845 Texas Avenue - Suite 3920
Greenwich, CT 06830
Email: dhindman@alixpartners.com

Re: Sale Process for Omnis Pleasants, LLC and Litigation Hold Notice

All:

As you know, we represent Quantum Pleasants, LLC ("QP"), Omnis Fuel Technologies, LLC ("OFT"), and Omnis Global Technologies, LLC ("OGT"). QP is the 100% owner of Omnis Pleasants, LLC ("OP").

Further to our emails on February 27 and 28, our clients are concerned that the purported Independent Manager[1] (Gilbert Nathan), the interim CEO (David Hindman), and the Lenders are engaged in a scheme to (i) impede OFT and its affiliates from marketing and selling OP's equity or assets (including the Power Plant), and (ii) prevent the Omnis companies—including OP and QP—from repaying the Lenders in full, thereby avoiding a foreclosure sale of their assets (including their ownership of OP and ultimate ownership of the Power Plant).[2] This interference breaches the contractual obligations under the Forbearance Agreement and Loan Agreements and the fiduciary duties owed by Messrs. Nathan and Hindman.

---

[1] Unless expressly defined otherwise, capitalized terms have the same meaning as in the amended and restated forbearance agreement, dated as of February 6, 2026, among the Lenders and the Omnis Parties (the "Forbearance Agreement").

[2] Although we received an email today from the Lenders' counsel denying knowledge of the February 27, 2026 letter from HSF Kramer, we highly doubt that the Independent Manager, or its representatives, are acting without the Lenders' knowledge and approval.

HERRICK



Prior to entry into the Forbearance Agreement, OFT and its representatives (including Charles Gassenheimer), with the full knowledge of and encouragement by the Lenders, have diligently and in good faith pursued a Sale Process intended to fully repay the Lenders. This process has continued after entry into, and pursuant to the express terms of, the Forbearance Agreement. And they have kept the Lenders, the Independent Manager, and the interim CEO apprised of that process and the results it has produced.

To date, there have been no fewer than 7 offers for the Power Plant or the equity of OP, each of which has been shared and discussed with the Lenders' representative (Ajay Gupta) and their counsel. Each of these offers involves a transaction that would result in the Lenders, and other Omnis creditors, being fully repaid. And the Forbearance Agreement was predicated upon and designed expressly to permit the parties' pursuit of such a sale.

Nevertheless, as evidenced by your February 27 letter—and earlier pronouncements made by Mr. Nathan upon being appointed as Independent Manager,[3] Mr. Nathan staunchly opposes "any potential sale at this time." This is a complete 180 from the Sale Process negotiated and agreed to under the Forbearance Agreement. And it is nonsensical, given that the sale is intended to repay the Omnis Parties' creditors (including the Lenders) in full.

What, if any, alternative plans is Mr. Nathan, or OP, pursuing to fully repay the Lenders before the expiration of the Forbearance Period?

Further, our clients' concerns about the Independent Manager, the interim CEO, and the Lenders' interference with the Sale Process are not limited to Mr. Nathan's lack of support for a sale. For example:

- Since August, Vinson & Elkins has represented OP as Federal Energy Regulatory Commission (FERC) counsel. As regulatory counsel, Vinson & Elkins raised concerns that the Independent Manager's appointment violated the Federal Power Act's interlocking rules. Shortly thereafter, the interim CEO (Mr. Hindman) fired Vinson & Elkins as OP's counsel in connection with the FERC investigation. After FERC was informed of the counsel change, FERC expanded the scope of the investigation against OP. This will likely increase defense costs in connection with the investigation and increases the risk and indemnity profile of QP—which further impedes the Sale Process and repayment of the indebtedness.

[3] On February 20, 2026, around 5:22 pm, Mr. Nathan called Morris DeFeo. During that call, Mr. Nathan stated that there "would be no sale." The next morning, around 8:45 am, Mr. DeFeo called Mr. Nathan to discuss the Sale Process. During that call, Mr. Nathan again indicated that a sale would not be pursued at this time.

HERRICK



- At Mr. Hindman's instruction, QP's chief scientist (Dr. James Swensen) was barred from entering QP's leased property, including the Omnis Quantum Refinery (OQR) Demonstration Facility. When Dr. Swensen attempted to speak to Mr. Hindman about his facility access, his calls were repeatedly ignored, actively declined, and never returned. Blocking QP, and its representatives, workers, and scientists from accessing QP's leased property prevents QP from conducting its work on QP's technology. And it raises concerns that Mr. Hindman will also bar QP or OFT from showing the property to potential buyers—which would effectively prevent a sale.

- We understand that the Lenders have made statements to potential buyers of OP (or the Power Plant) that appear to be intended to dissuade any sale.

Lastly, with respect to QP's press release about QP's technology (attached as **Exhibit A**), Mr. Hodson is the Omnis Director on QP's Board and remains the CEO of QP. Contrary to your assertion that Mr. Nathan "did not authorize th[e] statement," and therefore the statement should be immediately retracted, Mr. Hodson had full authority to authorize and issue QP's press release without Mr. Nathan's consent. Glaringly absent from your letter is any authority (or agreement) supporting your claim that Mr. Nathan's consent was needed for the QP press release.

**LITIGATION HOLD NOTICE:**

Based on the conduct of, without limitation, the Lenders, the interim CEO, and the Independent Manager to date, there is a likelihood of litigation concerning these matters. So, this letter constitutes notice that each of the recipients hereto—including the Lenders, the Independent Manager and his affiliated entity (Jackson Square Advisors), and the Interim CEO and his affiliated entity (AP Services, LLC), and each of their current and former officers, agents, principals, and employees (including, for the Lenders, Tony Robbins and Ajay Gupta)—must take immediate steps to preserve, and may not destroy, delete, or alter any documents, communications, data, or other information (including all recorded conversations, such as the phone calls recorded by Tony Robbins with Simon Hodson or any other agents, officers, employees, or representatives of the Omnis entities) in their possession, custody, or control, whether on paper or stored electronically concerning: (i) the Lenders' financing (debt or equity) of the Omnis entities, including any defaults, purported defaults, and any exercises of remedies (or attempts to exercise remedies); (ii) any communications between the Lenders and any other lenders or creditors of the Omnis Parties, including the West Virginia Economic Development Authority, BILT, or their respective representatives; (iii) the Loan Agreements, the Lender Liens, the Forbearance Agreement, the forbearance agreement between the Lenders dated October 22, 2025, the Independent Manager Agreement, and the operating agreements of OP and QP (including their amendments); (iv) the Sale Process or any other sale or potential sale of OP's equity or assets (including the Power Plant), including any reasons or motivations that the Lenders may have to not proceed with any such sale;

HERRICK



(v) the interim CEO's and Independent Manager's appointment and conduct with respect to OP and/or QP; and (vi) any financial statements, data, or other information concerning OP, including any and all transactions between OP, on the one hand, and each of the Lenders, the Independent Manager (or Jackson Square Advisors), or the interim CEO (or AP Services, LLC), on the other hand. For the avoidance of any doubt, all recorded phone conversations between Tony Robbins or any other officer, employee, principal, agent, or representative of the Lenders, on the one hand, and the Omnis entities or any of their officers, employees, principals, agents, or representatives (including Simon Hodson), on the other hand, must be preserved.

As you know, preservation of materials (especially electronic files and electronically stored information ("ESI")) for litigation is extremely important, and penalties can be imposed against parties who have not met their preservation obligations. If you have any questions about whether certain material is relevant and subject to the duty of preservation, please err on the side of gathering, preserving, and maintaining all such material. Preservation is to be interpreted in the broadest possible sense to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery in any litigation related to the above-described issues. The duty to preserve means taking steps to prevent the destruction or alteration of materials defined above. Until further notice, there must also be a hold on all normal document destruction procedures that may relate to or contain relevant documents and information.

Please note that the duty to preserve extends to all materials in the recipients' possession, custody, or control, including materials of employees or former employees that have been stored or archived. Please also be advised that identifying all relevant material may require reviewing multiple locations and computer systems maintained by the recipients and/or their employees. Relevant information may exist on employees' home offices or home computers, tablets, flash drives or CDs, Blackberries, iPhones, Android phones, or other smartphone devices, in a cloud computing infrastructure, or off-site on a remote server or backup tapes. The recipients are required to take all actions necessary to preserve all ESI that may be located on such devices, social media sites and chat platforms (such as LinkedIn, WhatsApp, Slack, Teams messages, and X), or other online platforms (including generative AI platforms like Claude and Chat GPT).

In addition to the above, it is imperative that the recipients inform all relevant employees, principals, agents, and other representatives that they too must refrain from deleting or destroying any documents, data, and other information that might be relevant to the above-described issues or an further disputes, regardless of any pre-existing document retention policy.

We look forward to a prompt response, detailing, among other things, Mr. Nathan's efforts to ensure timely repayment of the indebtedness. In the meantime, our clients reserve all rights and waive none.

HERRICK



Sincerely,

*Elizabeth Plowman*

Elizabeth Plowman

cc: Brian Shaughnessy, Herbert Smith Freehills Kramer
Ayla Lima, Herbert Smith Freehills Kramer
Nicholas Preservati
Morris DeFeo, Herrick
Sean E. O'Donnell, Herrick
Christopher C. Carty, Herrick

# EXHIBIT A

# Low-Cost Hydrogen Becomes Commercial Reality. Groundbreaking Hydrogen Fuel Technology at Pleasants Power Station Completes Technology Validation Testing.

---

NEWS PROVIDED BY
**Quantum Pleasants, LLC →**
Feb 27, 2026, 11:25 ET

---

PLEASANTS COUNTY, W.Va., Feb. 27, 2026 /PRNewswire/ -- Quantum Pleasants today announced a major milestone: the successful completion of a year-long evaluation of its revolutionary Omnis Quantum Reformer® ("OQR®") technology at Pleasants Power Station in West Virginia. The breakthrough technology produces hydrogen fuel onsite at 50% lower cost than any other hydrogen fuel and can be used in existing coal and gas power plants for electricity generation. "We have fully tested the commercial ultra-high temperature pyrolysis OQR® unit for more than a year," said Dr. Nansen Saleri, Chairman of the Omnis Hydrogen Technology Advisory Board. "The OQR® has been rigorously evaluated, and we are confident it can now be effectively scaled to supply hydrogen fuel for the entire plant."

A single OQR® has demonstrated the ability to produce hydrogen from carbon fuels. However, the true breakthrough lies in the unparalleled efficiency and cost-effectiveness of the proprietary process that is expected to reduce fuel costs at the 1,300MW Pleasants Power Station. When fully scaled with multiple OQR® units, Pleasants could usher in a new era of clean power generation, leveraging the state's rich hydrocarbon resources and positioning the Pleasants facility as the world's largest Hydrogen production plant.

**Independent Validation**

The groundbreaking, patented technology has been validated by numerous independent experts and industry leaders. A comprehensive third party study of the OQR® technology and operations at Pleasants Power Station, conducted over more than four months, concluded that it met all goals for safety, commercial capability, and economic viability. Over the past year, representatives from major academic institutions, the National Energy Technology Laboratory (NETL), the Department of Energy (DOE), and many West Virginia State legislators witnessed the OQR® reforming Quantum $H_2$® fuel from hydrocarbon feedstock and its use at Pleasants Power Station to generate electricity for the PJM market.

**Acknowledgments and Next Steps**

"I am confident in the future of Quantum $H_2$® as a sustainable, low-cost fuel for power generation," said Simon Hodson, Chairman of Quantum Pleasants, LLC. "We are grateful to the State of West Virginia and its Economic Development Authority for providing an early-stage loan that was invaluable. The Pleasants Power Station is now on track to become a fully restored, hydrogen-powered facility that uses West Virginia coal and natural gas, employing hundreds of local residents. The socio-economic benefits to the state at full-scale operations are enormous, as it will serve as a magnet for energy-intensive businesses. We could not have achieved this so quickly without the support of the State and the local community."

With commercial validation complete, Quantum Pleasants is moving forward with plans to convert the entire power station to hydrogen fuel. The fuel conversion is expected to take approximately 24 months. Once complete, the Pleasants Power Station will be the first large power plant converted from fossil fuel to 100% hydrogen fuel. In preparation for this next phase, the company is in advanced discussions with select strategic partners to assume ownership and operation of the power plant, enabling Quantum Pleasants to focus on advancing hydrogen reformation technology for the global power market.

**About Quantum Pleasants, LLC** Quantum Pleasants, LLC is a licensee of Omnis Energy, a leading innovator in hydrogen production technology, focused on developing commercially scalable, economically viable solutions for the energy sector. The company's patented technology, incorporating the Omnis Quantum Reformer®, achieves very low-cost production of Quantum $H_2$® at commercially viable quantities, supporting a global shift toward more sustainable and affordable energy.

SOURCE Quantum Pleasants, LLC

# 21%

more press release
views with
Amplify™

Request a Demo

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**AMENDMENT**
**TO THE**
**AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**OMNIS PLEASANTS, LLC**

This Amendment to the Amended and Restated Limited Liability Company Operating Agreement of Omnis Pleasants, LLC (this "**Amendment**") is made as of February 12, 2026 (the "**Amendment Effective Date**"), by and between Omnis Pleasants LLC ("the "**Company**") and Quantum Pleasants, LLC, as the sole member of the company ("**QP**"). Capitalized terms used but not defined in this Amendment shall have the meanings set forth in that certain Amended and Restated Limited Liability Company Operating Agreement of the Company, dated August 1, 2023 (the "**Operating Agreement**").

WHEREAS, pursuant to Section 11 of the Operating Agreement, the Operating Agreement may be amended by QP; and

WHEREAS, QP desires to amend the Operating Agreement as set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Amendments. The Operating Agreement is hereby amended as follows:

a. The Recitals are hereby amended by adding the following new Recitals G and H immediately after Recital F:

"G. On February 6, 2026, the Company entered into that certain Amended and Restated Forbearance Agreement (the "**Forbearance Agreement**"), by and among TRAG LLC ("**TRAG**"), RG Energy LLC ("**RGE**" and together with TRAG, the "**Lenders**"), the Company, QP, Omnis Global Technologies, LLC ("**OGT**") and Omnis Fuel Technologies, LLC ("**OFT**" and collectively with the Company, QP and OGT, the "**Omnis Parties**").

H. As a result of the Forbearance Agreement, QP desires to amend this Agreement as set forth in the Amendment to the Amended and Restated Limited Liability Company Operating Agreement of the Company dated as of February 12, 2026 (the "**Amendment**")."

b. Section 4(a) is hereby amended and restated in its entirety with the following:

"(a) Except as expressly set forth in this Agreement, the day-to-day affairs of the Company shall be managed by a Board of Directors (the "**Directors**"). The number of Directors on the Board of Directors shall be fixed at one (1), which Director shall an independent manager designated by the joint written consent of QP and the Lenders (the "**Independent Manager**"). The Independent Manager may be elected, removed and replaced at any time and from time to time, with or without cause, by the written consent of the QP; provided, however, until such time as the Lenders have received Payment in Full of the Obligations (as defined in the Forbearance Agreement), the Independent Manager may not be removed without the prior written consent of the Lenders. The Independent Manager shall act in good faith to ensure that all material decisions, actions, and approvals are made with the primary objective of maximizing the value of the Plant, consistent with his or her fiduciary duties under applicable law."

c. Section 4(b) is hereby amended by deleting the first letter in such section and replacing it with the following text:

"Except as expressly set forth in this Agreement, t"

d. Section 4(c) is hereby amended by adding the following text at the end of such section:

The Directors shall appoint a chief executive officer of the Company (the "**CEO**") in accordance with the terms set forth in the Forbearance Agreement; provided however, if the Omnis Parties and Lenders agree in writing that it is in the best interests of QP and the Company for the Independent Manager to serve as both the Independent Manager and the CEO, then the Omnis Parties and Lenders may direct the Independent Manager to remove the CEO and all references in this Agreement to the CEO will be deemed to refer to the Independent Manager. The CEO and AP Services, LLC, as the Company's independent financial advisor (the "**FA**"), shall be immediately granted access to all books and records, facilities, employees and any other materials and information of all Omnis Parties as may be reasonably necessary to allow the FA to deliver to the Omnis Parties and Lenders a report identifying any and all recommendations to improve performance, cash flow, profit and loss and such other financial metrics as shall be discussed between the FA and the CEO. The CEO, in consultation with the Independent Manager, shall have the authority to recommend a nationally recognized accounting firm to manage the accounting and financials for the Plant and the Company (the "**Independent Accounting Firm**"), which accounting firm shall be subject to the approval of the Lenders, QP and the Directors, which approval shall not be unreasonably withheld, conditioned, or delayed and shall be provided within five (5) days after the CEO's recommendation. The CEO is authorized to make all operational decisions regarding the Plant, including, but not limited to, authority to sign contracts, access all bank accounts, add and remove persons from such bank accounts, authorize payments on behalf of the Company and the Plant, approve expenditures and disbursements, hire and fire Plant personnel, engage counsel, incur indebtedness, and all other actions that are customary for a Chief Executive Officer operating in a similar industry. The CEO shall immediately have access to all books, records, facilities, materials, employees, and such information as may be reasonably necessary to execute the responsibilities set forth in the Amendment. The CEO shall be responsible for ensuring the timely payment of all payroll obligations for employees of the Company in the ordinary course of business consistent with current practices. This obligation shall include, but not be limited to, the payment of all wages, salaries, and related employment taxes and withholdings for such employees as and when due, subject to the availability of funds and applicable law. The CEO shall act in good faith to ensure that all material decisions, actions, and approvals are made with the primary objective of maximizing the value of the Plant, consistent with his or her fiduciary duties under applicable law."

e. Section 7 is hereby amended by adding the following text at the end of such section:

"Notwithstanding anything in this Agreement to the contrary, (a) the Directors shall approve (i) distributions to QP from the sale of the Plant after payment of all liabilities and obligations of the Company and the creation of a reasonable reserve for contingent liabilities, and (ii) annual distributions to QP in an aggregate amount of no less than QP's estimated tax liabilities (based on the maximum federal and West Virginia income tax rate for individuals residing in West Virginia) attributable to the net taxable profit generated by QP for the year in question, as directed by the Independent Accounting Firm), and (b) after Payment in Full of the Obligations, distributions shall be made to QP at such times and in

such amounts as determined by QP so long as the Company maintains sufficient reserves to account for all liabilities and obligations, as determined in good faith by the Independent Accounting Firm."

f. Section 11 is hereby amended and replaced in its entirety as follows:

"**11.** **Amendments.** The Member may, at any time and from time to time, amend this Agreement by executing a written amendment to this Agreement, provided however, that (a) prior to the Payment in Full of the Obligations, any such amendment shall require the consent of the Independent Manager, and (b) after the Payment in Full of the Obligations, any amendments that would alter or affect the rights, duties, or protections of the Independent Manager shall require the consent of the Independent Manager."

g. The following new Section 14 and Section 15 are hereby added immediately after Section 13:

"**14.** **Bankruptcy.** Notwithstanding anything in this Agreement to the contrary, after Payment in Full of the Obligations, the Member shall have sole discretion over any filing of any application or petition initiating (or consenting to the initiation of) any bankruptcy or insolvency proceeding under federal or state bankruptcy or insolvency laws without the consent of any Director or the Independent Manager.

**15.** **Member Information Rights.** The Member shall (A) receive all notices and materials provided to the Directors in connection with any meeting or action of the Directors by written consent, (B) have reasonable access to the books and records of the Company, and (C) participate in meetings (in person or telephonically) at which material Company actions are considered."

2. Miscellaneous.

a. Entire Agreement. The Operating Agreement, as amended by this Amendment, together with the certificate of formation of the Company and all related exhibits and schedules, constitutes the sole and entire agreement of the parties hereto with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

b. Ratification. This Amendment shall form a part of the Operating Agreement for all purposes, and each party thereto and hereto shall be bound hereby. From and after the execution of this Amendment by the parties hereto, each reference in the Operating Agreement to "this Agreement," "hereof," "hereunder," "herein," "hereby" or words of like import referring to the Operating Agreement shall mean and be a reference to the Operating Agreement as amended by this Amendment. Except as amended hereby, the terms and provisions of the Operating Agreement shall remain unchanged and in full force and effect. In the event of any conflict between the terms of the Operating Agreement and the terms of this Amendment, the terms of this Amendment shall govern and control.

c. Execution. In the event that any signature is delivered by electronic transmission or by email delivery of a "pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or "pdf" signature page were an original thereof.

d. Governing Law. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Amendment shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to the Amended and Restated Limited Liability Company Operating Agreement of the Company to be executed and delivered as of the Amendment Effective Date.

