# **EXHIBIT 14**

West Virginia E-Filing Notice

CC-37-2026-C-14

Judge: Timothy L. Sweeney

**To:** Isaac Forman
iforman@hfdrlaw.com

# NOTICE OF FILING

IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA
Omnis Global Technologies, LLC v. TRAG LLC
CC-37-2026-C-14

The following motion was FILED on 7/8/2026 9:48:06 AM

Notice Date: 7/8/2026 9:48:06 AM

Millie Farnsworth
CLERK OF THE CIRCUIT COURT
Pleasants County
301 Court Lane Room 201
ST MARYS, WV 26170

(304) 684-3513
Millie.Farnsworth@courtswv.gov

E-FILED | 7/8/2026 9:48 AM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs,**

**Civil Action No.:_______________**
**Judge:**

**v.**

**TRAG LLC, RG ENERGY LLC, and**
**GILBERT NATHAN,**

**Defendants.**

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER,**
**<u>PRELIMINARY INJUNCTION, AND EXPEDITED HEARING</u>**

Plaintiffs Omnis Global Technologies, LLC, Omnis Fuel Technologies, LLC, and Quantum Pleasants, LLC, by counsel, move under Rule 65 of the West Virginia Rules of Civil Procedure for a temporary restraining order, preliminary injunction, and expedited hearing. In support, Plaintiffs state as follows:

## I. INTRODUCTION

This case concerns a major West Virginia asset: the Pleasants Power Station in Belmont, West Virginia. Plaintiffs and their affiliate, Omnis Pleasants, LLC ("OP"), have been working to preserve the Plant, stabilize its finances, pursue sale or financing opportunities, and pay secured lenders TRAG LLC and RG Energy LLC (the "Lenders") in full.

The parties entered into an Amended and Restated Forbearance Agreement on February 6, 2026. The Forbearance Agreement was supposed to create a bridge: the Lenders would forbear from exercising remedies while Plaintiffs pursued a sale, financing, or other transaction that would result in a "Payment in Full"[1]. The Forbearance Agreement expressly preserves Plaintiffs'

[1] "Payment in Full" is specifically defined in the Forbearance Agreement. Ex. A, at § 2.a.

ability to procure funds resulting in Payment in Full and prohibits the Lenders from acting, or failing to act, for the purpose of frustrating, hindering, or unreasonably interfering with Plaintiffs' ability to comply with the Forbearance Agreement and the loan documents. Ex. A §§ 8(e), 11(b), 11(d), 13.[2]

But the Lenders used the Forbearance Agreement to install a gatekeeper. Gilbert Nathan was placed into governance roles at OP and Quantum Pleasants, LLC ("QP"). It was expressly agreed that Nathan was not to be the Lenders' agent, but rather he was supposed to act independently, in good faith, and with the primary objective of maximizing the value of the Plant. Ex. A § 9(a); Ex. C § 4(a); Ex. D § 6.2(c).

Nathan has done the opposite. Instead of protecting value, he has withheld the financial information, books and records, and Plant access needed to preserve and maximize the value of OP. QP is OP's sole member and owns 100% of OP's membership interests. QP is also the tenant under a Ground Lease at the Plant. Ex. E. Yet QP has been denied OP financials and denied reasonable access to its leased premises. Those denials make it impossible to preserve the Plant, deal with WVEDA, support sale and financing diligence, and provide the Lenders with Payment in Full.

At the same time, the Lenders promised to provide payoff information, then refused to do so. On April 19, 2026, Plaintiffs requested the amount necessary to pay the Lenders in full. On April 20, the Lenders' counsel responded: "We'll get you the payoff information." Ex. H. They did not. Instead, the Lenders demanded broad information about Plaintiffs' funding source, financing terms, and unrelated historical materials as a condition to providing the ordinary closing document every creditor must provide when it is to be paid: a payoff statement. Exs. I, J.

[2] Plaintiffs incorporate by reference the exhibits attached to their Verified Complaint for Declaratory and Injunctive Relief. Citations to "Ex. __" in this Motion refer to the corresponding exhibits attached to the Verified Complaint.

This motion seeks narrow relief. Plaintiffs do not ask the Court to approve any sale transaction, financing transaction, related-party transaction, restructuring, equity issuance, lien, asset transfer, or governance change. Plaintiffs ask only for an injunction preserving the status quo until seven (7) business days after the receipt of:

1. a payoff letter from the Lenders;
2. OP financial information, books, records, and director materials from Nathan; and
3. reasonable access to QP's leased premises and related Plant-access areas.

## II. FACTUAL BACKGROUND

### A. Omnis acquired the Pleasants Power Station to preserve and repurpose a major West Virginia asset.

Omnis Global Technologies, LLC, Omnis Fuel Technologies, LLC, QP and OP are affiliates of each other. QP owns 100% of OP and OP owns and operates the Pleasants Power Station in Belmont, West Virginia. QP, through its acquisition of OP, acquired the Plant in 2023 with the goal of preserving the Plant as a valuable operating asset and using it to showcase Omnis' clean-energy technology. The Plant is not an ordinary piece of personal property. It is a major industrial asset located in Pleasants County, tied to jobs, creditor rights, public interests, energy infrastructure, and the value of Plaintiffs' investment.

The acquisition and related operations were financed in part by loans from TRAG and RG Energy. After a default, the parties entered into the Forbearance Agreement on which this dispute largely centers. Ex. A.

