# EXHIBIT 18

HISSAM FORMAN DONOVAN RITCHIE PLLC

Isaac R. Forman
iforman@hfdrlaw.com
P.O. Box 3983
Charleston, WV 25339

July 20, 2026

*Via Email*

Gilbert Nathan
gil@jacksonsquareadvisors.com

David Hindman
dhindman@alixpartners.com

**Re: Immediate Removal, Turnover of Control, Preservation of Records, and Transition of Omnis Pleasants, LLC**

Gentlemen:

We represent Quantum Pleasants, LLC ("QP"), the sole member and 100% owner of Omnis Pleasants, LLC ("OP"), as well as the other Omnis parties, including Omnis Fuel Technologies ("OFT"), QP's sole Class A member.

As you know, the Omnis parties have tendered Payment in Full of the obligations asserted by TRAG LLC and RG Energy LLC. Despite repeated requests, TRAG and RGE have inexplicably refused to provide or confirm the amount they contend is necessary to accomplish Payment in Full. They cannot refuse to state the amount due and then rely on the uncertainty created by that refusal to prevent satisfaction of the obligations or perpetuate their temporary governance rights.

In the absence of a payoff statement, the Omnis parties calculated their tender using the amount stated by TRAG and RGE in their own recently proposed restructuring term sheet. That term sheet represents that the aggregate outstanding amount of all obligations under the existing TRAG/RGE loan agreements is $75,640,000. The Omnis parties believe that figure materially overstates the amount properly due, but nevertheless relied upon it to ensure that their tender was more than sufficient to satisfy all legitimate obligations. The tender was made subject to a full accounting and without waiving the right to recover any excess amount, dispute unsupported interest, fees, costs, or expenses, or challenge TRAG's and RGE's continuing refusal to provide a proper payoff statement.

Nathan has asserted that the source or structure of the tender constitutes a prohibited related-party transaction. That assertion is incorrect. The Omnis parties dispute both the factual premise that the transaction is a prohibited related-party transaction and the legal premise that any general restriction on affiliate or related-party transactions can be used to prevent Payment in Full.

The Forbearance Agreement expressly provides that "nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations." It separately permits transactions resulting in Payment in Full. Those specific provisions cannot be displaced by a generalized characterization of the funding source as affiliated or related.

In any event, Nathan has no authority to use a disputed related-party characterization as a basis to reject or obstruct Payment in Full, perpetuate the temporary lender-control structure, or continue exercising authority over OP after the obligations have been satisfied. Any objection concerning the separate terms between the Omnis parties and their funding source is reserved for the appropriate parties and forum; it does not permit TRAG, RGE, or Nathan to refuse payment of the debt.

The Omnis parties' tender constitutes Payment in Full. TRAG's and RGE's refusal to accept the funds does not permit them, or persons appointed as part of their temporary forbearance arrangement, to preserve governance and control rights that terminated upon Payment in Full. Section 11(b) of the Amended and Restated Forbearance Agreement expressly provides that Payment in Full "shall terminate this Agreement and the Loan Agreements." Accordingly, the Forbearance Agreement and the temporary restrictions and lender-consent rights imposed through it are no longer operative.

Accordingly, effective upon receipt of this letter and as of July 20, 2026, QP is resuming full governance and operational control of OP and the Pleasants Power Station. OP and the Plant shall be turned over immediately to QP and its authorized representative in accordance with the directions below.

**I. Immediate Removal of Gilbert Nathan from OP**

QP hereby removes Gilbert Nathan, with immediate effect, as the Independent Manager and sole Director of OP.

The amendment to OP's Operating Agreement provides that QP may elect, remove, and replace the Independent Manager by written consent and requires the Lenders' consent only until Payment in Full of the obligations. Because the Omnis parties have tendered Payment in Full and the Forbearance Agreement has terminated, no consent from TRAG or RG Energy is required for Nathan's removal.

