# EXHIBIT 19

West Virginia E-Filing Notice

CC-37-2026-C-14

Judge: Timothy L. Sweeney

**To:** Isaac Ralston Forman
iforman@hfdrlaw.com

# NOTICE OF FILING

IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA
Omnis Global Technologies, LLC v. TRAG LLC
CC-37-2026-C-14

The following motion was FILED on 7/21/2026 6:52:11 PM

Notice Date: 7/21/2026 6:52:11 PM

Millie Farnsworth
CLERK OF THE CIRCUIT COURT
Pleasants County
301 Court Lane Room 201
ST MARYS, WV 26170

(304) 684-3513
Millie.Farnsworth@courtswv.gov

E-FILED | 7/21/2026 6:52 PM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC,**
**OMNIS FUEL TECHNOLOGIES, LLC, and**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs/Counterclaim-Defendants,**

**v.**

**Civil Action No. CC-37-2026-C-14**
Judge Timothy L. Sweeney

**TRAG LLC, RG ENERGY LLC, and**
**GILBERT NATHAN,**

**Defendants/Counterclaim-Plaintiffs.**

---

**TRAG LLC's AND RG ENERGY LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND FOR EXPEDITED HEARING**

Counterclaim-Plaintiffs/Defendants TRAG LLC and RG Energy LLC (collectively, the "Lenders"), by and through their undersigned counsel, respectfully submit this Motion for Temporary Restraining Order and Preliminary Injunction and for Expedited Hearing (the "Motion") against Counterclaim-Defendants/Plaintiffs Omnis Global Technologies, LLC ("OGT"), Omnis Fuel Technologies, LLC ("OFT"), and Quantum Pleasants, LLC ("QP") (collectively, the "Omnis Parties") and state as follows:

**INTRODUCTION**

The Omnis Parties, led by Simon Hodson, are in default and owe the Lenders more than **$79 million** under various loan agreements (the "Loan Agreements"). Besides their admitted default on the Loan Agreements, the Omnis Parties have also engaged in a pattern of bad faith conduct, including but not limited to:

- diverting millions worth of WVEDA loan proceeds, that were supposed to be exclusively used to fund the Pleasants Power Station in Belmont, West Virginia (the "Power Plant"), to fund personal charges including chartered airplanes and restaurant meals, and other improper charges like university donations and payments to Omnis Hydrogen Advisory Board members (Counterclaim, ¶ 30, Exs. 12-13)[1];
- purposefully concealing self-dealing transactions (Counterclaim, ¶¶ 30-35, Ex. 13);
- diverting Lender funds provided under the Loan Agreements to unknown sources, or otherwise intentionally breaching exclusive-use provisions under the Loan Agreements (Counterclaim, ¶¶ 37-40, Exs. 23-24);
- refusing to provide the Lenders with documentation to evidence that the funds provided under the Loan Agreements were used within the parameters of those Agreements[2] (Counterclaim, ¶¶ 37-38);
- concealing the true nature of a proposed sales transaction from the Lenders, despite the Lenders' right to jointly engage in any such process (Counterclaim, ¶¶ 2, 5, 45-56); and
- engaging in conduct, prior to the appointment of the independent fiduciaries, that gave rise to a pending FERC investigation (Counterclaim, ¶ 57).

This pattern of bad faith behavior culminated in the Omnis Parties' most recent offense. Since this Court determined that the Omnis Parties had "made an insufficient showing that a Temporary Restraining Order or other preliminary injunctive relief are necessary to preserve the status quo," the Omnis Parties have attempted to cover up their transgressions through a convoluted and improper attempt to pay off the Lenders and remove the independent fiduciaries who were put in place given the Omnis Parties' default under the Loan Agreements.

Specifically, the Omnis Parties have (i) overnighted an uncertified personal check for $75,640,000 (the "Check") (Ex. 2), made out to TRAG LLC alone—omitting RG Energy LLC entirely—in an amount the Omnis Parties knew fell far short of the sum actually due (the "Proposed Transaction"); (ii) refused to provide the requisite information needed to ensure the

[1] Pin cites to the exhibits refer to the pagination of the PDF.

[2] Additionally, as alleged in the Lenders' corresponding Counterclaim, the Lenders have reason to believe that the Omnis Parties defaulted earlier in time than is currently known—which directly affects calculating default interest pursuant to the Loan Agreements. The Lenders have requested documentation to confirm whether such earlier default took place. The Omnis Parties have refused to provide that documentation.

Proposed Transaction is proper; and (iii) attempted to remove Gilbert Nathan as the Independent Manager of OP, citing the Check as reasoning to permit OP to "resume[] full governance and operational control of OP and the Pleasants Power Station." (Ex. 3, at 3.)

The Omnis Parties' conduct is improper and violates the Amended and Restated Forbearance Agreement dated February 6, 2026 (the "Forbearance Agreement" or "FA") (Ex. 1.) In exchange for the Lenders' agreement to stand down from exercising remedies following the Omnis Parties' breach of the Loan Agreements, the Omnis Parties agreed to a structured process designed to preserve and maximize the value of the Power Plant. The Forbearance Agreement installed independent governance, placed Gilbert Nathan and David Hindman in roles necessary to manage the Plant and the sale process, required transparency and cooperation in that process, and gave the Lenders and the Independent Manager bargained-for consent and approval rights over sales, related-party transactions, and capital raises. The Omnis Parties now attempt to thwart the very terms they agreed to.

