# EXHIBIT 20

West Virginia E-Filing Notice

CC-37-2026-C-14

Judge: Timothy L. Sweeney

**To:** Isaac Forman
iforman@hfdrlaw.com

# NOTICE OF FILING

IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA
Omnis Global Technologies, LLC v. TRAG LLC
CC-37-2026-C-14

The following motion response was FILED on 7/22/2026 2:56:55 PM

Notice Date: 7/22/2026 2:56:55 PM

Millie Farnsworth
CLERK OF THE CIRCUIT COURT
Pleasants County
301 Court Lane Room 201
ST MARYS, WV 26170

(304) 684-3513
Millie.Farnsworth@courtswv.gov

E-FILED | 7/22/2026 2:56 PM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs,**

**v.**

**Civil Action No.: 26-C-14**
**Judge Timothy L. Sweeney**

**TRAG LLC, RG ENERGY LLC, and**
**GILBERT NATHAN,**

**Defendants.**

**PLAINTIFFS/COUNTERCLAIM-DEFENDANTS' RESPONSE IN OPPOSITION TO TRAG LLC'S AND RG ENERGY LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs/Counterclaim-Defendants Omnis Global Technologies, LLC, Omnis Fuel Technologies, LLC, and Quantum Pleasants, LLC (collectively, the "Omnis Parties"), by counsel, submit this Response in Opposition to TRAG LLC's and RG Energy LLC's Motion for Temporary Restraining Order and Preliminary Injunction and for Expedited Hearing (the "Lenders' Motion").

## I. INTRODUCTION

The Lenders' Motion turns Rule 65 upside down. TRAG and RG Energy possess a $75,640,000 corporate check delivered for the express purpose of paying their loans. Yet they ask the Court to issue an emergency injunction protecting them from accepting payment, preserving every disputed lender-control right, reinstating Gilbert Nathan as OP's Independent Manager, compelling the Court to escrow a check payable to TRAG, and prohibiting the Omnis Parties from even stating that Payment in Full has occurred. That is not preservation of the status quo. It is merits relief dressed as a temporary restraining order.

The motion also obscures the cause of the present uncertainty. For more than three months, the Omnis Parties repeatedly asked the Lenders to identify the amount required for Payment in Full, provide a lender-by-lender allocation, state the per diem, address the TYR letter of credit, provide wiring instructions, and explain the release mechanics. On April 20, 2026, the Lenders' counsel promised: "We'll get you the payoff information." Ex. H.[1] They never did. Instead, they conditioned the most basic closing deliverable in any payoff—the payoff statement—on broad historical discovery, transaction documents, and approval of the source of funds. The Lenders now cite three materially different figures: "more than $79 million" in the opening of their motion, a supposed April 24 "minimum" amount of $83,197,642.21, and "not less than $87.368 million" in their own proposed restructuring term sheet. Lenders' Mot. at 1, 23. They still do not provide a current, itemized payoff statement.

Faced with that refusal, Dynamic Finance Corporation ("DFC") funded a loan to OFT and delivered a $75,640,000 check to Lenders' counsel. The tender was not an attempt to evade a legitimate balance. The Omnis Parties expressly agreed to pay any additional amount properly documented as due under the Loan Agreements. Ex. N (attached hereto). The payee allocation and form of payment are readily curable ministerial issues once the Lenders disclose how much each Lender claims, where it must be sent, and how the letter-of-credit obligation must be handled. The Lenders' refusal to provide those mechanics cannot become the basis for indefinite control over OP, QP, and the Plant.

The equities have also materially changed since the Court denied the Omnis Parties' request for temporary relief. WVEDA has agreed in principle to a ninety-day forbearance while

[1] Plaintiffs incorporate by reference the exhibits attached to their Verified Complaint for Declaratory and Injunctive Relief. Citations to "Ex. __" in this Motion refer to the corresponding exhibits attached to the Verified Complaint unless otherwise stated as attached hereto.

the parties finalize documentation, including security against the relevant real estate and the Plant. Ex. P (attached hereto). NRG Energy and other credible prospective purchasers are evaluating the Plant and require financial information and site access. That finite window can preserve a major West Virginia asset and create an orderly sale capable of paying creditors. The Lenders' requested order would instead freeze the sale process, entrench the same gatekeeper who has obstructed diligence, and preserve the Lenders' ability to force their own restructuring or disposition. The Court should deny the Lenders' Motion.

## II. RELEVANT BACKGROUND

### A. The Forbearance Agreement expressly preserves a path to Payment in Full.

The Amended and Restated Forbearance Agreement dated February 6, 2026 (the "Forbearance Agreement") amended the Loan Agreements to define "Payment in Full" as the indefeasible payment in cash of principal, interest, fees, costs, expenses, and other amounts owing, together with the termination, cancellation, or 103% cash collateralization of the TYR letter of credit. Ex. A § 2(a). Upon Payment in Full, the Loan Agreements terminate automatically, the Lenders' liens and encumbrances are released automatically, and the Lenders must provide termination statements and other release documentation. *Id.* § 2(e).

The Forbearance Agreement does not merely allow a sale process. It separately and specifically protects the Omnis Parties' right to procure payoff funds. Section 11(b) states that "nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations," and confirms that such payment terminates the Forbearance Agreement and Loan Agreements. Ex. A § 11(b). Section 11(d) excludes from its general asset-transfer restriction "transactions that will result in the Payment in Full of all Obligations under the Loan Agreements." *Id.* § 11(d). Sections 8(e) and 13 prohibit conduct whose primary purpose

is to materially interfere with, frustrate, hinder, or unreasonably interfere with efforts to accomplish Payment in Full or comply with the agreements. *Id.* §§ 8(e), 13.

Those specific provisions are central. The Lenders' Motion repeatedly cites Sections 11(b) and 11(d) as though they prohibit payoff financing. Lenders' Mot. at 8, 18. The quoted text says the opposite. The general restrictions on new debt, related-party agreements, and asset dispositions cannot be read to erase the specific provisions that authorize procuring funds and transactions resulting in Payment in Full.

**B. The Lenders promised a payoff statement, then withheld it.**

On April 19, 2026, OFT's counsel asked the Lenders to provide the amount required for Payment in Full as of April 21, including principal, accrued and unpaid interest, fees, costs, expenses, letter-of-credit amounts, and wiring instructions. The next day, the Lenders' counsel responded: "We'll get you the payoff information." Ex. H. The Lenders did not provide it.

The Omnis Parties renewed the request on June 1 and June 9, seeking a component breakdown, per diem interest, letter-of-credit treatment, payment instructions, and lien-release mechanics. Exs. I, J. Rather than state the amount due, the Lenders demanded information about the prospective funder, the future financing terms, and broad historical materials requested in a March 20 letter. *Id.* Those materials are simply not necessary to calculate principal, interest, fees, expenses, or the letter-of-credit amount uniquely within the Lenders' knowledge.

The Lenders now rely on an April 24 "minimum payoff calculation" of at least $83,197,642.21. Lenders' Mot. at 23. But they do not attach or reproduce a current lender-by-lender payoff statement in their motion. They do not identify the portion due to TRAG, the portion due to RG Energy, the per diem, the current legal fees, the precise letter-of-credit treatment, or the release instructions. Their own proposed restructuring term sheet uses still

another figure—aggregate obligations “not less than $87.368 million”—while identifying $75.640 million as the proposed principal amount of a new restructured facility after other items would be paid or addressed at closing. The shifting figures confirm why a current accounting is required.

### C. DFC funded the tender, and the Omnis Parties agreed to pay any documented shortfall.

After the Lenders continued to withhold a payoff statement, DFC funded a $75,640,000 loan to OFT and delivered a check in that amount to Lenders’ counsel. The Lenders inaccurately call the instrument a “personal check,” even though their own motion acknowledges that it was drawn from DFC’s Cathay Bank account. Lenders’ Mot. at 2, 19. The funds were tendered for the express purpose of paying the TRAG and RG Energy obligations, not to compromise the debt for less than the amount properly due.

