**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Omnis Pleasants, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11169 (KBO)<br><br>**Hearing Date: September 3, 2026 at 11:30 a.m. (ET)**<br>**Objection Deadline: August 27, 2026 at 4:00 p.m. (ET)**<br><br>**Re: Docket Nos. 84, 86** |

**OBJECTION AND RESERVATION OF RIGHTS OF**
**OMNIS FUEL TECHNOLOGIES, LLC AND QUANTUM PLEASANTS, LLC**
**TO BID PROCEDURES MOTION AND HOULIHAN RETENTION APPLICATION**

Omnis Fuel Technologies, LLC ("**OFT**") and Quantum Pleasants, LLC ("**Quantum**") (collectively, the "**Objecting Parties**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to: (i) the *Debtor's Motion for Entry of an Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 86] (the "**Bid Procedures Motion**"); and (ii) the *Debtor's Application for Entry of an Order, Pursuant to 11 U.S.C. §§ 327 and 328(a), Fed. R. Bankr. P. 2014, and Local Rules 2014-1 and 2016-2, Authorizing Retention and Employment of Houlihan Lokey Capital, Inc. as Investment Banker to the Debtor, Effective as of August 3, 2026* [Docket No. 84] (the "**Houlihan Retention Application**") filed by Omnis Pleasants, LLC (the "**Debtor**" or "**OP**") in the above-

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

captioned case (the "**Chapter 11 Case**"). In support of this Objection, the Objecting Parties respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1. The Court should deny the Bid Procedures Motion and the Houlihan Retention Application or, at a minimum, defer both until after the Court rules on the pending Dismissal Motion. As set forth in the Dismissal Motion, this Chapter 11 Case was filed in bad faith and without corporate authority. The Debtor cannot race ahead with a section 363 sale process while the threshold question of whether it even belongs in chapter 11 remains unresolved.

2. The Houlihan Retention Application is equally premature. It would saddle the estate with unnecessary monthly fees and other obligations for an investment banker retained to facilitate a sale that may never occur if the Dismissal Motion is granted. This is especially true since the public record already has several news articles indicating that Houlihan is already actively marketing the assets even prior to its approved retention. The estate should not fund a sale process that rests on disputed authority and may become moot upon dismissal. Until the Court determines whether this case can proceed at all, the estate should not bear these costs.

3. More importantly, the Debtor has no authority to enter into any sale without Quantum's prior written approval. The Operating Agreements are clear. Gilbert Nathan, acting as the purported Independent Manager, cannot unilaterally direct or approve any sale. He cannot convert limited approval rights into unilateral control, and his involvement cannot substitute for Quantum's required consent. Yet, Quantum's consent rights are not referenced anywhere in the

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to such terms further below in the Objection.

Bid Procedures Motion. Any bidding procedures that ignore these rights are fatally flawed and cannot support a lawful sale.

4. The Debtor claims that it needs to run a "robust" sale process to maximize value, but its proposed sale timeline gives the Debtor just two and a half months to do so. The Debtor offers no evidence whatsoever to support that such a truncated timeline will result in any value maximizing sale. The truth of the matter is that the proposed sale process is just another part of the larger scheme designed to benefit TRAG and RGE (entities controlled by Tony Robbins and Ajay Gupta) to misappropriate valuable assets at the expense of the Objecting Parties. The proposed Bidding Procedures make TRAG and RGE the exclusive Consultation Parties and give them veto rights over every material aspect of the sale process. They also purport to let TRAG and RGE credit bid the full amount of their dubious claims (that the Debtor does not actually owe) and to treat any forfeited deposit as their cash collateral. Quantum is excluded entirely, consistent with being shut out by the Independent Manager prior to the Petition Date. This is not a sale process; it is a mechanism for TRAG and RGE to seize full control of the Debtor's assets and manufacture benefits only for themselves. Oddly, the Debtor supports this.

5. The Objecting Parties therefore submit that the Bid Procedures Motion and the Houlihan Retention Application should be denied or deferred. Alternatively, if the proposed sale process is allowed to proceed, the proposed Bidding Procedures Order and Bidding Procedures should be revised so that (i) Quantum's prior written approval is expressly required thereunder for any sale, (ii) the proposed sale timeline is significantly extended to allow for the Dismissal Motion to be decided by the Court and allow for a real value-maximizing process, (iii) the Objecting Parties are included as Consultation Parties, and (iv) the provisions regarding TRAG and RGE's purported credit bid and cash collateral rights are removed.

