**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Omnis Pleasants, LLC, | ) | Case No. 26-11169 (KBO) |
| Debtor.[1] | ) | Related to Docket Nos. 83, 86, 168, 169, 171, 175, 188 |

**OMNIBUS REPLY OF THE DEBTOR IN SUPPORT OF ITS**
**(I) BIDDING PROCEDURES MOTION AND (II) RETENTION APPLICATIONS**

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia 26134.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 3

BACKGROUND ........ 6

I. Events Leading up to the Debtor's Engagement of HSF Kramer ........ 6

II. The Purpose of this Chapter 11 Case ........ 8

OMNIBUS REPLY ........ 9

I. The Bidding Procedures Objections Should be Overruled ........ 9

A. The Proposed Sale Timeline is Reasonable and Supports a Competitive Bidding Process ........ 9

B. The Quantum Parties' Remaining Objections Should Be Overruled ........ 10

i. The Bidding Procedures Motion Should be Granted Without Delay and During the Pendency of the Motion to Dismiss ........ 10

ii. The Quantum Parties' Demand for a Consent Right over the Sale Process is Premature ........ 11

iii. Granting Consultation Rights to the Quantum Parties Would be Value Destructive to the Debtor's Sale Process ........ 11

iv. The Bidding Procedures Are Appropriate Under the Bankruptcy Code with Respect to Stipulated Liens ........ 12

C. WVEDA's Objections Should be Overruled ........ 13

i. The WVEDA Cannot be a Consultation Party under the Bidding Procedures Due to Its Status as a Governmental Authority ........ 13

ii. The Proposed Qualified Bid Criteria Are Sufficient ........ 13

D. The Chen Parties' Objections Should be Overruled ........ 14

i. There is Sufficient Evidence that the Debtor's Marketing Process Should be Approved ........ 14

ii. Designating the Chen Parties as Consultation Parties Would be Value Destructive in the Sale Process ........ 15

II. The Objection to Houlihan's Retention Should be Overruled. ........ 15

III. The Objections to HSF Kramer's Application Should be Overruled ............................... 16

A. HSF Kramer's Retention Application Meets the Standards of Section 327(a). .......................................................................................................... 17

i. HSF Kramer Does Not Hold or Represent an Interest Adverse to the Estate. ................................................................................... 19

ii. HSF Kramer Does Not Have an Actual Conflict of Interest Because of Its Prior Representation of TRAG/RGE................................. 20

B. Any Potential Conflict is Addressed by Use of Conflicts Counsel. ..................... 24

C. HSF Kramer's Disqualification Would Cause Significant Harm to the Debtor's Estate and the Chapter 11 Case............................................................. 25

CONCLUSION........................................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank Brussels Lambert v. Coan (In re AroChem Corp.)*,
176 F.3d 610(2d Cir. 1999)....................20

*In re BH & P, Inc.*,
103 B.R. 556 (Bankr. D.N.J. 1989) ....................18, 21

*In re BH & P, Inc.*,
949 F.2d 1300 (3d Cir. 1991)....................17

*In re Black & White Stripes, LLC*,
623 B.R. 34. (Bankr. S.D.N.Y. 2020)....................23

*In re Boys Scouts of Am.*,
35 F.4th 149 (3d Cir. 2022) ....................17, 20, 23

*In re Caesars Ent. Operating Co.*,
561 B.R. 420 (Bankr. N.D. Ill. 2015) ....................19, 25

*Century Indemn. Co. v. Boy Scouts of Am. (In re Boy Scouts of Am.)*,
630 B.R. 122 (D. Del. 2021), *aff'd*, 35 F. 4th 149 (3d Cir. 2022) ....................19, 20, 23

*In re Chicago Hudson, LLC*,
345 B.R. 887 (Bankr. N.D. Ill. 2006) ....................11

*In re Colorado Sun Oil Processing LLC*,
No. 10-24424-SBB, 2011 WL 3585565 (Bankr. D. Colo. Aug. 12, 2011) ....................11

*In re Cred Inc.*,
No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020) [Docket No. 270] ....................11

*In re Diva Jewelry Design, Inc.*
367 B.R. 463 (Bankr. S.D.N.Y. 2007)....................22, 23

*In re eToys, Inc.*,
331 B.R. 176 (Bankr. D. Del. 2005) ....................17

*In re Franchise Grp.*,
No. 24-12480 (LSS) (Bankr. D. Del. Feb. 12, 2025) [Docket No. 975]....................20, 24

*In re FTX Trading Ltd.*,
No. 22-11068 (JTD) (Bankr. D. Del. Jan. 20, 2023) [Docket No. 558] ....................18, 25

*In re Invitae Corp.*,
No, 24-11362 (MBK), 2024 WL 2230069 (Bankr. D.N.J. May 7, 2024) ..........................25, 27

*In re Martin*,
817 F.2d 175 (1st Cir. 1987) ..........................17

*In re Marvel Ent. Grp. Inc.*,
140 F.3d 463 (3d Cir. 1998) ..........................18, 19

*In re Muma Servs., Inc.*,
286 B.R. 583 (Bankr. D. Del. 2002) ..........................19

*In re Peck*,
112 B.R. 485 (Bankr. D. Conn. 1990) ..........................23

*In re Vascular Access Centers, L.P.*,
613 B.R. 613 (Bankr. E.D. Pa. 2020) ..........................22, 23

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ..........................25

*In re Zenith Electronics Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ..........................24

**Statutes**

11 U.S.C. § 101(14) ..........................17

11 U.S.C. § 327 ..........................19, 23

11 U.S.C. § 327(a) .......................... *passim*

11 U.S.C. § 327(c) ..........................6, 18

Omnis Pleasants, LLC, d/b/a Pleasants Power Station, as debtor in possession (the "**Debtor**") hereby files this omnibus reply (this "**Reply**") in support of (i) the *Debtor's Motion for Entry of an Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 86] (the "**Bidding Procedures Motion**"); (ii) the *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Houlihan Lokey LLP as Investment Banker for the Debtor and Debtor in Possession Effective as of the Petition Date* [Docket No. 84] (the "**Houlihan Retention Application**") and (iii) the *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Herbert Smith Freehills Kramer (US) LLP as Attorneys for the Debtor and Debtor in Possession Effective as of the Petition Date* [Docket No. 83] (the "**HSF Kramer Retention Application**" and together with the Houlihan Retention Application, the "**Retention Applications**").[2]

The Debtor files this Reply in response to the (A) objections filed to the Bidding Procedures Motion by (i) Omnis Fuel Technologies, LLC and Quantum Pleasants, LLC (together, the "**Quantum Parties**") [Docket No. 169] (the "**Quantum Parties BP Objection**");[3] (ii) the West Virginia Economic Development Authority ("**WVEDA**") [Docket No. 171] (the "**WVEDA Objection**"); and (iii) Angela Chen (f/k/a Angela Chen Sabella), Harmony Trust, Dynamic HC Co (d/b/a Dynamic Holdings Corporation) ("**DHC**"), and Dynamic Finance Corporation

[2] Capitalized terms used but not otherwise defined in this Reply shall have the meanings given to them, as applicable, in the Bidding Procedures Motion, the Retention Applications, or the First Day Decl. (defined herein).

