# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Omnis Pleasants, LLC[1] | ) | Case No. 26-11169 (KBO) |
| Debtor. | ) | **Re: Docket No. 86** |

**DECLARATION OF DANIEL P. TOBIN**
**<u>IN SUPPORT OF THE BIDDING PROCEDURES MOTION</u>**

I, Daniel P. Tobin, make this declaration under 28 U.S.C. § 1746, and state:

1. I am a Managing Director in the Financial Restructuring Group of Houlihan Lokey Capital, Inc. ("**Houlihan**"). Houlihan is the proposed investment banker to the above-captioned debtor and debtor in possession (the "**Debtor**"). I submit this declaration (this "**Declaration**") in support of the *Debtor's Motion for Entry of an Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 86] (the "**Bidding Procedures Motion**").[2]

---

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia 26134.

[2] Capitalized terms not defined herein are defined in the *Declaration of David Hindman, as Chief Executive Officer of Omnis Pleasants, LLC d/b/a Pleasants Power Station, in Support of Chapter 11 Petition and First Day Motions* [Docket No. 10] (the "**First Day Declaration**"), the Bidding Procedures Motion, or Exhibit 1 to the *Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice*

2. All facts set forth in this Declaration are based on my (i) personal knowledge; (ii) discussions with the Debtor's management and other professionals, members of the Houlihan team, or other interested parties; (iii) review of relevant documents, including the Bidding Procedures; or (iv) opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs.

**QUALIFICATIONS**

3. Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,500 employees. Houlihan is a leader in providing such services to debtors, unsecured and secured creditors, acquirers, and other parties in interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan has been, and is, involved in some of the largest restructuring cases in the United States in this district and others, including, among others: *In re Claire's Holdings LLC*, Case No. 25-11454 (Bankr. D. Del. Aug. 6, 2025); *In re Azul S.A.*, Case No. 25-11176 (SHL) (Bankr. S.D.N.Y. Aug. 15, 2025); *In re Nikola Corp.*, Case No. 25-10258 (Bankr. D. Del. Feb. 19, 2025); *In re the Container Store Grp., Inc.*, Case No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 28, 2025); *In re True Value Co, L.L.C.*, Case No. 24-12337 (Bankr. D. Del. Oct. 14, 2024); *In re Wheel Pros, LLC*, Case No. 24-11939 (Bankr. D. Del. Sept. 8, 2024); *In re Lumio Holdings, Inc.*, Case No. 24-11916 (Bankr. D. Del. Sept. 3, 2024); *In re JOANN, Inc.*, Case No. 24-10418 (CTG) (Bankr. D. Del. Apr. 15, 2024); *In re Coach USA, Inc.*, Case No. 24-11258 (Bankr. D. Del. June 11, 2024); *In re MVK Farmco LLC*, Case No. 23-11721 (Bankr. D. Del. Oct. 13, 2023); *In re Independent Pet Partners Holdings, LLC*, Case No. 23-10153 (Bankr. D. Del. Apr. 4, 2023); *In re Walter Investment*

*and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* (the "**Bidding Procedures**"), as applicable.

*Management Corp.*, Case No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Ltd.*, Case No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Electric Co. LLC*, Case No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Roust Corp.*, Case No. 16-23786 (Bankr. S.D.N.Y. Dec. 30, 2016); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (Bankr. D. Del. Mar. 2, 2016); *In re Relativity Fashion, LLC (a.k.a. Relativity Media)*, Case No. 15-11989 (Bankr. S.D.N.Y. Jul. 30, 2015); *In re RadioShack Corp.*, Case No. 15-10197 (Bankr. D. Del. Feb. 5, 2015); *In re Caesars Entertainment Operating Co. Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Jan. 15, 2015); *In re Entegra Power Group LLC*, Case No. 14-11859 (Bankr. D. Del. Aug. 4, 2014).

4. Since joining Houlihan in 2008, I have worked on dozens of restructurings, both in chapter 11 and out of chapter 11, many of which were in the energy sector and/or involved sales of assets pursuant to section 363 of the Bankruptcy Code.

5. I hold a Bachelor of Business Administration, with a double major in Finance and International Business, from the University of Wisconsin.

**THE DEBTOR'S MARKETING EFFORTS**

6. Before Houlihan was engaged, I understand, based on conversations with the Debtor and parties engaged in the Debtor's pre-petition marketing process, that in the months leading to the Petition Date, the Debtor engaged with prospective purchasers and the Debtor's stakeholders to evaluate potential restructuring alternatives, including to gauge market interest in purchasing the Debtor's assets outside of a chapter 11 process (as further set forth in the Bidding Procedures Motion and the First Day Declaration). It is my understanding that the pre-petition process did not result in any actionable offers, but the Debtor generated market awareness and

received indications of interest from third parties—many of which conducted substantial due diligence—interested in acquiring the Plant.

7. The Debtor retained Houlihan on August 3, 2026, and instructed Houlihan to commence a formal marketing process for the sale of the Assets pursuant to section 363 of the Bankruptcy Code. Since then, Houlihan has spent a significant amount of time becoming familiar with the Debtor's business and has worked closely with the Debtor's management and other advisors to analyze the Debtor's financial position and outlook, prepare marketing and diligence materials, populate an electronic data room for prospective purchasers, assist with engaging an independent engineer to provide a report intended to assist potential purchasers in evaluating the Plant, and determine a list of parties potentially interested in purchasing the Assets.

8. To date, and as part of this effort, Houlihan has contacted approximately seventy-five potential purchasers, which included strategic acquirers and financial sponsors that may be interested in the Assets. This list of potential purchasers includes parties that: (a) already operate in the industry in which the Debtor operates; (b) are financial sponsors with current or former investments in such industry; or (c) are believed to have an interest in investing in such industry generally. This list also includes several inbound inquiries to which Houlihan responded. Thirty-four of the potential purchasers that were contacted have already entered into non-disclosure agreements ("**NDA**") or are actively negotiating the non-disclosure agreement. Parties that have executed an NDA received access to a virtual data room and diligence materials. Houlihan, on behalf of the Debtor, continues to broadly market the Assets during this chapter 11 case and expects that additional interested parties will receive access to the virtual data room as NDAs that are currently in negotiations are executed.

9. The virtual data room was opened on August 17, 2026, and contains approximately 250 documents, including a confidential information memorandum, financial model, and other financial, operational, commercial, maintenance, technical, environmental, insurance, permitting, regulatory, and legal diligence materials. The Debtor has also begun providing access to management and is in the process of scheduling site visits to the Plant for potential purchasers who have demonstrated a strong interest in the Assets and anticipate continuing to provide such access to prospective purchasers as it is requested.

10. Both prior to the Petition Date and since launching its sale process, the Debtor received multiple indications of interest in an amount substantially higher than the Debtor's funded debt obligations.

11. The Debtor is seeking approval of the Bidding Procedures to establish a clear and transparent process for the solicitation, receipt, and evaluation of bids on a court-approved timeline that allows the Debtor to timely consummate a sale of its Assets.

## THE DEBTOR'S PROPOSED SALE TIMELINE WAS ESTABLISHED TO GENERATE THE MOST VALUE-MAXIMIZING SALE TRANSACTION

12. The sale process timeline as set forth in the Bidding Procedures was designed to facilitate a robust and thorough marketing process to generate the most value-maximizing Bid for the Assets available to the Debtor. The proposed timeline was formulated to generate the most productive sale process for the Assets and ensure that potential purchasers are not faced with a protracted sale process, which may ultimately be value destructive given the significant capital investment the Plant will require in the spring of 2027 and the likelihood that any prospective purchaser will want to take an active role in overseeing such capital investment. Critically, the timeline was developed before any other "milestones" were agreed with the Debtor's secured lenders.

13. At an Auction, if any, as set forth in the proposed Bidding Procedures, the Debtor will have an opportunity to consider all competing offers and select the offer(s) that the Debtor, in consultation with its advisors and the Consultation Parties, deems to be the highest or otherwise best offer(s) for the Assets. I believe that the Bid Deadline and related timeline balance the need for an efficient process with providing sufficient time for interested parties to obtain information and to formulate and submit a bid to purchase the Assets.

14. Further, in light of the proposed timeline and the progress of the ongoing marketing process, I believe it is critical to the process of maximizing the value of the Assets that there is no delay with respect to entry of the order approving the Bidding Procedures. It is my opinion that elongating the timeline and delaying entry of the Bidding Procedures Order will create uncertainty, risk value deterioration, and jeopardize the legitimacy of the Debtor's sale process.

**THE BIDDING PROCEDURES ARE FAIR, APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR AND ITS STAKEHOLDERS**

15. Pursuant to the Bidding Procedures, the Debtor will market the Assets to potential purchasers and facilitate access to diligence materials, including access to an electronic data room containing financial models and other financial, operational, and legal diligence materials, confidential presentation materials and, as appropriate, meetings with management and on-site visits to the Plant.

16. I have reviewed the Bidding Procedures. They establish, among other things:

a. the availability of and access to conduct due diligence by potential purchasers;

b. the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be satisfied and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and to participate in the Auction;

c. the manner in which Qualified Bids will be evaluated by the Debtor;

d. the process for selection and designation of a Stalking Horse Bidder, if applicable, as well as Back-Up Bids;

e. the conditions for having the Auction and procedures for conducting the Auction, if any;

f. the selection and approval of one or more Successful Bidders; and

g. various other matters relating to the Sale Process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights.

17. In my opinion, the Bidding Procedures are calibrated to ensure an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Assets. The Bidding Procedures will allow the Debtor to review, analyze, and compare one or more Bids for the Assets and to engage with Bidders on an arm's length basis to work to improve the quality of their Bids for the benefit of all parties in interest. I believe that the Bidding Procedures are structured in a manner to promote active bidding by interested parties for some or all of the Assets, and to find the highest or otherwise best offer reasonably available for the Assets. I believe the Bidding Procedures will allow the Debtor to conduct any Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a sale or sales.

18. Based on my experience and the present circumstances, I believe the proposed Bidding Procedures reflect a competitive, market-based sale process that is critical to preserving the Debtor's business as a going concern and maximizing the value of the Assets for the benefit of its estate and stakeholders.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 1, 2026
New York, New York

By: _*Daniel P. Tobin*___________
Daniel P. Tobin
Managing Director
Houlihan Lokey Capital, Inc.

# EXHIBIT B-1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Omnis Pleasants, LLC, | ) | Case No. 26-11169 (KBO) |
| Debtor.[1] | ) | |

**ORDER (I) APPROVING AUCTION AND BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS, (II) SCHEDULING CERTAIN DATES AND DEADLINES RELATED THERETO, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) AUTHORIZING THE DEBTOR TO DESIGNATE A STALKING HORSE BIDDER AND OFFER BID PROTECTIONS RELATED THERETO, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI) APPROVING THE SALE OF ASSETS, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtor in possession (the "**Debtor**") for entry of an order (this "**Order**"): (a) approving marketing, auction, and bidding procedures attached hereto as **Exhibit 1** (the "**Bidding Procedures**"), to govern the solicitation and selection of the highest or otherwise best offer for the sale (the "**Sale Transaction**") of all or substantially all of the Debtor's assets (the "**Assets**"), (b) establishing certain dates and deadlines with respect to the marketing and sale of the Assets, (c) authorizing, but not directing, the Debtor to designate a stalking horse bidder (the "**Stalking Horse Bidder**") and offer bid protections related thereto (the "**Bid Protections**"), (d) approving the manner of notice of the Auction (if any) and Sale Transaction substantially in the form attached hereto as **Exhibit 2**, (e) approving

1 The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and service address is One Power Station Boulevard, Belmont, West Virginia 26134.

2 Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

procedures for the assumption and assignment of certain executory contracts (the "**Executory Contracts**") and unexpired leases, as applicable (the "**Unexpired Leases**" and together with the Executory Contracts, the "**Contracts**") in connection with the Sale Transaction and approving the manner of notice thereof (the "**Contract Assumption Notice**") substantially in the form attached hereto as **Exhibit 3**, and (f) granting related relief; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the Standing Order; and this Court having found that venue of the Chapter 11 Case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that due and proper notice of the Motion has been given, and that no other or further notice is required or necessary under the circumstances; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and upon the record in the Chapter 11 Case and the proceedings had before this Court; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT:**

A. Jurisdiction and Venue. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Statutory and Legal Predicates. The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1, and 9006-1(c).

C. Sale Process. The Debtor and its advisors have been engaging with a number of interested parties to solicit and develop the highest or otherwise best offer for the Assets.

D. Bidding Procedures. The Debtor has articulated good and sufficient business reasons for this Court to approve the Bidding Procedures. The Bidding Procedures are fair, reasonable, and appropriate, and are designed to maximize the value of the proceeds from the Sale Transaction. The Bidding Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets. The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

E. The Debtor has demonstrated a compelling and sound business justification for this Court to enter this Order and grant the relief set forth herein.

F. Stalking Horse Designation. The Stalking Horse Designation Procedures (as defined herein) and the granting of any Bid Protections are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of: (a) the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (b) the Purchase Price of the Bid submitted by the Stalking Horse Bidder and what portion is cash; (c) whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Bid submitted by the Stalking Horse Bidder;

(d) any proposed Bid Protections; (e) the Stalking Horse Agreement; (f) the Assets subject to the Stalking Horse Bid; and (g) the Stalking Horse Objection Deadline.

G. Auction Notice. The Auction Notice, substantially in the form attached hereto as **Exhibit 2**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction (if any) and the proposed Sale Transaction and relevant information related thereto, including: (a) the Bidding Procedures; (b) the date, time, and location of the Auction; (c) the date, time, and location of the Sale Hearing; and (d) the deadline for filing objections to any Sale Transaction and entry of the order approving any Sale Transaction; (e) instructions for obtaining a copy of the Form APA; (f) a summary of the Sale Transaction terms, including that the Sale Transaction contemplates a transfer of the Assets free and clear of liens, claims, interests, and other encumbrances, with such liens, claims, interests and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of applicable Contracts.

H. Contract Assumption Notice. The Contract Assumption Notice, substantially in the form attached hereto as **Exhibit 3**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no further notice of the Assumption and Assignment Procedures shall be required, except as expressly required herein.

I. Notice. Notice of the Motion, the Bidding Procedures, the Assumption and Assignment Procedures, the other relief granted herein, and the hearing regarding the foregoing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and (iii) adequate and sufficient under the circumstances

of the Debtor's Chapter 11 Case, such that no other or further notice of the foregoing need or shall be required or provided except as set forth herein or in the Bidding Procedures or the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is **GRANTED** as set forth herein.

2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

**I. Important Dates and Deadlines.**

3. *Bid Deadline*. November 9, 2026 at 4:00 p.m. (prevailing Eastern Time) or, if such date is extended in accordance with the Bidding Procedures, such extended date, is the deadline by which all Qualified Bids must be ***actually received*** by the parties and in the manner prescribed by the Bidding Procedures, which may be extended by the Debtor with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE.

4. *Auction*. The date and time of the Auction, if any, is November 12, 2026 at 10:00 a.m. (prevailing Eastern Time), or, if such date is extended in accordance with the Bidding Procedures, such extended date, at a time to be announced by the Debtor. Any extension or other change to the date, time, or format of the Auction shall be made by the Debtor with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE and upon written notice to this Court. The Auction will be conducted via remote video, in-person, or hybrid format, at the Debtor's election. Except as otherwise determined by the Debtor, in consultation with the Consultation Parties, only (i) the Debtor, (ii) the Office of the United States Trustee, (iii) the Consultation Parties, (iv) the Qualified Bidders (including, without limitation, any Stalking

Horse Bidder which has been approved by this Court (if any)), (v) all creditors who make a request to attend the Auction (*provided, however,* that any creditor seeking to attend the Auction must submit such request to the Debtor no later than three (3) business days before the Auction), and (vi) any other parties as the Debtor may determine to include in its reasonable discretion, or as otherwise ordered by this Court, in each case, along with the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction (such parties in clauses (ii) through (v) collectively, the "**Auction Parties**"), and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Auction. Notwithstanding the foregoing, the Consultation Parties and their respective representatives and professionals may attend the Auction without prior notice to the Debtor or its advisors of their intention to do so.

5. If the Debtor determines, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE, not to conduct an Auction for the Assets, then the Debtor shall file a notice on the docket of the Chapter 11 Case as soon as reasonably practicable after making such determination.

6. *Notice of Successful Bidder*. As soon as reasonably practicable after closing the Auction, the Debtor shall file a Notice of Successful Bid and Successful Bidder on the docket of the Chapter 11 Case.

7. *Sale Objection Deadline*. The Debtor must file the form of Sale Order no later than seven (7) days before the Sale Objection Deadline. Objections, if any, to the Sale Transaction must be made by the date that is fourteen (14) days after the Sale Notice is filed and served. Objections to the approval of the Sale Transaction must be in writing, state the basis of such objection with specificity, and be filed with this Court and served on the following parties (collectively, the "**Notice Parties**"):

a. proposed co-counsel to the Debtor, Young Conaway Stargatt & Taylor, LLP ("**YCST**"), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Andrew L. Magaziner (amagaziner@ycst.com), Robert F. Poppiti, Jr. (rpoppiti@ycst.com), and S. Alexander Faris (afaris@ycst.com); and Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**" and together with YCST, "**Debtor's Counsel**"), 1177 Avenue of the Americas, New York, New York 10036 (Attn: Alexander Woolverton (Alexander.Woolverton@hsfkramer.com), Andrew Pollack (Andrew.Pollack@HSFKramer.com), and Melissa Mertz (melissa.mertz@hsfkramer.com);

b. counsel to TRAG/RGE, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, Attn: Kristine Manoukian (kristine.manoukian@us.dlapiper.com); 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, Attn: R. Craig Martin (craig.martin@us.dlapiper.com); and 500 Eighth Street NW, Washington, DC 20004, Attn: Erik F. Stier (erik.stier@us.dlapiper.com); and

c. the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801 Attn: Benjamin Hackman (benjamin.a.hackman@usdoj.gov).

Any party or entity who fails to timely make an objection to the Sale Transaction on or before the Sale Objection Deadline shall be forever barred from asserting an objection to the Sale Transaction, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.

8. *Sale Hearing*. November 18, 2026 at [●]:[●], prevailing Eastern Time is the date and time for the hearing for this Court to consider approval of the Sale Transaction and the Successful Bid and entry of the Sale Order, which shall be in form and substance reasonably acceptable to TRAG/RGE.

9. The dates and deadlines set forth in this Order are subject to modification by the Debtor with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE in accordance with the Bidding Procedures.

## II. Auction, Bidding Procedures and Related Relief.

10. The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1,** are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale Transaction. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order. The Debtor is authorized to take any and all actions necessary to implement the Bidding Procedures with the goal of attaining the highest or otherwise best offer for the Debtor's Assets. Subject to the terms of the Bidding Procedures, the Debtor may, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, modify the Bidding Procedures as necessary or appropriate to maximize value for its estate. All rights of the Debtor, as it may reasonably determine to be in the best interests of its estate, to (i) modify the Bidding Procedures in good faith, (ii) further the goal of attaining the highest or otherwise best offer for the Assets, or (iii) impose, upon or prior to the selection of the Successful Bidder additional customary terms and conditions on the Sale, are reserved to the extent set forth in the Bidding Procedures. Notwithstanding the foregoing, the Debtor shall not amend or modify the Bidding Procedures, this Order, or the bidding process in a manner that reduces, eliminates, or otherwise modifies the Debtor's obligations to consult with or obtain the consent of the Consultation Parties, or that alters, limits, or imposes additional burdens on the rights of TRAG/RGE, without the prior written consent of TRAG/RGE.

11. Any deposit (including any Good Faith Deposit) provided by a Qualified Bidder shall be held in escrow by the Debtor or its agent in accordance with the Bidding Procedures, and shall not become property of the Debtor's bankruptcy estate unless and until released from escrow to the Debtor pursuant to the terms of the applicable escrow agreement, the Bidding Procedures,

or order of this Court, as applicable. To the extent any deposit is forfeited and becomes property of the Debtor’s estate, such amounts shall constitute cash collateral of TRAG/RGE and shall be subject to their liens and claims, subject to the terms of the Cash Collateral Order.

12. Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale Transaction and the Auction shall be conducted openly and the Auction shall be transcribed or videotaped, as set forth in the Bidding Procedures.

13. Other than any Bid Protections approved for a Stalking Horse Bidder in connection with a Stalking Horse Bid, no person or entity shall be entitled to any expense reimbursement, break-up fee, “topping,” termination, or other similar fee or payment in connection with any Sale Transaction, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any other fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise. Any Bid Protections approved by this Court shall be payable, solely in the event of consummation of a Sale Transaction to a Bidder other than the Stalking Horse Bidder, solely from the cash proceeds of the alternative transaction giving rise thereto, at the closing thereof, and shall not be payable from, or secured by any lien on, the collateral of TRAG/RGE or the proceeds thereof.