**COMPANY:**

OMNIS PLEASANTS, LLC

By: Signed by: Simon Hodson 52F88A74C72E45D...
Name: Simon Hodson
Title: Authorized Person

**SOLE MEMBER:**

QUANTUM PLEASANTS, LLC

By: Signed by: Simon Hodson 52F88A74C72E45D...
Name: Simon Hodson
Title: Authorized Person

Consented and Agreed by:

**DIRECTORS:**

Signed by: Simon Hodson 52F88A74C72E45D...
SIMON HODSON

Signed by: Randall Smith 52F88A74C72E45D...
RANDALL SMITH

DocuSigned by: Richard Hulme 63AFE1FF6DF3471...
RICHARD HULME

**INDEPENDENT MANAGER:**

______________________________
GILBERT NATHAN

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**AMENDMENT
TO THE
FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT
OF
QUANTUM PLEASANTS, LLC**

This Amendment to the First Amended and Restated Limited Liability Company Operating Agreement of Quantum Pleasants, LLC (this "**Amendment**") is made as of February 12, 2026 (the "**Amendment Effective Date**"), by and among Quantum Pleasants, LLC ("the "**Company**") and the undersigned members of the Company (the "**Members**"). Capitalized terms used but not defined in this Amendment shall have the meanings set forth in that certain First Amended and Restated Limited Liability Company Operating Agreement of the Company, dated July 14, 2023 (the "**Operating Agreement**").

WHEREAS, pursuant to Section 9.6 of the Operating Agreement, the Operating Agreement may be amended with the Super Majority Consent of the Members;

WHEREAS, the undersigned Members, representing at least seventy-five percent (75%) of the outstanding Voting Interests, constitute the Super Majority Consent; and

WHEREAS, the Members desire to amend the Operating Agreement as set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Amendments. The Operating Agreement is hereby amended as follows:

a. The Recitals are hereby amended by adding the following new Recitals F, G and H immediately after Recital E:

> "F. On February 6, 2026, the Company entered into that certain Amended and Restated Forbearance Agreement (the "Forbearance Agreement"), by and among TRAG LLC ("TRAG"), RG Energy LLC ("RGE" and together with TRAG, the "Lenders"), the Company, Omnis Pleasants, LLC, a wholly-owned Subsidiary of the Company ("OP"), Omnis Global Technologies, LLC and the Initial Member.
>
> G. As a result of the Forbearance Agreement, the Company amended the Amended and Restated Operating Agreement of OP by entering into an Amendment to the Amended and Restated Operating Agreement of OP dated as of February 12, 2026 (as amended, the "OP Operating Agreement").
>
> H. As a result of the Forbearance Agreement, the Members desire to amend this Agreement as set forth in the Amendment to the First Amended and Restated Limited Liability Company Operating Agreement of the Company dated as of February 12, 2026 (the "Amendment")."

b. Section 6.2(a) is hereby amended and restated in its entirety with the following:

> "(a) Subject to the provisions of this Agreement, the Board shall consist of the following two (2) individuals (each, a "Board Member"): (i) one (1) individual appointed

with the Consent of the Class A Members (the "Omnis Director"), who shall initially be Simon Hodson; and (ii) an independent manager elected by joint written consent of the Initial Member and the Lenders (the "Independent Manager"), who shall initially be Gilbert Nathan. The Omnis Director shall be elected, removed and replaced at any time and from time to time with the Consent of the Class A Members. The Independent Manager shall be elected, removed and replaced at any time and from time to time with the joint written consent of the Initial Member and the Lenders.

c. Section 6.2(c) is hereby amended and restated in its entirety with the following:

"(c) Subject to the provisions of this Agreement, the Omnis Director shall serve as a member of the Board at the pleasure of the Class A Members. The Independent Manager shall act in good faith to ensure that all material decisions, actions, and approvals are made as a fiduciary of the Company and consistent with applicable law."

d. Section 6.4 is hereby amended and restated in its entirety with the following:

"6.4 Quorum; Voting Requirement; Adjournment.

(a) Only the Omnis Director shall be required at all meetings of the Board to constitute a quorum of the Board for the transaction of business; provided however, both the Omnis Director and the Independent Manager shall be required at meetings of the Board to constitute quorum of the Board for the transaction of any action listed in Section 6.4(b).

(b) Except as set forth in Section 6.1(c) or as otherwise provided herein, at any meeting of the Board at which a quorum is present, the vote of the Omnis Director shall constitute and for all purposes be deemed the act of the Board; provided however, each of the following actions shall require the prior written approval of the Independent Manager (in addition to the approval of the Omnis Director):

(1) the Company's exercise of voting rights in OP with respect to the matters set forth in Section 7(b) of the Forbearance Agreement and any matters intended to circumvent decisions of the Chief Executive Officer of OP (the "CEO of OP") or the terms of the Forbearance Agreement;

(2) sales or disposals of the Company assets outside the ordinary course of business (including its interests in OP and the Pleasants Power Plant) prior to the Payment in Full of the Obligations;

(3) related party transactions involving the Company and its Members or Affiliates;

(4) distributions to the Members (provided that the Independent Manager shall approve distributions to the Members in an amount at least equal to the Members' estimated tax liabilities (notwithstanding Section 4.3(c), such estimate shall be based on the maximum federal and West Virginia income tax rate for individuals residing in West Virginia) attributable to the net taxable profit generated by the Company for the year in question, including gain generated by the sale of the Pleasants Power Plant, as directed by the Independent Accounting Firm of OP); provided that, after Payment in Full of the Obligations, the Independent Manager's approval rights over member distributions

shall not restrict or delay any distributions so long as the Company maintains sufficient reserves to account for all liabilities and obligations, as determined in good faith by the Independent Accounting Firm of OP;

(5) the annual budget, business plan, and material deviations until Payment in Full of the Obligations;

(6) amendments to this Agreement, provided that, after Payment in Full of the Obligations, the Independent Manager's approval rights over amendments to this Agreement shall be limited solely to amendments that would alter or affect the rights, duties, or protections of the Independent Manager;

(7) filing any application or petition initiating (or consenting to the initiation of) any bankruptcy or insolvency proceeding under federal or state bankruptcy or insolvency laws until Payment in Full of the Obligations; and

(8) dissolution of OP prior to the Payment in Full of the Obligations.

(c) It being expressly understood that (i) in all other matters not described in Section 6.4(b), the Omnis Director (subject to Sections 5.3(a) and (b)) shall retain exclusive governance and operational authority of the Company; (ii) with respect to Board acting on behalf of the Company as the sole member of OP, the Independent Manager shall have no voting rights as a Board Member on any Board decision relating to the removal of the independent manager of OP (such individual is referred to as the Independent Manager in the OP Operating Agreement); and (iii) with respect to Board acting on behalf of the Company as the sole member of OP, the Independent Manager shall have no voting rights as a Board Member on any Board decision relating to actions set forth in Section 5 of the OP Operating Agreement."

2. Miscellaneous.

a. Entire Agreement. The Operating Agreement, as amended by this Amendment, together with the Certificate and all related exhibits and schedules, constitutes the sole and entire agreement of the parties hereto with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

b. Ratification. This Amendment shall form a part of the Operating Agreement for all purposes, and each party thereto and hereto shall be bound hereby. From and after the execution of this Amendment by the parties hereto, each reference in the Operating Agreement to "this Agreement," "hereof," "hereunder," "herein," "hereby" or words of like import referring to the Operating Agreement shall mean and be a reference to the Operating Agreement as amended by this Amendment. Except as amended hereby, the terms and provisions of the Operating Agreement shall remain unchanged and in full force and effect. In the event of any conflict between the terms of the Operating Agreement and the terms of this Amendment, the terms of this Amendment shall govern and control.

c. Execution. In the event that any signature is delivered by electronic transmission or by email delivery of a "pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or "pdf" signature page were an original thereof.

d. Incorporation by Reference. The provisions of Article IX of the Operating Agreement are hereby incorporated by reference herein *mutatis mutandis*.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to the First Amended and Restated Limited Liability Company Operating Agreement of the Company to be executed and delivered as of the Amendment Effective Date.

**COMPANY:**

**QUANTUM PLEASANTS, LLC**

Signed by:
By: Simon Hodson
52F88A74C72E45D...
Name: Simon Hodson
Title: Authorized Person

**MEMBERS REPRESENTING SUPER MAJORITY CONSENT:**

**OMNIS FUEL TECHNOLOGIES, LLC**

Signed by:
By: Simon Hodson
52F88A74C72E45D...
Name: Simon Hodson
Title: Authorized Person

Consented and Agreed by:

**BOARD:**

Signed by:
Simon Hodson
52F88A74C72E45D...
SIMON HODSON

**INDEPENDENT MANAGER:**

______________________________
GILBERT NATHAN

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (this "Lease"), is made this 2nd day of January, 2026 (the "Effective Date"), by and between OMNIS PLEASANTS, LLC, a Delaware limited liability company, formerly known as ETEM Remediation Two LLC, having an address of 3710 Collins Ferry Road, Morgantown, West Virginia 26505 ("Landlord"), and QUANTUM PLEASANTS, LLC, a Delaware limited liability company, having an address of 3710 Collins Ferry Road, Morgantown, West Virginia 26505 ("Tenant" and together with Landlord, each a "Party" and together, the "Parties"):

WHEREAS, Landlord owns certain real estate located and situate in Grant District, Pleasants County, West Virginia, being more particularly described in the following instruments of record: (1) Special Warranty Deed from Pleasants LLC, a Delaware limited liability company, to ETEM Remediation Two LLC, a Delaware limited liability company, dated December 27, 2022, made effective December 29, 2022 and recorded in the Office of the Clerk of the County Commission of Pleasants County, West Virginia (the "Clerk's Office") in Deed Book 351, Page 1, and (2) Amended and Restated Special Warranty Deed from Pleasants LLC, a Delaware limited liability company, to ETEM Remediation Two LLC, a Delaware limited liability company, dated July 31, 2023, made effective December 27, 2022 and recorded in the Clerk's Office in Deed Book 356, Page 56, together with improvements thereon and appurtenances pertaining thereto (collectively, the "Property");

WHEREAS, Landlord has agreed to lease and demise to Tenant, and Tenant has agreed to lease and hire from Landlord, the surface of that portion of the Property shown and depicted on Exhibit A attached hereto and incorporated herein by this reference (the "Premises"), all upon the terms and provisions set forth below. The Premises shall permit ingress and egress to, from and over the Property (particularly with regard to access to the adjacent river and the ability to load and unload equipment, supplies, materials and similar items) for Tenant's reasonable needs so long as such ingress and egress does not unreasonably interfere with Landlord's operations or use of the Property;

WHEREAS, Tenant intends to use the Premises to build, construct and operate a hydrogen fuel generation facility (the "Hydrogen Facility") pursuant to which hydrogen fuel generated by such facility shall be supplied to Landlord, on a take or pay basis, as feedstock for the electric generation power plant located on or about a portion of Landlord's residual Property (other than the Premises) ("Landlord's Residual Property"), on discounted pricing from prevailing market prices for delivered coal or natural gas (the "Discounted Supply Commitment");

WHEREAS, Landlord and Tenant are in the process of negotiating r a Hydrogen Supply Contract to memorialize the Discounted Supply Commitment (the "Definitive Fuel Supply Contract"), and shall continue to negotiate the terms and provisions of such Definitive Fuel Supply Contract in good faith; and

WITNESSETH THAT, in consideration of the rents, mutual covenants and agreements between the Parties including, without limitation, Tenant's Discounted Supply Commitment and the mutual commitment to execute and deliver a Definitive Fuel Supply Contract, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Lease and Demise. Landlord does lease and demise to Tenant, and Tenant does lease and hire from Landlord, the Premises. Landlord and Tenant hereby agree to have a survey prepared for the purpose of describing, with particularity, the metes and bounds of the Premises, together with all permitted ingress and egress to, from and over the Property and access to the adjacent river and the ability to load and unload equipment, supplies, materials and similar items (the "Surveyed Descriptions"). Landlord and Tenant further agree to to execute and deliver an amendment to this Lease for the purpose of adopting,

affirming and conforming this Lease to the Surveyed Descriptions deriving from a mutually agreed upon survey.

2. Term. To have and to hold the Premises for a term of twenty (20) years (the "Initial Term") commencing on the Effective Date. Tenant shall the right to extend the Initial Term for four (4) extension or renewal terms of ten (10) years (each, a "Renewal Term" and collectively, the "Renewal Terms") to be exercised automatically by Tenant unless Tenant gives written notice to Landlord at least ninety (90) days notice prior to the expiration of the Initial Term or the then-current Renewal Term, as applicable, that it elects to not extend the Lease for the applicable Renewal Term. As used herein, "Term" shall mean and refer to the Initial Term, as extended by the Renewal Terms, as applicable.

3. Rent. On or about the Effective Date, Tenant shall pay to Landlord the sum of $1.00 (the "Base Rent"). Landlord and Tenant acknowledge and agree that the Base Rent shall be deemed to have been prepaid for the balance of the Term. At the commencement of any Renewal Term, Tenant shall pay to Landlord the sum of $1.00 as rent for the entire Renewal Term. Landlord and Tenant acknowledge and agree that Base Rent, although below market rate, is fair and equitable in consideration of the Discounted Supply Commitment and the Parties' mutual commitment to execute and deliver a Definitive Fuel Supply Contract.

4. AS-IS, WHERE-IS. Tenant has inspected the Premises which are being leased to Tenant in its "AS-IS, WHERE-IS" condition, provided, however, the Premises shall be delivered : (a) in compliance with all laws, rules, regulations, codes and ordinances, (b) free of all other tenancies or occupants, and (c) free of any and all trade fixtures, equipment or furniture not necessary for building operation.

5. Use. Tenant shall use the Premises for construction and operating of a hydrogen fuel plant, and for no other purpose not otherwise related thereto unless approved by Landlord in writing. For the avoidance of doubt, and notwithstanding any provision contained herein to the contrary, the Tenant shall retain all rights and incidents of ownership over the design, build, construction and operation of the hydrogen fuel generation plant including, without limitation, any patents, copyrights or other intellectual property deriving therefrom or associated therewith.

6. Improvements. Tenant shall not build or construct any buildings or improvements (collectively, "Improvements") without first submitting plans and specifications therefor prepared by a registered architect for Landlord's review. In connection with the construction of any approved Improvements on or to the Property by Tenant, Tenant shall conform to all laws, building codes and/or zoning regulations applicable to the Premises and promulgated by any federal, state, county or municipal authority and to all applicable requirements of any board of underwriters, rating bureau and/or carrier insurance with respect to the Premises. Tenant shall keep the Premises free from mechanic's liens or liens of a similar nature by reason of any improvement work done by Tenant or by reason of any work of repair, maintenance, improvement, removal, construction, alteration or addition done thereon by Tenant. Notice is hereby given that no mechanic's, materialmen's or other lien sought to be taken on the Premises shall in any manner affect the right, title or interest of Landlord. Landlord shall not be liable for labor or materials furnished Tenant in or about the construction of any Improvements made by Tenant nor for the death or injury of anyone employed in doing such construction or the making of such Improvements. Tenant agrees to provide, or to cause the contractor(s) doing the Improvements to provide, workmen's compensation insurance and public liability insurance during the construction of any Improvements upon the Premises in liability limits of not less than $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate.

7. Insurance. Tenant agrees to procure and maintain, at all times during the term hereof, a policy or policies of insurance, at its own cost and expense, insuring against claims, costs, demands, liability or actions for bodily injury to or death of any one person and property damages in an amount of

not less $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate, made by or in behalf of any person or persons, firm or corporation arising from, related to, or connected with the conduct and operation of Tenant's business on the Premises or otherwise occurring in, on or about the Premises. In addition, Tenant shall keep the Premises and Improvements insured against fire, windstorm, and other casualty, under an all-risk policy of insurance, written in standard form, in the full replacement value thereof. Landlord shall be named as an additional insured/loss payee on said insurance policy or policies. Tenant shall provide Landlord with a certificate of insurance evidencing the coverage or coverages required by this Section 7.

8. Title. Fee simple title to the Premises shall at all times remain with Landlord. Any Improvements made on the Premises that cannot be removed without doing material damage to the Premises shall be deemed to be affixed to the Premises for purposes of this Lease.

9. Representations and Warranties. Each Party represents and warrants that (i) it has the full right, power and authority to enter into this Lease and to perform its obligations hereunder, (ii) all requisite approvals, consents and board or committee actions necessary to authorize such Party to enter into this Lease and to bound by the provisions of this Lease have been obtained or taken, (iii) the person executing this Lease on behalf of the Party has authority on behalf of the Party to execute this Lease and all other documents contemplated hereby, and (iv) this Lease is a valid obligation of the Party and is binding upon and enforceable against the Party in accordance with its terms.

10. Quiet Enjoyment. Upon payment of rent to Landlord, Tenant shall have the right of quiet enjoyment of and possession of the Premises.

11. Maintenance and Repair. Tenant shall keep the Premises in a clean and tidy condition, ordinary wear and tear and damage from casualty excepted. Tenant, at its sole cost and expense, shall keep all of the Improvements constructed upon the Property in good and sanitary order, condition and repair (ordinary wear and tear excepted). At no time during the Term of this Lease shall Landlord be required to make any repairs to the Improvements or the Premises. The Premises and every part thereof including plumbing, lighting, fixtures, plate glass, heating and cooling equipment and all other equipment whatsoever shall at all times be kept by Tenant in good order, condition and repair and in a clean, sanitary and safe condition and in accordance with all applicable laws, ordinances and regulations of any governmental authority having jurisdiction, all at Tenant's sole cost and expense. To the extent of any shared improvements, common areas or other property, improvements or facilities which benefit both the Premises and Landlord's Residual Property (collectively, "Shared Facilities"), then and in that event Landlord shall maintain, repair and replace such Shared Facilities in good condition and repair, ordinary wear and tear and damage from casualty excepted; provided, that, Tenant shall be responsible for any specific item of damage caused by Tenant, or its employees, agents, vendors, contractors or invitees.

12. Taxes. Landlord will pay all taxes including real property taxes, personal property taxes, fire service fees, assessments and all other levies that may, during the existence of this Lease, become payable against the Property, including the Premises and the Shared Facilities. Notwithstanding the foregoing, Tenant shall pay all personal property taxes, fire service fees, assessments and all other levies that may, during the existence of this Lease, become payable in connection with the Improvements constructed by Tenant on the Premises and any personal property or equipment owned or leased by Tenant and located on the Premises, and Tenant shall defend, indemnify and hold Landlord harmless in respect thereof and reimburse Landlord for such items in the event Landlord is required to pay them as the owner of the Property.

13. Compliance. Tenant shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directions, rules and regulations of all governmental authorities having or claiming jurisdiction over the Premises or Improvements located thereon or any part thereof and of all

insurance companies writing policies covering the Premises or Improvements located thereon or any part thereof. Without limiting the generality of the foregoing, Tenant shall also procure each and every permit, license, certificate or other authorization required in connection with the lawful and proper use of the Premises and Improvements or required in connection with any improvement now or hereafter erected thereon.

14. Default.

(a) If any one or more of the following events occur, said event or events shall hereby be classified as a "Default":

(i) Subject to the Grace Period (as defined below), Tenant fails to pay Base Rent, or any other sums payable by it under this Lease on the due date; or

(ii) Tenant shall default in the performance of any other covenant or agreement of this Lease or any rules and regulations reasonably promulgated by Landlord for the use by Tenant of the Premises (a "Non-Monetary Default"); or

(iii) Tenant shall initiate a bankruptcy proceeding, make a general assignment for the benefit of creditors or have a bankruptcy or insolvency proceeding taken by or against Tenant without the matter being dismissed within sixty (60) days of the initiation of such proceeding; or

(iv) a receiver or trustee in bankruptcy be appointed for the Tenant's property and such appointment be not vacated and set aside within sixty (60) days from the date of such appointment.

(b) Notwithstanding anything contained in this Lease to the contrary, Tenant shall have a ten (10) day Grace Period following written notice from Landlord to pay the past due Base Rent or other monetary amount due hereunder without being deemed to be in Default of this Lease. Landlord shall provide Tenant with written notice of any Non-Monetary Default under this Lease and Tenant shall have sixty (60) additional days as a Grace Period to cure said Non-Monetary Default, provided if such Non-Monetary Default cannot be cured with such time, such additional time as is reasonably required for such cure so long as Tenant is diligently pursuing and using all reasonable best efforts to accomplish the cure at the earliest possible time.

15. Remedies. Should a Default occur under this Lease which is not cured within the Grace Periods set forth in Section 14(b) above, Landlord may pursue any or all of the following:

(a) Terminate this Lease and any right of renewal and retake possession of the Premises;

(b) Enter the Premises and relet the same or any part of the Premises in the name of Landlord, or otherwise, as Tenant's agent, for a term shorter or longer than the balance of the Term, and may grant concessions or free rent in connection therewith, thereby terminating Tenant's right to possess the Premises. Any amounts received by Landlord from reletting the Premises shall be deducted from Tenant's obligations under this Lease. Landlord shall have the obligation to make a reasonable effort to relet the Premises. Landlord shall not, in any event, be required to pay Tenant any surplus of any sums received by Landlord on a reletting of the Premises in excess of Base Rent provided in this Lease. Any entry or re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall not absolve or discharge Tenant from liability under this Lease. "Re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meaning. No such re-entry or taking possession of the

Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease or to accept a surrender of the Premises unless a written notice of such intention is given to Tenant. Notwithstanding any such re-letting without termination, Landlord may at all times thereafter elect to terminate this Lease for such previous Default;

(c) Institute an action to recover Base Rent due hereunder;

(d) Obtain injunctive and declaratory relief, temporary or permanent, or both, against Tenant or any acts, conduct, or omissions of Tenant, and further to obtain specific performance of any term, covenant, or condition of this Lease;

(e) The remedies provided in this Lease or presently or hereafter existing at law or in equity shall be cumulative and concurrent, and may be exercised as often as occasion therefor shall occur. No single or partial exercise by Landlord of any remedy shall preclude any other or further exercise of such remedy or of any other remedy. No action or inaction by Landlord shall constitute a waiver of a Default and no waiver of Default shall be effective unless it is in writing, signed by the Landlord; and

(f) Tenant acknowledges that any rights or options of first refusal, or to extend the Term, to purchase the Premises, or other such or similar rights or options which have been granted to Tenant under this Lease are conditioned upon the prompt and diligent performance of the terms of this Lease by Tenant.