### B. The Forbearance Agreement was supposed to preserve value and create a path to Payment in Full.

The Forbearance Agreement was not supposed to be a trap. It created a temporary framework to preserve value while Plaintiffs pursued a transaction resulting in the Lenders'

receiving Payment in Full. The Agreement established a process for a sale of OP or its assets, including the Plant. Ex. A § 8. It also separately preserved Plaintiffs' ability to procure funds resulting in Payment in Full. Ex. A § 11(b). Section 11(b) provides that "nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations." Ex. A § 11(b). Section 11(d) likewise authorizes "transactions that will result in the Payment in Full of all Obligations under the Loan Agreements." Ex. A § 11(d).

The Forbearance Agreement also contains non-interference protections. Section 8(e) prohibits the Lenders from any actions whose primary purpose is to materially interfere with the other party's efforts to pursue a transaction resulting in Payment in Full. Ex. A § 8(e). Section 13 similarly prohibits the Lenders from taking or failing to take action whose primary purpose is to frustrate, hinder, or unreasonably interfere with the Omnis Parties' efforts to comply with the Forbearance Agreement or loan documents. Ex. A § 13.

Those provisions mean the Lenders cannot say "we will forbear while you try to repay us," then obstruct the very process needed to repay them.

**C. The Lenders' chosen Independent Manager became the gatekeeper for OP and QP.**

As part of the Forbearance Agreement, the Lenders obtained significant control protections. One of the most important was Nathan's installation as Independent Manager in governance roles at OP and QP.

The Forbearance Agreement gives the Independent Manager access to board notices, board materials, books and records, and participation in meetings involving material business decisions. Ex. A § 9(a). The OP Operating Agreement amendment similarly gives the Independent Manager a central role in OP governance and requires the Independent Manager to act in good faith with the primary objective of maximizing the value of the Plant, consistent with

fiduciary duties under applicable law. Ex. C § 4(a). The QP Operating Agreement amendment provides that QP's board includes an Independent Manager, initially Gilbert Nathan, and requires the Independent Manager to act in good faith as a fiduciary of QP and consistent with applicable law. Ex. D § 6.2.

Nathan is therefore not a peripheral actor. He is the gatekeeper installed by the Lenders through the Forbearance Agreement. He has the practical ability to affect access to OP information, OP records, OP board materials, and the Plant. Under the amendments to the OP and QP operating agreements, TRAG may remove Nathan at any time as Independent Manager of OP and QP, and thus he continues to serve only because of the Lenders' acquiescence in and support of his obstructive conduct. But Nathan's authority exists to preserve value, not destroy it.

Nathan's own recent statement confirms that he views himself and OP as the gatekeepers for prospective transactions. On June 22, 2026, after receiving a preliminary indication of interest from a prospective all-cash purchaser, Nathan responded on behalf of OP that OP was "happy to consider parties interested in the asset, but as you know **we are in control of that process**." Ex. L (emphasis supplied).

That assertion matters because Nathan claims to control whether prospective purchasers receive the financial information, operating data, and site access necessary to conduct diligence. He cannot claim control over the transaction process while disclaiming responsibility for the information and access barriers that prevent credible sale and funding opportunities from advancing.

**D. Nathan has blocked the information needed to preserve value.**

QP is the sole member of OP and owns 100% of OP's membership interests. OP owns the Plant. QP therefore needs OP financial information to understand the value, financial

condition, obligations, and cash needs of the company it owns. QP also needs that information to support financing, engage with WVEDA, respond to creditor issues, and pursue a transaction that pays the Lenders.

Section 15 of the OP Operating Agreement gives QP member-information rights. Ex. C, at §15. QP is entitled to receive notices and materials provided to OP's directors in connection with meetings or written consents, reasonable access to OP's books and records, and participation in meetings at which material OP actions are considered. *Id*.

QP began requesting this information no later than March 2026. On March 9, QP's counsel advised OP's counsel that OP had provided no financial reporting since December 2025, despite repeated demands. Ex. F. QP requested all OP financial reporting and books and records since December 31, 2025, including financial statements, general ledgers, AlixPartners invoices, Independent Manager invoices, the interim CEO agreement, and reports or preliminary reports concerning OP's performance, cash flow, profit and loss, and financial metrics. *Id*.

On March 20, QP wrote directly to Nathan and David Hindman, the acting CEO of OP. Ex. G. QP explained that it remained frustrated in its ability to advance a sale or financing of OP because of Nathan's and Hindman's continuing actions and inactions. QP further explained that the information it requested was necessary to facilitate a sale or financing, enable repayment of the debt owed to the Lenders, avoid foreclosure on OP's and QP's assets, and preserve the value of the Plant. *Id*.

Nathan did not provide the requested information. The result is simple and harmful: Plaintiffs own 100% of OP but cannot obtain any information concerning its own company. Meanwhile the supposedly "independent" fiduciary responsible for maximizing the Plant's value withholds the information needed to repay the outstanding debts. In the absence of injunctive

relief, the Lenders may act on their threat to summarily dispose of valuable collateral, at least some of which, serves as security for the WVEDA Loan.

**E. Nathan has also blocked reasonable access to the Plant.**

In addition to its 100% ownership interest in OP, QP holds a Ground Lease at the Plant. Ex. E. The Ground Lease gives QP rights to the leased premises and related access, including ingress and egress to, from, and over the property for QP's reasonable needs, including access to load and unload equipment, supplies, and materials, so long as that access does not unreasonably interfere with OP's operations or use of the property. Ex. E.

QP needs access for its employees, vendors, contractors, consultants, financing sources, and diligence representatives. The access is necessary to inspect, preserve, maintain, recommission, and protect QP's equipment and technology; support financing and sale diligence; preserve the value of OP and the Plant; and protect the collateral securing the WVEDA Loan.