This removal applies immediately and unequivocally to Nathan's positions with OP. This letter does not, at this time, remove Nathan from any position he may continue to hold with QP. QP expressly reserves the right to take further action concerning Nathan's role at QP after he has completed the turnover and disclosure obligations described below.

Effective upon receipt of this letter, Nathan:

1. has no authority to act, speak, negotiate, approve, reject, direct, bind, or make decisions on behalf of OP;

2. shall cease holding himself out as OP's Independent Manager, Director, representative, fiduciary, or authorized decision-maker;
3. shall not communicate with any employee, vendor, creditor, governmental entity, purchaser, financing source, or other third party as a representative of OP, except as specifically authorized in writing by QP or its counsel for purposes of completing the transition;
4. shall not access OP bank accounts, electronic systems, data rooms, email accounts, records, facilities, or other property;
5. shall not enter or return to the Plant or any OP premises without the prior written authorization of Charles Gassenheimer or counsel for QP; and

Any action taken by Nathan after receipt of this letter that purports to bind OP or exercise authority on OP's behalf will be unauthorized.

**II. Appointment of Charles Gassenheimer**

Effective July 20, 2026, QP has appointed Charles Gassenheimer to serve as OP's interim Director and authorized representative.

Mr. Gassenheimer will exercise governance oversight and direct the transition of OP and the Plant pending QP's completion of discussions with the West Virginia Economic Development Authority ("WVEDA") concerning the selection and appointment of a more permanent independent manager.

All OP officers, employees, contractors, advisors, and service providers shall take direction from Mr. Gassenheimer or another person designated by QP in writing.

**III. Immediate Turnover of OP Property and Information**

Nathan must immediately turn over to QP all OP property, documents, information, and materials in his possession, custody, or control. His removal does not relieve him of his continuing fiduciary, contractual, preservation, and transition obligations to OP and QP.

Within twenty-four hours after receipt of this letter, Nathan shall provide QP and its counsel with:

1. all OP books and records;
2. all financial statements, general ledgers, trial balances, bank statements, account reconciliations, cash reports, accounts-payable reports, accounts-receivable reports, budgets, forecasts, and financial models;
3. all current and historical cash-flow projections, including any rolling thirteen-week cash-flow forecasts;
4. all capital-expenditure plans, capital-improvement plans, maintenance schedules, outage plans, repair estimates, operating reports, and assessments of the Plant's condition;
5. all board materials, written consents, resolutions, meeting notices, minutes, presentations, analyses, and materials concerning material OP decisions;

6. all contracts, leases, vendor agreements, consulting agreements, engagement letters, insurance materials, regulatory materials, tax materials, permits, correspondence, and notices relating to OP or the Plant;
7. all communications and documents concerning WVEDA and the WVEDA Loan;
8. all communications and documents exchanged with Cardinal, or any other actual or potential purchaser, bidder, investor, lender, financing source, advisor, broker, or diligence representative;
9. all communications and documents exchanged with TRAG, RG Energy, Tony Robbins, their counsel, their representatives, or any prospective purchaser or financing source introduced or supported by them;
10. all letters of intent, indications of interest, term sheets, offers, bids, proofs of funds, diligence requests, transaction documents, and drafts relating to any proposed sale, financing, restructuring, refinancing, foreclosure, disposition, or other transaction involving OP or the Plant;
11. all communications concerning any proposed restructuring term sheet, including the restructuring proposal recently circulated by TRAG;
12. all passwords, credentials, keys, access cards, security tokens, multifactor-authentication devices, bank tokens, and other means of access to OP property, records, accounts, or systems; and
13. all other information reasonably necessary for QP and Mr. Gassenheimer to assume control of OP without interruption.

This obligation includes materials located on personal accounts or devices to the extent they concern OP business, as well as communications with counsel where OP is the client or holder of the applicable privilege.

If Nathan possesses any OP-owned telephone, computer, tablet, external drive, storage device, security token, or other electronic equipment, he must return the device intact and unaltered within twenty-four hours. Nathan shall not delete, alter, transfer, wipe, reset, encrypt, or remove any information from any company-owned device before returning it.