*First*, the Forbearance Agreement requires that any "Payment in Full" be "indefeasible." (FA ¶ 2a.) The Check does not come close to meeting that definition. Specifically, the tender was made without providing the Lenders with payoff verification, transaction disclosures, compliance due diligence information, or prior-default/interest information, all of which the Lenders have *repeatedly* asked for and are contractually and legally entitled to review. Most worrisome, the Check, as demonstrated by an affidavit submitted to this Court by the Omnis Parties, is made out indirectly by Angela Chen—an individual known to have a relationship and investiture with the Omnis Parties—making the Proposed Transaction a "related-party transaction," which is explicitly prohibited in the Forbearance Agreement without the Independent Manager's express approval. FA ¶ 7. That approval has not been obtained. In fact, on July 20, the Independent Manager

explicitly stated to the Omnis Parties: "To be clear, I do not approve, and this [Proposed] [T]ransaction isn't valid." (Ex. 4, at 2.) In rejecting the Proposed Transaction, Nathan was acting squarely within the authority the Forbearance Agreement vests in him as Independent Manager, which expressly requires his approval before any related-party transaction involving QP and its members or affiliates, or any sale or disposal of QP's or OP's assets, including the Power Plant. (FA ¶ 7.) That approval right was not a formality—it was one of the significant control protections the Lenders obtained in exchange for forbearing from their remedies numerous times against a borrower group already under federal investigation and subject to adverse state findings of self-dealing and material misrepresentation.

*Second*, the Forbearance Agreement appointed Nathan to serve as an Independent Manager—serving as an independent check and someone with no stake in the Omnis Parties' self-dealing—who was required to act in good faith and with the primary objective of maximizing the value of the Power Plant. The Omnis Parties unilateral attempt to remove Nathan—after he refused to kowtow to the Omnis Parties' bad faith conduct and refused to approve of the improper Proposed Transaction—guts that bargained-for protection at the precise moment it matters most.[3]

The Lenders are thus forced to seek this Court's intervention and an Order:

(i) preserving the *status quo* pending further order of the Court, which shall mean (a) prohibiting the release or application of any tendered funds absent a subsequent order of this Court affirmatively finding the Proposed Transaction to be a conforming Payment in Full under the Forbearance Agreement, and (b) holding the Forbearance Agreement in place, and maintaining the parties' existing contractual rights, collateral positions, and Independent Manager and Lender consent/approval rights; (ii) maintaining Gilbert Nathan as the Independent Manager of OP; (iii)

---

[3] The Lenders are concerned that the Omnis Parties are concealing information from various investigations.

directing that the Check (and any supplemental check or wire transfer) be deposited and held in escrow by the Court, pending further order of this Court; (iv) prohibiting the Omnis Parties from asserting or claiming that the Loan Agreements have been paid in full; and (v) setting the matter for an expedited hearing.

A brief escrow of the tendered funds—preserving the Omnis Parties' ability to ultimately pay while protecting the Lenders from the irreversible consequences of accepting non-conforming, non-diligenced, or unlawful funds—is the quintessential *status quo* relief that courts routinely grant. The Lenders respectfully request that relief here.

## FACTUAL BACKGROUND

### A. TRAG and RG Energy Loan Approximately $135 Million to the Omnis Parties to Acquire and Operationalize the Power Plant

In 2023, TRAG and RG Energy extended a series of loans to the Omnis Parties to finance the acquisition and operation of the Power Plant. After conducting their due diligence—and relying on Mr. Hodson's representations about the financial stability of the relevant entities—TRAG and RG Energy invested millions of dollars with Mr. Hodson. The first tranche included a loan for $22.5 million from TRAG, dated May 26, 2023, which was later increased to $26.5 million (Ex. 5; Ex. 6), and a $12.15 million facility from RG Energy dated June 2, 2023, which was later increased to $27.25 million (Ex. 7; Ex. 8.) The second tranche provided a $75 million facility from TRAG dated November 8, 2023. The third tranche was a $4.7 million facility from TRAG dated January 14, 2025 (Ex. 9) and a $1.35 million Promissory Note issued in connection with the January 2025 Loan and Security Agreement, dated March 31, 2025 (Ex. 10).

### B. WVEDA Loans QP $50 Million to Fund the Pleasants County Power Station

In December 2023, the West Virginia Economic Development Authority ("WVEDA" or the "State")—a state authority tasked with fostering economic development for the citizens of

West Virginia—extended a $50 million loan to QP (the "WVEDA Loan") (Ex. 11) to help fund a portion of the costs of the "Project," defined as the acquisition of property adjacent to the Pleasants County Power Station (the "Project Property"), the purchase and installation of machinery, equipment, and other physical assets (the "Project Equipment"), and the employment and training of additional employees who will operate those facilities as part of the broader effort to convert the aging Power Plant from a coal-fired plant into a facility capable of generating electricity from hydrogen fuel.

The stated goal of the WVEDA Loan was to "deliver clean hydrogen power for the generation of low-carbon electrical energy and to produce graphite and/or graphene and other products as a by-product of that process." (Ex. 11, at 4.) In agreeing to disburse these public funds, WVEDA relied on the Omnis Parties' affirmative covenant that all loan proceeds would be used exclusively for the expenses of constructing and developing the Project, and expended in a manner consistent with the budget submitted by the Omnis Parties—a promise that underpinned WVEDA's decision to invest tens of millions of taxpayer dollars in the venture. (*Id.*, at 5, 19.) As described in detail below, *infra* D, G(2), the Omnis Parties failed to honor many of their core obligations under the WVEDA Loan.

**C. The Omnis Parties Default on the WVEDA Loan**

In March 2025, WVEDA notified the Omnis Parties that they were in default on the WVEDA Loan for, among other things, failing to purchase required real property, failing to continuously pursue federal funding, failing to maintain required loan accounts, failing to use loan proceeds solely for their intended purpose, and failing to operate the Power Plant in the ordinary course of business. (Ex. 12.) By July and August 2025, WVEDA had identified additional defaults—including material misrepresentations regarding the location of Project Equipment and

undisclosed related-party dealings—and declared all amounts disbursed under the WVEDA Loan immediately due and payable. (Ex. 13; Ex. 14.)