The Omnis Parties did not represent that $75,640,000 was necessarily the final exact number. They expressly agreed to pay any additional amount properly due under the applicable Loan Agreements and requested that the Lenders identify and document any claimed deficiency. Ex. N. (attached hereto). The Lenders refused. Ex. O (attached hereto). Their motion now argues that the check was payable only to TRAG and was below the amount due, but both issues could have been avoided immediately had the Lenders provided the allocation, wire instructions, and current calculation repeatedly requested.

### D. The DFC financing is not a sale of OP, QP, or the Plant.

The present DFC financing is a loan to OFT. It does not sell or transfer the Plant, OP’s assets, QP’s membership interest in OP, or any present governance right in OP or QP. The prospective DFC restructuring term sheet contemplates that, after the payoff, other Omnis entities may become obligors and may grant collateral on terms more favorable than the Lenders’

proposed restructuring. But that prospective post-payoff restructuring is not the transaction by which DFC funded OFT's tender, and it does not convert the tender into a present sale of the Plant.

The Lenders identify no deed, equity-transfer agreement, asset-purchase agreement, voting agreement, management agreement, or other instrument transferring the Plant or control of OP or QP to DFC. Their suggestion that the transaction "may" constitute a sale is based solely on their claimed lack of information, not on any evidence that an asset sale or disposition is actually contemplated. Lenders' Mot. at 19. A hypothetical possibility is not a clear showing of likely success or irreparable harm.

**E. The Lenders have already realized an extraordinary return and retain substantial equity upside.**

The Lenders' Motion presents TRAG and RG Energy as secured creditors facing the imminent loss of a precarious investment. The actual economics are materially different. Based on the Omnis Parties' records, the Lenders have already received approximately $22 million in interest, fees, and other returns on their debt investment. That represents an approximately forty-percent return on secured debt—not equity exposed to the ordinary risks of ownership—before accounting for the substantial equity interest TRAG obtained through its warrant.

TRAG's upside was not limited to interest and fees. In connection with its initial loan, TRAG received a warrant that was later amended to entitle it to Class B Units representing fifty percent of QP's fully diluted capitalization. TRAG subsequently exercised that warrant for 1,000,000 Class B Units. The equity interest was obtained through the warrant structure for consideration that was nominal relative to the potential value of an interest in QP and the Plant. The Omnis Parties understand that TRAG's equity interest could be worth approximately $100 million if the Plant is sold or developed as presently contemplated.

TRAG's own principal has publicly described the Plant as the "single best" financial investment of his life and stated that its returns are "ridiculous."[2] Those public statements are fundamentally inconsistent with the Motion's portrayal of the Lenders as facing an imminent and unrecoverable loss.

This is not a lender facing the destruction of its investment. The Lenders have already earned an extraordinary return on secured debt, have been offered repayment of every additional dollar properly documented as due, and retain substantial equity upside acquired through a warrant. Their claimed emergency is not the risk of nonpayment. It is the possibility that Payment in Full will end their temporary control over an asset their own principal publicly and privately describes as the best investment of his life.[3]

**F. WVEDA has created a finite window for an orderly sale, and credible purchasers are conducting diligence.**

WVEDA's current position is materially different from the historical notices emphasized in the Lenders' Motion. WVEDA has agreed in principle to a ninety-day forbearance while the parties document an accommodation, including a deed of trust against the relevant real estate and the Plant. Ex. P. (attached hereto). That accommodation creates a limited period to preserve the Plant, confirm its financial condition, complete buyer diligence, and pursue an orderly transaction that protects the State's position.

---

[2] https://finance.yahoo.com/sectors/technology/articles/tony-robbins-reveals-single-best-120158924.html?guccounter=1 (Last visited July 22, 2026).

[3] On July 21, 2026, the Omnis Parties placed in the mail their First Set of Interrogatories and Requests for Production to TRAG and RG Energy. Those requests seek, among other things, all recordings, transcripts, notes, and communications concerning telephone calls between Tony Robbins and Simon Hodson relating to the Lenders' investment, the Loan Agreements, the Plant, its value, the parties' returns, proposed sales or restructurings, and the Lenders' exercise of control. The Omnis Parties are informed that hundreds of such recorded calls exist and are within the Lenders' or their principals' possession, custody, or control. Those recordings bear directly on the Lenders' asserted risk, their valuation of the Plant, their motive for resisting Payment in Full, and the credibility of the irreparable-harm narrative presented in their Motion.

NRG Energy is evaluating a potential acquisition involving the Plant and/or QP's interest in OP. Like all potentially interested purchasers, they require ordinary financial, operational, environmental, and technical diligence and reasonable site access. The continued withholding of OP records and control of diligence by Nathan and Lender-aligned representatives risks wasting the finite WVEDA forbearance window and depressing the value available to every creditor.

The Lenders' own restructuring proposal confirms that their objective extends beyond receiving payment. Their proposal would retain lender-selected management, give TRAG and RG Energy approval rights over any sale or financing, grant broad first-priority liens over substantially all Omnis assets, impose a ten-percent exit fee, subordinate WVEDA, and require a sale on terms acceptable to the Lenders. The Omnis Parties are entitled to argue that the Lenders are using the payoff dispute to preserve control and steer the Plant toward a lender-directed transaction.

**G. The Court's prior order did not adjudicate the merits or authorize the Lenders to refuse payment.**

The Lenders repeatedly invoke the Court's July 9 order denying the Omnis Parties' first request for temporary relief. That order determined only that the showing then made was insufficient to establish that a TRO was necessary to preserve the status quo. It did not adjudicate the meaning of Payment in Full, declare the Lenders entitled to withhold a payoff statement, approve the Lenders' diligence demands, authorize Nathan to veto payoff funding, or resolve the parties' claims. The tender, WVEDA's ninety-day accommodation, and the active buyer diligence all arose or crystallized after the first motion. The changed circumstances warrant adjudication on the present record, not an inference that the prior order validated the Lenders' conduct.

## III. LEGAL STANDARD

A party seeking temporary or preliminary injunctive relief must make a clear showing of a reasonable likelihood of irreparable harm, the absence of an adequate remedy at law, and satisfaction of the familiar four-factor test: likelihood of irreparable harm to the movant, harm to the opposing party, likelihood of success on the merits, and the public interest. *Northeast Natural Energy LLC v. Pachira Energy LLC*, 243 W. Va. 362, 366, 844 S.E.2d 133, 137 (2020); *Jefferson County Board of Education v. Jefferson County Education Association*, 183 W. Va. 15, 24, 393 S.E.2d 653, 662 (1990). The factors operate in flexible interplay, but the movant still bears the burden to establish immediate, non-speculative injury and entitlement to the particular relief requested.

The Lenders characterize their requested order as merely preservative. It is not. They ask the Court affirmatively to maintain or reinstate Nathan as OP's Independent Manager after QP has removed him, to direct that a third-party check be deposited into court, to declare that the Forbearance Agreement remains effective, to preserve disputed lender approval rights, and to prohibit the Omnis Parties from asserting that Payment in Full has occurred. Lenders' Mot. at 4-5, 25. Those provisions compel affirmative action and substantially decide the central merits dispute. Mandatory interim relief requires particular caution and a clear right to the relief demanded. *Sams v. Goff*, 208 W. Va. 315, 318-19, 540 S.E.2d 532, 535-36 (1999).

Rule 65(c) also provides that a temporary restraining order or preliminary injunction may issue only if the movant gives security in an amount the Court considers proper to compensate a party wrongfully restrained. The Lenders' Motion does not address security. Any order that freezes buyer diligence, preserves disputed governance control, or impairs the WVEDA sale window should require substantial security commensurate with the potential loss.

## IV. ARGUMENT

### A. The Lenders cannot establish irreparable harm.

#### 1. The Lenders control the check and face no imminent compulsion to accept it.

The premise of the Lenders' emergency is circular. They contend that accepting the check might terminate their contractual rights, so they seek an injunction preventing release or application of the funds. But the check is in their counsel's possession. No one has the power to force TRAG to endorse it, to force RG Energy to accept an allocation it has not specified, or to compel either Lender to release collateral without a court order. The Lenders can preserve their position simply by maintaining the check unnegotiated while the Court sets an expedited hearing.