## BACKGROUND

### A. The Chapter 11 Case

6. On July 26, 2026 (the "**Petition Date**"), the Debtor commenced this Chapter 11 Case. No Committee has been appointed in this Chapter 11 Case. *See* Docket No. 66.

7. On August 14, 2026, the Objecting Parties filed the *Motion of Omnis Fuel Technologies, LLC d/b/a Omnis Energy and Quantum Pleasants, LLC for Entry of an Order (I) Dismissing the Debtor's Chapter 11 Case, or, (II) in the Alternative, Directing the Appointment of a Chapter 11 Trustee, and (III) Vacating the Interim Cash Collateral Order* [Docket No. 93] (the "**Dismissal Motion**"), together with the declaration of OFT's president in support of the Dismissal Motion [Docket No. 94], seeking, among other things, the dismissal of the Chapter 11 Case for cause as a bad-faith filing that lacked corporate authority or, in the alternative, the appointment of a chapter 11 trustee for the Debtor.

8. Contemporaneously herewith, the Objecting Parties are filing the *Objection of Omnis Fuel Technologies, LLC and Quantum Pleasants, LLC to Approval of the Cash Collateral Motion* (the "**Cash Collateral Objection**"),[3] objecting to the Debtor's Cash Collateral Motion on various grounds, including, without limitation, that the Debtors' stipulations therein are false and misleading and that TRAG and RGE are not entitled to adequate protection.

9. The Objecting Parties hereby incorporate by reference the factual background set forth in the Dismissal Motion and the Cash Collateral Objection as though set forth herein in full.

### B. The Bid Procedures Motion

10. On August 13, 2026, the Debtor filed the Bid Procedures Motion.

---

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Bid Procedures Motion, Dismissal Motion, and/or Cash Collateral Objection, as applicable.

11. By the Bid Procedures Motion, the Debtor seeks the entry of (i) the proposed Bidding Procedures Order attached as Exhibit 1 to the Bid Procedures Motion approving, among other things, certain Bidding Procedures pursuant to which the Debtor may sell all or substantially all of its assets, including the Plant, and (ii) after the conclusion of the bidding process contemplated under the Bidding Procedures, a further Sale Order authorizing, among other things, the sale of all or substantially all of the Debtor's assets to a Stalking Horse Bidder or other Successful Bidder, if any, free and clear.

12. According to the Bid Procedures Motion, the Debtor commenced this Chapter 11 Case to "consummate a value-maximizing sale transaction" through a "transparent, robust, and competitive marketing process." Bid Procedures Motion, ¶ 1. The Debtor also asserts that it needs to "run a robust and efficient marketing process," and that the proposed Bidding Procedures "are designed to encourage all prospective bidders to put their best bid forward, effectuate an efficient, value-maximizing process with minimal disruption to the Debtor's operations, and create a path towards the consummation of a Sale Transaction for the benefit of the Debtor's stakeholders." *Id.*, ¶¶ 21-22.

13. But, the Debtor has not identified a Stalking Horse Bidder, and there have been no concentrated prepetition marketing efforts by its current management team.[4] *See id.*, ¶¶ 17 (discussing the Debtor's prepetition "outreach" process, which did not result in any "actionable" or "binding" offers). The Debtor's proposed investment banker has not even been retained. Yet,

[4] The Debtor's failure to meaningfully market its assets prior to this Chapter 11 Case is not for the Objecting Parties' lack of trying. Prior to the Debtor's bankruptcy filing, the Objecting Parties had been engaged in substantial negotiations with various parties and had received term sheets and advanced deal documentation for a potential sale or refinancing. But, none of those deals could proceed further without the required financial information and Plant access that the Objecting Parties repeatedly requested but were denied. Gilbert Nathan and David Hindman repeatedly obstructed any buyer due diligence and prohibited the Objecting Parties from advancing the sales process, in violation of their fiduciary duties and the terms of the Forbearance Agreement and the Debtor's Operating Agreement.

the Debtor has proposed an unsubstantiated and highly expedited sale timeline under which preliminary bids must be submitted no later than September 29, 2026 (just 26 days after the hearing on the Bid Procedures Motion) and the proposed Sale Hearing would be scheduled to commence in mid-November. *Id.*, ¶ 20.