[3] The Quantum Parties BP Objection also objected to the Houlihan Retention Application.

(collectively, with Angela Chen, Harmony Trust, and DHC, the "**Chen Parties**") [Docket No. 182] (the "**Chen Parties' Objection**" and, collectively with the Quantum Parties BP Objection, WVEDA Objection, and the Chen Parties' Objection, the "**Bidding Procedures Objections**") [4]; and (B) objections to the HSF Kramer Retention Application filed by (i) the United States Trustee for the District of Delaware (the "**UST**") [Docket No. 175] (the "**UST Objection**") and (ii) the Quantum Parties (together with the UST, the "**Retention Objection Parties**") [Docket No. 188] (the "**Quantum Parties Retention Objection**," and, together with the UST Objection, the "**Retention Objections**").

In support of this Reply, the Debtor submits: (i) the *Declaration of Daniel Tobin in Support of the Bidding Procedures* (the "**Tobin Declaration**"), attached hereto as **Exhibit A**; (ii) a revised proposed order approving the Bidding Procedures Motion (the "**Revised Proposed Bidding Procedures Order**"), attached hereto as **Exhibit B-1** (with **Exhibit B-2** as the redline to the version attached to the Bidding Procedures Motion); (iii) a revised proposed order approving the HSF Kramer Retention Application (the "**Revised Proposed Retention Order**"), attached hereto as **Exhibit C-1** (with **Exhibit C-2** as the redline to the version attached to the HSF Kramer Retention Application); (iv) the *Supplemental Declaration of Alexander Woolverton in Support of Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Herbert Smith Freehills Kramer (US) LLP as Attorneys for the Debtor and Debtor in Possession Effective*

---

[4] Industrial Accessories Company ("**IAC**") filed a limited objection [Docket No. 168] (the "**IAC Limited Objection** The Debtor and IAC have consensually resolved the issues asserted in the IAC Limited Objection. Accordingly, the Debtor has not addressed the IAC Limited Objection in this Reply and asserts that the Court should overrule the IAC Limited Objection to the extent not withdrawn.

In addition to the Bidding Procedures Objections, the Debtor received the *Reservation of Rights of Pleasants, LLC Regarding the Bidding Procedures Motion* [Docket No. 173]. The Debtor does not believe the filing constitutes an objection, but for completeness, the Debtor does not intend to sell any emissions allowances, credits, or other assets that it does not own. All parties' rights are reserved with respect to that matter in connection with the Sale Hearing.

*as of the Petition Date* (the "**Supplemental Woolverton Declaration**"), attached hereto as **Exhibit D**; and (v) the *Supplemental Declaration of David Hindman in Support of Herbert Smith Freehills Kramer LLP Retention Application*, the Chief Executive Officer of the Debtor (the "**Supplemental Hindman Declaration**"), attached hereto as **Exhibit E**, and states as follows:

## PRELIMINARY STATEMENT

1. The Debtor commenced this Chapter 11 Case to accomplish two related objectives: (i) to consummate a value-maximizing sale of the Plant and solve the Debtor's extensive and complicated debt obligations—something that could not have been done out of court due to the overhang caused by prior management's pervasive mismanagement; and (ii) to use the tools available in chapter 11 to continue the Debtor's extensive investigation into prior management's misconduct, and to preserve or prosecute valuable estate causes of action. The Debtor has seen meaningful progress on both fronts, having already received pre- and post-petition indications of interest for the Plant that exceed known claims against the Debtor, and, on the investigation side, having already served 21 subpoenas on parties with critical information that the Debtor could not obtain pre-petition.

2. These efforts will benefit the many stakeholders in this Chapter 11 Case. They include the holders of the Debtor's funded debt obligations—TRAG and RGE, WVEDA, and Bilt; the Federal Energy Regulatory Commission, which is conducting an investigation arising out of prior management's conduct, which could result in substantial penalties against the Debtor; holders of litigation claims against the Debtor; and perhaps most importantly, the 130+ people who work at the Plant, and the West Virginia power market that the Plant serves, all of whom rely on the continued operation of the Plant.

3. The Quantum Parties are fundamentally opposed to this Chapter 11 Case because they know that their pre-petition misconduct will otherwise be revealed to this Court, and that they

will be held accountable for their actions. Their baseless objections are designed to avoid this, by forestalling the Debtor's value-maximizing sale process and blocking the retention of HSF Kramer (who is leading the investigation and coordinating the turnaround of the Debtor's business and operations) in the hope of obviating a Motion to Dismiss[5] trial that will put their misconduct on full display. The Court should not let the Quantum Parties use false accusations and speculation to prevent the Debtor from working to enhance the value of its estate.

4. The Bidding Procedures, for example, provide a framework for a value-maximizing sale process. The Debtor's proposed investment banker, Houlihan, has set forth a timeline that strikes a balance between a process that is fast enough to ensure competitive tension, without being so long that potential bidders might lose interest. This approach has already yielded promising results, as discussed above: indications of interest well in excess of the Debtor's known claims (including claims in respect of the TRAG/RGE's liens).

5. None of the Quantum Parties' arguments speaks to the propriety of the Bidding Procedures themselves. Rather, they seek to put the entire process on hold pending the outcome of their Motion to Dismiss, which is tentatively scheduled for trial between mid-November and mid-December 2026. The Quantum Parties argue that a massive delay would be a good thing, a position that is devoid of factual support, logic, or reason. It is also inconsistent with the Debtor's belief (informed by their investment banker's advice) that a sale process must strike a balance between being too short and too long. The Bidding Procedures strike that balance. The Court should thus reject the Quantum Parties' objection for what it is—conclusory lawyer argument

---

[5] The *Motion of Omnis Fuel Technologies, LLC d/b/a Omnis Energy and Quantum Pleasants, LLC for Entry of an Order (I) Dismissing the Debtor's Chapter 11 Case, or (II) In the Alternative, Directing the Appointment of a Chapter 11 Trustee, and (III) Vacating the Interim Cash Collateral Order* [Docket No. 93].

without any facts demonstrating what is in the Debtor's best interest. The Court should evaluate, and approve, the Bidding Procedures based on the ***facts*** in the record.

6. The objections to the HSF Kramer Retention Application—which incorrectly argue that the Debtor filed this Chapter 11 Case for some reason related to the Prepetition Liens—likewise miss the mark. The Prepetition Liens were neither a direct nor indirect cause of this Chapter 11 Case. As stated above, the thesis of this Chapter 11 Case is maximizing value via a section 363 sale and investigating and prosecuting estate causes of action against prior management for the benefit of the estate.