## III. Stalking Horse Bidders and Stalking Horse Bid Protections

14. The Debtor, upon entry of this Order, shall be authorized, but not obligated, in an exercise of its reasonable business judgment, following consultation with the Consultation Parties, to (a) designate a Stalking Horse Bidder, (b) enter into a Stalking Horse Agreement, and (c) agree to any Bid Protections for the Stalking Horse Bidder subject to further Court approval, in each

case, any time prior to the Stalking Horse Supplement Deadline (as defined below) in accordance with the following procedures (the "**Stalking Horse Designation Procedures**"):

a. The Debtor may, at any time prior to the Stalking Horse Supplement Deadline (as defined below), designate a stalking horse bidder (the "**Stalking Horse Bidder**"), whose Qualified Bid (as defined below), subject to the entry of the Stalking Horse Approval Order (as defined below), shall serve as the stalking horse bid (the "**Stalking Horse Bid**") and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid (in form and substance reasonably acceptable to TRAG/RGE, the "**Stalking Horse Agreement**"), including any bid protections (the "**Bid Protections**"), will be binding on the Debtor and the Stalking Horse Bidder and set the floor for all Qualified Bids, subject to higher or otherwise better offers at the Auction.

b. To obtain entry of a Stalking Horse Approval Order, the Debtor is authorized to file a notice (the "**Stalking Horse Supplement**") on or prior to October 22, 2026 (the "**Stalking Horse Supplement Deadline**"). Such Stalking Horse Supplement will be served on (i) the office of the United States Trustee, (ii) the Consultation Parties, (iii) those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Case, (iv) ReliabilityFirst Corporation, (v) North American Electric Reliability Corporation, (vi) the United States Environmental Protection Agency, (vii) West Virginia Department of Environmental Protection, (viii) West Virginia Economic Development Authority, (ix) the Federal Energy Regulatory Commission, (x) all environmental authorities having jurisdiction over the Plant, (xi) counterparties to all PJM, interconnection, energy management, fuel, lime, environmental, rail/barge/transportation, landfill/CCR, hedging, and operating contracts, and (xii) the Debtor's insurance carriers and sureties (those parties listed in clauses (i) through (xii), collectively, the "**Stalking Horse Notice Parties**"), with no further notice being required. The Debtor shall submit with the Stalking Horse Supplement a proposed form of order (in form and substance reasonably acceptable to TRAG/RGE, the "**Stalking Horse Approval Order**") approving the Debtor's designation of the Stalking Horse Bidder, the Stalking Horse Bid, the Stalking Horse Agreement, and any Bid Protections afforded to the proposed Stalking Horse Bidder.

c. Any Stalking Horse Supplement shall (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor), (ii) set forth the Purchase Price of the Bid submitted by the Stalking Horse Bidder and what portion is cash, (iii) state whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Bid submitted by the Stalking Horse Bidder, (iv) specify any proposed Bid Protections (including the amount and calculation thereof), (v) specify which Assets the Bid submitted by the Stalking Horse Bidder includes, (vi) attach the Stalking Horse Agreement, and

(vii) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections. The Stalking Horse Supplement shall set forth the reasons the Debtor believes any Bid Protections satisfy the requirements of section 503(b) of the Bankruptcy Code. For the avoidance of doubt, nothing in this Order is: (a) shifting the burden of proof under applicable bankruptcy law with respect to the approval of any Bid Protections; (B) authorizing the Debtor to propose or award any Bid Protections related to a credit bid; or (c) approving any Bid Protections.

d. Objections to the designation of any Stalking Horse Bidder or any of the terms of any Stalking Horse Bid (a "**Stalking Horse Objection**") must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court no later than five (5) calendar days after the service of any such Stalking Horse Supplement (the "**Stalking Horse Objection Deadline**") and be served on the Stalking Horse Notice Parties and Debtor's Counsel. If no Stalking Horse Objection is timely filed with respect to the Stalking Horse Bid in accordance with these Stalking Horse Designation Procedures, the Court may enter the proposed Stalking Horse Approval Order without further notice or a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Supplement.

e. Any Stalking Horse Agreement executed by the Debtor and the Sale Transaction contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtor will be deemed to be a Qualified Bidder.

## IV. Assumption and Assignment Procedures.

15. The procedures set forth below (the "**Assumption Procedures**") regarding the assumption and assignment of the Executory Contracts and Unexpired Leases proposed to be assumed by the Debtor pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale Transaction are hereby approved to the extent set forth herein. These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtor's Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sale Transaction under a purchase agreement (including a Stalking Horse Agreement), subject to the payment of any amount necessary pursuant to section 365 of the Bankruptcy Code or otherwise

to cure all existing and continuing defaults under the applicable Executory Contract or Unexpired Lease (the foregoing amounts as stated in the Contract Assumption Notice, the "**Cure Payments**"):

a. **Contract Assumption Notice**. No less than two weeks prior to the Auction, (the "**Assumption and Assignment Service Deadline**"), the Debtor shall serve a notice of potential contract assumption and assignment (the "**Contract Assumption Notice**"), in substantially the form attached hereto as **Exhibit 3** via first class mail on the counterparties to such Contracts (the "**Contract Counterparties**"). The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Contract to be potentially assumed and assigned; (ii) the name of the counterparty to the Contract; (iii) the Debtor's good faith estimates of the Cure Payments, if any, required in connection with the potential assumption and assignment of the Contract, as of the date of the Cure notice; and (iv) the Contract Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtor or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a Contract on the Contract Assumption Notice is not a guarantee that such Contract will ultimately be assumed and assigned.

b. **Cure Payments**. The payment of the applicable Cure Payments by the Debtor and/or the Successful Bidder (including a Stalking Horse Bidder (if any) which has been approved by this Court), as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtor and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

c. **Supplemental Contract Assumption Notice**. To the extent the Debtor, at any time after the Assumption and Assignment Service Deadline (i) identifies additional Contracts that may be assumed by and assigned to the Successful Bidder (including a Stalking Horse Bidder (if any) which has been approved by this Court), or (ii) modifies the previously stated Cure Payment associated with any Contract, the Debtor will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "**Supplemental Assumption Notice**") on each of the Contract Counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice.

d. **Cure Objections**. Objections, if any, to the potential assumption and assignment of the Contracts or the Cure Payments proposed with respect thereto (such objections, the "**Cure Objections**"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed on the docket of the Chapter 11 Case and served upon the Notice Parties, so as actually to be received on or before the Contract Objection Deadline or the deadline set forth in the Supplemental Assumption Notice, as applicable.

e. **Adequate Assurance Objections**. Objections, if any, to the Successful Bidder's provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must be (i) in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection, and (iv) be filed on the docket of the Chapter 11 Case and served upon the Notice Parties, so as actually to be received on **12:00 p.m. (ET) on November 16, 2026** (the "**Adequate Assurance Objection Deadline**").

f. **Dispute Resolution**. In the event that the Debtor and a Contract Counterparty cannot resolve an objection to a Cure Payment, the Contract at issue may be assumed by the Debtor and assigned to the Successful Bidder, provided that the Debtor shall segregate the disputed Cure Payment amount, pending resolution by the Court or mutual agreement of the parties. Any objection to the proposed assumption and assignment of a Contract or related Cure Payment proposed in connection with the Sale Transaction that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Court). Notwithstanding the foregoing, in accordance with the terms of this Order, the Debtor may, in its sole discretion and in consultation with the Consultation Parties and the Successful Bidder, adjourn Cure Objections to a later hearing and assign to the Successful Bidder other proposed Contracts to be assumed and assigned while such objections remain outstanding.

16. Any party failing to timely file Cure Objection or an Adequate Assurance Objection is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Contract, and (c) adequate assurance of future performance. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Contracts, and adequate assurance of future performance, whether or not applicable law excuses

such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder with respect to such party's Contract.

17. To the extent the Debtor seeks to assume and assign a Contract in connection with a Sale Transaction (an "**Assumed Contract**," and the counterparty to such Assumed Contract, the "**Assumed Contract Counterparty**"), the Debtor shall, at the request of the Assumed Contract Counterparty, provide evidence to such Assumed Contract Counterparty that the Successful Bidder for the Contract has the ability to comply with the requirements of adequate assurance of future performance on a confidential basis. All Bidders are deemed to consent to the transmission of such evidence of adequate assurances of future performance on a confidential basis to counsel for the Assumed Contract Counterparties via email with such information to be used only for the purpose of assessing the applicable Bidder and objection to adequate assurance; *provided*, that any such Assumed Contract Counterparty shall use best efforts to maintain the confidentiality of such information, including by filing the relevant portions of such objection under seal.

**V. Miscellaneous.**

18. The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

19. To the extent any dates or deadlines set forth herein are modified pursuant to this Order or the Bidding Procedures, and such modification is inconsistent with the requirements of Local Rule 9006-1, such requirements shall be deemed satisfied.

20. Notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by this Court, nothing in this Order or the Bidding Procedures shall require the Debtor, its sole Director and Independent Manager, or similar governing body of the Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures or the Sale Transaction, if the sole Director and Independent Manager, or similar governing body reasonably determines in good faith, after consultation with their outside counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, *however*, that the Debtor shall provide the Consultation Parties with notice of such action or inaction within two (2) Business Days of such action or inaction.

21. In the event of any inconsistencies between this Order and the Motion, this Order shall govern in all respects. In the event of any inconsistencies between this Order and the Bidding Procedures, the Bidding Procedures shall govern in all respects.

22. All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters. All actions by the Debtor necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and to implement the Bidding Procedures are hereby authorized.

23. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

24. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25. The Debtor is authorized to make non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without further order of this Court, including, without limitation, changes to correct typographical and grammatical errors; *provided* that such changes are reasonably acceptable to TRAG/RGE.

26. The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

27. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# **EXHIBIT 1**

## **Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Omnis Pleasants, LLC, | ) | Case No. 26-11169 (KBO) |
| Debtor.[1] | ) | |

**BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS**

On July 26, 2026, the above-captioned debtor in possession (the "**Debtor**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

On August 13, 2026, the Debtor filed the *Motion of Debtor for Entry of an Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 86] (the "**Bidding Procedures Motion**").

On [●], 2026, the Court entered the *Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. ●] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**") setting forth the process by which the Debtor is authorized to solicit bids for and conduct an auction (the "**Auction**") for a sale or disposition (a "**Sale Transaction**") of all or substantially all of the Debtor's Assets (as defined herein).

---

1 The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

2 Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures Motion, each as defined herein.

## I. Key Dates.

The key dates for the sale process are as follows. In accordance with the Bidding Procedures Order, the Debtor may, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG LLC ("**TRAG**") and RG Energy LLC ("**RGE**" and together with TRAG, "**TRAG/RGE**" or the "**Consultation Parties**")[3], extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures:

| **Event** | **Proposed Date** |
|---|---|
| Preliminary Bid Deadline | September 29, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Stalking Horse Supplement Deadline | October 22, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Assumption and Assignment Service Deadline | October 23, 2026 |
| Sale Notice Filing and Service Deadline | No later than twenty-one (21) days prior to the Sale Hearing |
| Assumption Notice Objection Deadline | No earlier than fourteen (14) days after service of each Contract Assumption Notice |
| Bid Deadline | November 9, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Form of Sale Order | No later than seven (7) days before the Sale Objection Deadline |
| Sale Objection Deadline | No earlier than fourteen (14) days after the Sale Notice is filed and served |
| Auction (if necessary) | November 12, 2026 at 10:00 a.m. (prevailing Eastern Time) |
| Sale Hearing | November 18, 2026 at [●]:[●] (prevailing Eastern Time) (or such other date as set by the Court) |

## II. Assets to be Auctioned.

These Bidding Procedures set forth the terms by which proposed bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for all or substantially all of the Debtor's assets. These assets include, but are not limited to, the Debtor's going-concern business, the Pleasants Power Station located in Belmont, West Virginia (the "**Plant**") and related real property, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, causes of action,[4] insurance proceeds, prepaid expenses

---

[3] Email from counsel to TRAG/RGE is sufficient to constitute consent by the Consultation Parties or TRAG/RGE, as applicable, under these Bidding Procedures.

[4] Unless otherwise expressly provided in the applicable purchase agreement and approved by the Court, the Assets shall not include estate claims, avoidance actions, claims against insiders, former officers, directors, managers, members, affiliates, upstream entities, or control persons, claims relating to alleged cash sweeps, misappropriation, diversion of funds, related-party transactions, breach of fiduciary duty, fraudulent transfer, or similar misconduct, or any rights necessary for the Debtor or its estate to comply with the Federal Energy Regulatory Commission ("**FERC**") Enforcement cooperation obligations.

and deposits, books and records, and other personal property (collectively, the "**Assets**"), free and clear of all liens, claims, interests, or other encumbrances to the fullest extent permitted by the Bankruptcy Code and any applicable non-bankruptcy law, with such liens, claims, interests and/or other encumbrances attaching to the proceeds of the sale of the Assets with the same validity and priority as such liens, claims, interests, and/or other encumbrances applied against the Assets.

The Debtor prefers bids for all Assets as a single lot from bidders submitting Qualified Bids (as defined herein) but reserves the right, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, to consider bids for less than all of the Assets.

## III. Marketing Process.

### A. Participation Requirements

To participate in the bidding process and to receive diligence information, including access to the Debtor's electronic data room (the "**Data Room**") and to additional non-public information regarding the Debtor (collectively, the "**Diligence Materials**"), any party interested in submitting a bid (each a "**Potential Bidder**"), must deliver by email to each of: (a) proposed co-counsel to the Debtor, (i) Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**"), Attn: Alexander Woolverton (alexander.woolverton@HSFKramer.com), Andrew Pollack (andrew.pollack@HSFKramer.com), and Melissa Mertz (melissa.mertz@HSFKramer.com); and (ii) Young Conaway Stargatt & Taylor, LLP ("**YCST**" and together with HSF Kramer, "**Debtor's Counsel**"), Attn: Andrew L. Magaziner (amagaziner@ycst.com), Robert F. Poppiti, Jr. (rpoppiti@ycst.com), and S. Alexander Faris (afaris@ycst.com); (b) proposed financial advisor to the Debtor, AlixPartners, LLP ("**AlixPartners**") (alix-pleasants@alixpartners.com); and (c) proposed investment banker to the Debtor, Houlihan Lokey Capital, Inc. ("**Houlihan**"), Attn: Xander Hector (XHector@HL.com) and Thad Williams (TWilliams@HL.com) and Project_Combustion@hl.com (collectively, the "**Bid Notice Parties**"), the following documents (collectively, the "**Preliminary Bid Documents**") on or prior to **September 29, 2026 at 4:00 p.m. (prevailing Eastern Time)** (the "**Preliminary Bid Deadline**"), unless otherwise waived or extended by the Debtor with the consent of the Consultation Parties:

(i) an executed confidentiality agreement in form and substance acceptable to the Debtor (a "**Confidentiality Agreement**");

(ii) a statement or other factual support demonstrating to the Debtor's reasonable satisfaction that the Potential Bidder has a bona fide interest in purchasing the Assets (or some subset thereof);

(iii) the identification of the Potential Bidder and any principals and representatives thereof (including counsel), including identifying those principals and representatives who are authorized by the Potential Bidder to appear and act on

such Potential Bidder's behalf for all purposes under these Bidding Procedures regarding the Potential Bidder's contemplated Sale Transaction;

(iv) written disclosure of any and all connections or agreements the Potential Bidder (including its affiliates and any related persons) may have to the Debtor, or "insiders" of the Debtor (as that term is contemplated by section 101(31) of the Bankruptcy Code), and/or any manager or any entity holding direct or indirect membership interests in the Debtor; and

(v) any other information or documentation that the Debtor reasonably requests.

The Debtor, in consultation with the Consultation Parties, will determine whether such Potential Bidder has submitted adequate Preliminary Bid Documents (an "**Acceptable Bidder**") to proceed with the bidding process and shall notify Potential Bidders who submitted the above Preliminary Bid Documents whether they have been determined to be an Acceptable Bidder by the Debtor within 5 business days after the Preliminary Bid Deadline, *provided* that, the Debtor will consult with the advisors to TRAG/RGE before determining that any potential Affiliated Bidder (as defined below) has submitted adequate Preliminary Bid Documents to be determined an Acceptable Bidder. Only Acceptable Bidders, as determined by the Debtor, in consultation with the Consultation Parties, may submit Bids. Each Prepetition Secured Party shall at all times be deemed an Acceptable Bidder.

To the extent that any of the Consultation Parties submits a Stalking Horse Bid, Credit Bid, or other alternative Bid for any Assets in connection with these Bidding Procedures, then such Consultation Party shall not be a consultation party solely with respect to the Assets that are the subject of such Bid unless and until such Bid is withdrawn, but shall remain a consultation party for all other purposes. For the avoidance of doubt, the exercise by the Consultation Parties of their rights under section 363(k) of the Bankruptcy Code shall not require the Consultation Parties to waive or relinquish any right, claim, lien, or remedy.

### B. Access to Diligence Materials

Beginning on or as soon as is reasonably practicable after the Debtor determines that a Potential Bidder is an Acceptable Bidder, the Debtor will provide such Acceptable Bidder with access to the Diligence Materials. The Debtor, with the assistance of its advisors, will coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access, *provided* that the Debtor may, after consultation with the advisors to the Consultation Parties, decline to provide such information to any Acceptable Bidder who, in the Debtor's reasonable business judgment, has not established, or who has raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a Sale Transaction.

The Debtor will grant each Acceptable Bidder access to the Data Room up to and including the Bid Deadline (as defined below) (such period, the "**Diligence Period**"). The Debtor shall afford any Acceptable Bidder access to the Diligence Materials or additional information as may be reasonably requested by the Potential Bidder that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances. The Debtor shall grant the Consultation Parties and their respective advisors access to the Data Room and the Diligence

Materials, subject to the Consultation Parties and their respective advisors maintaining the confidentiality of such information. The Debtor will provide in the Data Room a form asset purchase agreement for the sale of the Assets, in form and substance reasonably acceptable to TRAG/RGE (the "**Form APA**"). The Debtor may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Acceptable Bidders. If any such due diligence material is prepared by the Debtor in written form and has not previously been provided to any other Acceptable Bidder, the Debtor will simultaneously provide access to such materials to all Acceptable Bidders. Each Acceptable Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

The Debtor may reasonably withhold or limit access by any Acceptable Bidder (including its affiliates and any related persons) to the Diligence Materials at any time and for any reason, including, without limitation, if (i) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to an Acceptable Bidder by the Debtor, including, but not limited to, Acceptable Bidders who are customers or competitors of the Debtor or affiliates thereof, and other industry participants, (ii) the Potential Bidder does not become, or the Debtor determines that the Acceptable Bidder is not likely to become a Qualified Bidder (as defined herein), (iii) the Acceptable Bidder violates the terms of its Confidentiality Agreement, (iv) the Debtor becomes aware that the information set forth on the Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Acceptable Bidder's ability to close its contemplated transaction, (v) the Acceptable Bidder (including its affiliates and any related persons) uses information obtained from the Data Room or the diligence process in connection with, or related to, any litigation or other legal action related to the Debtor or any current or former managers of the Debtor, (vi) such disclosure would jeopardize protections afforded the Debtor under the attorney-client privilege or the attorney work product doctrine, or (vii) the bidding process is terminated in accordance with its terms.

Neither the Debtor nor any of the Debtor's representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (a) to any person or entity who is not an Acceptable Bidder or (b) if and to the extent doing so would (i) violate any law to which the Debtor is subject, including any privacy law, (ii) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (iii) violate any legally-binding obligation of the Debtor with respect to confidentiality, non-disclosure or privacy or (iv) jeopardize protections afforded to the Debtor under the attorney-client privilege or the attorney work product doctrine (provided that the Debtor shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation, or law).

Acceptable Bidders may not use FERC investigation materials provided in the Diligence Materials for any purpose other than diligence, and may not in connection with the Sale Transaction contact FERC, PJM Interconnection, L.L.C., the Independent Market Monitor, the North American Electric Reliability Corporation, ReliabilityFirst Corporation, or the West Virginia Department of Environmental Protection.

The due diligence period will end on the Bid Deadline, and after the Bid Deadline, the Debtor shall have no obligation to furnish any due diligence information to any party.

**All due diligence requests directed to the Debtor must be directed to: Houlihan, Attn: Xander Hector (XHector@HL.com) and Thad Williams (TWilliams@HL.com) and Project_Combustion@hl.com.**

### C. Due Diligence from Potential Bidders or Acceptable Bidders

Each Potential Bidder or Acceptable Bidder shall comply with all reasonable requests with respect to information and due diligence access by the Debtor or its advisors regarding such Potential Bidder or Acceptable Bidder, as applicable, and its contemplated Sale Transaction. Failure by a Potential Bidder or Acceptable Bidder to comply with reasonable requests for additional information and due diligence access will be a basis for the Debtor, in consultation with the Consultation Parties, to determine that the Potential Bidder or Acceptable Bidder, as applicable, is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtor, in consultation with the Consultation Parties, to revoke any bidder's classification as a Qualified Bidder.