16. Environmental.

(a) Definitions:

(i) Environmental Claim. Means any investigation, enforcement, cleanup, removal, containment, remedial or other private or governmental or regulatory action at any time threatened, instituted or completed pursuant to any applicable Environmental Requirement (hereinafter defined), against either Landlord or Tenant against or with respect to the Property (including the Premises) or any condition, use or activity on the Property (including any such action against Landlord or Tenant regarding the Property), and any claim at any time threatened or made by any person against Landlord or Tenant or against or with respect to the Property or any condition, use or activity on the Property (including any such claim Landlord or Tenant), relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or in any way arising in connection with any Hazardous Material (hereinafter defined) or any Environmental Requirement (hereinafter defined).

(ii) "Environmental Law" means any federal, state or local law, statute, ordinance, code, rule, regulation, license, authorization, decision, order, injunction, decree, or rule of common law applicable to Landlord, Tenant or the Property, and any judicial interpretation of any of the foregoing, which pertains to health, safety, any Hazardous Material, or the environment (including but not limited to ground or air or water or noise pollution or contamination, and underground or above ground tanks) and shall include without limitation, the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"); the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., and any other state or federal environmental statutes, and all rules, regulations, orders and decrees now or hereafter promulgated under any of the foregoing, as any of the foregoing now exist or may be changed or amended or come into effect in the future.

(iii) "Environmental Requirement" means any Environmental Law (hereinafter defined) applicable to :Landlord, Tenant or the Property, as the same now exists or may be changed or amended or come into effect in the future, which pertains to health, safety, any Hazardous Material, or the environment, including but not limited to ground or air or water or noise pollution or contamination, and underground or aboveground tanks.

(iv) "Hazardous Material" means any substance, whether solid, liquid or gaseous: which is listed, defined or regulated as a "hazardous substance", "hazardous waste" or "solid waste", or otherwise classified as hazardous or toxic, in or pursuant to any Environmental Requirement; or which is or contains asbestos, radon, any polychlorinated biphenyl, urea formaldehyde foam insulation, explosive or radioactive material, or motor fuel or other petroleum hydrocarbons; or which causes or poses a threat to cause a contamination or nuisance on the Property or any adjacent property or a hazard to the environment or to the health or safety of persons on the Property.

(v) "On" or "on", when used with respect to the Property or any property adjacent to the Property, means "on, in, under, above or about."

(vi) Whenever the phrase "actual knowledge" is used in connection with a Party, such term shall be interpreted to mean the actual knowledge of the Party and their respective directors, officers, managers, and direct owners.

(b) Representations and Warranties. Landlord and Tenant represent and warrant to the other that the representations and warranties each of them made concerning the environmental condition of the Premises under that certain Heads of Agreement, dated December __________ 2025, among Landlord, Tenant, and other parties, are true and correct as of the date of this Agreement.

(c) Violations. Following the Closing, each Party will comply with all applicable Environmental laws and not cause, commit, or knowingly permit or allow to continue (a) any violation of any Environmental Requirement (i) by such Party or by any person or entity over whom such Party has legal responsibility or control, (ii) by or with respect to the Property or any use of or condition or activity on the Property, or (b) the attachment of any environmental lien to the Property. Except as permitted in the following paragraph, each Party will not place, install, dispose of or release, or cause, permit, or allow the placing, installation, disposal, spilling, leaking, dumping or release of, any Hazardous Material or storage tank (or similar vessel, excluding septic tanks) on the Property and will keep the Property free of Hazardous Material. Tenant, at Tenant's sole expense, shall keep the Premises free and clear of all environmental contaminants or residue ("Environmental Contamination") resulting from or occurring during Tenant's occupation or use of the Premises. Tenant shall be solely responsible for the cost of all work carried out to correct any Environmental Contamination which occurs on the Premises, or which occurs on the Property as a result of Tenant's occupation or use of the Premises. Landlord, at Landlord's sole expense, shall keep Landlord's Residual Property free and clear of Environmental Contamination. Landlord shall be solely responsible for the cost of all work carried out to correct any Environmental Contamination which occurs on the Premises or the Landlord's Residual Property, except to the extent caused by or resulting from Tenant's occupation or use of the Premises.

(d) Notice. Each Party shall promptly deliver to other Party a copy of each material report pertaining to the Property or to the Party pursuant to any Environmental Requirement. Each Party shall promptly advise the other Party in writing of any Environmental Claim or of the discovery of any Hazardous Material on the Property, promptly after such Party first obtains knowledge thereof, including a full description of the nature and extent of the Environmental Claim and/or Hazardous Material and all relevant circumstances.

(e) Remedial Actions. If any Hazardous Material is discovered on the Property at any time due to the breach of a Party's representations or warranties under Section 2 or its covenants under Section 3, the actions or directions of Party (or otherwise due to circumstances within the control of the Party), in violation of Environmental Laws, such Party shall promptly at its sole risk and expense remove, treat, and dispose of the Hazardous Material in compliance with all applicable Environmental Requirements and solely under such Party's name (or if removal is prohibited by any Environmental Requirement, take whatever action is required by any Environmental Requirement), in addition to taking such other action as is necessary to have the full use and benefit of the Property, and provide the other Party with reasonable evidence thereof. Nothing herein shall preclude any Party from seeking reimbursement from any third party for any costs or expenses incurred by such Party due to the acts or omissions of such third party.

(f) Indemnity.

(i) Landlord. Landlord hereby agrees to protect, indemnify, defend and hold (A) Tenant; (B) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Tenant; (C) the directors, officers, members, partners, employees and agents of Tenant and/or such persons or entities; and (D) the heirs, personal representatives, successors and assigns of each of the foregoing persons or entities (each an "Tenant Indemnified Party") harmless from and against, and, if and to the extent paid, reimburse them on demand for, any and all Environmental Damages (hereinafter defined) that are attributable to a beach by Landlord of its representations, warranties or covenants under this Agreement. Such indemnity shall not apply to any Tenant Indemnified Party if the Tenant Indemnified Party caused or contributed to the indemnified claim. Upon demand by the Tenant Indemnified Party, Landlord shall diligently defend any Environmental Claim for which the Tenant Indemnified Party is indemnified hereunder and which affects the Property or is made or commenced against the Tenant Indemnified Party due to an act or omission in which it is indemnified hereunder , whether alone or together with Landlord or any other person, all at Landlord's own cost and expense and by counsel to be approved by the Tenant Indemnified Party in the exercise of its reasonable judgment. Such indemnification obligation shall survive any termination of this Agreement.

(ii) Tenant. Tenant hereby agrees to protect, indemnify, defend and hold (A) Landlord; (B) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Landlord; (C) the directors, officers, members, partners, employees and agents of Landlord and/or such persons or entities; and (D) the heirs, personal representatives, successors and assigns of each of the foregoing persons or entities (each an "Landlord Indemnified Party") harmless from and against, and, if and to the extent paid, reimburse them on demand for, any and all Environmental Damages (hereinafter defined) that are attributable to a beach by Tenant of its representations, warranties or covenants under this Agreement. Such indemnity shall not apply to any Landlord Indemnified Party if the Landlord Indemnified Party caused or contributed to the indemnified claim. Upon demand by the Landlord Indemnified Party, Tenant shall diligently defend any Environmental Claim for which the Landlord Indemnified Party is indemnified hereunder and which affects the Premises or the Property or is made or commenced against the Landlord Indemnified Party due to an act or omission in which it is indemnified hereunder, whether alone or together with Tenant or any other person, all at Tenant's own cost and expense and by counsel to be approved by the Landlord Indemnified Party in the exercise of its reasonable judgment. Such indemnification obligation shall survive any termination of this Agreement.

(iii) As used in this Agreement, the term "Environmental Damages" means all actual claims, demands, liabilities (including strict liability), losses, damages (excluding punitive and consequential damages, and excluding diminution in value), causes of action, judgments, penalties, fines, costs and reasonable expenses (including reasonable fees, costs and expenses of attorneys, consultants, contractors, experts and laboratories), of any and every kind or character, contingent or otherwise, matured or

unmatured, known or unknown, foreseeable or unforeseeable, made, incurred, suffered, brought, or imposed at any time and from time to time, and arising in whole or in part from:

(A) the presence of any Hazardous Material on the Property, or any escape, seepage, leakage, spillage, emission, release, discharge or disposal of any Hazardous Material on or from the Property, or the migration or release or threatened migration or release of any Hazardous Material to, from or through the Property; or

(B) any violation of any Environmental Requirement; or

(C) any Environmental Claim, or the filing or imposition of any environmental lien against the Property, because of, resulting from, in connection with, or arising out of any of the matters referred to in subparagraphs (i) and (ii) preceding; and regardless of whether any of the foregoing subparagraphs (A) through (C) was caused by a Party or a tenant or subtenant of the Property or its tenant or subtenant, or any third party, including but not limited to (v) injury or damage to any person, property or natural resource occurring on or off of the Property, including but not limited to the cost of demolition and rebuilding of any improvements on real property; (w) the investigation or remediation of any such Hazardous Material or violation of any Environmental Requirement, including but not limited to the preparation of any feasibility studies or reports and the performance of any cleanup, remediation, removal, response, abatement, containment, closure, restoration, monitoring or similar work required by any Environmental Requirement; (x) all liability to pay or indemnify any person or governmental authority for costs expended in connection with any of the foregoing; (y) the investigation and defense of any claim, whether or not such claim is ultimately defeated; and (z) the settlement of any claim or judgment. Notwithstanding the foregoing, a Party shall have no indemnification or other obligation under this Agreement or otherwise for any Environmental Damages that are not the result of a breach of their representations, warranties and covenants hereunder, including any acts or omissions solely caused by acts or occurrences by third parties after the Landlord has sold the Property (or its indirect interests therein if the sale is accomplished through the sale of the membership interests in the entity owing the Property), or, in the case of Tenant, after it has ceased to occupy the Premises.

17. Destruction of Shared Facilities.

(a) If the Shared Facilities, or any portion thereof, shall be so damaged that substantial alteration or reconstruction of the Shared Facilities shall be required (whether or not the Premises shall have been damaged by such casualty), Landlord shall commence and proceed with reasonable diligence to restore the Shared Facilities to substantially the same condition they were in immediately prior to the happening of the casualty. If the Premises or any Improvements built or constructed by Tenant, or any portion thereof, shall be so damaged that substantial alteration or reconstruction of the Premises or the Improvements shall be required (whether or not the Landlord's Residual Property shall have been damaged by such casualty), Tenant shall commence and proceed with reasonable diligence to restore the Premises and Improvements to substantially the same condition they were in immediately prior to the happening of the casualty.

(b) Notwithstanding subsection (a) above, (i) Landlord shall have no duty to restore, rebuild, or replace any portion of the Premises or any Improvements built and constructed by Tenant; and (ii) Tenant's obligations to repair, rebuild, or restore the Premises and the Improvements shall exist only to the extent that insurance proceeds are actually received by Tenant in connection with the casualty which gave rise to Tenant's obligation to repair, rebuild, or restore.

(c) If Landlord shall fail to restore any portion of the Shared Facilities not useable by Tenant as a result of any casualty, within thirty (30) days of the date on which the Shared Facilities becomes

unusable, then and in that event Tenant shall have the right to restore the condition of such Shared Facilities and Landlord shall have an obligation to reimburse Tenant for all costs and expenses incurred in connection with such restoration plus a twenty percent (20%) fee to compensate Tenant for the management of the restoration project.

18. Assignment and Sublease. Tenant shall not assign or enter into a sublease of the Premises unless the assignee or sublessee agrees to bound by the terms of this Lease and notwithstanding the assignment or sublease, Tenant shall continue to remain liable to Landlord to perform any obligations under this Lease that were due to be performed prior to the effective date of the assignment or sublease. For the avoidance of doubt, no such assignment or sublease shall relieve Tenant of its obligations hereunder.

19. Indemnification. Except for matters arising from the negligent acts or omissions or the intentional acts of Landlord, its agents, employees or contractors, Tenant shall defend, indemnify and hold Landlord harmless from all costs, expenses, claims, liens and liabilities arising out of or relating to (a) the construction, operation or removal of the Improvements, (b) otherwise as a result of Tenant's or its invitee's use, enjoyment and occupancy of the Premises or any portion thereof, or (c) injury to person or damage to property sustained by anyone in and about the Premises.

20. Surrender. Tenant shall, prior to the expiration or sooner termination of the Term, remove or cause to be removed from the Premises any and all personal property located thereon, and peaceably surrender and yield up to Landlord the Premises and Improvements.

21. Time is of the Essence. Time shall be of the essence of this Lease.

22. Governing Law. This Lease shall be construed pursuant to the laws of State of West Virginia, with regards to any applicable conflicts of law principles.

23. Successors and Assigns. This Lease shall inure to the benefit of, and be binding upon, Landlord and Tenant, and their respective successors and assigns.

24. No Waiver. The waiver by a Party of a breach of a term, covenant or condition herein contained will not be deemed to be a waiver of a subsequent breach of the same or another term, covenant or condition herein contained.

25. Notice. Any notice to be given under this Lease shall be in writing and shall be validly given if delivered, transmitted by facsimile, emailed, or mailed by prepaid registered mail to the Parties as follows:

Landlord: Omnis Pleasants, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505

Tenant: Quantum Pleasants, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505

or to such other person or address as either Party may designate by notice given in accordance with this Lease. Notice shall be deemed to have been initially given on the third (3rd) day following the mailing thereof.

26. Estoppel Certificates. At any time and from time to time during any Term of this Lease, either Party shall deliver to the other Party, within fifteen (15) business days after request therefor, a written statement certifying the following: Tenant is in possession of the Premises; this Lease is unmodified and in full force and effect (or if there have been modifications, this Lease is in full force and effect as modified and stating the modifications); the dates to which the Annual Base Rent have been paid in advance, if any; such party is not aware of any event of default under this Lease and is not aware of any event that with the giving of notice or passage of time would constitute an event of default; and such other certifications as the requesting party may reasonably request.

27. Subordination, Non-Disturbance and Attornment. Tenant hereby acknowledges and agrees that this Lease is and is to be subject and subordinate to, at all times, the encumbrance of any Security Instrument (as such term is defined below) securing any Mortgagee (as such term is defined below), whether dated, executed, acknowledged, delivered, or recorded prior to, concurrently with, or subsequent to this Lease, or a memorandum thereof, to the end and effect that any and all such Security Instruments are to be deemed to have been executed, acknowledged, delivered, and recorded prior to this Lease or a memorandum thereof, without knowledge of this Lease, actual, constructive, or otherwise, on the part of such Mortgagee; provided, however, that any such Mortgagee is to be deemed to have (a) acknowledged and recognized the validity of this Lease, and the rights of Tenant, its successors, assigns, and sub-lessees, to quiet use, enjoyment, and possession of the Premises, and (b) covenanted and agreed not to disturb or otherwise foreclose or terminate this Lease or the rights of Tenant, its successors, assigns and sublessees, to quiet use, enjoyment, and possession of the Premises absent the occurrence of an unremedied or uncured event of default.

(a) Tenant hereby attorns to and recognizes (i) any and all Mortgagees; (ii) any transferee, including any Mortgagee, at a foreclosure sale, whether judicial or non-judicial in nature, under a Security Instrument; (iii) any transferee, including any Mortgagee, that acquires the Premises by way of a deed or deeds in lieu of foreclosure; and (iv) any transferee, successor, or assign that succeeds to such Mortgagee's, Tenant's or transferee's interest in the Premises, as its Landlord for the unexpired balance of the Initial Term or the Renewal Terms, as applicable, under the same terms, provisions, and conditions as set forth in this Lease, which attornment is and is to be effective and self-operative upon the acquisition or any interest in or title to the Premises by any such Mortgagee, Tenant, transferee, successor, or assigns, without the execution, acknowledgment, delivery, or recording of any other instruments, documents, or agreements by Landlord, Tenant or any Mortgagee, Tenant, transferee, successor, or assign.

(b) Tenant is to have the right and authority to encumber Tenant's interest in and to this Lease pursuant to a Security Instrument, Leasehold Mortgage (as such term is defined below) or otherwise; provided, however, that Tenant is to neither have the power, right, nor authority to encumber Landlord's interest in and to the Property or Premises, and that any attempted encumbrance by Tenant of all or any part of Landlord's interest in and to the Property or Premises shall be entirely void and of no effect whatsoever.

(c) In the event Tenant executes, acknowledges, and delivers any Security Instrument that places an Encumbrance on Tenant's interest in and to this Lease, in whole or in part, or subjects Tenant's interest in and to the Lease, in whole or in part, to any Encumbrance (as such term is defined below), Tenant shall, within thirty (30) days of such Encumbrance, notify Landlord, in writing, of the existence of such Security Instrument and the address of the Secured Party or Leasehold Mortgagee to

which notices under this Lease are to be sent. Furthermore, in the event any such Security Instrument is be assigned, Tenant and such Leasehold Mortgagee or Secured Party shall notify Landlord, in writing, of such assignment and the address of such assignee. So long as such a Security Instrument is in effect and Landlord has been given notice in accordance with the provisions of this section, and provided that no event of default has occurred which has not been cured within the applicable grace period, if any, Landlord covenants and agrees that no surrender amendment, alteration, enlargement, modification, or change of this Lease is to be made or effected without the prior written consent of such Secured Party or Leasehold Mortgagee or its assigns.

(d) In the event Landlord gives notice to Tenant with respect to or in connection with any event of default, Landlord shall also serve a copy of such notice upon each Secured Party or Leasehold Mortgagee and the assignee, if any, of any such Leasehold Mortgagee with respect to which Landlord has received notice in accordance with the provisions of this Section 26. Subject to such condition precedent, Landlord covenants and agrees that no such notice to Tenant is to be effective unless and until a copy of such notice is duly served upon such Secured Party or Leasehold Mortgagee or its assignee, if any, in accordance with the provisions of this section. Upon the receipt of such notice by such Secured Party or Leasehold Mortgagee or its assigns, the same is to have the right and opportunity to cure or remedy or cause to be cured or remedied any beach or default within the same time period provided to Tenant, and Landlord shall accept such performance by the same as if the same had been done or performed by Tenant.

(e) In the event any Leasehold Mortgagee exercises its rights of foreclosure, and such Leasehold Mortgagee, its successors or assigns, becomes the holder of the leasehold estate of Tenant, Landlord agrees to recognize such Leasehold Mortgagee, its successors or assigns, as Tenant hereunder, subject to all terms and conditions of this Lease and subject to all uncured events of default.

(f) Landlord agrees to execute and deliver any reasonable Subordination, Non-Disturbance and Attornment Agreement presented by a Leasehold Mortgagee. Landlord acknowledges that Leasehold Mortgagee's request for reasonable additional time for the Leasehold Mortgagee to cure an event of default before the termination of this Lease is acceptable to Landlord, not to exceed thirty (30) days without Landlord's express written consent. Further Landlord acknowledges that Leasehold Mortgagee's request for Landlord to subordinate any express or implied "Landlord's lien" or other similar lien to the lien of the Leasehold Mortgagee shall be acceptable to Landlord.

(g) Tenant agrees to execute and deliver any commercially reasonable Subordination, Non-Disturbance and Attornment Agreement presented by a Mortgagee. Tenant acknowledges that Mortgagee's request for reasonable additional time for the Mortgagee to cure an event of default before the termination of this Lease is acceptable to Tenant, not to exceed thirty (30) days without Tenant's express written consent.

(h) For the purposes of this Lease, the following terms have the meanings as set forth below:

(i) "Encumbrance" means any lien, security interest, or encumbrance on or against this Lease or the Premises that is evidenced or perfected by a Security Instrument, judgment lien, writ of execution, mechanic's liens, tax lien, or notice of lis pendens.

(ii) "Leasehold Mortgagee" means the holder of any debt instrument, the payment of which is secured by a Security Instrument that encumbers or places a lien upon Tenant's interest in and to the Lease.

(iii) "Mortgagee" means the holder of any debt instrument, the payment of which is secured by a Security Instrument that encumbers or places a lien upon Landlord's interest in and to the Premises.

(iv) "Security Instrument" means any deed of trust, leasehold deed of trust, credit line deed of trust, leasehold credit line deed of trust, mortgage, leasehold mortgage, UCC fixture filing, security agreement, UCC financing statement, assignment of leases and rents, collateral assignment of lease, or similar security instrument which secures the payment of any indebtedness or any other obligations and all renewals, modifications, amendments, supplements, consolidations, replacements, and extensions thereof, to the full extent of the amounts secured thereby.