Nathan has nevertheless attempted to terminate or deny QP's access under the Ground Lease. The stated basis for that attempted termination was a lien placed on OP's premises by one of QP's equipment vendors for nonpayment. But the obligation allegedly giving rise to that lien was not QP's obligation. It was an obligation owed by OP. Nathan therefore attempted to terminate QP's leasehold and site-access rights based on an asserted default that QP did not cause and was not contractually responsible to cure.

That attempted termination was invalid. It also created immediate practical harm. QP's equipment at the Plant is the primary collateral securing the WVEDA Loan. By denying QP access to the Plant, Nathan prevents QP from inspecting, repairing, maintaining, recommissioning, and protecting the very collateral on which WVEDA relies. Continued denial of access therefore erodes the value of WVEDA's security, impairs QP's ability to address the

WVEDA Loan, and undermines Plaintiffs' efforts to preserve the Plant and pursue Payment in Full.

QP raised the access problem in writing. In the March 20 letter, QP advised Nathan and Hindman that QP personnel, vendors, and potential financing sources had been denied access to the Plant and leased property, including personnel from a key equipment vendor. Ex. G. QP explained that this denial of access impaired QP's ability to effect a sale or financing and repay the indebtedness owed to the Lenders. *Id*.

Nathan's conduct is especially problematic because he was not merely acting for OP. Nathan also served as Independent Manager of QP and owed duties to QP under the governing documents and applicable law. Rather than honoring those obligations, Nathan chose to act in a manner that directly conflicted with them: he purported to act for OP in terminating or denying QP's Ground Lease rights, even though he knew that QP's value and collateral position depended on preserving those same rights. Nathan affirmatively placed himself in this conflict and then acted to QP's detriment, in clear breach of his fiduciary obligations.

QP is willing to comply with reasonable safety, insurance, escort, advance-notice, and noninterference conditions. But Nathan should not be allowed to ignore the parties written lease and wield plant access as a weapon to prevent QP from preserving its own property, supporting diligence, and pursuing repayment.

**F. The Lenders promised payoff information, then withheld it.**

While Nathan blocks information and access, the Lenders separately are blocking the ordinary first step of any payoff: a payoff letter. On April 19, 2026, Plaintiffs requested the amount required to provide Payment in Full to the Lenders. Ex. H. The request asked for all

principal, accrued and unpaid interest, fees, costs, expenses, any amount associated with the letter of credit, and wiring instructions. Ex. H.

The next day, the Lenders' counsel responded: "We'll get you the payoff information." Ex. H. The Lenders then refused to provide it.

Plaintiffs renewed the request on June 1 and June 9. Plaintiffs requested the payoff amount, a component breakdown, daily interest accrual, and information concerning the TYR Energy letter of credit. Ex. I. Instead of providing the payoff information, the Lenders demanded information about the proposed funding source, the terms of the financing, and related documents, along with other broad information previously demanded in March. Ex. I.

On June 11, Plaintiffs responded that the Lenders cannot condition the basic act of providing a payoff letter and accounting on approval of the funding source, the terms of future financing, or broad historical materials unrelated to calculating the payoff amount. Plaintiffs again requested the payoff letter and supporting calculations. Ex. J.

A payoff letter is not extraordinary relief. It is the document needed to pay a creditor and it is particularly critical where, as is the case here, the creditor is threatening to immediately foreclose on collateral posted as security. The Lenders know the amount they contend is due. Plaintiffs cannot tender Payment in Full without a payoff letter.

**G. Immediate relief is necessary to preserve the Plant and allow Payment in Full.**

Angela Chen, through one of her affiliated companies, is ready, willing, and able to provide funding sufficient to provide the Lenders a Payment in Full, subject to receipt and confirmation of payoff information, OP financial information and Plant access, and customary due diligence and closing documentation. Ex. K.

Ms. Chen has deposited $72,000,000 into an escrow account, but Payment in Full cannot move forward without a payoff letter. Ex. K. Plaintiffs cannot know the final amount, per diem interest, wire instructions, letter-of-credit treatment, or the debt transfer mechanics unless the Lenders provide them. Plaintiffs also cannot properly support funding, address WVEDA, or protect the Plant without OP financial information and reasonable Plant access.

The separate WVEDA Loan makes the situation more urgent. The approximately $50 million WVEDA Loan matured on June 13, 2026. Ex. M, at ¶¶3-5. QP is the borrower, and OP is obligated on the WVEDA note. Ex. A; Exs. I, J. Plaintiffs are pursuing a coordinated solution under which the available funding would pay the Lenders in full and support a partial paydown and restructuring of the WVEDA Loan. Exs. K, M.

On June 11, 2026, Plaintiffs met at the State Capitol with Nicholas Preservati, who serves as the Deputy Secretary of the West Virginia Department of Commerce and the Director of the West Virginia Office of Energy. Defendant Nathan was also in attendance at the meeting. Ex. M, at ¶6. Plaintiffs explained that their efforts to secure financing pursuant to the Forbearance Agreement were being frustrated by the Defendants. *Id.* ¶¶8-10. Plaintiffs further explained that, despite owning 100% of Omnis Pleasants LLC and despite holding a ground lease on the property, Defendant Nathan was blocking physical access to the plant and withholding financial information necessary to pursue Payment in Full. *Id.* ¶13. At the June 11 meeting, and as of the date of this filing, the Defendants have refused to provide a payoff letter and have offered no plan or alternative for payment of the WVEDA Loan. *Id.* ¶¶14-15.