Nathan must also identify any OP information stored on a non-company device, personal account, cloud account, messaging application, or other location and cooperate in preserving and transferring that information.

**IV. Standstill on Extraordinary Actions**

Effective immediately, neither Nathan nor Hindman, AP Services, AlixPartners, Jackson Square Advisors, or anyone acting at their direction may take, authorize, approve, recommend, negotiate, or implement any action outside the ordinary course of OP's safe, routine, and continuing operation without QP's prior written approval through Mr. Gassenheimer or counsel.

Prohibited actions include, without limitation:

1. negotiating, approving, executing, or implementing TRAG's proposed restructuring term sheet or any similar restructuring;

2. pursuing, negotiating, approving, or consummating any sale, transfer, foreclosure, private disposition, public disposition, acceptance of collateral, or other disposition of OP, the Plant, or any material asset;
3. entering into or modifying any financing, refinancing, credit facility, guaranty, lien, mortgage, deed of trust, security agreement, intercreditor agreement, or pledge;
4. incurring indebtedness outside the ordinary course;
5. transferring, encumbering, impairing, or disposing of any OP asset;
6. amending any operating agreement, organizational document, governance arrangement, or delegation of authority;
7. entering into, amending, terminating, or waiving any material contract;
8. hiring or terminating senior personnel, consultants, professionals, or advisors;
9. making extraordinary expenditures, distributions, transfers, or payments;
10. initiating or consenting to any bankruptcy, insolvency, receivership, restructuring, or similar proceeding; or
11. communicating any purported approval, rejection, recommendation, or commitment to a prospective purchaser, financing source, creditor, governmental entity, or other transaction participant.

Nothing in this directive is intended to interrupt safe Plant operations. Ordinary payroll, routine vendor payments, regulatory compliance, ordinary maintenance, safety measures, and other recurring operating matters may continue, subject to Mr. Gassenheimer's oversight.

**V. Hindman and AlixPartners Transition**

QP presently directs David Hindman to remain available for a limited transition period. During that period, Hindman shall continue only those ordinary-course operational functions necessary to maintain safe and uninterrupted Plant operations and shall not make any decision outside the ordinary course without Mr. Gassenheimer's prior written approval.

Hindman shall provide QP and Mr. Gassenheimer with a complete management and financial transition briefing within two business days after receipt of this letter. That briefing shall include, at minimum:

1. current cash balances and all bank accounts;
2. current accounts payable and accounts receivable;
3. the most recent rolling thirteen-week cash-flow forecast;
4. current and projected operating results;
5. current operating and capital budgets;
6. required and proposed capital improvements;
7. deferred maintenance, repair, outage, and reliability issues;
8. current and anticipated vendor obligations;
9. current employee and contractor matters;
10. regulatory, environmental, insurance, and compliance matters;
11. the status of all material contracts and negotiations;
12. the status of all discussions with WVEDA, TRAG, RG Energy, and other creditors;
13. the status of all sale, financing, and diligence processes; and

14. any material issue that QP should know to operate, finance, preserve, or sell OP and the Plant.

Following completion of that transition, QP anticipates terminating Hindman's services and the engagement of AP Services and AlixPartners, except to the extent QP determines that a narrowly defined role is useful for verifying historical figures, supporting buyer diligence, answering specific accounting or operational questions, or completing identified transition items.

Until QP provides further written direction, neither Hindman nor AlixPartners is authorized to expand the scope of its work, incur new professional fees outside the ordinary course, negotiate a transaction, or undertake any new project.

**VI. NRG Energy Due Diligence**

NRG Energy is presently evaluating a potential acquisition transaction involving the Plant and/or QP's ownership interest in OP.

Nathan and Hindman must fully cooperate with that diligence process as directed by QP and Mr. Gassenheimer. That cooperation includes promptly:

1. producing requested financial, operational, environmental, technical, maintenance, contractual, and regulatory information;
2. providing complete and accurate responses to diligence inquiries;
3. identifying and producing previously requested materials;
4. facilitating reasonable site access, inspections, management calls, and meetings;
5. making appropriate Plant personnel and subject-matter experts available; and
6. disclosing any prior communications, submissions, representations, or materials provided to NRG Energy.