**D. The Omnis Parties Default on the Loan Agreements**

The Omnis Parties' default on the WVEDA Loan was not an isolated occurrence. It mirrored a substantially similar pattern of default under the TRAG and RG Loan Agreements. Indeed, the Omnis Parties have since failed to pay back much of the money due under the Loan Agreements and are therefore in default. By the time the Omnis Parties received the additional $4.7 million loan from TRAG in January 2025, the original TRAG and RG Energy loans—each due and payable months earlier—remained unpaid. (Ex. 5; Ex. 7.) The Omnis Parties nonetheless continued to draw on additional credit while representing that they would be able to abide by their existing obligations. (Ex. 9, §§ 3.2, 5.2, 5.6, 6.5.) They did not.

On October 1, 2025, both TRAG and RG Energy issued Notices of Default and Reservation of Rights, identifying, among other things, a Payment Default under Section 8.1 of the respective Loan Agreements arising from the Omnis Parties' failure to pay the Obligations as and when due, and expressly reserving "all of Lender's remedies, powers, rights or privileges," including as to "all defaults, whether now existing or hereafter arising, and whether known or unknown." (Ex. 15, at 3; Ex. 16, at 3; Ex. 17, at 3.) On October 21, 2025, the Lenders followed with Notices of Disposition of Collateral by Private Sale. (Ex. 19.)

**E. The Parties Enter into a Forbearance Agreement**

Despite the Omnis Parties' defaults under the Loan Agreements, the Lenders agreed—not once, but twice—to forbear from exercising their remedies while the parties pursued a resolution. The parties first entered into a forbearance agreement on October 22, 2025, which itself terminated as a result of a breach by the Omnis Parties. (FA, Recitals.) Notwithstanding that breach, the

Lenders agreed to the Forbearance Agreement, stating that the aggregate principal balance outstanding was not less than approximately $58.9 million, with accrued interest, fees, and expenses bringing the total obligation to approximately $75.5 million, as of February 3, 2026—nearly five months from the date of this filing. (FA ¶ 4(b).)

In exchange for this forbearance, the Omnis Parties agreed to a comprehensive set of governance and control protections benefiting the Lenders: the appointment of an Independent Manager with "approval rights" over related-party transactions and asset sales, among other things; a "Joint Sale Process" requiring a "Bona Fide Offer" and Lender prior written approval before any sale of OP or the Power Plant could be promised or pledged; and negative covenants prohibiting the Omnis Parties from raising capital or incurring indebtedness without Lender consent and entering into related-party transactions without Independent Manager consent. (FA ¶¶ 4(a), 4(b), 7, 8, 8(b), 8(c), 11, 11(a), 11(d), 11(g).)

These were not gratuitous protections. They were the price the Lenders extracted, and the Omnis Parties agreed to pay, for continued forbearance in the face of a continuing, uncured default by a borrower group already under federal investigation and subject to adverse state findings of self-dealing and material misrepresentation in connection with the separate WVEDA Loan for $50 million for the same Project. (Ex. 13.) Indeed, in their pre-litigation correspondence, the Lenders explained that the Forbearance Agreement "was negotiated in the context of significant enterprise risk, including ongoing governmental investigations and near-term obligations to governmental creditors." (Ex. 20, at 2; Ex. 21, at 3.) This risk is not the Lenders' invention—it is the direct result of the Omnis Parties' own conduct.

### F. The Omnis Parties Breach the Forbearance Agreement

Rather than honoring these bargained-for protections, the Omnis Parties spent the weeks preceding this litigation pursuing an undisclosed transaction with a third party, Javelin, while representing to the Lenders that it was merely an ordinary "OFT-level" refinancing not requiring Lender consent. (Ex. 20, at 2; Ex. 22.) The Lenders learned the true nature of the proposed transaction only because Javelin itself contacted them directly. (Ex. 21, at 2.)

On April 30, 2026, and again on May 4, 2026, the Lenders' counsel formally notified the Omnis Parties' counsel that the "Proposed Javelin Transaction," taken as a whole, was "an integrated, multi-step arrangement" that would confer on Javelin "all the benefits of having purchased the Power Plant"—including a $6 million annual fee, a 75% cash sweep, and conveyance of governance rights—in violation of the Forbearance Agreement's consent and sale process provisions. (Ex. 20 at 1; Ex. 21; FA ¶¶ 8(b-c), 11(d).) Indeed, the Forbearance Agreement expressly prohibits the Omnis Parties from entering into any agreement with any affiliate or related party without the approval of the Independent Manager (FA ¶ 11(g)), and from entering into any transaction to sell, transfer, or assign material assets without Lender consent (FA ¶ 11(d)). Counsel further advised that the Omnis Parties' repeated refusal to produce the underlying transaction documents and funding-source information the Lenders had been requesting for weeks left the Lenders no choice but to treat the transaction as prohibited. (Ex. 20, at 3; Ex. 21, at 3.)

### G. Simon Hodson's Conduct and Credibility Are Central to This Dispute

Simon Hodson, the Omnis Parties' Chief Executive Officer and the principal driving force behind the transactions at issue in this litigation, is not a disinterested, or removed, bystander. His credibility is squarely at issue in this dispute.

### 1. WVEDA Has Documented Mr. Hodson's False Statements and Self-Dealing Transactions

The State of West Virginia, through WVEDA and the Department of Commerce, has made pointed, documented findings that Mr. Hodson engaged in self-dealing and provided false information in connection with the WVEDA Loan. (Ex. 13, at 8-9.) These findings demonstrate a pattern of misrepresentation and misuse of loan proceeds by Mr. Hodson. Specifically, the Omnis Parties failed to purchase the property adjacent to the Pleasants Power Station as promised, misrepresented the location of the Project Equipment securing WVEDA's lien, and diverted loan proceeds to uses far outside the Project's intended scope—including, among other things, for donations to multiple universities, compensation to Omnis Hydrogen Advisory board members, and personal charges like chartered airplanes, restaurant meals, and charitable donations. (Ex. 12, at 3-4; Ex. 13, at 2-7.)