An injunction is unnecessary to protect a party from an action that the party itself exclusively controls. The Lenders' claimed injury does not arise "before the adverse party can be heard." W. Va. R. Civ. P. 65(b)(1). It arises only if the Lenders voluntarily negotiate the instrument or agree to closing terms. Their possession of a substantial tender is not irreparable harm.

#### 2. The alleged payoff shortfall is monetary and can be addressed through an accounting.

The Lenders' claim that the tender may be approximately $7.5 million short is a dispute over money. It can be resolved by a current accounting and a prompt top-up. The Omnis Parties have agreed to pay any properly documented additional amount. Ex. N. (attached hereto). The Lenders' assertion that merely accepting funds would necessarily destroy all collateral rights assumes the very merits issue the Court has not decided.

*Wood v. West Virginia Mortgage & Discount Corp.*, 99 W. Va. 117, 127 S.E. 917 (1925) supports an accounting and a fair opportunity to pay where the amount due is disputed. It does

not authorize the creditor to withhold a current payoff, preserve every collateral and governance right indefinitely, and block the debtor's ability to complete payment.

### 3. The claimed loss of governance rights is a contractual consequence, not irreparable injury.

The Lenders cannot have it both ways. Their Motion repeatedly invokes the sanctity of the governance and consent rights for which they purportedly "bargained," yet when the Omnis Parties exercise the equally bargained-for right to procure funds resulting in Payment in Full, the contract's agreed termination mechanism suddenly becomes "irreparable harm." It is not. The expiration of temporary control rights upon satisfaction of the debt is not an equitable injury; it is the precise exchange the parties negotiated—payment of all Obligations in return for termination of the Forbearance Agreement and release of the Lenders' liens and control rights. If the Lenders wanted those rights to survive Payment in Full, they could have bargained for that result. They did not. A contractual consequence does not become irreparable merely because it now operates against the party invoking the contract.

The economic realities make the Lenders' claim of irreparable harm still less credible. The Lenders have already received approximately $22 million in returns on their secured debt investment—roughly forty percent—before accounting for TRAG's substantial equity interest. This was not speculative equity capital exposed to the ordinary risks of ownership. It was secured debt protected by liens, default interest, fees, governance rights, and foreclosure remedies. Having already realized an astronomical return for a secured creditor, the Lenders now demand an injunction because the Omnis Parties seek to pay the remaining debt in full.

The proposed payoff eliminates rather than creates risk for the Lenders. Upon Payment in Full, TRAG and RG Energy receive every dollar properly due under their Loan Agreements. The Omnis Parties and DFC then assume the entire continuing risk associated with the Plant,

including its operations, the WVEDA debt, the contemplated refinancing, future capital requirements, buyer negotiations, and any subsequent decline in value. The Lenders bear none of that debt or operational risk after payoff. Their Motion asks the Court to preserve control for parties who will have been paid while shifting one hundred percent of the continuing financial exposure to the Omnis Parties and their new lender.

TRAG's equity position makes the request even more inequitable. TRAG acquired fifty percent of QP's fully diluted equity through a warrant for consideration that was nominal when compared to the potential value of that interest. That equity may be worth approximately $100 million. Thus, even after receiving Payment in Full and eliminating its debt exposure, TRAG retains the possibility of enormous equity upside. Its downside on the ongoing enterprise is limited to its comparatively nominal equity basis, while the Omnis Parties and DFC place more than $75 million of new capital at risk.

That is not irreparable injury. It is an exceptionally profitable secured investment reaching the contractual point at which the debt is repaid and the temporary control rights end. Equity does not exist to protect a secured creditor from the agreed consequence of being paid, much less to preserve that creditor's ability to control a valuable asset after its debt risk has been eliminated.

**4. Nathan's disputed removal does not create an irreversible emergency.**

The Lenders' argument concerning Nathan likewise overstates the situation. QP removed Nathan from OP based on its tendering of Payment in Full which terminated the Lenders' consent right under the OP Operating Agreement amendment. Ex. Q. (attached hereto). The Court can preserve ordinary Plant operations and prohibit extraordinary transactions pending a

prompt hearing without granting Nathan unrestricted authority or prejudging whether the removal was valid.

The Lenders also mischaracterize the appointment of Charles Gassenheimer. QP did not purport to eliminate independent oversight permanently or entrench Mr. Gassenheimer as a permanent replacement. It appointed him as an interim Director and authorized representative to preserve operational continuity while QP completes its discussions with WVEDA concerning the selection of a mutually acceptable permanent independent manager. The appointment was a temporary transition measure necessitated by Nathan's refusal to recognize QP's authority, turn over records, or permit owner-directed diligence—not an effort to operate the Plant indefinitely without independent governance.

**5. The OFAC and FERC theories are speculative and readily addressed through focused diligence.**

The Lenders do not identify a sanctioned person, sanctioned jurisdiction, blocked bank, blocked beneficial owner, or specific fact connecting DFC, Angela Chen, Cathay Bank, or the tendered funds to any sanctions program. Their invocation of OFAC's "50 Percent Rule" states a general proposition but does not establish a transaction-specific risk. OFAC guidance provides that an entity is automatically blocked when one or more blocked persons own fifty percent or more, directly or indirectly, in the aggregate. OFAC FAQ 401.[4] The Lenders identify no blocked person and no ownership percentage.

The Lenders' reliance on Executive Order 13224 underscores the speculative nature of their OFAC argument. That Order was issued in the immediate aftermath of September 11 to block property and prohibit transactions involving terrorists, terrorist organizations, and persons who support terrorism. Yet the Lenders identify no terrorist, designated person, blocked

[4] https://ofac.treasury.gov/faqs/401 (Last visited July 22, 2026).

beneficial owner, sanctioned jurisdiction, or other counterterrorism nexus involving DFC, Angela Chen, Cathay Bank, or the tendered funds. Their theory is simply that, because they profess not to know every person in DFC's ownership chain, a blocked person might theoretically exist somewhere within it. Executive Order 13224 does not transform that hypothetical possibility into evidence of a sanctions violation or irreparable harm.

Nor does 31 C.F.R. § 501.603 supply the missing link. That provision governs reporting when blocked property comes into a person's possession or control; it does not create a presumption that ordinary commercial funds are blocked or authorize a secured creditor to withhold a payoff indefinitely until every diligence demand is satisfied. The Lenders may conduct reasonable sanctions screening. They may not invoke counterterrorism authorities without identifying any counterterrorism or sanctions nexus and then characterize their self-created uncertainty as irreparable injury.

The Lenders' reliance on the pending FERC investigation is equally speculative. A document-preservation notice is not a finding of wrongdoing, much less a directive prohibiting repayment of debt or termination of contractual governance rights. The Lenders identify no FERC order, regulation, agency communication, or other authority suggesting that acceptance of the tendered funds would violate federal law, interfere with the investigation, or expose them to liability. Their assertion that accepting payment might somehow "implicate or prejudice" their position is unsupported by any identified legal or factual basis.

**B. The Lenders have not shown a likelihood of success on their declaratory claim.**

**1. "Indefeasible" does not mean "subject to every condition the Lenders later demand."**

The Forbearance Agreement defines the result required for Payment in Full: cash payment of all principal, interest, fees, costs, expenses, and other amounts owing, plus specified

treatment of the letter of credit. Ex. A § 2(a). It does not say that the Lenders may refuse to provide a payoff amount until they approve the borrower's financing, select the escrow agent, receive broad historical discovery, complete an open-ended FERC review, or obtain every document they request.

The Lenders attempt to convert the word "indefeasible" into a discretionary closing condition. Nothing in the text supports that construction. Questions concerning clearance of funds, avoidance risk, allocation, and the letter of credit can be handled through ordinary closing documents. They do not create a lender veto over the express right to procure payoff funding.

**2. The Lenders materially omit the specific Payment-in-Full carveouts.**

The central contractual defect in the Lenders' Motion appears in their summary of Section 11. They tell the Court that Section 11(b) prohibits the Omnis Parties from raising capital or incurring indebtedness without Lender approval. Lenders' Mot. at 18. They omit the operative proviso: "provided, further, that nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations." Ex. A § 11(b). They likewise cite Section 11(d) as prohibiting material asset transactions, while omitting its express exclusion for "transactions that will result in the Payment in Full of all Obligations under the Loan Agreements." *Id.* § 11(d).