14. Based on the proposed Bidding Procedures, the Debtor intends to conduct this truncated sale process with the substantial oversight and direct control of TRAG and RGE. They are designated as the sole "Consultation Parties" under the Bidding Procedures. Bid Procedures Motion, Ex. A-1, at 2. As Consultation Parties, TRAG and RGE shall have immediate access to the Data Room and Diligence Materials and the rights to consult with the Debtor on, among other things: (i) the selection of a Stalking Horse Bidder and entry into a Stalking Horse Agreement, (ii) which potential bidders are "Acceptable Bidders" (who will be given access to the Data Room) and/or "Qualified Bidders" (who will be permitted to participate in the Auction, if any), and (iii) the selection of the Successful Bidder, if any.

15. TRAG and RGE's prior consent or approval is also required for all of the following:

- the form asset purchase agreement;
- any extension of the Bid Deadline;
- any extension or other change to the date, time, or format of the Auction and any decision not to conduct an Auction;
- the modification of any other dates and deadlines set forth in the Bidding Procedures Order;
- any amendment or modification of the Bidding Procedures, the Bidding Procedures Order, or the bidding process that alters, limits, or imposes burdens on the rights of TRAG or RGE;
- any non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents;
- the form and substance of any proposed Stalking Horse Approval Order;
- the form and substance of any binding purchase agreement; and
- the form and substance of the proposed Sale Order.

*See generally*, Bid Procedures Motion, Ex. A-1.

16. In addition to this overwhelming control, the proposed Bidding Procedures also purport to grant valuable rights to TRAG and RGE. They provide that TRAG and RGE, "and any other person or entity holding a valid and perfected security interest in the Assets," shall have the right to credit bid "up to the full amount of its claims against the Debtor, including all principal, accrued and accruing interest, fees, expenses, premiums, indemnities, and any adequate protection obligations … with respect to any Assets constituting such Secured Creditor's collateral." *See* Bid Procedures Motion, Ex. A-1, at 14.

17. Furthermore, the Bidding Procedures purport to deem any Good Faith Deposit that is forfeited and becomes property of the Debtor's estate the "cash collateral" of TRAG and RGE and "subject to their liens and claims, subject to the terms of the Cash Collateral Order." *Id.* at 22.

**C. <u>The Houlihan Retention Application</u>**

18. The Debtor also filed the Houlihan Retention Application on August 13, 2026.

19. By the Houlihan Retention Application, and in connection with the Bid Procedures Motion and potential sale of the Debtor's assets, the Debtor seeks to retain Houlihan Lokey Capital, Inc. ("**Houlihan**") as its investment banker to assist the Debtor in conducting the sale.

20. For its proposed services, the Debtor intends to pay Houlihan (i) a nonrefundable monthly fee of $125,000, (ii) certain transaction fees, which in the event of a restructuring or sale shall be in the amount of at least $2 million, and (iii) reimbursement of Houlihan's expenses up to $35,000 and legal fees up to $50,000. Houlihan Retention Application ¶ 15.

**D. <u>The Forbearance Agreement and Prepetition Joint Sale Process</u>**

21. Although not disclosed in the Bid Procedures Motion, neither Gilbert Nathan nor TRAG and RGE have the unilateral or exclusive authority to approve or consummate a sale of the

Debtor's assets. Rather, the Forbearance Agreement expressly requires a joint sale process among the Independent Manager, TRAG and RGE, the Debtor, and the Objecting Parties.

22. Specifically, Section 8 of the Forbearance Agreement provides:

> Joint Sale Process Authority. Notwithstanding anything to the contrary in this Agreement or the Loan Agreements, the Lenders and OFT, acting through their respective designated representatives, shall have the ***joint authority*** to initiate, manage, and conduct a process to solicit, and negotiate one or more transactions for the sale of all or substantially all of the assets of OP, including the Power Plant, or the equity interests in OP (the "Sale Process"). The parties may, at their own cost and expense, engage advisors, market the assets, and take such other actions as are reasonably necessary to facilitate the Sale Process and consummate a sale of the Power Plant, subject to the terms herein.