7. Nevertheless, to avoid the appearance of a conflict or a potential conflict, the Debtor has agreed that its proposed conflicts counsel, Young Conaway Stargatt & Taylor, LLP, will advise it with respect to the Prepetition Liens and any claims against TRAG/RGE under the Forbearance Agreement. HSF Kramer's prior representation of TRAG/RGE is not disabling to its ability to represent the Debtor on the key issues in this case, none of which relate to the Prepetition Liens or claims against TRAG/RGE under the Forbearance Agreement.

8. The Court need only consider the facts, none of which is in dispute. HSF Kramer had no relationship with TRAG/RGE, before being engaged by them in January 2026, or since that engagement terminated in February 2026. The representation was terminated before HSF Kramer was retained by the Debtor, and HSF Kramer was never paid a single dollar in connection with that representation. And both the Debtor and TRAG/RGE provided broad and informed waivers specifically in connection with, and prior to, HSF Kramer's retention by the Debtor.

9. There is, objectively, no reason that HSF Kramer's disinterestedness could reasonably be questioned. Courts routinely approve retentions of law firms under section 327(a) when those firms have longstanding, concurrent and lucrative engagements with major parties in

interest in a bankruptcy case—*i.e.*, under circumstances where a law firm's disinterestedness could much more realistically be questioned. And cases where courts have disapproved of a law firm's retention because of an "actual conflict of interest" under section 327(c) are totally different, often involving concurrent representations, or of a client who is a significant adversary of the debtor in its Chapter 11 Case. The Debtor's proposed solution—conflicts counsel to handle matters where the estate is adverse to TRAG/RGE and that touch on HSF Kramer's prepetition representation of them—is a sensible solution that ensures the Debtor is not significantly prejudiced by having to replace its selected counsel and removes any doubt whatsoever as to the disinterested nature of the Debtor's lawyers.

10. For these reasons and those set forth below, as well as those set forth in the Bidding Procedures Motion and Retention Applications, and on the basis of the evidence to be presented at the Final Hearing, the Debtor respectfully requests that the Court reject the Objections and grant the Bidding Procedures Motion and Retention Applications in their entirety.

## BACKGROUND

### I. Events Leading up to the Debtor's Engagement of HSF Kramer

11. HSF Kramer first began work for TRAG/RGE on January 9, 2026 and was engaged to advise on questions relating to TRAG/RGE's rights under the Prepetition Credit Documents—which at the time were in respect of loans made to non-debtor affiliates of the Debtor. HSF Kramer conducted a lien search to ensure the TRAG/RGE's liens against the Quantum Parties were properly perfected. Finding that they had not been, on January 13, 2026, HSF Kramer filed a UCC-1 financing statement on behalf of TRAG against Quantum Pleasants, LLC ("**Quantum**"). Suppl. Woolverton Decl. ¶ 6.

12. Prior to HSF Kramer's engagement by TRAG/RGE, and without HSF Kramer's involvement, TRAG/RGE had been negotiating a new forbearance agreement with the Quantum

Parties and the Debtor (who was at the time controlled by the Quantum Parties and shared a law firm with them). *Id.* at ¶ 7. This forbearance agreement was ultimately signed on February 6, 2026 (the "**Forbearance Agreement**"). Manatt, Phelps & Phillips, LLP ("**Manatt**") negotiated the Forbearance Agreement on behalf of TRAG/RGE. *See id.* ¶ 5. HSF Kramer, which was not involved in the negotiations, reviewed several drafts of the Forbearance Agreement at Manatt's request and provided limited comments to Manatt, who ultimately advised TRAG/RGE in connection with its entry into the contract. Importantly, HSF Kramer did not propose Gilbert Nathan as the Independent Manager of Pleasants and Quantum, or David Hindman as the CEO of Pleasants. *Id.* ¶¶ 7–9.

13. After Mr. Nathan's appointment, he approached HSF Kramer to represent the Debtor in connection with certain litigation, general corporate matters and a potential restructuring. *Id.* at ¶ 11. Mr. Woolverton informed Mr. Nathan that he would need to speak to TRAG/RGE directly about the matter since HSF Kramer was retained as their counsel. *Id.*

14. As a result of those conversations, HSF Kramer was released as counsel to TRAG/RGE. HSF Kramer obtained a written conflicts waiver from both TRAG/RGE (the "**TRAG/RGE Conflicts Waiver**") (*see* Suppl. Woolverton Decl. at Exhibit 1) and the Debtor (*see* the Engagement Letter attached to the Application). Pursuant to the TRAG/RGE Conflicts Waiver, TRAG/RGE explicitly agreed to waive any and all conflicts related to HSF Kramer's representation of Omnis Pleasants, LLC, including, in connection with a potential financial and operational restructuring that may impact the Prepetition Secured Lenders' debt. Suppl. Woolverton Decl. at Exhibit 1.

15. On February 20, 2026, HSF Kramer ceased all work for TRAG/RGE prior to commencing any work for the Debtor. Supp. Woolverton Decl. ¶ 14. HSF Kramer wrote off all

the fees and expenses (totaling approximately $243,000) associated with the representation. *Id.* at ¶ 9, Original Woolverton Decl. ¶ 31.

**II. The Purpose of this Chapter 11 Case**

16. As detailed in the First Day Declaration and the Supplemental Hindman Declaration, the Debtor's decision to file chapter 11 was driven by two primary reasons: (i) the need to effectuate a value-maximizing sale of the company free and clear of liens, claims, and encumbrances; and (ii) the need to restructure the Debtor's substantial and complicated debt obligations that could not be resolved consensually out of court. Suppl. Hindman Decl. ¶ 5. The defaults and unresolved means to address impending maturity dates on the complicated debt structure, combined with a costly FERC investigation into the Plant, was all the result of prior management's misconduct and mismanagement, as Mr. Nathan and Mr. Hindman's extensive investigation has uncovered.

17. Moreover, in addition to the Prepetition Liens, the Debtor carries a number of substantial debt obligations that need to be restructured, including: $51 million in Quantum's debt guaranteed by the Debtor and owed to the WVEDA; $20 million in debt owed to Bilt; approximately $55 million in intercompany notes purportedly owed to Quantum and Omnis Fuel Technologies, LLC; substantial claims associated with the Vistra Arbitration, asserted materialman liens, and certain claims and obligations arising from purported leases allegedly leased by Quantum and Element H, and the various "power purchase agreements" entered into by prior management. Suppl. Hindman Decl. ¶ 9. There may also be significant liability arising from the FERC investigation. Suppl. Hindman Decl. ¶ 7.

18. A successful restructuring (or going-concern sale to an established and well-funded third party) will also benefit the Debtor itself by ensuring its next owner is capable of investing the money needed to ensure the long-term reliability of the Plant, which will in turn benefit the

130+ employees at the Plant, the State of West Virginia (whose local economy the Debtor serves), and the power market in which the Debtor operates.