### D. Communications with Potential Bidders

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Potential Bidders regarding the Debtor or its Assets shall involve the Debtor and the Debtor's advisors. **<u>No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent (email being sufficient) from the Debtor</u>**.

## IV. Stalking Horse Bidders and Bid Protections

The Stalking Horse Designation procedures set forth in paragraph 14 of the Bidding Procedures Order apply to the designation of any Stalking Horse Agreement and related Bid Protections. Any Stalking Horse Agreement executed by the Debtor and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to any Stalking Horse Agreement executed by the Debtor will be deemed a Stalking Horse Bidder.

Other than as provided by order of the Court, no party submitting a Bid (other than a Stalking Horse Bidder) will be entitled to a break-up fee or expense reimbursement. By submitting a Bid, an Acceptable Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bidding Procedures, or participation in the Debtor's sale process.

The Debtor may, at any time prior to the Stalking Horse Supplement Deadline (as defined below), following consultation with the Consultation Parties, designate a stalking horse bidder (the "**<u>Stalking Horse Bidder</u>**"), whose Qualified Bid (as defined below), subject to the entry of the Stalking Horse Approval Order (as defined below), shall serve as the stalking horse bid

(the "**Stalking Horse Bid**") and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid (in form and substance reasonably acceptable to the Consultation Parties, the "**Stalking Horse Agreement**"), including any bid protections (the "**Bid Protections**") will be binding on the Debtor and the Stalking Horse Bidder and set the floor for all Qualified Bids, subject to higher or otherwise better offers at the Auction.

The Debtor may designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement on or prior to October 22, 2026 (the "**Stalking Horse Supplement Deadline**"). If the Debtor decides to designate a Stalking Horse Bidder, the Debtor shall file a supplement to the Bidding Procedures Motion (the "**Stalking Horse Supplement**") seeking approval of the same, with no less than five (5) calendar days' notice of the objection deadline (the "**Stalking Horse Objection Deadline**") to (i) the Office of the United States Trustee, (ii) counsel to the Consultation Parties, (iii) those parties who have filed appropriate notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Case, (iv) FERC, (v) PJM Interconnection L.L.C., (vi) PJM Settlement, Inc., (vii) Monitoring Analytics, (viii) ReliabilityFirst Corporation, (ix) North American Electric Reliability Corporation, (x) the United States Environmental Protection Agency, (xi) West Virginia Department of Environmental Protection, (xii) West Virginia Economic Development Authority, (xiii) all environmental authorities having jurisdiction over the Plant, (xiv) counterparties to all PJM, interconnection, energy management, fuel, lime, environmental, rail/barge/transportation, landfill/CCR, hedging, and operating contracts, and (xv) the Debtor's insurance carriers and sureties (those parties listed in clauses (i) through (xv), the "**Stalking Horse Notice Parties**") with no further notice being required. The Stalking Horse Supplement shall: (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the Purchase Price of the Bid submitted by the Stalking Horse Bidder and what portion is cash; (iii) state whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Bid submitted by the Stalking Horse Bidder; (iv) specify any proposed Bid Protections (including the amount and calculation thereof); (v) specify which Assets the Bid submitted by the Stalking Horse Bidder includes; (vi) attach the Stalking Horse Agreement; and (vii) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections.

Objections to the designation of a Stalking Horse Bidder or any terms of a Stalking Horse Bid (a "**Stalking Horse Objection**") shall (i) be in writing; (ii) comply with Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules; (iii) state with specificity, the legal and factual bases thereof; and (iv) be filed with the Court and served on the Stalking Horse Notice Parties and Debtor's Counsel within five (5) calendar days after the service of the Stalking Horse Supplement.

If a timely Stalking Horse Objection is filed, the Debtor shall schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable. If no timely Stalking Horse Objection is filed and served with respect to the Stalking Horse Bid, upon the expiration of the Stalking Horse Objection Deadline, the Debtor is authorized to submit to the Court an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse Agreement (the "**Stalking Horse Approval Order**"), which may be entered by the Court without further notice or a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Supplement.

Any Stalking Horse Agreement executed by the Debtor and the Sale Transaction contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtor will be deemed to be a Qualified Bidder.

No party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for any Bid Protections granted to any Stalking Horse Bidder which has been approved by the Bankruptcy Court, *provided* that no Bid Protections shall be made available to (i) any party submitting a Credit Bid or (ii) any Affiliated Bidder. Solely in the event that the Debtor consummates a Sale Transaction with a Bidder other than the Stalking Horse Bidder, any Bid Protections approved by the Court shall be payable solely from the cash proceeds of the alternative transaction giving rise to such Bid Protections, at the closing thereof, and shall not be payable from, or secured by any lien on, the collateral of TRAG/RGE or the proceeds thereof.

If any Stalking Horse Bid is not selected as the Successful Bid (as defined herein), such Stalking Horse Bidder must be willing to still serve as the Back-Up Bidder (as defined herein), if its bid represents the second-highest or otherwise best bid after the Auction, unless such requirement is waived in writing (email being sufficient) by the Debtor. For the avoidance of doubt, the Debtor may hold an Auction notwithstanding the selection of a Stalking Horse Bid.

## V. Qualified Bids

### A. Qualified Bid Requirements

Other than in the case of a bid submitted by a designated Stalking Horse Bidder, to participate in the Auction, an Acceptable Bidder must deliver to the Debtor and its advisors an irrevocable offer via email (in .pdf or similar format) for the purchase of all or substantially all of the Assets (each, a "**Bid**") and shall meet the following requirements (the **"Bid Requirements**"), in each case, on or prior to the Bid Deadline (as defined herein), unless any such requirements are waived in writing (email being sufficient) by the Debtor, in consultation with the Consultation Parties, *provided* that any Stalking Horse Bid which has been approved by the Court (if any) shall constitute and be deemed a Qualified Bid.

a. ***Purchased Assets and Assumed Liabilities***: Each Bid must clearly state the following: (i) the particular Assets to be purchased; (ii) to the extent such Bid is for substantially all of the Assets, which Assets, if any, are to be excluded from the Proposed Sale Transaction; (iii) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (iv) as applicable, whether the Acceptable Bidder intends to operate the Debtor's business as a going concern;

b. ***Purchase Price***: Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"), including and identifying separately any cash and non-cash components of the Purchase Price, such as liabilities to be assumed as part of the Sale Transaction, and if the Bid is for less than all of the Assets, the Purchase Price must indicate the allocation of the Purchase Price among the applicable Assets. The

Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis;

c. ***Affiliated Purchaser / Source of Funds***: Each Bid must disclose any direct or indirect relationship, agreement, understanding, side letter, financing arrangement, management arrangement, consulting arrangement, employment arrangement, option, royalty, earnout, release, settlement, or other economic arrangement involving Quantum Pleasants, LLC, Omnis Fuel Technologies, LLC, Omnis Global Technologies, LLC, Dynamic Finance Corporation, their respective equity holders, and any affiliate of the foregoing, or any other current or former upstream Omnis-related party. Any Bidder that has any such relationship listed in the prior sentence or is an "insider" of the Debtor (as that term is defined in section 101(31) of the Bankruptcy Code) being deemed an "**Affiliated Bidder**";

d. ***Good Faith Deposit***: Each Bid must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtor (the "**Good Faith Deposit**"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction; provided that no Good Faith Deposit shall be required in respect of any Credit Bid or any credit bid portion of a Bid;

e. ***Same or Better Terms; Bid Documents***: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**"). The Bid Documents shall include: (i) a form of purchase agreement; (ii) a schedule of contracts and leases to be assumed and assigned to the bidder at closing to the extent applicable to the Bid, and confirmation that the bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtor); (iii) the identification of causes of action to be purchased, if any; (iv) with respect to the purchase agreement, a redline of such agreement marked against the Form APA to reflect the amendments and modifications; (v) any other material documents integral to such Bid; and (vi) a statement from the Acceptable Bidder that (A) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, by the Bid Deadline), and (B) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "**Back-Up Bid**")) until the consummation of the Sale Transaction;

f. ***Committed Financing***: To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing,

documented to the Debtor's satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtor;

g. ***Proof of Financial Ability to Perform***: Each Bid must contain evidence acceptable to the Debtor, in its sole discretion, that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under sections 365(b)(1) and 365(b)(3) of the Bankruptcy Code. Without limiting the foregoing, such evidence must include current financial statements or other financial information, tax returns, bank account statements, and/or any other documentation that the Debtor further requests;

h. ***Identity***: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom the Debtor's advisors should contact regarding such Bid;

i. ***No Qualified Bidder Bid Protections***: A Qualified Bid, other than a Stalking Horse Bid approved by the Court (if any), must include a statement disclaiming any right to receive a fee analogous to a break-up fee, expense reimbursement, or "topping" or termination fee, or any other similar form of compensation. No Qualified Bidder (other than a Stalking Horse Bidder, if any, which has been approved by the Court) will be permitted to request, nor be granted by the Debtor at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

j. ***Contingencies; No Financing or Diligence Outs***: The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

k. ***As-Is, Where-Is***: Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct

any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

l. ***Authorization***: Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder;

m. ***Joint Bids***: The Debtor shall be authorized to approve joint Bids on a case-by-case basis so long as a joint Bid meets the Qualified Bid Requirements, and the applicable bidders otherwise comply with these Bidding Procedures;

n. ***Contracts and Leases***: Prior to the Bid Deadline, each Bid must identify all executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "**<u>Assigned Contracts</u>**"). Each Bid must be accompanied by written evidence of the applicable Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of future performance under all Assigned Contracts, which evidence shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtor may request in writing (email being sufficient) (the "**<u>Adequate Assurance Package</u>**"). The Adequate Assurance Package should be submitted in its own compiled PDF document;

o. ***Acknowledgement of Compliance with Bidding Procedures, Bidding Procedures Order, Bankruptcy Code, and Non-Bankruptcy Law***: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code and any applicable non-bankruptcy law;

p. ***No Collusion***: The Acceptable Bidder must represent in writing (i) that it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code or other applicable non-bankruptcy law with respect to any Bids, the Auction, or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (ii) that it agrees not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction. For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from

working with other Potential Bidder(s) with the Debtor's prior written consent (email being sufficient);

q. ***Good Faith Offer***: The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction and must include a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code;

r. ***Irrevocable***: The Bid must include a letter stating that the Acceptable Bidder's offer is irrevocable and binding until the closing of the Sale Transaction if such Acceptable Bidder is the Successful Bidder, and that the Acceptable Bidder agrees to serve as a Back-Up Bidder (as defined herein) if such bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid (as defined herein);

s. ***Back-Up Bid***: Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined herein) if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

t. ***Regulatory Approvals and Covenants***: A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, including approval by FERC, and an explanation and/or evidence of the Acceptable Bidder's ability to obtain all such regulatory and third-party approvals, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

u. ***FPA Section 203 Approval***: Each Bid must state that if the Acceptable Bidder is selected as the Successful Bidder or the Back-Up Bidder, within five (5) business days following the date on which the Successful Bidder and the Back-Up Bidder, as applicable, is announced, such Acceptable Bidder shall take all actions reasonably necessary to prepare, in consultation with the Debtor, an application under section 203 of the Federal Power Act for approval of the proposed Sale Transaction and requesting expedited action from the Federal Energy Regulatory Commission ("**FERC**"), which shall be submitted to FERC jointly by such Acceptable Bidder and the Debtor within such five (5) business days;

v. ***PJM and Market-Participation Transition***: Each Bid must include a regulatory transition plan addressing PJM Interconnection, L.L.C. and PJM Settlement, Inc. requirements, including, as applicable, PJM membership, credit and collateral requirements, market-participant registration, PJM officer and authorized representative updates, generation owner / generator operator updates, Capacity Resource obligations, energy-market participation, resource-limitation reporting, eDART / eGADS / GADS reporting, settlement arrangements, and any required

PJM or PJM Settlement consents, notices, forms, or approvals. Each Bid must also identify whether the Acceptable Bidder intends to assume or replace any energy-management, scheduling, hedging, or market-participation arrangements necessary to operate the Plant and participate in PJM markets after closing;

w. ***Market-Based-Rate Authority and FERC Part 35 Filings***: Each Bid must include a plan for all FERC Part 35 filings required for the Acceptable Bidder or post-closing operating entity to make wholesale sales of energy, capacity, or ancillary services, including any market-based-rate application, notice of succession, notice of cancellation, notice of change in status, asset appendix update, or other filing required to preserve authority to sell into PJM markets following closing;

x. ***Reliability and Compliance Transition***: Each Bid must include a plan for maintaining compliance with all applicable NERC Reliability Standards and regional requirements, including any required Generator Owner, Generator Operator, or related registration changes, ReliabilityFirst coordination, compliance personnel, procedures, event-reporting obligations, and transition of books and records needed to maintain reliability compliance. The Acceptable Bidder must identify the personnel, operator, asset manager, or third-party service provider that will perform these functions after closing;

y. ***Adequate Working Capital and Operating Support***: Each Bid must provide evidence satisfactory to the Debtor that the Acceptable Bidder will have sufficient working capital, credit support, vendor relationships, and operational funding to operate the Plant as a going concern after closing, including funding for coal, lime, fuel handling, maintenance, payroll, taxes, insurance, environmental compliance, ash disposal, PJM credit and collateral, and other consumables and ordinary-course operating needs;

z. ***Operational Transition / Transition Services***. Each Bid must identify whether the Acceptable Bidder intends to enter into any transition services arrangement with the Debtor, current management, an energy manager, plant operator, asset manager, or other third-party provider for plant operations, PJM market participation, fuel procurement, dispatch coordination, environmental compliance, accounting, payroll, IT, compliance reporting, or other services necessary to operate the Plant after closing. If applicable, the Bid must include a proposed transition services agreement or term sheet;

aa. ***Expected Closing Date***: Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction;

bb. ***Time Frame for Closing***: A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtor. The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as

practicable subject to any potential regulatory issues that may arise as set forth above;

cc. ***No Fees***: Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation;

dd. ***Adherence to the Bidding Procedures***: By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

ee. ***Consent to Jurisdiction***: The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, the Auction, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable;

ff. ***Conditions to Closing***: Each Bid must identify with particularity all conditions to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required; and

gg. ***Other Information***: Each Bid must contain such other information as may be reasonably requested by the Debtor in writing (email being sufficient).

**B. Right to Credit Bid**

TRAG/RGE, and any other person or entity holding a valid and perfected security interest in the Assets (each, a "**Secured Creditor**"), together with any agent or designee thereof, shall have the right to credit bid up to the full amount of its claims against the Debtor, including all principal, accrued and accruing interest, fees, expenses, premiums, indemnities, and any adequate protection obligations, in each case through the closing of the Sale Transaction, pursuant to and subject to section 363(k) of the Bankruptcy Code, with respect to any Assets constituting such Secured Creditor's collateral (each such bid, a "**Credit Bid**").

Any Credit Bid shall be deemed a cash Bid for all purposes of evaluating Bids hereunder, and the fact that a Bid is composed in whole or in part of a Credit Bid shall not be a detrimental factor in the Debtor's determination of the highest or otherwise best Bid. Any Secured Creditor submitting a Credit Bid shall be deemed an Acceptable Bidder and a Qualified Bidder, its Credit Bid shall be deemed a Qualified Bid, and it may participate in the Auction with respect to any Assets constituting its collateral, in each case without the requirement to submit a Good Faith Deposit, a Confidentiality Agreement, Preliminary Bid Documents, evidence of committed

financing, or any Bid Documents other than a purchase agreement marked against the Form APA; *provided* that any Credit Bid must be submitted on or prior to the Bid Deadline. A Credit Bid shall not be required to serve as the Back-Up Bid.

### C. Designation of Qualified Bids

Only Bids fulfilling all of the Bid Requirements (other than any waived in writing by the Debtor in accordance with these Bidding Procedures) may, in the Debtor's reasonable business judgment and in consultation with the Consultation Parties, be deemed to be "**Qualified Bids**," and only those parties submitting Qualified Bids may, in the Debtor's reasonable business judgment and in consultation with the Consultation Parties, be deemed to be "**Qualified Bidders**"; *provided* that a Stalking Horse Bid will constitute and be deemed a Qualified Bid for all purposes hereunder; *provided further* that the Debtor will consult with counsel to the Consultation Parties before designating any Bid submitted by an Affiliated Bidder a Qualified Bid.

As soon as reasonably practicable after the Bid Deadline and prior to the Auction, the Debtor shall determine, in its reasonable business judgment and in consultation with the Consultation Parties, which of the Bids received by the Bid Deadline qualify as Qualified Bids and will notify each Qualified Bidder in writing (email being sufficient) of its status as a Qualified Bidder. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtor; *provided* that if the Debtor receives a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtor may, in consultation with the Consultation Parties, provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction. Potential Bidders shall have until the Bid Deadline to remedy any deficiencies with respect to non-conforming or non-Qualified Bids. The Debtor may, in consultation with the Consultation Parties, waive or modify in writing (email being sufficient) any of the Bid Requirements in the exercise of its reasonable business judgment.

Between the date that the Debtor notifies an Acceptable Bidder in writing (email being sufficient) that it is a Qualified Bidder and the Auction, the Debtor may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent (email being sufficient) of the Debtor, in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Neither the Debtor nor the Debtor's advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtor to a bidder, or any other matter or thing regarding the Assets. All bidders must acknowledge and agree that upon closing the Debtor shall

sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale Transaction. The Debtor and each of the Debtor's representatives and advisors, are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction. Neither the Debtor nor the Debtor's advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtor, any advisor, or agent representing or purporting to represent the Debtor to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtor only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

**D. Bid Deadline**

Qualified Bids must be submitted in writing to the Bid Notice Parties so as to be actually received **no later than 4:00 p.m. (prevailing Eastern Time) on November 9, 2026**, or, if such date is extended in accordance with Section I hereof, such extended date (the "**Bid Deadline**"):

The Debtor may extend the Bid Deadline, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, for any reason whatsoever, in its reasonable business judgment.

**E. Evaluation of Qualified Bids.**

The Debtor shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtor's business judgment and in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid for the Assets (the "**Starting Bid**").

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor, in consultation with the Consultation Parties, will consider the following factors, to the extent applicable, in addition to any other factors that the Debtor deems appropriate: (i) the amount and nature of the total consideration; (ii) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (iii) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; (iv) the tax consequences of such Qualified Bid; (v) the Assets subject to the Qualified Bid and whether the Qualified Bid is for all of the Assets; (vi) the impact on trade and other unsecured creditors. In addition, the Debtor, in consultation with the Consultation Parties, may consider the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; (vii) the Qualified Bidder's ability to obtain FERC, PJM, PJM Settlement, NERC, ReliabilityFirst, environmental, and other regulatory approvals; (viii) the Qualified Bidder's ability to maintain the Debtor's PJM capacity-resource obligations and operate the Plant reliably after closing; (ix) the Qualified Bidder's PJM credit/collateral plan and market-participation plan; (x) the Qualified Bidder's ability to fund coal, lime, maintenance, payroll, environmental compliance, and ordinary-course operating needs; (xi) whether the Qualified Bidder has power-generation operating experience; (xii) the Qualified Bidder's ability and commitment to operate the Plant as a going concern; (xiii) whether the Qualified Bid supports the Debtor's proposed FERC settlement and sale free-and-clear objectives; and (xiv) the likelihood and timing

of obtaining all required approvals and closing without operational disruption; and (xv) the extent to which the Qualified Bid provides for the indefeasible payment in full in cash at closing of the obligations owing to TRAG/RGE. The Debtor will prefer Qualified Bids for all of the Assets but reserves the right, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, to consider bids for less than all of the Assets to multiple Qualified Bidders to the extent necessary to fulfill its fiduciary duties. Prior to commencing the Auction, the Debtor shall notify all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction.

### F. No Qualified Bids.

If no Qualified Bids other than a Stalking Horse Bid, which has been approved by the Court, or in the absence of a Stalking Horse Bid, the Debtor has only received a single Qualified Bid by the Bid Deadline, the Debtor, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, may cancel the Auction and the Stalking Horse Bid or the Qualified Bid, as applicable, will be deemed to be the Successful Bid for the Assets to which such Stalking Horse Bid or the Qualified Bid relates. The Debtor shall file a notice on the docket of the Chapter 11 Case of any cancellation of the Auction as soon as reasonably practicable after making such determination.

## VI. Auction.

If more than one Qualified Bid is received, the Auction will take place on **November 12, 2026 at 10:00 a.m. (prevailing Eastern Time)** via remote video, in-person, or hybrid format, at the Debtor's election.