27. Eminent Domain.

(a) If all or any part of the Property is appropriated or condemned by any public or quasi-public authority in the exercise of its right of condemnation or eminent domain, both Landlord and Tenant are to have the right to prosecute a claim for an award and to share in the proceeds of any and all awards based upon their respective interests as hereafter set forth. Specifically, Landlord shall have the right to prosecute a claim for the value of Landlord's Residual Property plus any reversionary interest in the Premises and/or the Improvements beyond the expiration of the Term, and Tenant shall have the right to prosecute a claim for the value of its leasehold interest in the Premises and the Improvements for the remainder of the Term.

(b) If all the Premises is appropriated or condemned, this Lease is to terminate as of the time when possession is required by such public or quasi-public authority. In the event all or any part of the Premises is taken or condemned, Landlord is be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents that it would have received in the future and for the present value of its reversionary interest in the Premises and all Improvements thereon, and the damage to its residual estate, and, notwithstanding the termination of this Lease, Tenant is to be entitled to that portion of any and all awards necessary to compensate it for the leasehold value of its Improvements to the Leasehold Premises, the value of its leasehold estate, and the damages that it may sustain as a result of termination of this Lease prior to the end of the Term, and the present value of any sublessee rents it would have received in the future.

(c) In the event that a part of the Premises is taken or condemned and that (a) the part so taken includes Improvements on the Premises or any part thereof, or (b) the part so taken makes it impracticable for Tenant to continue operation at the Premises in Tenant's sole discretion, Tenant may, at any time either prior to or within a period of sixty (60) days after the date when the condemning authority requires possession of the part of the Premises taken or condemned, elect to terminate this Lease.

(d) In the event Tenant elects to terminate this Lease, Landlord is to be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents that it would have received in the future and for the present value of its reversionary interest in the Premises and all improvements thereon, and the damage to its residual estate, and notwithstanding the termination of this Lease, Tenant is to be entitled to that portion of any and all awards necessary to compensate it for the leasehold value of its Improvements to the Premises, the value of its leasehold estate and the damages that it may sustain as a result of termination of this Lease prior to the end of the Term including, without limitation, the cost of relocating and moving personal property and equipment, and the present value of the sublessee's rents Tenant would have received in the future.

(e) In the event that Tenant does not elect to terminate this Lease or in the event that a part of the Premises is taken or condemned under circumstances under which Tenant will have no such

election, then and in either event, Tenant is to receive so much of any and all awards as is necessary to pay for repairs to and alterations of the Improvements on the Premises for the purpose of restoring the same to an economic architectural unit, susceptible to the same use as that which was in effect immediately prior to such taking and Landlord shall receive the balance, if any, of any awards.

(f) Landlord and Tenant agree to submit any dispute concerning any matter associated with the right to funds arising from eminent domain to binding arbitration before the Judicial Arbitration and Mediation Service ("JAMS") in Wilmington, Delaware under the JAMS' Commercial Arbitration Rules (the "JAMS Rules"). The proceedings of the arbitration shall be kept confidential by the arbitrator, the parties to the arbitration and their respective counsel and other representatives (except to the extent necessary to enforce any award made by the arbitrator). Arbitration may be commenced by Landlord or Tenant by filing a demand for arbitration pursuant to the JAMS Rules (an "Arbitration Demand"). The initiating party shall also send a copy of the Arbitration Demand to the other party. The Parties shall jointly select one arbitrator within fifteen (15) days of the date of the Arbitration Demand. If they fail to agree, the arbitrator shall be selected pursuant to the JAMS Rules within thirty (30) days from the end of such fifteen (15) day period. If an arbitrator so selected becomes unable to serve, his or her successors shall be similarly selected or appointed. Any arbitrator that is appointed shall agree that his or her schedule is sufficiently flexible to accommodate the timelines set forth in this Section 27. Notwithstanding the provision in Section 27 with respect to applicable substantive law, the arbitration shall be conducted pursuant to the Federal Arbitration Act and such procedures as the Parties may agree, or, in the absence of such agreement, pursuant to the JAMS Rules. The arbitrator will agree to comply with the Federal Arbitration Act and the procedures agreed to by the parties, or if applicable, the JAMS Rules and the terms of this Section 27. The arbitrator shall have case management authority and shall resolve the dispute in final within sixty (60) days from the commencement of the arbitration. For purposes of calculating the effects of any statutes of limitations, any lawsuit initiated pursuant to this provision will be deemed to have been filed on the date that the arbitration was commenced, as established by the Federal Arbitration Act or the JAMS Rules, if applicable. Each Party have the right to conduct discovery and present evidence in accordance with the following rules: (a) each Party shall be allowed to conduct reasonable discovery through written document requests and depositions, the nature and extent of which discovery shall be determined by the Party; provided, that if the Parties cannot agree on the terms of discovery, the nature and extent thereof will be determined by the arbitrator who will take into account the needs of the Parties, and the purposes of arbitration to make discovery expeditious and cost effective, and (b) access to any confidential or proprietary financial or other information produced in discovery will be limited to the discovering Party's lawyers and other experts and a limited number (to be agreed by the Parties) of senior management of the discovering Party, who will be obligated to preserve the confidentiality of such information on reasonable and customary terms. Each Party shall provide to the other, reasonably in advance of the hearing, copies of all documents which such Party intends to present at the hearing. Each Party agrees that a judgment may be entered on the arbitrator's award in any court of competent jurisdiction. The arbitrator in reviewing any Arbitration Matter under this Lease shall have the exclusive authority to determine any issues as to the arbitrability of such Arbitration Matter hereunder. In reaching a decision, the arbitrator shall interpret, apply and be bound by this Lease and by applicable law. The arbitrator shall have no authority to add to, detract from or modify this Lease or ancillary agreement, as applicable, or any applicable law in any respect. The arbitrator may grant any remedy or relief that a court of competent jurisdiction could grant, including specific performance and injunctive relief, except that the arbitrator may not grant any relief or remedy greater than that sought by the disputing Parties nor any special, indirect, punitive or consequential damages, except to the extent such damages are reasonably foreseeable or actually awarded to a third party by a court of competent jurisdiction. The arbitrator shall have the power to award attorneys' fees and costs to the prevailing Party. Any up-front costs of the arbitrator and JAMS shall be borne equally by the initiating Party and the responding Party to the dispute, and each such Party shall initially bear its own costs incurred in connection with attorneys' fees, expert witness fees, accounting fees and related expenses; provided,

however, that the non-prevailing Party in any such arbitration (as determined by the arbitrator) shall pay, and, to the extent applicable, reimburse the prevailing Party for, its legal costs, expert witness fees and accounting costs associated with the proceeding, as determined by the arbitrator, and the costs and expenses of the arbitrator and JAMS, including costs and expenses payable to the JAMS. Nothing in this Lease shall limit or in any way restrict the ability of any Party to seek legal or equitable relief in a court or other judicial body. The award of the arbitrator shall be binding and conclusive on the Parties to the proceeding, absent a finding that such award was arbitrary and capricious by a court of competent jurisdiction.

28. Memorandum of Lease. This Lease shall not be recorded, but Tenant may record a memorandum of lease in form acceptable to Landlord and executed by both Parties. Landlord shall prepare the aforesaid memorandum of lease and pay the cost of recording the same.

29. Transfer Taxes. Landlord shall pay all transfer taxes related to or imposed upon this Lease, if any.

30. Signage. Tenant shall have the right to design, locate, and install the maximum signage allowable by the governmental agency with governing authority.

31. Confidentiality. Landlord and Tenant expressly acknowledge and agree that the terms and conditions of this Lease, together with any discussions, negotiations, and or agreements arising out of this Lease or any such discussions shall be deemed confidential information (“Confidential Information”) and shall not be disclosed by Landlord, Tenant or any of its agents, professional advisors, directors, lenders, officers, employees or consultants, without the express prior written consent of the other Party; provided the terms of this Lease and a copy thereof may be provided to any person or legal entity interested in purchasing or leasing the Property or Premises or in purchasing either of the Parties.. Except as provided in the immediately preceding sentence, Landlord and Tenant agree to hold the Confidential Information in strict confidence and not to disclose such Confidential Information to any third party, except as specifically authorized, and to use all reasonable precautions to prevent the unauthorized use or disclosure of the Confidential Information. Confidential Information shall not include information that is already available to the public, or becomes available to the public through no fault of Landlord.

[Remainder of Left Blank Intentionally; Signature Page to Follow]

IN WITNESS WHEREOF the Parties hereto have executed this lease as of the day and year written below.

LANDLORD:
OMNIS PLEASANTS, LLC,
a Delaware limited liability company,
formerly known as ETEM Remediation Two LLC

By: ______________________
Name: Randall Smith
Title: CFO

TENANT:
QUANTUM PLEASANTS, LLC,
a Delaware limited liability company,

By: ______________________
Name: Randall Smith
Title: CFO

**EXHIBIT A**
**TO**
**LEASE AGREEMENT**

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

HERRICK

Elizabeth Plowman
Partner
212.592.1586
eplowman@herrick.com

March 9, 2026

**VIA EMAIL**

Herbert Smith Freehills Kramer
1177 Avenue of the Americas
New York, NY 10036
Attention: Alexander Woolverton
Email: alexander.woolverton@hsfkramer.com
*Counsel to Omnis Pleasants, LLC*

Re: Omnis Pleasants, LLC

Xander:

First, thank you for confirming that "Mr. Nathan will forbear" "from contacting prospective bidders to notify them that he does not support continuing the sale process."[1] If his position changes, we expect you to please let us know promptly and well before Mr. Nathan contacts any prospective bidders. If you are unwilling to do so, let us know now.

Second, we have received no response concerning how, if at all, Mr. Nathan plans to repay the Omnis Parties' indebtedness.[2] That indebtedness includes (i) no less than $75 million owed to the Lenders as of February 3, 2026, (ii) a $50 million loan from WVEDA that matures in June 2026, and (iii) a $20 million loan with Bilt. The forbearance period with the Lenders expires on April 7, 2026, and Herrick's clients have diligently worked to negotiate forbearance terms with WVEDA and Bilt. As you have repeatedly acknowledged, Mr. Nathan is a fiduciary of both OP and Quantum Pleasants. But he has ignored repeated requests to execute or provide feedback on the Bilt forbearance agreement. And, as discussed below, Messrs. Nathan and Hindman are engaging in conduct that appears to be aimed at interfering with Quantum Pleasants' ability to enter into a forbearance agreement with WVEDA. Meanwhile, you have represented that Mr. Nathan is refusing to consider or support any sale regardless of deal terms and lender support. So again, please let us know: Absent a sale that would repay the lenders in full, what is Mr. Nathan's plan

---

[1] 3/3/26 email from Alexander Woolverton.

[2] Unless otherwise defined, capitalized terms have the same meaning as in the amended and restated forbearance agreement, dated as of February 6, 2026, among the Lenders and the Omnis Parties (the "Forbearance Agreement").

HERRICK



to satisfy OP's and QP's indebtedness?[3] Similarly, please provide us with OP's prompt approval or feedback on the forbearance terms with Bilt.

Third, we understand that OP has provided no financial reporting to Quantum Pleasants since December 2025, despite our clients' repeated demands. Quantum Pleasants is the parent and sole member of OP. It is entitled to OP's financial reporting—which is critical to any sales process.[4] OP's refusal to provide material financial information materially impairs our clients' ability to market and sell OP and its Power Plant. Please promptly produce all of OP's financial reporting and books and records since December 31, 2025. This information should include: (i) OP's financial statements and general ledgers; (ii) Alix Partners' invoices to OP since the invoice dated January 7, 2026; (iii) the Independent Manager's invoices; (iv) the interim CEO agreement between OP and APS Services, LLC; and (v) the report, when available, and all preliminary reports "identifying any and all recommendations to improve performance, cash flow, profit and loss and such other financial metrics as shall be discussed between the FA and the CEO." (Forbearance Agreement § 7(e); 2/12/26 Amendment to OP's Operating Agreement § 1(d)).

Fourth, we understand that your firm directly contacted our clients requesting several categories of documents for Quantum Pleasants, OFT, and OGT. The requested documents date back to 2023, and consist of a wide range of information, including bank statements, check registers, general ledgers, corporate cards, and travel and expense reports. We understand that Quantum Pleasants' bank statements have already been provided to (i) OP and its agent, including Alix Partners, (ii) the Lenders, and (iii) the Lenders' forensic accountant, and Quantum Pleasants' general ledgers have already been provided to the Lenders' forensic accountant. And we struggle to understand how the requested information concerns OP's operations. The Forbearance Agreement entitles Mr. Nathan only to documents "necessary to allow the FA to deliver to the Omnis Parties and Lenders a report identifying any and all recommendations to improve performance, cash flow, profit and loss and such other financial metrics as shall be discussed between the FA and CEO." (Forbearance Agreement § 7(e)). Frankly, we are astounded by Mr. Nathan's focus on corporate cards and travel expenses for non-OP entities, when he should be dedicating all his immediate attention to promptly repaying OP's and QP's debt and avoiding foreclosure. We're willing to meet and confer about the document requests. But all future document requests should be directed to Herrick since—as you know—we represent Quantum Pleasants, OFT, and OGT.

---

[3] We understand that Alix Partners has been engaged as a financial advisor to OP since October 2025. It has had plenty of time to formulate a strategy.

[4] *E.g.*, 2/12/26 Amendment to OP's Operating Agreement § 1(g) ("Member Information Rights. The Member [Quantum Pleasants] shall (A) receive all notices and materials provided to the Directors in connection with any meeting or action of the Directors by written consent, (B) have reasonable access to the books and records of the Company [OP], and (C) participate in meetings (in person or telephonically) at which material Company [OP] actions are considered."); 6 Del. C. § 18-305.

HERRICK



Fifth, we also previously raised that Messrs. Nathan and Hindman are preventing Quantum Pleasants' scientist (Dr. Swensen) from accessing property that Quantum Pleasants leases from OP (the "Leased Property").[5] This is a plain breach of the lease, providing for Quantum Pleasants' access to the Leased Property, including "ingress and egress to, from and over the "Property." (Ex. A ¶ 1). Please promptly confirm that Mr. Swensen—and other scientists, employees, and agents of Quantum Pleasants—will immediately be granted access to the Leased Property.

Sixth, your March 2 letter's reference to purportedly "damning" and "troubling" allegations by WVEDA "against OP's prior management," is irresponsible, misleading, and, at best, deliberately obtuse. As OP's counsel, you should understand the facts concerning the WVEDA loan.[6] You should especially do so before irresponsibly writing about WVEDA's allegations in written correspondence in which you inexplicably decided to copy[7] the Deputy Director of the West Virginia Department of Commerce. WVEDA's allegations were not limited to claims against "prior management;" the allegations were made against both of our firms' respective clients. And you selectively attached to your letter one-sided correspondence from WVEDA, while ignoring the many other letters from our respective clients—Quantum Pleasants, OFT, and OP—responding to, and refuting, each allegation. We encourage you to read our clients' responses to WVEDA's letters, particularly the letters dated July 8, 2025, July 13, 2025, and August 6, 2025, and to speak to the Omnis Parties' employees with knowledge of the facts, before continuing to lend credence to WVEDA's baseless allegations. As you know (or should know), after WVEDA and our respective clients exchanged letters from March 2025 to October 2025 about WVEDA's concerns, the parties met in person in November 2025 and, since then, they have been engaged in productive negotiations over a forbearance agreement.

Messrs. Nathan's and Hindman's intentional interference with the WVEDA negotiations, as further evidenced by your March 2 letter, threatens to undermine the progress that has been made with WVEDA. As counsel to OP's sole member, Quantum Pleasants, we demand a copy of all communications since October 24, 2025 between (i) OP, Quantum Pleasants, and each of their representatives (including the interim CEO, OP's financial advisor, and the Independent Manager, and their representatives or agents, including counsel), on the one hand, and (ii) WVEDA, the West Virgina Department of Commerce, other West Virginia state agencies, or their

[5] The lease is attached as **Exhibit A**.

[6] You describe the WVEDA loan as "a $50 million loan that OP obtained" from WVEDA. (3/2/26 Letter from Herbert Smith Freehills Kramer, at 1). Quantum Pleasants is the borrower of that loan. OP is a guarantor.

[7] The only basis we can see for copying Mr. Preservati on your communications is to attempt to hinder our clients' ability to enter into a forbearance agreement with WVEDA.

HERRICK



representatives, concerning the WVEDA loan or the allegations by WVEDA referenced in your March 2 letter. We similarly demand: (i) all written communications between the Independent Manager, the financial advisor, and the interim CEO; and (ii) all written communications between the Independent Manager, the financial advisor, and the interim CEO, on the one hand, and the Lenders or Bilt, on the other hand.

You have repeatedly misstated other facts, documents, and agreements. We will not attempt to correct all your mistakes. But:

- Mr. Nathan's fiduciary obligations are not limited to maximizing the value of the Power Plant, and his obligations are also owed to our client (Quantum Pleasants).

- Mr. Nathan's statements to Herrick that there would be "no sale"—despite the forbearance agreement and his contractual and fiduciary obligations—are not privileged. Among other things, the statements did not seek legal advice. We further note that your letters to us copied WVEDA (breaking any purported privileged) while citing to WVEDA's "troubling" and "damning" allegations made against our clients as if they were fact.

- We understand that the boots on the ground operations are (and continue to be) handled by third parties (Alix Partners, Pure Energy, and Tyr). So, we fail to see how Mr. Nathan is "focus[ed] on the operational turnaround the Company [OP] so desperately needs."[8] Please tell us if you disagree (and why).

- We fail to see how terminating Vinson & Elkins as OP's counsel was in OP's best interests and not "remotely relevant to FERC."[9] Please let us know why the termination occurred. Our clients would also like an explanation for Herrick's termination as counsel to OP.

Lastly, please confirm that, as OP's counsel, you have advised the interim CEO, AP Services, LLC, Mr. Nathan, and Jackson Square Advisors of their obligations to preserve documents and information. If not, please direct us to their counsel; otherwise, we will directly communicate with each of them. We also assume that you are instituting all appropriate litigation holds on behalf of your client (OP). Please confirm.

In sum—especially with the Lenders' stating their support "to continue to explore the proposal from Cardinal Power"—it is critical for Mr. Nathan to stop playing games and help consummate a sale that is wholly supported by OP's parent, Quantum Pleasants, and fully repays all of OP's

---

[8] 3/3/26 email from Alexander Woolverton.

[9] 3/2/26 Letter from Herbert Smith Freehills Kramer, at 2.

HERRICK



lenders. This includes promptly providing us with the requested OP financial information (as opposed to irrelevant travel records from non-OP entities dating back three years) and consummating reasonable forbearance terms with Bilt and WVEDA.

We look forward to our call on Tuesday. As always, our clients reserve all rights and waive none.

Sincerely,

Elizabeth Plowman

Elizabeth Plowman

cc: Brian Shaughnessy, Herbert Smith Freehills Kramer, LLP
Ayla Lima, Herbert Smith Freehills Kramer, LLP
Gilbert Nathan, Jackson Square Advisors, LLC
David Hindman, AP Services, LLC
Thomas Michael, Manatt, Phelps & Phillips, LLC
Sean E. O'Donnell, Herrick Feinstein LLP
Christopher C. Carty, Herrick Feinstein LLP
Morris DeFeo, Herrick Feinstein LLP

# EXHIBIT A

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease"), is made this 2nd day of January, 2026 (the "Effective Date"), by and between OMNIS PLEASANTS, LLC, a Delaware limited liability company, formerly known as ETEM Remediation Two LLC, having an address of 3710 Collins Ferry Road, Morgantown, West Virginia 26505 ("Landlord"), and QUANTUM PLEASANTS, LLC, a Delaware limited liability company, having an address of 3710 Collins Ferry Road, Morgantown, West Virginia 26505 ("Tenant" and together with Landlord, each a "Party" and together, the "Parties"):

WHEREAS, Landlord owns certain real estate located and situate in Grant District, Pleasants County, West Virginia, being more particularly described in the following instruments of record: (1) Special Warranty Deed from Pleasants LLC, a Delaware limited liability company, to ETEM Remediation Two LLC, a Delaware limited liability company, dated December 27, 2022, made effective December 29, 2022 and recorded in the Office of the Clerk of the County Commission of Pleasants County, West Virginia (the "Clerk's Office") in Deed Book 351, Page 1, and (2) Amended and Restated Special Warranty Deed from Pleasants LLC, a Delaware limited liability company, to ETEM Remediation Two LLC, a Delaware limited liability company, dated July 31, 2023, made effective December 27, 2022 and recorded in the Clerk's Office in Deed Book 356, Page 56, together with improvements thereon and appurtenances pertaining thereto (collectively, the "Property");

WHEREAS, Landlord has agreed to lease and demise to Tenant, and Tenant has agreed to lease and hire from Landlord, the surface of that portion of the Property shown and depicted on Exhibit A attached hereto and incorporated herein by this reference (the "Premises"), all upon the terms and provisions set forth below. The Premises shall permit ingress and egress to, from and over the Property (particularly with regard to access to the adjacent river and the ability to load and unload equipment, supplies, materials and similar items) for Tenant's reasonable needs so long as such ingress and egress does not unreasonably interfere with Landlord's operations or use of the Property;

WHEREAS, Tenant intends to use the Premises to build, construct and operate a hydrogen fuel generation facility (the "Hydrogen Facility") pursuant to which hydrogen fuel generated by such facility shall be supplied to Landlord, on a take or pay basis, as feedstock for the electric generation power plant located on or about a portion of Landlord's residual Property (other than the Premises) ("Landlord's Residual Property"), on discounted pricing from prevailing market prices for delivered coal or natural gas (the "Discounted Supply Commitment");

WHEREAS, Landlord and Tenant are in the process of negotiating r a Hydrogen Supply Contract to memorialize the Discounted Supply Commitment (the "Definitive Fuel Supply Contract"), and shall continue to negotiate the terms and provisions of such Definitive Fuel Supply Contract in good faith; and

WITNESSETH THAT, in consideration of the rents, mutual covenants and agreements between the Parties including, without limitation, Tenant's Discounted Supply Commitment and the mutual commitment to execute and deliver a Definitive Fuel Supply Contract, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Lease and Demise. Landlord does lease and demise to Tenant, and Tenant does lease and hire from Landlord, the Premises. Landlord and Tenant hereby agree to have a survey prepared for the purpose of describing, with particularity, the metes and bounds of the Premises, together with all permitted ingress and egress to, from and over the Property and access to the adjacent river and the ability to load and unload equipment, supplies, materials and similar items (the "Surveyed Descriptions"). Landlord and Tenant further agree to to execute and deliver an amendment to this Lease for the purpose of adopting,

affirming and conforming this Lease to the Surveyed Descriptions deriving from a mutually agreed upon survey.