That WVEDA accommodation cannot be meaningfully pursued while Plaintiffs lack the Lenders' payoff figure and Nathan withholds OP's current financial and operating information.

Delay risks default, acceleration, enforcement, loss of WVEDA's cooperation, and impairment of the Plant and WVEDA collateral.

The risk of Lender enforcement is also concrete. The Lenders previously served notices of private disposition seeking to sell broad categories of Plaintiffs' collateral, and the Forbearance Agreement expressly preserved the Lenders' right to reissue disposition notices after the Forbearance Period. Ex. A § 3(a) & Ex. C thereto.

The harm is urgent. Plaintiffs are trying to preserve a major West Virginia asset, address a mature taxpayer financed loan, pay secured creditors, and prevent the Forbearance Agreement from becoming a loan-to-own mechanism. Nathan's conduct, aided and abetted by the TRAG, LLC and RG Energy, LLC is the center of the obstruction. His mandate was to preserve value. Instead, he has wielded his authority to withhold records and access, in clear breach of the operating agreements, written lease, and his fiduciary duties to the Plaintiffs. The Lenders benefit from that obstruction and have added their own by refusing to provide a payoff letter, while retaining the ability to dispose of collateral in a manner that is commercially unreasonable and compromises Plaintiffs' ability to satisfy the TRAG and RG Energy loans, as well as the WVEDA Loan.

## III. LEGAL STANDARD

Rule 65 authorizes temporary restraining orders and preliminary injunctions. West Virginia courts apply a flexible equitable standard considering: "(1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest." *Jefferson County Bd. of Educ. v. Jefferson County Educ. Ass'n,* 183 W.Va. 15, 24, 393 S.E.2d

653, 662 (1990) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985).

The Supreme Court of Appeals has reaffirmed that these factors operate in "flexible interplay." *Justice v. W. Va. AFL-CIO*, 246 W. Va. 205, 866 S.E.2d 613 (2021). While injunctive relief is extraordinary, West Virginia courts have recognized that the remedy is appropriate where immediate relief is needed to prevent practical and irreparable harm before the merits can be resolved.

West Virginia law also recognizes that mandatory injunctive relief may be appropriate where the applicant's right is clear and the need for relief is urgent. *Sams v. Goff*, 208 W. Va. 315, 318-19, 540 S.E.2d 532, 535-36 (1999). In *Sams*, the Supreme Court affirmed an injunction requiring a seller to accept prepayment and convey real property where the purchasers had secured financing and risked losing their lending commitment if they could not promptly obtain unencumbered title. *Id*. The Court explained that the mere existence of a legal remedy does not bar injunctive relief unless the legal remedy is as practical, efficient, and prompt as equitable relief. *Id*.

That principle applies here. Plaintiffs seek preservation of the status quo until seven (7) business days after Plaintiffs receive (1) a payoff letter from the Lenders, (2) production of information from Nathan consistent with his contractual and fiduciary obligations, and (3) reasonable site access that Nathan is contractually obligated to provide. Without immediate relief, the WVEDA Loan may trigger cascading creditor consequences, the Lenders may reissue private-disposition notices or take other irreversible action against collateral and with respect to the Plant, Plaintiffs may lose a time-sensitive payoff opportunity, and Plaintiffs will be unable to

protect QP's contractual and membership rights. Money damages would be inadequate to repair those harms.

## IV. ARGUMENT

### A. Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on four related claims: (1) breach of the Forbearance Agreement by the Lenders, (2) breach of the implied covenant of good faith and fair dealing by the Lenders, (3) breach of fiduciary duty by Nathan, and (4) the Lenders' knowing participation and aiding and abetting Nathan's breach of fiduciary duty.

#### 1. *Plaintiffs are likely to succeed on their claim that the Lenders breached the Forbearance Agreement.*

The Forbearance Agreement preserves Plaintiffs' ability to procure funds resulting in Payment in Full. Ex. A § 11(b). It authorizes Plaintiffs to pursue funding for transactions resulting in Payment in Full. Ex. A § 11(d). It prohibits interference with a transaction resulting in Payment in Full. Ex. A § 8(e). And it prohibits the Lenders from acting or failing to act for the purpose of frustrating, hindering, or unreasonably interfering with the Omnis Parties' ability to comply with the agreements. Ex. A § 13.

The Lenders' refusal to provide a payoff letter is a clear breach of the Forbearance Agreement. Plaintiffs cannot make Payment in Full unless the Lenders provide the amount they contend is required, the interest, the wire instructions, the letter-of-credit treatment, and the debt transfer mechanics. The Lenders promised to provide the payoff information, then refused to provide it, and then attempted to condition it on broad disclosures unrelated to calculating the payoff. Exs. H, I, J.

The requested relief does not rewrite the Forbearance Agreement. It enforces the heart of it. If Plaintiffs have the right to make Payment in Full, the Lenders must provide the information

necessary to make that payment. This is particularly so where the Lenders are threatening to immediately foreclose on the collateral.

West Virginia law supports that practical result. In *Sams*, the Supreme Court affirmed mandatory injunctive relief where purchasers had a contractual right to prepay, needed unencumbered title to obtain financing, and faced the risk that delay would cost them the lending commitment. 208 W. Va. at 318-19, 540 S.E.2d at 535-36. Because West Virginia law permits mandatory relief requiring acceptance of payment where the right is clear and the need urgent, it necessarily permits the narrower relief of preserving the status quo unless and until the Defendants provide a comprehensive payoff statement.