Nathan shall not communicate with NRG Energy as an OP representative after receipt of this letter unless specifically requested by QP for purposes of transferring historical information. Hindman shall coordinate all further NRG Energy diligence through Mr. Gassenheimer and QP's counsel.

The foregoing cooperation and noninterference obligations apply equally to any other prospective purchaser, investor, or transaction participant with whom QP is presently negotiating, or may negotiate, regarding a potential sale of OP, the Plant, QP's ownership interest in OP, or any material Plant-related assets. Nathan, Hindman, and their respective representatives shall promptly facilitate reasonable diligence requested by any such party when directed by QP or Mr. Gassenheimer and shall not obstruct, delay, condition, or independently control those diligence efforts.

**VII. WVEDA Forbearance and Security Documentation**

WVEDA has offered to provide OP and the applicable Omnis parties with a ninety-day forbearance period. QP and WVEDA are presently working to prepare and finalize documents memorializing that arrangement.

As part of its proposal, WVEDA has requested a deed of trust encumbering the relevant real estate and the Pleasants Power Station as security for the WVEDA obligations. QP is working with WVEDA to document an arrangement that protects WVEDA's position, preserves the Plant, and permits an orderly sale or financing process.

Nathan, Hindman, AlixPartners, and their representatives shall not interfere with, delay, contradict, or independently negotiate the WVEDA arrangement. They shall promptly provide QP with all information and documents needed to evaluate, document, and close the proposed WVEDA forbearance and security arrangement.

No deed of trust, lien, security agreement, amendment, forbearance agreement, or related document may be executed or approved on behalf of OP except by QP's authorized representative and in accordance with QP's written direction.

**VIII. Preservation and Confirmation**

Nathan and Hindman must preserve all documents and electronically stored information relating to OP, QP, the Plant, WVEDA, TRAG, RG Energy, prospective purchasers, financing sources, restructuring proposals, diligence, and the matters addressed in this letter. No such information may be deleted, altered, overwritten, destroyed, transferred, concealed, or rendered inaccessible.

Nathan and Hindman are expected to comply fully and immediately with the directives set forth above. Any action taken by either Nathan or Hindman after receipt of this letter in purported reliance on authority he no longer possesses—including any attempt to bind OP, interfere with OP's operations or property, obstruct the transition of control, withhold company materials, impede buyer diligence, or proceed with any restructuring or extraordinary transaction—will be undertaken at his own risk.

If Nathan or Hindman receives any instruction, direction, request, or communication from TRAG, RG Energy, or anyone acting on their behalf that is inconsistent with this letter or purports to authorize him to disregard, delay, or avoid any directive stated herein, he shall disregard that instruction and notify QP and its counsel immediately. TRAG and RG Energy have no authority to countermand QP's directives concerning OP following Payment in Full, and Nathan and Hindman may not rely on any contrary instruction as a basis for continuing to act on behalf of OP or withholding OP property or information.

Failure to comply is likely to subject Nathan or Hindman, as applicable, to personal liability for any resulting loss or damage, including liability arising from breach of fiduciary duty, conversion or wrongful retention of company property, interference with contractual or

prospective business relationships, spoliation or destruction of evidence, and any other applicable claim or remedy. QP and OP will seek all available legal and equitable relief, including injunctive relief, damages, attorneys' fees where recoverable, and an accounting of any actions taken or expenditures incurred without authority.

Nothing in this letter waives any claim, defense, right, privilege, remedy, or position of QP, OP, or any other Omnis party. All rights are expressly reserved.

Sincerely,

*/s/ Isaac R. Forman*
Isaac R. Forman

cc:
Nick Preservati; nicholas.s.preservati@wv.gov
Alexander Woolverton; alexander.woolverton@hsfkramer.com
Kristine Manoukian; kmanoukian@mcdermottlaw.com