Such conduct prompted WVEDA to issue formal notices of default, which, among other things, also documented a web of self-dealing transactions involving StarSource, LLC ("StarSource")—an entity whose ownership Mr. Hodson claimed not to know, despite he and his family together owning 100% of StarSource and, according to WVEDA, serving as its CEO and personally executing the very agreements that funneled millions of dollars to it. (Ex. 13, at 2-7; Ex. 23, at 3.) StarSource had an outsized and concealed role in the Project, which WVEDA uncovered only after repeated inquiry. For example, WVEDA's July 2, 2025, Notice of Default identified that StarSource charged $75 million in fees to Industrial Accessories Company, "the general contractor of the Project." (Ex. 13, at 9-10.) Per WVEDA, StarSource had also received approximately $37 million in payments related to the quantum reformers. Despite StarSource charging for and receiving this volume of funds for Project-related expenses—an amount larger than the total amount WVEDA had agreed to provision to QP—StarSource was conspicuously

omitted from the list of entities involved in the quantum reformers that WVEDA had specifically requested from the Omnis Parties. (Ex. 13, at 9-10.)

When directly asked about charges associated with the quantum reformers, Mr. Hodson told WVEDA in March 2025 that "Omnis didn't keep this detail as all work was done by others." (Ex. 13, at 7.) Then, when WVEDA representatives directly asked Mr. Hodson about who StarSource was and what its role was in the Project, in person weeks later, Mr. Hodson responded that StarSource's involvement was "limited" and that it "just helped source items from China." (Ex. 13, at 8.) When pressed on if he knew who owned the company, Mr. Hodson, according to WVEDA's account, "became agitated" and initially said the information "was not important," before ultimately stating that he "did not know who the owners of StarSource were"—despite he and his family together owning 100% of StarSource. (Ex. 13, at 8; Ex. 23, at 3.) Per documents provided by the Omnis Parties to the Lenders, approximately $30 million in WVEDA funds was funneled to StarSource. (Ex. 23, at 10-11.)

Mr. Hodson's own statements to state officials reflect a similarly cavalier attitude toward compliance obligations. When representatives of the State questioned him about the use of loan proceeds, Mr. Hodson responded, "so what... it doesn't matter how we spend the money as long as we pay you back," and when asked whether it would be acceptable to spend the State's funds on prostitution, drugs, and alcohol so long as the WVEDA Loan was repaid, Mr. Hodson did not acknowledge that such use of funds would be improper, and instead simply said "we didn't do that." (Ex. 14, at 5.) The State "vehemently reject[ed] Mr. Hodson's belief that he can spend the [WVEDA] Loan proceeds however he wishes as long as the funds are repaid." *Id.*

WVEDA characterized Mr. Hodson's concealment of StarSource's role and his misrepresentations regarding StarSource's ownership as "purposeful concealment of self-dealing"

and the provision of false information constituting fraudulent acts meant to deceive the State, in violation of the WVEDA Loan agreement's Events of Default provisions barring fraudulent conduct intended to deceive WVEDA. (Ex. 13, at 9; Ex. 11, §§ H.3–H.4.). On August 1, 2025, after finding the Omnis Parties' cure-period responses insufficient, WVEDA declared all disbursements made under the WVEDA Loan immediately due and payable. (Ex. 14, at 10.)

**2. The Lenders Do Not Have a Clear Accounting of the Use of Loan Proceeds**

The Lenders have found the same pattern of evidence of Mr. Hodson's misuse of TRAG and RGE loans. The RGE-OGT Loan and Security Agreement provided that "the proceeds of the Loan shall be used solely in connection with the Proposed Transactions"—namely, the acquisition of one or more coal-fired power plants. (Ex. 7, § 2.1(c).) Yet no additional power plants were acquired, in plain breach of the exclusive-use provision. (*Id.*) The Omnis Parties have ignored the Lenders' continuous requests for books and records and evidence of acquisitions of power plants.

In response to the Lenders' repeated requests for an accounting of loan proceeds provided via other loan agreements, the Omnis Parties produced certain financial documents. (Ex. 23; Ex. 24; Ex. 25.)

The few documents the Omnis Parties have produced raise a question as to whether Mr. Hodson used the January 2025 TRAG Loan to enrich himself by funneling loan proceeds to StarSource, similar to the self-dealing issues WVEDA identified. Per a cash flow spreadsheet showing transactions in and out of QP and OFT, on January 14, 2025, TRAG deposited $700,000 into a bank account associated with OFT. (Ex. 23, at 47.) That same day, *from that same account*, OFT transferred $250,000 to StarSource, with the memo "Note due to StarSource." (*Id.*) Then, on January 22, 2025, TRAG made an additional deposit to OFT pursuant to the January 2025 loan, of $3,000,000. (*Id.* at 48.) That same day, *from that same account*, OFT transferred $318,065 to

StarSource. (*Id.*) While the account received other deposits during this period, the spreadsheet does not identify the source of dollars used to pay StarSource and the Lenders are unable to exactly trace the use of the TRAG proceeds. However, the timing of the deposits—and the fact that StarSource is the recipient—raises the question of whether Mr. Hodson improperly routed Lender funds through StarSource and misrepresented the use of funds to the Lenders. In light of WVEDA's allegations that Mr. Hodson concealed StarSource's involvement and ownership, the Lenders have a reasonable basis to suspect similar misuse of their loan proceeds.