Delaware law requires the agreement to be read as a whole and gives effect to specific language over general language. *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). The Delaware Supreme Court has reaffirmed that a specific provision may qualify a general provision so that the general term does not swallow the specific exception. *Thompson Street Capital Partners IV, L.P. v. Sonova U.S. Hearing Instruments*, LLC, 340 A.3d 1151, 1166 (Del. 2025). The Lenders' construction would make the Payment-in-Full carveouts meaningless

because any financing could be recharacterized as new debt or a related-party agreement requiring the very consent the carveout was designed to avoid.

Sections 8(e) and 13 reinforce the same conclusion. The parties agreed not to take or omit actions for the primary purpose of materially interfering with, frustrating, hindering, or unreasonably interfering with efforts to reach Payment in Full or comply with the agreements. Ex. A §§ 8(e), 13. Refusing for months to provide a current payoff figure, then invoking the resulting uncertainty to preserve control, is precisely the conduct those provisions address.

**3. The amount and form of the tender present curable questions, not a basis for the Lenders' requested declaration.**

The Omnis Parties do not ask the Court to ignore the difference between an uncertified check and collected funds, the fact that the check names TRAG, or the unresolved letter-of-credit component. Those are closing-mechanics issues. They are not grounds to declare that the Lenders may refuse payment until the Court approves the entire DFC transaction and every historical inquiry the Lenders have raised.

The payee issue is particularly self-created. The Omnis Parties repeatedly requested the allocation between TRAG and RG Energy and the wiring instructions. Exs. H-J. The Lenders never supplied them. The amount issue is similarly remediable. Plaintiffs have agreed to pay any properly documented shortfall. The equitable answer is to require the Lenders to state the amount and permit a prompt top-up—not to preserve lender control indefinitely.

**4. The Lenders have not established a prohibited related-party transaction.**

The Lenders rely principally on Angela Chen's prior investment and lending relationships with Omnis entities. That does not establish that payment of the Lenders' debt is itself prohibited.

First, the funded transaction is a loan from DFC to OFT. The Lenders identify no present agreement by which QP or OP became a borrower, guarantor, grantor, seller, or transferor before Payment in Full. Section 7's related-party approval language concerns transactions involving QP and its members or affiliates. The present tender does not transfer QP or OP property. Second, even assuming the OFT loan is an affiliate or related-party agreement within Section 11(g), Section 11(b) specifically provides that nothing in Section 11 limits procuring funds resulting in Payment in Full. The specific provision controls the general restriction.

Third, Nathan's email does not establish a contractual violation. He wrote: "Given that I have no window into how this potential transaction is structured, I do not approve of any payoff related to the TRAG and RG debt." Lenders' Mot. at 19. That statement confirms he disapproved the payoff before identifying any term that violated any provision. Whatever approval rights he has over a separate QP or OP related-party agreement, he does not possess an unrestricted veto over the express right to procure funds to pay the Lenders.

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006), illustrates the interpretive problem. Delaware courts do not stretch negotiated restrictions beyond their text to prohibit a transaction sophisticated parties did not expressly bar. The Lenders cannot transform a general related-party covenant into an absolute prohibition on repayment from an affiliated funding source when the same section expressly authorizes procuring payoff funds.

**5. The Lenders have not established that the tender is a sale or disposition.**

The Lenders repeatedly say the DFC transaction "may" constitute a sale of the Plant or OP assets. Lenders' Mot. at 18-20. But likelihood of success requires more than speculation. The available documents state that DFC funded OFT and contemplate a future restructuring of that loan. There is no present asset-purchase agreement, equity-transfer agreement, or transfer of

Plant control. The Lenders' Sale Process rights under Section 8 are triggered by a transaction to sell OP, the Plant assets, or OP equity—not by the repayment of the Lenders' loans.

The Lenders' argument also ignores Section 11(d), which expressly excludes transactions resulting in Payment in Full from the restriction on material asset transactions. Even if some ancillary step were later proposed, the Court could address that discrete step based on actual documents. The possibility of a future transaction cannot justify an injunction preserving every Lender and Independent Manager right now.

**6. The historical accusations against Hodson do not prove entitlement to the requested injunction.**

The Lenders devote much of their motion to disputed allegations concerning prior uses of WVEDA and Lender funds, StarSource, a pending federal complaint, and an asserted FERC investigation. Those allegations may be relevant to the counterclaims or discovery. They do not establish that DFC's funds are unavailable, sanctioned, unlawful, or part of a sale of the Plant. A complaint filed by a former employee is not a finding of fact. A document-preservation notice is not an enforcement determination. Historical WVEDA default notices do not erase WVEDA's current willingness to provide a ninety-day accommodation.

The Rule 65 inquiry concerns immediate harm from the conduct to be restrained. Character attacks and unadjudicated allegations do not establish that the Lenders will suffer irreparable harm from being paid what they are owed and relinquishing the temporary control rights that the parties agreed would terminate upon Payment in Full.

**C. The balance of hardships favors the Omnis Parties and a neutral, reciprocal standstill.**

The Lenders face minimal hardship from the denial of their requested order. They possess the tender. They can leave it unnegotiated. They retain their existing documents and liens until the Court determines that Payment in Full has occurred.

The harm to the Omnis Parties, OP, QP, WVEDA, employees, vendors, and prospective purchasers is substantially greater. WVEDA's ninety-day forbearance creates a finite opportunity to stabilize the State's approximately $50 million exposure and pursue an orderly transaction. NRG and other prospective purchasers require diligence now. A one-sided order preserving lender control, empowering Nathan to continue controlling information and access, and prohibiting QP from advancing a sale could consume that window and destroy transaction value that cannot be recreated later.

The requested order would also permit the Lenders to advance their own restructuring while blocking alternatives unless the Court expressly restrains them. Their proposed restructuring would impose new liens, fees, governance controls, and a lender-approved sale. Equity should not grant the Lenders unilateral control over the field while the Omnis Parties' tender sits in their counsel's office.

**D. The public interest favors repayment, transparency, and preservation of the WVEDA sale window.**

The public interest favors payment of legitimate secured obligations, protection of WVEDA's public funds, preservation of a major West Virginia generating asset, continued employment and vendor relationships, and a competitive process designed to maximize value. Those interests are served by a current payoff statement, focused compliance review, and buyer

diligence. They are not served by allowing the Lenders to retain undefined control while refusing to state the amount necessary to end that control.

The competing WVEDA proposals further expose whose position actually protects the public creditor. Under the Lenders' proposal, WVEDA would receive only a subordinated position: TRAG and RG Energy would remain senior and would be paid before the State. The Omnis Parties' proposal is materially better. Following Payment in Full and the release of the existing Lender Liens, DFC is prepared to permit WVEDA to receive a true first-priority lien on the Plant and relevant real estate, senior to the new lender. In practical terms, TRAG proposes that the State remain second until TRAG is paid; the Omnis Parties propose that the State be paid and secured first. The public interest does not favor an injunction preserving the inferior proposal. The contemporaneous correspondence states that the new lender would subordinate to WVEDA, whereas TRAG's proposal would grant WVEDA a lien only after TRAG's priority was satisfied.

The Lenders invoke sanctions and FERC compliance as public-interest concerns. Legitimate compliance concerns should be addressed. But they can be addressed directly and promptly through beneficial-ownership certification, sanctions screening, source-of-funds verification, and any required regulatory condition. The public interest does not support using hypothetical regulatory concerns to block repayment and a State-supported sale process.

**E. The requested relief is overbroad, affirmative, and unworkable.**

**1. An order "holding the Forbearance Agreement in place" would decide the merits.**

Whether the Forbearance Agreement terminated is the central declaratory dispute. An interim order declaring it to remain in place and preserving all Lender and Independent Manager rights would give the Lenders the ultimate relief they seek before an evidentiary hearing. A true

standstill would preserve assets and ordinary operations without deciding whether Payment in Full occurred or which governance position is ultimately correct.