Forbearance Agreement, § 8 (emphasis added).

23. As part of any sale process, Omnis Energy, TRAG, and RGE agreed to "provide each other with full and prompt access to all information, documents, communications, and materials related to the Sale Process, including but not limited to all term sheets, proposals, offers, correspondence with potential purchasers, and drafts of transaction documents." *Id.* § 8(a). They also agreed that they and their respective advisors "shall have the right to participate in all material meetings and discussions with prospective purchasers or their representatives, and to receive reasonable advance notice of such meetings." *Id.*

24. So, the Forbearance Agreement granted TRAG and RGE and Nathan, as the Debtor's purported Independent Manager, the right to, at most, approve a sale ***together with the Objecting Parties***.[5] *See id.* §§ 8(c) ("No sale of OP or the Power Plant assets pursuant to the Sale

[5] For the avoidance of doubt, TRAG and RGE's rights to consent to or approve a sale of the Debtor's assets under the Forbearance Agreement are not unlimited. The Forbearance Agreement expressly states that their consent cannot be withheld (*i.e.*, must be given) if a proposed sale "would result in Payment in Full of the Obligations under the Loan Agreements, plus the payment in full of all other indebtedness of Quantum Pleasants and [the Debtor]," unless TRAG

Process shall be promised, pledged, or agreed without the prior written approval of [TRAG and RGE], which approval shall not be unreasonably withheld, conditioned, or delayed."); 8(d) ("… any sale of OP or the Power Plant assets pursuant to the Sale Process shall also be subject to the prior written approval of the Independent Manager and the board of directors (or equivalent governing body) of OP (and, if applicable, Quantum Pleasants)."); 7(b) (the Independent Manager shall have "approval rights" over sales or disposals of the Debtor's assets outside the ordinary course of business).

25. In other words, while TRAG, RGE, and the Independent Manager may be able to ***prevent*** a sale of the Debtor's assets without their consent, they cannot unilaterally ***direct*** the Debtor to enter into a sale without the Objecting Parties' consent.

26. Critically, the Debtor's Operating Agreement confirms this. Section 5 of its Operating Agreement, which was not altered or removed by the amendments related to the Forbearance Agreement and remains applicable to the Debtor, provides:

> **Member Approval Rights.** Notwithstanding anything in this Agreement to the contrary, each of the following shall require the prior written approval of those Members owning a majority of the membership interests in the [Debtor]:
>
> (i) any amendment, modification, termination, or waiver of this Agreement or any term or provision hereof;
>
> (ii) the dissolution and/or liquidation of the [Debtor];
>
> (iii) ***any sale, license, transfer, or other disposition of all or substantially all of the assets of the [Debtor]***;
>
> (iv) the issuance of any equity interest in the [Debtor] or the admission of any additional member(s) to the [Debtor]; and

and RGE "present a written, binding, and superior Bona Fide Offer (on terms at least as favorable in the aggregate to the Omnis Parties and their creditors), within five (5) Business Days … [.]" Forbearance Agreement, § 8(c).

> (v) any other action by, on behalf of, or with respect to, the [Debtor] identified in writing by the Directors at any time and from time to time by resolution or otherwise.

OP Operating Agreement, § 5(iii) (emphasis added).

27. Quantum, the Debtor's sole member, owns *all* (not just a majority) of the Debtor's membership interests. Thus, any sale of all or substantially all of the Debtor's assets requires Quantum's prior written approval under the Debtor's Operating Agreement.

28. Quantum's Operating Agreement, in turn, provides, in relevant part:

> Except as set forth in <u>Section 6.1(c)</u> or as otherwise provided herein, at any meeting of the Board at which a quorum is present, the vote of the Omnis Director shall constitute and for all purposes be deemed the act of the Board; provided however, each of the following actions shall require the prior written approval of the Independent Manager (***in addition to the approval of the Omnis Director***):
>
> (1) [Quantum]'s exercise of voting rights in OP with respect to the matters set forth in Section 7(b) of the Forbearance Agreement … [.]