19. For months, the Debtor and its advisors fought to reach a consensual, comprehensive, out-of-court resolution of these issues, to the benefit of the Debtor and its stakeholders. But despite its best efforts, that process was not successful, due in large part to the actions of the Quantum Parties.

## OMNIBUS REPLY

### I. The Bidding Procedures Objections Should be Overruled

#### A. The Proposed Sale Timeline is Reasonable and Supports a Competitive Bidding Process

20. In preparing the Bidding Procedures, Houlihan crafted a sale timeline designed to maximize value. The Bidding Procedures Objections criticize this timeline as too short. *See, e.g.*, Quantum Parties BP Obj. ¶ 44; WVEDA Obj. ¶¶ 30–32; Chen Parties Obj. ¶¶ 21–22. But those arguments lack any foundation in evidence and should therefore be overruled.

21. The sale timeline represents a balance that the Debtor sought between a timeline that was too short (and therefore would not give parties enough time to properly evaluate the assets to be sold) and a timeline that was too long (which would risk bidders losing interest). Tobin Decl. ¶¶ 12–14. In developing this proposed sale process, the Debtor, with Houlihan's assistance, considered, among other things, the Plant's highly regulated nature, the diligence expected to be required by strategic and financial bidders, the timeline for expected capital expenditures required by the Debtor, and the need to preserve momentum in an active marketing process. *Id.* at ¶¶ 8– 9, 12.

22. The proposed schedule gives potential bidders sufficient time to review the regulatory and operational diligence necessary to submit a bid. Almost all interested parties that

have entered into a non-disclosure agreement have already entered the virtual data room and are engaged in the ongoing diligence process. The Tobin Declaration explains that the timeline is supported by the Debtor's pre-petition and post-petition marketing efforts. *Id.* at ¶ 6. Those efforts include, among other things, Houlihan's broad outreach to potential purchasers, the establishment of a data room, and ongoing engagement with parties that have executed or are in the process of executing non-disclosure agreements. *Id.* at ¶¶ 7–9.

23. The Bidding Procedures, including the proposed sale timeline, provide interested buyers sufficient time while limiting the Debtor's time and expense in chapter 11. That timeline is reasonable given the significant costs of a prolonged chapter 11 process and the potential value deterioration should the marketing process be extended. *Id.* at ¶ 14. The Bidding Procedures also give the Debtor flexibility to extend key deadlines if appropriate. The proposed sale timeline is reasonable and consistent with market practice, and the Debtor believes that it will attract and retain a value-maximizing bid. *Id.* at ¶ 17. Any delay in approving the Bidding Procedures directly jeopardizes the legitimacy of the ongoing marketing process, which would be value destructive.

**B. The Quantum Parties' Remaining Objections Should Be Overruled**

***i. The Bidding Procedures Motion Should be Granted Without Delay and During the Pendency of the Motion to Dismiss***

24. The Quantum Parties ask the Court to deny or defer the Bidding Procedures Motion as "premature" pending resolution of their Motion to Dismiss. Such a delay would provide the Quantum Parties the substantive relief they seek in connection with their Motion to Dismiss under the guise of an objection to bidding procedures, and at material prejudice to the Debtor. Such a significant delay would risk losing interested bidders and impairing the Debtor's ability to maximize value, particularly where the Debtor has already received and expects to continue receiving compelling indications of interest and ultimately binding bids well in advance of the trial

on the Motion to Dismiss. *See Id.* at ¶ 14. The sale process therefore should continue so that the Debtor can pursue a value-maximizing transaction for the benefit of all stakeholders.

25. Courts have permitted sale processes to proceed notwithstanding a pending motion to dismiss where, as here, continuation of the process preserves value for the estate and does not decide the merits of dismissal. *See, e.g., In re Cred Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020) [Docket No. 270] (approving bidding procedures while motion to dismiss was pending); *In re Colorado Sun Oil Processing LLC*, No. 10-24424-SBB, 2011 WL 3585565, at *12–13 (Bankr. D. Colo. Aug. 12, 2011) (approving bidding procedures while motion to dismiss was under advisement); *In re Chicago Hudson, LLC*, 345 B.R. 887, 894–95 (Bankr. N.D. Ill. 2006) (sale process allowed to proceed while motion to dismiss was pending).

***ii. The Quantum Parties' Demand for a Consent Right over the Sale Process is Premature***

26. The Quantum Parties object to the Bidding Procedures because they do not provide for a consent right over the Sale Transaction for the Quantum Parties. Any argument over the Quantum Parties' consent right over a Sale Transaction should be adjudicated at the Sale Hearing, not in connection with this Court's approval of the Bidding Procedures. And critically, including any consent right for the Quantum Parties—who are hostile to the entire sale process and these proceedings at large—would cause further disruption and concerns for potential bidders.

***iii. Granting Consultation Rights to the Quantum Parties Would be Value Destructive to the Debtor's Sale Process***

27. The Quantum Parties' request to be included as Consultation Parties is inappropriate while their Motion to Dismiss is pending. The Debtor has a fiduciary duty to maximize value for the benefit of the estate. Including as Consultation Parties the very parties that are working to derail this Chapter 11 Case—and caused significant harm to the Debtor's business (*see* First Day Declaration ¶¶ 47–49, 53–60, 75–76)—would almost certainly chill bidding. As

detailed in the Tobin Declaration, the proposed Bidding Procedures were designed to encourage competitive participation, provide bidders with sufficient time to conduct diligence and submit binding bids, and conduct an Auction if necessary. *See* Tobin Decl. ¶¶ 12–15. Put simply, granting the Quantum Parties a formal role in the sale process would send the wrong message.

28. Moreover, the Quantum Parties' demand for Consultation Party status is inconsistent with their objection to the Bidding Procedures as premature and to their belief that this case should be dismissed entirely. The Quantum Parties BP Objection is therefore ***not*** about improving the mechanics of the sale process to yield the highest and best bid for the benefit of the Debtor's estate, but about using the hearing on the Bidding Procedures as leverage for their dismissal strategy. The Court should not sanction such tactics.

***iv. The Bidding Procedures Are Appropriate Under the Bankruptcy Code with Respect to Stipulated Liens***

29. The Quantum Parties argue that the proposed sale process purports to grant TRAG/RGE improper relief. Quantum Parties BP Obj. ¶¶ 52–57. The Bidding Procedures Order does not seek to abrogate any party's right to challenge the Prepetition Lien and Claim Matters (as defined in the Cash Collateral Order), or to object to the ability of TRAG/RGE to credit bid. Any successful Challenge (as defined in the Cash Collateral Order) will necessarily impact TRAG/RGE's credit bid rights. Further, any party who wishes to raise an objection to a proposed Sale Transaction pursuant to a credit bid may raise an objection in connection with the Sale Transaction, but any such objection is premature.