The Auction will be conducted by the Debtor in accordance with the following procedures (the "**Auction Procedures**"):

a. the Auction will be conducted openly;

b. except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the auction;

c. bidding shall begin with the Starting Bid;

d. subsequent bids (each, an "**Overbid**") may only be made at the Auction and shall be at least a $1,000,000.00 increase in cash, cash equivalents, or other such consideration that the Debtor, in its reasonable business judgment, deems equivalent over the previous bid (a "**Minimum Overbid**"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. The Debtor may, in its reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction, in consultation with the Consultation Parties. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration

that the Debtor, in its reasonable business judgment, deems equivalent that exceeds the then existing highest Bid by at least the amount of the Minimum Overbid;

e. at the commencement of the Auction, the Debtor may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s);

f. each Qualified Bidder will be permitted a reasonable amount of time to respond to previous bids at the Auction;

g. during the course of the Auction, the Debtor shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtor's view, the then highest or otherwise best bid(s) for the applicable Assets;

h. the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

i. each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction;

j. each Qualified Bidder will be required to confirm that its Bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith prior to or at the Auction);

k. the Court and the Debtor will not consider Bids made after the Auction has been closed;

l. the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, consistent with the Debtor's fiduciary obligations under applicable law to maximize the value of its estate and to consider the interests of its stakeholders, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtor determines is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures Order, the Bidding Procedures, or the terms and conditions of the Sale Transaction, (iii) contrary to the best interests of the Debtor, its estate, its creditors, and other stakeholders; or (iv) otherwise violative of any of the Debtor's fiduciary obligations under applicable law.

m. the Debtor has the right to request any additional information that will allow the Debtor to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by its proposal and any further information that the Debtor believes is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

n. the Debtor, in consultation with the Consultation Parties, reserves the right to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtor and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

o. notwithstanding anything herein to the contrary, the Debtor, in consultation with the Consultation Parties, may, at any time choose to adjourn the Auction by announcement prior to or at the Auction. The Debtor shall file notice of such adjournment on the docket of the Chapter 11 Case as soon as reasonably practicable.

The Auction shall include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; provided that any Overbid made by a Qualified Bidder (including with respect to any Back-Up Bid) must remain open and binding on the Qualified Bidder until the earliest of (i) the closing of a Sale Transaction pursuant to the Successful Bid or Back-Up Bid, (ii) 120 days after the date of the Sale Hearing, provided, that, with respect to any Back-Up Bid, such date may be extended by up to an additional eighty (80) days if the only item outstanding with respect to the closing of any Sale Transaction pursuant to the Successful Bid is obtaining the required regulatory approvals, and (iii) the release of such Back-Up Bid by the Debtor in writing (email being sufficient) (the "**Back-Up Bid Termination Date**"). The Debtor may, in its reasonable business judgment and in consultation with the Consultation Parties, negotiate with any and all Qualified Bidders participating in the Auction the terms of such Qualified Bidder's respective Bids.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtor from exercising its fiduciary duties under applicable law (as reasonably determined in good faith by the Debtor, in consultation with counsel).

The Consultation Parties and their respective representatives and professionals shall be entitled to attend the Auction, without any requirement to provide prior notice of their intention to do so. Except as otherwise determined by the Debtor, only (i) the Debtor, (ii) the Office of the United States Trustee, (iii) the Consultation Parties, (iv) the Qualified Bidders (including, without limitation, any Stalking Horse Bidder which has been approved by the Court (if any)), (v) all creditors who make a request to attend the Auction (*provided, however,* that any creditor seeking to attend the Auction must submit such request to the Debtor no later than three (3) business days before the Auction), and (vi) any other parties as the Debtor may determine to include in its reasonable discretion, or as otherwise ordered by the Court, in each case, along with the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction (such parties in clauses (ii) through (vi) collectively, the "**Auction Parties**").

## A. Acceptance of Successful Bid

The Auction shall continue until (i) there is only one Qualified Bid that the Debtor determines, in its reasonable business judgment and in consultation with the Consultation Parties, consistent with the exercise of its fiduciary duties and outlined below in further detail, is the highest or otherwise best bid to purchase the Assets (each, a "**Successful Bid**"), and (ii) the Debtor determines, in its reasonable business judgment and with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid that would be reasonably acceptable to the Debtor, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor shall take into account the factors set forth in Section V.E of these Bidding Procedures, as well as any other factors the Debtor, in its reasonable business judgment, reasonably deems relevant and/or appropriate.

Any Qualified Bidder that submits a Successful Bid will be deemed a "**Successful Bidder**" with respect to the Assets contemplated for the purchase pursuant to such Successful Bid. As soon as reasonably practicable, after closing the Auction, the Debtor shall file notice of the Successful Bid and the Successful Bidder on the docket of the Chapter 11 Case. Following conclusion of the Auction and selection of a Successful Bidder, the Debtor shall present the results of the Auction at the sale hearing scheduled pursuant to the Bidding Procedures Order (the "**Sale Hearing**") and shall seek entry of the Sale Order approving a binding purchase agreement reasonably acceptable to TRAG/RGE with the Successful Bidder on the terms of the Successful Bid. The Sale Order shall deem the Debtor's selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtor shall not solicit and/or accept any further bids or offers to submit a bid after such selection; *provided* that nothing in these Bidding Procedures shall require the sole Director and Independent Manager, or similar governing body of the Debtor to take or refrain from taking any action that the Debtor determines in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including any Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtor pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## B. Designation of Back-Up Bidder.

The Back-Up Bid to purchase the Assets (the "**Back-Up Bidder**") will be determined by the Debtor, in consultation with the Consultation Parties, at the conclusion of the Auction, and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtor's selection of a Back-Up Bid shall be deemed final and the Debtor shall not accept any further bids or offers to submit a bid after such selection. The Debtor will be authorized, but not required, to

consummate the Sale Transaction with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved pursuant to the Sale Order or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale Transaction with the Debtor as soon as is reasonably practicable without further order of the Court (so long as such Back-Up Bid shall have been approved pursuant to the Sale Order or subject to Court approval if not).

The Back-Up Bid shall remain open and irrevocable until the Back-Up Bid Termination Date. The Debtor shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Bid Termination Date.

## VII. Approval of the Sale Transaction.

The Sale Hearing to consider approval of the Sale Transaction shall take place **on November 18, 2026 at [●]:[●] (prevailing Eastern Time)**, or such other date as set by the Court, at the United States Bankruptcy Court for the District of Delaware, 824 Market St. N, Wilmington, Delaware 19801 or by such other virtual or electronic means as determined by the Court.

At the Sale Hearing certain findings will be sought from the Court regarding the Sale Transaction and the Auction, including, among other things, that: (i) the Auction was conducted, and the Successful Bidder (which may be any Stalking Horse Bidder (if any) which has been approved by the Court) was selected, in accordance with the Bidding Procedures; (ii) the Auction was fair in substance and procedure; (iii) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (iv) consummation of any Sale Transaction as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the Assets and is in the best interests of the Debtor and its estate. **The Sale Hearing may be continued to a later date by the Debtor by filing a notice on the docket of the Chapter 11 Case and/or making an announcement at the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

Objections to the Sale Transaction and entry of any Sale Order approving the Sale Transaction must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to be **actually received** by the Debtor and the Bid Notice Parties by **the date that is fourteen (14) days after the Sale Notice is filed and served, at 4:00 p.m. (prevailing Eastern Time)**.

## VIII. Return of Good Faith Deposit.

The Good Faith Deposit of the Successful Bidder, if any, will, upon consummation of the Successful Bid, become property of the Debtor's estate and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder (or Back-Up Bidder, if applicable), if any, fails to consummate the Successful Bid (or Back-Up Bid if applicable), then the Good Faith Deposit(s) of such Successful Bidder will be irrevocably forfeited to the Debtor and may be retained by the Debtor as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for any Back-Up Bidder) will be returned within five (5) business days after consummation of the applicable Sale Transaction or upon the permanent withdrawal of the applicable proposed Sale Transaction.

The Good Faith Deposit of any Back-Up Bidder, if any, will be returned in accordance with Section VI.B of these Bidding Procedures.

All such deposits shall be held in escrow and at no time shall be deemed property of the Debtor's estate absent further order of the Court.

## IX. Reservation of Rights.

The Debtor reserves its rights to modify these Bidding Procedures in its reasonable business judgment with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, and in a manner consistent with the exercise of its fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional terms and conditions on the sale of the Assets, including, without limitation: (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment; provided that the Debtor shall not amend or modify these Bidding Procedures or the bidding process to reduce, eliminate, or otherwise modify its obligations to consult with or obtain the consent of the Consultation Parties (as applicable) without the prior written consent of the Consultation Parties.

## X. Consent to Jurisdiction.

All Qualified Bidders (including any Stalking Horse Bidder (if any) which has been approved by the Court) at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale Transaction and the construction and enforcement of these Bidding Procedures, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, as applicable, and consented to the

entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to any Sale Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XI. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures or any other document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require the Debtor or the sole Director and Independent Manager, or similar governing body of the Debtor to take any action or to refrain from taking any action related to any Sale Transaction or with respect to these Bidding Procedures, to the extent the Debtor, the sole Director and Independent Manager, or similar governing body of the Debtor reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided, however,* that the Debtor shall provide the Consultation Parties with notice of such action or inaction within two (2) Business Days of such action or inaction.

# EXHIBIT B-2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Omnis Pleasants, LLC, | ) | Case No. 26-11169 (KBO) |
| Debtor.[1] | ) | |

**ORDER (I) APPROVING AUCTION AND BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS, (II) SCHEDULING CERTAIN DATES AND DEADLINES RELATED THERETO, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) AUTHORIZING THE DEBTOR TO DESIGNATE A STALKING HORSE BIDDER AND OFFER BID PROTECTIONS RELATED THERETO, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI) APPROVING THE SALE OF ASSETS, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtor in possession (the "**Debtor**") for entry of an order (this "**Order**"): (a) approving marketing, auction, and bidding procedures attached hereto as **Exhibit 1** (the "**Bidding Procedures**"), to govern the solicitation and selection of the highest or otherwise best offer for the sale (the "**Sale Transaction**") of all or substantially all of the Debtor's assets (the "**Assets**"), (b) establishing certain dates and deadlines with respect to the marketing and sale of the Assets, (c) authorizing, but not directing, the Debtor to designate a stalking horse bidder (the "**Stalking Horse Bidder**") and offer bid protections related thereto (the "**Bid Protections**"), (d) approving the manner of

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and service address is One Power Station Boulevard, Belmont, West Virginia 26134.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

notice of the Auction (if any) and Sale Transaction substantially in the form attached hereto as **Exhibit 2**, (e) approving procedures for the assumption and assignment of certain executory contracts (the "**Executory Contracts**") and unexpired leases, as applicable (the "**Unexpired Leases**" and together with the Executory Contracts, the "**Contracts**") in connection with the Sale Transaction and approving the manner of notice thereof (the "**Contract Assumption Notice**") substantially in the form attached hereto as **Exhibit 3**, and (f) granting related relief; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the Standing Order; and this Court having found that venue of the Chapter 11 Case and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that due and proper notice of the Motion has been given, and that no other or further notice is required or necessary under the circumstances; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and upon the record in the Chapter 11 Case and the proceedings had before this Court; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT:**

A. Jurisdiction and Venue. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Statutory and Legal Predicates. The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1, and 9006-1(c).

C. Sale Process. The Debtor and its advisors have been engaging with a number of interested parties to solicit and develop the highest or otherwise best offer for the Assets.

D. Bidding Procedures. The Debtor has articulated good and sufficient business reasons for this Court to approve the Bidding Procedures. The Bidding Procedures are fair, reasonable, and appropriate, and are designed to maximize the value of the proceeds from the Sale Transaction. The Bidding Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets. The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

E. The Debtor has demonstrated a compelling and sound business justification for this Court to enter this Order and grant the relief set forth herein.

F. Stalking Horse Designation. The Stalking Horse Designation Procedures (as defined herein) and the granting of any Bid Protections are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of: (a) the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (b) the Purchase Price of the Bid submitted by the Stalking Horse Bidder and what portion is cash; (c) whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Bid submitted by the Stalking Horse

Bidder; (d) any proposed Bid Protections; (e) the Stalking Horse Agreement; (f) the Assets subject to the Stalking Horse Bid; and (g) the Stalking Horse Objection Deadline.

G. Auction Notice. The Auction Notice, substantially in the form attached hereto as **Exhibit 2**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction (if any) and the proposed Sale Transaction and relevant information related thereto, including: (a) the Bidding Procedures; (b) the date, time, and location of the Auction; (c) the date, time, and location of the Sale Hearing; and (d) the deadline for filing objections to any Sale Transaction and entry of the order approving any Sale Transaction; (e) instructions for obtaining a copy of the Form APA; (f) a summary of the Sale Transaction terms, including that the Sale Transaction contemplates a transfer of the Assets free and clear of liens, claims, interests, and other encumbrances, with such liens, claims, interests and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of applicable Contracts.

H. Contract Assumption Notice. The Contract Assumption Notice, substantially in the form attached hereto as **Exhibit 3**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no further notice of the Assumption and Assignment Procedures shall be required, except as expressly required herein.

I. Notice. Notice of the Motion, the Bidding Procedures, the Assumption and Assignment Procedures, the other relief granted herein, and the hearing regarding the foregoing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and (iii) adequate and sufficient under the

circumstances of the Debtor's Chapter 11 Case, such that no other or further notice of the foregoing need or shall be required or provided except as set forth herein or in the Bidding Procedures or the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is **GRANTED** as set forth herein.

2. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

## I. Important Dates and Deadlines.

3. *Bid Deadline*. November 9, 2026 at 4:00 p.m. (prevailing Eastern Time) or, if such date is extended in accordance with the Bidding Procedures, such extended date, is the deadline by which all Qualified Bids must be ***actually received*** by the parties and in the manner prescribed by the Bidding Procedures, which may be extended by the Debtor with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE.

4. *Auction*. The date and time of the Auction, if any, is November 12, 2026 at 10:00 a.m. (prevailing Eastern Time), or, if such date is extended in accordance with the Bidding Procedures, such extended date, at a time to be announced by the Debtor. Any extension or other change to the date, time, or format of the Auction shall be made by the Debtor with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE and upon written notice to this Court. The Auction will be conducted via remote video, in-person, or hybrid format, at the Debtor's election. Except as otherwise determined by the Debtor, in consultation with the Consultation Parties, only (i) the Debtor, (ii) the Office of the United States Trustee, (iii) the Consultation Parties, (iv) the Qualified Bidders (including, without limitation,

any Stalking Horse Bidder which has been approved by this Court (if any)), and (v) all creditors who make a request to attend the Auction (*provided, however,* that any creditor seeking to attend the Auction must submit such request to the Debtor no later than three (3) business days before the Auction), and (vi) any other parties as the Debtor may determine to include in its reasonable discretion, or as otherwise ordered by this Court, in each case, along with the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction (such parties in clauses (ii) through (v) collectively, the "**Auction Parties**"), and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Auction. Notwithstanding the foregoing, the Consultation Parties and their respective representatives and professionals may attend the Auction without prior notice to the Debtor or its advisors of their intention to do so.

5. If the Debtor determines, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE, not to conduct an Auction for the Assets, then the Debtor shall file a notice on the docket of the Chapter 11 Case as soon as reasonably practicable after making such determination.

6. *Notice of Successful Bidder*. As soon as reasonably practicable after closing the Auction, the Debtor shall file a Notice of Successful Bid and Successful Bidder on the docket of the Chapter 11 Case.

7. *Sale Objection Deadline*. The Debtor must file the form of Sale Order no later than seven (7) days before the Sale Objection Deadline. Objections, if any, to the Sale Transaction must be made by the date that is fourteen (14) days after the Sale Notice is filed and served. Objections to the approval of the Sale Transaction must be in writing, state the basis of

such objection with specificity, and be filed with this Court and served on the following parties (collectively, the "**Notice Parties**"):

a. proposed co-counsel to the Debtor, Young Conaway Stargatt & Taylor, LLP ("**YCST**"), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Andrew L. Magaziner (amagaziner@ycst.com), Robert F. Poppiti, Jr. (rpoppiti@ycst.com), and S. Alexander Faris (afaris@ycst.com); and Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**" and together with YCST, "**Debtor's Counsel**"), 1177 Avenue of the Americas, New York, New York 10036 (Attn: Alexander Woolverton (Alexander.Woolverton@hsfkramer.com), Andrew Pollack (Andrew.Pollack@HSFKramer.com), and Melissa Mertz (melissa.mertz@hsfkramer.com);

b. counsel to TRAG/RGE, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, Attn: Kristine Manoukian (kristine.manoukian@us.dlapiper.com); 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, Attn: R. Craig Martin (craig.martin@us.dlapiper.com); and 500 Eighth Street NW, Washington, DC 20004, Attn: Erik F. Stier (erik.stier@us.dlapiper.com); and

c. the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801 Attn: Benjamin Hackman (benjamin.a.hackman@usdoj.gov).

Any party or entity who fails to timely make an objection to the Sale Transaction on or before the Sale Objection Deadline shall be forever barred from asserting an objection to the Sale Transaction, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.

8. *Sale Hearing*. November 18, 2026 at [●]:[●], prevailing Eastern Time is the date and time for the hearing for this Court to consider approval of the Sale Transaction and the Successful Bid and entry of the Sale Order, which shall be in form and substance reasonably acceptable to TRAG/RGE.

9. The dates and deadlines set forth in this Order are subject to modification by the Debtor with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG/RGE in accordance with the Bidding Procedures.

**II. Auction, Bidding Procedures and Related Relief.**

10. The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1,** are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale Transaction. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order. The Debtor is authorized to take any and all actions necessary to implement the Bidding Procedures with the goal of attaining the highest or otherwise best offer for the Debtor's Assets. Subject to the terms of the Bidding Procedures, the Debtor may, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, modify the Bidding Procedures as necessary or appropriate to maximize value for its estate. All rights of the Debtor, as it may reasonably determine to be in the best interests of its estate, to (i) modify the Bidding Procedures in good faith, (ii) further the goal of attaining the highest or otherwise best offer for the Assets, or (iii) impose, upon or prior to the selection of the Successful Bidder additional customary terms and conditions on the Sale, are reserved to the extent set forth in the Bidding Procedures. Notwithstanding the foregoing, the Debtor shall not amend or modify the Bidding Procedures, this Order, or the bidding process in a manner that reduces, eliminates, or otherwise modifies the Debtor's obligations to consult with or obtain the consent of the Consultation Parties, or that alters, limits, or imposes additional burdens on the rights of TRAG/RGE, without the prior written consent of TRAG/RGE.

11. Any deposit (including any Good Faith Deposit) provided by a Qualified Bidder shall be held in escrow by the Debtor or its agent in accordance with the Bidding Procedures, and shall not become property of the Debtor's bankruptcy estate unless and until released from escrow to the Debtor pursuant to the terms of the applicable escrow agreement, the Bidding

Procedures, or order of this Court, as applicable. To the extent any deposit is forfeited and becomes property of the Debtor's estate, such amounts shall constitute cash collateral of TRAG/RGE and shall be subject to their liens and claims, subject to the terms of the Cash Collateral Order.

12. Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale Transaction and the Auction shall be conducted openly and the Auction shall be transcribed or videotaped, as set forth in the Bidding Procedures.

13. Other than any Bid Protections approved for a Stalking Horse Bidder in connection with a Stalking Horse Bid, no person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale Transaction, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any other fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise. Any Bid Protections approved by this Court shall be payable, solely in the event of consummation of a Sale Transaction to a Bidder other than the Stalking Horse Bidder, solely from the cash proceeds of the alternative transaction giving rise thereto, at the closing thereof, and shall not be payable from, or secured by any lien on, the collateral of TRAG/RGE or the proceeds thereof.