2. Term. To have and to hold the Premises for a term of twenty (20) years (the "Initial Term") commencing on the Effective Date. Tenant shall the right to extend the Initial Term for four (4) extension or renewal terms of ten (10) years (each, a "Renewal Term" and collectively, the "Renewal Terms") to be exercised automatically by Tenant unless Tenant gives written notice to Landlord at least ninety (90) days notice prior to the expiration of the Initial Term or the then-current Renewal Term, as applicable, that it elects to not extend the Lease for the applicable Renewal Term. As used herein, "Term" shall mean and refer to the Initial Term, as extended by the Renewal Terms, as applicable.

3. Rent. On or about the Effective Date, Tenant shall pay to Landlord the sum of $1.00 (the "Base Rent"). Landlord and Tenant acknowledge and agree that the Base Rent shall be deemed to have been prepaid for the balance of the Term. At the commencement of any Renewal Term, Tenant shall pay to Landlord the sum of $1.00 as rent for the entire Renewal Term. Landlord and Tenant acknowledge and agree that Base Rent, although below market rate, is fair and equitable in consideration of the Discounted Supply Commitment and the Parties' mutual commitment to execute and deliver a Definitive Fuel Supply Contract.

4. AS-IS, WHERE-IS. Tenant has inspected the Premises which are being leased to Tenant in its "AS-IS, WHERE-IS" condition, provided, however, the Premises shall be delivered : (a) in compliance with all laws, rules, regulations, codes and ordinances, (b) free of all other tenancies or occupants, and (c) free of any and all trade fixtures, equipment or furniture not necessary for building operation.

5. Use. Tenant shall use the Premises for construction and operating of a hydrogen fuel plant, and for no other purpose not otherwise related thereto unless approved by Landlord in writing. For the avoidance of doubt, and notwithstanding any provision contained herein to the contrary, the Tenant shall retain all rights and incidents of ownership over the design, build, construction and operation of the hydrogen fuel generation plant including, without limitation, any patents, copyrights or other intellectual property deriving therefrom or associated therewith.

6. Improvements. Tenant shall not build or construct any buildings or improvements (collectively, "Improvements") without first submitting plans and specifications therefor prepared by a registered architect for Landlord's review. In connection with the construction of any approved Improvements on or to the Property by Tenant, Tenant shall conform to all laws, building codes and/or zoning regulations applicable to the Premises and promulgated by any federal, state, county or municipal authority and to all applicable requirements of any board of underwriters, rating bureau and/or carrier insurance with respect to the Premises. Tenant shall keep the Premises free from mechanic's liens or liens of a similar nature by reason of any improvement work done by Tenant or by reason of any work of repair, maintenance, improvement, removal, construction, alteration or addition done thereon by Tenant. Notice is hereby given that no mechanic's, materialmen's or other lien sought to be taken on the Premises shall in any manner affect the right, title or interest of Landlord. Landlord shall not be liable for labor or materials furnished Tenant in or about the construction of any Improvements made by Tenant nor for the death or injury of anyone employed in doing such construction or the making of such Improvements. Tenant agrees to provide, or to cause the contractor(s) doing the Improvements to provide, workmen's compensation insurance and public liability insurance during the construction of any Improvements upon the Premises in liability limits of not less than $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate.

7. Insurance. Tenant agrees to procure and maintain, at all times during the term hereof, a policy or policies of insurance, at its own cost and expense, insuring against claims, costs, demands, liability or actions for bodily injury to or death of any one person and property damages in an amount of

not less $1,000,000.00 per occurrence, $2,000,000.00 in the aggregate, made by or in behalf of any person or persons, firm or corporation arising from, related to, or connected with the conduct and operation of Tenant's business on the Premises or otherwise occurring in, on or about the Premises. In addition, Tenant shall keep the Premises and Improvements insured against fire, windstorm, and other casualty, under an all-risk policy of insurance, written in standard form, in the full replacement value thereof. Landlord shall be named as an additional insured/loss payee on said insurance policy or policies. Tenant shall provide Landlord with a certificate of insurance evidencing the coverage or coverages required by this Section 7.

8. Title. Fee simple title to the Premises shall at all times remain with Landlord. Any Improvements made on the Premises that cannot be removed without doing material damage to the Premises shall be deemed to be affixed to the Premises for purposes of this Lease.

9. Representations and Warranties. Each Party represents and warrants that (i) it has the full right, power and authority to enter into this Lease and to perform its obligations hereunder, (ii) all requisite approvals, consents and board or committee actions necessary to authorize such Party to enter into this Lease and to bound by the provisions of this Lease have been obtained or taken, (iii) the person executing this Lease on behalf of the Party has authority on behalf of the Party to execute this Lease and all other documents contemplated hereby, and (iv) this Lease is a valid obligation of the Party and is binding upon and enforceable against the Party in accordance with its terms.

10. Quiet Enjoyment. Upon payment of rent to Landlord, Tenant shall have the right of quiet enjoyment of and possession of the Premises.

11. Maintenance and Repair. Tenant shall keep the Premises in a clean and tidy condition, ordinary wear and tear and damage from casualty excepted. Tenant, at its sole cost and expense, shall keep all of the Improvements constructed upon the Property in good and sanitary order, condition and repair (ordinary wear and tear excepted). At no time during the Term of this Lease shall Landlord be required to make any repairs to the Improvements or the Premises. The Premises and every part thereof including plumbing, lighting, fixtures, plate glass, heating and cooling equipment and all other equipment whatsoever shall at all times be kept by Tenant in good order, condition and repair and in a clean, sanitary and safe condition and in accordance with all applicable laws, ordinances and regulations of any governmental authority having jurisdiction, all at Tenant's sole cost and expense. To the extent of any shared improvements, common areas or other property, improvements or facilities which benefit both the Premises and Landlord's Residual Property (collectively, "Shared Facilities"), then and in that event Landlord shall maintain, repair and replace such Shared Facilities in good condition and repair, ordinary wear and tear and damage from casualty excepted; provided, that, Tenant shall be responsible for any specific item of damage caused by Tenant, or its employees, agents, vendors, contractors or invitees.

12. Taxes. Landlord will pay all taxes including real property taxes, personal property taxes, fire service fees, assessments and all other levies that may, during the existence of this Lease, become payable against the Property, including the Premises and the Shared Facilities. Notwithstanding the foregoing, Tenant shall pay all personal property taxes, fire service fees, assessments and all other levies that may, during the existence of this Lease, become payable in connection with the Improvements constructed by Tenant on the Premises and any personal property or equipment owned or leased by Tenant and located on the Premises, and Tenant shall defend, indemnify and hold Landlord harmless in respect thereof and reimburse Landlord for such items in the event Landlord is required to pay them as the owner of the Property.

13. Compliance. Tenant shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directions, rules and regulations of all governmental authorities having or claiming jurisdiction over the Premises or Improvements located thereon or any part thereof and of all

insurance companies writing policies covering the Premises or Improvements located thereon or any part thereof. Without limiting the generality of the foregoing, Tenant shall also procure each and every permit, license, certificate or other authorization required in connection with the lawful and proper use of the Premises and Improvements or required in connection with any improvement now or hereafter erected thereon.

14. Default.

(a) If any one or more of the following events occur, said event or events shall hereby be classified as a "Default":

(i) Subject to the Grace Period (as defined below), Tenant fails to pay Base Rent, or any other sums payable by it under this Lease on the due date; or

(ii) Tenant shall default in the performance of any other covenant or agreement of this Lease or any rules and regulations reasonably promulgated by Landlord for the use by Tenant of the Premises (a "Non-Monetary Default"); or

(iii) Tenant shall initiate a bankruptcy proceeding, make a general assignment for the benefit of creditors or have a bankruptcy or insolvency proceeding taken by or against Tenant without the matter being dismissed within sixty (60) days of the initiation of such proceeding; or

(iv) a receiver or trustee in bankruptcy be appointed for the Tenant's property and such appointment be not vacated and set aside within sixty (60) days from the date of such appointment.

(b) Notwithstanding anything contained in this Lease to the contrary, Tenant shall have a ten (10) day Grace Period following written notice from Landlord to pay the past due Base Rent or other monetary amount due hereunder without being deemed to be in Default of this Lease. Landlord shall provide Tenant with written notice of any Non-Monetary Default under this Lease and Tenant shall have sixty (60) additional days as a Grace Period to cure said Non-Monetary Default, provided if such Non-Monetary Default cannot be cured with such time, such additional time as is reasonably required for such cure so long as Tenant is diligently pursuing and using all reasonable best efforts to accomplish the cure at the earliest possible time.

15. Remedies. Should a Default occur under this Lease which is not cured within the Grace Periods set forth in Section 14(b) above, Landlord may pursue any or all of the following:

(a) Terminate this Lease and any right of renewal and retake possession of the Premises;

(b) Enter the Premises and relet the same or any part of the Premises in the name of Landlord, or otherwise, as Tenant's agent, for a term shorter or longer than the balance of the Term, and may grant concessions or free rent in connection therewith, thereby terminating Tenant's right to possess the Premises. Any amounts received by Landlord from reletting the Premises shall be deducted from Tenant's obligations under this Lease. Landlord shall have the obligation to make a reasonable effort to relet the Premises. Landlord shall not, in any event, be required to pay Tenant any surplus of any sums received by Landlord on a reletting of the Premises in excess of Base Rent provided in this Lease. Any entry or re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall not absolve or discharge Tenant from liability under this Lease. "Re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meaning. No such re-entry or taking possession of the

Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease or to accept a surrender of the Premises unless a written notice of such intention is given to Tenant. Notwithstanding any such re-letting without termination, Landlord may at all times thereafter elect to terminate this Lease for such previous Default;

(c) Institute an action to recover Base Rent due hereunder;

(d) Obtain injunctive and declaratory relief, temporary or permanent, or both, against Tenant or any acts, conduct, or omissions of Tenant, and further to obtain specific performance of any term, covenant, or condition of this Lease;

(e) The remedies provided in this Lease or presently or hereafter existing at law or in equity shall be cumulative and concurrent, and may be exercised as often as occasion therefor shall occur. No single or partial exercise by Landlord of any remedy shall preclude any other or further exercise of such remedy or of any other remedy. No action or inaction by Landlord shall constitute a waiver of a Default and no waiver of Default shall be effective unless it is in writing, signed by the Landlord; and

(f) Tenant acknowledges that any rights or options of first refusal, or to extend the Term, to purchase the Premises, or other such or similar rights or options which have been granted to Tenant under this Lease are conditioned upon the prompt and diligent performance of the terms of this Lease by Tenant.

16. Environmental.

(a) Definitions:

(i) Environmental Claim. Means any investigation, enforcement, cleanup, removal, containment, remedial or other private or governmental or regulatory action at any time threatened, instituted or completed pursuant to any applicable Environmental Requirement (hereinafter defined), against either Landlord or Tenant against or with respect to the Property (including the Premises) or any condition, use or activity on the Property (including any such action against Landlord or Tenant regarding the Property), and any claim at any time threatened or made by any person against Landlord or Tenant or against or with respect to the Property or any condition, use or activity on the Property (including any such claim Landlord or Tenant), relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or in any way arising in connection with any Hazardous Material (hereinafter defined) or any Environmental Requirement (hereinafter defined).

(ii) "Environmental Law" means any federal, state or local law, statute, ordinance, code, rule, regulation, license, authorization, decision, order, injunction, decree, or rule of common law applicable to Landlord, Tenant or the Property, and any judicial interpretation of any of the foregoing, which pertains to health, safety, any Hazardous Material, or the environment (including but not limited to ground or air or water or noise pollution or contamination, and underground or above ground tanks) and shall include without limitation, the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"); the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., and any other state or federal environmental statutes, and all rules, regulations, orders and decrees now or hereafter promulgated under any of the foregoing, as any of the foregoing now exist or may be changed or amended or come into effect in the future.

(iii) "Environmental Requirement" means any Environmental Law (hereinafter defined) applicable to :Landlord, Tenant or the Property, as the same now exists or may be changed or amended or come into effect in the future, which pertains to health, safety, any Hazardous Material, or the environment, including but not limited to ground or air or water or noise pollution or contamination, and underground or aboveground tanks.

(iv) "Hazardous Material" means any substance, whether solid, liquid or gaseous: which is listed, defined or regulated as a "hazardous substance", "hazardous waste" or "solid waste", or otherwise classified as hazardous or toxic, in or pursuant to any Environmental Requirement; or which is or contains asbestos, radon, any polychlorinated biphenyl, urea formaldehyde foam insulation, explosive or radioactive material, or motor fuel or other petroleum hydrocarbons; or which causes or poses a threat to cause a contamination or nuisance on the Property or any adjacent property or a hazard to the environment or to the health or safety of persons on the Property.

(v) "On" or "on", when used with respect to the Property or any property adjacent to the Property, means "on, in, under, above or about."

(vi) Whenever the phrase "actual knowledge" is used in connection with a Party, such term shall be interpreted to mean the actual knowledge of the Party and their respective directors, officers, managers, and direct owners.

(b) Representations and Warranties. Landlord and Tenant represent and warrant to the other that the representations and warranties each of them made concerning the environmental condition of the Premises under that certain Heads of Agreement, dated December _________ 2025, among Landlord, Tenant, and other parties, are true and correct as of the date of this Agreement.

(c) Violations. Following the Closing, each Party will comply with all applicable Environmental laws and not cause, commit, or knowingly permit or allow to continue (a) any violation of any Environmental Requirement (i) by such Party or by any person or entity over whom such Party has legal responsibility or control, (ii) by or with respect to the Property or any use of or condition or activity on the Property, or (b) the attachment of any environmental lien to the Property. Except as permitted in the following paragraph, each Party will not place, install, dispose of or release, or cause, permit, or allow the placing, installation, disposal, spilling, leaking, dumping or release of, any Hazardous Material or storage tank (or similar vessel, excluding septic tanks) on the Property and will keep the Property free of Hazardous Material. Tenant, at Tenant's sole expense, shall keep the Premises free and clear of all environmental contaminants or residue ("Environmental Contamination") resulting from or occurring during Tenant's occupation or use of the Premises. Tenant shall be solely responsible for the cost of all work carried out to correct any Environmental Contamination which occurs on the Premises, or which occurs on the Property as a result of Tenant's occupation or use of the Premises. Landlord, at Landlord's sole expense, shall keep Landlord's Residual Property free and clear of Environmental Contamination. Landlord shall be solely responsible for the cost of all work carried out to correct any Environmental Contamination which occurs on the Premises or the Landlord's Residual Property, except to the extent caused by or resulting from Tenant's occupation or use of the Premises.

(d) Notice. Each Party shall promptly deliver to other Party a copy of each material report pertaining to the Property or to the Party pursuant to any Environmental Requirement. Each Party shall promptly advise the other Party in writing of any Environmental Claim or of the discovery of any Hazardous Material on the Property, promptly after such Party first obtains knowledge thereof, including a full description of the nature and extent of the Environmental Claim and/or Hazardous Material and all relevant circumstances.

(e) Remedial Actions. If any Hazardous Material is discovered on the Property at any time due to the breach of a Party's representations or warranties under Section 2 or its covenants under Section 3, the actions or directions of Party (or otherwise due to circumstances within the control of the Party), in violation of Environmental Laws, such Party shall promptly at its sole risk and expense remove, treat, and dispose of the Hazardous Material in compliance with all applicable Environmental Requirements and solely under such Party's name (or if removal is prohibited by any Environmental Requirement, take whatever action is required by any Environmental Requirement), in addition to taking such other action as is necessary to have the full use and benefit of the Property, and provide the other Party with reasonable evidence thereof. Nothing herein shall preclude any Party from seeking reimbursement from any third party for any costs or expenses incurred by such Party due to the acts or omissions of such third party.

(f) Indemnity.

(i) Landlord. Landlord hereby agrees to protect, indemnify, defend and hold (A) Tenant; (B) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Tenant; (C) the directors, officers, members, partners, employees and agents of Tenant and/or such persons or entities; and (D) the heirs, personal representatives, successors and assigns of each of the foregoing persons or entities (each an "Tenant Indemnified Party") harmless from and against, and, if and to the extent paid, reimburse them on demand for, any and all Environmental Damages (hereinafter defined) that are attributable to a beach by Landlord of its representations, warranties or covenants under this Agreement. Such indemnity shall not apply to any Tenant Indemnified Party if the Tenant Indemnified Party caused or contributed to the indemnified claim. Upon demand by the Tenant Indemnified Party, Landlord shall diligently defend any Environmental Claim for which the Tenant Indemnified Party is indemnified hereunder and which affects the Property or is made or commenced against the Tenant Indemnified Party due to an act or omission in which it is indemnified hereunder , whether alone or together with Landlord or any other person, all at Landlord's own cost and expense and by counsel to be approved by the Tenant Indemnified Party in the exercise of its reasonable judgment. Such indemnification obligation shall survive any termination of this Agreement.

(ii) Tenant. Tenant hereby agrees to protect, indemnify, defend and hold (A) Landlord; (B) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with Landlord; (C) the directors, officers, members, partners, employees and agents of Landlord and/or such persons or entities; and (D) the heirs, personal representatives, successors and assigns of each of the foregoing persons or entities (each an "Landlord Indemnified Party") harmless from and against, and, if and to the extent paid, reimburse them on demand for, any and all Environmental Damages (hereinafter defined) that are attributable to a beach by Tenant of its representations, warranties or covenants under this Agreement. Such indemnity shall not apply to any Landlord Indemnified Party if the Landlord Indemnified Party caused or contributed to the indemnified claim. Upon demand by the Landlord Indemnified Party, Tenant shall diligently defend any Environmental Claim for which the Landlord Indemnified Party is indemnified hereunder and which affects the Premises or the Property or is made or commenced against the Landlord Indemnified Party due to an act or omission in which it is indemnified hereunder, whether alone or together with Tenant or any other person, all at Tenant's own cost and expense and by counsel to be approved by the Landlord Indemnified Party in the exercise of its reasonable judgment. Such indemnification obligation shall survive any termination of this Agreement.

(iii) As used in this Agreement, the term "Environmental Damages" means all actual claims, demands, liabilities (including strict liability), losses, damages (excluding punitive and consequential damages, and excluding diminution in value), causes of action, judgments, penalties, fines, costs and reasonable expenses (including reasonable fees, costs and expenses of attorneys, consultants, contractors, experts and laboratories), of any and every kind or character, contingent or otherwise, matured or

unmatured, known or unknown, foreseeable or unforeseeable, made, incurred, suffered, brought, or imposed at any time and from time to time, and arising in whole or in part from:

(A) the presence of any Hazardous Material on the Property, or any escape, seepage, leakage, spillage, emission, release, discharge or disposal of any Hazardous Material on or from the Property, or the migration or release or threatened migration or release of any Hazardous Material to, from or through the Property; or

(B) any violation of any Environmental Requirement; or

(C) any Environmental Claim, or the filing or imposition of any environmental lien against the Property, because of, resulting from, in connection with, or arising out of any of the matters referred to in subparagraphs (i) and (ii) preceding; and regardless of whether any of the foregoing subparagraphs (A) through (C) was caused by a Party or a tenant or subtenant of the Property or its tenant or subtenant, or any third party, including but not limited to (v) injury or damage to any person, property or natural resource occurring on or off of the Property, including but not limited to the cost of demolition and rebuilding of any improvements on real property; (w) the investigation or remediation of any such Hazardous Material or violation of any Environmental Requirement, including but not limited to the preparation of any feasibility studies or reports and the performance of any cleanup, remediation, removal, response, abatement, containment, closure, restoration, monitoring or similar work required by any Environmental Requirement; (x) all liability to pay or indemnify any person or governmental authority for costs expended in connection with any of the foregoing; (y) the investigation and defense of any claim, whether or not such claim is ultimately defeated; and (z) the settlement of any claim or judgment. Notwithstanding the foregoing, a Party shall have no indemnification or other obligation under this Agreement or otherwise for any Environmental Damages that are not the result of a breach of their representations, warranties and covenants hereunder, including any acts or omissions solely caused by acts or occurrences by third parties after the Landlord has sold the Property (or its indirect interests therein if the sale is accomplished through the sale of the membership interests in the entity owing the Property), or, in the case of Tenant, after it has ceased to occupy the Premises.