*Wood v. West Virginia Mortgage & Discount Corp*., 99 W. Va. 117, 127 S.E. 917 (1925), points in the same direction. There, the Supreme Court held that where a borrower sought an accounting and the amount of the debt was at issue, an injunction restraining sale under a deed of trust should not be dissolved until the amount of the debt was ascertained and the debtor has a fair opportunity to pay it. *Id*. Plaintiffs likewise seek the amount necessary to satisfy the asserted obligations. Equity does not permit a creditor to withhold the amount it claims is owed while using the uncertainty it created as leverage.

2. *Plaintiffs are likely to succeed on their claim that the Lenders breached the covenant of good faith and fair dealing.*

Under Delaware law, which governs the Forbearance Agreement, the implied covenant of good faith and fair dealing inheres in every contract and requires parties not to act arbitrarily or unreasonably in a way that prevents the counterparty from receiving the fruits of the bargain.[3]

[3] The Forbearance Agreement provides that it will be construed in accordance with the laws of the State of Delaware. Ex. A, at ¶15.a. Even if that were not the case, West Virginia has long viewed Delaware courts as persuasive authority due to their "specialized expertise" in matters of corporate law and governance. *Manville Personal Injury Settlement Trust v. Blankenship*, 231 W. Va. 637, 644-45 (2013)

*Dunlap v. State Farm Fire & Cas. Co*., 878 A.2d 434, 441-42 (Del. 2005). Delaware courts apply that principle with care, and enforce it where a party uses contractual discretion or a gap in the agreement to defeat the agreement's purpose. *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099 (Del. 2022) (holding that where an LLC Agreement gives a party discretionary authority to determine whether another party has satisfied an express good-faith standard, the implied covenant requires that discretionary determination itself to be made in good faith). Accordingly, Nathan and the Lenders cannot invoke contractual discretion or managerial authority in a way that arbitrarily defeats the very purpose of the Forbearance Agreement.

West Virginia law is consistent. Every contract imposes a duty of good faith and fair dealing in performance and enforcement. *Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va*., 244 W. Va. 508, 529 n.9, 854 S.E.2d 870, 891 n.9 (2020). In *Mountaineer Fire*, the Supreme Court explained that bad faith may include "evasion of the spirit of the bargain," "lack of diligence," "abuse of a power to specify terms," and "interference with or failure to cooperate in the other party's performance." *Id.*; *Miller v. WesBanco Bank, Inc*., 245 W. Va. 363, 386-87, 859 S.E.2d 306, 329-30 (2021), likewise applies the implied covenant in the lender-borrower context.

That is what happened here. The Lenders agreed to a Forbearance Agreement that expressly preserved a path to Payment in Full. Then, when Plaintiffs asked for the payoff amount, the Lenders withheld it. They did not say Plaintiffs could not pay. They did not say they were unable to calculate the amount. They promised the payoff information and then demanded unrelated information first. Exs. H, I, J. The information requested has nothing to do with the indebtedness since once Payment in Full has been achieved, the Lender will have no legitimate interest in the information sought.

The implied covenant does not require the Court to approve any financing or related-party transaction. It requires only that the Lenders not destroy Plaintiffs' express right to repay by withholding the basic information needed to repay. *See Hexion Specialty Chems., Inc. v. Huntsman Corp*., 965 A.2d 715 (Del. Ch. 2008) (ordering specific performance of a buyer's contractual pre-closing financing and transaction-support covenants where buyer knowingly pursued conduct that impaired the financing and obstructed the closing process). Neither Delaware nor West Virginia law allows a party to frustrate the process needed for contractual performance and then benefit from their own obstructive conduct.

3. *The Lenders' anticipated related-party argument does not justify withholding payoff information.*

The Lenders may argue that Plaintiffs' anticipated payoff funding implicates a related-party restriction in the Forbearance Agreement. That argument is a red herring. There is no contractual limitation on any party, related or not, providing the funds to acquire the TRAG/RGE indebtedness and achieving Payment in Full. To conclude otherwise would produce an absurd result since the principal purpose of the Forbearance Agreement is to provide a pathway to pay off the debt, not to allow the Lenders to continue to accrue interest at a high default rate and assert control over QP and OP through their refusal to remove Nathan.

First, Plaintiffs are not asking this Court to approve any related-party transaction. Plaintiffs are not asking the Court to approve the Angela Chen funding arrangement, approve any loan agreement, approve any lien, approve any equity issuance, approve any asset transfer, or decide any governance issue. Plaintiffs ask only for the antecedent information necessary to determine the amount the Lenders contend is required for Payment in Full. Lenders cannot withhold the payoff amount based on objections relating to the source of potential funds.

Second, the Forbearance Agreement contains specific Payment-in-Full provisions. Section 11(b) provides that "nothing herein" limits or restricts the Omnis Parties from procuring funds resulting in Payment in Full. Ex. A § 11(b). Section 11(d) carves out transactions that will result in Payment in Full. Ex. A § 11(d). Sections 8(e) and 13 prohibit conduct whose purpose is to interfere with or frustrate Plaintiffs' ability to pursue such a transaction or comply with the Forbearance Agreement and loan documents. Ex. A §§ 8(e), 13.

Under Delaware law, contracts are read as a whole, and specific provisions control over general ones. *DCV Holdings, Inc. v. ConAgra, Inc*., 889 A.2d 954, 961 (Del. 2005). The Delaware Supreme Court recently reaffirmed that a specific provision may operate as an exception to a general provision and should be used to harmonize provisions rather than allow a general provision to swallow the specific one. *Thompson St. Capital Partners IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A.3d 1151, 1166 (Del. 2025). Those principles are decisive here. A broad limitation on related-party transactions cannot nullify the specific right to procure funds resulting in Payment in Full.