#### 3. Mr. Hodson Has Demonstrated a Pattern of Questionable Business Behavior

Mr. Hodson's credibility has also been called into question in separate, pending federal litigation. In *Christian v. OGT, et al.*, No. 2:24-cv-01319 (E.D.P.A), Michelle Christian, a former Vice President at Omnis Global Technologies, has asserted claims against Mr. Hodson under the False Claims Act and for unjust enrichment, among other causes of action, arising out of his alleged misrepresentations to federal and state officials regarding the Omnis Parties' finances and the viability of its "coal to hydrogen" technology. (Ex. 26.) Specifically, Ms. Christian has alleged that Mr. Hodson "had not been a part of the federal loan process and was still not [sic] given permission to apply for the federal loan or other federal funds" as of September 2023, even as he represented to West Virginia officials at the same time that he had been vetted by, and approved for, hundreds of millions of dollars from, the U.S. Department of Energy. (*Id.* ¶ 190.) Ms. Christian has further alleged that when she refused to corroborate Mr. Hodson's representations to government officials and confronted him about them he arranged for her termination days later. (*Id.* ¶¶ 65-77.) The lawsuit is ongoing and the allegations remain contested, but they further illustrate why the Lenders have a good-faith reason to require verification, rather than take Mr. Hodson's representations at face value, before relinquishing their collateral rights.

**G. The Omnis Parties File a Lawsuit Against the Lenders and Seek a TRO**

On July 8, 2026, the Omnis Parties filed a Verified Complaint for Declaratory and Injunctive Relief against the Lenders and Nathan in this Court (the "Verified Complaint"), together with a Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing. The Omnis Parties alleged, among other things, that the Lenders breached the Forbearance Agreement by withholding a payoff letter. (Verified Complaint ¶¶ 106–156.) The Omnis Parties characterized their requested relief as merely seeking a *status quo* order until seven business days after the Omnis Parties received: (i) a complete payoff letter and accounting from the Lenders; (ii) OP financial information, books, records, and director materials from Nathan; and (iii) reasonable access to QP's leased premises and related Power Plant-access areas. (*Id.* ¶ 14.)

The Court denied that relief the following day, determining that the Omnis Parties had made "an insufficient showing that a temporary restraining order or other preliminary injunctive relief are necessary to preserve the status quo" pending further proceedings. (Order Denying Temporary Relief at 1 (July 9, 2026).) (Dkt. 16-1.)

**H. The Omnis Parties Overnight a Check to the Lenders' Counsel**

Following the Court's decision to deny the Omnis Parties' TRO, on July 15, 2026, David Orenstein (on behalf of Angela Chen/Dynamic Finance Corporation) advised the Lenders' counsel that Chen had deposited $72 million with Fidelity National Title to purchase the TRAG/RG Energy secured loans, and that Orenstein's calculations showed a full payoff of approximately $72.8 million, but that a proposed restructuring term sheet bracketed the payoff at $75.64 million. Orenstein threatened to overnight a $75,640,000 check if wire instructions were not received by

9:00 p.m. PST on July 15, 2026. (Ex. 27, at 2.) To be clear, the Lenders have not sold any loans to Chen, her entities or anyone else. They have never even interacted with her.

On July 16, 2026, the Lenders' counsel provided a detailed response, explaining that TRAG and RG Energy require certain information before any payoff may proceed, including: (i) escrow of sufficient funds with an escrow agent selected by TRAG and RG Energy to independently verify sufficiency and availability of funds and to ensure funds are released only once all required information and documentation is provided; (ii) full terms and documentation of the contemplated transaction, because: (a) the Forbearance Agreement requires Independent Manager approval for related-party transactions, which TRAG and RG Energy understand the Proposed Transaction to be; (b) Independent Manager approval is also required if the transaction involves a disposition of QP's or OP's assets; and (c) the transaction may raise FERC issues given the pending investigation; and (iii) due diligence information regarding the proposed payor. (Ex. 28, at 2-3.)

Despite the Lenders' counsel's response, Dynamic Finance Corporation—which is not in privity with TRAG or RG Energy—overnighted the Check for $75,640,000 to Lenders' counsel's office, purportedly constituting "Payment in Full" as defined in the Forbearance Agreement. (Ex. 2.) Importantly, none of the conditions or requested information from the Lenders' counsel's July 16 response were satisfied before the Check was sent. Despite this, on July 20, the Omnis Parties unilaterally declared that the Check "constitutes Payment in Full and hence terminates the Forbearance Agreement." (Ex. 29, at 3.) It does not, and the Forbearance Agreement has not been terminated. The Lenders' counsel quickly replied noting that the Check does not constitute "Payment in Full," and the Forbearance Agreement has not been terminated, regardless of Omnis Parties' assertion otherwise. (*Id.* at 2.) The Lenders' counsel further requested that the Omnis

Parties "cease and desist from making unfounded and improper statements." (*Id.*) Rather than comply, the Omnis Parties, through counsel, sent their own cease and desist letter again incorrectly stating (among other incorrect statements) that the Omnis Parties "have tendered Payment in Full." (Ex. 3, at 3.) In that same letter, the Omnis Parties have attempted to remove Nathan, "with immediate effect, as the Independent Manager and sole Director of OP." (*Id.*)

The Omnis Parties attempt to remove Nathan is improper; the Check shall not be accepted by the Lenders, the Forbearance Agreement remains in effect and should be maintained, and the Check should be escrowed by the Court for the reasons stated herein.

## LEGAL STANDARD

In West Virginia, a party seeking injunctive relief must make a "clear showing" of a reasonable likelihood of irreparable harm, the absence of an adequate remedy at law, and the satisfaction of a hardship-balancing test weighing: (1) the likelihood of irreparable harm to the movant without the injunction; (2) the likelihood of harm to the opposing party if the injunction is granted; (3) the movant's likelihood of success on the merits; and (4) the public interest. *Northeast Natural Energy LLC v. Pachira Energy LLC*, 243 W. Va. 362, 366, 844 S.E.2d 133, 137 (2020).

Critically, the relief the Lenders seek here—a *status quo* order directing that tendered funds be held in escrow and that existing contractual conditions remain in place pending judicial determination—is *preservative* and *prohibitory* in nature, not mandatory. It maintains the pre-tender *status quo* of the parties' contractual relationship rather than compelling any affirmative act. Accordingly, the traditional four-factor test governs.