**2. The Lenders' Request to Reinstate Nathan Seeks Mandatory Merits Relief, Not Preservation of the Status Quo.**

QP has already delivered written notice removing Nathan from OP. Ex. Q. (attached hereto). Although the Lenders label their request preservative, the proposed order would grant mandatory and affirmative merits relief. It would reverse Nathan's completed removal, displace QP's interim appointee, compel delivery of the tendered funds to the Court, and restore contractual authority that Plaintiffs contend terminated upon Payment in Full. That relief would not merely preserve the present circumstances; it would affirmatively reconstruct the prior governance arrangement before the Court has resolved the parties' contractual dispute.

**3. The requested prohibition on "asserting or claiming" Payment in Full is improper.**

The Lenders ask the Court to prohibit the Omnis Parties from "asserting or claiming that the Loan Agreements have been paid in full." Lenders' Mot. at 25. Rule 65 authorizes restraint of conduct causing cognizable harm; it does not authorize an order preventing a litigant from stating facts in pleadings, communications with counterparties, or negotiations. The requested language is vague, overbroad, and incompatible with Rule 65(d)'s requirement that an injunction describe the acts restrained in reasonable detail.

**4. The Lenders have not addressed the security required by Rule 65(c).**

Any injunction preserving disputed lender control, delaying buyer diligence, or impairing the WVEDA window creates a substantial risk of loss if improvidently granted. Rule 65(c) requires security sufficient to compensate a party wrongfully restrained. The Lenders have not proposed any bond. If the Court grants any portion of their requested relief, it should require

meaningful security tied to the potential loss of sale value, increased WVEDA exposure, professional fees, operating losses, and other consequences of delay.

**F. The Lenders are not entitled to emergency relief on a selectively developed record.**

The Omnis Parties are fully prepared for an expedited evidentiary hearing. They are prepared to present testimony concerning the tender, the amount and source of DFC's funds, the Lenders' investment returns, TRAG's warrant and equity interest, the proposed WVEDA security arrangement, the Plant's value, and the removal and temporary replacement of Nathan.

But an expedited hearing should not become a vehicle through which the Lenders obtain sweeping merits relief while withholding the evidence most directly bearing on their factual claims. The Lenders and their principals possess hundreds of recorded telephone conversations involving Simon Hodson and Tony Robbins. Those calls concern the investment, the Plant, its value, the Lenders' returns, control of the sale process, and the parties' respective obligations. The Omnis Parties have requested those materials in discovery.

If the Court sets an evidentiary hearing, the Lenders should be required to produce the recordings, transcripts, and related communications sufficiently in advance of that hearing to permit their meaningful use. The Lenders cannot ask the Court to credit their assertion that they face an existential and irreversible loss while withholding contemporaneous recordings in which their principal discusses the investment's returns, value, and strategic objectives. The appropriate immediate disposition remains denial of the requested TRO. Any later preliminary-injunction hearing should proceed on a developed evidentiary record rather than the selective presentation accompanying the Lenders' Motion.

**G. The Court should deny the Lenders' Motion rather than rewrite the parties' agreement through interim relief.**

The Lenders' requested relief is not a neutral preservation of the status quo. It would grant them the principal relief they seek on the merits before an evidentiary record has been developed. The Lenders ask the Court to declare, at least provisionally, that Payment in Full has not occurred; preserve the Forbearance Agreement indefinitely; restore Nathan to control of OP; maintain all Lender consent and approval rights; prevent Plaintiffs from asserting that Payment in Full has occured; and place the tendered funds under the Court's control. Each request assumes the answer to the central disputed question—whether the Omnis Parties were entitled to procure and tender funds resulting in Payment in Full under the parties' agreement.

Rule 65 does not permit the Lenders to obtain an advance merits determination by labeling their requested relief a preservation of the status quo. The status quo is not the arrangement the Lenders prefer. Nor is it frozen at the moment immediately before Plaintiffs exercised their contractual right to procure funds for Payment in Full. The relevant status quo is the parties' contractual relationship, including the express provisions permitting Plaintiffs to obtain payoff financing and providing that the Lenders' temporary governance, collateral, and approval rights terminate upon Payment in Full.

The Lenders have also identified no need for an equitable compromise. They have been offered more than $75 million, together with an express commitment to pay any additional amount supported by a proper accounting. They have refused the tender, refused to provide a definitive payoff amount, and now ask the Court to preserve their control over the Plant while this dispute proceeds. Equity does not reward a creditor for manufacturing uncertainty and then invoking that uncertainty as the basis for extraordinary relief.

Nor should the Court use interim relief to preserve the Lenders' opportunity to capture the Plant's future value. The Lenders can be made entirely whole through payment of every dollar properly owed to them. Once that occurs, all remaining economic risk—including the risk of the Plant's operation, the WVEDA obligation, any refinancing, and any future decrease in value—belongs to Plaintiffs and their financing source. The Lenders are not entitled to retain control, collateral rights, or governance authority merely because the underlying asset may ultimately prove more valuable than the secured debt.

## V. CONCLUSION

The Lenders have failed to demonstrate a likelihood of success on the merits, irreparable injury, a favorable balance of hardships, or that their requested relief would serve the public interest. Their Motion rests on the untenable premise that the contractual consequences of Payment in Full constitute irreparable harm and asks the Court to preserve lender control rights that the parties expressly agreed would terminate when the debt was paid.

The Lenders are not facing the loss of their investment. Plaintiffs have tendered substantial, immediately available funds and remain prepared to pay every additional dollar shown to be properly due. The Lenders' claimed injury is therefore not the risk of nonpayment; it is the loss of control and future upside after payment. That is not irreparable harm. It is the result for which the parties bargained.

Accordingly, Plaintiffs respectfully request that the Court deny TRAG LLC's and RG Energy LLC's *Motion for Temporary Restraining Order and Preliminary Injunction* in its entirety. Plaintiffs further request that the Court proceed with an expedited evidentiary hearing on the parties' pending claims and motions, at which Plaintiffs are prepared to present evidence concerning the tender, the Lenders' returns, the value of their equity interests, the recorded

communications among the relevant parties, the proposed WVEDA security arrangement, and the absence of any genuine risk to the Lenders.

Respectfully submitted,

**OMNIS GLOBAL TECHNOLOGIES, LLC,**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC**

By Counsel

/s/ *Isaac R. Forman*
Isaac R. Forman (WV State Bar No. 11668)
Levi B. Pellegrin (WV State Bar No. 13669)
HISSAM FORMAN DONOVAN RITCHIE, PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304–982–8056 *fax*
iforman@hfdrlaw.com
lpellegrin@hfdrlaw.com

**IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA**

**OMNIS GLOBAL TECHNOLOGIES, LLC**
**OMNIS FUEL TECHNOLOGIES, LLC,**
**QUANTUM PLEASANTS, LLC,**

**Plaintiffs,**

**v.**

**Civil Action No.: 26-C-14**
**Judge Timothy L. Sweeney**

**TRAG LLC, RG ENERGY LLC, and**
**GILBERT NATHAN,**

**Defendants.**

**CERTIFICATE OF SERVICE**

The undersigned counsel does hereby certify that on the 22nd day of July 2026, he electronically filed the *Plaintiffs/Counterclaim-Defendants' Response in Opposition to TRAG LLC's and RG Energy LLC's Motion for Temporary Restraining Order and Preliminary Injunction* with the Clerk of this Court via WV E-file, which will send electronic notification of such filing to counsel of record.