QP Operating Agreement, § 6.4(b)(1) (emphasis added).

29. The matters set forth in Section 7(b) of the Forbearance Agreement include, among other things, "sales or disposals of OP assets outside the ordinary course of business (including the Power Plant)." Forbearance Agreement, § 7(b)(1).

30. Simon Hodson is the "Omnis Director" of Quantum. *See* QP Operating Agreement § 6.2(a). As such, Mr. Hodson's affirmative vote is ***required*** for Quantum to approve the sale of all or substantially all of the Debtor's assets and, therefore, for any such sale to occur. The Independent Manager may be able to stop Mr. Hodson from voting, but it cannot compel his vote. And the Independent Manager's vote alone is not sufficient or even permitted. *Id.* § 6.4(c)(iii) ("[W]ith respect to Board acting on behalf of [Quantum] as the sole member of OP, the

Independent Manager shall have no voting rights as a Board Member on any Board decision relating to actions set forth in Section 5 of the OP Operating Agreement.").

31. Nevertheless, and despite these express provisions in the Operating Agreements, the Debtor now seeks through the Bid Procedures Motion to improperly conduct a sale process under the direction of only Mr. Nathan, TRAG, and RGE that entirely excludes Quantum. This process, if approved by the Court, inures solely to the benefit of TRAG and RGE.

## OBJECTION

32. The Objecting Parties object to the Bid Procedures Motion and Houlihan Retention Application on the grounds that (i) they are premature, (ii) any sale of the Debtor's assets is and must be subject to and conditioned upon the express prior approval of Quantum and Mr. Hodson (in his capacity as Omnis Director), (iii) the Debtor's proposed sale timeline is not designed to maximize value and should be delayed until there is a ruling on the Dismissal Motion, (iv) the Objecting Parties should be consulted and provided with full access and transparency with respect to any discussions, indications of interest, letters of intent, offers, bids, and/or purchase agreements related to the Debtor's assets, and (v) the Bid Procedures Motion seeks to grant to TRAG and RGE unfounded and improper rights, protections, and other relief.

### I. The Bid Procedures Motion and Houlihan Retention Application Are Premature.

33. The Court should defer ruling on the Bid Procedures Motion and the Houlihan Retention Application until after the Dismissal Motion is decided.

34. As set forth in the Dismissal Motion, this Chapter 11 Case was filed in bad faith and without the requisite corporate authority. The only purpose that this Chapter 11 Case will serve is to provide a new forum for the Debtor's current management and TRAG and RGE to litigate

against the Objecting Parties, at great cost to the Debtor and its estate. If the Court dismisses the Chapter 11 Case (as it should), there will be no section 363 sale and, thus, no need for the Bidding Procedures or the retention of any investment banker under sections 327 and 328.

35. Alternatively, if the Court instead orders the appointment of a chapter 11 trustee, then the trustee must be given the opportunity to evaluate and propose its own bidding procedures and investment banker/broker, if any, for the Debtor.

36. Approving the Bid Procedures Motion and the Houlihan Retention Application at this stage in the Chapter 11 Case would only cause the Debtor to incur additional unnecessary costs and expenses, including an immediate and automatic $125,000 monthly payment to Houlihan and the reimbursement of its costs and expenses up to the total amount of $85,000, regardless of whether any sale or other transaction ever occurs. This is money that cannot be recovered if the Chapter 11 Case is subsequently dismissed.

## II. **Any Proposed Sale Must Be Subject to Quantum's Express Prior Approval.**

37. The Debtor, TRAG, and RGE look to this Court to bestow rights that were neither negotiated for nor authorized prepetition. If the Court decides to hear the Bid Procedures Motion, the Court should deny the motion because it ignores Quantum's proper rights under the Debtor's operative governance documents.