30. The Revised Proposed Bidding Procedures Order addresses the Quantum Parties' concern regarding the Good Faith Deposit. *See id.* ¶ 17. Specifically, it removes language from the Bidding Procedures providing that any forfeited Good Faith Deposit that becomes property of

the Debtor's estate automatically constitutes the cash collateral of TRAG/RGE and is subject to their liens and claims under the Cash Collateral Order.

31. For the foregoing reasons, the Debtor respectfully requests that the Court overrule the Quantum Parties BP Objection.

**C. WVEDA's Objections Should be Overruled**

32. The WVEDA Objection fundamentally supports the sale process but seeks peripheral modifications to address specific concerns of WVEDA. WVEDA Obj. ¶ 30. While the Debtor is prepared to accommodate certain of WVEDA's requests, it will not jeopardize the integrity of the sale process to accommodate all of them.

***i. The WVEDA Cannot be a Consultation Party under the Bidding Procedures Due to Its Status as a Governmental Authority***

33. Although WVEDA requests Consultation Party status, its interests as a government entity make its status as a Consultation Party untenable. For confidentiality reasons, the Debtor cannot provide WVEDA with Consultation Party status and attendant access to non-public information regarding the sale process. Doing so would raise confidentiality concerns regarding potential public-disclosure obligations, including under the Freedom of Information Act (FOIA) or similar laws. The Debtor therefore should not be required to designate WVEDA as a Consultation Party under the Bidding Procedures.

***ii. The Proposed Qualified Bid Criteria Are Sufficient***

34. WVEDA also argues that the bid evaluation factors do not give sufficient weight to a bidder's operational track record in power generation, ability to maintain the existing workforce, or commitment to operating the Plant as a going concern. WVEDA Obj. ¶ 34. The Debtor has revised the Bidding Procedures to permit it to consider each of these factors in determining what

is the highest or otherwise best bid. To the extent these changes do not adequately address the WVEDA Objection on this point, it should be overruled.

### D. The Chen Parties' Objections Should be Overruled

35. The Chen Parties do not even explain why they have standing to appear and be heard in this Chapter 11 Case. Based on the Debtor's books and records, they are not creditors of the Debtor. The Debtor believes that they are potentially creditors of Quantum Pleasants and are a minority equity holder in Quantum Pleasants as well. But that does not give them standing to appear in this case, and so their pleading should be stricken.

36. In any event, the Chen Parties' Objection is an unsubstantiated, disingenuous attempt to undermine the legitimacy of the Debtor's proposed sale process by labeling it "flawed" without providing any factual support. The Chen Parties suggest that only a chapter 11 trustee could "be trusted" to conduct a fair and transparent sale process, but do not clearly articulate why the proposed sale process is insufficient or why the current management team should be replaced. On the other hand, the Bidding Procedures are supported by evidence proving why they should be approved. To the extent that the Court considers the Chen Parties' Objection at all (it shouldn't), it should be overruled.

#### *i. There is Sufficient Evidence that the Debtor's Marketing Process Should be Approved*

37. The Chen Parties' Objection contends that no details about the data room have been made available. *See* Chen Parties Obj. ¶ 22. The Tobin Declaration submitted herewith provides robust support regarding the contents of the data room, how many parties have executed or are in discussions to execute a non-disclosure agreement, who has been provided access, and how active potential bidders have accessed it. Tobin Decl. ¶¶ 7–9. The Debtor has also begun providing bidders access to management and is in the process of scheduling site visits to the Plant for

potential purchasers who have demonstrated a strong interest. *Id*. at ¶ 9. Further, both pre- and post-petition, the Debtor received numerous indications of interest regarding a sale of the Plant for an amount in excess of the known claims against the Debtor. *Id.* at ¶ 10.

38. Accordingly, there is more than sufficient evidence to support the relief in the Bidding Procedures Motion.

***ii. Designating the Chen Parties as Consultation Parties Would be Value Destructive in the Sale Process***

39. The Chen Parties also seek designation as Consultation Parties. Chen Parties Obj. ¶ 23. The objection provides no basis or support as to why a party without standing to appear in this Chapter 11 Case should be so designated. In the absence of any explanation, the Debtor respectfully submits that request should be denied.[6]

**II. The Objection to Houlihan's Retention Should be Overruled.**

40. Within and related to their objection to the relief requested in the Bidding Procedures Motion, the Quantum Parties also ask the Court to deny or defer the Houlihan Retention Application as premature pending resolution of the Motion to Dismiss. Quantum Parties BP Obj. ¶ 33. The Quantum Parties do not provide any other legal basis to object to Houlihan's retention, and it should be overruled.

41. As described in the Tobin Declaration, Houlihan is one of the country's leading restructuring and M&A investment banks, with substantial experience advising chapter 11 debtors in complex sale processes. They also are market leaders in the power and utilities space, having represented buyers and sellers in out-of-court and in-court sale transactions of coal, natural gas,

---

[6] The Debtor notes that the Chen Parties' Objection also contains a "request" for the appointment of a chapter 11 trustee. While the Debtor opposes any such request, because the Chen Parties have not filed a motion seeking appointment of a chapter 11 trustee, the Debtor will not respond further to the request contained in the Chen Parties' Objection.

and renewable generation assets. The Quantum Parties themselves acknowledge that any sale process, if approved, must be conducted properly. They cannot at the same time seek to deprive the Debtor of the professionals best positioned to achieve that result. Nor do the Quantum Parties' cost concerns (*see id.* ¶ 36) justify delay: while they focus on the expense of Houlihan's retention, they ignore the significant costs to the estate of delaying the sale process (not to mention the cost to the estate of litigating the Motion to Dismiss when the Quantum Parties appear to agree that the Plant should be sold).

42. The Debtor needs a competent investment banker to effectuate any value-maximizing sale process—something even the Quantum Parties say they want. The Court should therefore overrule the Quantum Parties' objection to Houlihan's retention.

**III. The Objections to HSF Kramer's Application Should be Overruled**

43. As stated above, the Debtor's goal in this Chapter 11 Case is to sell the Plant and use the proceeds to pay off the Debtor's numerous creditor constituencies, ranging from funded-debt creditors (TRAG/RGE, WVEDA, Bilt), to government entities and litigation claimants. The benefits of such a process go beyond repaying debt, though. Such a process will benefit, as stated above, the locality and state in which the Plant operates, the energy markets it serves, and the employees who depend on the Plant's continued operation. And again, the Debtor also seeks to investigate, preserve and pursue valuable estate causes of action.

44. Given the posture of this case, any adversity between the estate and TRAG/RGE is speculative, and unlikely. There is thus no actual conflict of interest in HSF Kramer's ability to represent the Debtor in this case. However, to avoid either the appearance of a conflict of interest or a potential conflict of interest, Young Conaway will advise the Debtor on discrete matters relating to the Prepetition Liens or claims against TRAG/RGE arising under the Forbearance Agreement.