## III. Stalking Horse Bidders and Stalking Horse Bid Protections

14. The Debtor, upon entry of this Order, shall be authorized, but not obligated, in an exercise of its reasonable business judgment, following consultation with the Consultation Parties, to (a) designate a Stalking Horse Bidder, (b) enter into a Stalking Horse Agreement, and

(c) agree to any Bid Protections for the Stalking Horse Bidder subject to further Court approval, in each case, any time prior to the Stalking Horse Supplement Deadline (as defined below) in accordance with the following procedures (the "**Stalking Horse Designation Procedures**"):

a. The Debtor may, at any time prior to the Stalking Horse Supplement Deadline (as defined below), designate a stalking horse bidder (the "**Stalking Horse Bidder**"), whose Qualified Bid (as defined below), subject to the entry of the Stalking Horse Approval Order (as defined below), shall serve as the stalking horse bid (the "**Stalking Horse Bid**") and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid (in form and substance reasonably acceptable to TRAG/RGE, the "**Stalking Horse Agreement**"), including any bid protections (the "**Bid Protections**"), will be binding on the Debtor and the Stalking Horse Bidder and set the floor for all Qualified Bids, subject to higher or otherwise better offers at the Auction.

b. To obtain entry of a Stalking Horse Approval Order, the Debtor is authorized to file a notice (the "**Stalking Horse Supplement**") on or prior to October 22, 2026 (the "**Stalking Horse Supplement Deadline**"). Such Stalking Horse Supplement will be served on (i) the office of the United States Trustee, (ii) the Consultation Parties, (iii) those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Case, (iv) ReliabilityFirst Corporation, (v) North American Electric Reliability Corporation, (vi) the United States Environmental Protection Agency, (vii) West Virginia Department of Environmental Protection, (viii) West Virginia Economic Development Authority, (ix) the Federal Energy Regulatory Commission, (x) all environmental authorities having jurisdiction over the Plant, (~~x~~xi) counterparties to all PJM, interconnection, energy management, fuel, lime, environmental, rail/barge/transportation, landfill/CCR, hedging, and operating contracts, and (~~xi~~xii) the Debtor's insurance carriers and sureties (those parties listed in clauses (i) through (~~xi~~xii), collectively, the "**Stalking Horse Notice Parties**"), with no further notice being required. The Debtor shall submit with the Stalking Horse Supplement a proposed form of order (in form and substance reasonably acceptable to TRAG/RGE, the "**Stalking Horse Approval Order**") approving the Debtor's designation of the Stalking Horse Bidder, the Stalking Horse Bid, the Stalking Horse Agreement, and any Bid Protections afforded to the proposed Stalking Horse Bidder.

c. Any Stalking Horse Supplement shall (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor), (ii) set forth the Purchase Price of the Bid submitted by the Stalking Horse Bidder and what portion is cash, (iii) state whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Bid submitted by

the Stalking Horse Bidder, (iv) specify any proposed Bid Protections (including the amount and calculation thereof), (v) specify which Assets the Bid submitted by the Stalking Horse Bidder includes, (vi) attach the Stalking Horse Agreement, and (vii) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections. The Stalking Horse Supplement shall set forth the reasons the Debtor believes any Bid Protections satisfy the requirements of section 503(b) of the Bankruptcy Code. For the avoidance of doubt, nothing in this Order is: (a) shifting the burden of proof under applicable bankruptcy law with respect to the approval of any Bid Protections; (B) authorizing the Debtor to propose or award any Bid Protections related to a credit bid; or (c) approving any Bid Protections.

d. Objections to the designation of any Stalking Horse Bidder or any of the terms of any Stalking Horse Bid (a "**Stalking Horse Objection**") must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court no later than five (5) calendar days after the service of any such Stalking Horse Supplement (the "**Stalking Horse Objection Deadline**") and be served on the Stalking Horse Notice Parties and Debtor's Counsel. If no Stalking Horse Objection is timely filed with respect to the Stalking Horse Bid in accordance with these Stalking Horse Designation Procedures, the Court may enter the proposed Stalking Horse Approval Order without further notice or a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Supplement.

e. Any Stalking Horse Agreement executed by the Debtor and the Sale Transaction contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtor will be deemed to be a Qualified Bidder.

## IV. Assumption and Assignment Procedures.

15. The procedures set forth below (the "**Assumption Procedures**") regarding the assumption and assignment of the Executory Contracts and Unexpired Leases proposed to be assumed by the Debtor pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale Transaction are hereby approved to the extent set forth herein. These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtor's Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the

Sale Transaction under a purchase agreement (including a Stalking Horse Agreement), subject to the payment of any amount necessary pursuant to section 365 of the Bankruptcy Code or otherwise to cure all existing and continuing defaults under the applicable Executory Contract or Unexpired Lease (the foregoing amounts as stated in the Contract Assumption Notice, the "**Cure Payments**"):

a. **Contract Assumption Notice**. No less than two weeks prior to the Auction, (the "**Assumption and Assignment Service Deadline**"), the Debtor shall serve a notice of potential contract assumption and assignment (the "**Contract Assumption Notice**"), in substantially the form attached hereto as **Exhibit 3** via first class mail on the counterparties to such Contracts (the "**Contract Counterparties**"). The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Contract to be potentially assumed and assigned; (ii) the name of the counterparty to the Contract; (iii) the Debtor's good faith estimates of the Cure Payments, if any, required in connection with the potential assumption and assignment of the Contract, as of the date of the Cure notice; and (iv) the Contract Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtor or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a Contract on the Contract Assumption Notice is not a guarantee that such Contract will ultimately be assumed and assigned.

b. **Cure Payments**. The payment of the applicable Cure Payments by the Debtor and/or the Successful Bidder (including a Stalking Horse Bidder (if any) which has been approved by this Court), as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtor and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

c. **Supplemental Contract Assumption Notice**. To the extent the Debtor, at any time after the Assumption and Assignment Service Deadline (i) identifies additional Contracts that may be assumed by and assigned to the Successful Bidder (including a Stalking Horse Bidder (if any) which has been approved by this Court), or (ii) modifies the previously stated Cure Payment associated with any Contract, the Debtor will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a

"**Supplemental Assumption Notice**") on each of the Contract Counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice.

d. **Cure Objections**. Objections, if any, to the potential assumption and assignment of the Contracts or the Cure Payments proposed with respect thereto (such objections, the "**Cure Objections**"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed on the docket of the Chapter 11 Case and served upon the Notice Parties, so as actually to be received on or before the Contract Objection Deadline or the deadline set forth in the Supplemental Assumption Notice, as applicable.

e. **Adequate Assurance Objections**. Objections, if any, to the Successful Bidder's provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must be (i) in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection, and (iv) be filed on the docket of the Chapter 11 Case and served upon the Notice Parties, so as actually to be received on **12:00 p.m. (ET) on November 16, 2026** (the "**Adequate Assurance Objection Deadline**").

f. **Dispute Resolution**. In the event that the Debtor and a Contract Counterparty cannot resolve an objection to a Cure Payment, the Contract at issue may be assumed by the Debtor and assigned to the Successful Bidder, provided that the Debtor shall segregate the disputed Cure Payment amount, pending resolution by the Court or mutual agreement of the parties. Any objection to the proposed assumption and assignment of a Contract or related Cure Payment proposed in connection with the Sale Transaction that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Court). Notwithstanding the foregoing, in accordance with the terms of this Order, the Debtor may, in its sole discretion and in consultation with the Consultation Parties and the Successful Bidder, adjourn Cure Objections to a later hearing and assign to the Successful Bidder other proposed Contracts to be assumed and assigned while such objections remain outstanding.

16. Any party failing to timely file Cure Objection or an Adequate Assurance Objection is deemed to have consented to (a) such Cure Payment, (b) the assumption and

assignment of such Contract, and (c) adequate assurance of future performance. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Contracts, and adequate assurance of future performance, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder with respect to such party's Contract.

17. To the extent the Debtor seeks to assume and assign a Contract in connection with a Sale Transaction (an "**Assumed Contract**," and the counterparty to such Assumed Contract, the "**Assumed Contract Counterparty**"), the Debtor shall, at the request of the Assumed Contract Counterparty, provide evidence to such Assumed Contract Counterparty that the Successful Bidder for the Contract has the ability to comply with the requirements of adequate assurance of future performance on a confidential basis. All Bidders are deemed to consent to the transmission of such evidence of adequate assurances of future performance on a confidential basis to counsel for the Assumed Contract Counterparties via email with such information to be used only for the purpose of assessing the applicable Bidder and objection to adequate assurance; *provided*, that any such Assumed Contract Counterparty shall use best efforts to maintain the confidentiality of such information, including by filing the relevant portions of such objection under seal.

**V. Miscellaneous.**

18. The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

19. To the extent any dates or deadlines set forth herein are modified pursuant to this Order or the Bidding Procedures, and such modification is inconsistent with the requirements of Local Rule 9006-1, such requirements shall be deemed satisfied.

20. Notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by this Court, nothing in this Order or the Bidding Procedures shall require the Debtor, its sole Director and Independent Manager, or similar governing body of the Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures or the Sale Transaction, if the sole Director and Independent Manager, or similar governing body reasonably determines in good faith, after consultation with their outside counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, *however*, that the Debtor shall provide the Consultation Parties with notice of such action or inaction within two (2) Business Days of such action or inaction.

21. In the event of any inconsistencies between this Order and the Motion, this Order shall govern in all respects. In the event of any inconsistencies between this Order and the Bidding Procedures, the Bidding Procedures shall govern in all respects.

22. All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters. All actions by the Debtor necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and to implement the Bidding Procedures are hereby authorized.

23. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

24. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25. The Debtor is authorized to make non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without further order of this Court, including, without limitation, changes to correct typographical and grammatical errors; *provided* that such changes are reasonably acceptable to TRAG/RGE.

26. The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

27. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**EXHIBIT 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Omnis Pleasants, LLC, | ) | Case No. 26-11169 (KBO) |
| Debtor.[1] | ) | |

**BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S ASSETS**

On July 26, 2026, the above-captioned debtor in possession (the "**Debtor**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

On August 13, 2026, the Debtor filed the *Motion of Debtor for Entry of an Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. ●86] (the "**Bidding Procedures Motion**").

On [●], 2026, the Court entered the *Order (I) Approving the Auction and Bidding Procedures for the Sale of the Debtor's Assets, (II) Scheduling Certain Dates and Deadlines Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtor to Designate a Stalking Horse Bidder and Offer Bid Protections Related Thereto, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving the Sale of Assets, and (VII) Granting Related Relief* [Docket No. ●] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**") setting forth the process by which the Debtor is authorized to solicit bids for and conduct an auction (the "**Auction**") for a sale or disposition (a "**Sale Transaction**") of all or substantially all of the Debtor's Assets (as defined herein).

## I. Key Dates.

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures Motion, each as defined herein.

The key dates for the sale process are as follows. In accordance with the Bidding Procedures Order, the Debtor may, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of TRAG LLC ("**TRAG**") and RG Energy LLC ("**RGE**" and together with TRAG, "**TRAG/RGE**" or the "**Consultation Parties**")[3], extend any of the deadlines, or delay any of the applicable dates, in these Bidding Procedures:

| Event | Proposed Date |
|---|---|
| Preliminary Bid Deadline | September 29, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Stalking Horse Supplement Deadline | October 22, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Assumption and Assignment Service Deadline | October 23, 2026 |
| Sale Notice Filing and Service Deadline | No later than twenty-one (21) days prior to the Sale Hearing |
| Assumption Notice Objection Deadline | No earlier than fourteen (14) days after service of each Contract Assumption Notice |
| Bid Deadline | November 9, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Form of Sale Order | No later than seven (7) days before the Sale Objection Deadline |
| Sale Objection Deadline | No earlier than fourteen (14) days after the Sale Notice is filed and served |
| Auction (if necessary) | November 12, 2026 at 10:00 a.m. (prevailing Eastern Time) |
| Sale Hearing | November 18, 2026 at [●]:[●] (prevailing Eastern Time) (or such other date as set by the Court) |

## II. Assets to be Auctioned.

These Bidding Procedures set forth the terms by which proposed bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for all or substantially all of the Debtor's assets. These assets include, but are not limited to, the Debtor's going-concern business, the Pleasants Power Station located in Belmont, West Virginia (the "**Plant**") and related real property, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, causes of action,[4] insurance proceeds, prepaid expenses and deposits, books and records, and other personal property (collectively, the "**Assets**"), free and clear of all liens, claims, interests, or other encumbrances to the fullest extent

[3] Email from counsel to TRAG/RGE is sufficient to constitute consent by the Consultation Parties or TRAG/RGE, as applicable, under these Bidding Procedures.

[4] Unless otherwise expressly provided in the applicable purchase agreement and approved by the Court, the Assets shall not include estate claims, avoidance actions, claims against insiders, former officers, directors, managers, members, affiliates, upstream entities, or control persons, claims relating to alleged cash sweeps, misappropriation, diversion of funds, related-party transactions, breach of fiduciary duty, fraudulent transfer, or similar misconduct, or any rights necessary for the Debtor or its estate to comply with the Federal Energy Regulatory Commission ("**FERC**") Enforcement cooperation obligations.

permitted by the Bankruptcy Code and any applicable non-bankruptcy law, with such liens, claims, interests and/or other encumbrances attaching to the proceeds of the sale of the Assets with the same validity and priority as such liens, claims, interests, and/or other encumbrances applied against the Assets.

The Debtor prefers bids for all Assets as a single lot from bidders submitting Qualified Bids (as defined herein) but reserves the right, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, to consider bids for less than all of the Assets.

## III. Marketing Process.

### A. Participation Requirements

To participate in the bidding process and to receive diligence information, including access to the Debtor's electronic data room (the "**Data Room**") and to additional non-public information regarding the Debtor (collectively, the "**Diligence Materials**"), any party interested in submitting a bid (each a "**Potential Bidder**"), must deliver by email to each of: (a) proposed co-counsel to the Debtor, (i) Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**"), Attn: Alexander Woolverton (alexander.woolverton@HSFKramer.com), Andrew Pollack (andrew.pollack@HSFKramer.com), and Melissa Mertz (melissa.mertz@HSFKramer.com); and (ii) Young Conaway Stargatt & Taylor, LLP ("**YCST**" and together with HSF Kramer, "**Debtor's Counsel**"), Attn: Andrew L. Magaziner (amagaziner@ycst.com), Robert F. Poppiti, Jr. (rpoppiti@ycst.com), and S. Alexander Faris (afaris@ycst.com); (b) proposed financial advisor to the Debtor, AlixPartners, LLP ("**AlixPartners**") (alix-pleasants@alixpartners.com); and (c) proposed investment banker to the Debtor, Houlihan Lokey Capital, Inc. ("**Houlihan**"), Attn: Xander Hector (XHector@HL.com) and Thad Williams (TWilliams@HL.com) and Project_Combustion@hl.com (collectively, the "**Bid Notice Parties**"), the following documents (collectively, the "**Preliminary Bid Documents**") on or prior to **September 29, 2026 at 4:00 p.m. (prevailing Eastern Time)** (the "**Preliminary Bid Deadline**"), unless otherwise waived or extended by the Debtor with the consent of the Consultation Parties:

(i) an executed confidentiality agreement in form and substance acceptable to the Debtor (a "**Confidentiality Agreement**");

(ii) a statement or other factual support demonstrating to the Debtor's reasonable satisfaction that the Potential Bidder has a bona fide interest in purchasing the Assets (or some subset thereof);

(iii) the identification of the Potential Bidder and any principals and representatives thereof (including counsel), including identifying those principals and representatives who are authorized by the Potential Bidder to appear and act on such Potential Bidder's behalf for all purposes under these Bidding Procedures regarding the Potential Bidder's contemplated Sale Transaction;

(iv) written disclosure of any and all connections or agreements the Potential Bidder (including its affiliates and any related persons) may have to the Debtor, or "insiders" of the Debtor (as that term is contemplated by section 101(31) of the Bankruptcy Code), and/or any manager or any entity holding direct or indirect membership interests in the Debtor; and

(v) any other information or documentation that the Debtor reasonably requests.

The Debtor, in consultation with the Consultation Parties, will determine whether such Potential Bidder has submitted adequate Preliminary Bid Documents (an "**Acceptable Bidder**") to proceed with the bidding process and shall notify Potential Bidders who submitted the above Preliminary Bid Documents whether they have been determined to be an Acceptable Bidder by the Debtor within 5 business days after the Preliminary Bid Deadline, *provided* that, the Debtor will consult with the advisors to TRAG/RGE before determining that any potential Affiliated Bidder (as defined below) has submitted adequate Preliminary Bid Documents to be determined an Acceptable Bidder. Only Acceptable Bidders, as determined by the Debtor, in consultation with the Consultation Parties, may submit Bids. Each Prepetition Secured Party shall at all times be deemed an Acceptable Bidder.

To the extent that any of the Consultation Parties submits a Stalking Horse Bid, Credit Bid, or other alternative Bid for any Assets in connection with these Bidding Procedures, then such Consultation Party shall not be a consultation party solely with respect to the Assets that are the subject of such Bid unless and until such Bid is withdrawn, but shall remain a consultation party for all other purposes. For the avoidance of doubt, the exercise by the Consultation Parties of their rights under section 363(k) of the Bankruptcy Code shall not require the Consultation Parties to waive or relinquish any right, claim, lien, or remedy.

**B. Access to Diligence Materials**

Beginning on or as soon as is reasonably practicable after the Debtor determines that a Potential Bidder is an Acceptable Bidder, the Debtor will provide such Acceptable Bidder with access to the Diligence Materials. The Debtor, with the assistance of its advisors, will coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access, *provided* that the Debtor may, after consultation with the advisors to the Consultation Parties, decline to provide such information to any Acceptable Bidder who, in the Debtor's reasonable business judgment, has not established, or who has raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a Sale Transaction.

The Debtor will grant each Acceptable Bidder access to the Data Room up to and including the Bid Deadline (as defined below) (such period, the "**Diligence Period**"). The Debtor shall afford any Acceptable Bidder access to the Diligence Materials or additional information as may be reasonably requested by the Potential Bidder that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances. The Debtor shall grant the Consultation Parties and their respective advisors access to the Data Room and the Diligence Materials, subject to the Consultation Parties and their respective advisors maintaining the confidentiality of such information. The Debtor will provide in the Data Room a form asset purchase agreement for the sale of the Assets, in form and substance reasonably acceptable to TRAG/RGE (the "**Form APA**"). The Debtor may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Acceptable Bidders. If any such due diligence material is prepared by the Debtor in written form and has not previously been provided to any other Acceptable Bidder, the Debtor will simultaneously provide access to such materials to all Acceptable Bidders. Each Acceptable Bidder shall be required to acknowledge that it has had an opportunity to conduct any

and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

The Debtor may reasonably withhold or limit access by any Acceptable Bidder (including its affiliates and any related persons) to the Diligence Materials at any time and for any reason, including, without limitation, if (i) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to an Acceptable Bidder by the Debtor, including, but not limited to, Acceptable Bidders who are customers or competitors of the Debtor or affiliates thereof, and other industry participants, (ii) the Potential Bidder does not become, or the Debtor determines that the Acceptable Bidder is not likely to become a Qualified Bidder (as defined herein), (iii) the Acceptable Bidder violates the terms of its Confidentiality Agreement, (iv) the Debtor becomes aware that the information set forth on the Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Acceptable Bidder's ability to close its contemplated transaction, (v) the Acceptable Bidder (including its affiliates and any related persons) uses information obtained from the Data Room or the diligence process in connection with, or related to, any litigation or other legal action related to the Debtor or any current or former managers of the Debtor, (vi) such disclosure would jeopardize protections afforded the Debtor under the attorney-client privilege or the attorney work product doctrine, or (vii) the bidding process is terminated in accordance with its terms.

Neither the Debtor nor any of the Debtor's representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (a) to any person or entity who is not an Acceptable Bidder or (b) if and to the extent doing so would (i) violate any law to which the Debtor is subject, including any privacy law, (ii) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (iii) violate any legally-binding obligation of the Debtor with respect to confidentiality, non-disclosure or privacy or (iv) jeopardize protections afforded to the Debtor under the attorney-client privilege or the attorney work product doctrine (provided that the Debtor shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation, or law).

Acceptable Bidders may not use FERC investigation materials provided in the Diligence Materials for any purpose other than diligence, and may not in connection with the Sale Transaction contact FERC, PJM Interconnection, L.L.C., the Independent Market Monitor, the North American Electric Reliability Corporation, ReliabilityFirst Corporation, or the West Virginia Department of Environmental Protection.

The due diligence period will end on the Bid Deadline, and after the Bid Deadline, the Debtor shall have no obligation to furnish any due diligence information to any party.

**All due diligence requests directed to the Debtor must be directed to: Houlihan, Attn: Xander Hector (XHector@HL.com) and Thad Williams (TWilliams@HL.com) and Project_Combustion@hl.com.**

### C. Due Diligence from Potential Bidders or Acceptable Bidders

Each Potential Bidder or Acceptable Bidder shall comply with all reasonable requests with respect to information and due diligence access by the Debtor or its advisors regarding such Potential Bidder or Acceptable Bidder, as applicable, and its contemplated Sale Transaction. Failure by a Potential Bidder or Acceptable Bidder to comply with reasonable requests for additional information and due diligence access will be a basis for the Debtor, in consultation with the Consultation Parties, to determine that the Potential Bidder or Acceptable Bidder, as applicable, is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtor, in consultation with the Consultation Parties, to revoke any bidder's classification as a Qualified Bidder.

### D. Communications with Potential Bidders

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Potential Bidders regarding the Debtor or its Assets shall involve the Debtor and the Debtor's advisors. **No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent (email being sufficient) from the Debtor**.

## IV. Stalking Horse Bidders and Bid Protections

The Stalking Horse Designation procedures set forth in paragraph 14 of the Bidding Procedures Order apply to the designation of any Stalking Horse Agreement and related Bid Protections. Any Stalking Horse Agreement executed by the Debtor and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to any Stalking Horse Agreement executed by the Debtor will be deemed a Stalking Horse Bidder.

Other than as provided by order of the Court, no party submitting a Bid (other than a Stalking Horse Bidder) will be entitled to a break-up fee or expense reimbursement. By submitting a Bid, an Acceptable Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bidding Procedures, or participation in the Debtor's sale process.