17. Destruction of Shared Facilities.

(a) If the Shared Facilities, or any portion thereof, shall be so damaged that substantial alteration or reconstruction of the Shared Facilities shall be required (whether or not the Premises shall have been damaged by such casualty), Landlord shall commence and proceed with reasonable diligence to restore the Shared Facilities to substantially the same condition they were in immediately prior to the happening of the casualty. If the Premises or any Improvements built or constructed by Tenant, or any portion thereof, shall be so damaged that substantial alteration or reconstruction of the Premises or the Improvements shall be required (whether or not the Landlord's Residual Property shall have been damaged by such casualty), Tenant shall commence and proceed with reasonable diligence to restore the Premises and Improvements to substantially the same condition they were in immediately prior to the happening of the casualty.

(b) Notwithstanding subsection (a) above, (i) Landlord shall have no duty to restore, rebuild, or replace any portion of the Premises or any Improvements built and constructed by Tenant; and (ii) Tenant's obligations to repair, rebuild, or restore the Premises and the Improvements shall exist only to the extent that insurance proceeds are actually received by Tenant in connection with the casualty which gave rise to Tenant's obligation to repair, rebuild, or restore.

(c) If Landlord shall fail to restore any portion of the Shared Facilities not useable by Tenant as a result of any casualty, within thirty (30) days of the date on which the Shared Facilities becomes

unusable, then and in that event Tenant shall have the right to restore the condition of such Shared Facilities and Landlord shall have an obligation to reimburse Tenant for all costs and expenses incurred in connection with such restoration plus a twenty percent (20%) fee to compensate Tenant for the management of the restoration project.

18. Assignment and Sublease. Tenant shall not assign or enter into a sublease of the Premises unless the assignee or sublessee agrees to bound by the terms of this Lease and notwithstanding the assignment or sublease, Tenant shall continue to remain liable to Landlord to perform any obligations under this Lease that were due to be performed prior to the effective date of the assignment or sublease. For the avoidance of doubt, no such assignment or sublease shall relieve Tenant of its obligations hereunder.

19. Indemnification. Except for matters arising from the negligent acts or omissions or the intentional acts of Landlord, its agents, employees or contractors, Tenant shall defend, indemnify and hold Landlord harmless from all costs, expenses, claims, liens and liabilities arising out of or relating to (a) the construction, operation or removal of the Improvements, (b) otherwise as a result of Tenant's or its invitee's use, enjoyment and occupancy of the Premises or any portion thereof, or (c) injury to person or damage to property sustained by anyone in and about the Premises.

20. Surrender. Tenant shall, prior to the expiration or sooner termination of the Term, remove or cause to be removed from the Premises any and all personal property located thereon, and peaceably surrender and yield up to Landlord the Premises and Improvements.

21. Time is of the Essence. Time shall be of the essence of this Lease.

22. Governing Law. This Lease shall be construed pursuant to the laws of State of West Virginia, with regards to any applicable conflicts of law principles.

23. Successors and Assigns. This Lease shall inure to the benefit of, and be binding upon, Landlord and Tenant, and their respective successors and assigns.

24. No Waiver. The waiver by a Party of a breach of a term, covenant or condition herein contained will not be deemed to be a waiver of a subsequent breach of the same or another term, covenant or condition herein contained.

25. Notice. Any notice to be given under this Lease shall be in writing and shall be validly given if delivered, transmitted by facsimile, emailed, or mailed by prepaid registered mail to the Parties as follows:

Landlord: Omnis Pleasants, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505

Tenant: Quantum Pleasants, LLC
3710 Collins Ferry Road
Morgantown, West Virginia 26505

or to such other person or address as either Party may designate by notice given in accordance with this Lease. Notice shall be deemed to have been initially given on the third (3rd) day following the mailing thereof.

26. Estoppel Certificates. At any time and from time to time during any Term of this Lease, either Party shall deliver to the other Party, within fifteen (15) business days after request therefor, a written statement certifying the following: Tenant is in possession of the Premises; this Lease is unmodified and in full force and effect (or if there have been modifications, this Lease is in full force and effect as modified and stating the modifications); the dates to which the Annual Base Rent have been paid in advance, if any; such party is not aware of any event of default under this Lease and is not aware of any event that with the giving of notice or passage of time would constitute an event of default; and such other certifications as the requesting party may reasonably request.

27. Subordination, Non-Disturbance and Attornment. Tenant hereby acknowledges and agrees that this Lease is and is to be subject and subordinate to, at all times, the encumbrance of any Security Instrument (as such term is defined below) securing any Mortgagee (as such term is defined below), whether dated, executed, acknowledged, delivered, or recorded prior to, concurrently with, or subsequent to this Lease, or a memorandum thereof, to the end and effect that any and all such Security Instruments are to be deemed to have been executed, acknowledged, delivered, and recorded prior to this Lease or a memorandum thereof, without knowledge of this Lease, actual, constructive, or otherwise, on the part of such Mortgagee; provided, however, that any such Mortgagee is to be deemed to have (a) acknowledged and recognized the validity of this Lease, and the rights of Tenant, its successors, assigns, and sub-lessees, to quiet use, enjoyment, and possession of the Premises, and (b) covenanted and agreed not to disturb or otherwise foreclose or terminate this Lease or the rights of Tenant, its successors, assigns and sublessees, to quiet use, enjoyment, and possession of the Premises absent the occurrence of an unremedied or uncured event of default.

(a) Tenant hereby attorns to and recognizes (i) any and all Mortgagees; (ii) any transferee, including any Mortgagee, at a foreclosure sale, whether judicial or non-judicial in nature, under a Security Instrument; (iii) any transferee, including any Mortgagee, that acquires the Premises by way of a deed or deeds in lieu of foreclosure; and (iv) any transferee, successor, or assign that succeeds to such Mortgagee's, Tenant's or transferee's interest in the Premises, as its Landlord for the unexpired balance of the Initial Term or the Renewal Terms, as applicable, under the same terms, provisions, and conditions as set forth in this Lease, which attornment is and is to be effective and self-operative upon the acquisition or any interest in or title to the Premises by any such Mortgagee, Tenant, transferee, successor, or assigns, without the execution, acknowledgment, delivery, or recording of any other instruments, documents, or agreements by Landlord, Tenant or any Mortgagee, Tenant, transferee, successor, or assign.

(b) Tenant is to have the right and authority to encumber Tenant's interest in and to this Lease pursuant to a Security Instrument, Leasehold Mortgage (as such term is defined below) or otherwise; provided, however, that Tenant is to neither have the power, right, nor authority to encumber Landlord's interest in and to the Property or Premises, and that any attempted encumbrance by Tenant of all or any part of Landlord's interest in and to the Property or Premises shall be entirely void and of no effect whatsoever.

(c) In the event Tenant executes, acknowledges, and delivers any Security Instrument that places an Encumbrance on Tenant's interest in and to this Lease, in whole or in part, or subjects Tenant's interest in and to the Lease, in whole or in part, to any Encumbrance (as such term is defined below), Tenant shall, within thirty (30) days of such Encumbrance, notify Landlord, in writing, of the existence of such Security Instrument and the address of the Secured Party or Leasehold Mortgagee to

which notices under this Lease are to be sent. Furthermore, in the event any such Security Instrument is be assigned, Tenant and such Leasehold Mortgagee or Secured Party shall notify Landlord, in writing, of such assignment and the address of such assignee. So long as such a Security Instrument is in effect and Landlord has been given notice in accordance with the provisions of this section, and provided that no event of default has occurred which has not been cured within the applicable grace period, if any, Landlord covenants and agrees that no surrender amendment, alteration, enlargement, modification, or change of this Lease is to be made or effected without the prior written consent of such Secured Party or Leasehold Mortgagee or its assigns.

(d) In the event Landlord gives notice to Tenant with respect to or in connection with any event of default, Landlord shall also serve a copy of such notice upon each Secured Party or Leasehold Mortgagee and the assignee, if any, of any such Leasehold Mortgagee with respect to which Landlord has received notice in accordance with the provisions of this Section 26. Subject to such condition precedent, Landlord covenants and agrees that no such notice to Tenant is to be effective unless and until a copy of such notice is duly served upon such Secured Party or Leasehold Mortgagee or its assignee, if any, in accordance with the provisions of this section. Upon the receipt of such notice by such Secured Party or Leasehold Mortgagee or its assigns, the same is to have the right and opportunity to cure or remedy or cause to be cured or remedied any beach or default within the same time period provided to Tenant, and Landlord shall accept such performance by the same as if the same had been done or performed by Tenant.

(e) In the event any Leasehold Mortgagee exercises its rights of foreclosure, and such Leasehold Mortgagee, its successors or assigns, becomes the holder of the leasehold estate of Tenant, Landlord agrees to recognize such Leasehold Mortgagee, its successors or assigns, as Tenant hereunder, subject to all terms and conditions of this Lease and subject to all uncured events of default.

(f) Landlord agrees to execute and deliver any reasonable Subordination, Non-Disturbance and Attornment Agreement presented by a Leasehold Mortgagee. Landlord acknowledges that Leasehold Mortgagee’s request for reasonable additional time for the Leasehold Mortgagee to cure an event of default before the termination of this Lease is acceptable to Landlord, not to exceed thirty (30) days without Landlord’s express written consent. Further Landlord acknowledges that Leasehold Mortgagee’s request for Landlord to subordinate any express or implied “Landlord’s lien” or other similar lien to the lien of the Leasehold Mortgagee shall be acceptable to Landlord.

(g) Tenant agrees to execute and deliver any commercially reasonable Subordination, Non-Disturbance and Attornment Agreement presented by a Mortgagee. Tenant acknowledges that Mortgagee’s request for reasonable additional time for the Mortgagee to cure an event of default before the termination of this Lease is acceptable to Tenant, not to exceed thirty (30) days without Tenant’s express written consent.

(h) For the purposes of this Lease, the following terms have the meanings as set forth below:

(i) “Encumbrance” means any lien, security interest, or encumbrance on or against this Lease or the Premises that is evidenced or perfected by a Security Instrument, judgment lien, writ of execution, mechanic's liens, tax lien, or notice of lis pendens.

(ii) “Leasehold Mortgagee” means the holder of any debt instrument, the payment of which is secured by a Security Instrument that encumbers or places a lien upon Tenant's interest in and to the Lease.

(iii) "Mortgagee" means the holder of any debt instrument, the payment of which is secured by a Security Instrument that encumbers or places a lien upon Landlord's interest in and to the Premises.

(iv) "Security Instrument" means any deed of trust, leasehold deed of trust, credit line deed of trust, leasehold credit line deed of trust, mortgage, leasehold mortgage, UCC fixture filing, security agreement, UCC financing statement, assignment of leases and rents, collateral assignment of lease, or similar security instrument which secures the payment of any indebtedness or any other obligations and all renewals, modifications, amendments, supplements, consolidations, replacements, and extensions thereof, to the full extent of the amounts secured thereby.

27. Eminent Domain.

(a) If all or any part of the Property is appropriated or condemned by any public or quasi-public authority in the exercise of its right of condemnation or eminent domain, both Landlord and Tenant are to have the right to prosecute a claim for an award and to share in the proceeds of any and all awards based upon their respective interests as hereafter set forth. Specifically, Landlord shall have the right to prosecute a claim for the value of Landlord's Residual Property plus any reversionary interest in the Premises and/or the Improvements beyond the expiration of the Term, and Tenant shall have the right to prosecute a claim for the value of its leasehold interest in the Premises and the Improvements for the remainder of the Term.

(b) If all the Premises is appropriated or condemned, this Lease is to terminate as of the time when possession is required by such public or quasi-public authority. In the event all or any part of the Premises is taken or condemned, Landlord is be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents that it would have received in the future and for the present value of its reversionary interest in the Premises and all Improvements thereon, and the damage to its residual estate, and, notwithstanding the termination of this Lease, Tenant is to be entitled to that portion of any and all awards necessary to compensate it for the leasehold value of its Improvements to the Leasehold Premises, the value of its leasehold estate, and the damages that it may sustain as a result of termination of this Lease prior to the end of the Term, and the present value of any sublessee rents it would have received in the future.

(c) In the event that a part of the Premises is taken or condemned and that (a) the part so taken includes Improvements on the Premises or any part thereof, or (b) the part so taken makes it impracticable for Tenant to continue operation at the Premises in Tenant's sole discretion, Tenant may, at any time either prior to or within a period of sixty (60) days after the date when the condemning authority requires possession of the part of the Premises taken or condemned, elect to terminate this Lease.

(d) In the event Tenant elects to terminate this Lease, Landlord is to be entitled to receive that portion of any and all awards necessary to compensate it for the present value of the rents that it would have received in the future and for the present value of its reversionary interest in the Premises and all improvements thereon, and the damage to its residual estate, and notwithstanding the termination of this Lease, Tenant is to be entitled to that portion of any and all awards necessary to compensate it for the leasehold value of its Improvements to the Premises, the value of its leasehold estate and the damages that it may sustain as a result of termination of this Lease prior to the end of the Term including, without limitation, the cost of relocating and moving personal property and equipment, and the present value of the sublessee's rents Tenant would have received in the future.

(e) In the event that Tenant does not elect to terminate this Lease or in the event that a part of the Premises is taken or condemned under circumstances under which Tenant will have no such

election, then and in either event, Tenant is to receive so much of any and all awards as is necessary to pay for repairs to and alterations of the Improvements on the Premises for the purpose of restoring the same to an economic architectural unit, susceptible to the same use as that which was in effect immediately prior to such taking and Landlord shall receive the balance, if any, of any awards.

(f) Landlord and Tenant agree to submit any dispute concerning any matter associated with the right to funds arising from eminent domain to binding arbitration before the Judicial Arbitration and Mediation Service ("JAMS") in Wilmington, Delaware under the JAMS' Commercial Arbitration Rules (the "JAMS Rules"). The proceedings of the arbitration shall be kept confidential by the arbitrator, the parties to the arbitration and their respective counsel and other representatives (except to the extent necessary to enforce any award made by the arbitrator). Arbitration may be commenced by Landlord or Tenant by filing a demand for arbitration pursuant to the JAMS Rules (an "Arbitration Demand"). The initiating party shall also send a copy of the Arbitration Demand to the other party. The Parties shall jointly select one arbitrator within fifteen (15) days of the date of the Arbitration Demand. If they fail to agree, the arbitrator shall be selected pursuant to the JAMS Rules within thirty (30) days from the end of such fifteen (15) day period. If an arbitrator so selected becomes unable to serve, his or her successors shall be similarly selected or appointed. Any arbitrator that is appointed shall agree that his or her schedule is sufficiently flexible to accommodate the timelines set forth in this Section 27. Notwithstanding the provision in Section 27 with respect to applicable substantive law, the arbitration shall be conducted pursuant to the Federal Arbitration Act and such procedures as the Parties may agree, or, in the absence of such agreement, pursuant to the JAMS Rules. The arbitrator will agree to comply with the Federal Arbitration Act and the procedures agreed to by the parties, or if applicable, the JAMS Rules and the terms of this Section 27. The arbitrator shall have case management authority and shall resolve the dispute in final within sixty (60) days from the commencement of the arbitration. For purposes of calculating the effects of any statutes of limitations, any lawsuit initiated pursuant to this provision will be deemed to have been filed on the date that the arbitration was commenced, as established by the Federal Arbitration Act or the JAMS Rules, if applicable. Each Party have the right to conduct discovery and present evidence in accordance with the following rules: (a) each Party shall be allowed to conduct reasonable discovery through written document requests and depositions, the nature and extent of which discovery shall be determined by the Party; provided, that if the Parties cannot agree on the terms of discovery, the nature and extent thereof will be determined by the arbitrator who will take into account the needs of the Parties, and the purposes of arbitration to make discovery expeditious and cost effective, and (b) access to any confidential or proprietary financial or other information produced in discovery will be limited to the discovering Party's lawyers and other experts and a limited number (to be agreed by the Parties) of senior management of the discovering Party, who will be obligated to preserve the confidentiality of such information on reasonable and customary terms. Each Party shall provide to the other, reasonably in advance of the hearing, copies of all documents which such Party intends to present at the hearing. Each Party agrees that a judgment may be entered on the arbitrator's award in any court of competent jurisdiction. The arbitrator in reviewing any Arbitration Matter under this Lease shall have the exclusive authority to determine any issues as to the arbitrability of such Arbitration Matter hereunder. In reaching a decision, the arbitrator shall interpret, apply and be bound by this Lease and by applicable law. The arbitrator shall have no authority to add to, detract from or modify this Lease or ancillary agreement, as applicable, or any applicable law in any respect. The arbitrator may grant any remedy or relief that a court of competent jurisdiction could grant, including specific performance and injunctive relief, except that the arbitrator may not grant any relief or remedy greater than that sought by the disputing Parties nor any special, indirect, punitive or consequential damages, except to the extent such damages are reasonably foreseeable or actually awarded to a third party by a court of competent jurisdiction. The arbitrator shall have the power to award attorneys' fees and costs to the prevailing Party. Any up-front costs of the arbitrator and JAMS shall be borne equally by the initiating Party and the responding Party to the dispute, and each such Party shall initially bear its own costs incurred in connection with attorneys' fees, expert witness fees, accounting fees and related expenses; provided,

however, that the non-prevailing Party in any such arbitration (as determined by the arbitrator) shall pay, and, to the extent applicable, reimburse the prevailing Party for, its legal costs, expert witness fees and accounting costs associated with the proceeding, as determined by the arbitrator, and the costs and expenses of the arbitrator and JAMS, including costs and expenses payable to the JAMS. Nothing in this Lease shall limit or in any way restrict the ability of any Party to seek legal or equitable relief in a court or other judicial body. The award of the arbitrator shall be binding and conclusive on the Parties to the proceeding, absent a finding that such award was arbitrary and capricious by a court of competent jurisdiction.

28. Memorandum of Lease. This Lease shall not be recorded, but Tenant may record a memorandum of lease in form acceptable to Landlord and executed by both Parties. Landlord shall prepare the aforesaid memorandum of lease and pay the cost of recording the same.

29. Transfer Taxes. Landlord shall pay all transfer taxes related to or imposed upon this Lease, if any.

30. Signage. Tenant shall have the right to design, locate, and install the maximum signage allowable by the governmental agency with governing authority.

31. Confidentiality. Landlord and Tenant expressly acknowledge and agree that the terms and conditions of this Lease, together with any discussions, negotiations, and or agreements arising out of this Lease or any such discussions shall be deemed confidential information ("Confidential Information") and shall not be disclosed by Landlord, Tenant or any of its agents, professional advisors, directors, lenders, officers, employees or consultants, without the express prior written consent of the other Party; provided the terms of this Lease and a copy thereof may be provided to any person or legal entity interested in purchasing or leasing the Property or Premises or in purchasing either of the Parties.. Except as provided in the immediately preceding sentence, Landlord and Tenant agree to hold the Confidential Information in strict confidence and not to disclose such Confidential Information to any third party, except as specifically authorized, and to use all reasonable precautions to prevent the unauthorized use or disclosure of the Confidential Information. Confidential Information shall not include information that is already available to the public, or becomes available to the public through no fault of Landlord.

[Remainder of Left Blank Intentionally; Signature Page to Follow]

IN WITNESS WHEREOF the Parties hereto have executed this lease as of the day and year written below.

LANDLORD:
OMNIS PLEASANTS, LLC,
a Delaware limited liability company,
formerly known as ETEM Remediation Two LLC

By: ______________________
Name: Randall Smith
Title: CFO

TENANT:
QUANTUM PLEASANTS, LLC,
a Delaware limited liability company,

By: ______________________
Name: Randall Smith
Title: CFO

**EXHIBIT A**
**TO**
**LEASE AGREEMENT**

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

# Quantum Pleasants, LLC

March 20, 2026

VIA EMAIL

David Hindman
david.hindman@omnispleasants.com

Gil Nathan
gilbert.nathan@omnispleasants.com

Re: Omnis Pleasants, LLC

Gentlemen:

Reference is made to the letter dated March 9, 2026 (the "March 9 Letter"), from Herrick, counsel to Quantum Pleasants, LLC ("QP"), to counsel for Omnis Pleasants LLC ("OP"). Despite repeated requests, QP remains frustrated in its ability to make any meaningful progress in advancing a sale or financing of OP in large part due to continuing actions or inactions on your part, contrary to the purpose and intent of the Forbearance Agreement and to your duties and responsibilities as fiduciaries of OP, and, in the case of Mr. Nathan, QP. These areas of extreme concern are identified below.