Third, courts do not expand restrictions beyond their text to block transactions the parties did not prohibit. In *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006), the Court of Chancery refused to stretch an insider-debt restriction to prohibit a new equity investment. *Allied Capital Corp.* reflects the same principle: sophisticated parties are held to the words they used, and restrictions are not expanded beyond their terms to defeat a transaction they did not clearly prohibit.

The related-party issue is therefore a red herring at this stage. The Court need not decide whether any final financing transaction is permissible. The Court need only decide whether the Lenders may refuse to provide payoff information. The answer is no. The Forbearance

Agreement preserves a specific path to Payment in Full, and the Lenders cannot rely on a general limitation to eviscerate the clear authorization of transactions resulting in Payment in Full.

4. *QP is likely to succeed on its claim that Nathan breached his fiduciary and good-faith duties.*

Nathan's role is defined by the documents. He was installed to be an Independent Manager of both OP and QP. He is required to act in good faith and owes fiduciary duties to both OP and QP. He is required to act with the primary objective of maximizing the value of the Plant, consistent with these fiduciary duties. Ex. A § 9; Ex. C § 4(a); Ex. D § 6.2(c).

Nathan has done just the opposite. QP is OP's sole member and owns 100% of OP's membership interests. QP has express rights to OP books and records, director materials, and participation in material OP matters. Ex. C § 15. QP is also OP's tenant and has contractual rights to reasonable access to its leased premises and related ingress and egress. Ex. E. Yet Nathan, as the Independent Manager and fiduciary of QP, has acted on behalf of OP to deny it these rights without any valid basis for doing so.

Delaware law recognizes that LLC managers owe fiduciary duties unless those duties are clearly modified, restricted, or eliminated by the governing agreement. *See Auriga Capital Corp. v. Gatz Props*., 40 A.3d 839 (Del. Ch. 2012). The point is even simpler here because the governing documents affirmatively require Nathan to act in good faith and as a fiduciary. Ex. C § 4(a); Ex. D § 6.2(c). Delaware courts also distinguish between eliminating a fiduciary duty and merely limiting monetary remedies for breach of that duty. *Calumet Capital Partners LLC v. Victory Park Capital Advisors, LLC*, 353 A.3d 88 (Del. Ch. 2026). A party seeking to eliminate fiduciary duties must do so plainly and unambiguously. *Id*.

*Auriga Capital* shows why Nathan's conduct violates his duties. There, the Court of Chancery found bad-faith fiduciary misconduct where an LLC manager refused to explore

strategic alternatives, refused to engage with a credible buyer, failed to provide due diligence, and allowed the company to be placed in a position of economic weakness that the manager could exploit. 40 A.3d at 875, 878. Nathan's conduct fits this description to a tee. He was placed in a position of trust to preserve and maximize the value of the Plant. Yet he is withholding OP financials, books and records, director materials, and blocking Plant access needed to preserve value and support sale, financing, and payoff efforts. Exs. F, G.

Nathan's June 22 email provides direct evidence of the control he claims over the process. In response to a preliminary indication of interest from a prospective all-cash purchaser, Nathan wrote on behalf of OP that OP was "happy to consider parties interested in the asset, but as you know we are in control of that process." Ex. L. Nathan therefore cannot plausibly characterize himself as a passive actor who lacks responsibility for the barriers to diligence. He claims control over the process and obstructs Plaintiffs' efforts to obtain Payment in Full, contrary to his fiduciary obligations and the plain language of the Forbearance Agreement.

Nathan's conduct is in bad faith and in breach of his fiduciary obligations to QP, which owns 100% of the membership interests in OP. He was put in place to protect and maximize value. He has instead blocked the owner and tenant from obtaining the records, diligence access, and site access needed to protect value and advance transactions capable of paying creditors and preserving the Plant.

5. *Plaintiffs are likely to succeed on their claim that the Lenders knowingly participated in and aided Nathan's breach of fiduciary duty.*

The Lenders are not strangers to Nathan's conduct. The Lenders' role is even more direct because they hold consent rights over Nathan's continued service. Under the Forbearance Agreement and amended governing documents, Nathan may not be removed and replaced before Payment in Full without the Lenders' written consent. Ex. A § 7; Ex. C § 4(a); Ex. D § 6.2(a).

Plaintiffs have repeatedly advised the Lenders that Nathan is obstructing OP financial-record access, Plant access, sale and financing efforts, and Plaintiffs' ability to pursue Payment in Full. Upon information and belief, Nathan has also allowed the $50 million WVEDA loan to mature without any plan for payment, while refusing to disclose OP's cash balances and ability to make any partial payments on the loan. Plaintiffs have also asked the Lenders to consent to Nathan's removal or replacement. The Lenders refused or failed to do so. That refusal, after notice of Nathan's conduct, supports a reasonable inference that the Lenders knowingly tolerate, approve, and benefit from Nathan's obstruction.

The Forbearance Agreement created Nathan's role. The Lenders obtained consent rights and control protections tied to Nathan's appointment and service. Ex. A; Exs. C, D. The Lenders also knew from the March correspondence that QP was complaining that Nathan's conduct is impairing the sale process, obstructing access, and preventing QP from obtaining OP financial information needed to repay debt and preserve value. Exs. B, F, G.