## ARGUMENT

### I. The Lenders' Request for Declaratory Judgment is Likely to Succeed

To demonstrate a likelihood of success on the merits, a moving party need only show a "reasonable likelihood" of success on the merits. *See Wendt v. W. Virginia Land Res., Inc.*, No. 24-459, 2025 WL 3285431, at *4 (W. Va. Nov. 25, 2025) (memorandum opinion); *see also Jefferson Cnty. Bd. of Educ. v. Jefferson Cnty. Educ. Ass'n*, 183 W. Va. 15, 24, 393 S.E.2d 653, 662 (1990) (noting that the preliminary injunction factors must be considered "in flexible interplay" with each other). The Lenders are likely to succeed on their sole cause of action requesting that the Court issue a declaratory judgment. Specifically, the Lenders request that the Court declare that the Lenders need not accept or cash the Check until the Court affirmatively determines that the Proposed Transaction complies with the Forbearance Agreement and applicable law.

Here, the Lenders have reason to believe the Proposed Transaction does not comply with either the Forbearance Agreement or applicable law for multiple reasons. The Forbearance Agreement clearly provides the Lenders and the Omnis Parties with certain rights and obligations before any payoff or sales transaction may be completed. Indeed, the Forbearance Agreement's plain text requires:

- Independent Manager approval over (i) sales or disposals of QP's or OP's assets, including its interests in the Power Plant; and (ii) related party transactions involving QP and its members or affiliates (¶¶ 7a, 7b);
- The Lenders and OFT to have "the joint authority to initiate, manage, and conduct a process to solicit, and negotiate" all transactions for the sale of all or substantially all of the assets of OP, including the Power Plant" ("<u>Sales Process</u>") (¶ 8);
- The Lenders and OFT to "provide each other with full and prompt access to all information, documents, communications, and materials" related to any Sales Process (¶ 8a);
- Lender approval before any sale of OP or the Power Plant is promised, pledged, or agreed to (¶ 8c);

- The Omnis Parties to not (i) raise capital or incur indebtedness, or (ii) enter into any transaction to sell, transfer, or assign any materials assets of the Omnis Parties, including the Power Plant, without prior Lender approval (¶¶ 11b, 11d); and
- The Omnis Parties to not enter into any agreement with any affiliate or related-party without approval from the Independent Manager (¶ 11g).

To ensure the Proposed Transaction is not in violation of the foregoing rights and obligations, the Lenders requested certain information—none of which was provided. (Ex. 36.) Indeed, the Proposed Transaction and Check raise serious questions that must be resolved before any funds are accepted or applied: (i) the Proposed Transaction appears to be a related-party transaction requiring Independent Manager approval; (ii) the Proposed Transaction may constitute a sale of assets, including the Power Plant; (iii) depending on the nature of the transaction, it may create issues with the FERC investigation that the Lenders need to consider; and (iv) the Proposed Transaction may violate applicable law, including OFAC regulations. To answer these questions and assess compliance, the Lenders require full disclosure of the terms and all related documentation. Despite the Lenders' request for this information, it has not been forthcoming.

**i. The Proposed Transaction Appears to Be a Related Party Transaction**

The Proposed Transaction appears to be a related-party transaction, requiring the Independent Manager's consent, which as far as the Lenders understand has not been received. Angela Chen, through Harmony Trust and Dynamic HC Co, has already advanced funds to OGT, OFT, and QP—indebtedness expressly identified in the Forbearance Agreement as "DHC Indebtedness." (FA, Recitals; *see also* Chen Declaration, ¶ 2 ("Through the Harmony Trust in which I am the primary beneficiary, I am an investor in Quantum Pleasants LLC."); *id*, ("I have lent substantial sums to the [Omnis Parties] and to their affiliate, [OP].")) Harmony Trust documents reportedly reflect a 5% fully diluted equity interest in QP. (Ex. 30, at 2.)

Furthermore, Angela Chen is the apparent principal of Dynamic Finance Corporation, the entity from whose Cathay Bank account the tendered $75,640,000 was drawn. Independent Manager Gilbert Nathan has expressly rejected this transaction, stating that, pursuant to the Forbearance Agreement: “Given that I have no window into how this potential transaction is structured, I do not approve of any payoff related to the TRAG and RG debt.” (Ex. 31, at 2.)

**ii. The Proposed Transaction May Constitute a Sale**

If the Proposed Transaction constitutes a sale of QP’s or OP’s assets, such as the Power Plant, the Lenders and Independent Manager must approve it, and the Lenders enjoy “joint authority” with OFT to conduct a sale process. (FA ¶ 8.) The proposed payor’s counsel has unilaterally declared that the Proposed Transaction is not a sale—without any supporting documentation—and therefore that the Independent Manager’s approval is “not necessary.” (Ex. 32, at 2-4.) If that is accurate, the Lenders require documentation confirming that characterization—specifically, the proposed loan purchase or assignment agreement and all related transaction documents—so the Lenders and this Court can independently evaluate whether the transaction’s substance, rather than its label, constitutes a disposition of assets requiring consent under ¶¶ 7, 8, and 11(d). The proposed payor’s unilateral assertion that Independent Manager approval is “not necessary” does not discharge this contractual requirement.

**iii. FERC Compliance Concerns**

The Omnis Parties are subject to a pending FERC investigation, as evidenced by FERC Document Preservation notices issued to both TRAG and RG Energy, dated April 24, 2026. (Ex. 33; Ex. 34.) The investigation is understood to stem from Mr. Hodson and the Omnis Parties’ prior mismanagement of the Power Plant before the independent fiduciaries, Gilbert Nathan and David Hindman, were appointed. The Lenders cannot and shall not accept funds—and thereby effectively

transfer their collateral and governance positions—without understanding whether doing so could implicate or prejudice their position in that proceeding. The proposed payor's counsel's citation to a Vinson & Elkins "email report" does not constitute the kind of documentation the Lenders require for independent evaluation. (Ex. 32, at 3-4.)