/s/ *Isaac R. Forman*
Isaac R. Forman (WV State Bar No. 11668)

E-FILED | 7/22/2026 2:56 PM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** Gregson Perry <gperrylaw@prodigy.net>
**To:** Manoukian, Kristine <kmanoukian@mcdermottlaw.com>
**Cc:** Koff, Douglas <dkoff@mcdermottlaw.com>; iforman@hfdrlaw.com <iforman@hfdrlaw.com>; David Orenstein <david@orenste.in>; Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Sent:** Friday, July 17, 2026 at 08:17:04 PM PDT
**Subject:** Re: payoff/loan acquisition

Dear Ms. Manoukian,

It is most unfortunate that your client continues to play games and further hinder and impede QP's efforts to repay the TRAG/RGE debt in full. As you are aware the Forbearance Agreement only provides one basic condition to a Payment in Full—it cannot involve a sale of QP, OP or the Plant. The current funding does not. As such the only remaining issue is the payoff amount which we have continually asked for since your April 24 email and been repeatedly denied. Given this and the fact that you refused to send us wire information, we were forced to overnight a check in the amount of $75,640,000 which was the amount in the restructuring agreement, albeit in brackets. We advised you the amount might not include the nominal accrual of interest, so please inform the undersigned by this Monday, 9:00 est. as to the correct amount you claim with a detailed calculation thereof, and we will wire the supplemental amount (assuming you provide us the wire information, and if not, we will overnight a check). If this information is not timely provided, we will assume our prior payment was sufficient and move forward on this basis.

Our insistence on timing is made more imperative by the fact that NRG has expressed an interest in purchasing the Plant and will send us an NDA. We must have Plant access and financial information to proceed, and since your client has refused to provide both to QP, let alone a definitive payoff letter, we have no choice but to act immediately. Quite simply, we cannot afford further delays. By the way, as for the failure to deliver a payoff letter, you might refer to Cal. Civil Code 2943 imposing penalties and damages on a lender for failing to timely comply.

With regard to FERC and CFIUS issues, please see Vinson and Elkins email report below:

1. There is no FERC reason that the payoff cannot occur.
2. Whether CFIUS has jurisdiction is a very facts and circumstances test related to the warrants and attached governance. However, assuming Angela is not a non-US governmental official (but merely a non-US citizen), there wouldn't be a mandatory filing. Instead, *if* CFIUS has jurisdiction (an open question, though unlikely), and CFIUS doesn't like this, the risk would be the committee might make Angela divest, which doesn't negatively affect TRAG or anyone else, only her.

As for information concerning the lender, it is as follows:

Full legal name: Dynamic Finance Corporation

Address: [redacted]

FEIN: [redacted]

Bank: Cathay Bank
Anna [redacted] Account officer [redacted]

Also attached are letters from Cathay Bank (obviously a reputable financial institution) confirming the bona fides of the lender and its long-term relationship with the bank.

As for the need to confirm the loan terms and the possible approval of Mr. Nathan, please know this is not necessary. The loan is being made to Omnis Fuel Technologies and therefore outside the purview of Mr. Nathan and the OP and QP operating agreements. As stated above, the loan is compliant with the terms of the Forbearance Agreement.

As to this latter point, the Forbearance Agreement does not require compliance with any of the issues or concerns you have raised, but we have nonetheless addressed them as a courtesy to avoid further delays. We remind you of your client's and Mr. Nathan's obligations under Sections 9(b)(i), 13 and 14 of the Forbearance Agreement to (i) not hinder, delay or unreasonably interfere with the Omnis Parties' ability to comply with the terms of the agreement, (ii) act in good faith and in the best interests of QP and OP, and (iii) execute all documents and instruments necessary to facilitate compliance with the agreement. We expect your clients and Mr. Nathan to adhere to their responsibilities and not further impede payment in full of the TRAG/RGE indebtedness

I look forward to receiving the payment information requested by Monday morning at 9:00 est.
Sincerely,
Greg Perry

Law Offices of Gregson M. Perry
[redacted]

E-FILED | 7/22/2026 2:56 PM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** Manoukian, Kristine <kmanoukian@mcdermottlaw.com>
**Sent:** Monday, July 20, 2026 2:22 PM
**To:** Charles Gassenheimer <cgassenheimer@omnisenergy.com>
**Cc:** Ajay K. Gupta <ajay@robbinsgupta.com>; Nicholas S Preservati <nicholas.s.preservati@wv.gov>; Simon Hodson <skhodson99@gmail.com>; Simon Hodson <simonkhodson@gmail.com>; Randall Smith <rsmith@omnisenergy.com>; Blake Stephens <bstephens@omnisenergy.com>; Nick Thomas <nick@jnicholsonlawgroup.com>; Robbins Tony <passiontr@mac.com>; joseph.d.brouse@wv.gov <joseph.d.brouse@wv.gov>; teresa.w.helmick@wv.gov <teresa.w.helmick@wv.gov>; taylor.s.cole@wv.gov <taylor.s.cole@wv.gov>; Gilbert Nathan <gil@jacksonsquareadvisors.com>; Shaughnessy, Brian F. <bshaughnessy@kramerlevin.com>; Woolverton, Alexander <awoolverton@kramerlevin.com>; David Hindman <dhindman@alixpartners.com>
**Subject:** [EXTERNAL] RE: URGENT: offering a call on restructuring

Charles,

You are wrong. TRAG or RGE have not been paid in full or otherwise on the loans. The loans remain in default.

As you are aware, the payment is not indefeasible as expressly required by the documents for a variety of reasons.

Moreover, no one has provided us the following, despite repeated requests-

- We need to see the underlying documentation concerning the transaction that caused Dynamic Finance Corporation to issue the check you referred to in order to ensure compliance with the Forbearance Agreement. Your representations are meaningless without that documentation. This includes whether the transaction is impermissible under the documents. We are not sure why this information is being hidden from us and must assume at this point that is being concealed because it is an improper transaction, and in violation of the Forbearance Agreement. If it is not, simply provide the information to demonstrate that. And as you are aware Gill has made it clear he has not approved this transaction because it is clearly a related party transaction involving Quantum Pleasants and its members or affiliates.

- The amount attempted to be paid is lower than the amount owed TRAG and RGE.

For these and other reasons, you are wrong and you should cease and desist from making unfounded and improper statements about this issue. Your actions are value destructive and have the potential to be massively so. And please be aware that if you continue, you will be liable for any damages that arise from such actions.

**Kristine Manoukian**
Partner

**T:** +1 212 756 2466 | **M:** +1 917 573 9509
kmanoukian@mcdermottlaw.com | LinkedIn

McDermott Will & Schulte LLP | mcdermottlaw.com
919 Third Avenue | New York, NY 10022

McDermott Will & Schulte

E-FILED | 7/22/2026 2:56 PM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

**From:** Helmick, Teresa W <teresa.w.helmick@wv.gov>
**Sent:** Monday, July 20, 2026 6:26 AM
**To:** Hindman, David <dhindman@alixpartners.com>
**Cc:** Ajay Gupta <ajay@robbinsgupta.com>; Preservati, Nicholas S <nicholas.s.preservati@wv.gov>; Charles Gassenheimer <cgassenheimer@omnisenergy.com>; Simon Hodson <skhodson99@gmail.com>; Simon Hodson <simonkhodson@gmail.com>; Randall Smith <rsmith@omnisenergy.com>; Blake Stephens <bstephens@omnisenergy.com>; Nicholson Thomas <nick@jnicholsonlawgroup.com>; Tony Robbins <passiontr@mac.com>; Kristine Manoukian <kmanoukian@mcdermottlaw.com>; joseph.d.brouse@wv.gov; taylor.s.cole@wv.gov; Gilbert Nathan <gil@jacksonsquareadvisors.com>; Brian F. Shaughnessy <brian.shaughnessy@hsfkramer.com>; Alexander Woolverton <alexander.woolverton@hsfkramer.com>
**Subject:** Re: URGENT: offering a call on restructuring

Omnis/Quantum folks,

We have held internal discussions here at WVEDA regarding the status of the Quantum Pleasants loan and the next steps from WVEDA's standpoint.

WVEDA believes an interim agreement is the best next step. Given the ongoing negotiations on the potential sale of the power plant, the EDA is willing to enter into a 90-day forbearance agreement to allow the details of a potential sale to be worked out.

In exchange for forbearance on payment of the outstanding balance, WVEDA would require Omnis to grant a deed of trust against all real estate and the power plant as security for the loan. WVEDA understands that this deed of trust would automatically be a second lien subordinate to the TRAG/RGE deed of trust. WVEDA would require this deed of trust to be filed within 14 days to trigger the forbearance.

If it is clear after the 90-day period that no sale is likely, WVEDA will consider restructuring the loan if it makes sense at that time. WVEDA staff and the Board of Directors must approve any restructuring.