38. While section 363 of the Bankruptcy Code permits a debtor to sell property of its estate outside the ordinary course of business, subject to court approval after notice and a hearing, any proposed sale must still be done with the requisite corporate authority. *See In re Eton St. Brewery, LLC*, 663 B.R. 866, 876 (Bankr. E.D. Mich. 2024) (dismissing chapter 11 case where, even assuming debtor's manager had the authority to file the case, the manager did not have authority under the debtor's operating agreement to conduct the sale process for which the case

was filed); *see also Price v. Gurney*, 324 U.S. 100, 106 (1945) (stating that "those who purport to act on behalf of [a] corporation" in bankruptcy must have the authority to do so "by local law").

39. Put differently, a debtor cannot circumvent the requirements of its governance documents or obtain more rights to use or sell its property merely by filing a bankruptcy petition. *See, e.g.*, *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy. … A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either."); *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997) (noting that a debtor's estate has "no greater rights in property than those held by the debtor prior to the bankruptcy"); *Long Term Disability Plan of Hoffman-La Roche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 244 (Bankr. D.N.J. 1989) (stating that pursuant to 11 U.S.C. § 541 "the estate can have no greater right in property than the debtor had"); *TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.)*, 158 B.R. 583, 585 (D. Del. 1993) ("To the extent that an interest is limited in the hands of the debtor, it is, therefore, equally limited in the hands of the estate. The rule is elementary that the estate succeeds to only the title and rights in the property that the debtor possessed.") (internal quotations omitted).

40. As set forth above and as stated in the Dismissal Motion, the Debtor has no right or authority to sell all or substantially all of its assets without Quantum's prior written approval. *See* OP Operating Agreement § 5(iii). This was not changed by either the Forbearance Agreement or the Debtor's bankruptcy filing. Further, Mr. Nathan, whether acting as either the Debtor's purported Independent Manager or Quantum's Independent Manager, has no authority to unilaterally direct or approve any sale. *See* QP Operating Agreement § 6.4(b)(1). In fact, as Quantum's Independent Manager, ***he does not even get a vote***. *Id.* § 6.4(c)(iii).

41. Any sale of the Debtor's assets (including in this Chapter 11 Case) is subject to, and must be conditioned upon, the express prior approval of Quantum, as the sole member of the Debtor, and, by extension, of Mr. Hodson, as the Omnis Director of Quantum. Quantum's approval right is not merely a governance restriction but a substantive property right that runs with its 100% membership interests in the Debtor. This right must be honored and respected.

42. However, the Bid Procedures Motion does not account for any of this or even reference Quantum's approval rights at all. Instead, it only provides that the Debtor, presumably acting at the direction of Mr. Nathan, will unilaterally conduct the bidding process and seek approval of any resulting sale with the consent and approval of TRAG and RGE—but not Quantum. This would not be permissible outside of bankruptcy, and it is not permissible in this Chapter 11 Case. The Court should not approve Bidding Procedures designed to circumvent the parties' bargained-for corporate governance rights.

43. Because the Bid Procedures Motion contemplates a sale process that appears to exclude Quantum in violation of the Debtor's Operating Agreement, the Bid Procedures Motion should be denied.

**III. <u>The Proposed Sale Timeline Will Not Maximize Value.</u>**

44. If approved in their current form, the Bidding Procedures would give the Debtor less than three months to solicit, receive, and evaluate any bids for its assets, identify a stalking horse bidder and any other qualified bidders, conduct an auction (if necessary), and hold a sale hearing. Indeed, preliminary bids would be due just 26 days after the hearing on the Bid Procedures Motion. This is all despite there having been no meaningful prepetition marketing process conducted by the Debtor's purported current management.

45. Perhaps if this were a different case, such as a retail bankruptcy with a fulsome prepetition marketing process and committed stalking horse purchaser ready to go, the Debtor's proposed timeline could very well be reasonable and appropriate. But, this is not that case. The Debtor does not manufacture or sell widgets. It operates a nearly 1,300-megawatt Power Plant, which Plant is seemingly so important to West Virginia that it passed specific legislation to prevent the Plant's demolition in 2023. Given the importance and complexity of the Debtor's assets, the inherent regulatory issues, and the potential real-world ramifications of any sale, the Debtor's proposed 10-week timeframe is wholly unreasonable and deficient.[6]