**A. HSF Kramer's Retention Application Meets the Standards of Section 327(a).**

45. There is no basis to disqualify HSF Kramer. Section 327(a) of the Bankruptcy Code authorizes a debtor in possession to employ attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons" to represent or assist a debtor in possession in carrying out its duties in a chapter 11 bankruptcy case. 11 U.S.C. § 327(a). HSF Kramer does not hold an adverse interest and is disinterested.

46. An "adverse interest" is defined as an "economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005).

47. A "disinterested person" is defined in section 101(14) of the Bankruptcy Code as a person who:

> a. is not a creditor, an equity security holder, or an insider;
>
> b. is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> c. does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

48. The Third Circuit recognizes that while the two prongs of section 327(a) of the Bankruptcy Code are formally distinct, in many cases they are collapsed into a single test. *In re Boys Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022); *In re BH & P, Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991) ("There is, indisputably, some overlap between the section 327(a) standard and the section 101(14)(E) disinterest requirement."); *In re Martin*, 817 F.2d 175, 179 n.4 (1st Cir. 1987) (noting that "something of a redundancy" exists between section 101(14) and section 327(a)).

49. Bankruptcy courts have considerable discretion in approving retention applications under the standards of section 327(a). *See In re Marvel Ent. Grp. Inc.*, 140 F.3d 463, 476 (3d Cir. 1998). Disqualification is only mandated under section 327(a) where there is an "actual conflict" with the interests of the debtor's estate, whereas "where the conflict is "potential" . . . disqualification is within the discretion of the court." *In re BH & P, Inc.*, 103 B.R. 556, 566 (Bankr. D.N.J. 1989); *Marvel*, 140 F.3d at 477 ("Section 327(a) presents a *per se* bar to the appointment of a law firm with an actual conflict and gives the district court wide discretion in deciding whether to approve the appointment of a law firm with a potential conflict."); Hr'g Tr. at 49:1-7, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 20, 2023) [Docket No. 558] ("[T]he Third Circuit has said that a potential conflict is not *per se* disqualifying"). Further, a court may not disqualify an attorney under section 327(a) "on the appearance of a conflict alone." *Marvel*, 140 F.3d at 476.

50. Section 327(c) provides a limited—and in this case, inapplicable—basis to disqualify professionals when there is an actual conflict of interest. *See* 11 U.S.C. § 327(c) ("[A] [professional] is not disqualified for employment under [section 327] solely because of such [professional's] employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment ***if there is an actual conflict of interest***.") (emphasis added). The Third Circuit has held that "(1) Section 327(a), as well as § 327(c), imposes a *per se* disqualification as [debtor's] counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) and consistent with § 327(c)—disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone." *Marvel*, 140 F.3d at 476.

51. The HSF Kramer Retention Application and accompanying declarations satisfy the Debtor's initial burden for HSF Kramer to be retained under section 327 of the Bankruptcy Code. *See In re Caesars Ent. Operating Co.*, 561 B.R. 420, 431 (Bankr. N.D. Ill. 2015) ("The burden of proving that section 327(a) has been satisfied rests with the applicant seeking to retain a professional . . . . Under Bankruptcy Rule 2014, the application typically meets that burden with its application and the verified statement the rule requires."). The burden thus shifts to the Retention Objection Parties to show that the HSF Kramer Retention Application somehow violates the Bankruptcy Code. *See Century Indemn. Co. v. Boy Scouts of Am. (In re Boy Scouts of Am.)*, 630 B.R. 122, 130 (D. Del. 2021), *aff'd*, 35 F. 4th 149 (3d Cir. 2022) (citing *In re Art Van Furniture*, 617 B.R. 509, 515 & n.34 (Bankr. D. Conn. 2020) and *Marvel*, 140 F.3d at 477). The Objecting Parties do not, and cannot, meet their burden here.

***i. HSF Kramer Does Not Hold or Represent an Interest Adverse to the Estate.***

52. As a threshold matter, HSF Kramer does not "hold" or "represent" an interest adverse to the estate. Section 327(a) is written in "the present tense." *In re Muma Servs., Inc.*, 286 B.R. 583, 590-91 (Bankr. D. Del. 2002); *Boy Scouts*, 35 F.4th at 158 n.5 ("We also note that § 327(a) is written in the present tense: it bars the retention of professionals who 'hold or represent' adverse interests. It only allows disqualifications for adverse interests that existed at the time of retention."). Consequently, counsel will be disqualified under section 327(a) only if it ***presently*** "holds or represents an interest adverse to the estate, notwithstanding any interests it may have held or represented in the past." *Id.* at 591.

53. HSF Kramer is not a pre-petition creditor of the Debtor, nor does HSF Kramer otherwise personally possess or hold any economic interest in, against, or contrary to the estate.

Accordingly, HSF Kramer cannot "hold" an interest adverse to the estate. *See Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623(2d Cir. 1999).

54. Similarly, HSF Kramer does not "represent" any interest that is adverse to the estate. The Retention Objection Parties focus on HSF Kramer's ***prior*** representation of TRAG/RGE. But HSF Kramer does not currently represent TRAG/RGE, has not represented TRAG/RGE since February 20, 2026 and never concurrently represented TRAG/RGE and the Debtor. *See* Suppl. Woolverton Decl. ¶ 14. Nor does HSF Kramer currently represent the interest of TRAG/RGE (who have their own counsel) and therefore does not "represent" any interest that is adverse to the Debtor's estate. *See AroChem Corp*, 176 F.3d at 624 ("Because [counsel] no longer "represents" Wells . . . [counsel] does not represent any interests adverse to the Estates within the meaning of section 327(a) based on its prior representation of Wells.").

***ii. HSF Kramer Does Not Have an Actual Conflict of Interest Because of Its Prior Representation of TRAG/RGE.***

55. Contrary to the Retention Objecting Parties' assertions, HSF Kramer's short-term representation of TRAG/RGE does not rise to the level of an "actual conflict of interest." An actual conflict exists only "when the specific facts before the bankruptcy court suggest that it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest." *Boy Scouts*, 35 F.4th at 158 (internal citation omitted). A professional's relationship with another party in interest does not amount to an actual conflict if the relationship does "not affect its ability to advocate on behalf [of the debtor]." *Id.* at 159. In other words, only where "counsel's ability to advocate on behalf of the debtors is impaired or constrained" does an actual conflict exist. Hr'g Tr. at 11:17-19, *In re Franchise Grp.*, No. 24-12480 (LSS) (Bankr. D. Del. Feb. 12, 2025) [Docket No. 975]. Conversely, where competition between two interests "is presently dormant, but may become active if certain contingencies

occur," it is merely a potential conflict and, thus, subject to the court's discretionary review and judgment. *See In re BH & P, Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989).