The Debtor may, at any time prior to the Stalking Horse Supplement Deadline (as defined below), following consultation with the Consultation Parties, designate a stalking horse bidder (the "**Stalking Horse Bidder**"), whose Qualified Bid (as defined below), subject to the entry of the Stalking Horse Approval Order (as defined below), shall serve as the stalking horse bid (the "**Stalking Horse Bid**") and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid (in form and substance reasonably acceptable to the Consultation Parties, the "**Stalking Horse Agreement**"), including any bid protections (the "**Bid Protections**") will be binding on the Debtor and the Stalking Horse Bidder and set the floor for all Qualified Bids, subject to higher or otherwise better offers at the Auction.

The Debtor may designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement on or prior to October 22, 2026 (the "**Stalking Horse Supplement Deadline**"). If the Debtor decides to designate a Stalking Horse Bidder, the Debtor shall file a supplement to the Bidding Procedures Motion (the "**Stalking Horse Supplement**") seeking approval of the same, with no less than five (5) calendar days' notice of the objection deadline (the "**Stalking Horse Objection Deadline**") to (i) the Office of the United States Trustee, (ii) counsel to the Consultation Parties, (iii) those parties who have filed appropriate notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Case, (iv) FERC, (v) PJM Interconnection L.L.C., (vi) PJM Settlement, Inc., (vii) Monitoring Analytics, (viii) ReliabilityFirst Corporation, (ix) North American Electric Reliability Corporation, (x) the United States Environmental Protection Agency, (xi) West Virginia Department of Environmental Protection, (xii) West Virginia Economic Development Authority, (xiii) all environmental authorities having jurisdiction over the Plant, (xiv) counterparties to all PJM, interconnection, energy management, fuel, lime, environmental, rail/barge/transportation, landfill/CCR, hedging, and operating contracts, and (xv) the Debtor's insurance carriers and sureties (those parties listed in clauses (i) through (xv), the "**Stalking Horse Notice Parties**") with no further notice being required. The Stalking Horse Supplement shall: (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the Purchase Price of the Bid submitted by the Stalking Horse Bidder and what portion is cash; (iii) state whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Bid submitted by the Stalking Horse Bidder; (iv) specify any proposed Bid Protections (including the amount and calculation thereof); (v) specify which Assets the Bid submitted by the Stalking Horse Bidder includes; (vi) attach the Stalking Horse Agreement; and (vii) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections.

Objections to the designation of a Stalking Horse Bidder or any terms of a Stalking Horse Bid (a "**Stalking Horse Objection**") shall (i) be in writing; (ii) comply with Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules; (iii) state with specificity, the legal and factual bases thereof; and (iv) be filed with the Court and served on the Stalking Horse Notice Parties and Debtor's Counsel within five (5) calendar days after the service of the Stalking Horse Supplement.

If a timely Stalking Horse Objection is filed, the Debtor shall schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable. If no timely Stalking Horse Objection is filed and served with respect to the Stalking Horse Bid, upon the expiration of the Stalking Horse Objection Deadline, the Debtor is authorized to submit to the Court an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse Agreement (the "**Stalking Horse Approval Order**"), which may be entered by the Court without further notice or a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Supplement.

Any Stalking Horse Agreement executed by the Debtor and the Sale Transaction contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtor will be deemed to be a Qualified Bidder.

No party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for any Bid Protections granted to any Stalking Horse Bidder which has been approved by the Bankruptcy Court, *provided* that no Bid Protections shall be made available to (i) any party submitting a ~~credit bid~~Credit Bid or (ii) any Affiliated Bidder. Solely in the event that the Debtor consummates a Sale Transaction with a Bidder other than the Stalking Horse Bidder, any Bid Protections approved by the Court shall be payable solely from the cash proceeds of the alternative transaction giving rise to such Bid Protections, at the closing thereof, and shall not be payable from, or secured by any lien on, the collateral of TRAG/RGE or the proceeds thereof.

If any Stalking Horse Bid is not selected as the Successful Bid (as defined herein), such Stalking Horse Bidder must be willing to still serve as the Back-Up Bidder (as defined herein), if its bid represents the second-highest or otherwise best bid after the Auction, unless such requirement is waived in writing (email being sufficient) by the Debtor. For the avoidance of doubt, the Debtor may hold an Auction notwithstanding the selection of a Stalking Horse Bid.

## V. Qualified Bids

### A. Qualified Bid Requirements

Other than in the case of a bid submitted by a designated Stalking Horse Bidder, to participate in the Auction, an Acceptable Bidder must deliver to the Debtor and its advisors an irrevocable offer via email (in .pdf or similar format) for the purchase of all or substantially all of the Assets (each, a "**Bid**") and shall meet the following requirements (the "**Bid Requirements**"), in each case, on or prior to the Bid Deadline (as defined herein), unless any such requirements are waived in writing (email being sufficient) by the Debtor, in consultation with the Consultation Parties, *provided* that any Stalking Horse Bid which has been approved by the Court (if any) shall constitute and be deemed a Qualified Bid.

a. ***Purchased Assets and Assumed Liabilities***: Each Bid must clearly state the following: (i) the particular Assets to be purchased; (ii) to the extent such Bid is for substantially all of the Assets, which Assets, if any, are to be excluded from the Proposed Sale Transaction; (iii) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (iv) as applicable, whether the Acceptable Bidder intends to operate the Debtor's business as a going concern;

b. ***Purchase Price***: Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"), including and identifying separately any cash and non-cash components of the Purchase Price, such as liabilities to be assumed as part of the Sale Transaction, and if the Bid is for less than all of the Assets, the Purchase Price must indicate the allocation of the Purchase Price among the applicable Assets. The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis;

c. ***Affiliated Purchaser / Source of Funds***: Each Bid must disclose any direct or indirect relationship, agreement, understanding, side letter, financing arrangement, management arrangement, consulting arrangement, employment arrangement, option, royalty, earnout, release, settlement, or other economic arrangement involving Quantum Pleasants, LLC, Omnis Fuel Technologies, LLC, Omnis Global Technologies, LLC, Dynamic Finance Corporation, their respective equity holders, and any affiliate of the foregoing, or any other current or former upstream Omnis-related party. Any Bidder that has any such relationship listed in the prior sentence or is an "insider" of the Debtor (as that term is defined in section 101(31) of the Bankruptcy Code) being deemed an "**Affiliated Bidder**";

d. ***Good Faith Deposit***: Each Bid must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtor (the "**Good Faith Deposit**"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction; provided that no Good Faith Deposit shall be required in respect of any Credit Bid or any credit bid portion of a Bid;

e. ***Same or Better Terms; Bid Documents***: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**"). The Bid Documents shall include: (i) a form of purchase agreement; (ii) a schedule of contracts and leases to be assumed and assigned to the bidder at closing to the extent applicable to the Bid, and confirmation that the bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtor); (iii) the identification of causes of action to be purchased, if any; (iv) with respect to the purchase agreement, a redline of such agreement marked against the Form APA to reflect the amendments and modifications; (v) any other material documents integral to such Bid; and (vi) a statement from the Acceptable Bidder that (A) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, by the Bid Deadline), and (B) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "**Back-Up Bid**")) until the consummation of the Sale Transaction;

f. ***Committed Financing***: To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtor's satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and

other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtor;

g. ***Proof of Financial Ability to Perform***: Each Bid must contain evidence acceptable to the Debtor, in its sole discretion, that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under sections 365(b)(1) and 365(b)(3) of the Bankruptcy Code. Without limiting the foregoing, such evidence must include current financial statements or other financial information, tax returns, bank account statements, and/or any other documentation that the Debtor further requests;

h. ***Identity***: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom the Debtor's advisors should contact regarding such Bid;

i. ***No Qualified Bidder Bid Protections***: A Qualified Bid, other than a Stalking Horse Bid approved by the Court (if any), must include a statement disclaiming any right to receive a fee analogous to a break-up fee, expense reimbursement, or "topping" or termination fee, or any other similar form of compensation. No Qualified Bidder (other than a Stalking Horse Bidder, if any, which has been approved by the Court) will be permitted to request, nor be granted by the Debtor at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

j. ***Contingencies; No Financing or Diligence Outs***: The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

k. ***As-Is, Where-Is***: Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever,

whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

l. ***Authorization***: Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder;

m. ***Joint Bids***: The Debtor shall be authorized to approve joint Bids on a case-by-case basis so long as a joint Bid meets the Qualified Bid Requirements, and the applicable bidders otherwise comply with these Bidding Procedures;

n. ***Contracts and Leases***: Prior to the Bid Deadline, each Bid must identify all executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "**Assigned Contracts**"). Each Bid must be accompanied by written evidence of the applicable Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of future performance under all Assigned Contracts, which evidence shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtor may request in writing (email being sufficient) (the "**Adequate Assurance Package**"). The Adequate Assurance Package should be submitted in its own compiled PDF document;

o. ***Acknowledgement of Compliance with Bidding Procedures, Bidding Procedures Order, Bankruptcy Code, and Non-Bankruptcy Law***: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code and any applicable non-bankruptcy law;

p. ***No Collusion***: The Acceptable Bidder must represent in writing (i) that it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code or other applicable non-bankruptcy law with respect to any Bids, the Auction, or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (ii) that it agrees not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction. For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtor's prior written consent (email being sufficient);

q. ***Good Faith Offer***: The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction and must include a statement that the

Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code;

r. ***Irrevocable***: The Bid must include a letter stating that the Acceptable Bidder's offer is irrevocable and binding until the closing of the Sale Transaction if such Acceptable Bidder is the Successful Bidder, and that the Acceptable Bidder agrees to serve as a Back-Up Bidder (as defined herein) if such bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid (as defined herein);

s. ***Back-Up Bid***: Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined herein) if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

t. ***Regulatory Approvals and Covenants***: A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, including approval by FERC, and an explanation and/or evidence of the Acceptable Bidder's ability to obtain all such regulatory and third-party approvals, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

u. ***FPA Section 203 Approval***: Each Bid must state that if the Acceptable Bidder is selected as the Successful Bidder or the Back-Up Bidder, within five (5) business days following the date on which the Successful Bidder and the Back-Up Bidder, as applicable, is announced, such Acceptable Bidder shall take all actions reasonably necessary to prepare, in consultation with the Debtor, an application under section 203 of the Federal Power Act for approval of the proposed Sale Transaction and requesting expedited action from the Federal Energy Regulatory Commission ("**<u>FERC</u>**"), which shall be submitted to FERC jointly by such Acceptable Bidder and the Debtor within such five (5) business days;

v. ***PJM and Market-Participation Transition***: Each Bid must include a regulatory transition plan addressing PJM Interconnection, L.L.C. and PJM Settlement, Inc. requirements, including, as applicable, PJM membership, credit and collateral requirements, market-participant registration, PJM officer and authorized representative updates, generation owner / generator operator updates, Capacity Resource obligations, energy-market participation, resource-limitation reporting, eDART / eGADS / GADS reporting, settlement arrangements, and any required PJM or PJM Settlement consents, notices, forms, or approvals. Each Bid must also identify whether the Acceptable Bidder intends to assume or replace any energy-management, scheduling, hedging, or market-participation arrangements necessary to operate the Plant and participate in PJM markets after closing;

w. ***Market-Based-Rate Authority and FERC Part 35 Filings***: Each Bid must include a plan for all FERC Part 35 filings required for the Acceptable Bidder or post-closing operating entity to make wholesale sales of energy, capacity, or ancillary services, including any market-based-rate application, notice of succession, notice of cancellation, notice of change in status, asset appendix update, or other filing required to preserve authority to sell into PJM markets following closing;

x. ***Reliability and Compliance Transition***: Each Bid must include a plan for maintaining compliance with all applicable NERC Reliability Standards and regional requirements, including any required Generator Owner, Generator Operator, or related registration changes, ReliabilityFirst coordination, compliance personnel, procedures, event-reporting obligations, and transition of books and records needed to maintain reliability compliance. The Acceptable Bidder must identify the personnel, operator, asset manager, or third-party service provider that will perform these functions after closing;

y. ***Adequate Working Capital and Operating Support***: Each Bid must provide evidence satisfactory to the Debtor that the Acceptable Bidder will have sufficient working capital, credit support, vendor relationships, and operational funding to operate the Plant as a going concern after closing, including funding for coal, lime, fuel handling, maintenance, payroll, taxes, insurance, environmental compliance, ash disposal, PJM credit and collateral, and other consumables and ordinary-course operating needs;

z. ***Operational Transition / Transition Services***. Each Bid must identify whether the Acceptable Bidder intends to enter into any transition services arrangement with the Debtor, current management, an energy manager, plant operator, asset manager, or other third-party provider for plant operations, PJM market participation, fuel procurement, dispatch coordination, environmental compliance, accounting, payroll, IT, compliance reporting, or other services necessary to operate the Plant after closing. If applicable, the Bid must include a proposed transition services agreement or term sheet;

aa. ***Expected Closing Date***: Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction;

bb. ***Time Frame for Closing***: A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtor. The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid as soon as practicable subject to any potential regulatory issues that may arise as set forth above;

cc. ***No Fees***: Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation;

dd. ***Adherence to the Bidding Procedures***: By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

ee. ***Consent to Jurisdiction***: The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, the Auction, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable;

ff. ***Conditions to Closing***: Each Bid must identify with particularity all conditions to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required; and

gg. ***Other Information***: Each Bid must contain such other information as may be reasonably requested by the Debtor in writing (email being sufficient).

**B. Right to Credit Bid**

TRAG/RGE, and any other person or entity holding a valid and perfected security interest in the Assets (each, a "**Secured Creditor**"), together with any agent or designee thereof, shall have the right to credit bid up to the full amount of its claims against the Debtor, including all principal, accrued and accruing interest, fees, expenses, premiums, indemnities, and any adequate protection obligations, in each case through the closing of the Sale Transaction, pursuant to and subject to section 363(k) of the Bankruptcy Code, with respect to any Assets constituting such Secured Creditor's collateral (each such bid, a "**Credit Bid**").

Any Credit Bid shall be deemed a cash Bid for all purposes of evaluating Bids hereunder, and the fact that a Bid is composed in whole or in part of a Credit Bid shall not be a detrimental factor in the Debtor's determination of the highest or otherwise best Bid. Any Secured Creditor submitting a Credit Bid shall be deemed an Acceptable Bidder and a Qualified Bidder, its Credit Bid shall be deemed a Qualified Bid, and it may participate in the Auction with respect to any Assets constituting its collateral, in each case without the requirement to submit a Good Faith Deposit, a Confidentiality Agreement, Preliminary Bid Documents, evidence of committed financing, or any Bid Documents other than a purchase agreement marked against the Form APA; *provided* that any Credit Bid must be submitted on or prior to the Bid Deadline. A Credit Bid shall not be required to serve as the Back-Up Bid.

**C. Designation of Qualified Bids**

Only Bids fulfilling all of the Bid Requirements (other than any waived in writing by the Debtor in accordance with these Bidding Procedures) may, in the Debtor's reasonable business judgment and in consultation with the Consultation Parties, be deemed to be "**Qualified Bids**," and only those parties submitting Qualified Bids may, in the Debtor's reasonable business judgment and in consultation with the Consultation Parties, be deemed to be "**Qualified Bidders**"; *provided* that a Stalking Horse Bid will constitute and be deemed a Qualified Bid for all purposes hereunder; *provided further* that the Debtor will consult with counsel to the Consultation Parties before designating any Bid submitted by an Affiliated Bidder a Qualified Bid.

As soon as reasonably practicable after the Bid Deadline and prior to the Auction, the Debtor shall determine, in its reasonable business judgment and in consultation with the Consultation Parties, which of the Bids received by the Bid Deadline qualify as Qualified Bids and will notify each Qualified Bidder in writing (email being sufficient) of its status as a Qualified Bidder. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtor; *provided* that if the Debtor receives a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtor may, in consultation with the Consultation Parties, provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction. Potential Bidders shall have until the Bid Deadline to remedy any deficiencies with respect to non-conforming or non-Qualified Bids. The Debtor may, in consultation with the Consultation Parties, waive or modify in writing (email being sufficient) any of the Bid Requirements in the exercise of its reasonable business judgment.

Between the date that the Debtor notifies an Acceptable Bidder in writing (email being sufficient) that it is a Qualified Bidder and the Auction, the Debtor may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent (email being sufficient) of the Debtor, in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Neither the Debtor nor the Debtor's advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtor to a bidder, or any other matter or thing regarding the Assets. All bidders must acknowledge and agree that upon closing the Debtor shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets, except to the extent expressly provided in the Bankruptcy Court's order

approving the Sale Transaction. The Debtor and each of the Debtor's representatives and advisors, are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction. Neither the Debtor nor the Debtor's advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtor, any advisor, or agent representing or purporting to represent the Debtor to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtor only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

**D. Bid Deadline**

Qualified Bids must be submitted in writing to the Bid Notice Parties so as to be actually received **no later than 4:00 p.m. (prevailing Eastern Time) on November 9, 2026**, or, if such date is extended in accordance with Section I hereof, such extended date (the "**Bid Deadline**"):

The Debtor may extend the Bid Deadline, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, for any reason whatsoever, in its reasonable business judgment.

**E. Evaluation of Qualified Bids.**

The Debtor shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtor's business judgment and in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid for the Assets (the "**Starting Bid**").

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor, in consultation with the Consultation Parties, will consider the following factors, to the extent applicable, in addition to any other factors that the Debtor deems appropriate: (i) the amount and nature of the total consideration; (ii) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (iii) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; (iv) the tax consequences of such Qualified Bid; (v) the Assets subject to the Qualified Bid and whether the Qualified Bid is for all of the Assets; (vi) the impact on trade and other unsecured creditors. In addition, the Debtor, in consultation with the Consultation Parties, may consider the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; (vii) the Qualified Bidder's ability to obtain FERC, PJM, PJM Settlement, NERC, ReliabilityFirst, environmental, and other regulatory approvals; (viii) the Qualified Bidder's ability to maintain the Debtor's PJM capacity-resource obligations and operate the Plant reliably after closing; (ix) the Qualified Bidder's PJM credit/collateral plan and market-participation plan; (x) the Qualified Bidder's ability to fund coal, lime, maintenance, payroll, environmental compliance, and ordinary-course operating needs; (xi) whether the Qualified Bidder has power-generation operating experience; (xii) the Qualified Bidder's ability and commitment to operate the Plant as a going concern; (xiii) whether the Qualified Bid supports the Debtor's proposed FERC settlement and sale free-and-clear objectives; and (~~xii~~xiv) the likelihood and timing of obtaining all required approvals and closing

without operational disruption; and (~~xiii~~xv) the extent to which the Qualified Bid provides for the indefeasible payment in full in cash at closing of the obligations owing to TRAG/RGE. The Debtor will prefer Qualified Bids for all of the Assets but reserves the right, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, to consider bids for less than all of the Assets to multiple Qualified Bidders to the extent necessary to fulfill its fiduciary duties. Prior to commencing the Auction, the Debtor shall notify all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction.

### F. No Qualified Bids.

If no Qualified Bids other than a Stalking Horse Bid, which has been approved by the Court, or in the absence of a Stalking Horse Bid, the Debtor has only received a single Qualified Bid by the Bid Deadline, the Debtor, with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, may cancel the Auction and the Stalking Horse Bid or the Qualified Bid, as applicable, will be deemed to be the Successful Bid for the Assets to which such Stalking Horse Bid or the Qualified Bid relates. The Debtor shall file a notice on the docket of the Chapter 11 Case of any cancellation of the Auction as soon as reasonably practicable after making such determination.

## VI. Auction.

If more than one Qualified Bid is received, the Auction will take place on **November 12, 2026 at 10:00 a.m. (prevailing Eastern Time)** via remote video, in-person, or hybrid format, at the Debtor's election.

The Auction will be conducted by the Debtor in accordance with the following procedures (the "**Auction Procedures**"):

a. the Auction will be conducted openly;
b. except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the auction;
c. bidding shall begin with the Starting Bid;
d. subsequent bids (each, an "**Overbid**") may only be made at the Auction and shall be at least a $1,000,000.00 increase in cash, cash equivalents, or other such consideration that the Debtor, in its reasonable business judgment, deems equivalent over the previous bid (a "**Minimum Overbid**"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. The Debtor may, in its reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction, in consultation with the Consultation Parties. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtor, in its reasonable business judgment, deems equivalent that exceeds the then existing highest Bid by at least the amount of the Minimum Overbid;

e. at the commencement of the Auction, the Debtor may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s);

f. each Qualified Bidder will be permitted a reasonable amount of time to respond to previous bids at the Auction;

g. during the course of the Auction, the Debtor shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtor's view, the then highest or otherwise best bid(s) for the applicable Assets;

h. the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

i. each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction;

j. each Qualified Bidder will be required to confirm that its Bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith prior to or at the Auction);

k. the Court and the Debtor will not consider Bids made after the Auction has been closed;

l. the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, consistent with the Debtor's fiduciary obligations under applicable law to maximize the value of its estate and to consider the interests of its stakeholders, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtor determines is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures Order, the Bidding Procedures, or the terms and conditions of the Sale Transaction, (iii) contrary to the best interests of the Debtor, its estate, its creditors, and other stakeholders; or (iv) otherwise violative of any of the Debtor's fiduciary obligations under applicable law.

m. the Debtor has the right to request any additional information that will allow the Debtor to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by its proposal and any further information that the Debtor believes is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

n. the Debtor, in consultation with the Consultation Parties, reserves the right to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtor and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

o. notwithstanding anything herein to the contrary, the Debtor, in consultation with the Consultation Parties, may, at any time choose to adjourn the Auction by announcement prior to or at the Auction. The Debtor shall file notice of such adjournment on the docket of the Chapter 11 Case as soon as reasonably practicable.