**Adversarial Relationship.** Your principal responsibilities are to increase the profitability of OP and hence its value and help QP facilitate a sale or financing of OP to enable it to pay the indebtedness currently owed to TRAG, LLC and RG Energy, LLC (the "Lenders"), thereby avoiding a foreclosure on OP's and QP's assets. Part of the information QP is requesting below is directed to each of you explaining exactly what strategies and plans you are implementing to achieve these goals. To date, Mr. Nathan's efforts have been focused on creating a hostile relationship with QP that has resulted in his breaching the Forbearance Agreement and the governing documents for QP and OP, notwithstanding that (i) he is a director of QP and owes a fiduciary duty to it, (ii) QP is the 100% owner of OP, and (iii) QP is the possessor of the technology that is the main value driver for the combined enterprise. Mr. Nathan's actions have generated a

continual legal writing campaign between QP and OP that has prompted excessive and unwarranted legal fees and expenses. More importantly, it has caused QP to lose precious time in pursuing avenues to repay the indebtedness owed to the Lenders. This must stop.

**Cardinal Transaction**. The Lenders[1] have met with representatives of Cardinal Power, LLC ("Cardinal") concerning a potential transaction in which Cardinal would acquire 100% of QP's ownership interests in OP at a cash purchase price sufficient to fully satisfy the Omnis Parties' indebtedness to the Lenders. One of the key reasons that the Omnis Parties, including OP, entered into the Forbearance Agreement was to establish a mechanism and period to facilitate a sale as a means to repay such indebtedness. QP has been working intensely and transparently to accomplish this.

Mr. Nathan has stated that, in his opinion, without any articulated basis, the state of the plant, the pending FERC investigation and the lease between QP and OP make any sale to Cardinal or any other buyer an impossibility. Despite this, Cardinal has indicated that it is aware of these issues and is nevertheless willing to proceed on the basis of the term sheet which you have received. It makes no sense to block the commencement of diligence on the part of Cardinal and progress on a sale that would, if consummated, repay all the indebtedness based solely on your unfounded conclusion that a deal would not close. As you know, the Cardinal term sheet mandates a 60-day exclusivity period. Given the Forbearance Period, we must reiterate any decision to grant Cardinal 60 days of exclusivity should be made quickly and will require extending the Forbearance Period.

**Access**. Despite repeated requests, you have continued to impede access to the Pleasants Power Plant (the "Plant") and leased property by QP personnel, vendors and potential sources of financing further hindering our ability to effect a sale and/or repay the indebtedness owed to the Lenders. Most recently, personnel from IAC, one of QP's key equipment vendors, were denied access to the site to conduct work related to IAC's equipment. This is contrary to the Forbearance Agreement, the existing ground lease and the best interests of the Omnis Parties. Quite simply, access must be granted immediately. Funds from such financiers can be used to repay the Omnis Parties' indebtedness, including the amounts owed to the Lenders. Given the importance of the potential financing, and QP's' rights under the lease, QP demands that access be provided to all of its invitees who request presence at the site. **Failure to do so, is a breach of the foregoing agreements and, in the case of Mr. Nathan, his fiduciary duty owed to QP**.

[1] Unless otherwise defined, capitalized terms have the same meaning as in the amended and restated forbearance agreement, dated as of February 6, 2026, among the Lenders and the Omnis Parties (the "Forbearance Agreement").

**Failure to Include QP in Decisions**. As you are also aware, Section 15 of the Amendment to the Amended and Restated Operating Agreement of OP (the "OP Agreement") entitles QP, as the sole member of OP, to: (a) all notices and materials provided to OP's manager(s) in connection with any meeting or action of the manager(s) by written consent, (b) reasonable access to the books and records of OP, and (c) participate in meetings (in person or telephonically) at which material OP actions are considered. Mr. Nathan has made numerous material decisions without consulting the undersigned, as a director and CEO of QP, in clear violation of the OP Agreement, including clandestine dealings with OP's lenders, the termination of Herrick and Vinson & Elkins as counsel to OP, and the engagement of new counsel to replace them. Going forward, any action of a material nature by Mr. Nathan will require notice to the undersigned affording him the ability to participate in the decision-making process. **Failure to do so is a breach of the OP Agreement.**

**Review of Books and Records**. As cited above, Section 15 of the OP Agreement grants QP reasonable access to the OP's books and records, including notices and materials provided to Mr. Nathan in connection with any action taken in his capacity as a director of OP. QP has repeatedly requested and been denied documentation relevant to Mr. Nathan's decision-making process and other written communications as to which QP has a legitimate interest. In view of this, QP is hereby demanding production of the following documentation and information most of which were requested in the March 9 Letter:

- All financial statements and supporting data of OP since December 31, 2025, including : (i) OP's financial statements and general ledgers; (ii) Alix Partners' invoices to OP since the invoice dated January 7, 2026; (iii) Mr. Nathan's invoices; and (iv) the interim CEO agreement between OP and APS Services, LLC (all requested previously in the March 9 letter), also, please provide all invoices and a list of payments made to counsel engaged by Mr. Nathan.
- Any written plans, communications or proposed strategies (or summaries or notes thereof) for repaying the obligations of the Omnis Parties to the Lenders and Bilt prior to expiration of the Forbearance Period, including Mr. Nathan's or Mr. Hindman's current recommended plan and strategy, (requested in the March 9 Letter).
- All written communications (or notes or summaries thereof) since October 24, 2025 between Messrs. Nathan or Hindman or their counsel or related parties, on the one hand, and WVEDA, Bilt, or the Lenders or their counsel or related parties, on the other hand, with respect to the indebtedness or obligations of OP or QP, or any forbearance or restructuring thereof, including the current status of the negotiations with WVEDA and Bilt (requested in the March 9 Letter).
- All preliminary reports by Messrs. Nathan or Hindman or their related parties identifying any recommendations to improve the performance, cash flow, profit and loss or such other financial metrics of OP and the Plant as required pursuant to Section 7(e) of the Forbearance Agreement (requested in the March 9 Letter).

- All written communications (or notes or summaries thereof) between Messrs. Hindman or Nathan or their related parties concerning the Omnis Parties, other than with respect to the day to day operations of OP (requested in the March 9 letter).
- All written communications (or notes or summaries thereof) between Messrs. Hindman or Nathan or their counsel or related parties, on the one hand, and the Lenders, their counsel or related parties, including Mr. Gupta and Mr. Robbins, on the other hand, concerning any of the Omnis Parties in which QP or the undersigned were not copied (requested in the March 9 letter).
- All written communications (or notes or summaries thereof) between Messrs. Hindman or Nathan or their counsel or their related parties, on the one hand, and any third party, on the other hand, with regard to the sale or financing of OP or the Plant.

I further request that all of the foregoing materials be available for review during regular business hours by Blake Stephens, QP's general counsel, at OP's offices by no later than Friday, March 27. Please advise the undersigned of the day and time these materials will be made available to Mr. Stephens and please ensure there is a copier readily available for his use.

Please be advised that the undersigned requests that he copied on any the foregoing communications, plans, recommendations, notes, summaries, analyses and information that are transmitted in the future.

In this regard, as emphasized in the March 9 Letter, QP is the parent and sole member of OP. It is entitled to OP's financial reporting which is critical to any sales process. OP's refusal to provide material financial information materially impairs QP's ability to market and sell OP and the Plant. **Hence, failure to produce the requested materials in a timely manner is a breach of the OP Agreement**.

**False or Misleading LinkedIn Information.** It was reported that, on his LinkedIn page, Mr. Nathan overstated his role at other public utilities, and may have misstated other information. I request that Mr. Nathan provide me and the Lenders by March 27, 2026, with a corrected LinkedIn profile for Mr. Nathan highlighting the changes from the original version, coupled with an explanation why the required corrections were necessitated. Please also confirm that Mr. Hindman's LinkedIn profile as presented originally to the undersigned and the Lenders was correct at the time presented.

**Requirements under March 11, 2026 Letter.** In Ms. Plowman's March 11, 2026 letter to HSFK summarizing the conversation they had with the Lenders, it was confirmed that OP and its representatives, including Messrs. Nathan and Hindman, will, "for the time being," refrain from communicating to third parties any lack of support for the Sales Process. We trust, and must insist, that this will not change.

The letter further reported that HSFK intended to provide Herrick with term sheets for Bilt and WVEDA, and a proposed framework for all debt, by March 13, 2026, and it also promised to: (i) seek Herrick's comments to the term sheets before sending them to any lenders; and (ii) copy Herrick on all future communications with each of the following parties, including their respective representatives or counsel: (a) the Lenders, (b) WVEDA, (c) West Virginia, and (d) Bilt. QP requests that you each will cause HSFK to promptly comply with such commitments.

As also stated in the letter, HSFK said that a revised engagement letter is being negotiated with Alix Partners or its related parties. Herrick asked to see the revised engagement letter before it is finalized although HSFK stated it must confer with its client (is this OP or Mr. Nathan individually, or both?) and report back. QP renews its request to see the revised agreement prior to execution since it unquestionably is a "material" action affording QP the right to participate.

I would greatly prefer that we work cooperatively together to cause the indebtedness owed to the Lenders and Bilt to be paid in full prior to the end of the forbearance agreement. I trust that the hostility Mr. Nathan has displayed will not continue and that he will adhere to his obligations as a fiduciary to both OP and QP and to the terms of the governing documents. However, just yesterday, Mr. Nathan refused to provide QP with information it requested to provide a proposed financing party with relevant information it sought regarding the Plant's operations, notwithstanding that all of the parties QP is dealing with have signed non-disclosure agreements protecting against the unauthorized use or disclosure of OP's non-public information. These obstructionist efforts must stop immediately.

Simply put, if you are unable or unwilling to (i) support the sale or financing process, (ii) fulfill your duties and obligations under the Forbearance Agreement and the governing documents of QP and OP, or (iii) comply with your obligations as fiduciaries of OP and, as applicable, Quantum Pleasants, you should consider resigning immediately without the need for the Lenders and the undersigned to take further action.

Sincerely,

QUANTUM PLEASANTS, LLC

Simon K. Hodson, Director and CEO

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** "Manoukian, Kristine" <kmanoukian@mcdermottlaw.com>
**Subject: RE: Loan Pay off**
**Date:** April 20, 2026 at 12:21:35 AM EDT
**To:** "DeFeo, Morris F." <mdefeo@herrick.com>, Tom Michael <tmichael@manatt.com>
**Cc:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>, Simon Hodson <skhodson99@gmail.com>, "Chang, Liliana" <lchang@herrick.com>, "Stabler, Eric A." <establer@herrick.com>

Morris,

We'll get you the payoff information. Thanks.

**Kristine Manoukian**
Partner

**T:** +1 212 756 2466 | **M:** +1 917 573 9509
kmanoukian@mcdermottlaw.com | LinkedIn

McDermott Will & Schulte LLP | mcdermottlaw.com
919 Third Avenue | New York, NY 10022

McDermott Will & Schulte

---

**From:** DeFeo, Morris F. <mdefeo@herrick.com>
**Sent:** Sunday, April 19, 2026 8:07 PM
**To:** Tom Michael <tmichael@manatt.com>; Manoukian, Kristine <kmanoukian@mcdermottlaw.com>
**Cc:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>; Simon Hodson <skhodson99@gmail.com>; Chang, Liliana <lchang@herrick.com>; Stabler, Eric A. <establer@herrick.com>; DeFeo, Morris F. <mdefeo@herrick.com>
**Subject:** Loan Pay off
**Importance:** High

You don't often get email from mdefeo@herrick.com. Learn why this is important
**[ External Email ]**

Kristine and Tom:

Good evening.

Our client, OFT, intends to pay off its Obligations (as defined in the A&R Forbearance Agreement) to TRAG and RGE in full on Tuesday, April 21. Please confirm the amount of all principal, accrued and unpaid interest, fees, costs, expenses, and other amounts owing under the A&R Forbearance Agreement (including any amounts associated with the Letter of Credit, if applicable) required to pay off the Obligations to TRAG and RGE in accordance with the "Payment in Full" definition of the A&R Forbearance Agreement as of such date and the wiring instructions to ensure payment is received by TRAG and RGE.

Kind regards,
Morris

HERRICK

**Morris F. DeFeo Jr.**
**Partner/Co-Chair Corporate Department**
**Herrick, Feinstein LLP**
Two Park Avenue | New York, NY 10016
212.592.1463 Office
202.494.1133 Mobile
mdefeo@herrick.com

The information in this message may be privileged, intended only for the use of the named recipient. If you received this communication in error, please immediately notify us by return e-mail and delete the original and any copies.

*******************************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information. Thank you.
*******************************************************************************************************************

Please visit http://www.mcdermottlaw.com/ for more information about our Firm.

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** "Manoukian, Kristine" <kmanoukian@mcdermottlaw.com>
**Subject: RE: Final Opportunity to Respond sent on behalf of Simon K Hodson**
**Date:** June 9, 2026 at 10:53:24 PM EDT
**To:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Cc:** Simon Hodson <skhodson99@gmail.com>, Nick Thomas <nick@jnicholsonlawgroup.com>, "Manoukian, Kristine" <kmanoukian@mcdermottlaw.com>, "Koff, Douglas" <dkoff@mcdermottlaw.com>, "Ajay Gupta" <ajay@robbinsgupta.com>

Charles,

As we had communicated to Herrick numerous times when they were representing the relevant Omnis entities, and I trust that you have seen all of those communications, consistent with the terms of the Forbearance Agreement and the Omnis entities obligations thereunder we will need to be provided with all of the information regarding the proposed lender, the terms of the financing, and the documents related thereto.

Furthermore, we have previously requested and have not received the information in the attached letter that was sent to Herrick in March. Please provide us with the information as soon as possible consistent with the Omnis parties obligations under the relevant loan documents, the Forbearance Agreement, and the governance documents. It has been over 2 months since this request was made and the information has to be produced imminently.

Finally, as to your request that we demand that Mr. Nathan or Mr. Woolverton provide you with information that you have requested, you will have to take that up with them directly. They are not representatives of TRAG or RGE and we cannot direct them to provide you information. I understand that you have been in communications with Mr. Woolverton about your request and will leave it to you and him to take this further.

Thanks,
Kristine

**Kristine Manoukian**
Partner

**T:** +1 212 756 2466 | **M:** +1 917 573 9509
kmanoukian@mcdermottlaw.com | LinkedIn

McDermott Will & Schulte LLP | mcdermottlaw.com
919 Third Avenue | New York, NY 10022

McDermott Will & Schulte

---

**From:** Ajay Gupta <ajay@robbinsgupta.com>
**Sent:** Tuesday, June 9, 2026 2:46 PM
**To:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Cc:** Manoukian, Kristine <kmanoukian@mcdermottlaw.com>; Simon Hodson <skhodson99@gmail.com>; Nick Thomas <nick@jnicholsonlawgroup.com>
**Subject:** Re: Final Opportunity to Respond sent on behalf of Simon K Hodson

**[ External Email ]**
Kristine,
I will let you handle the below request and while you are at it, please get all the financial information we have requested multiple times. We are still trying to figure out what Charles and Simon did with our funds.
Thank you,
Ajay

Ajay K. Gupta, CIMA® CRPC® CPWA®
**Robbins Gupta Holdings** | Principal
www.robbinsgupta.com

---

**From:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Date:** Tuesday, June 9, 2026 at 9:29 AM
**To:** Ajay Gupta <ajay@robbinsgupta.com>
**Cc:** Manoukian, Kristine <kmanoukian@mcdermottlaw.com>; Simon Hodson <skhodson99@gmail.com>; Nick Thomas <nick@jnicholsonlawgroup.com>
**Subject:** Final Opportunity to Respond sent on behalf of Simon K Hodson

Dear Ajay:

I have received no response to my June 1, 2026 to you requesting that TRAG, in its capacity as a member of, and lender to, Quantum Pleasants ("QP"), produce a payoff letter for the existing indebtedness owed by the Omnis Parties to TRAG and RGE (the "Indebtedness"), and to correspond with Xander Woolverton and Gil Nathan to insist that Omnis Pleasants ("OP") produce the information requested in my letter of the same date to Woolverton (which you were copied on). I have not received a response from you and Woolverton has refused to provide QP with the information requested. Without the payoff and other financial information we are unable to proceed with repaying the Indebtedness notwithstanding we have a lender willing to do so if the information received warrants their funding. Simply put, TRAG's and Nathan's inactions are preventing the Omnis Parties from liquidating the Indebtedness and it is unfathomable why TRAG is not interceding to make this happen.

To be clear, I request from TRAG a payoff amount for the Loan as of June 1 2026, and a breakdown of the components of such calculation—principal, accrued interest (regular rate plus default interest), legal fees and other charges--and the daily interest accrual on the outstanding balance from June 1 forward. As also referred to in my letter, I need the information concerning the letter of credit TRAG or one of its affiliates posted to Tyr Energy (its amount and the specific obligation it secures), so the lender can substitute its own LC. My understanding is that current LC expires on July 1, 2026..

I cannot stress the critical significance of receiving the requested information to move forward with the proposed refinancing. In addition, we have a meeting scheduled for June 11, 2026 with WVEDA to discuss the extension or potential forgiveness of their $50M loan which matures the following day. As you may know, QP and OP are the obligor and guarantor, respectively, on the loan. Since QP is in the dark as to OP's financial condition, and currently lacks any liquidity because OP has withheld all funds at its level, QP is unable to meaningfully participate in the meeting or provide WVEDA with any assurances of payment even on an extended basis. As a final matter, QP is unable to commit itself to the terms of the proposed Cardinal transaction without such information, unduly prolonging the documentation, let along consummation, of this deal. I remind you that under the terms of the OP operating agreement, Nathan has a duty to disclose the information QP seeks.

If TRAG does not provide us with the payoff information we have requested by June 10 and at the same time force Nathan to release the OP financial information we have requested (including by direct order upon threat of removal), we can only assume TRAG supports his inaction and is unwilling to reasonably assist the Omnis Parties in working with our lender to satisfying the Indebtedness.

I thank you in advance for your anticipated assistance with my request.

Sincerely,

Simon Hodson

Cc: McDermott

**ATTENTION!** This message was sent by an external sender. Do not open attachments or click on the links from unknown senders or unexpected emails.

*************************************************************************************************************************

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information. Thank you.
*************************************************************************************************************************

Please visit http://www.mcdermottlaw.com/ for more information about our Firm.

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** Nick Thomas <nick.thomas@qrigroup.com>
**Subject: Omnis Pleasants**
**Date:** June 11, 2026 at 7:26:46 PM EDT
**To:** "kmanoukian@mcdermottlaw.com" <kmanoukian@mcdermottlaw.com>
**Cc:** Simon Hodson <simonkhodson@gmail.com>, Charles Gassenheimer <cgassenheimer@omnisenergy.com>, Randall Smith <rsmith@omnisenergy.com>, Blake Stephens <bstephens@omnisenergy.com>, Frank Simmerman III <trey@simmermanlaw.com>

Dear Kristine:

Please see attached my letter to you responding to your June 9 email to Charles Gassenheimer. My intent was to be constructive and not combative, with the hope that we can find a common path to cause Gil Nathan to assist with Quantum Pleasant's understandable requests for access to the Power Plant and financial information. This will afford QP a reasonable opportunity to refinance the TRAG/RGE debt and/or sell the Power Plant on equitable terms. Related to this is the need to receive a payoff letter from TRAG which in the normal course any lender will provide.

These foregoing issues have become more sensitive given the pending default by QP and Omnis Pleasants on the $50M WVEDA loan, not to mention OP's attempt to terminate its lease with QP, thereby decimating the value of QP and the WVEDA collateral.

I look forward to working with you with these objectives in mind.

Regards, Nick Thomas

THOMAS & ASSOCIATES INTERNATIONAL, INC.
A PROFESSIONAL LAW CORPORATION
J. NICHOLSON THOMAS, ESQ.
TEL: 310-401-0140

June 11, 2026

Via PDF Delivery

Kristine Manoukian
kmanoukian@mcdermottlaw.com
McDermott Will & Schulte LLP

Dear Kristine.

As counsel to Quantum Pleasants, LLC ("QP"), I have been referred your June 9 email to Charles Gassenheimer for response. As an initial matter, you misread the Amended and Restated Forbearance Agreement ("FA"). Nowhere does it provide for approval by the Lenders or Independent Manager (the "IM") of any financing transaction that results in a Payment in Full of the Obligations (as such term is defined in the FA), nor is QP required to specify the identity of the financing party or the terms.

In fact, the opposite is true--the Lenders are required to facilitate the refinancing process which is the obvious intent of any forbearance agreement.

Section 8(e) of the FA states in pertinent part as follows: "Neither the Lenders nor OFT shall intentionally take actions the primary purpose of which is to materially interfere with the other party's efforts to pursue a transaction that would result in the Payment in Full of the Obligations."

Moreover, Section 9(i) of the FA provides that "(a)ny decisions made by the ...Lenders, the CEO, IM, CFO and FA under [the FA] shall be made in good faith and in a manner reasonably intended to be in the best interests of Quantum Pleasants and OP, and for the purpose of reducing their expenses or maximizing their revenues without unduly exposing their assets or operations to risks of material liabilities (other than contractual obligations)." Repaying secured financing that is currently in default and subject to a risk of foreclosure is most assuredly in the best interests of QP and OP and avoids their assets being exposed to material loss.

Finally and most significantly, Section 9(j) of the FA provides in pertinent part "that nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of the Obligations (which payment shall terminate [the FA] and the Loan Agreements)."