Delaware law recognizes a claim for aiding and abetting breach of fiduciary duty where there is: (1) the existence of a fiduciary relationship; (2) a breach of fiduciary duty; (3) knowing participation in that breach; and (4) damages proximately caused by the breach. *Calumet*, 353 A.3d 88, 114-115. The knowing-participation requirement is demanding, but it is satisfied where the secondary actor has actual knowledge of the fiduciary breach. *In re Columbia Pipeline Group, Inc. Merger Litigation*, 342 A.3d 324 (2025) (holding that "Of course, circumstantial evidence—such as the defendant's possession of documents or presence during relevant conversations—might suffice to establish the defendant's knowledge of the underlying breach, but that knowledge must still be actual.").

The present record demonstrates that the Lenders are aiding and abetting Nathan in breaching his fiduciary obligations. The Lenders insisted on the structure that placed Nathan in the gatekeeper position. They knew QP was complaining that Nathan's conduct was impairing the sale process, obstructing access, and preventing the production of financial information. Exs. B, F, G. They benefited from that obstruction because the less Plaintiffs can do to preserve the Plant, support financing, engage with WVEDA, and pursue Payment in Full, the more leverage the Lenders retain. Most importantly, despite their clear knowledge of Nathan's misconduct, Nathan continues serving as OP and QP independent manager only because the Lenders refuse to consent to his removal.

The Lenders are further aiding and abetting Nathan's misconduct by adding their own obstruction by refusing to provide a payoff letter. Exs. H, I, J. Taken together, Nathan's obstruction and the Lenders' refusal to provide payoff information are not isolated events. They are part of the same value-destroying strategy: run out the clock while denying Plaintiffs the records, access, and payoff information needed to provide Payment in Full and maximize the value of the Plant.

**B. Plaintiffs will suffer irreparable harm without immediate relief.**

Without immediate relief, Plaintiffs face several forms of irreparable harm that cannot be repaired by a later damages award.

First, the approximately $50 million WVEDA Loan has matured, creating a second and independent creditor crisis. QP is the borrower, OP is obligated on the WVEDA note, and the loan matured on June 12, 2026. Ex. A; Exs. I, J. Plaintiffs seek to use the available funding to pay the Lenders in full, immediately tender a partial paydown, and subsequently repay the WVEDA Loan in full. Ex. K.

That requires both categories of information Defendants are withholding. Plaintiffs cannot determine the capital required or close the payoff without the Lenders' payoff figure, OP financial information, Plant access, and closing mechanics. They cannot provide WVEDA with these items in order for it to assess OP's ability to perform and document a restructuring plan to provide for repayment. Every day of delay increases the risk of default consequences, acceleration, enforcement, foreclosure on valuable assets, loss of a consensual WVEDA accommodation, and impairment of the Plant as a going concern. Those consequences cannot be unwound through a later damages award.

Second, the threat of asset disposition is not hypothetical. The Lenders previously served multiple Notices of Disposition of Collateral by Private Sale, stating that broad categories of Plaintiffs' collateral would be sold at private sales on as little as ten days' notice. Ex. A, Recitals & Ex. C thereto. The Forbearance Agreement expressly permits the Lenders to reissue notices of foreclosure or exercise other remedies upon expiration of the Forbearance Period. Ex. A § 3(a). The initial sixty-day Forbearance Period has expired.

The practical effect of the Lenders' position is therefore stark: they are withholding the payoff information necessary to permit Payment in Full while retaining the ability to reissue private-sale notices and proceed against collateral. A private disposition, credit bid, acceptance of collateral, transfer of equity interests, or other enforcement action could alter ownership, control, and operating rights before Plaintiffs receive a fair opportunity to pay the amount demanded. Those transactions could not be readily unwound after the fact.

*Wood* is directly instructive. There, the Supreme Court held that an injunction restraining sale of secured property should remain in place until the amount of the debt was ascertained and the debtor had a fair opportunity to pay it. 99 W. Va. 117, 127 S.E. 917 (1925). The same

equitable problem exists here: the creditor should not be permitted to withhold the amount necessary to satisfy the debt while preserving the ability to dispose of the collateral securing it.

Third, Plaintiffs may lose the time-sensitive opportunity to make Payment in Full. Ms. Chen's affidavit confirms that payoff funding is available, but it cannot be deployed without payoff information, OP financial information, diligence access, and customary closing mechanics. Ex. K. A later damages action will not restore a lost funding opportunity after the window closes.

*Sams* is directly instructive. There, the Supreme Court affirmed mandatory injunctive relief where the purchasers had a lending commitment, needed unencumbered title, and risked losing the financing if relief were delayed. 208 W. Va. at 318-19, 540 S.E.2d at 535-36. The Court recognized that the commitment was "ephemeral" and that a protracted legal remedy might cost the purchasers the financing opportunity. *Id*. Plaintiffs face the same practical problem here. Funding is available, but it cannot be used unless the Lenders provide the payoff amount and closing mechanics.

Fourth, Nathan's withholding of OP financial information and denial of Plant access independently threaten QP's membership, leasehold, and property rights. QP is OP's sole member and the tenant under the Ground Lease. Ex. E. Without OP's financials, bank information, cash position, AP/AR, budgets, projections, director materials, and WVEDA-related information, QP cannot evaluate the company it owns, protect its value, or negotiate with creditors. Denial of access interferes with QP's ability to preserve equipment, technology, vendor relationships, diligence, sale efforts, and financing efforts. Lost access cannot be fully repaired later with money because the lost opportunity to inspect, preserve, maintain, and support diligence will have already passed.