**iv. OFAC Regulations**

The Proposed Transaction also raises unresolved compliance concerns. The Lenders' obligations in this regard are not confined to a generic reference to "OFAC." Under OFAC and relevant authorities, U.S. persons are prohibited from engaging, directly or indirectly, in any transaction with a person listed on OFAC's Specially Designated Nationals and Blocked Persons List (the "SDN List") or otherwise subject to blocking sanctions, and from facilitating a transaction that a blocked person could not undertake directly. *See* 31 C.F.R. § 501.603; Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (as amended). Violations expose U.S. persons to substantial civil and, in some circumstances, criminal penalties, and civil liability under IEEPA-based sanctions programs generally does not require proof of intent.

These prohibitions are not limited to persons or entities that appear by name on the SDN List. Under OFAC's longstanding "50 Percent Rule," any entity that is owned, directly or indirectly, 50 percent or more in the aggregate by one or more blocked persons is itself considered blocked, regardless of whether that entity is separately named on the SDN List or any other sanctions list. *See* U.S. Dep't of Treasury, OFAC, Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property Are Blocked (Aug. 13, 2014). A U.S. person is therefore prohibited from engaging in a transaction with such an entity to the same extent as if that entity itself appeared on the SDN List, even though a search of the SDN List alone would not reveal the prohibition. As a result, an unnamed shell or holding entity—or a trust, investment vehicle, or

other affiliate—can be a blocked person, even though it is blocked only through the aggregate ownership interests of its beneficial owners.

The record here creates precisely the unresolved exposure these authorities are designed to prevent. The proposed payor is not the Omnis Parties themselves but a third party—Dynamic Finance Corporation, acting through Angela Chen—whose relationship to the Omnis enterprise, source of funds, and true beneficial ownership remain uncertain. Because an entity can be blocked under the 50 Percent Rule solely by virtue of its ownership structure, a clean SDN List search of Dynamic Finance Corporation's name, without more, would not establish that accepting funds from that entity is permissible; the Lenders must also identify and screen each individual and entity that, directly or indirectly, owns an interest in Dynamic Finance Corporation to confirm that no combination of blocked persons holds, individually or in the aggregate, 50 percent or more of that entity.

While counsel, purportedly for Ms. Chen, has provided certain information to the Lenders to verify that the Check will not violate any OFAC regulations, unanswered questions still remain; in fact, their latest email refuses to answer them. (Ex. 35, at 2; Ex. 36, at 2.). Absent answers to those questions, the Lenders cannot confirm that the proposed payor, the originating financial institution, or any beneficial owner of the tendered funds—individually or in combination—is not a blocked or sanctioned person, that the funds do not originate from a sanctioned jurisdiction, or that accepting the Check would not itself constitute engaging in a transaction prohibited under OFAC-administered sanctions, including sanctions arising solely from aggregate beneficial ownership under the 50 Percent Rule. Accepting $75,640,000 in undiligenced funds under these circumstances risks violating the regulations administered by OFAC and the Lenders' obligations

under IEEPA—a risk the Lenders, as U.S. persons and as secured creditors, cannot be compelled to assume.

## II. The Lenders Will Suffer Irreparable Harm Absent Injunctive Relief

In West Virginia, a movant seeking a temporary restraining order must make a "clear showing" of a reasonable likelihood of irreparable harm and the absence of an adequate remedy at law. *Pachira Energy*, 243 W. Va. at 366. Harm is irreparable where it cannot be undone by a later damages award—where money cannot restore the *status quo* ante. *See id.* That standard is squarely met here on multiple, independent grounds.

*First*, accepting the Check would force the Lenders to relinquish, in a manner that cannot be undone, the bargained-for consent and collateral protections they negotiated in exchange for forbearing from their remedies numerous times following the Omnis Parties' defaults. (*See, e.g.*, FA ¶¶ 7a, 7b, 8, 11(b), 11(d), 11(g).) Once the Lenders treat a non-conforming transaction as Payment in Full, the Forbearance Agreement and Loan Agreements terminate by their own terms, and the Lenders' security interests, Independent Manager approval rights, and Joint Sale Process Authority are extinguished. There is no mechanism to restore those bargained-for rights after the fact if the transaction later proves non-conforming.

*Second*, accepting funds from an undiligenced payor exposes the Lenders to potential liability under the sanctions authorities described above—including IEEPA and OFAC's implementing regulations—which carry severe civil and, in some circumstances, criminal penalties, reputational harm, and regulatory consequences that cannot be remedied after the fact. This is a paradigmatic case of irreparable harm: an injury to legal and regulatory standing that no later damages award can undo. *See, e.g.*, *Kalshiex, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026) (noting that being "threatened . . . with civil and criminal penalties" and risking "economic

and reputational harm, including loss of business and goodwill" both constitute irreparable harm); *Dominion Energy Transmission, Inc. v. 8.00 Acres of Land in Doddridge Cty.*, 2018 WL 1144982, at *5 (N.D. W. Va. Mar. 02, 2018) (noting that the possibility of non-compliance with FERC requirements, coupled with financial harm and potential liability-exposure, constituted irreparable harm).

*Third*, if the Lenders are compelled to accept the Check and release their collateral before the payoff amount is verified, and the tendered amount later proves insufficient, the shortfall may prove uncollectable. The amount tendered—$75,640,000—is approximately $7.5 million less than the Lenders' own April 24, 2026 minimum payoff calculation of not less than $83,197,642.21. Having relinquished their secured position for less than the full amount owed, the Lenders would be left as unsecured creditors for any shortfall against counterparties already in continuing default—a loss of collateral rights that cannot be reversed. *See Wood v. W. Va. Mortgage & Discount Corp.*, 99 W. Va. 117 (1925) (supporting an orderly process to ascertain the debt secured by collateral).