We look forward to your feedback on this proposal. To maintain open communication, please send any response via email to the group.

**Teresa W. ("Terri") Helmick**
**General Counsel**
**West Virginia Economic Development Authority**
180 Association Drive
Charleston, WV 25311
Office: 304-558-3651
Direct Line: 681-313-2789

E-FILED | 7/22/2026 2:56 PM
CC-37-2026-C-14
Pleasants County Circuit Clerk
Millie Farnsworth

HFDR
HISSAM FORMAN DONOVAN RITCHIE PLLC

iforman@hfdrlaw.com
P.O. Box 3983
Charleston, WV 25339

July 20, 2026

*Via Email*

Gilbert Nathan
gil@jacksonsquareadvisors.com

David Hindman
dhindman@alixpartners.com

**Re: Immediate Removal, Turnover of Control, Preservation of Records, and Transition of Omnis Pleasants, LLC**

Gentlemen:

We represent Quantum Pleasants, LLC ("QP"), the sole member and 100% owner of Omnis Pleasants, LLC ("OP"), as well as the other Omnis parties, including Omnis Fuel Technologies ("OFT"), QP's sole Class A member.

As you know, the Omnis parties have tendered Payment in Full of the obligations asserted by TRAG LLC and RG Energy LLC. Despite repeated requests, TRAG and RGE have inexplicably refused to provide or confirm the amount they contend is necessary to accomplish Payment in Full. They cannot refuse to state the amount due and then rely on the uncertainty created by that refusal to prevent satisfaction of the obligations or perpetuate their temporary governance rights.

In the absence of a payoff statement, the Omnis parties calculated their tender using the amount stated by TRAG and RGE in their own recently proposed restructuring term sheet. That term sheet represents that the aggregate outstanding amount of all obligations under the existing TRAG/RGE loan agreements is $75,640,000. The Omnis parties believe that figure materially overstates the amount properly due, but nevertheless relied upon it to ensure that their tender was more than sufficient to satisfy all legitimate obligations. The tender was made subject to a full accounting and without waiving the right to recover any excess amount, dispute unsupported interest, fees, costs, or expenses, or challenge TRAG's and RGE's continuing refusal to provide a proper payoff statement.

Nathan has asserted that the source or structure of the tender constitutes a prohibited related-party transaction. That assertion is incorrect. The Omnis parties dispute both the factual premise that the transaction is a prohibited related-party transaction and the legal premise that any general restriction on affiliate or related-party transactions can be used to prevent Payment in Full.

The Forbearance Agreement expressly provides that "nothing herein will limit or restrict the Omnis Parties from procuring funds resulting in a Payment in Full of all Obligations." It separately permits transactions resulting in Payment in Full. Those specific provisions cannot be displaced by a generalized characterization of the funding source as affiliated or related.

In any event, Nathan has no authority to use a disputed related-party characterization as a basis to reject or obstruct Payment in Full, perpetuate the temporary lender-control structure, or continue exercising authority over OP after the obligations have been satisfied. Any objection concerning the separate terms between the Omnis parties and their funding source is reserved for the appropriate parties and forum; it does not permit TRAG, RGE, or Nathan to refuse payment of the debt.

The Omnis parties' tender constitutes Payment in Full. TRAG's and RGE's refusal to accept the funds does not permit them, or persons appointed as part of their temporary forbearance arrangement, to preserve governance and control rights that terminated upon Payment in Full. Section 11(b) of the Amended and Restated Forbearance Agreement expressly provides that Payment in Full "shall terminate this Agreement and the Loan Agreements." Accordingly, the Forbearance Agreement and the temporary restrictions and lender-consent rights imposed through it are no longer operative.

Accordingly, effective upon receipt of this letter and as of July 20, 2026, QP is resuming full governance and operational control of OP and the Pleasants Power Station. OP and the Plant shall be turned over immediately to QP and its authorized representative in accordance with the directions below.

**I. Immediate Removal of Gilbert Nathan from OP**

QP hereby removes Gilbert Nathan, with immediate effect, as the Independent Manager and sole Director of OP.

The amendment to OP's Operating Agreement provides that QP may elect, remove, and replace the Independent Manager by written consent and requires the Lenders' consent only until Payment in Full of the obligations. Because the Omnis parties have tendered Payment in Full and the Forbearance Agreement has terminated, no consent from TRAG or RG Energy is required for Nathan's removal.

This removal applies immediately and unequivocally to Nathan's positions with OP. This letter does not, at this time, remove Nathan from any position he may continue to hold with QP. QP expressly reserves the right to take further action concerning Nathan's role at QP after he has completed the turnover and disclosure obligations described below.

Effective upon receipt of this letter, Nathan:

1. has no authority to act, speak, negotiate, approve, reject, direct, bind, or make decisions on behalf of OP;

2. shall cease holding himself out as OP's Independent Manager, Director, representative, fiduciary, or authorized decision-maker;
3. shall not communicate with any employee, vendor, creditor, governmental entity, purchaser, financing source, or other third party as a representative of OP, except as specifically authorized in writing by QP or its counsel for purposes of completing the transition;
4. shall not access OP bank accounts, electronic systems, data rooms, email accounts, records, facilities, or other property;
5. shall not enter or return to the Plant or any OP premises without the prior written authorization of Charles Gassenheimer or counsel for QP; and

Any action taken by Nathan after receipt of this letter that purports to bind OP or exercise authority on OP's behalf will be unauthorized.

**II. Appointment of Charles Gassenheimer**

Effective July 20, 2026, QP has appointed Charles Gassenheimer to serve as OP's interim Director and authorized representative.

Mr. Gassenheimer will exercise governance oversight and direct the transition of OP and the Plant pending QP's completion of discussions with the West Virginia Economic Development Authority ("WVEDA") concerning the selection and appointment of a more permanent independent manager.

All OP officers, employees, contractors, advisors, and service providers shall take direction from Mr. Gassenheimer or another person designated by QP in writing.

**III. Immediate Turnover of OP Property and Information**

Nathan must immediately turn over to QP all OP property, documents, information, and materials in his possession, custody, or control. His removal does not relieve him of his continuing fiduciary, contractual, preservation, and transition obligations to OP and QP.

Within twenty-four hours after receipt of this letter, Nathan shall provide QP and its counsel with:

1. all OP books and records;
2. all financial statements, general ledgers, trial balances, bank statements, account reconciliations, cash reports, accounts-payable reports, accounts-receivable reports, budgets, forecasts, and financial models;
3. all current and historical cash-flow projections, including any rolling thirteen-week cash-flow forecasts;
4. all capital-expenditure plans, capital-improvement plans, maintenance schedules, outage plans, repair estimates, operating reports, and assessments of the Plant's condition;
5. all board materials, written consents, resolutions, meeting notices, minutes, presentations, analyses, and materials concerning material OP decisions;

6. all contracts, leases, vendor agreements, consulting agreements, engagement letters, insurance materials, regulatory materials, tax materials, permits, correspondence, and notices relating to OP or the Plant;
7. all communications and documents concerning WVEDA and the WVEDA Loan;
8. all communications and documents exchanged with Cardinal, or any other actual or potential purchaser, bidder, investor, lender, financing source, advisor, broker, or diligence representative;
9. all communications and documents exchanged with TRAG, RG Energy, Tony Robbins, their counsel, their representatives, or any prospective purchaser or financing source introduced or supported by them;
10. all letters of intent, indications of interest, term sheets, offers, bids, proofs of funds, diligence requests, transaction documents, and drafts relating to any proposed sale, financing, restructuring, refinancing, foreclosure, disposition, or other transaction involving OP or the Plant;
11. all communications concerning any proposed restructuring term sheet, including the restructuring proposal recently circulated by TRAG;
12. all passwords, credentials, keys, access cards, security tokens, multifactor-authentication devices, bank tokens, and other means of access to OP property, records, accounts, or systems; and
13. all other information reasonably necessary for QP and Mr. Gassenheimer to assume control of OP without interruption.

This obligation includes materials located on personal accounts or devices to the extent they concern OP business, as well as communications with counsel where OP is the client or holder of the applicable privilege.