46. The Debtor has not presented any evidence to support that its proposed truncated timeline will result in any value maximizing sale. To the contrary, the Debtor's own conduct demonstrates the need for additional time to conduct any sale. On August 20, 2026 (one week after filing the Bid Procedures Motion), the Debtor served 21 separate subpoenas on various individuals and entities. *See* Docket Nos. 121-132. According to the subpoenas, the Debtor intends to take at least eight depositions between now and mid-October and is seeking hundreds (if not thousands) of documents.[7] Somehow, with the Debtor's own extensive discovery and the pending litigation with respect to the Dismissal Motion and other matters in this Chapter 11 Case going on all at the same time, the Debtor believes (without evidence) that the proposed Bidding Procedures afford sufficient time for a value-maximizing sale process with "minimal disruption" to its operations. This strains credulity, to put it mildly.

---

[6] Coincidentally, the Debtor's proposed sale timeline matches the milestones set forth in the Cash Collateral Motion. This begs the question of whether the Bidding Procedures reflect any good-faith calculation of how to get to the best sale possible for all stakeholders, or whether they are just another capitulation to TRAG and RGE's improper demands.

[7] The Objecting Parties expressly reserve and preserve all rights with respect to the subpoenas and any and all other discovery served or sought in connection with this Chapter 11 Case.

47. Thus, the Bidding Procedures must be amended to provide a timeline and a framework for a sale process that will actually maximize value for all stakeholders, and not just for TRAG and RGE.

## IV. <u>The Objecting Parties Should Be Consultation Parties for Any Sale.</u>

48. As demonstrated by the Debtor's unreasonable sale timeline, TRAG and RGE's undue influence continues to infect and impair this Chapter 11 Case. To counteract this, and for Quantum to realize the full value of its sale approval rights, the Objecting Parties must have a say in any sale process, if one is to go forward. The Debtor must consult with the Objecting Parties regarding the timing and conduct of the sale and the designation and selection of any stalking horse bidder, qualified bidder, and/or successful bidder, particularly given that the Debtor will need Quantum's consent to consummate any sale. There is absolutely no basis to circumvent this.

49. The Objecting Parties must also be permitted to actively participate in the sale process and be given full access and transparency with respect to all documents, correspondence, and meetings with respect thereto. These are the protections that the Debtor, TRAG, and RGE unambiguously agreed to provide Quantum under the Forbearance Agreement, and they do not and cannot disappear simply because the Debtor commenced the Chapter 11 Case.

50. Yet, as set forth in the Dismissal Motion, the Objecting Parties have largely been denied access to due diligence and other financial information. And, now, only TRAG and RGE and any bidder that they deem to be an "Acceptable Bidder" will gain access to the Debtor's Data Room. The Debtor's current management is also only required to consult with TRAG and RGE regarding any bids, the bidding process, and the selection of any proposed buyer.[8] This is all a

[8] While the Debtor is seeking to grant TRAG and RGE improper influence and control over the sale process through the Bid Procedures Motion, the Debtor is simultaneously also seeking to give TRAG and RGE the power to abruptly end the sale process through the Cash Collateral Motion. That is, as set forth in the Cash Collateral Objection, TRAG and RGE would be able to foreclose on their alleged collateral, including the Plant, upon little to no notice after one

continuation of the many contractual and fiduciary breaches committed by Gilbert Nathan, TRAG, and RGE against the Objecting Parties before and in the lead up and filing of this Chapter 11 Case.

51. This Court should not sanction all of the material prepetition misconduct of Nathan, TRAG, and RGE now. The Debtor's current management and TRAG and RGE should not be allowed to circumvent their obligations under the Forbearance Agreement and the Debtor's Operating Agreement. TRAG and RGE also should not be allowed to continue to pull all the strings in this Chapter 11 Case. Accordingly, at a minimum, if any sale process is to proceed in this Chapter 11 Case, the Objecting Parties must be included as Consultation Parties and be given all of their rights and access as authorized under the corporate governance documents.

## IV. <u>The Proposed Bidding Procedures Order Purports to Grant TRAG and RGE Improper Relief.</u>

52. Under the current proposed forms, the Bidding Procedures Order and Bidding Procedures would be yet another windfall for TRAG and RGE in this Chapter 11 Case.