56. The Retention Objection Parties either misunderstand or purposely mischaracterize the main goals of the Chapter 11 Case. Both Retention Objection Parties focus on the Forbearance Agreement, which, as noted in the Supplemental Hindman Declaration, was not the genesis for the filing, nor will it be a key feature. The Debtor filed the Chapter 11 Case to pursue a value-maximizing sale process that will facilitate a restructuring that was made difficult, if not impossible, outside of bankruptcy as a result of mismanagement by the Quantum Parties and significant governance disputes among the Debtor's principals. Suppl. Hindman Decl. ¶¶ 12, 19. The Debtor is in the midst of a comprehensive investigation (led by HSF Kramer) into former management (Suppl. Woolverton Decl. ¶ 15) and the bankruptcy filing enables the Debtor to utilize the compulsory process available under the Bankruptcy Code to obtain cooperation from parties who had stonewalled multiple prepetition information requests, and to prosecute estate causes of action arising from prior management's misconduct. *See* Suppl. Hindman Decl. ¶ 6. The sale proceeds and the proceeds of any claims against prior management will fund recoveries to the Debtor's creditors and, the Debtor expects, equity holders. The Forbearance Agreement, and any liens granted to TRAG/ RGE pursuant to it, played no role in precipitating the Chapter 11 Case, and is, at most, an ancillary matter in the administration of the Chapter 11 Case.

57. The UST suggests that a successful challenge to the Prepetition Liens could potentially give rise to claims by TRAG/RGE against HSF Kramer. Even if true, this is an example of an appearance of a conflict or, at most, a potential conflict that does not require disqualification. Particularly given HSF Kramer's secondary role with respect to the Forbearance Agreement (it

only reviewed a few advanced drafts and played no role in negotiating its terms with the Quantum Parties (who were then in control of the Debtor), such claims are exceedingly unlikely.

58. Given the very limited work that HSF Kramer did in connection with the Forbearance Agreement, its lack of any economic or historic ties to TRAG/RGE, and together with the fulsome TRAG/RGE Conflicts Waiver, HSF Kramer has not been constrained in its ability to zealously represent the Debtor on all case matters to date. Nor will it be.

59. Courts have approved the retention of counsel (over objection) in cases with similar facts as here. For example, in *In re Diva Jewelry Design, Inc.*, the bankruptcy court approved the retention of proposed counsel to the chapter 7 trustee over an objection by the United States trustee where proposed counsel had represented certain creditors in the same bankruptcy case in an investigation into the apparent disappearance of certain estate assets. *See* 367 B.R. 463, 465 (Bankr. S.D.N.Y. 2007). In approving the retention, the bankruptcy court found that there "plainly is no conflict or adverse interest with respect to the great bulk of the matters for which [counsel] would presumably act as counsel for the trustee." *Id.* at 472.

60. Similarly, in *In re Vascular Access Centers, L.P.*, the bankruptcy court approved the retention of proposed debtor's counsel over the objection of the United States trustee where proposed counsel had for a short period of time represented the debtor's general partner in connection with a potential bankruptcy filing. *See In re Vascular Access Centers, L.P.*, 613 B.R. 613, 616–17 (Bankr. E.D. Pa. 2020). In approving the retention, the bankruptcy court found that proposed counsel had only a potential conflict of interest based on its prior representation of the general partner (which was limited in nature and no fees were collected), but because the law firm did not simultaneously represent the debtor and the general partner, the representation did not rise to the level of an actual conflict of interest and was therefore not disqualifying. *See id.* at 627.

61. HSF Kramer's prior short-term engagement of TRAG/RGE was discrete and narrow in scope, and, as in *Vascular Access Centers*, does not rise to the level of an actual conflict of interest. *See* 613 B.R. at 627. Similarly, as in *Diva Jewelry Design*, HSF Kramer's prior representation of TRAG/RGE does not implicate the great bulk of matters for which HSF Kramer has been retained to represent the Debtor in the Chapter 11 Case, which include, the ongoing investigation, advising the Debtor in connection with the ongoing sale process, and formulation of a chapter 11 plan and disclosure statement. Accordingly, HSF Kramer's limited prior involvement with TRAG/RGE does not create a conflict that would constrain its ability to zealously advocate on behalf of the Debtor in this Chapter 11 Case.

62. The Quantum Parties appear to be asking this Court to adopt a *per se* rule that a law firm cannot represent a debtor where it previously represented a creditor in matters that "touch upon" the creditor's relationship with the Debtor. Quantum Parties Retention Obj. ¶ 20. However, as the Third Circuit has consistently recognized, courts proceed on a case-by-case basis in determining whether a disqualifying conflict exists under section 327 of the Bankruptcy Code. *See Boy Scouts*, 35 F.4th 149, 158 (3d Cir. 2022). Therefore, the "application of *per se* rules in making determinations under § 327(a) is not appropriate." *In re Peck*, 112 B.R. 485, 492 (Bankr. D. Conn. 1990) (citing *In re Martin*, 817 F.2d 175, 183 (1st Cir. 1987)).

63. The instances where a court found an actual conflict of interest involved situations where the matters arising from the previous engagement were so pervasive to the central issues of the case that counsel could not perform the core functions for which it was retained. *See In re Black & White Stripes, LLC*, 623 B.R. 34, 45, 51. (Bankr. S.D.N.Y. 2020) (proposed debtors' counsel had an actual conflict of interest where it had previously defended certain principals of the debtors in state court litigation and avoidance actions related to those claims were likely the most

valuable source of recovery in the bankruptcy case); Hr'g Tr. at 18:15-17, *In re Franchise Grp.*, No. 24-12480 (LSS) (Bankr. D. Del. Feb. 12, 2025) [Docket No. 975] (disqualifying counsel who had previously co-represented the debtor and former CEO who was indicted and the estate had valuable claims against the former CEO, which were "central elements of the case"). As noted above, that is ***not*** the case here.

64. The case that the Quantum Parties primarily rely on—*In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)—is irrelevant. In *Zenith*, the debtor's proposed banker had been previously retained by the debtor's majority shareholder and single largest creditor to conduct a valuation of the debtor and advise it on whether to continue its investment in the debtor. *See Zenith*, 241 B.R. at 100. In connection with that engagement, the investment banker had numerous telephone calls with the shareholder's representatives, engaged in extensive "fact-finding," compiled confidential information, and participated in a board meeting of the debtor. *Id.* The bankruptcy court found that representation to be an actual conflict of interest because the plan at the center of the bankruptcy was premised entirely on the shareholder's valuation of the debtor. *See id.* at 100, 102.

65. The facts in *Zenith* and other examples where a court has denied a professional's retention demonstrate why disqualification is unwarranted here. TRAG/RGE's liens and claims against it are simply not a focal point of this Chapter 11 Case. Suppl. Hindman Decl. ¶ 5. This case is about maximizing value by selling the Plant and thereby benefiting its broad stakeholder base. Suppl. Hindman Decl. ¶¶ 5,9.