The Auction shall include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; provided that any Overbid made by a Qualified Bidder (including with respect to any Back-Up Bid) must remain open and binding on the Qualified Bidder until the earliest of (i) the closing of a Sale Transaction pursuant to the Successful Bid or Back-Up Bid, (ii) 120 days after the date of the Sale Hearing, provided, that, with respect to any Back-Up Bid, such date may be extended by up to an additional eighty (80) days if the only item outstanding with respect to the closing of any Sale Transaction pursuant to the Successful Bid is obtaining the required regulatory approvals, and (iii) the release of such Back-Up Bid by the Debtor in writing (email being sufficient) (the "**Back-Up Bid Termination Date**"). The Debtor may, in its reasonable business judgment and in consultation with the Consultation Parties, negotiate with any and all Qualified Bidders participating in the Auction the terms of such Qualified Bidder's respective Bids.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtor from exercising its fiduciary duties under applicable law (as reasonably determined in good faith by the Debtor, in consultation with counsel).

The Consultation Parties and their respective representatives and professionals shall be entitled to attend the Auction, without any requirement to provide prior notice of their intention to do so. Except as otherwise determined by the Debtor, only (i) the Debtor, (ii) the Office of the United States Trustee, (iii) the ~~Committee, (iv) the~~ Consultation Parties, (~~v~~iv) the Qualified Bidders (including, without limitation, any Stalking Horse Bidder which has been approved by the Court (if any)), (v) all creditors who make a request to attend the Auction (*provided, however,* that any creditor seeking to attend the Auction must submit such request to the Debtor no later than three (3) business days before the Auction), and (vi) any other parties as the Debtor may determine to include in its reasonable discretion, or as otherwise ordered by the Court, in each case, along with the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction (such parties in clauses (ii) through (vi) collectively, the "**Auction Parties**").

**A. Acceptance of Successful Bid**

The Auction shall continue until (i) there is only one Qualified Bid that the Debtor determines, in its reasonable business judgment and in consultation with the Consultation Parties, consistent with the exercise of its fiduciary duties and outlined below in further detail, is the highest or otherwise best bid to purchase the Assets (each, a "**Successful Bid**"), and (ii) the Debtor determines, in its reasonable business judgment and with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid that would be reasonably acceptable to the Debtor, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor shall take into account the factors set forth in Section V.E of these Bidding Procedures, as well as any other factors the Debtor, in its reasonable business judgment, reasonably deems relevant and/or appropriate.

Any Qualified Bidder that submits a Successful Bid will be deemed a "**Successful Bidder**" with respect to the Assets contemplated for the purchase pursuant to such Successful Bid. As soon as reasonably practicable, after closing the Auction, the Debtor shall file notice of the Successful Bid and the Successful Bidder on the docket of the Chapter 11 Case. Following conclusion of the Auction and selection of a Successful Bidder, the Debtor shall present the results of the Auction at the sale hearing scheduled pursuant to the Bidding Procedures Order (the "**Sale Hearing**") and shall seek entry of the Sale Order approving a binding purchase agreement reasonably acceptable to TRAG/RGE with the Successful Bidder on the terms of the Successful Bid. The Sale Order shall deem the Debtor's selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtor shall not solicit and/or accept any further bids or offers to submit a bid after such selection; *provided* that nothing in these Bidding Procedures shall require the sole Director and Independent Manager, or similar governing body of the Debtor to take or refrain from taking any action that the Debtor determines in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including any Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtor pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

### B. Designation of Back-Up Bidder.

The Back-Up Bid to purchase the Assets (the "**Back-Up Bidder**") will be determined by the Debtor, in consultation with the Consultation Parties, at the conclusion of the Auction, and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtor's selection of a Back-Up Bid shall be deemed final and the Debtor shall not accept any further bids or offers to submit a bid after such selection. The Debtor will be authorized, but not required, to consummate the Sale Transaction with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved pursuant to the Sale Order or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale Transaction with the Debtor as soon as is reasonably practicable without further order of the Court (so long as such Back-Up Bid shall have been approved pursuant to the Sale Order or subject to Court approval if not).

The Back-Up Bid shall remain open and irrevocable until the Back-Up Bid Termination Date. The Debtor shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Bid Termination Date.

## VII. Approval of the Sale Transaction.

The Sale Hearing to consider approval of the Sale Transaction shall take place **on November 18, 2026 at [•]:[•] (prevailing Eastern Time)**, or such other date as set by the Court, at the United States Bankruptcy Court for the District of Delaware, 824 Market St. N, Wilmington, Delaware 19801 or by such other virtual or electronic means as determined by the Court.

At the Sale Hearing certain findings will be sought from the Court regarding the Sale Transaction and the Auction, including, among other things, that: (i) the Auction was conducted, and the Successful Bidder (which may be any Stalking Horse Bidder (if any) which has been approved by the Court) was selected, in accordance with the Bidding Procedures; (ii) the Auction was fair in substance and procedure; (iii) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (iv) consummation of any Sale Transaction as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the Assets and is in the best interests of the Debtor and its estate. **The Sale Hearing may be continued to a later date by the Debtor by filing a notice on the docket of the Chapter 11 Case and/or making an announcement at the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

Objections to the Sale Transaction and entry of any Sale Order approving the Sale Transaction must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed

with the Court and served so as to be **actually received** by the Debtor and the Bid Notice Parties by **the date that is fourteen (14) days after the Sale Notice is filed and served, at 4:00 p.m. (prevailing Eastern Time**).

## VIII. Return of Good Faith Deposit.

The Good Faith Deposit of the Successful Bidder, if any, will, upon consummation of the Successful Bid, become property of the Debtor's estate and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder (or Back-Up Bidder, if applicable), if any, fails to consummate the Successful Bid (or Back-Up Bid if applicable), then the Good Faith Deposit(s) of such Successful Bidder will be irrevocably forfeited to the Debtor and may be retained by the Debtor as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for any Back-Up Bidder) will be returned within five (5) business days after consummation of the applicable Sale Transaction or upon the permanent withdrawal of the applicable proposed Sale Transaction.

The Good Faith Deposit of any Back-Up Bidder, if any, will be returned in accordance with Section VI.B of these Bidding Procedures.

All such deposits shall be held in escrow and at no time shall be deemed property of the Debtor's estate absent further order of the Court. ~~To the extent any Good Faith Deposit is forfeited and becomes property of the Debtor's estate, such amounts shall constitute cash collateral of TRAG/RGE and shall be subject to their liens and claims, subject to the terms of the Cash Collateral Order.~~[4]

[4] ~~"Cash Collateral Order" means the *Interim Order (I) Authorizing Postpetition Use of Prepetition Collateral, Including Cash Collateral, (II) Granting Adequate Protection Liens to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 50] or such final order as may be entered by the Court.~~

## IX. Reservation of Rights.

The Debtor reserves its rights to modify these Bidding Procedures in its reasonable business judgment with the consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Consultation Parties, and in a manner consistent with the exercise of its fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional terms and conditions on the sale of the Assets, including, without limitation: (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment; provided that the Debtor shall not amend or modify these Bidding Procedures or the bidding process to reduce, eliminate, or otherwise modify its obligations to consult with or obtain the consent of the Consultation Parties (as applicable) without the prior written consent of the Consultation Parties.

## X. Consent to Jurisdiction.

All Qualified Bidders (including any Stalking Horse Bidder (if any) which has been approved by the Court) at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale Transaction and the construction and enforcement of these Bidding Procedures, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to any Sale Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XI. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures or any other document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require the Debtor or the sole Director and Independent Manager, or similar governing body of the Debtor to take any action or to refrain from taking any action related to any Sale Transaction or with respect to these Bidding Procedures, to the extent the Debtor, the sole Director and Independent Manager, or similar governing body of the Debtor reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, *however*, that the Debtor shall provide the Consultation Parties with notice of such action or inaction within two (2) Business Days of such action or inaction.

# EXHIBIT C-1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| OMNIS PLEASANTS, LLC, [1] | ) | Case No. 26-11169 (KBO) |
| Debtor. | ) | |

**ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF HERBERT SMITH FREEHILLS KRAMER (US) LLP AS ATTORNEYS FOR THE DEBTOR AND DEBTOR IN POSSESSION EFFECTIVE AS OF THE PETITION DATE**

Upon the *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Herbert Smith Freehills Kramer (US) LLP as Attorneys for the Debtor and Debtor in Possession Effective as of the Petition Date* (the "**Application**")[2] of the above-captioned debtor in possession (the "**Debtor**") for entry of an order (this "**Order**") authorizing the Debtor to retain and employ Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**") as its attorneys on the terms set forth in the Application effective as of the Petition Date, pursuant to sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1; and upon the Declaration of Alexander Woolverton (the "**Woolverton Declaration**") attached to the Application as Exhibit B; and upon the Declaration of David Hindman, Chief Executive Officer (the "**Hindman Declaration**"), attached to the Application as Exhibit C; and this Court having jurisdiction pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(b) to consider the Application and the relief requested therein; and venue being proper in

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided under the particular circumstances; and it appearing that no other or further notice need be provided; and this Court finding that HSF Kramer does not represent or hold any interest adverse to the Debtor or its estate as to the matters upon which HSF Kramer has been and is to be employed, and that HSF Kramer is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code; and this Court having determined that the legal and factual bases set forth in the Application, the Woolverton Declaration and the Hindman Declaration establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Application is approved as set forth herein.

2. Pursuant to sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1, the Debtor is authorized to employ HSF Kramer as its co-counsel on the terms set forth in the Application, the Woolverton Declaration, and the Engagement Letter, effective as of the Petition Date.

3. HSF Kramer shall apply for compensation and professional services rendered and reimbursement of expenses incurred in connection with the Debtor's Chapter 11 Case in compliance with sections 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-1(a), and such other procedures as may be fixed by order of this Court. HSF Kramer also intends to, and shall, make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the U.S. Trustee Guidelines, both in connection with the Application and the interim and final fee applications to be filed by HSF Kramer in this Chapter 11 Case.

4. HSF Kramer is authorized to apply its remaining retainer against any outstanding prepetition fees, expenses, and costs and/or hold its remaining retainer as security during the pendency of this Chapter 11 Case until HSF Kramer's postpetition fees and expenses are awarded and payable to HSF Kramer on a final basis. At the conclusion of HSF Kramer's engagement by the Debtor, if the amount of HSF Kramer's outstanding and estimated fees, expenses, and costs is less than the amount of the remaining retainer, HSF Kramer shall pay to the Debtor the amount by which HSF Kramer's retainer exceeds such fees, expenses, and costs.

5. Prior to applying any increases in its hourly rates beyond the rates set forth in the Application, HSF Kramer shall provide ten (10) calendar days' prior notice of any such increases to the Debtor and the U.S. Trustee and shall file a Supplemental Affidavit with the Court. All parties in interest retain rights to object to any rate increase on all grounds, including the reasonableness standard set forth in section 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to section 330 of the Bankruptcy Code.

6. Except with respect to document review services, notwithstanding anything in the Application and the Woolverton Declaration to the contrary, HSF Kramer shall (i) to the extent that HSF Kramer uses the services of independent contractors or subcontractors (collectively, the "**Contractors**") in this Chapter 11 Case, pass through the cost of such Contractors at the same rate that HSF Kramer pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the same conflicts checks as required for HSF Kramer; (iv) file with this Court such disclosures required by Bankruptcy Rule 2014; and (v) attach any such Contractor invoices to its monthly fee statements, interim fee applications and/or final fee applications filed in this Chapter 11 Case.

7. Young Conaway will advise the Debtor on matters relating to liens held by TRAG/RGE and potential claims against TRAG/RGE potentially arising under that certain amended and restated forbearance agreement entered into as of February 6, 2026.

8. To the extent the Application, the Engagement Letter, the Woolverton Declaration, or the Hindman Declaration are inconsistent with this Order, the terms of this Order shall govern.

9. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10. The Debtor and HSF Kramer are authorized to take all actions they deem necessary and appropriate to effectuate the relief granted pursuant to this Order in accordance with the Application.

11. This Court has and shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

# EXHIBIT C-2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| OMNIS PLEASANTS, LLC, [1] | ) | Case No. 26-11169 (KBO) |
| Debtor. | ) | |

**ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF HERBERT SMITH FREEHILLS KRAMER (US) LLP AS ATTORNEYS FOR THE DEBTOR AND DEBTOR IN POSSESSION EFFECTIVE AS OF THE PETITION DATE**

Upon the *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Herbert Smith Freehills Kramer (US) LLP as Attorneys for the Debtor and Debtor in Possession Effective as of the Petition Date* (the "**Application**")[2] of the above-captioned debtor in possession (the "**Debtor**") for entry of an order (this "**Order**") authorizing the Debtor to retain and employ Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**") as its attorneys on the terms set forth in the Application effective as of the Petition Date, pursuant to sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1; and upon the Declaration of Alexander Woolverton (the "**Woolverton Declaration**") attached to the Application as Exhibit B; and upon the Declaration of David Hindman, Chief Executive Officer (the "**Hindman Declaration**"), attached to the Application as Exhibit C; and this Court having jurisdiction pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(b) to consider the Application and the relief requested therein; and

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

venue being proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided under the particular circumstances; and it appearing that no other or further notice need be provided; and this Court finding that HSF Kramer does not represent or hold any interest adverse to the Debtor or its estate as to the matters upon which HSF Kramer has been and is to be employed, and that HSF Kramer is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code; and this Court having determined that the legal and factual bases set forth in the Application, the Woolverton Declaration and the Hindman Declaration establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Application is approved as set forth herein.

2. Pursuant to sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1, the Debtor is authorized to employ HSF Kramer as its co-counsel on the terms set forth in the Application, the Woolverton Declaration, and the Engagement Letter, effective as of the Petition Date.

3. HSF Kramer shall apply for compensation and professional services rendered and reimbursement of expenses incurred in connection with the Debtor's Chapter 11 Case in compliance with sections 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-1(a), and such other procedures as may be fixed by order of this Court. HSF Kramer also intends to, and shall, make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the U.S. Trustee Guidelines, both in connection with the Application and the interim and final fee applications to be filed by HSF Kramer in this Chapter 11 Case.

4. HSF Kramer is authorized to apply its remaining retainer against any outstanding prepetition fees, expenses, and costs and/or hold its remaining retainer as security during the pendency of this Chapter 11 Case until HSF Kramer's postpetition fees and expenses are awarded and payable to HSF Kramer on a final basis. At the conclusion of HSF Kramer's engagement by the Debtor, if the amount of HSF Kramer's outstanding and estimated fees, expenses, and costs is less than the amount of the remaining retainer, HSF Kramer shall pay to the Debtor the amount by which HSF Kramer's retainer exceeds such fees, expenses, and costs.

5. Prior to applying any increases in its hourly rates beyond the rates set forth in the Application, HSF Kramer shall provide ten (10) calendar days' prior notice of any such increases to the Debtor and the U.S. Trustee and shall file a Supplemental Affidavit with the Court. All parties in interest retain rights to object to any rate increase on all grounds, including the reasonableness standard set forth in section 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to section 330 of the Bankruptcy Code.

6. Except with respect to document review services, notwithstanding anything in the Application and the Woolverton Declaration to the contrary, HSF Kramer shall (i) to the extent that HSF Kramer uses the services of independent contractors or subcontractors (collectively, the "**Contractors**") in this Chapter 11 Case, pass through the cost of such Contractors at the same rate that HSF Kramer pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the same conflicts checks as required for HSF Kramer; (iv) file with this Court such disclosures required by Bankruptcy Rule 2014; and (v) attach any such Contractor invoices to its monthly fee statements, interim fee applications and/or final fee applications filed in this Chapter 11 Case.

7. Young Conaway will advise the Debtor on matters relating to liens held by TRAG/RGE and potential claims against TRAG/RGE potentially arising under that certain amended and restated forbearance agreement entered into as of February 6, 2026.

8. ~~7.~~ To the extent the Application, the Engagement Letter, the Woolverton Declaration, or the Hindman Declaration are inconsistent with this Order, the terms of this Order shall govern.

9. ~~8.~~ The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10. ~~9.~~ The Debtor and HSF Kramer are authorized to take all actions they deem necessary and appropriate to effectuate the relief granted pursuant to this Order in accordance with the Application.

11. ~~10.~~ This Court has and shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| OMNIS PLEASANTS, LLC, [1] | ) | Case No. 26-11169 (KBO) |
| Debtor. | ) | |

**SUPPLEMENTAL DECLARATION OF ALEXANDER WOOLVERTON IN SUPPORT OF DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF HERBERT SMITH FREEHILLS KRAMER (US) LLP AS ATTORNEYS FOR THE DEBTOR AND DEBTOR IN POSSESSION EFFECTIVE AS OF THE PETITION DATE**

I, Alexander Woolverton make this declaration under 28 U.S.C. § 1746, and state the following:

1. I am an attorney at law and in good standing to practice in the State of New York before the United States District Court for the Southern District of New York, and I have been admitted *pro hac vice* to the United States Bankruptcy Court for the District of Delaware for the purposes of this Chapter 11 Case.

2. I am a partner with the law firm of Herbert Smith Freehills Kramer (US) LLP ("**HSF Kramer**"),[2] which is located at 1177 Avenue of the Americas, New York, New York 10036.

[1] The last four digits of the Debtor's tax identification number are 2673. The location of the Debtor's principal place of business and the Debtor's service address is One Power Station Boulevard, Belmont, West Virginia, 26134.

[2] Effective as of June 1, 2025, Kramer Levin Naftalis & Frankel LLP ("**Legacy Kramer Levin**") combined with the international law firm Herbert Smith Freehills ("**Legacy HSF**"), to become Herbert Smith Freehills Kramer. Legacy Kramer Levin practices in the United States through HSF Kramer. HSF Kramer is an affiliate and subsidiary of Herbert Smith Freehills Kramer LLP and Herbert Smith Freehills Kramer, an Australian partnership, all of which are separate member firms of the international legal practice known as "**Herbert Smith Freehills Kramer**." Attorneys previously with Legacy HSF and who are presently part of Herbert Smith Freehills Kramer may also provide advice as part of HSF Kramer's engagement, and those services will be reflected on HSF Kramer's fee

3. I submit this supplemental declaration (this "**Supplemental Declaration**") in support of the *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Herbert Smith Freehills Kramer (US) LLP as Attorneys for the Debtor and Debtor in Possession Effective as of the Petition Date* [Docket No. 83] (the "**Application**"). This Supplemental Declaration supplements and clarifies certain disclosure and statements contained in my original declaration, dated August 13, 2026 (the "**Original Declaration**"), attached as Exhibit B to the Application.

4. HSF Kramer commenced work for TRAG LLC ("**TRAG**") and RG Energy LLC ("**RGE**") on January 9, 2026. Neither HSF Kramer nor I had ever previously represented TRAG and RGE in connection with any other matters.

5. HSF Kramer was retained to advise TRAG and RGE in connection with their investments in certain affiliates of the Debtor. TRAG and RGE were also represented by Manatt, Phelps & Phillips, LLP ("**Manatt**") and based on my understanding, Manatt handled the liens granted to TRAG and RGE on the Debtor's property pursuant to the Forbearance Agreement (defined below).

6. On January 13, 2026, after conducting a lien search, HSF Kramer filed a UCC-1 financing statement on behalf of TRAG against Quantum Pleasants, LLC ("**Quantum**"), relating to its loans made to Quantum (made in May 2023, January 2025 and March 2025).

7. It is my understanding that, prior to our engagement by TRAG and RGE, Manatt had been engaged, on behalf of TRAG and RGE, in negotiations with advisors to the Quantum

statements. All disclosures in this Application are for the global firm of Herbert Smith Freehills Kramer, and thus "HSF Kramer" as used in this Application shall also include the global firm of Herbert Smith Freehills Kramer.

Parties and the Debtor (who was at the time controlled by the Quantum Parties and shared a law firm with them), regarding a forbearance agreement (the "**Forbearance Agreement**").

8. On January 15, 2026, Manatt and TRAG shared with HSF Kramer a draft forbearance agreement. That draft included language that is substantively identical to section 7 of the executed Forbearance Agreement (which provided for the appointment of an independent manager and the grant of liens to TRAG and RGE over the Debtor's property). Based on a review of my correspondence with TRAG, RGE and Manatt, HSF Kramer reviewed three drafts of the Forbearance Agreement and provided limited comments to Manatt.