Suffice it to say, we are entitled—indeed encouraged—by the FA to proceed with a financing that will pay the Lenders' indebtedness in full without they or the IM imposing any obstacles or restrictions to its consummation.

2000 AVENUE OF THE STARS, SUITE 1200N, LOS ANGELES, CALIFORNIA 90067-4700
EMAIL: NICK@JNICHOLSONLAWGROUP.COM

THOMAS & ASSOCIATES INTERNATIONAL, INC.



As to your insistence that TRAG must receive certain specified information before it provides a payoff letter or takes steps to cause OP to release needed financial information, we reject this as simply a ploy. We have provided TRAG with reams of financial data, cash flow analyses and financial statements for OP, QP and Omnis Energy, and we have responded to prior questions and the data. We, on the other hand, have received nothing of significance from OP and certainly nothing that will permit QP to move forward with a refinancing. OP continues to withhold cash balance statements, first quarter 2026 balance sheets and near and long-term financial projections, all of which are required to pursue the financing of its indebtedness.

We are entitled to this information under Delaware law and the OP amended operating agreement which grants QP reasonable access to financial information. We signed a very restricted NDA for the obvious purpose of receiving OP's data, yet this proved to be ruse as nothing of substance was produced.. Indeed OP assured QP that the information would be in the data room, but this proved false. Various pretexts have been given for OP's dilatory actions which are specious at best. One novel position is that we would use the information for an "improper purpose." It is truly twisted logic to conclude that repaying secured debt that is in default and subject to potential foreclosure is "improper." Simply put, the Lenders have no valid reason for not immediately providing QP with a payoff letter and supporting calculations.

As to the final point in your email stating that TRAG has no effective control over Mr. Nathan or OP, we categorically disagree. TRAG insisted on Nathan being inserted as the IM and has stood by cavalierly and with indifference as he took a wrecking ball to QP and breached the material terms of the FA and the OP operating agreement. TRAG has the power to remove him under the OP operating agreement and could do so if he failed to follow its directives. TRAG appears to believe that by remaining in the shadows it somehow avoids or mitigates exposure to liability. In fact, it is just the opposite. By failing to take action to reign in or remove Mr. Nathan, TRAG is acting in concert with him. I might remind you that TRAG is the most significant investor in QP and has a duty to act in its best interests. It also presumably owes a fiduciary duty to RRI (which I understand is an ESOP or similar non-profit) to protect its investment in QP from being decimated by Nathan's misconduct. Given that QP owns 100% of OP, it is unfathomable why it has been denied access to its worksite at the Power Plant and information needed to provide financing solutions.

We have made multiple requests for the payoff letter and the financial information reasonably related to any standard financing initiative. This is one last to request for the payoff information and related calculations and to issue a directive to Mr. Nathan to immediately release the financial information we have repeatedly asked for and to allow QP access to the Plant and its equipment. We ask that this be provided to Charles Gassenheimer by Monday, June 15, 2026, 5:00 pm est. If not forthcoming, we can only assume it will not be produced and we will be forced to seek another route to obtain it. I hope this will not be necessary but we cannot afford to lose another opportunity capable of paying the TRAG indebtedness in full.

As a final point, QP, David Hindman, Mr. Nathan and counsel met with WVEDA this afternoon to discuss the prospects of QP and OP repaying the 50M loan which becomes due tomorrow. Having been informed that the only prospect for repaying the loan in the near term is through a sale of the Power Plant, WVEDA was extremely concerned about the lack of cooperation between the parties, QP's inability to get relevant financial information which WVEDA will also request, the purported cancelation of the OP-QP lease which essentially wipes out WVEDA's collateral value given that QP's equipment must be removed from the site if the termination is determined to be valid, and the amount of management related expenses and legal fees that have been incurred by OP following Mr. Nathan becoming the IM.

The outcome of the meeting is that WVEDA will assert that the loan is in default and it wants a pathway to having it paid in cash, in full and in the near term. It will not accept any two-year or prolonged payment plan as was proposed originally by Mr. Nathan. WVEDA insists that the parties collaborate and share information to achieve the repayment objective.

To this end, we look forward to receiving the payoff letter and TRAG's directive to Mr. Nathan to work cooperatively with QP and provide it access. From our end, we will review the missing data OP has requested and if reasonably related to its operations, we will provide it.

We suggest having a call with Mr. Nathan, the TRAG and QP principals, and their counsel to hopefully achieve alignment on the issues addressed above, with particular emphasis on the sharing of information, addressing the soon to be defaulted WVEDA loan, the QP-OP lease termination, and QP's need to access the Power Plant both to protect its equipment (as to which it has a $80M investment) and to provide interested financing parties with the means to assess the value of the Power Plant and the QP assets. We will reach out to Mr Nathan to recommend this but TRAG must also be included given its essential role.

We would prefer to work constructively with TRAG to achieve what should be our mutually shared goals—repaying the defaulted TRAG debt being chief among them.

I am happy to discuss any of the foregoing points at your convenience.

Sincerely,

J. Nicholson Thomas

cc: Simon K. Hodson
Charles Gassenheimer

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs,**

**v.**

**Civil Action No.:_______________**
**Judge:**

**TRAG LLC, RG ENERGY LLC, and GILBERT NATHAN, in his capacity as Independent Manager of Omnis Pleasants, LLC and Quantum Pleasants, LLC,**

**Defendants.**

**DECLARATION OF ANGELA CHEN**

I, **Angela Chen**, being first duly sworn, state as follows:

1. I am over the age of eighteen and competent to testify to the matters set forth in this Declaration. I make this Declaration based upon my personal knowledge.

2. Through the Harmony Trust in which I am the primary beneficiary, I am an investor in Quantum Pleasants LLC. Through the Harmony Trust and other entities which I control as the primary beneficial owner, including, Dynamic HC Co, I have lent substantial sums to the Plaintiffs and to their affiliate, Omnis Pleasants ("Omnis Pleasants" and together with the Plaintiffs, the "Omnis Entities." I am authorized to act on behalf of Harmony Trust and my affiliates who have lent sums to the Plaintiffs with respect to the proposed funding described below.

3. Based on my review of information provided to me and discussions with representatives of the Omnis Entities, I am familiar with the proposed payoff of the indebtedness (the "Indebtedness") owed by the Omnis Entities to TRAG LLC and RG Energy LLC

(collectively, "TRAG") under the applicable loan documents and the Amended and Restated Forbearance Agreement dated February 6, 2026 (the "Forbearance Agreement").

4. Subject to the receipt of a payoff statement and customary due diligence, I will cause one of my affiliated entities which I fully control (the "Lender") to acquire the Indebtedness from TRAG and succeed to TRAG's rights and obligations thereunder as well as the collateral s pledged as security for the Indebtedness As required under the terms of the Forbearance Agreement, the Indebtedness will be "Paid in Full" (as such term is defined therein). Based upon the Plaintiff's calculations of the estimated payoff amount, I have caused $72,000,000 to be deposited into an escrow account and I will cause those funds, and any additional funds to achieve Payment in Full, to be released for the benefit of the Lender to acquire the Indebtedness . I will also cause the Lender to satisfy all "know your customer" and "anti-money laundering' requirements traditionally required by lending institutions.

5. Prior to releasing those funds, I must receive a detailed payoff statement from TRAG and financial information and plant access from Gilbert Nathan as described below.

6. The payoff statement must include (a) the total amount required for Payment in Full through a specified closing date; (b) the daily per diem after that date; (c) an itemization of principal, accrued interest, default interest, fees, expenses, and any other charges constituting Payment in Full; (d) wire-transfer instructions; (e) confirmation that the letter of credit issued by TRAG or its affiliates for the benefit of TYR Energy, LLC has terminated; (f) confirmation that TRAG's collateral interests will be transferred to the Lender upon receipt of the payment constituting Payment in Full; and (g) all conditions the Lenders contend must be satisfied to achieve Payment in Full.

7. The absence of a payoff letter and the inability to conduct standard due diligence prevent me and my affiliated entities from determining the payoff amount, arranging the mechanics of the funding, and confirming that the payment will constitute Payment in Full so as to discharge the obligations owed to TRAG and result in a transfer of the collateral interests to the Lender.

8. Upon receipt of a complete payoff letter, plant access, relevant financial information and completion of standard due diligence, I am prepared to cause the Lender to extend financing for the purpose of tendering Payment in Full to TRAG to discharge all of the Indebtedness.

9. Upon completion of this transaction and confirmation of Omnis Pleasants' current cash balances and other balance sheet assets and liabilities, as well as cash flow projections, it is my hope and expectation that Omnis Pleasants will have sufficient liquidity to make an immediate payment of $10,000,000 toward the WVEDA Loan. It is my further understanding that immediately after funding, the Plaintiffs can proceed with negotiations for the sale of the Plant, which will result in full payment of the WVEDA Loan. It is also my understanding that this process has been repeatedly hindered by TRAG, and by Mr. Nathan, who have consistently refused to provide the access and financial information that would be a necessary part of this or any similar transaction. This has also significantly harmed the Omnis Entities and their lenders and investors, including my affiliated entities.

10. On information and belief, this plan has been presented to the West Virginia Economic Development Authority, less than a month ago.

11. I offer this Declaration in support of Plaintiffs' request for immediate injunctive relief prohibiting TRAG LLC, RG Energy LLC, and Mr. Nathan from taking any adverse action

prior to seven business days after providing a complete payoff statement as well as the financial information and site access which would be necessary and customary as part of any standard due diligence.

Further affiant sayeth not.

Angela Chen

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Subject: Re: IDM LOI for Purchase of the Pleasants Power Station**
**Date:** June 24, 2026 at 7:51:03 PM EDT
**To:** Gilbert Nathan <gil@jacksonsquareadvisors.com>
**Cc:** "Nicholas.S.Preservati@wv.gov" <Nicholas.S.Preservati@wv.gov>, Frank Simmerman III <trey@simmermanlaw.com>, Blake Stephens <bstephens@omnisenergy.com>, David Hindman <dhindman@alixpartners.com>, Alexander Woolverton <alexander.woolverton@hsfkramer.com>, Nick Thomas <nick@jnicholsonlawgroup.com>

And this just in from Rockland Power, one of the largest and most professional PE firms in the US in the space.

Please pay particular attention to the Detailed Due Diligence and Timing section.

Regards,
Charles

On Jun 22, 2026, at 11:07 PM, Gilbert Nathan <gil@jacksonsquareadvisors.com> wrote:

Charles,
This is the first I have ever heard of any of these parties or have seen the letters and any of the attachments. To be clear, this is not a letter of intent to purchase the power plant. It is a preliminary indication of interest. That being said, thank you for providing it. Please send the contact information for the individuals and have them fill out the attached KYC form and have them return it directly to OP. We are happy to consider parties interested in the asset, but as you know we are in control of that process.
Thank you,
Gil

**Gilbert Nathan**
Managing Member
**Jackson Square Advisors**
646.279.2210 cell
gil@jacksonsquareadvisors.com

---

**From:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Sent:** Monday, June 22, 2026 8:54 PM
**To:** Nicholas.S.Preservati@wv.gov <Nicholas.S.Preservati@wv.gov>
**Cc:** Frank Simmerman III <trey@simmermanlaw.com>; Blake Stephens <bstephens@omnisenergy.com>;

Gilbert Nathan <gil@jacksonsquareadvisors.com>; David Hindman <dhindman@alixpartners.com>; Alexander Woolverton <alexander.woolverton@hsfkramer.com>; Nick Thomas <nick@jnicholsonlawgroup.com>
**Subject:** IDM LOI for Purchase of the Pleasants Power Station

Nick,

It was a pleasure to meet you last week. I'm sorry it was under difficult circumstances. Please find enclosed yet another Letter of Intent to purchase the Pleasants Power Station. The advantage of this offer is it is all cash. I have taken the liberty of including proof of funds also to ensure this is a realistic transaction. Like all of the other LOIs we currently have, IDM will need site access and access to standard financial and operating data. All of this is currently being barred by Mr. Nathan as discussed last week. We remain confident that if a sale of the power plant is accomplished, the state of WV's loan will be fully satisfied.

Regards,
Charles

E-FILED | 7/8/2026 9:42 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs,**

**Civil Action No.:______________**
**Judge:**

**v.**

**TRAG LLC, RG ENERGY LLC, and GILBERT NATHAN, in his capacity as Independent Manager of Omnis Pleasants, LLC and Quantum Pleasants, LLC,**

**Defendants.**

**DECLARATION OF CHARLES GASSENHEIMER**

I, **Charles Gassenheimer**, being first duly sworn, state as follows:

1. I am over the age of eighteen and competent to testify to the matters set forth in this Affidavit. I make this Affidavit based upon my personal knowledge.

2. I am the President of Omnis Fuel Technologies, LLC, doing business as Omnis Energy.

3. On or about December 13, 2023, a loan in the amount of $50,000,000.00 was issued by the West Virginia Economic Development Authority ("WVEDA") to Quantum Pleasants, LLC, as the borrower. The loan was separately guaranteed by Omnis Pleasants, LLC.

4. The loan bears a stated interest of 1% for a term of thirty (30) months. The loan is secured by equipment of Quantum Pleasants(the "WVEDA Loan").

5. The WVEDA Loan matured on or about June 13, 2026.

6. On June 11, 2026, a meeting was held at the West Virginia State Capitol with Nicholas Preservati. Mr. Preservati serves as Deputy Cabinet Secretary of the West Virginia

Department of Commerce and Director of the West Virginia Office of Energy. Also in attendance was Defendant Gilbert Nathan.

7. The purpose of the meeting was to bring the interested loan parties together to discuss the status of the WVEDA Loan as the maturity date of the loan was approaching.

8. On behalf of Quantum Pleasants, I explained the details of our efforts to secure financing pursuant to the Forbearance Agreement had been frustrated by actions and inactions of Defendants TRAG LLC, RG Energy LLC, and Gilbert Nathan. I further explained that Quantum Pleasants pursued multiple sales and financing transactions with various partners with the goal of achieving timely payment of the WVEDA Loan.

9. At that meeting, WVEDA indicated that it would exercise its contractual remedies if Quantum Pleasants and Omnis Pleasants failed to provide either: (1) payment of the WVEDA Loan within thirty (30) days of the maturity date; or (2) an alternative proposal for full and prompt payment of the WVEDA Loan.

10. Since at least Fall 2025, I have been diligently working on proposed transactions that would provide sufficient liquidity for all outstanding financial obligations of Quantum Pleasants and Omnis Pleasants, including the WVEDA Loan. My efforts in this regard have been continually frustrated by Defendants TRAG LLC, RG Energy LLC, and Gilbert Nathan.

11. The actions and inactions of Defendants TRAG LLC, RG Energy LLC, and Gilbert Nathan continue to threaten Quantum Pleasants' and Omnis Pleasants' ability to (1) repay the TRAG,LLC and RG Energy, LLC indebtedness, (2) replace Mr. Nathan with a qualified and experienced manager who will maximize the value of the power plant, (3) make a prompt and significant payment of the WVEDA Loan, and (4) subsequently sell the Plant, resulting in repayment of the WVEDA loan in full.

12. By blocking physical access to the plant as well as withholding financial information to which Quantum Pleasants is clearly entitled, while simultaneously threatening to dispose of assets which provide security for the WVEDA Loan, the Defendants are breaching their contractual and common law obligations to the Plaintiffs, resulting in immediate and irreparable harm to the Plaintiffs and to the taxpayers of West Virginia.

13. These actions and inactions by the Defendants are causing irreparable harm to Quantum Pleasants, Omnis Pleasants, and the taxpayers of West Virginia. For example, the roadblocks created by the Defendants have already prevented Quantum Pleasants and Omnis Pleasants from entering into multiple sales and financing arrangements, each of which would have resulted in prompt and full payment of the WVEDA Loan.

14. Quantum Pleasants, as borrower, is currently in discussions with a financing partner who has specifically expressed a willingness to pay off the loans funded by TRAG LLC and RG Energy LLC and following repayment to cause Omnis Pleasants (i) to make an immediate partial payment of the WVEDA Loan and (ii) to enter into negotiations for prompt payment of the balance.

15. Defendants TRAG LLC, RG Energy LLC, and Gilbert Nathan have offered no plan or alternative for payment of the WVEDA Loan.

16. Upon receipt of the payoff letter and confirmation of the amount payable to TRAG LLC and RG Energy LLC, and following review and evaluation of financial information, and access to Omnis Pleasants property, Quantum Pleasants and Omnis Pleasants will be in a position to satisfy the financial obligations owed to TRAG LLC and RG Energy LLC, and to provide WVEDA with a viable plan for the near term repayment of the WVEDA Loan.

17. Without relief from the Court, Quantum Pleasants, Omnis Pleasants, WVEDA, and the West Virginia taxpayers will continue to suffer irreparable harm.

18. On July 5, 2026, I transmitted a follow up letter to Nicholas Preservati, Director of the West Virginia Office of Energy, explaining that the Defendants' actions are hindering payment of the WVEDA Loan. I explained to Mr. Preservati that Plaintiffs would be pursuing this litigation to obtain (i) a payoff letter from TRAG, (ii) financial information from Nathan, and (iii) reasonable pant access for the purpose of conducting due diligence, all for the purpose of paying off the outstanding debts, including the WVEDA Loan. A copy of my letter to Mr. Preservati is attached hereto as Exhibit A.

19. I declare under penalty of perjury that the foregoing statements are true and accurate and made to the best of knowledge.

Further affiant sayeth not.

Charles Gassenheimer
Charles Gassenheimer (Jul 6, 2026 11:23:50 EDT)

Charles Gassenheimer
President, Omnis Fuel Technologies

07/06/2026
Date

# Quantum Pleasants, LLC

Mr. Nicholas Preservati
Director
West Virginia Office of Energy
State Capitol Complex Building 3, Suite 600
Charleston, WV 25305-0311

Dear Nick,

As we have documented, and I'm sure by now you have confirmed, the newly installed independent manager of Omnis Pleasants ("OP"), Gil Nathan and CEO, David Hindman, appointed through the February 2026 forbearance agreement, have thwarted every effort by Quantum Pleasants ("QP") to sell the plant and pay off the WVEDA loan – and continue to frustrate basic information/detail sharing which is necessary to move in a proactive manner.

Despite your admonition that OP and QP must work together to come up with a workable repayment plan, OP continues to refuse to play ball and provide QP with financial information and access. QP has no idea of OP's current cash position and projected cash flow, including no knowledge as to the reserve account/State account, and it is unaware that OP has any solution to repaying the state despite knowing well in advance that the loan would be due. Perhaps more concerning, OP continues to deny QP access to the plant despite QP having a valid lease to occupy the site, and QP has been unable to verify the current condition of the pilot project equipment which serves as collateral for the state loan.

Pursuant to the forbearance agreement, the independent manager and CEO can only be removed/replaced upon agreement of Simon Hodson and TRAG. TRAG has thus far refused – Simon Hodson is prepared and ready to seek an alternative independent manager with the State's input. Make no mistake, it's not the forbearance we take issue with, its TRAG's and the IM's refusal to enforce it's terms.

At this juncture, given the deadlock on these basic issues, the only viable path forward is to retake control of OP and make an immediate payment to the state at least equal to the cash reserves in excess of $20m of net income as required by the loan agreement but in no event less than $10m. Our lender, Angela Chen, has placed $72 million in escrow to repay the TRAG loan once a payoff letter has been received confirming the amount due (proof of funds attached). Assuming the payoff amount approximates the $72m in escrow and the financial information and access is reasonably adequate, the lender is ready, willing and able to proceed to payoff TRAG.

If TRAG continues to refuse to provide QP with the payoff for the TRAG loan, we plan to utilize the courts to order i) a payoff letter from TRAG; ii) OP financial information, and iii) reasonable access to QP's leased premises and related plant-access areas. Even if the litigation proves unsuccessful (which is unlikely), the lender has indicated she may still be willing to proceed because allowing Nathan and the CEO to remain in control of OP is simply intolerable.



Exhibit A

To increase the likelihood of success, we would prefer to file with the State as a party, or by providing an amicus brief, and we respectfully request that the state consider assisting in this regard.

Upon payment of the TRAG loan and the termination of the forbearance agreement, QP can remove the IM and CEO and regain control of the power plant, thereby providing access to its cash reserves and allowing QP to sell the plant for at least $350m to one of five current suitors and payoff the balance of the state loan. We estimate that the sale of the plant would require a 4-6 month extension of the WVEDA note and the proceeds of that sale would be substantially more than enough to satisfy all debts at closing, including the balance of the state loan not paid through the payment of current operating profits. The window could, perhaps, be shorter after review of plant finances – we first need access to detail/accounts. We would simultaneously, upon gaining access to plant financials, conduct an immediate "exit" point audit of plant finances after removal of Nathan/Hindman – involving the State in this process.

To summarize, by taking control of the plant which is accomplished by repaying the TRAG loan, QP intends to use the existing cash reserves to make a payment of at least $10m to the state (and more if the reserves are sufficient to do so) and then sell the plant or OP within the next four to six months to repay the loan in full. We ask, in turn, that the state consider granting a reasonable forbearance period to accomplish the foregoing – among others we believe such a request is justified given the ongoing battle to gain access to basic plant information necessary to move these issues to resolution.

Regards,

Charles Gassenheimer

President, Omnis Energy