The Plant is a unique West Virginia industrial asset that cannot be replaced in the ordinary market. West Virginia law recognizes irreparable harm where business or property assets face imminent impairment before the merits can be resolved. In *Northeast Natural Energy LLC v. Pachira Energy LLC*, 243 W. Va. 362, 844 S.E.2d 133 (2020), the Supreme Court affirmed injunctive relief protecting business property from threatened misuse and rejected the view that later damages necessarily provided an adequate remedy. The same principle applies here. Plaintiffs should not be forced to watch the WVEDA position deteriorate, collateral be transferred, a funding opportunity expire, or the Plant lose value while the Lenders and Nathan withhold the information and access necessary to prevent those harms.

**C. The balance of hardships favors Plaintiffs.**

The requested relief imposes minimal hardship on Defendants. The Lenders are being asked to provide a payoff letter. That does not reduce their debt, waive defenses, impair liens, or force them to accept less than they contend is owed. It requires them to say what they contend is owed.

Nathan is being asked to provide or cause production of OP financial information and reasonable Plant access within his possession, custody, control, authority, or practical ability. That is not unfair. QP is OP's sole member, has information rights, and is the tenant under the Ground Lease. Exs. C, E.

By contrast, Plaintiffs face serious harm without relief: deterioration of their position on the matured WVEDA Loan, loss of a consensual WVEDA restructuring opportunity, reissuance of private-disposition notices, transfer or impairment of collateral, loss of a payoff opportunity, loss of Plant value, denial of access to leased premises, impairment of technology and equipment, and further obstruction of a transaction that could pay the Lenders in full.

**D. The public interest supports relief.**

The public interest favors enforcement of contracts, repayment of secured obligations, preservation of a major West Virginia industrial assets, protection of the State's approximately $50 million WVEDA credit exposure, and prevention of bad-faith conduct by a gatekeeper charged with preserving value.

The requested order promotes transparency and repayment. It requires the Lenders to provide the information necessary to be paid. It requires Nathan to stop withholding records and access needed to preserve the Plant. It does not approve any sale, financing, related-party transaction, transfer, lien, restructuring, or governance change.

## V. REQUESTED RELIEF

Plaintiffs request a narrowly tailored order preserving the status quo until seven (7) business days after receipt of (1) payoff information, (2) OP financial information, and (3) reasonable Plant access.

First, Plaintiffs request that the Court prohibit the Lenders from exercising contractual remedies until seven (7) business days after delivery of a complete written payoff letter and accounting identifying the amount the Lenders contend is required for Payment in Full, including principal, interest, default interest, fees, expenses, attorneys' fees, per diem interest, wire instructions, letter-of-credit treatment, payoff conditions, and lien-release mechanics.

Second, Plaintiffs request that the Court enjoin Nathan, in his capacity as Independent Manager, from taking any further actions with respect to QP and OP until seven (7) business days after delivery of OP financial information, books and records, director materials, WVEDA-related materials, consultant and financial-advisor materials, and other OP records reasonably

necessary for QP to evaluate OP's financial condition, protect its membership interest, address WVEDA, support Payment in Full, and preserve the Plant.

Third, Plaintiffs request that the Court enjoin Nathan, in his capacity as Independent Manager, from taking any further actions with respect to QP and OP until seven (7) business days after providing Plaintiffs with reasonable access to QP's leased premises and related Plant-access areas, subject to reasonable safety, security, insurance, escort, advance-notice, and noninterference conditions.

Nothing in the requested relief would approve any specific transaction, financing agreement, restructuring, equity issuance, lien, asset transfer, sale transaction, or governance transaction. The relief would preserve the status quo and require only the information and access necessary for Plaintiffs to pursue Payment in Full and protect the Plant while the Court sets an expedited preliminary-injunction hearing.

## VI. SECURITY

Plaintiffs request that the Court require no bond or only a nominal bond. The requested order preserves the status quo, requires the Lenders to provide payoff information necessary for them to be paid, and requires Nathan to provide or cause production of information and access that QP is entitled to receive. The relief does not reduce any debt, approve any transaction, transfer any asset, impair any lien, or require the Lenders to accept less than they contend is owed. To the extent the Court requires security under Rule 65(c), Plaintiffs request that the amount be set narrowly and proportionately to the limited relief requested.

## VII. RULE 65 NOTICE CERTIFICATION

Pursuant to Rule 65(b)(1) of the West Virginia Rules of Civil Procedure, undersigned counsel certifies that he has attempted to provide actual notice of this Motion and the relief

requested herein to Defendants by transmitting copies of the Verified Complaint, Preliminary Injunction Motion, and supporting exhibits via email to the attorneys believed to be representing the Defendants in this matter. The undersigned further certifies that, based upon the verified complaint and supporting declarations, the Court should issue a temporary restraining order immediately and without notice in order to preserve the status quo and avoid the irreparable injury and harm detailed herein.

## VIII. CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant this motion and issue a temporary restraining order and preliminary injunction preserving the status quo until seven (7) business days after the Lenders deliver a complete payoff letter and accounting, and Nathan provides financial information and reasonable access to QP's leased premises and related Plant-access areas. Plaintiffs further request that the Court set an expedited preliminary-injunction hearing, and grant such other relief as the Court deems just and proper.

Respectfully submitted,

**OMNIS GLOBAL TECHNOLOGIES, LLC,**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC**

By Counsel

/s/ *Isaac R. Forman*
Isaac R. Forman (WV State Bar No. 11668)
Andrew J. Tessman (WV State Bar No. 13734)
Levi B. Pellegrin (WV State Bar No. 13669)
HISSAM FORMAN DONOVAN RITCHIE, PLLC
P.O. Box 3983
Charleston, WV 25339
681 - 265 - 3802 *office*
304 – 982 – 8056 *fax*
iforman@hfdrlaw.com
atessman@hfdrlaw.com
lpellegrin@hfdrlaw.com