*Fourth*, the Omnis Parties' attempt to unilaterally remove Nathan as OP's Independent Manager and sole Director compounds the irreparable harm described above. On July 20, 2026—purporting to rely on their self-proclaimed "Payment in Full" that is the central disputed issue in this litigation—the Omnis Parties' counsel notified the Lenders and Nathan that he was removed "with immediate effect" from his position, appointed Charles Gassenheimer as interim director in his place, and directed Nathan to turn over all OP books, records, financial materials, passwords, and access credentials within twenty-four hours. (Ex. 3.) The same letter bars Nathan from communicating with OP's employees, vendors, creditors, or counterparties, from accessing OP's bank accounts, systems, or premises, and from taking any further action on OP's behalf. (*Id.*). This

is not a harm compensable in damages; it is the elimination of the very independent check—the Independent Manager's approval rights over related-party transactions and asset dispositions under paragraphs 7a, 7b, and 11(g) of the Forbearance Agreement—that the Lenders bargained for in exchange for forbearing from their remedies numerous times. Once Nathan is displaced by a director installed unilaterally by the parties whose related-party dealings and self-dealing history are themselves at issue in this litigation, that safeguard cannot be restored after the fact: any transactions, disclosures, or dispositions consummated in the interim will have occurred without the independent oversight the parties contracted for, and no later damages award can unwind that lost oversight or the transactions it might otherwise have caught. Indeed, the Omnis Parties' own July 20 letter confirms the stakes: it directs that further cooperation with NRG Energy's due diligence, all communications concerning any sale or restructuring of OP or the Plant, and negotiation of a WVEDA forbearance and deed of trust proceed solely through Gassenheimer and QP's counsel, with no role for, or oversight by, an independent fiduciary. (Ex. 3.) If the Omnis Parties are permitted to consummate any such transaction or disposition before this Court determines whether the Check constitutes a conforming Payment in Full, the resulting harm to the Lenders' collateral, governance, and consent rights will be immediate and irreversible—precisely the type of harm injunctive relief exists to prevent.

## III. The Balance of Hardships Favors Lenders

The balance of equities favors the preservation of the *status quo*. An escrow imposes minimal hardship on the Omnis Parties; they are not deprived of their ability to ultimately pay—they are merely required to do so through a conforming process. By contrast, release of $75+ million without verification of compliance risks irreversible harm to the Lenders' contractual rights, regulatory position, and legal exposure. *See Wood v. W. Va. Mortgage & Discount Corp.*,

99 W. Va. 117 (1925) (supporting an orderly process to ascertain the debt secured by collateral); *see also Villers v. Wilson*, 172 W. Va. 111, 304 S.E.2d 16 (1983) (noting that injunctive relief is appropriate to prevent the foreclosure on collateral where "the proper amount due on the debt is in dispute").

**IV. The Public Interest Favors Granting the Motion**

The public interest supports enforcing contracts as written, promoting orderly resolution of disputed obligations, and ensuring compliance with regulatory and sanctions regimes. A brief escrow maintaining existing contractual conditions, collateral positions, and governance protections while the Court adjudicates conformity serves these interests and preserves the integrity of the Court's eventual declaratory relief.

## CONCLUSION

Consistent with the foregoing, the Court should enter a temporary restraining order that: (i) preserves the *status quo* pending further order of the Court, (a) prohibiting the release or application of any tendered funds absent a subsequent order of this Court affirmatively finding the Proposed Transaction to be a conforming Payment in Full under the Forbearance Agreement, and (b) holding the Forbearance Agreement in place, and maintaining the parties' existing contractual rights, collateral positions, and Independent Manager and Lender consent/approval rights; (ii) maintains Gilbert Nathan as the Independent Manager of OP; (iii) directs that the Check (and any supplemental check or wire transfer) be deposited and held in escrow by the Court, pending further order of this Court; (iv) prohibits the Omnis Parties from asserting or claiming that the Loan Agreements have been paid in full; and (v) sets the matter for an expedited hearing.

Respectfully submitted this 21st day of July, 2026,

TRAG LLC, RG Energy LLC,

By counsel

*/s/Stephen D. Annand*
Stephen D. Annand (WV State Bar No. 150)
Jonathon C. Stanley (WV State Bar No. 13470)
Kent J. George (WV State Bar No. 4842)
ROBINSON & McELWEE PLLC
700 Virginia Street East, Suite 400
Charleston, West Virginia 25301
Telephone: (304) 347-8358
sda@ramlaw.com
jcs@ramlaw.com
kjg@ramlaw.com

***OF COUNSEL***

Douglas I. Koff
Daryoush Behbood
Neema Jyothiprakash
McDermott Will & Schulte LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2773
dkoff@mcdermottlaw.com
dbehbood@mcdermottlaw.com
njyothiprakash@mcdermottlaw.com

*Counsel for Defendants/Counterclaim-Plaintiffs*
*TRAG LLC and RG Energy LLC*
*(Pro hac vice admission to be sought)*

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC,**
**OMNIS FUEL TECHNOLOGIES, LLC, and**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs/Counterclaim-Defendants,**

**v.** **Civil Action No. CC-37-2026-C-14**
Judge Timothy L. Sweeney

**TRAG LLC, RG ENERGY LLC, and**
**GILBERT NATHAN,**

**Defendants/Counterclaim-Plaintiffs.**

---

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of July, 2026, I caused a true and correct copy of the foregoing *TRAG LLC'S AND RG ENERGY LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND FOR EXPEDITED HEARING* to be served upon the Omnis Parties' counsel of record via the Court's electronic filing system and/or by U.S. Mail, postage prepaid, addressed as follows:

Isaac R. Forman (WV State Bar No. 11668)
Andrew J. Tessman (WV State Bar No. 13734)
Levi B. Pellegrin (WV State Bar No. 13669)
Hissam Forman Donovan Ritchie, PLLC
P.O. Box 3983
Charleston, WV 25339

*Counsel for Plaintiffs/Counterclaim-Defendants*

*/s/ Stephen D. Annand*
Stephen D. Annand (W.Va. Bar #150)