If Nathan possesses any OP-owned telephone, computer, tablet, external drive, storage device, security token, or other electronic equipment, he must return the device intact and unaltered within twenty-four hours. Nathan shall not delete, alter, transfer, wipe, reset, encrypt, or remove any information from any company-owned device before returning it.

Nathan must also identify any OP information stored on a non-company device, personal account, cloud account, messaging application, or other location and cooperate in preserving and transferring that information.

**IV. Standstill on Extraordinary Actions**

Effective immediately, neither Nathan nor Hindman, AP Services, AlixPartners, Jackson Square Advisors, or anyone acting at their direction may take, authorize, approve, recommend, negotiate, or implement any action outside the ordinary course of OP's safe, routine, and continuing operation without QP's prior written approval through Mr. Gassenheimer or counsel.

Prohibited actions include, without limitation:

1. negotiating, approving, executing, or implementing TRAG's proposed restructuring term sheet or any similar restructuring;

2. pursuing, negotiating, approving, or consummating any sale, transfer, foreclosure, private disposition, public disposition, acceptance of collateral, or other disposition of OP, the Plant, or any material asset;
3. entering into or modifying any financing, refinancing, credit facility, guaranty, lien, mortgage, deed of trust, security agreement, intercreditor agreement, or pledge;
4. incurring indebtedness outside the ordinary course;
5. transferring, encumbering, impairing, or disposing of any OP asset;
6. amending any operating agreement, organizational document, governance arrangement, or delegation of authority;
7. entering into, amending, terminating, or waiving any material contract;
8. hiring or terminating senior personnel, consultants, professionals, or advisors;
9. making extraordinary expenditures, distributions, transfers, or payments;
10. initiating or consenting to any bankruptcy, insolvency, receivership, restructuring, or similar proceeding; or
11. communicating any purported approval, rejection, recommendation, or commitment to a prospective purchaser, financing source, creditor, governmental entity, or other transaction participant.

Nothing in this directive is intended to interrupt safe Plant operations. Ordinary payroll, routine vendor payments, regulatory compliance, ordinary maintenance, safety measures, and other recurring operating matters may continue, subject to Mr. Gassenheimer's oversight.

**V. Hindman and AlixPartners Transition**

QP presently directs David Hindman to remain available for a limited transition period. During that period, Hindman shall continue only those ordinary-course operational functions necessary to maintain safe and uninterrupted Plant operations and shall not make any decision outside the ordinary course without Mr. Gassenheimer's prior written approval.

Hindman shall provide QP and Mr. Gassenheimer with a complete management and financial transition briefing within two business days after receipt of this letter. That briefing shall include, at minimum:

1. current cash balances and all bank accounts;
2. current accounts payable and accounts receivable;
3. the most recent rolling thirteen-week cash-flow forecast;
4. current and projected operating results;
5. current operating and capital budgets;
6. required and proposed capital improvements;
7. deferred maintenance, repair, outage, and reliability issues;
8. current and anticipated vendor obligations;
9. current employee and contractor matters;
10. regulatory, environmental, insurance, and compliance matters;
11. the status of all material contracts and negotiations;
12. the status of all discussions with WVEDA, TRAG, RG Energy, and other creditors;
13. the status of all sale, financing, and diligence processes; and

14. any material issue that QP should know to operate, finance, preserve, or sell OP and the Plant.

Following completion of that transition, QP anticipates terminating Hindman's services and the engagement of AP Services and AlixPartners, except to the extent QP determines that a narrowly defined role is useful for verifying historical figures, supporting buyer diligence, answering specific accounting or operational questions, or completing identified transition items.

Until QP provides further written direction, neither Hindman nor AlixPartners is authorized to expand the scope of its work, incur new professional fees outside the ordinary course, negotiate a transaction, or undertake any new project.

**VI. NRG Energy Due Diligence**

NRG Energy is presently evaluating a potential acquisition transaction involving the Plant and/or QP's ownership interest in OP.

Nathan and Hindman must fully cooperate with that diligence process as directed by QP and Mr. Gassenheimer. That cooperation includes promptly:

1. producing requested financial, operational, environmental, technical, maintenance, contractual, and regulatory information;
2. providing complete and accurate responses to diligence inquiries;
3. identifying and producing previously requested materials;
4. facilitating reasonable site access, inspections, management calls, and meetings;
5. making appropriate Plant personnel and subject-matter experts available; and
6. disclosing any prior communications, submissions, representations, or materials provided to NRG Energy.

Nathan shall not communicate with NRG Energy as an OP representative after receipt of this letter unless specifically requested by QP for purposes of transferring historical information. Hindman shall coordinate all further NRG Energy diligence through Mr. Gassenheimer and QP's counsel.

The foregoing cooperation and noninterference obligations apply equally to any other prospective purchaser, investor, or transaction participant with whom QP is presently negotiating, or may negotiate, regarding a potential sale of OP, the Plant, QP's ownership interest in OP, or any material Plant-related assets. Nathan, Hindman, and their respective representatives shall promptly facilitate reasonable diligence requested by any such party when directed by QP or Mr. Gassenheimer and shall not obstruct, delay, condition, or independently control those diligence efforts.

**VII. WVEDA Forbearance and Security Documentation**

WVEDA has offered to provide OP and the applicable Omnis parties with a ninety-day forbearance period. QP and WVEDA are presently working to prepare and finalize documents memorializing that arrangement.

As part of its proposal, WVEDA has requested a deed of trust encumbering the relevant real estate and the Pleasants Power Station as security for the WVEDA obligations. QP is working with WVEDA to document an arrangement that protects WVEDA's position, preserves the Plant, and permits an orderly sale or financing process.

Nathan, Hindman, AlixPartners, and their representatives shall not interfere with, delay, contradict, or independently negotiate the WVEDA arrangement. They shall promptly provide QP with all information and documents needed to evaluate, document, and close the proposed WVEDA forbearance and security arrangement.

No deed of trust, lien, security agreement, amendment, forbearance agreement, or related document may be executed or approved on behalf of OP except by QP's authorized representative and in accordance with QP's written direction.

**VIII. Preservation and Confirmation**

Nathan and Hindman must preserve all documents and electronically stored information relating to OP, QP, the Plant, WVEDA, TRAG, RG Energy, prospective purchasers, financing sources, restructuring proposals, diligence, and the matters addressed in this letter. No such information may be deleted, altered, overwritten, destroyed, transferred, concealed, or rendered inaccessible.

Nathan and Hindman are expected to comply fully and immediately with the directives set forth above. Any action taken by either Nathan or Hindman after receipt of this letter in purported reliance on authority he no longer possesses—including any attempt to bind OP, interfere with OP's operations or property, obstruct the transition of control, withhold company materials, impede buyer diligence, or proceed with any restructuring or extraordinary transaction—will be undertaken at his own risk.

If Nathan or Hindman receives any instruction, direction, request, or communication from TRAG, RG Energy, or anyone acting on their behalf that is inconsistent with this letter or purports to authorize him to disregard, delay, or avoid any directive stated herein, he shall disregard that instruction and notify QP and its counsel immediately. TRAG and RG Energy have no authority to countermand QP's directives concerning OP following Payment in Full, and Nathan and Hindman may not rely on any contrary instruction as a basis for continuing to act on behalf of OP or withholding OP property or information.

Failure to comply is likely to subject Nathan or Hindman, as applicable, to personal liability for any resulting loss or damage, including liability arising from breach of fiduciary duty, conversion or wrongful retention of company property, interference with contractual or

prospective business relationships, spoliation or destruction of evidence, and any other applicable claim or remedy. QP and OP will seek all available legal and equitable relief, including injunctive relief, damages, attorneys' fees where recoverable, and an accounting of any actions taken or expenditures incurred without authority.

Nothing in this letter waives any claim, defense, right, privilege, remedy, or position of QP, OP, or any other Omnis party. All rights are expressly reserved.

Sincerely,

*/s/ Isaac R. Forman*
Isaac R. Forman

cc:
Nick Preservati; nicholas.s.preservati@wv.gov
Alexander Woolverton; alexander.woolverton@hsfkramer.com
Kristine Manoukian; kmanoukian@mcdermottlaw.com