53. As Consultation Parties, TRAG and RGE have significant oversight over the bidding and auction process, and they also are able to control what any proposed sale ultimately looks like, including the identity of the proposed buyer, the form and substance of the proposed asset purchase agreement, and the terms of the proposed sale order. This one-sided relief is wholly improper.

54. The proposed Bidding Procedures Order and Bidding Procedures do not stop there. They go on to assume that TRAG and RGE have "valid and perfected security interests" in the Debtor's assets and, based on that assumption, grant TRAG and RGE the right to credit bid the

or more of many "Events of Default" occurs, some of which are entirety out of the Debtor's control. Thus, rather than being a forum for a true value-maximizing sale, this Chapter 11 Case appears to be nothing more than a collusive opportunity to hand over the keys to the Plant (and the Debtor's other assets) to TRAG and RGE.

"full amount" of their claims against the Debtor, "including all principal, accrued and accruing interest, fees, expenses, premiums, indemnities, and any adequate protection obligations." Bidding Procedures, at 14. However, as set forth in the Dismissal Motion and the Cash Collateral Objection, TRAG and RGE do not have any legitimate claims against the Debtor. The Debtor does not owe TRAG and RGE a single cent, let alone any interest, fees, expenses, premiums, or indemnities. At most, TRAG and RGE may have security interests in the Debtor's assets, but the validity and avoidability of such security interests is seriously in doubt. The Deed of Trust and Assignment of Rents, in particular, are avoidable on their face. Thus, TRAG and RGE are not entitled to any presumption or stipulation that they hold valid, properly perfected, and enforceable liens or security interests in the Debtor's assets.

55. As such, any determination that TRAG and/or RGE have the right to credit bid on any of the Debtor's assets must wait until after the Court rules on the validity of their corresponding security interests, which ruling must be made based on all of the evidence.

56. Furthermore, the proposed Bidding Procedures also state that any forfeited Good Faith Deposit shall constitute TRAG and RGE's "cash collateral" and shall be subject to their liens and claims. Bidding Procedures, at 22. But, as set forth in the Cash Collateral Objection, TRAG and RGE do not have any properly perfected security interests in the Debtor's cash, and the Debtor never granted them a security interest in any after-acquired property. There is simply no legal basis for any Good Faith Deposit or any other cash now held or later acquired by the Debtor to constitute TRAG and RGE's cash collateral.

57. Accordingly, if the Bid Procedures Motion goes forward, then, at a minimum, the foregoing provisions in the Bidding Procedures automatically entitling TRAG and RGE to credit bid and deeming any deposit or other cash their cash collateral must be stricken.

## NO WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)

58. The Debtor has requested that any order approving any sale include waivers of the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d) in order to facilitate the expeditious closing of any sale. The Objecting Parties oppose any waiver of the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). The stay of execution as provided by the Bankruptcy Code is sacrosanct to protect creditors and other parties in interest from injustice and afford them the opportunity to protect their rights on appeal, and this is the exact case where injustice looms. To the extent that any sales are approved in this Chapter 11 Case, there should absolutely not be a waiver of the requirements of Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

59. The Objecting Parties reserve and preserve all of their rights with respect to the Bid Procedures Motion, the Houlihan Retention Application, and/or any and all documents related thereto, including, without limitation, to assert further and/or additional objections to the Bid Procedures Motion and/or the Houlihan Retention Application, to withdraw or amend this Objection as facts develop, to file any replies or responsive papers in accordance with the Local Rules and/or leave of the Court, and to object to any and all proposed sales of any of the Debtor's Assets.

**WHEREFORE**, the Objecting Parties respectfully request that the Court deny or defer approval of the Bid Procedures Motion and the Houlihan Retention Application or condition approval of the Bid Procedures Motion on the changes requested herein, and grant such other and further relief that the Court deems necessary or appropriate.

Dated: August 27, 2026
Wilmington, Delaware

**LOWENSTEIN SANDLER LLP**

Christopher A. Ward (No. 3877)
Shanti M. Katona (No. 5352)
1000 N West Street, Suite 1200
Wilmington, DE 19801
Telephone: (973) 597-2500
cward@lowenstein.com
skatona@lowenstein.com

*Counsel to Omnis Fuel Technologies, LLC and Quantum Pleasants LLC*