**B. Any Potential Conflict is Addressed by Use of Conflicts Counsel.**

66. At most, there is a "potential" conflict of interest, which does not mandate HSF Kramer's disqualification. Courts have consistently recognized that there are "better solutions than depriving [the Debtor] of its choice of counsel . . . [including,] "the retention of conflicts

counsel." *In re Caesars Ent. Operating Co.*, 561 B.R. 420, 435 (Bankr. N.D. Ill. 2015); *see In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("[I]n most cases the use of conflicts counsel solves the problem."); Hr'g Tr. at 49:9–18, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan 20, 2023) ("Here, any potential conflicts are ameliorated by the fact that there's conflicts counsel in place.").

67. The Quantum Parties suggest that conflicts counsel would be insufficient in this case, because it is best suited "where primary counsel has a discrete, stand-alone issue." But that is precisely the case here. As discussed above, the matters on which HSF Kramer (tangentially) advised TRAG/RGE (*i.e.*, the Forbearance Agreement) are not central to this Chapter 11 Case.

68. To obviate any concerns, the Debtor and HSF Kramer have agreed that Young Conaway will advise the Debtor on matters relating to the liens held by TRAG/RGE and potential claims against TRAG/RGE potentially arising under the Forbearance Agreement. *See* Revised Proposed Retention Order ¶ 7.

**C. HSF Kramer's Disqualification Would Cause Significant Harm to the Debtor's Estate and the Chapter 11 Case.**

69. The UST asserts that even a potential conflict should result in HSF Kramer's disqualification because there has been "no showing that every competent law firm is already employed in this case." UST Obj. ¶ 33 (citing *BH & P, Inc.*). That is not the sole exception for potential conflicts of interest and courts are hesitant to disqualify a debtor's proposed counsel where doing so would be detrimental to the bankruptcy estate and the creditors. *See In re Invitae Corp.*, No, 24-11362 (MBK), 2024 WL 2230069, at * 6 (Bankr. D.N.J. May 7, 2024).

70. Depriving the Debtor of its chosen counsel, who possesses extensive institutional knowledge of the Debtor and this Chapter 11 Case, would cause significant harm to the Debtor, including by imposing significant delay and expense. *See* Suppl. Hindman Decl. ¶¶ 22-23. HSF

Kramer has represented the Debtor for more than six months in connection with its ongoing investigation, sale and restructuring efforts, and has been diligently working to maximize value for the Debtor's stakeholders. Specifically, HSF Kramer has expended significant time (both prepetition and throughout the course of this Chapter 11 Case) investigating the conduct of the Debtor's prior management and claims related thereto. Through these efforts, HSF Kramer has already identified and collected over 1.3 million documents, reviewed and analyzed over 100,000 documents, and interviewed key plant personnel and the personnel of cooperative third parties. Supp. Woolverton Decl. ¶ 15. Clearly the investigation is not "nascent," as the UST incorrectly argues: the purpose of the recent subpoenas was to gather information using the tools of the Bankruptcy Code that were not available earlier with respect to non-cooperative parties. These potential claims against former management represent significant value to the Debtor's estate, and replacing HSF Kramer at this juncture would not only result in additional expense and the duplication of work that has already been done by HSF Kramer but could also potentially undermine the ongoing investigation.

71. Moreover, this Chapter 11 Case has been marked by significant and complex litigation since its inception. In addition to its robust ongoing investigation into prior mismanagement of the Debtor, HSF Kramer is currently preparing to defend against the Motion to Dismiss filed by the Quantum Parties. This dispute is highly fact sensitive and involves extensive discovery, including the review and analysis of voluminous document productions and depositions of key witnesses. HSF Kramer has already developed a detailed understanding of the factual record underlying the Motion to Dismiss, including the history of governance disputes among the Debtor's principals, the circumstances surrounding prior management's misconduct, and the operational challenges facing the Power Station. The Motion to Dismiss is subject to time-

sensitive discovery and hearing schedules. It would be difficult, if not impossible, for a replacement law firm to simply step into this role without significant delay. Requiring new counsel to get up to speed on the factual and legal complexities of this litigation at this late stage would therefore not only result in significant duplicative costs to the estate but could also jeopardize the Debtor's ability to meet critical court-imposed deadlines, potentially prejudicing the Debtor's position on the merits.

72. Further, HSF Kramer is currently advising the Debtor in connection with its sale process, which is gathering momentum. HSF Kramer has been intimately involved in every aspect of the sale process from its inception, including the preparation of bidding procedures, the coordination with the Debtor's investment banker, and communications with prospective bidders. Replacing HSF Kramer at this stage would require substitute counsel to familiarize itself with the intricacies of the sale process, the status of ongoing negotiations with potential bidders, and the unique operational and regulatory considerations associated with the Debtor’s power station assets—all of which HSF Kramer has spent considerable time developing expertise in. Courts have recognized that precisely this type of prejudice to the estate weighs heavily against disqualification. *See In re Invitae Corp*., No. 24-11362 (MBK), 2024 WL 2230069, at *6 (Bankr. D.N.J. May 7, 2024).

73. HSF Kramer’s Retention Application should be approved as HSF Kramer has no actual conflict of interest, permitting Young Conaway to handle matters adverse to TRAG/RGE relating to their liens or claims against them under the Forbearance Agreement adequately addresses any potential conflict that may exist, and because its deep knowledge of the case will be critical to carrying out the Debtor’s fiduciary duty to maximize value for the estate.

**CONCLUSION**

74. For the reasons set forth above, the Bidding Procedures Objections and the Retention Objections should be overruled. The Bidding Procedures Motion should be approved, the Houlihan Retention Application should be approved and HSF Kramer's Application should be approved under section 327(a) of the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

Date: September 1, 2026

*/s/ Andrew L. Magaziner*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Andrew L. Magaziner (No. 5426)
Robert F. Poppiti, Jr. (No. 5052)
S. Alexander Faris (No. 6278)
James C. Diver (No. 7568)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: amagaziner@ycst.com
rpoppiti@ycst.com
afaris@ycst.com
jdiver@ycst.com

*– and –*

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Alexander Woolverton*
Kyle J. Ortiz*
Brian F. Shaughnessy*
Jennifer Sharret*
Andrew Pollack*
Melissa Mertz*
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
E-mail: alexander.woolverton@hsfkramer.com
kyle.ortiz@hsfkramer.com
brian.shaughnessy@hsfkramer.com
jennifer.sharret@hsfkramer.com
andrew.pollack@hsfkramer.com
melissa.mertz@hsfkramer.com

**Admitted Pro Hac Vice*

*Proposed Co-Counsel to the Debtor and Debtor in Possession*