9. HSF Kramer was not otherwise involved in the negotiation or drafting of the Forbearance Agreement. In addition, HSF Kramer did not propose Gilbert Nathan as Independent Manager and sole Director of the Debtor.

10. In connection with HSF Kramer's representation of TRAG and RGE, nine (9) HSF Kramer attorneys billed time to the matter. Those attorneys are Alexander Woolverton, Brian F. Shaughnessy, John Bessonette, Colin Bumby, Andrew Pollack, Nathanial J. Norman, Jason A. Fruchter, Ayla Lima, and Andrew Litman. HSF Kramer attorneys billed 154.5 hours in the aggregate to the TRAG and RGE representation. As noted in the Original Declaration, HSF Kramer incurred approximately $243,000 in fees but has since written off all fees and expenses associated with that representation.

11. After his appointment as Independent Manager of the Debtor, Mr. Nathan called me to ask if HSF Kramer could represent Omnis Pleasants, LLC in connection with certain litigation, general corporate matters, and a potential restructuring. I explained that HSF Kramer was counsel to TRAG and RGE, and that if he wanted to retain HSF Kramer, he would have to

first speak to TRAG and RGE. I understand that Mr. Nathan contacted TRAG and thereafter TRAG contacted me to discuss the terms of a release and a waiver.

12. On February 20, 2026, prior to being engaged by the Debtor, HSF Kramer obtained a written conflicts waiver (the "**TRAG/RGE Conflicts Waiver**") from TRAG and RGE, which is attached hereto as **Exhibit 1**.

13. HSF Kramer also obtained a written conflicts waiver from the Debtor, included in the Engagement Letter, attached to the Application as Exhibit 1 to the proposed Order attached as Exhibit A to the Application.

14. As of February 20, 2026, HSF Kramer ceased all work for TRAG and RGE prior to commencing work for the Debtor.

15. After its engagement as counsel to the Debtor, HSF Kramer was asked to conduct an investigation into the prepetition conduct of and potential claims against the Debtor's prior management. In the months leading up to the Petition Date, HSF Kramer spent considerable time on this investigation (which has continued post-petition). Specifically, based on conservative estimates, HSF Kramer spent over 2,400 hours and accrued approximately $4.0 million in fees related to this investigation in the months leading up to the Petition Date, including: identifying, collecting, and preserving over 1.3 million documents from the books and records it had access to, or was able to obtain from cooperative third parties; reviewing, assessing, and analyzing over 100,000 documents; interviewing key plant personnel and the personnel of cooperative third parties; and conducting extensive research and analysis of the potential claims and causes of action. Prior to the Petition Date, HSF Kramer advised the Debtor on a potential sale process, explored restructuring options (including out-of-court restructuring options) and served as general corporate counsel to the Debtor.

*****

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 1, 2026

*/s/ Alexander Woolverton*
Alexander Woolverton
Partner
Herbert Smith Freehills Kramer (US) LLP

**EXHIBIT 1**

**From:** Ajay Gupta <ajay@robbinsgupta.com>
**Sent:** Friday, February 20, 2026 12:48 PM
**To:** Woolverton, Alexander
**Cc:** Shaughnessy, Brian F.; Michael, Tom
**Subject:** [EXTERNAL] Re: Omnis - Termination of HSF Kramer Engagement and Conflicts Waiver

I just reviewed with Tom and agree with the terms and waivers below.

Ajay

Ajay K. Gupta, CIMA® CRPC® CPWA®
**Robbins Gupta Holdings |** Principal
www.robbinsgupta.com

---

**From:** Woolverton, Alexander <alexander.woolverton@hsfkramer.com>
**Date:** Thursday, February 19, 2026 at 6:03 PM
**To:** Ajay Gupta <ajay@robbinsgupta.com>
**Cc:** Shaughnessy, Brian F. <brian.shaughnessy@hsfkramer.com>, Michael, Tom <tmichael@manatt.com>
**Subject:** Omnis - Termination of HSF Kramer Engagement and Conflicts Waiver

Ajay,

As you are aware, we currently represent RG Energy, LLC and TRAG, LLC in its capacity as lender to, and indirect equity holder in, Omnis Pleasants, LLC, in connection with its debt and equity investments in Omnis Pleasants, LLC and certain of its affiliated entities. Omnis Pleasants, LLC recently asked that we represent it in connection with general corporate and litigation matters, including a potential financial and operational restructuring that may impact your debt and equity investments in Omnis Pleasants, LLC.

Although this creates a potential conflict under New York ethics rules, you have advised us that you want to waive any and all conflicts that would arise from our Firm's taking on this new representation, and that it will be deemed a "Permitted Representation" under the terms of your engagement. New York law requires that a client’s consent to a conflict of interest be informed. We wish to make sure that you have information adequate to make an informed decision and the opportunity to consult with us or independent counsel, with respect to the terms and conditions of these provisions.

Based on the foregoing, you hereby confirm, consent and agree that (a) our representation of RG Energy, LLC and TRAG, LLC is hereby terminated effective as of February 20, 2026, (b) the above-mentioned Permitted Representation will not be asserted by you either as a conflict of interest with respect to, or as a basis to preclude, challenge or otherwise disqualify the Firm from, any current or future representation of any client in any matter (including transactions, litigation, or counseling); (c) any conflict of interest or breach of duty that exists or might be asserted to exist with respect to the above-mentioned Permitted Representation is waived; (d) your consent to these provisions is voluntary and fully informed; and (e) you intend for your consent to be effective and fully enforceable and to be relied upon by the Firm.

You and the Firm have reached this agreement with knowledge that without your waiver and consent the Firm might be prohibited by applicable law or the New York Rules of Professional Conduct from accepting the above-mentioned Permitted Representation due to the rules governing conflicts of interest.

Please confirm your agreement to the above terms by reply email.

Thank you,

Xander

**Alexander Woolverton**
Partner

Herbert Smith Freehills Kramer (US) LLP
1177 Avenue of the Americas, New York, New York 10036
T: +1 212 715 9251 M: +1 929 371 4425 F: +1 212 715 8251
alexander.woolverton@hsfkramer.com
www.hsfkramer.com

**Kramer Levin is now HSF Kramer.**
**Global capability. One firm.**

This message (including any attachment) is confidential and may be covered by legal professional privilege or include information that is legally protected. If you are not the intended recipient you must not disclose or use the information contained in it. If you have received this email in error please notify us immediately by return email or by calling our main switchboard on +1 212 715 9100 or +1 917 542 7600 (New York), +1 650 752 1700 (Silicon Valley) or +1 202 775 4500 (Washington, D.C.) and delete the email.

This message was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer under U.S. Federal tax law. Some of this material may constitute attorney advertising within the meaning of sections 1200.1 and 1200.6-8 of Title 22 of the New York Codes, Rules and Regulatory Advertising Regulations. The following statement is made in accordance with those rules: ATTORNEY ADVERTISING: PRIOR RESULTS DO NOT GUARANTEE A SIMILAR OUTCOME. Results depend upon a variety of factors unique to each representation.

Herbert Smith Freehills Kramer LLP and its affiliated and subsidiary businesses and firms, Herbert Smith Freehills Kramer (US) LLP and its affiliate, and Herbert Smith Freehills Kramer, an Australian Partnership, are separate member firms of the international legal practice known as Herbert Smith Freehills Kramer. In New York, we practice through both Herbert Smith Freehills Kramer New York LLP, a limited liability partnership registered in England and Wales with registered number OC375072 and Herbert Smith Freehills Kramer (US) LLP, a registered limited liability partnership organized under the laws of the State of New York with an office at 1177 Avenue of the Americas, New York, NY 10036. In Washington, D.C. and California, we practice through Herbert Smith Freehills Kramer (US) LLP. We use the word partner of Herbert Smith Freehills Kramer New York LLP or of Herbert Smith Freehills Kramer (US) LLP to refer to a member of those entities, or an employee or consultant with equivalent standing and qualifications.

Further information is available on our website www.HSFKramer.com, including our privacy policy which describes how we handle personal information.

# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| OMNIS PLEASANTS, LLC[1] | ) | Case No. 26-11169-KBO |
| Debtor. | ) | |

**SUPPLEMENTAL DECLARATION OF DAVID HINDMAN IN SUPPORT OF HERBERT SMITH FREEHILLS KRAMER (US) LLP RETENTION APPLICATION**

I, David Hindman, make this declaration under 28 U.S.C. § 1746, and state the following:

1. I am a Shareholder, Partner, and Managing Director at AlixPartners, LLP ("**AlixPartners**"), an operational performance advisory firm, and an affiliate of AP Services, LLC ("**APS**"). I have been employed at AlixPartners since 2016 and currently serve as the Global Power, Utility, and Renewable Energy Practice Leader, a practice I founded. Over my 25-plus year career, I have led teams through comprehensive business transformations, with a particular focus on the power and renewables sector. I hold a Master of Business Administration from Harvard Business School, as well as a Bachelor of Science in Mechanical Engineering and a Bachelor of Arts in Economics from Rice University.

2. Since February 17, 2026, I have served as the Chief Executive Officer of Omnis Pleasants, LLC (the "**Debtor**" or "**Pleasants**") through APS. Before that, starting on October 27, 2025, I served as an advisor to the Debtor through AlixPartners. As an advisor and officer of the Debtor over the last nine months, I have become intimately familiar with the business, financial affairs, and day-to-day operations of the Debtor.

[1] The last four digits of Pleasants' tax identification number are 2673. The location of Pleasants' principal place of business and the Debtor's service address is 1 Power Station Blvd., Belmont, West Virginia 26134.

3. The statements in this declaration (this "**Declaration**") are based on my own personal knowledge, including my direct involvement in every issue described below, my review of documents and information available to me as an advisor to and/or CEO of Pleasants, and additional information provided to me by AlixPartners, Herbert Smith Freehills Kramer (US) LLP (proposed counsel to Pleasants, "**HSF Kramer**"), or other advisors retained by Pleasants.

4. I submit this Declaration in support of the Debtor's application to employ HSF Kramer as counsel to the Debtor in the above-captioned chapter 11 case. This Declaration addresses the core reasons for the Debtor's chapter 11 filing and in my view, as the Debtor's CEO, that HSF Kramer is essential to the Debtor's ability to conduct this bankruptcy case and has at all times acted in the best interests of the Debtor and its estate.

**PURPOSE OF BANKRUPTCY FILING**

5. The liens held by TRAG LLC ("**TRAG**") and RG Energy LLC ("**RGE**") were not the reason that Pleasants filed for bankruptcy. The Debtor's decision to seek bankruptcy protection was driven by two primary reasons: (i) the need to effectuate a value-maximizing sale of the company free and clear of liens, claims, and encumbrances; and (ii) the need to restructure the Debtor's substantial and complicated debt obligations that could not be resolved consensually out of court.

6. The Debtor had been considering filing for bankruptcy since February 2026 but sought to restructure consensually before concluding that a filing was necessary. The timing of the Debtor's bankruptcy filing was driven by the failure of those out-of-court restructuring efforts, combined with escalating threats and aggressive conduct by the Omnis Parties in the days immediately preceding the filing. A bankruptcy filing would also enable the Debtor to continue its investigation (described in more detail below), use additional tools to obtain formal and

informal discovery from previously uncooperative parties, and preserve and ultimately pursue related claims and causes of action.

**The Need for a Free and Clear Sale**

7. Discussions with prospective buyers of Pleasants beginning in February 2026 had consistently resulted in buyers asking how they would take ownership of the company's power plant (the "**Power Plant**") without the burden of Pleasants' litigation exposure. This included supposed related-party contracts, such as leases to Quantum Pleasants, LLC ("**Quantum**") and Element H Data, LLC ("**Element H**") and power purchase agreements ("**PPAs**") between the Debtor and Element H and Element H and Bilt Technology LLC ("**Bilt**"), environmental clean-up related to coal combustion residual material temporarily stored on the coal pile at Pleasants, materialman liens filed by Quantum's vendors who had not been paid by Quantum, incomplete financial disclosure to support past audits leading to the retraction of that audit, a $20 million debt owing to Bilt, as well as significant potential liabilities related to the Federal Energy Regulatory Commission ("**FERC**") investigation into the conduct of Pleasants' prior management, and a potentially significant arbitration over emission allowances brought by Pleasants, LLC through its parent, Vistra Corp. (the "**Vistra Arbitration**").

8. Prospective buyers indicated that they were interested in a sale that was free and clear of these issues.

**The Need to Restructure Substantial Obligations**

9. The Debtor also carries substantial debt that it worked tirelessly for months, but unsuccessfully, to restructure on a consensual basis outside of chapter 11. Those debt obligations include: $51 million in Quantum's debt guaranteed by Pleasants owed to the West Virginia Economic Development Authority ("**WVEDA**"); $20 million in debt owed to Bilt; approximately

$55 million in intercompany notes purportedly owed to Quantum and Omnis Fuel Technologies, LLC ("**Omnis Energy**"); and various other unsecured claims, including substantial claims associated with the Vistra Arbitration, asserted materialman liens, and certain claims arising from purported leases allegedly leased by Quantum and Element H, and the PPAs. The Debtor's assets are also subject to security interests in the amount of over $80 million that are held by TRAG and RGE that were granted by the Debtor's prior management.

10. Prior to filing for bankruptcy, the Debtor explored the possibility of obtaining third-party financing sufficient to refinance or repay the Debtor's various financial obligations. Potential financing counterparties stated that they were not interested in providing funding on a junior or unsecured basis. What was contemplated was a first lien, first priority financing arrangement that would be senior to the Debtor's other financial obligations. In discussions with potential financing counterparties, however, those parties grew reluctant to move forward as their diligence revealed the same set of issues that had deterred prospective buyers. As a result, the Debtor was unable to reach an agreement with any new funding source that would have provided sufficient capital to repay the outstanding obligations.

11. In tandem with its efforts to raise financing, the Debtor also pursued a consensual out-of-court debt restructuring. Beginning in February 2026, the Debtor's approach to that restructuring was to seek arrangements that would extend the maturity dates of various funded debt obligations that were in default or approaching maturity; address the Debtor's intercompany obligations, recognizing that TRAG, RGE, and intercompany obligations overlapped in ways that should not result in the company being burdened twice for the same dollar; and clarify that there were a number of loans under which the company never received the benefit of any of the dollars for which it was now obligated. The Debtor's proposal further contemplated that, once operations

were sufficiently stabilized, the Debtor would pursue a value-maximizing sale of the Power Plant.

12. Those restructuring efforts were partially successful with the Debtor making meaningful progress with multiple parties, including WVEDA, TRAG, and RGE. However, it became clear that the Omnis Parties, Charles Gassenheimer, Simon Hodson, and Randall Smith were not going to agree to a consensual restructuring out of court. In fact, they constantly worked against these efforts, as described more fully below.

**Investigation into Prior Management's Conduct**

13. AlixPartners began working as an advisor to the Debtor at the end of October 2025. Among other things, we undertook a historical review of the Debtor's finances, which included general ledgers, bank statements, and financial reports, in part to answer the questions of where money raised for, or guaranteed by, Pleasants went and why the Power Plant had not made money over roughly the past two and a half years.

14. This review revealed that funds ostensibly raised by former management for the benefit of the Power Plant, had not, in fact, remained with the plant. For example, on April 17, 2025, a deposit of $20 million was made by Bilt into a Pleasants bank account and was transferred out of that account to Omnis Energy on the same day. Despite that, the Debtor remains obligated on a note held by Bilt.

15. In February of 2026, at the time Mr. Nathan was formally installed as the independent manager of both Pleasants and Quantum and I was appointed as CEO of Pleasants, the FERC issued a robust data request to Pleasants in connection with its investigation of past power outages at the Power Plant. This made it necessary for Pleasants to issue litigation holds and undertake a thorough historical document review. At the same time, WVEDA, through its counsel, reached out to the Debtor and raised concerns about the conduct of prior management,

including allegations and evidence of self-dealing and fraud. Prior management included: Simon Hodson (Chairman and Chief Executive Officer), Richard Hulme (President and Chief Operating Officer), Randall Smith (Chief Financial Officer), Charles Gassenheimer (President of Omnis Energy), and Blake Stephens (General Counsel for Omnis Global Technologies, LLC and affiliates).

16. As a result of the FERC's requests for information, which focused in part on how funds had been raised and spent, and in light of the concerns raised by WVEDA, Mr. Nathan and I determined that the company should undertake a formal and comprehensive investigation into all prior transactions involving the Debtor and its affiliates.

17. Under the WVEDA loan program, WVEDA agreed to fund up to $50 million of project costs associated with the Quantum Reformer Pilot Project. All amounts advanced under the WVEDA loan program are guaranteed by the Debtor. To obtain a loan disbursement, Quantum was required to submit vendor invoices and demonstrate that the Omnis Parties had already paid one-half of the amount due. As part of the investigation, we learned that transfers from Omnis Energy to StarSource were used to create the appearance, but not reality, that project expenditures had been paid and therefore qualified for reimbursement under the WVEDA program.

18. Through the investigation, which HSF Kramer has led from its beginning, we identified a recurring pattern involving improper transfers between Omnis Energy and StarSource, a company controlled by Simon Hodson. First, Omnis Energy would transfer funds from one of its bank accounts to StarSource. StarSource would then transfer substantially the same funds back to Omnis Energy, but into a different Omnis Energy bank account. Quantum would then submit the original transfer as evidence of a qualifying expenditure in support of a WVEDA disbursement request, without disclosing that the funds had been returned. As a result, the same funds appeared

to be recycled through a series of transactions and then falsely presented as independent expenditures to support requests for WVEDA loan disbursements. To the best of my knowledge, $40 million disbursed by WVEDA on account of these transfers has never been accounted for by the Omnis Parties or other entities who received the funds.

**Omnis Parties' Threats and Aggressive Conduct Precipitating the Bankruptcy Filing**

19. In the weeks immediately preceding the July 26, 2026 bankruptcy filing, it became clear that the Omnis Parties would not agree to a consensual restructuring. They began taking aggressive actions to reassert control over the Debtor. They were contacting plant staff via emails, texts, and voicemails falsely stating that Mr. Nathan was no longer the independent manager of Pleasants and thus no longer in charge. They were also contacting key vendors and making the same false statements. They told numerous individuals, including myself, that they were going to show up at the plant on morning of July 27, 2026 and would enter the facility and "bring the use of force if we have to."

20. This created an incredibly disruptive environment. Employees have to continue to come to work because they understand there is a business and a job there. Vendors have to continue to enter into new transactions with the Debtor. All of that was being threatened. I spent a significant amount of time talking to the local sheriff, the county commissioner, and private security contractors to make sure we had appropriate security on site to keep our employees safe and to keep the facility secure. It was untenable. It was determined that we would need to file for bankruptcy protection to avoid this threatened standoff and use of force. On the Sunday night of the weekend of July 26, 2026, we filed for federal bankruptcy protection.

**HSF KRAMER LLP RETENTION**

21. Based on my experience working with HSF Kramer both before the bankruptcy

filing and during the chapter 11 case, and my daily direct observations and interactions with the firm, I believe that HSF Kramer has acted in the best interests of the Debtor and its estate, and I have every reason to believe it will continue to do so.

22. Before Pleasants retained HSF Kramer, Mr. Nathan and I were aware that HSF Kramer had advised TRAG and RGE for a limited period of time. We did not, and still do not, believe that this representation created any conflict of interest, and determined to ask HSF Kramer to serve as counsel to the company. Out of an abundance of caution, we also determined to waive any potential conflict. As counsel to Pleasants, HSF Kramer has advised the company on a broad range of matters, including routine corporate issues, such as NDAs; more significant matters such as potential debt restructurings; and the investigation I described above, which HSF Kramer has led from the outset, including coordinating all the related work that other Pleasants advisors have done as part of the investigation, including AlixPartners and Sidley Austin LLP. HSF Kramer has also played a central role in organizing, managing, and advancing all aspects of the Debtor's restructuring efforts, and has served as outside general corporate counsel on a wide range of other issues that face the company in its ordinary course of business.

23. The company is deeply reliant upon HSF Kramer, not only for its legal advice, but also the substantial institutional knowledge it has developed regarding the Debtor, its operations, and the bespoke issues facing the company as it navigates this chapter 11 proceeding. HSF Kramer has also developed a unique understanding of the extensive issues that are the subject of the Debtor's ongoing investigation—and the potential claims arising therefrom.

24. It would be extremely difficult and impractical for the Debtor to try to replace HSF Kramer with respect to any of these matters, the counsel they have been providing, and the knowledge base they have developed specific to this situation and to the Debtor. In my view, it

would be highly disruptive to Debtor's reorganization efforts to attempt to replace HSF Kramer at this stage. No other advisor has the same familiarity with the Debtor's affairs, and the loss of that knowledge would be detrimental to the Debtor and its estate.

25. For these reasons, I respectfully submit that the retention of HSF Kramer as counsel to the Debtor should be approved.

***

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 1, 2026

*/s/ David R. Hindman*
Name: David R. Hindman
Title: Chief Executive Officer of Omnis Pleasants, LLC